UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| *IN RE* NORTHFIELD LABORATORIES, INC. SECURITIES LITIGATION | ) ) ) ) ) ) | No. 06 C 1493<br><br>Judge George M. Marovich |

## MEMORANDUM OPINION AND ORDER

Lead plaintiffs the Paul H. Shield, M.D. Inc. Money Purchase Plan and the Paul H.

Shield, M.D. Inc. Profit Sharing Plan filed a consolidated class action complaint on behalf of a

purported class of shareholders of defendant Northfield Laboratories, Inc. ("Northfield"). In the

complaint, plaintiffs assert claims against defendants Northfield, Steven A. Gould, M.D.

("Gould") and Richard E. DeWoskin ("DeWoskin"). In Count I, plaintiffs assert that defendants

violated § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and

Rule 10b-5, 17 C.F.R. 240.10b-5. In Count II, plaintiffs assert against DeWoskin and Gould a

"control person" claim for violation of § 20(a) of the Act. Defendants Gould and Northfield

have filed a joint motion to dismiss the claims against them. Defendant DeWoskin has also filed

a motion to dismiss the claims against him. For the reasons set forth below, the Court grants

both motions and dismisses without prejudice plaintiffs' complaint.

## I.    Background

For purposes of a motion to dismiss, the Court takes as true the allegations in plaintiffs'

complaint. The following facts come from plaintiffs' complaint.

To date, no company has managed to bring a blood substitute to market. Such a product

could save the lives of those who have suffered severe blood loss when actual blood is

unavailable.  Part of the difficulty in developing a blood substitute is that the oxygen-carrying hemoglobin molecules are dangerous when not contained within red blood cells.  Outside of red blood cells, hemoglobin molecules can constrict blood vessels, inflame blood vessel walls and cause clotting.

Despite these difficulties, many, including the United States Army, have attempted to develop oxygen-carrying blood substitutes.  Thus far, no one has been successful.  For example, Baxter International, Inc. ("Baxter") spent some $500 million attempting to develop a blood substitute.  Baxter halted a Phase III trial of its blood substitute after determining that the death rate was 46% for patients given its blood substitute after blood loss, as compared to 17% for patients who received blood transfusions.  The latest attempt at developing a blood substitute has been by Northfield.

Northfield was founded in 1985 by defendants DeWoskin and Gould.  Northfield's primary purpose is to research and develop a hemoglobin-based blood substitute to treat life-threatening blood loss.  DeWoskin served as Chairman and CEO from 1985 to July 2002.  Gould has been Northfield's Chairman and CEO since July 2002.

Since its founding, Northfield has worked on the research and development of a blood-substitute called PolyHeme.  PolyHeme is a hemoglobin-based, oxygen-carrying blood substitute that is compatible with all blood types.  Northfield manufactures PolyHeme by extracting hemoglobin molecules from outdated human blood, chemically modifying the hemoglobin into a polymerized form of hemoglobin and incorporating the polymerized hemoglobin into a solution, which can then be administered to humans.  The polymerization process is intended to avoid the harmful effects that hemoglobin can have outside of red blood cells.

PolyHeme, Northfield's only product, has not been approved for sale. Northfield has raised operating money via public offerings of shares in the company. Since its initial public offering in 1994, Northfield has raised $194 million by offering its shares to the public.

### PolyHeme studies

At some point, Northfield conducted a study in which it compared two sets of hospital trauma patients who had lost blood. The first set of patients were Jehovah's Witnesses, who refused blood transfusions. The second set of patients received PolyHeme. The study showed a clinical benefit for those who received PolyHeme as compared to those who received nothing.

The clinical trial that is at the heart of this lawsuit began in 1998. That is when Northfield began what it called the Acute Normovelemic Hemodilution ("ANH") trial. The point of the ANH trial was to try to solve a problem for elective surgery patients. Typically, a patient can try to avoid the use of donated blood by banking up to two units of his or her own blood before a surgery. Typically, when a patient banks those two units of blood, the patient is injected with a colloid solution (which does not contain hemoglobin) to replace the blood. The goal of the ANH study was to see if a patient could bank three times as much of his or her own blood (six units) by replacing the blood with PolyHeme.

In the ANH study, participants were divided into two groups. In the study group, each participant banked six units of blood (which is about 60% of an individual's blood volume), and that blood was replaced with six units of PolyHeme. In the control group, each participant banked three units of blood, and that blood was replaced with a colloid solution. The original plan was to enroll 240 patients in the study. After the troubling results in the Baxter trial of its

blood substitute, however, the United States Food and Drug Administration ("FDA") requested that the number of patients in the ANH trial be increased to 600.

The ANH study never got that far. An independent data monitoring committee looked at the interim results after 120 patients had been enrolled. They found that 54% of the patients in the PolyHeme group suffered adverse events, relative to 28% in the control group. The difference was found to be statistically significant, i.e., the difference was not a result of randomness. In addition, the independent data monitoring committee found that 10 of the 81 patients who received PolyHeme had suffered heart attacks while no one in the control group had. (The complaint does not assert that the heart attack finding was statistically significant.)

Northfield closed the ANH trial in October 2000.

### Statements about PolyHeme

On April 17, 2001, Northfield issued a press release. Northfield stated that prior clinical trials demonstrated "the life-sustaining capability of PolyHeme in the setting of life-threatening blood loss when blood may be unavailable." The release also stated that PolyHeme was the "only blood substitute undergoing clinical trials that has been tested at large enough dosages to be considered a substitute for acute blood loss in trauma and surgical settings."

### August 2001 annual report

On August 3, 2001, Northfield filed with the SEC its 10-K annual report for the year ending May 31, 2001. In that annual report, Northfield stated:

> We are presently conducting clinical trials of PolyHeme at multiple locations in the United States. Our clinical trials include the infusion of PolyHeme in trauma and emergency surgical applications as well as in elective surgical procedures. The observations in the trials continue to demonstrate the potential clinical utility of PolyHeme in the treatment of urgent blood loss. Both our trauma trials and elective surgery trials involved high dosage and rapid infusion of PolyHeme in

situations that are life-threatening and where massive blood loss routinely occurs. We believe that this application addresses the largest worldwide clinical need and has the greatest market opportunity.

\*\*\*

Clinical studies to date demonstrate the life-sustaining capacity of PolyHeme when used as treatment for massive, life-threatening blood loss in lieu of blood.

\*\*\*

We are also conducting clinical trials of PolyHeme in elective surgical applications at multiple locations in the United States. . . . While the use of PolyHeme in our elective surgery trials is the same as that for trauma–high dose, rapid infusion for acute blood loss–the clinical endpoint for these trials is the elimination of the use of banked blood.

We believe these trials are producing important results. Due to the complexity of the clinical protocol, however, patient accrual is progressing slowly, as previously reported. As a result, we are considering instituting additional elective surgery trials with different protocols to more broadly and rapidly confirm PolyHeme's capability as an alternative to blood in critical care situations. We intend to terminate our current elective surgery protocol after the BLA is filed and focus on these additional trials. We believe our clinical trials may continue throughout the regulatory review process.

In its August 3, 2001 annual report, Northfield also stated:

THE MARKET

We estimate that approximately 12 million units of blood were transfused in the United States in 2000 of which approximately 7.2 million units were administered to patients suffering the effects of acute blood loss. Patient charges for the units of blood used in the United States in 2000 for the treatment of acute blood loss exceed $2 billion. The transfusion market in the United States consists of two principal segments. The acute blood loss segment, which comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss. The chronic blood loss segment represents approximately 40% of the transfusion market and includes transfusions in connection with general medical applications and chronic anemias.

PolyHeme is intended for use in the treatment of acute blood loss. The two principal clinical settings in which patients experience acute blood loss are urgent use in trauma, emergency surgery and other unexpected blood loss, and elective use in planned surgery. For trauma and emergency surgical procedures, the immediate availability and universal compatibility of PolyHeme are expected to provide significant advantages over transfused blood by avoiding the delay and

opportunities for error associated with blood typing.  The major benefit of PolyHeme in elective surgery is expected to be increased transfusion safety for patients and health care professionals.

The same day that Northfield issued its annual report, it also issued a proxy supplement.

In that supplement, Northfield stated:

Our trials continue in three different areas.  Our primary focus remains the trials in urgent blood loss at doses of up to 20 units, equivalent to two complete blood volumes.  The other trials in elective surgery at a dose of six units, and compassionate use for life-saving therapy also continue.  The important safety observations are that none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies. . . . We are pleased with the response of both scientific and lay audiences to these results.

Northfield issued another proxy supplement on August 16, 2001.  It stated:

We are pleased with the results from our clinical studies and believe the safety and efficacy data that we will present to the FDA are compelling.

Northfield issued a press release on August 28, 2001.  In that press release, Northfield stated, among other things:

"PolyHeme provides a remarkable clinical benefit, and represents more than 16 years of product development, clinical studies and data analysis.  More importantly, it addresses a large market opportunity and fills an important clinical need. . . ." said De Woskin.
Dr. Steven A. Gould, president, said, "The data from our clinical trials demonstrate that PolyHeme will support life in seriously injured, bleeding patients in the virtual absence of circulating red blood cells, and thereby improve survival in situations when blood cannot be used.  We believe these results demonstrate the ability of PolyHeme to effectively and safely transport oxygen.  . . . PolyHeme is the only blood substitute that has been safely infused rapidly and at large enough dosages to be considered a substitute for acute blood loss in trauma and surgical settings."

Also in August 2001, Northfield sought FDA approval of PolyHeme for use with respect to life-threatening blood loss.  On August 28, 2001, Northfield announced that it had applied to the FDA for approval, based on the comparison between the use of PolyHeme and the

experience of Jehovah's Witnesses who had refused blood transfusions.  On November 19, 2001, Northfield announced that the FDA rejected its application.  Northfield stated that the FDA was concerned about the broad nature of the proposed use, the validity of the control group (the Jehovah's Witnesses) and the trial design.  Then-CEO DeWoskin stated that "[o]ur outlook for the commercialization of our product, PolyHeme, for use in urgent, massive blood-loss situations, remains as positive as ever . . . Results from our clinical data are remarkable."

### Autumn 2001

Northfield continued to make statements about PolyHeme in the fall of 2001.  On August 29, 2001, the Boston Globe quoted a Northfield spokesperson as stating that "final-stage clinical trials, involving elective surgery patients and trauma patients, are ongoing."  On September 4, 2001, Northfield issued a press release, in which it quoted DeWoskin as saying, "Our trial results document a very compelling clinical benefit that we believe provides substantial evidence of safety and efficacy required by the FDA."  During the same time period, Gould was asked whether there were "any serious adverse events documented that were considered directly related to PolyHeme."  Gould answered, "The answer to that is a strong–no."

On September 5, 2001, the Boston Globe quoted DeWoskin as saying the ANH surgery trial was still ongoing.

On October 11, 2001, Northfield issued another press release.  This time, Gould commented on PolyHeme's safety record.  He reported no "evidence" of blood vessel constriction and no renal, pancreatic, gastrointestinal or cardiac dysfunction.  He added that the company had encountered no "serious product-related adverse events."

On December 21, 2001, the company issued another press release. In it, DeWoskin stated, "Our outlook for the commercialization of our product, PolyHeme, for use in urgent, massive blood-loss situations, remains as positive as ever. . . . Results from our clinical trial data are remarkable." Several months later, on May 15, 2002, Northfield issued another press release. In the May release, Northfield stated, among other things:

> We have infused up to 20 units in massive hemorrhage situations and have accumulated substantial evidence of safety and efficacy. . . . Northfield Laboratories, founded in 1985, is a leading developer of an oxygen-carrying blood substitute. Its product, PolyHeme, is the only blood substitute undergoing clinical trials that has been tested at large enough dosages to be considered a substitute for acute blood loss in trauma and surgical settings.

### August 2002 annual report

A few months later, on August 9, 2002, Northfield filed with the SEC its 10-K annual report for the year ending May 31, 2002. In that annual report, Northfield stated, among other things:

> Northfield Laboratories Inc. believes it is a leader in the development of a safe and effective alternative to transfused blood for use in the treatment of acute blood loss. . . . Clinical studies to date indicate that PolyHeme carries as much oxygen, and loads and unloads oxygen in the same manner, as transfused blood. Infusion of PolyHeme also restores blood volume. Therefore, PolyHeme should be effective as an oxygen-carrying resuscitative fluid in the treatment of hemorrhagic shock resulting from extensive blood loss.
>
> ***
>
> We have conducted clinical trials of PolyHeme at multiple locations in the United States. Our clinical trials included infusion of PolyHeme in trauma and emergency surgical applications, in elective surgical procedures, and as life-saving therapy in situations of compassionate use. The observations in these trials have demonstrated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels. Our trials have involved high dosage and rapid infusion of PolyHeme in situations that are life-threatening and where massive blood loss routinely occurs. We believe that this application addresses the largest world-wide clinical need and has the greatest market opportunity. . . .
>
> ***

PolyHeme is intended for use in the treatment of acute blood loss. Clinical studies to date indicate that PolyHeme carries as much oxygen, and loads and unloads oxygen in the same manner, as transfused blood. Infusion of PolyHeme also restores blood volume. Therefore, PolyHeme should be effective as an oxygen-carrying resuscitative fluid in the treatment of hemorrhagic shock resulting from extensive blood loss. Clinical studies to date demonstrate the life-sustaining capacity of PolyHeme when used as treatment for massive, life-threatening blood loss in lieu of blood.

***

## THE MARKET

We estimate that approximately 12 millions units of blood were transfused in the United States in 2001, of which approximately 7.2 million units were administered to patients suffering the effects of acute blood loss. Patient charges for the units of blood used in the United States in 2001 for the treatment of acute blood loss exceed $2 billion. The transfusion market in the United States consists of two principal segments. The acute blood loss segment, which comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss. The chronic blood loss segment represents approximately 40% of the transfusion market and includes transfusion in connection with general medical applications and chronic anemias.

PolyHeme is intended for use in the treatment of acute blood loss. The two principal clinical settings in which patients experience acute blood loss are urgent use in trauma, emergency surgery and other unexpected blood loss, and elective use in planned surgery. For trauma and emergency surgical procedures, the immediate availability and universal compatibility of PolyHeme are expected to provide significant advantages over transfused blood by avoiding the delay and opportunities for error associated with blood typing. The major benefit of PolyHeme in elective surgery is expected to be increased transfusion safety for patients and health care professionals.

***

## CLINICAL TRIALS

We have conducted clinical trials of PolyHeme at multiple locations in the United States. Our clinical trials included infusion of PolyHeme in trauma and emergency surgical applications, in elective surgical procedures, and as life-saving therapy in situations of compassionate use. The observations in these trials have demonstrated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life threatening hemoglobin levels. Our trials have involved high dosage and rapid infusion of PolyHeme in situations that are life-threatening and where massive blood loss routinely occurs. We believe that this

application addresses the largest world-wide clinical need and has the greatest
market opportunity.

***

ELECTIVE SURGICAL APPLICATIONS

We have also conducted clinical trials of PolyHeme in elective surgical
applications at multiple locations in the United States.  Our clinical protocol for
these trials was a randomized controlled study in which elective surgical patients
were infused with up to six units of PolyHeme (three liters containing 300 grams
of hemoglobin).  The majority of elective surgical procedures require the infusion
of six units or less of blood.

While the use of PolyHeme in our elective surgery trials was the same as that for
trauma–high dose, rapid infusion for acute blood loss–the clinical endpoint for
these trials was the eliminations of the use of banked blood.  Due to the
complexity of the clinical protocol, however, patient accrual progressed slowly.
As a result, we closed the elective surgery protocol after our BLA was submitted.
We anticipate other potential trials in elective surgery in the future.

### *Urban Trauma trial*

In October 2002, Northfield announced that it had submitted to the FDA a protocol for a

new study.  The point of the new study (the "Urban Trauma trial") was to test the efficacy and

safety of PolyHeme in treating patients with severe blood loss under circumstances where blood

was not available, i.e., before they reach the hospital.

An immediate difficulty in such a study is that it is impossible for a such a patient–who is

in shock from severe blood loss–to provide informed consent to participate in the trial.  In such

circumstances, the FDA allows an exception to its usual informed consent requirements.  Under

the exception, members of the community must be provided disclosures about the risks and

benefits of the study so that they can make informed decisions about whether to opt-out of the

study ahead of time.  Thus, Northfield and participating hospitals held community meetings and

distributed information about PolyHeme.

By January 2003, Northfield offered a website with information about itself and its

product.  At that time, it stated on its website:

> PolyHeme is the only blood substitute in development that has been rapidly and
> safely infused in clinical trials in sufficiently massive quantities to be useful in the
> treatment of urgent, large volume blood loss.  PolyHeme's unique characteristics
> make it the ideal resuscitative fluid:
>
> ***
>
> *   Has been used to treat more than 300 patients in five clinical trials.
> *   Favorable safety profile.  No clinically relevant drug-related adverse
>     effects, specifically, no organ toxicities nor systemic or pulmonary
>     hypertension have occurred in clinical trials to date. . . ..

Northfield also used its website to provide information about its Urban Trauma trial.  On

a page titled "PolyHeme Pivotal Phase III Trial FAQs," Northfield stated, among other things:

> Q.      How many Patients have been treated with PolyHeme?
> A.      Over 300 patients have been treated, including patients in a hospital-based
>         trauma trial.
> Q.      What is known about the safety of PolyHeme?
> A.      PolyHeme has been well tolerated in the patient populations tested in
>         clinical trials to date.
> Q.      What are the potential risks of participating in the study?
> A.      -Rash
>         -Increased blood pressure
>         -Kidney or liver damage
>         -Transmission of hepatitis and HIV viruses
>         -Unforeseen happenings.

In another effort to provide information on the Urban Trauma trial, Northfield began, in

March 2003, supplying information to the hospitals that would serve as sites for the study.  The

documents stated, among other things:

> Q.      Is PolyHeme Safe?
> A.      In clinical trials to date, PolyHeme has demonstrated no clinically relevant
>         adverse effects.  Past studies have shown that PolyHeme . . . has not
>         caused organ damage. . . .
> Q.      What are the potential risks of participating in the study?
> A.      -Rash
>         -Increased blood pressure

-Kidney or liver damage
-Transmission of hepatitis and HIV viruses
-Unforeseen happenings.

***Summer and autumn of 2003***

A few months later, in the summer of 2003, Northfield was offering to the public $50 million worth of additional shares. On June 27 and July 23, 2003, Northfield issued, respectively, an S-3 Registration Statement and a Prospectus Supplement. Those documents stated, among other things:

> We believe PolyHeme is the only blood substitute in development that has been safely infused in clinical trials in sufficient quantities to be useful in the treatment of urgent, large volume blood loss in trauma and surgical settings, with a particular focus on situations where donated blood is not immediately available. We have conducted Phase II and Phase III clinical trials of PolyHeme at multiple locations in the United states in trauma and emergency surgical applications, in elective surgical procedures, and as life-saving therapy in situations of compassionate use. The observations in these trials have demonstrated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels. In these trials in hospitalized trauma patients, PolyHeme significantly improved survival compared to historical control patients who did not receive blood. Our trials have involved high dosage and rapid infusion of PolyHeme in situations that are life-threatening and where massive blood loss routinely occurs. We believe that this application addresses the largest world-wide clinical need and has the greatest market opportunity.

On August 13, 2003, Northfield filed with the SEC its 10-K annual report for the year ending May 31, 2003. In that report, Northfield stated, among other things:

> . . . We believe PolyHeme is the only blood substitute in development that has been safely infused in clinical trials in sufficient quantities to be useful in the treatment of urgent, large volume blood loss in trauma and surgical settings, . . .
> ***
> We have previously conducted Phase II and Phase III clinical trials of PolyHeme at multiple locations in the United States in trauma and emergency surgical applications, in elective surgical procedures, and as life-saving therapy in situations of compassionate use. The observations in these trials have demonstrated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels.

-12-

***

We have also conducted clinical trials of PolyHeme in elective surgical applications at multiple locations in the United States.  Our clinical protocol for these trials was a randomized controlled study in which elective surgical patients were infused with up to six units of PolyHeme (three liters containing 300 grams of hemoglobin).  The majority of elective surgical procedures require the infusion of six units of less of blood.

While the use of PolyHeme in our elective surgery trials was the same as that for trauma–high dose, rapid infusion for acute blood loss–the clinical endpoint for these trials was the elimination of the use of banked blood.  Due to the complexity of the clinical protocol, however, patient accrual progressed slowly.  As a result, we closed the elective surgery protocol after our BLA was submitted.  We anticipate other potential trials in elective surgery in the future.
***

## ELECTIVE SURGICAL APPLICATIONS

We have also conducted clinical trials of PolyHeme in elective surgical applications at multiple locations in the United States.  Our clinical protocol for these trials was a randomized controlled study in which elective surgical patients were infused with up to six units of PolyHeme (three liters containing 300 grams of hemoglobin).  The majority of elective surgical procedures require the infusion of six units or less of blood.

While the use of PolyHeme in our elective surgery trials was the same as that for trauma–high dose, rapid infusion for acute blood loss–the clinical endpoint for these trials was the elimination of the use of banked blood.  Due to the complexity of the clinical protocol, however, patient accrual progressed slowly.  As a result, we closed the elective surgery protocol after our BLA was submitted.  We anticipate other potential trials in elective surgery in the future.

***

## THE MARKET

We estimate that approximately 14 million units of blood were transfused in the United States in 2002, of which approximately 8.4 million units were administered to patients suffering the effects of acute blood loss.  Patient charges for the units of blood used in the United States in 2002 for the treatment of acute blood loss represent a multi-billion dollar market.  The transfusion market in the United States consists of two principal segments.  The acute blood loss segment, which comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss.  The chronic blood loss segment represents approximately 40% of the transfusion market and includes transfusions in connection with general medical applications and chronic anemias.

PolyHeme is intended for use in the treatment of acute blood loss. The two principal clinical settings in which patients experience acute blood loss are urgent use in trauma, emergency surgery and other unexpected blood loss, and elective use in planned surgery. For trauma and emergency surgical procedures, the immediate availability and universal compatibility of PolyHeme are expected to provide significant advantages over transfused blood by avoiding the delay and opportunities for error associated with blood typing. The major benefit of PolyHeme in elective surgery is expected to be increased transfusion safety for patients and health care professionals.

On December 22, 2003, Northfield announced that it had begun enrolling participants in the Urban Trauma study.

### *2004 statements*

On January 26, 2004, Northfield supplemented its July 2003 Prospectus. In the supplement, Northfield, once again, stated, among other things:

We believe PolyHeme is the only blood substitute in development that has been safely infused in clinical trials in sufficient quantities to be useful in the treatment of urgent, large volume blood loss in trauma and surgical settings, . . .

We have conducted Phase II and Phase III clinical trials of PolyHeme at multiple locations in the United States in trauma and emergency surgical applications, in elective surgical procedures, and as life-saving therapy in situations of compassionate use. The observations in these trials have demonstrated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels.

As in prior years, in August 2004, Northfield filed with the SEC its 10-K annual report. That report was similar, though not identical, to previously-filed 10-K annual reports. In its annual report, Northfield stated, among other things:

We believe PolyHeme is the only blood substitute in development that has been well tolerated when infused in patients in clinical trials in sufficient quantities for the treatment of urgent, large volume blood loss in trauma and surgical settings, . . .

We have previously conducted Phase II and Phase III clinical trials of PolyHeme at multiple locations in the Untied States in trauma and emergency surgical applications, in elective surgical procedures, and in situations of compassionate

use in life-threatening situations. The observations in these trials have indicated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels. . . . Our trials have involved high dosage and rapid infusion of PolyHeme in situations that are life-threatening and where massive blood loss routinely occurs. We believe that this application addresses the largest world-wide clinical need for this type of product and represents the greatest potential market opportunity.

\*\*\*

## THE MARKET

We estimate that approximately 14 million units of blood are transfused in the United States each year, of which approximately 8.4 million units are administered to patients suffering the effects of acute blood loss. Patient charges for the units of blood used in the United States each year for the treatment of acute blood loss represent a multi-billion dollar market. The transfusion market in the United States consists of two principal segments. The acute blood loss segment, which comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss. The chronic blood loss segment represents approximately 40% of the transfusion market and includes transfusion in connection with general medical applications and chronic anemias.

We believe the most appropriate use for PolyHeme is in the treatment of acute blood loss. The principal clinical settings in which patients experience acute blood loss are unplanned blood loss in trauma, emergency surgery, and other causes of urgent hemorrhage, and planned blood loss in elective surgery. For trauma and emergency surgery procedures, the immediate availability and universal compatibility of PolyHeme may provide significant advantages over transfused blood by avoiding the delay and opportunities for error associated with blood typing. In elective surgery, PolyHeme has the potential to increase transfusion safety for patients and health car [sic] professionals.

\*\*\*

## ELECTIVE SURGERY APPLICATIONS

We have also conducted clinical trials of PolyHeme in elective surgical applications at multiple locations in the United States. Our clinical protocol for these trials was a randomized controlled study in which elective surgical patients were infused with up to six units of PolyHeme (three liters containing 300 grams of hemoglobin). The majority of elective surgical procedures require the infusion of six units or less of blood.

While the use of PolyHeme in our elective surgery trials was the same as that for trauma–high dose, rapid infusion for acute blood loss–the clinical endpoint for these trials was the elimination of the use of banked blood. Due to the complexity

of the clinical protocol, however, patient accrual progressed slowly.  As a result, we closed the elective surgery protocol after our BLA was submitted in August 2001.  We anticipate other potential trials in elective surgery in the future.

In early 2005, Northfield filed a prospectus in support of a public offering of 3.5 million shares of common stock at $15.00 per share.  In the prospectus, Northfield stated, among other things:

THE MARKET OPPORTUNITY

Transfused blood represents a multi-billion dollar market in the United States. We estimate that approximately 14 million units of blood are transfused in the United States each year.  The transfusion market in the United States consists of two principal segments.  The acute blood loss segment, which we estimate comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss.  The chronic blood loss segment, which we believe represents approximately 40% of the transfusion market, includes transfusions in connection with general medical applications and chronic anemias.

We believe that PolyHeme will be most useful in the treatment of acute blood loss.  The principal clinical settings in which patients experience acute blood loss are unplanned blood loss in trauma, emergency surgery and other causes of urgent hemorrhage, and planned blood loss in elective surgery.  For trauma and emergency surgical procedures, the immediate availability and universal compatibility of PolyHeme may provide significant advantages over transfused blood by avoiding the delay and opportunities for error associated with blood typing.  In elective surgery, PolyHeme has the potential to increase transfusion safety for patients and health care professionals.

We believe PolyHeme is the only blood substitute in development that has been well tolerated when infused in patients in clinical trials in sufficient quantities for the treatment of urgent, large volume blood loss in trauma and surgical settings,  . . .

**Walter Reed study**

Meanwhile, Northfield was not the only entity interested in blood substitutes. Independent of Northfield, researchers at Walter Reed Army Medical Center ("Walter Reed") wanted to conduct a study on survival rates of rats that were given various resuscitative fluids after suffering severe blood loss. In 2004, the researchers asked Northfield to provide PolyHeme for their study; Northfield obliged.

The results of the Walter Reed study were published in April 2005. In the study, researchers compared four groups of rats: those receiving PolyHeme, those receiving saline solution, those receiving a starch/saline combination and those receiving no fluids. The researchers found, among other things, that rats receiving the PolyHeme suffered the highest mortality rate (53%). Northfield never commented on the study.

### *August 2005 annual report*

Another August rolled around, and Northfield filed with the SEC another 10-K. In its August 2005 annual report, Northfield stated, among other things:

> We believe that PolyHeme represents a substantial global market opportunity, based on the need for a universally compatible, immediately available oxygen carrying product and PolyHeme's potential for eventual approval for multiple indications.
>
> ***
>
> THE MARKET OPPORTUNITY
>
> Transfused blood represents a multi-billion dollar market in the United States. We estimate that approximately 14 million units of blood are transfused in the United States each year. The transfusion market in the United States consists of two principal segments. The acute blood loss segment, which we estimate comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss. The chronic blood loss segment, which we believe represents approximately 40% of the transfusion market, includes transfusions in connection with general medical applications and chronic anemias.
>
> We believe that PolyHeme will be most useful in the treatment of acute blood loss. The principal clinical settings in which patients experience acute blood loss are unplanned blood loss in trauma, emergency surgery and other causes of urgent

hemorrhage, and planned blood loss in elective surgery.  For trauma and emergency surgical procedures, the immediate availability and universal compatibility of PolyHeme may provide significant advantages over transfused blood by avoiding the delay and opportunities for error associated with blood typing.  In elective surgery, PolyHeme has the potential to increase transfusion safety for patients and health care professionals.

***

We recently engaged a national consulting firm to conduct an independent assessment of the potential market opportunity for PolyHeme.  Using a variety of primary and secondary sources along with original research, their analysis indicates a potential market opportunity in the United States for PolyHeme's initial indication of unavailability in excess of 350,000 units per year, representing an estimated market value of $400 to $500 million.  In addition, the global opportunity for our initial indication, as well as multiple other potential indications, is estimated to be six to seven times the U.S. unavailability projection, or $2 to $3 billion.

In addition to some of the usual language, Northfield also made statements about the Urban Trauma trial.  Specifically, Northfield stated that "[o]ur current trial is based on our experience in prior clinical trials documenting the potential life-sustaining capability of PolyHeme when given in rapid, massive infusions to critically injured patients in the hospital."

In September 2005, Northfield changed some of the disclosures it provided to hospitals and made changes to its website.  For example, Northfield stated that participants in the ANH study who were given PolyHeme suffered a higher incidence of heart attacks than did other patients.  Northfield also stated that no direct link between the heart attacks and the use of PolyHeme had been established.

### The Wall Street Journal articles

On February 22, 2006, the *Wall Street Journal* published an article under the heading, "Amid Alarm Bells, a Blood Substitute Keeps Pumping."  Among other things, the *Wall Street Journal* reported that 10 of 81 patients who received PolyHeme in the ANH study had suffered heart attacks, while none of the control group had.  It also reported that 54% of the PolyHeme users suffered adverse effects, as compared to 28% of the control group.  According to plaintiffs'

allegations, the publication of the *Wall Street Journal* article was the first time that investors and the public learned the results of the ANH trial.

The *Wall Street Journal* also reported that Northfield tried to suppress the release of the ANH trial data. According to the article, Drs. Ronald Fairman and Albert Cheung, of the University of Pennsylvania, called Gould many times in an attempt to encourage Northfield to publish the data. Dr. Fairman stated that Gould would not publish the data. When Dr. T.J. Gan, of Duke University, asked Gould to publish the data, Gould told him that someone was working on it.

Northfield issued a press release the same day the *Wall Street Journal* published its article. In the press release, Northfield stated, among other things:

> We particularly disagree with the characterization that Northfield Laboratories did not disclose the results of or discouraged others from publishing those results. In fact, we believe that prompt publication of the study data would have been favorable to Northfield Laboratories.
>
>     \*   \*   \*
>
> Because we experienced difficulty in enrolling the number of patients required to complete the study in a timely manner, with FDA approval, we wound down the study over a period of months, not abruptly as the article states. The trial closed in 2000 and the full data were reported to the FDA.

On February 24, 2006, the *Wall Street Journal* reported that Senator Charles Grassley had begun an inquiry into whether the potential participants in the Urban Trauma trial had been told enough about the potential risks of PolyHeme.

Plaintiffs allege that "[a]s a direct result of the adverse disclosures in the *Wall Street Journal* articles of February 22 and 24, 2006, and notwithstanding the patently false denials issued in response by Northfield on February 22, 2006," the price of a Northfield share dropped from $12.23 to $10.54.

## II.    <u>Standard on a motion to dismiss</u>

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor. *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombley*, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombley*, 127 S.Ct. at 1964-1965. A complaint must include enough factual allegations to "raise a right to relief above a speculative level." *Twombley*, 127 S.Ct. at 1965. Although the Federal Rules require notice pleading, certain allegations must be stated with particularity. For example, Federal Rule of Civil Procedure 9(b) mandates that "all averments of fraud" be "stated with particularity." Fed.R.Civ.P. 9(b).

In addition to the pleading requirements of the Federal Rules of Civil Procedure, securities plaintiffs must also comply with the pleading requirements of the Private Securities Litigation Reform Act. The PSLRA outlines requirements that plaintiffs must plead to avoid dismissal of their securities claims. *See* 15 U.S.C. § 78u-4(b). If plaintiffs fail to include sufficient allegations, the Court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(3)(A) ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met."). Paragraphs (1) and (2), in turn, provide:

(1) **Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant–

> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) **Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)-(2).

In considering a motion to dismiss, a court may not consider matters outside the pleadings without converting the motion to a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). The pleadings include documents attached to the complaint. *See* Fed.R.Civ.P. 10(c).

## III.    Discussion

### A.    Defendants' motion to dismiss Count I

In Count I, plaintiffs assert that defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5.

The securities laws aim to deter fraud by providing a private remedy therefor. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Private securities actions are available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at

345. Because such claims can be "employed abusively," Congress passed the Private Securities Litigation Reform Act, which, among other things, heightens pleading requirements. *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504 (2007).

From plaintiffs' allegations, it is clear that an investment in Northfield was extremely risky. Northfield is in the business of developing a product which it is prohibited from selling. It has little or no revenues and, hence, relies on public share offerings to raise money. Investing in a company with no revenues is inherently risky. Adding to the riskiness is the fact that the *one* product it is attempting to develop has never been successfully developed by anyone. The Army tried and failed. Baxter International, Inc. spent $500 million trying and failing. No one has succeeded because hemoglobin is inherently dangerous outside of red blood cells, and no one has figured out a way to deliver it without red blood cells. Investing in Northfield was something like investing in an airplane company before Orville and Wilbur Wright figured out how to make them fly: there was a huge upside potential but also a pretty good chance of losing everything. As it considers whether plaintiffs have adequately plead their claim under the strict requirements of the PSLRA, the Court is mindful of the fact that the securities laws do not exist to provide down-side investment insurance. The Court is also mindful of the fact that public companies are not allowed to use deceit as a means of raising capital.

In order to prevail on a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, one must establish: (1) a material misrepresentation; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005). Defendants argue that

plaintiffs have failed to plead adequately a material misrepresentation, loss causation and scienter.

### 1.    Material misrepresentation

The Court first considers whether plaintiffs have adequately alleged any material misrepresentations.  Under the PSLRA, a plaintiff must specify each statement and the reason or reasons why the statement is false or misleading.

*Statements about the closing of the ANH trial*

The Court first considers Northfield's alleged comments regarding the timing of the end of the ANH study.  According to plaintiff's allegations, Northfield closed the study in October 2000.  Plaintiffs allege that even *after* Northfield had closed the trial, it made statements that the trial was ongoing and that it was *planning* to close the trial.

Specifically, in its August 3, 2001 10-K, Northfield described elective surgery trials the "clinical endpoint" of which was to "eliminat[e] the use of banked blood."  That describes the ANH trial.  Northfield went on to say:

> Due to the complexity of the clinical protocol, however, patient accrual is progressing slowly, as previously reported.  . . .  We *intend* to terminate our current elective surgery protocol after the BLA is filed and focus on . . . additional trials.

August 3, 2001 10-K (emphasis added).  Plaintiffs also allege that Northfield told the Boston Globe that "final-stage, clinical trials, involving *elective* surgery patients . . . are ongoing." (Emphasis added).

These allegations are sufficient to allege a material misrepresentation, namely, that Northfield stated that it was planning to close a trial that it had, in fact, already closed.

*Statements about the reason for closing the ANH trial*

Plaintiffs also assert that Northfield made misstatements about its reason for closing the ANH trial. Plaintiffs allege that the reason Northfield closed the study was "highly negative safety and efficacy data." Plaintiffs also allege that an independent monitoring committee looked at the results of the first 120 (of the proposed 600) study participants and found a statistically-significant difference between the PolyHeme group and the control group with respect to adverse events. Fifty-four percent of the PolyHeme group suffered an adverse event, while 28% of the control group suffered an adverse event. The independent monitoring committee also found that 10 of the 81 participants who received PolyHeme suffered a heart attack, while none of the participants in the control group suffered a heart attack. The heart attack finding is not alleged to be statistically significant.

Plaintiffs have also alleged that Northfield gave a different reason for halting the ANH study. Specifically, in its August 9, 2002 10-K, Northfield stated that "[d]ue to the complexity of the clinical protocol, however, patient accrual progressed slowly. As a result, we closed the elective surgery protocol after our BLA was submitted." Plaintiffs have not alleged that it was false to note slow patient accrual. Rather, it is consistent with plaintiffs' allegations that the study, which started in 1998 and was supposed to involve 600 patients, had only 120 participants by the fall of 2000. But, by using the phrase "[a]s a result," Northfield suggested that slow patient accrual was the *only* reason for halting the study. Plaintiffs have alleged another reason (adverse results) and thus have, at a minimum, alleged a material omission. Northfield continued to state that it had closed the ANH trial due to slow patient accrual in its 2003 and 2004 10-K filings. Those statements, too, are adequately alleged to be material misrepresentations.

*Statements about PolyHeme's efficacy*

Plaintiffs also assert that defendants made several misstatements about PolyHeme's efficacy.

One category of statements concerns PolyHeme's potential use in circumstances of urgent, massive blood-loss. For example, DeWoskin is alleged to have said, in November of 2001, that "[o]ur outlook for the commercialization of our product, PolyHeme, for use in urgent, massive blood-loss situations, remains as positive as ever." Plaintiffs assert that this statement is false, given the results of the ANH study. The Court disagrees.

The result of the ANH study, as alleged by plaintiffs, is that individuals who both received PolyHeme and lost six units of blood were more likely to suffer adverse events than those who lost only three units of blood and received a colloid solution. The fact that the finding was statistically significant means that there was a non-random correlation between the PolyHeme users and increased adverse events. *See Tagatz v. Marquette University*, 861 F.2d 1040, 1044 (7th Cir. 1988) (Statistical significance means "that there is a probability of less than 5 in 1,000 that the difference is due to chance. . . . All that the data show is that there is in all likelihood a *real*, not a spurious, difference between the means of the samples compared. . . . Correlation is not causation."). Causation is not the same as correlation, so the allegations do not establish that PolyHeme caused the adverse events. It may have, but so might have the fact that the individuals lost six units of blood rather than three. Even if the ANH study had shown that PolyHeme caused the adverse events, the upshot of that would be that given the choice (as one is given when blood-loss results from elective surgery) between PolyHeme and blood, one would likely choose blood. It does not mean, however, that where there is no choice, i.e., in

circumstances of emergency blood loss, that PolyHeme cannot improve outcomes. In fact, according to plaintiff's allegations, one other PolyHeme study (the Jehovah's Witness study) had been completed as of the time of the November 2001 statement. That study showed that individuals who received PolyHeme after suffering blood loss had better outcomes than those who received nothing.

Thus, plaintiffs have failed to allege sufficient facts to show that DeWoskin's November 2001 statement was false or misleading. For the same reasons, plaintiffs have failed to allege sufficient facts as to statements that "PolyHeme should be effective as an oxygen-carrying resuscitative fluid in the treatment of hemorrhagic shock resulting from extensive blood loss" or about the "potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels."

A number of other alleged statements are inadequately alleged to be misstatements for similar reasons. For example, in April 2001, Northfield issued a press release in which it said clinical trials had demonstrated, "the life-sustaining capability of PolyHeme in the setting of life-threatening blood loss when blood may be unavailable." Far from being a misstatement, the statement is entirely consistent with the results of previous clinical trials, as alleged in plaintiffs' complaint. The Jehovah's Witness study showed that patients suffering massive blood loss did better with PolyHeme than with nothing. That suggests that, given the choice between (a) immediate death from blood loss (and the correspondent inability to transmit oxygen to the brain and other vital organs); and (b) using PolyHeme to transport oxygen immediately but with an increased risk of adverse events later, one could quite rationally choose PolyHeme. Plaintiffs have failed to allege that that statement was materially false or misleading.

Northfield made another similar statement on August 28, 2001, when it issued a press release. In the press release, Steven Gould is quoted as saying:

> The data from our clinical trials demonstrate that PolyHeme will support life in seriously injured, bleeding patients in the virtual absence of circulating blood cells, and thereby *improve survival in situations when blood cannot be used.* We believe these results demonstrate the ability of PolyHeme to effectively and safely transport oxygen.

August 28, 2001 Press Release (emphasis added). Once again, this statement concerns the efficacy of PolyHeme when blood is unavailable. Plaintiffs have not alleged sufficient facts to show that this statement was materially false or misleading.

Statements Northfield made in the summer of 2003 are similarly benign. In connection with the sale of additional shares, Northfield stated:

> We believe PolyHeme is the only blood substitute in development that has been safely infused in clinical trials in sufficient quantities to be useful in the treatment of urgent, large volume blood loss in trauma and surgical settings, *with a particular focus on situations where donated blood is not immediately available.* We have conducted Phase II and Phase III clinical trials . . . The observations in these trials have demonstrated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels. *In these trials in hospitalized trauma patients, PolyHeme significantly improved survival compared to historical control patients who did not receive blood.*

S-3 Registration Statement (emphasis added). These statements are consistent with plaintiffs' allegations about the study involving Jehovah's Witnesses. Plaintiffs have not alleged sufficient facts to show that these statements are materially false or misleading.

### Other statements about PolyHeme's safety

Plaintiffs allege that on August 3, 2001, in a proxy supplement signed by Gould and DeWoskin, Northfield stated that "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies." Plaintiffs also allege that hemoglobin can cause blood vessel constriction, inflamed blood vessels and blood clotting.

Plaintiffs further allege that the ANH study found a greater incidence of "adverse events" in patients who received PolyHeme relative to patients who received blood. Plaintiffs do not allege what those adverse events were (other than to mention a greater incidence of heart attacks, albeit not a statistically significant one), which makes it impossible to tell whether those adverse events included blood vessel constriction, inflamed blood vessels or blood clotting. Accordingly, plaintiffs have not alleged sufficient facts to show that the August 3, 2001 statement about adverse effects was materially false or misleading.

Plaintiffs also allege that during a presentation in September 2001, Gould was asked whether "there were any serious adverse events that were considered *directly related* to PolyHeme." (Emphasis added). Gould answered, "The answer to that is a strong–no." Plaintiffs assert that this was false because the ANH study found a statistically-significant difference between those who did and did not received PolyHeme, in that 54% of the PolyHeme patients suffered adverse events, as compared to 28% of patients who did not receive PolyHeme. The reason Gould's answer is not a misstatement is because he was asked whether any adverse events were *directly* related, which is another way of asking if any adverse events were *caused by* PolyHeme. Plaintiffs have not alleged that the adverse events that occurred during the ANH trial were caused by PolyHeme. Instead, they have alleged a correlation (a statistically significant difference) between PolyHeme use and the adverse events. Had Gould been asked whether any adverse events were correlated with the use of PolyHeme, his answer would have been a misstatement. But plaintiffs have not alleged that he was asked that question. Accordingly, plaintiffs have not plead enough facts to show that Gould's answer was materially false or misleading.

*Other statements about side effects*

Plaintiffs assert that in January of 2003, Northfield published on its website that PolyHeme users had suffered "no organ toxicities nor systemic or pulmonary hypertension have occurred in clinical trials to date." Plaintiffs assert that this statement was false in light of the results of the ANH trial. Once again, however, plaintiffs have not alleged what adverse effects PolyHeme users suffered in the ANH trial, so it is impossible to know whether organ toxicities or pulmonary hypertension were among them. Plaintiffs have failed to allege that the statement was materially false or misleading.

Plaintiffs assert that a statement Gould made on October 11, 2001 is false or misleading. In a press release, Northfield quoted Gould as reporting "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction." Plaintiffs have not alleged the existence of any studies or other evidence of PolyHeme patients suffering blood vessel constriction or renal, pancreatic or gastrointestinal dysfunction. Accordingly, plaintiffs have not adequately alleged that those portions of Gould's quote were materially false or misleading. Plaintiffs have, however, alleged that 10 of the 81 patients in the ANH trial suffered heart attacks, while none of the control patients did. Although the finding does not establish that PolyHeme caused the heart attacks, the finding is some "evidence" (albeit less than convincing evidence) of cardiac dysfunction. Accordingly, plaintiffs have adequately plead that that portion of Gould's October 11, 2001 statement was materially false or misleading.

*Statements in connection with the Urban Trauma trial*

Plaintiffs next allege that Northfield made misstatements about the safety of PolyHeme in connection with the Urban Trauma trial. (There is, of course, some question about whether these statements were made in connection with the sale of a security.) Specifically, Northfield

provided a question and answer document on its website and to hospitals involved with the Urban Trauma trial. One question asked about the "potential risks of participating in the study." The answer listed five risks: rash, increased blood pressure, kidney or liver damage, transmission of hepatitis or HIV viruses and unforeseen happenings. The answer did not explicitly mention the results of the ANH study, which, as plaintiffs have alleged, found a correlation between the use of PolyHeme and adverse events. It is unclear from the complaint whether all of the correlated adverse events are listed as risks, because the complaint does not say what those adverse events were. Thus, plaintiffs have not adequately alleged that the answer was materially false or misleading.

### 2. Loss causation

To prevail, plaintiffs must show that defendants' misrepresentations "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 346 ("The statute . . . makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."). It is not sufficient to plead merely transaction causation, which is that plaintiffs would not have purchased the stock had they known about the alleged fraud. Rather, plaintiffs must alleged that "but for the circumstances that the fraud revealed, the investment . . . would not have lost its value." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997)). Unlike other elements, the PSLRA did not heighten the pleading requirement for loss causation. *Dura*, 544 U.S. at 346.

The Seventh Circuit has described the various ways plaintiffs can prove loss causation. *See Citigroup*, 482 F.3d at 995. The approach plaintiffs utilize, the "fraud on the market"

approach, requires plaintiffs to allege "both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Citigroup*, 482 F.3d at 995. A complaint must "provid[e] the defendants with notice of what the relevant economic loss might be [and] of what the causal connection might be between that loss and the misrepresentation." *Dura*, 544 U.S. at 347.

The Court notes that plaintiffs have alleged that the Northfield shares traded in an efficient market such that plaintiffs purchased their shares at inflated prices. The Court considers, next, whether plaintiffs have adequately plead loss causation with respect to each of the three statements plaintiffs have adequately alleged to be materially false or misleading.

The first such statement was the August 3, 2001 statement that Northfield *intended* to terminate the ANH study when, in fact, it had already closed the trial in late 2000. Plaintiffs allege that the fact that the trial closed in 2000 was disclosed by Northfield in a February 22, 2006 press release. Plaintiffs, however, do not allege that the press release caused the stock to decline. To the contrary, plaintiffs allege the stock declined for other reasons, namely "as a direct result of the adverse disclosures in the *Wall Street Journal* articles of February 22 and 24, 2006, and notwithstanding the patently false denials issued in response by Northfield on February 22, 2006." Accordingly, plaintiffs have failed to plead loss causation with respect to Northfield's August 3, 2001 statement that it intended to close a trial that it had already closed.

The Court next considers whether the plaintiffs have plead loss causation with respect to Northfield's August 9, 2002 statement that it had shut down the ANH study due to slow patient accrual. As the Court already explained, that statement is adequately alleged as a materially false or misleading statement because it implies an absence of other reasons while the plaintiffs have alleged that another reason was the negative results of the ANH trial. Plaintiffs have

alleged that the negative results of the ANH trial were disclosed in a February 22, 2006 article in the *Wall Street Journal*. Plaintiffs have also alleged that as a direct result of the article, the price of a Northfield share dropped from $12.23 to $10.54. Accordingly, plaintiffs have adequately alleged loss causation with respect to the statements–in the 2002, 2003 and 2004 Annual Reports–about the reasons for shutting down the ANH study.

The final properly-alleged misstatement is that Gould stated, in an October 11, 2001 press release, that there was no "evidence" of cardiac dysfunction. Plaintiffs also allege that in September 2005, Northfield disclosed on its website that there was a greater incidence of heart attacks in ANH trial patients who received PolyHeme. Plaintiffs, however, do not allege that the share price dropped as a result of this disclosure. Accordingly, plaintiffs have failed to plead loss causation with respect to Gould's statement in the October 11, 2001 press release.

### 3. Scienter

In order to establish liability under §10(b) and Rule 10b-5, a "private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2507 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 and n. 12 (1976)). That means "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, __ F.3d __, __, 2007 WL 2142298 at *1 (7th Cir. July 27, 2007). Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(1)-(2). A strong inference is a "powerful or cogent" inference. *Tellabs*, 127 S.Ct. at 2510. In order to determine whether a plaintiff has adequately alleged scienter, a court must consider all of the allegations and "must consider plausible

nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 127 S.Ct. at 2510. Thus, a complaint survives a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S.Ct. at 2510.

Because of the heightened pleading requirements of the PSLRA, it is not enough simply to allege that defendants knew the results of the ANH trial. Rather, plaintiffs must plead with particularity facts that give a strong inference that they knew. Plaintiffs came close to pleading adequately such facts. First, plaintiffs allege that two doctors, Drs. Ronald Fairman and Albert Cheung, repeatedly called Gould to request that Northfield publish the data from the ANH trial. Plaintiffs further allege that Dr. Fairman states that Gould refused to publish the data. Gould is alleged to have told another doctor, Dr. T.J. Gan, that someone was working on the data. Gould is also alleged to have tried to prevent these researchers from learning the results of the ANH trial. In addition, in September 2005, Northfield stated on its website that there had been a greater incidence of heart attacks in patients in the ANH trial. The strong inference of these facts is that Gould, and, hence, Northfield, knew the results of the ANH trial at some point. But what plaintiffs have failed to allege is facts that provide a strong inference that defendants knew the results of the ANH trial when they made the statements. The statements were made in August 2002, August 2003 and August 2004. Plaintiffs have alleged defendants knew the results by September 2005 but not by August 2004. Thus, plaintiffs have failed to plead scienter with the required particularity.

Accordingly, plaintiffs have failed to plead adequately that any defendant violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5. The Court dismisses without prejudice Count I against every defendant.

**B.** **Plaintiffs' control person claims against Gould and DeWoskin**

In Count II, plaintiffs assert that Gould and DeWoskin are liable as controlling persons for Northfield's alleged violations of the securities laws. Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), "creates vicarious liability for a person who actually or potentially controlled the primary violator's acts. *Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 543 (7th Cir. 2005). Because plaintiffs have failed to state a claim for a primary violation, they have necessarily failed to state a claim for § 20(a) liability. *See DH2, Inc. v. Athanassiades*, 359 F. Supp.2d 708, 720 (N.D. Ill. 2005).

Accordingly, Count II is dismissed without prejudice.

**IV.** **Conclusion**

For the reasons set forth above, the Court grants defendants Northfield Laboratories, Inc. and Steven Gould's motion to dismiss and defendant Richard DeWoskin's motion to dismiss. The Court dismisses without prejudice plaintiffs' complaint. As some of the defects may be curable, the Court grants plaintiffs leave to file an amended complaint on or before November 20, 2007. Should plaintiffs choose to file an amended complaint, defendants shall answer or otherwise plead within 21 days after plaintiffs file their amended complaint.

ENTER:

_George M. Marovich_

George M. Marovich
United States District Judge

DATED: September 25, 2007