UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| *IN RE* NORTHFIELD LABORATORIES, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) | No. 06 C 1493<br><br>Judge George M. Marovich |

# MEMORANDUM OPINION AND ORDER

After the Court dismissed their most recent complaint, lead plaintiffs the Paul H. Shield, M.D. Inc. Money Purchase Plan and the Paul H. Shield, M.D. Inc. Profit Sharing Plan filed a second amended consolidated class action complaint on behalf of a purported class of shareholders of defendant Northfield Laboratories, Inc. ("Northfield"). In the second amended complaint, plaintiffs assert claims against defendants Northfield, Steven A. Gould, M.D. ("Gould") and Richard E. DeWoskin ("DeWoskin"). In Count I, plaintiffs assert that defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5. In Count II, plaintiffs assert against DeWoskin and Gould a "control person" claim for violation of § 20(a) of the Act. Defendants Gould and Northfield have filed a joint motion to dismiss the claims against them. Defendant DeWoskin has also filed a motion to dismiss the claims against him. For the reasons set forth below, the Court denies the motions to dismiss.

**I. Background**

For purposes of a motion to dismiss, the Court takes as true the allegations in plaintiffs' complaint. The Court has previously outlined the facts relevant to this motion. *See In re: Northfield Labs., Inc. Securities Lit'n*, 527 F. Supp.2d 769 (N.D. Ill. 2007). The Court does not

repeat all of those facts here. Rather, the Court discusses the additions to and subtractions from the most recent complaint.

This case involves the attempt by defendant Northfield Laboratories, Inc. to develop a blood substitute called PolyHeme. PolyHeme is a hemoglobin-based, oxygen-carrying blood substitute that is compatible with all blood types. Northfield manufactures PolyHeme by extracting hemoglobin molecules from outdated human blood, chemically modifying the hemoglobin into a polymerized form of hemoglobin and incorporating the polymerized hemoglobin into a solution, which can then be administered to humans. The polymerization process is intended to avoid the harmful effects that hemoglobin can have outside of red blood cells. To date, no company has managed to bring a blood substitute to market.

Northfield was founded in 1985 by defendants DeWoskin and Gould. Northfield's primary purpose is to research and develop a hemoglobin-based blood substitute to treat life-threatening blood loss. DeWoskin served as Chairman and CEO from 1985 to July 2002. Gould has been Northfield's Chairman and CEO since July 2002.

PolyHeme, Northfield's only product, has not been approved for sale. Northfield has raised operating money via public offerings of shares in the company. Since its initial public offering in 1994, Northfield has raised $194 million by offering its shares to the public.

One significant area of difference between the most recent complaint and the second amended complaint is the ANH trial. In 1998, Northfield began what it called the Acute Normovelemic Hemodilution ("ANH") trial. The point of the ANH trial was to try to solve a problem for elective surgery patients. Generally, a patient can try to avoid the use of donated blood by banking up to two units of his or her own blood before a surgery. Typically, when a

patient banks those two units of blood, the patient is injected with a colloid solution (which does not contain hemoglobin) to replace the blood. The goal of the ANH study was to see if a patient could bank three times as much of his or her own blood (six units) by replacing the blood with PolyHeme.

In the ANH study, participants were divided into two groups. In the study group, each participant banked six units of blood (which is about 60% of an individual's blood volume), and that blood was replaced with six units of PolyHeme. In the control group, each participant banked three units of blood, and that blood was replaced with a colloid solution. The original plan was to enroll 240 patients in the study. The United States Food and Drug Administration ("FDA"), however, requested that the number of patients in the ANH trial be increased to 600.

The ANH study never got that far. An independent data monitoring committee looked at the interim results after 120 patients had been enrolled. In the second amended complaint, plaintiffs allege that the independent data monitoring committee noticed differences between the PolyHeme group and the control group. According to the second amended complaint, the independent data monitoring group asked Northfield to conduct further analysis. The independent data monitoring committee revealed all of the safety and efficacy data to Northfield. The second amended complaint alleges that it was Northfield's own analysis that determined that 54% of the patients in the PolyHeme group suffered adverse events, relative to 28% in the control group. The difference was found to be statistically significant, i.e., the difference was not a result of randomness. In the second amended complaint, plaintiffs also allege that "Northfield conducted a further analysis of the trial data to 'assess whether the difference

between the two groups was caused by a randomization failure, a treatment 'confounder' . . . or some inherent toxicity of PolyHeme.'"

Northfield closed the ANH trial in October 2000 without disclosing the results.

Next, plaintiffs have added to the second amended complaint allegations about adverse effects historically associated with hemoglobin solutions. Plaintiffs allege that "adverse cardiac events" have been historically associated with the use of hemoglobin solutions. Specifically, plaintiffs allege that adverse cardiac events, such as cardiac arrest, occurred in clinical trials of competing hemoglobin solutions Hemolink and Hemopure.

Plaintiffs have deleted from their complaint their allegation that Northfield, in September 2005, disclosed on its websites that participants in the ANH study who were given PolyHeme suffered a higher incidence of heart attacks than did participants in the control group.

## II. **Standard on a motion to dismiss**

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor. *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombley*, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombley*, 127 S.Ct. at 1964-1965. A complaint must include enough factual allegations to "raise a right to relief above a speculative level." *Twombley*, 127 S.Ct. at 1965. Although the Federal Rules require notice pleading, certain allegations must be

stated with particularity. For example, Federal Rule of Civil Procedure 9(b) mandates that "all averments of fraud" be "stated with particularity." Fed.R.Civ.P. 9(b).

In addition to the pleading requirements of the Federal Rules of Civil Procedure, securities plaintiffs must also comply with the pleading requirements of the Private Securities Litigation Reform Act. The PSLRA outlines requirements that plaintiffs must plead to avoid dismissal of their securities claims. *See* 15 U.S.C. § 78u-4(b). If plaintiffs fail to include sufficient allegations, the Court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(3)(A) ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met."). Paragraphs (1) and (2), in turn, provide:

> (1) **Misleading statements and omissions**
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant–
>
>> (A) made an untrue statement of a material fact; or
>> (B) omitted to state a material fact necessary in order to make the
>
> statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) **Required state of mind**
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)-(2).

In considering a motion to dismiss, a court may not consider matters outside the pleadings without converting the motion to a motion for summary judgment. *See* Fed.R.Civ.P. 12(b). The pleadings include documents attached to the complaint. *See* Fed.R.Civ.P. 10(c).

### III. Discussion

#### A. Defendants' motion to dismiss Count I

In Count I, plaintiffs assert that defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5.

In order to prevail on a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, one must establish: (1) a material misrepresentation; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005). Defendants argue that plaintiffs have failed to plead adequately a material misrepresentation, loss causation and scienter.

##### 1. Material misrepresentation

In its previous ruling, the Court concluded that plaintiffs had adequately alleged the existence of three material misrepresentations.

First, the Court concluded that plaintiffs had adequately alleged that Northfield made a material misstatement with respect to the closing of the ANH study. Plaintiffs allege that Northfield closed the study in October 2000. Plaintiffs allege that even *after* Northfield had closed the trial, it made statements that the trial was ongoing and that it was *planning* to close the trial. Specifically, in its August 3, 2001 10-K, Northfield described elective surgery trials the

"clinical endpoint" of which was to "eliminat[e] the use of banked blood." That describes the ANH trial. Northfield went on to say:

> Due to the complexity of the clinical protocol, however, patient accrual is progressing slowly, as previously reported. . . . We *intend* to terminate our current elective surgery protocol after the BLA is filed and focus on . . . additional trials.

August 3, 2001 10-K (emphasis added). Plaintiffs also allege that Northfield told the Boston Globe that "final-stage, clinical trials, involving *elective* surgery patients . . . are ongoing." (Emphasis added).

Second, the Court concluded that plaintiffs had adequately alleged that Northfield made misstatements about its reason for closing the ANH trial. Plaintiffs allege that the reason Northfield closed the study was "highly negative safety and efficacy data." Plaintiffs also allege that Northfield gave a different reason for halting the ANH study. Specifically, in its August 9, 2002 10-K, Northfield stated that "[d]ue to the complexity of the clinical protocol, however, patient accrual progressed slowly. As a result, we closed the elective surgery protocol after our BLA was submitted." By using the phrase "[a]s a result," Northfield suggested that slow patient accrual was the *only* reason for halting the study. Plaintiffs have alleged another reason (adverse results) and thus have, at a minimum, alleged a material omission. Northfield continued to state that it had closed the ANH trial due to slow patient accrual in its 2003 and 2004 10-K filings. Those statements, too, are adequately alleged to be material misrepresentations.

Third, the Court concluded that plaintiffs had adequately alleged that Northfield and Gould made a false or misleading statement on October 11, 2001 when Northfield issued a press release quoting Gould as reporting "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction." Plaintiffs also alleged that 10 of the 81

-7-

patients in the ANH trial suffered heart attacks, while none of the control patients did. Accordingly, plaintiffs have adequately plead that that portion of Gould's October 11, 2001 statement was materially false or misleading.

The Court next considers whether plaintiffs' second amended complaint adequately alleged any additional false or misleading statements.

In the second amended complaint, plaintiffs again take issue with DeWoskin's statement that "[o]ur outlook for the commercialization of our product, PolyHeme, for use in urgent, massive blood-loss situations, remains as positive as ever." Plaintiffs argue that this statement is misleading because plaintiffs believe the outlook for commercialization of PolyHeme for elective surgery was poor after the ANH trial. The Court disagrees, as it did the last time. DeWoskin's statement specifically refers to commercialization for urgent, massive blood-loss situations. The statement does *not* refer to commercialization for elective surgery. Accordingly, plaintiffs have not adequately alleged that the statement was false or misleading.

Next, plaintiffs allege that on September 4, 2001, Northfield issued a press release that quoted DeWoskin as saying, "Our trial results document a very compelling clinical benefit that we believe provides the substantial evidence of safety and efficacy required by the FDA." Plaintiffs argue that this statement was false or misleading because the ANH trial showed a higher incidence of adverse events in the PolyHeme group as compared to the control group. The Court agrees. DeWoskin seems to be referring to all Northfield trials in his statement, and plaintiffs have alleged that at least one of Northfield's trials (the ANH trial) did not provide evidence of safety and efficacy. Accordingly, plaintiffs have sufficiently alleged that DeWoskin's statement in Northfield's September 4, 2001 press release was false or misleading.

Plaintiffs also allege that on August 3, 2001, in a proxy supplement signed by Gould and DeWoskin, Northfield stated that "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies." The Court previously concluded that plaintiffs had not alleged sufficient facts to show that this statement was false or misleading because plaintiffs had failed to include any allegations that the adverse effects alleged to have been found in the ANH trial were historically associated with hemoglobin solutions. Plaintiffs have added allegations asserting that adverse cardiac events were historically associated with hemoglobin solutions. They have also asserted that there was a greater incidence of heart attacks in the PolyHeme patients in the ANH trial. Accordingly, the plaintiffs have adequately alleged that the August 3, 2001 proxy statement signed by Gould and DeWoskin contained a false or misleading statement.

### 2. Loss causation

To prevail, plaintiffs must show that defendants' misrepresentations "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 346 ("The statute . . . makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."). It is not sufficient to plead merely transaction causation, which is that plaintiffs would not have purchased the stock had they known about the alleged fraud. Rather, plaintiffs must allege that "but for the circumstances that the fraud revealed, the investment . . . would not have lost its value." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir.

1997)).  Unlike other elements, the PSLRA did not heighten the pleading requirement for loss causation.  *Dura*, 544 U.S. at 346.

The Seventh Circuit has described the various ways plaintiffs can prove loss causation. *See Citigroup*, 482 F.3d at 995.  The approach plaintiffs utilize, the "fraud on the market" approach, requires plaintiffs to allege "both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception."  *Citigroup*, 482 F.3d at 995.  A complaint must "provid[e] the defendants with notice of what the relevant economic loss might be [and] of what the causal connection might be between that loss and the misrepresentation."  *Dura*, 544 U.S. at 347.

The Court notes that plaintiffs have alleged that the Northfield shares traded in an efficient market such that plaintiffs purchased their shares at inflated prices.  The Court considers, next, whether plaintiffs have adequately plead loss causation with respect to each of the statements plaintiffs have adequately alleged to be materially false or misleading.

The first such statement was the August 3, 2001 statement that Northfield *intended* to terminate the ANH study when, in fact, it had already closed the trial in late 2000.  Plaintiffs allege that the fact that the trial closed in 2000 was disclosed by Northfield in a February 22, 2006 press release.  In the second amended complaint, plaintiffs also allege that the price of Northfield stock declined "as a direct result of the adverse disclosures in the *Wall Street Journal* articles of February 22 and 24, 2006, and the disclosures in Northfield's February 22, 2006 press release of the true date when the ANH Trial had closed down . . ."  Accordingly, plaintiffs have adequately plead loss causation with respect to Northfield's August 3, 2001 statement that it intended to close a trial that it had already closed.

The Court previously concluded that plaintiffs had adequately alleged loss causation with respect to the statements–in the 2002, 2003 and 2004 Annual Reports–about the reasons for shutting down the ANH study.

In its last opinion, the Court concluded that plaintiffs had failed to plead loss causation with respect to Gould's statement in an October 11, 2001 press release that there was no "evidence" of cardiac dysfunction. The reason for the Court's previous ruling was that plaintiffs had alleged that in September 2005, Northfield disclosed on its website that there was a greater incidence of heart attacks in ANH trial participants who received PolyHeme. Plaintiffs had not, however, alleged that the share price dropped as a result of the September 2005 disclosure. Now, plaintiffs have amended their complaint to omit reference to the September 2005 disclosure. While this omission may cause plaintiffs problems at the summary judgment stage, it will not be used against them here. *See Equal Empl't Opportunity Comm'n v. Concentra Health Serv., Inc.*, 496 F.3d 773, 778 (7th Cir. 2007) (a party is not bound to the allegations in the original complaint after it has been dismissed); *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("When a party has amended a pleading, allegations and statements in earlier pleadings are not considered judicial admissions."). Plaintiffs have alleged that the results of the ANH trial were first released in a UBS analyst report and that the stock price dropped as a result. Accordingly, plaintiffs have adequately plead loss causation with respect to Gould's statement in the October 11, 2001 press release.

Next, the Court considers whether plaintiffs have adequately plead loss causation with respect to two additional statements alleged to be false or misleading. First, on September 4, 2001, Northfield issued a press release that quoted DeWoskin as saying, "Our trial results

document a very compelling clinical benefit that we believe provides the substantial evidence of safety and efficacy required by the FDA." Second, on August 3, 2001, in a proxy statement signed by Gould and DeWoskin, Northfield stated that "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies." Plaintiffs have alleged that the truth was revealed in a UBS analyst's report and that the price of Northfield shares dropped as a result of the disclosures. Accordingly, plaintiffs have adequately alleged loss causation with respect to these statements.

### 3. Scienter

In order to establish liability under §10(b) and Rule 10b-5, a "private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2507 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 and n. 12 (1976)). That means "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, __ F.3d __, __, 2007 WL 2142298 at *1 (7th Cir. July 27, 2007). Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(1)-(2). A strong inference is a "powerful or cogent" inference. *Tellabs*, 127 S.Ct. at 2510. In order to determine whether a plaintiff has adequately alleged scienter, a court must consider all of the allegations and "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 127 S.Ct. at 2510. Thus, a complaint survives a motion to dismiss "only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S.Ct. at 2510.

Because of the heightened pleading requirements of the PSLRA, it is not enough simply to allege that defendants knew the results of the ANH trial or the actual timing of the close of the trial. Rather, plaintiffs must plead with particularity facts that give rise to a strong inference that defendants knew. Plaintiffs have done so. In the second amended complaint, plaintiffs allege that in November 1999, the ANH trial's independent data monitoring committee provided the study data to Northfield and that Northfield itself conducted the analysis that determined that the PolyHeme group suffered adverse events at a higher rate than the control group. This makes it clear that Northfield knew that at least some of the results of the ANH trial were negative. Those allegations alone do not raise a strong inference that Gould and DeWoskin knew the results. Plaintiffs, however, have included other allegations that create a strong inference that Gould and DeWoskin knew the results. Gould, a medical doctor, co-founded Northfield and became its CEO in July 2002. DeWoskin was Northfield's other co-founder and served as its CEO from 1985 until July 2002. One could easily infer that the two co-founders of a one-product company knew the results of a data analysis the company itself performed with respect to a study of that company's one product.

Plaintiffs further argue that defendants had a financial motive to make false or misleading statements in connection with the sale of a security. Some financial interests are too general to give rise to a strong interest of scienter. For example, "[e]very shareholder in a company that decides to go public has a financial interest in obtaining a high offering price. Equating that interest with an intent to defraud would make all such shareholders targets of securities fraud."

*Central Laborer's Pension Fund v. Sieva, Inc.*, Case No. 04 C 7644, 2006 WL 2787520 at *16 (N.D. Ill. Sept. 22, 2006).

Furthermore, the very fact that Northfield continued to invest its resources in PolyHeme suggests that defendants actually believed PolyHeme was a safe and effective product that would one day receive FDA approval. *See Oppenheim Primerica Asset Mgt. SAIL v. Incisive Pharmaceuticals, Inc.,* Case No. 06-3022, 2007 WL 2720074 at *5 (S.D. Texas Sept. 18, 2007) ("[Defendant] used a large part of the money it acquired from the stock sales to finance the development of [its drug], indicating Defendants' belief that [the drug's] potential as a successful and lucrative product for the company justified the expenditures."). Thus, a reasonable inference from the fact that Northfield continued to study PolyHeme even after the ANH trial is that defendants actually believed PolyHeme was safe. Because PolyHeme participants are alleged to have had twice as much blood removed as participants in the control group had removed, defendants might have believed that any negative results in the PolyHeme participants were attributable to blood volume issues rather than to PolyHeme itself. This inference, however, would be more compelling if defendants had released the results of the ANH trial immediately. *See Kairalla v. Advanced Medical Optics, Inc.*, Case No. 07-5569, 2008 WL 2879087 at *13 (C.D. Cal. June 6, 2008) (inference of scienter less compelling than opposing inference where defendants initiated a product recall on the same day they received data associating the product with an infection). Unlike the defendants in *Kairalla*, the defendants in this case are alleged to have kept mum until UBS and the *Wall Street Journal* released the results of the ANH trial.

A reasonable inference from the facts plaintiffs allege is that defendants wanted to keep the results of the ANH study away from investors for fear that the results would be perceived by

-14-

investors as being negative. If investors became concerned that PolyHeme caused the heart attacks suffered during the ANH trial, they might stop funding the company. Without funding, Northfield could not continue its quest to obtain FDA approval to market PolyHeme, because it had no other source of revenue. A reasonable inference is that defendants wanted to keep the ANH results away from investors until it could prove–in its next trial, the urban trauma trial–that PolyHeme was safe and effective. Another reasonable inference is that instead of releasing the results and explaining that they did not think the heart attacks were caused by PolyHeme, defendants attempted to cover up the results of the study: by saying the study was ongoing, by saying the study had to be closed due to slow patient accrual, by stating that its trials were showing PolyHeme to be safe and effective and by stating that PolyHeme was not causing problems historically associated with blood substitutes.

The inference of scienter is cogent. The facts underlying the inference may not ultimately be proven, and a fact-finder might find a different inference more compelling. This inference of scienter, however, is at least as compelling as the opposing inference. Accordingly, plaintiffs have adequately alleged scienter.

The plaintiffs have adequately stated a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Accordingly, the Court denies defendants' motions to dismiss Count I.

### B. Plaintiffs' control person claims against Gould and DeWoskin

In Count II, plaintiffs assert that Gould and DeWoskin are liable as controlling persons for Northfield's alleged violations of the securities laws. Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), "creates vicarious liability for a person who actually or potentially controlled the primary violator's acts. *Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 543 (7th Cir. 2005). Defendants move to dismiss Count II on the grounds that if plaintiffs have failed to state a claim for a primary violation, they have necessarily failed to state a claim for § 20(a) liability. *See DH2, Inc. v. Athanassiades*, 359 F. Supp.2d 708, 720 (N.D. Ill. 2005). The Court, however, has concluded that plaintiffs have stated a claim in Count I. Accordingly, their argument for dismissing Count II is unavailing, and the Court denies the motions to dismiss with respect to Count II.

## IV. Conclusion

For the reasons set forth above, the Court denies defendants' motions to dismiss.

This case is set for status on October 14, 2008.

       ENTER:

       _____
       George M. Marovich
       United States District Judge

DATED: September 23, 2008