IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| | ) | No. 06CV1493 |
| IN RE NORTHFIELD LABORATORIES | ) | Honorable Judge George M. Marovich |
| INC. SECURITIES LITIGATION | ) | Magistrate Nan R. Nolan |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT NORTHFIELD'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
330 N. Wabash
Chicago, IL 60611
(312) 222-9350

Dated: January 21, 2009

## Contents

Introduction ........ 1

Background ........ 3

Argument ........ 6

I. Plaintiffs Should Not Be Permitted To Obtain Merits Discovery Through The Back Door ........ 6

II. Plaintiffs' Ostensible Justification For Seeking To Discover Non-Public Information Is Based On A Misapprehension Of Northfield's Contentions ........ 8

Conclusion ........ 12

## Introduction

As shown below, this Court should deny plaintiffs' motion to compel for two basic reasons.

First, the motion constitutes an end run around Judge Marovich's October 14, 2008 discovery Order, which requires that discovery be bifurcated and that class discovery proceed before merits discovery. Judge Marovich stated that he was requiring bifurcation to focus discovery on the central class-certification question presented here: whether plaintiffs can establish the "fraud on the market" presumption of reliance. Judge Marovich held (Ex. A, 10/14/08 Tr. 3):

> I am going to bifurcate the discovery in this case for two reasons: One is the legal one, and my reading of Seventh Circuit law indicates to me that before I as a District Judge can certify a class, it has to be determined whether or not the so-called fraud in the marketplace presumption prevails, and that gives you enough stuff to discover without going into the merits of the case.

The point of Judge Marovich's bifurcation Order is to concentrate discovery on the issues relevant to the fraud-on-the-market presumption — namely, what information was disclosed to the market and when. In light of the Order, plaintiffs are free to seek documents and other discovery about what information was actually communicated to the public via press statements, presentations to securities analysts, and so forth. Northfield is producing that information. But plaintiffs cannot seek non-public information that is effectively merits discovery, such as information about Northfield's non-public communications with government regulators and Northfield's internal discussions about those communications. What matters for fraud-on-the-market purposes is what information was available to the market and when, and whether the market reacted "efficiently" to it. Everything else is merits discovery, which is off limits. *See* Part I below.

Second, as Northfield expressly stated in its discovery objections, the supposed "contention" upon which plaintiffs predicate their request to discover non-public information is incorrect. *See* Northfield Interrog. Resp. Nos. 5 & 6 (objecting because request "misstates Northfield's contention"). Plaintiffs argue that they are entitled to discovery of non-public

information regarding government investigations — investigations that closed without any enforcement action against Northfield. According to plaintiffs (Pls. Mem. 2-3), Northfield supposedly contends "that the news disclosures about the Senate Finance Committee's and the SEC's investigations of Northfield were not related to the alleged misstatements about the Company's ANH clinical trials of Polyheme, and thus, do not establish loss causation." *See also* Pls. Mem. 3 ("Defendants contend that the disclosure of the SEC's and Senator Grassley's inquiries was . . . unrelated to the disclosure or materialization of the alleged fraud").[1/]

Plaintiffs misapprehend Northfield's point. With regard to the SEC and Senate investigations, Northfield's contention does not rest on any non-public information concerning the subject matter of the investigations. By definition, the fraud-on-the-market theory cannot be based on non-public information. Northfield contends that, based upon public information, plaintiffs cannot satisfy their burden of proving loss causation because the central information that Northfield allegedly concealed <u>already had been disclosed</u> to the market long before the investigations began and long before the stock drops upon which plaintiffs base their claims. The market already had received correct information many months, and in some instances years, before the post-investigation stock drops that supposedly caused plaintiffs' loss. In addition, to establish loss causation, plaintiffs must disaggregate stock declines attributable to the alleged misstatements from stock declines attributable to other factors, including the mere existence of government investigations which can affect stock prices independent of the investigations' subject matter or their ultimate outcome. Because those issues will turn exclusively on publicly disclosed information — as they must under the fraud-on-the-market theory — plaintiffs have no basis for discovering the non-public information that they seek. *See* Part II below.

---

[1] "Loss causation" is the statutory requirement that securities plaintiffs must prove a causal link between their claimed loss and the challenged misstatements. 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages").

**Background**

Defendant Northfield is seeking to gain FDA approval to sell Northfield's sole product, an artificial blood substitute named "PolyHeme." Plaintiffs allege that Northfield inflated the price of its stock by making misstatements about an elective surgery study (the "ANH Trial") involving PolyHeme. The gist of plaintiffs' allegations is that Northfield purportedly concealed that heart attacks were observed in the ANH Trial and that Northfield supposedly terminated the study as a result — even though no one involved in the study (including the FDA) thought that the heart attacks were caused by PolyHeme, as opposed to by other factors unique to certain smaller test sites. After multiple complaint amendments by plaintiffs and two rounds of briefing on motions to dismiss, Judge Marovich has narrowed the case to five alleged misstatements by Northfield:

1. The August 2001 statements that "[we] intend to terminate our current elective surgery protocol after the BLA [Biologics License Application] is filed" and that "final-stage, clinical trials, involving elective surgery patients and trauma patients are ongoing." (9/23/08 Opinion on Mtn. to Dismiss at 6-7.)

2. The August 9, 2002 statement that "[d]ue to the complexity of the clinical protocol, however, patient accrual progressed slowly. As a result, we closed the elective surgery protocol after our BLA was submitted." *Id.* at 7.

3. The October 11, 2001 statement that there was "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction" in the study discussed there. *Id.* at 7-8.

4. The September 4, 2001 statement that "Our trial results document a very compelling clinical benefit that we believe provides the substantial evidence of safety and efficacy required by the FDA." *Id.* at 8.

5. The August 3, 2001 statement that "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies." *Id.* at 9.

The reason why fraud-on-the-market issues loom large in this case is because those purported misstatements were made in the 2001 to 2002 time frame. However, according to their certifications, plaintiffs did not purchase any shares until two years later (in 2004), and the stock drops on which plaintiffs premise their securities claims did not happen until two years

after that (in January to March 2006). (2d Am. Cmplt. ¶¶ 26-27; 106-19.) Thus, in order for plaintiffs to demonstrate their supposed entitlement to the fraud-on-the-market presumption of reliance, plaintiffs must demonstrate that correct information was not disclosed to the market at any time before the 2006 stock drops, and plaintiffs must tie the 2006 stock drops to the purported misstatements made in 2001 and 2002 (as opposed to any other factors that caused the stock to decline).

Because the fraud-on-the-market issue is central to class certification, and because merits discovery is expensive and time consuming for a small company such as Northfield, defendants asked Judge Marovich to bifurcate class discovery and merits discovery. *See* Ex. B, 10/10/08 Mem. at 1. Northfield argued that "bifurcation of class discovery makes particular sense because the key certification issue is relatively simple: whether plaintiffs can establish the fraud-on-the-market presumption of reliance, including the loss causation component." *Id.* at 2. Northfield further argued that the fraud-on-the-market "issue will not require substantial discovery" because "the inquiry focuses on information in the public domain and on the market's reaction to that information." *Id.* at 2-3 (citing *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007) ("Little discovery from defendants is demanded by the fraud-on-the-market regimen. Its 'proof' is drawn from public data and public filings, as in this case. It is largely an empirical judgment that can be made then [*i.e.*, pre-class certification] as well as later in the litigation.")). Northfield also contended that "there is no such thing as quick and easy merits discovery," especially where "Northfield is a tiny company with only a small number of personnel and limited resources." (Ex. B, 10/10/08 Mem. at 6.) The whole point of requiring discovery to be conducted in phases is to avoid the "extraordinary and unnecessary expense and burden" of merits discovery. *Manual for Complex Litigation* (Fourth) § 21.14.[2/]

---

[2] Northfield further argued in the bifurcation briefing before Judge Marovich that the fraud-on-the-market presumption is critical to class certification because, when put to their proofs, plaintiffs' assertions on those points will fail. For example, although plaintiffs' entire case turns on stock drops occurring in January to March 2006, the facts will show that the central information about the heart attacks was disclosed many months earlier, including on Northfields' website and the websites of multiple hospitals. *See* 9/23/08 Opinion on Mtn. to Dismiss at 11

In response, plaintiffs maintained that bifurcation would cause "substantial duplication of [e]fforts" because "discovery of matters relevant to class certification may be so intertwined with the merits that targeting discovery would be inefficient." (Ex. C, Pls. 10/13/08 Mem. at 2-3.) As a fall back, plaintiffs argued that merits-related documents "already produced to the U.S. government" should be produced no matter what because doing so supposedly is "inexpensive and easy." *Id.* at 4.

Judge Marovich rejected plaintiffs' arguments. Judge Marovich held that he was "going to bifurcate the discovery in this case for two reasons." (Ex. A, 10/14/08 Tr. 3.) First, given that Seventh Circuit precedent requires district courts to make factual findings regarding the satisfaction of each Rule 23 requirement, "it has to be determined whether or not the so-called fraud in the marketplace presumption prevails." *Id.* Judge Marovich noted that discovery into the fraud-on-the-market presumption "gives you enough stuff to discover without going into the merits of the case." *Id.* Second, Judge Marovich identified a "practical reason" for bifurcation — that class certification "in many instances is dispositive" of the entire case. *Id.* at 4. He concluded that he would "not burden any of you with the additional discovery until we decide whether or not we have a class." *Id.*[3/]

Despite the bifurcation Order, plaintiffs have served discovery requests on Northfield seeking information that, because it was non-public, could not have affected the market. In

(observing that plaintiffs' newest complaint deletes prior references to the website disclosures: "While this omission may cause plaintiffs problems at the summary judgment stage, it will not be used against them here."). *See generally* Ex. B, 10/10/08 Mem. at 5-6.

[3] In reaching that result, Judge Marovich applied the Seventh Circuit's *Szabo* principle, which requires district courts to determine specifically whether plaintiffs have presented sufficient evidence to establish all of Rule 23's requirements. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (holding that district courts no longer can accept plaintiffs' factual allegations as true for purposes of class certification while leaving factual disputes for a later day). At least three Courts of Appeals — the Second, Fourth, and Fifth Circuits — have applied the *Szabo* principle in federal securities actions, holding that district courts must make findings that loss causation and other requirements of the fraud-on-the-market presumption are met before a class can be certified. *See, e.g., Oscar*, 487 F.3d at 269 (5th Cir. 2007); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 485 (2d Cir. 2008).

substance, the requests seek all information and documents in Northfield's possession that "evidence, refer, or relate to" the now-closed investigations of Northfield by the SEC and Senator Grassley's Senate Finance Committee — investigations that were initiated and publicly announced in March 2006. (Pls. Doc Req. Nos. 17-20.) Plaintiffs also have propounded interrogatories asking for all information and documents relating to Northfield's supposed "contention . . . that the [SEC and Senate] inquiry and/or investigation . . . was not the result of or caused by the results, conclusions, or observations from the Company's ANH (Acute Normovolemic Hemodilution) clinical trial." (Pls. Interrogs. Nos. 4, 5.)

## Argument

### I. Plaintiffs Should Not Be Permitted To Obtain Merits Discovery Through The Back Door.

By seeking non-public information that could not have affected the market, plaintiffs are violating the whole point of Judge Marovich's bifurcation Order. The key class-certification question here is whether plaintiffs can satisfy the requirements for the fraud-on-the-market presumption. Those requirements center on whether an "efficient market" incorporating public information about Northfield's stock exists and whether plaintiffs traded in that market before "the truth was revealed":

> Reliance is presumed if the plaintiffs can show that "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed."

*Oscar*, 487 F.3d at 264 (5th Cir. 2007); *see Gariety*, 368 F.3d at 364 (4th Cir. 2004) (containing essentially identical list).

The entire focus of the fraud-on-the-market theory is the market — what the market knew and how it reacted. The theory holds that in a well-developed "efficient" market, publicly available information is incorporated into the company's stock price:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . .

> Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

Therefore, by definition, the fraud-on-the-market theory centers on what information actually was "available" to the market. *Basic*, *id.* The inquiry essentially is fourfold:

1. Is the market for Northfield stock efficient?
2. What information was disclosed to the market?
3. When was that information disclosed?
4. How did the stock price react to the information when it was disclosed?

As noted above, discovery on fraud-on-the-market issues should be relatively simple because "the inquiry focuses on information in the public domain and on the market's reaction to that information." (Ex. B, 10/10/08 Mem. at 2-3.) Before Judge Marovich, Northfield cited the Fifth Circuit's decision in *Oscar*, which made that exact point in concluding that fraud-on-the-market issues must be examined at the class certification stage. The Fifth Circuit stressed that discovery regarding fraud-on-the-market issues is comparatively easy because the analysis is based on public disclosures — what was publicly disclosed and when:

> Little discovery from defendants is demanded by the fraud-on-the-market regimen. Its "proof" is drawn from public data and public filings, as in this case. It is largely an empirical judgment that can be made then [*i.e.*, pre-class certification] as well as later in the litigation.

*Oscar*, 487 F.3d at 267 (5th Cir. 2007).

Under Judge Marovich's bifurcation decision, discovery is focused on those four questions: was the market efficient, what information was publicly available, when was it available, and how did the market react. As a practical matter, discovery actually concentrates on the second and third questions, given that stock price reactions are matters of public record and market efficiency generally is determined through expert testimony.

Nevertheless, despite the bifurcation Order, plaintiffs have not limited their discovery requests to publicly disclosed documents and information (which Northfield is producing). Rather, plaintiffs have served discovery requests seeking non-public documents and

communications with the SEC and the Senate Finance Committee. In particular, plaintiffs seek documents that relate to the "request for information and documents made by" those government entities. (Pls. Doc Req. Nos. 17, 20.) Plaintiffs also seek documents that relate to the "purpose of, and reasons for" the investigations by those entities. (Pls. Doc Req. Nos. 18, 19.) Plaintiffs' interrogatories effectively ask for the same information. (Pls. Interrogs. Nos. 4, 5.)

Some portion of the requested information was released to the public — and that information is fair game for discovery and is being produced. But non-public information is merits information, not class certification information. Non-public information does not matter to the fraud-on-the-market theory. The only information that can affect the market is information actually communicated to the public. Because the materials sought here were not communicated to the public, they cannot support plaintiffs' class certification efforts. Therefore, they are off limits under the bifurcation Order.

## II. Plaintiffs' Ostensible Justification For Seeking To Discover Non-Public Information Is Based On A Misapprehension Of Northfield's Contentions.

As Northfield expressly stated in its discovery objections, the supposed "contention" upon which plaintiffs predicate their request to discover non-public information regarding the (now closed) government investigations is incorrect. *See* Northfield Interrog. Resp. Nos. 5 & 6 (objecting because the request "misstates Northfield's contention"). According to their interrogatories, plaintiffs seek information and documents relating to Northfield's supposed "contention" that each of the investigations "was not the result of or caused by the results, conclusions, or observations from the Company's ANH . . . clinical trial." (Pls. Interrogs. Nos. 4, 5.) Plaintiffs make the same assertion — about Northfield's supposed "contention" — throughout their memorandum. *See, e.g.*, Pls. Mem. 2-3 ("Defendants steadfastly have maintained that the news disclosures about the Senate Finance Committee's and the SEC's investigations of Northfield were not related to the alleged misstatements about the Company's ANH clinical trials of Polyheme, and thus, do not establish loss causation"); Pls. Mem. 3 ("Defendants contend

that the disclosure of the SEC's and Senator Grassley's inquiries was . . . unrelated to the disclosure or materialization of the alleged fraud").

As Northfield has explained to plaintiffs, they misapprehend Northfield's point. Northfield's contention does not rest on any non-public information. Rather, the fraud-on-the-market analysis must be based on publicly disclosed information. Based upon plaintiffs' arguments to date, Northfield expects to argue that the content and timing of the public disclosures concerning the heart attacks observed in the ANH Trial and the content and timing of the public disclosures concerning the government investigations defeat class certification.

Plaintiffs allege that information about the ANH Trial was concealed from the market until January to March 2006, when its disclosure purportedly precipitated government investigations and stock drops. In reality, the allegedly concealed information already had been disclosed to the market long before the government investigations began — and long before the stock drops upon which plaintiffs base their claims. For example, although plaintiffs' entire case turns on stock drops occurring in January to March 2006, the key information about the heart attacks observed in the ANH Trial was disclosed publicly many months earlier, including on Northfield's website and the websites of multiple hospitals. Indeed, the existence of the heart attacks, and their effect on Northfield's long-term prospects, was discussed by investors at length on internet "chat" boards concerning Northfield starting at least by June 2005 — over six months before the stock drops that plaintiffs contend caused their loss. *See, e.g.,* Yahoo message board, ticker symbol NFLD (June 24, 2005 discussion thread entitled "Update FAQ on Polyheme-Utah").

It is elementary that plaintiffs cannot rely on the fraud-on-the-market theory if the market "already has become aware" of the supposedly concealed information:

> In a fraud-on-the-market case, an omission is actionable under section 10(b) and Rule 10b-5 only if the allegedly undisclosed information has not already entered the market. If the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's prices and the market will not be misled.

*Heliotrope Gen'l, Inc. v. Ford Motor Co.*, 189 F.3d 971, 975-76 (9th Cir. 1999) (citations and internal quotation marks omitted). The Seventh Circuit has expressed the same point this way:

> [Plaintiff] Roots has failed to allege such loss causation, however, because the fraud-on-the-market theory under which Roots proceeds presumes that news is promptly incorporated into stock price. Accordingly, Roots cannot ask us to presume that the market reacted to the allegedly fraudulent prediction but ignored later information of [defendant] Lands' End's actual earnings results, which information was announced months before plaintiffs purchased.

*Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1499 (7th Cir. 1992) (citations omitted); *accord Teachers' Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their revelation in Hunter's 2003 complaint could not have caused Cree's stock price to decline"); *The Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co*, No. 02-1152, 2008 WL 4791492, at *10 (N.D. Tex. Nov. 4, 2008) (denying motion for class certification: "Information already known to the market cannot actually affect the stock price because an efficient market will not respond to information that is already known.").

That is why the authorities cited by plaintiffs regarding disclosure of government investigations are beside the point. (Pls. Mem. 6.) Those authorities deal with situations where corrective disclosures do not occur until after or at the same time as the announcement of the investigations. *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (disclosure of the alleged fraud occurred after announcement of SEC investigation); *In re Imax Sec. Litig.*, No.06-6128, 2008 WL 4307981, at *11 (S.D.N.Y. Sept. 16, 2008) (disclosure of the alleged fraud coincided with announcement of SEC investigation); *see also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 547-48 (N.D. Ill. 2007) (case cited by plaintiffs but not involving any government investigation; apparently cited because it discusses (and distinguishes) *Bradley*).

Here, the fact that information concerning the observed heart attacks was disclosed to the market long before the investigations and the stock drops upon which plaintiffs rely means one of two things, both of which are bad for plaintiffs. First, it could mean that, when information concerning the heart attacks was disclosed, the market did not assimilate "available material

information regarding the company." *Basic*, 485 U.S. at 241 (1988). In that event, the market for Northfield stock was not "efficient," and plaintiffs cannot rely on the fraud-on-the-market theory for class certification. Second, it could mean that, if the market for Northfield stock was efficient, plaintiffs cannot show a causal link between their claimed loss and the misstatements upon which their case rests — given that the stock drops did not occur until long after the market knew about the allegedly concealed heart attacks and incorporated that information into the stock price. That scenario likewise eliminates any chance of class certification because loss causation is an essential element of plaintiffs' securities claim and must be proved on a class-wide basis. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 338, 342 (2005) ("A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss. . . . Normally, in cases such as this one (*i.e.*, fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.").

Under either scenario, the class certification inquiry will depend entirely on publicly disclosed information. Therefore, plaintiffs do not have any need or justification for non-public information about the government investigations. Northfield's point is that corrective disclosures about the purported misstatements already had been made to the market months earlier. *See, e.g., Teachers' Retirement*, 477 F.3d at 187-188 (4th Cir. 2007) ("Because no such [new] facts were disclosed, the drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by a founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.").

That is why all of this will be the subject of expert testimony based upon public information. To show loss causation, plaintiffs' expert presumably will attempt to disaggregate stock declines supposedly attributable to the alleged misstatements from stock declines attributable to other factors, including the mere existence of government investigations which can affect stock prices independent of the subject matter of the investigations or their ultimate

outcome. Because that expert testimony will turn exclusively on publicly disclosed information — as it must under the fraud-on-the-market theory — plaintiffs have no basis for discovering the non-public information that they seek.

**Conclusion**

For the foregoing reasons, plaintiffs' motion to compel should be denied.

Dated: January 21, 2009

Respectfully submitted,

NORTHFIELD LABORATORIES INC.

s/ Ronald L. Marmer
One of Its Attorneys

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
330 N. Wabash
Chicago, IL 60611
(312) 222-9350

**CERTIFICATE OF SERVICE**

I, SUZANNE J. PRYSAK, an attorney, hereby certify that on this 21st day of January, 2009, I caused the foregoing **DEFENDANT NORTHFIELD'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL** to be served with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel in Case No. 06-1493 on the attached service list at their e-mail addresses on file with the Court.

/s/Suzanne J. Prysak
SUZANNE J. PRYSAK