**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NORTHFIELD LABORATORIES, INC. SECURITIES LITIGAION | Master File No. 06 C 1493 Judge George M. Marovich (Consolidated) |

**DECLARATION OF SCOTT D. HAKALA, PH.D., CFA**

**REGARDING MARKET EFFICIENCY**

I.      **Background and Qualifications of the Expert**

1.      I am a director of CBIZ Valuation Group, LLC, a national business valuation and consulting firm that operates as a wholly owned subsidiary of CBIZ, Inc., a publicly traded business services firm (NYSE: CBZ).  CBIZ Valuation Group is one of the largest business valuation and consulting firms in the United States with offices in Dallas, Chicago, Atlanta, St. Louis, Milwaukee and Princeton (New Jersey).  CBIZ Valuation Group employs approximately 100 individuals providing business valuation services to public and private companies.

2.      I received a Doctor of Philosophy degree in Economics and a Bachelor's degree in Economics from the University of Minnesota.  I have earned the professional designation of Chartered Financial Analyst, awarded by the Association for Investment Management and Research.  I have taught courses on asset pricing and market efficiency at the doctorate (Ph.D.) level in a Ph.D. granting institution.  I co-authored a law review article on the economics of loss causation, Thorsen, Kaplan and Hakala, "Rediscovering

the Economics of Loss Causation," *Journal of Business and Security Law Acceptance*, Vol. 6, No. 1 and 2, April 2006, pp. 93-125, cited, for example, in *In re Motorola Securities Litigation*, 2007 U.S. Dist. LEXIS 9530 (N. D. Illinois, February 8, 2007). In addition, I have served as a consultant and expert witness on numerous occasions regarding economic issues similar to those in this litigation. I have extensive training in the trading of public securities, including knowledge of market makers, securities markets and the modeling of individual and institutional trading patterns. I have extensive training and experience with determining inflation per share and preparing event studies. I have previously been engaged to provide my expertise in analyzing and evaluating companies in the pharmaceutical products and medical research sectors. I have testified in a number of instances as to market efficiency and other matters in support of class certification over the past eight years. Recent decisions by courts granting class certification with reference to my testimony and rejecting opposing testimony and arguments include: *Wagner v. Barrick Gold et al.*, 2008 U.S. Dist. LEXIS 15811 (S.D. N.Y., Feb. 15, 2008); *In re Flag Telecom Ltd. Holdings Sec. Litig.*, 2007 U.S. Dist. LEXIS 67173, (S.D. N.Y., Sept. 4, 2007); *Lapin v. Goldman Sachs*, 2008 U.S. Dist. LEXIS 69574, (S.D. N.Y., Sept. 15, 2008); *In re Parmalat Sec. Litig.*, 2008 U.S. Dist. LEXIS 64296, (S.D. N.Y., Aug. 21, 2008); and *In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656; 2008 U.S. Dist. LEXIS 73790 (D. Utah, Sept. 25, 2008). I have testified at trial as an expert on damages in two class action securities cases, *In re Clarent Sec. Litig.* (trial testimony February 2005) and *In re JDS Uniphase Sec. Litig.* (trial testimony November 2007). I have been found qualified as an expert to testify regarding materiality, event studies, loss causation and damages on numerous occasions.

I have prepared numerous damage analyses in securities litigation and numerous plans of allocation for allocating settlement amounts based on damages to individual class members in connection with distributing the proceeds of various settlements. With respect to plans of allocation, courts have cited my work in approving the settlement and plan of allocation over various objections in *In re Broadcom Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 41976 (C.D. Cal., Sept. 12, 2005). Other examples of similar rulings by courts occurred in the following cases: *In re i2 Technologies Sec. Litig.*, No. 3:01-CV-418-H (N.D. Tex.); *In re Patriot American Hospitality Sec. Litig.*, 2005 WL 3801595 (N.D. Cal., Nov. 30, 2005) (citing my event study); *In re Williams Cos. Sec. Litig.,* Case No. 02-cv-72-SFP (FHM) (N.D. Okla., Feb. 9, 2007) and *In re AOL Time Warner Sec. Litig.*, 2006 WL 903236 (S. D. N. Y., Apr. 6, 2006) (citing my event study). A detailed summary of my qualifications, including prior testimony and articles, is provided on the curriculum vitae attached hereto as Exhibit A.

3.    Plaintiffs are being charged fees for my services in this engagement based on my hourly billing rate of $550 per hour in 2008 and $575 per hour in 2009. I have received assistance from other staff employed by CBIZ Valuation Group. My staff bills at ranges between $135 and $340 per hour.

## II. Information Considered

4.    My opinions are based on my professional experience and education, as well as a thorough review of a substantial amount of available materials, including:

> a. The Consolidated Second Amended Class Action Complaint in this matter;

b. The various briefs filed in connection with the Defendants' Motion to Dismiss Consolidated Class Action Complaint;

c. Published news articles and other public news regarding Northfield Laboratories, Inc. ("Northfield Laboratories," "Northfield Labs," or the "Company") from September 2000 through September 2006 found on Factiva and Bloomberg, L.P.;

d. The SEC filings by Northfield Laboratories from October 2000 through September 2006;

e. Various published analyst reports regarding Northfield Laboratories between September 2000 and September 2006 found on Thomson Research and First Call;

f. Various academic texts and published articles as cited in the text.

### III. Summary of the Analyses and Conclusions

5.     For purposes of this opinion and report, and based on the information identified in paragraph 4, I assume, as a general summary, the following:

a. During the Class Period from March 19, 2001 through March 20, 2006 ("Class Period"), Northfield Laboratories issued false and misleading press statements, concealed material adverse information concerning Northfield Laboratories' sole product PolyHeme, and misled investors regarding PolyHeme's safety and effectiveness. The false and misleading press statements concerned the following:
  i. The success of ongoing elective surgery clinical trials;
  ii. The statistically and clinically significant occurrence of serious adverse events in elective surgery trials;
  iii. The reasons why the Northfield Laboratories Phase III trial of PolyHeme was terminated;
  iv. That the elective surgery trial was continuing to produce important results even thought it has been terminated for nearly a year;
  v. The increased risk for obtaining market approval for PolyHeme's use in elective surgery as a result of the serious adverse events in the elective surgery trial.

b.  Northfield Laboratories' false and misleading statements were associated with quarterly financial announcements, annual financial announcements, and other filings with the Securities and Exchange Commission ("SEC") during the Class Period, and the Defendants repeatedly made similar false and misleading statements during associated conference calls discussing Company financial performance and operating results.  The false and misleading statements were then repeated or stated in other ways in Form 10-Qs and a Form 10-K filed by Northfield Laboratories and reasserted in various presentations, interviews, and meetings with investors and analysts.

c.  On January 6, 2006 a UBS analyst issued a report that downgraded Northfield Laboratories and lowered its price target on the basis of a potential safety risk associated with PolyHeme.  Then the *Wall Street Journal* published a story on February 22, 2006 that revealed that an earlier trial, started in 1998 ("ANH Trial") had not been published or disclosed by the Defendants and questioned the safety and efficacy of PolyHeme.  Northfield Laboratories issued a press release in response, disagreeing with the article and stating that the study was wound down over a period of months in 2000 although Northfield Laboratories had previously told investors that the study was ongoing in 2001 and producing important results.  This led to additional news of ethical and safety concerns by government authorities on February 24, March 10 and 14, 2006.

*Market Efficiency*

6.  In assessing the type of market efficiency required for the fraud-on-the-market presumption, I assume that the relevant inquiry is informational efficiency.  Informational efficiency means that the current market price of the security reflects all public information and rapidly reacts to significant changes in the mix of public information.[1] Consistent with the framework outlined in these two cases, and in addressing the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), I found strong evidence for the level of market efficiency required for class certification.  I found no evidence of

---

[1] A good summary of the practical concept of market efficiency consistent with my understanding is set forth in Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, Second Edition, 2002, pp. 112-116.  *See, also*, *In re Xcelera.com Securities Litigation* (District of Massachusetts, opinion September 2004; US First Circuit Court of Appeals, opinion December 13, 2005).

an undeveloped or inefficient market with respect to the trading of the common shares of Northfield Laboratorie s.

7.    The public shares of Northfield Laboratories were traded in an informationally efficient market. Northfield Laboratories had a substantial number of shares outstanding: 14,265,875 on February 28, 2001, according to Company's Form 10-Q for the quarter ended February 28, 2001 that was filed on April 13, 2001, and 26,772,938 as of February 28, 2006, according to the Company's Form 10-Q for the quarter ended February 28, 2006 that was filed on April 10, 2006. Northfield Laboratories also maintained a substantial float in both shares (greater than 10 million shares held by non-affiliates throughout the Class Period)[2] and market value (market value of shares held by non-affiliates of approximately $315 million as of November 30, 2005, according to the Company's Form 10-Q for the quarter ended November 30, 2005 and filed on January 9, 2006, and the estimated market value of the public float exceeded $100 million throughout the Class Period).

8.    As shown in Exhibit D, the average trading volume of Northfield Laboratories' shares during the Class Period exceeded 183,000 shares per trade day (gross turnover of the public float in excess of 1.8% per day and 8.4% per week during the Class Period). Northfield Laboratories' shares were actively held and traded by institutional investors during the Class Period. Additionally, there were over 30 reporting institutions (many representing the holdings of multiple funds, trusts and clients) holding in excess of 1.4 million shares as of March 31, 2001. The number of institutions holding Northfield shares and amount of shares held by identified institutions increased generally throughout the Class Period, as shown in Exhibit C.

---

[2] Calculated using Northfield Laboratories' SEC filings.

9.    Northfield Laboratories was eligible to file S-3 registration statements during the Class Period.

10.    Furthermore, as shown in the event study analysis and discussed in this declaration, analyst coverage was extensive and active, with numerous analysts from many of the larger brokerage firms issuing opinions on Northfield Laboratories following major disclosure events (earnings announcements and guidance) during the Class Period. News coverage of Northfield Laboratories was similarly extensive.  The event study documents the immediate movement of Northfield's share price caused by unexpected corporate events or financial releases that altered investors' expectations.

11.    As a result of the large public float, substantial rate of turnover of shares, substantial institutional investor interest and substantial analyst and news coverage, consistent with an informationally efficient market as shown in Exhibit B, Northfield Laboratories' shares moved significantly in connection with market and industry forces (after controlling for company-specific news events).  Consistent with an informationally efficient market, the event study analysis (discussed in more detail later in this report) found that Northfield Laboratories' share price responded rapidly to new information and found no ability to profitably trade on prior stock price movements.

12.    In Exhibit B, I summarize the event study analysis performed in this case.  This extensive event study analysis examines the movements in Northfield Laboratories' share price as a function of identified company-specific news and disclosure events, movements in the share prices of seven guideline companies in the same and similar industry sectors as the Company, and movements in a broader market index (the Russell 2000 Index, or RTY).    Five guideline companies were combined into a single

SUBINDEX based on their significance in modeling the movement of Northfield Laboratories' share prices.  The remaining two guideline companies were combined to form a second industry index, SUBIND2.  These three indices were significant in their ability to explain Northfield Laboratories' stock movements.  A Composite Index was constructed to provide a combined prediction for Northfield Laboratories' share price based on the coefficients in Exhibit B applied to the RTY, SUBINDEX, and SUBIND2.  The Composite Index returns were compared with the returns on Northfield Laboratories' shares between March 19, 2001 and September 20, 2006, in order to isolate the idiosyncratic movements (abnormal returns) in Northfield Laboratories' share price and to isolate the effects of the events of interest (see Exhibit B).

13.    The event study analysis found that, after controlling for company-specific news events, a statistically significant portion of the variation in Northfield Laboratories' share price could be associated with industry forces and industry share price movements.  As the event study in Exhibit B indicates, the allegedly false and misleading statements identified were extremely material to the Northfield Laboratories' investors.  Perception of positive drug trial results and related news of potential market approval of PolyHeme led to significant relative increases in Northfield Laboratories' share price before and during the Class Period on August 16, 2001; March 6, 2003; June 12, 2003; February 23, 2004; April 11, 2005; and November 15, 2005.  By contrast, fears of negative trial results and safety concerns led to significant relative declines in Northfield Laboratories' share price during and immediately after the Class Period on November 20, 2001, January 6, 2006, February 22 to 24, 2006, and March 10 and 14, 2006.

14.   I also considered, based on the event study analysis, the stated beliefs and understandings of analysts and investors regarding Northfield Laboratories, news articles discussing the safety of the Company's products, the fact that the Company's product line consisted of one product, and articles concerning the FDA's actions related to Northfield Laboratories.  The information before January 6, 2006 in Exhibit B was inconsistent with the information released and the statements made by the Defendants after January 6, 2006 with respect to efficacy of Northfield Laboratories' product PolyHeme, the safety of the Company's product, and the future prospects for the Company's product.  Specifically, analysts and investors were misled into believing that: (1) the Company's ongoing elective surgery trials were successful; (2) there were no statistically or clinically significant occurrences of serious adverse events in the elective surgery trial that were possibly related to PolyHeme; (3) the reasons why Northfield Laboratories' Phase III trial of PolyHeme for elective surgery was terminated were benign; (4) the elective surgery trial was continuing to produce important results even though it had been terminated for nearly a year; and (5) there were no increased risks for obtaining marketing approval for PolyHeme's use in elective surgery as a result of serious adverse events in the elective surgery trial.  Had investors known of the drug trial information set forth in various disclosures between January 6 and March 14, 2006 (set forth in Exhibit B) prior January 6, 2006, then Northfield Laboratories' share price would have traded at a substantially lower price throughout the Class Period.  In this context, the substantial decline in Northfield Laboratories' share price in both absolute and relative terms between January 5 and March 14, 2006 was a direct and foreseeable consequence of the alleged fraud in

this case and the event study analyses can be used to draw inferences both as to the inflation per share in the stock price throughout the Class Period and as to loss causation.

## IV. Further Discussion and Analysis

### Event Study Summary

15.    Materiality is often assessed in the context of an event study.  An event study is based on a market model.  A market model is a model of how the price of a security (in this case, the price of Northfield Laboratories' publicly traded common shares) moves in relation to a market index and/or an index of peer group companies and responds to news and information.

16.    The event study that I conducted in this case is often referred to as the Intervention Analysis or Event Parameter Method.  This method is composed of three stages.

17.    The first stage of my event study was the identification of material events.  The method of identifying company-specific news events in advance and on economic grounds and controlling for such events has been repeatedly published in the academic literature and recognized as a legitimate step and improvement in analyzing the movements of stock prices (estimating the market models used in event studies) over time.[3]  The intent of this step of the event study analysis was to control for all days when

---

[3] *See*, *e.g.*, Roll, "R^2," *Journal of Finance*, Vol. 43:3, Jul. 1988, pp. 541-566 (identified and controlled for all company-specific news events identified in *Dow Jones* news and *Wall Street Journal* databases for 96 large public companies);  Thompson, Olsen and Dietrich, "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the *Wall Street Journal* Index," *Journal of Accounting Research*, Vol. 25:2, Autumn 1987, pp. 245-274;  Thompson, Olsen, and Dietrich, "The Influence of Estimation Period News Events on Standard Market Model Prediction Errors," *The Accounting Review*, Vol. 63:3, Jul. 1988, pp. 448-471;  Ryan and Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-specific News Releases?" *Journal of Business Finance and Accounting*, Vol. 31:1, Jan./Mar. 2004, pp. 49-82;  Franses, *Time Series Models for Business and Economic Forecasting,* 1998, Ch. 6;  and Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of*

potentially material information came into the market.[4] The available public information was reviewed to determine information that investors would find to be material to Northfield Laboratories on a qualitative basis.[5]   This information included analyst reports, press releases, securities filings,[6] and news articles (newspapers and daily publications, as well as more general publications).   This component of the event study was compiled through a "blind" data selection process, meaning that the information likely to be new and material was selected for inclusion in the study without access to or reference to the actual stock price reaction on the corresponding dates.   Our search for news was more selective in this case.   As a natural consequence of this, as with any, truly "blind" data selection process, there are certain dates on which Northfield Laboratories' stock price moved in a significant manner, but which do not appear to be correlated to

---

*Corporate Finance*, Vol. 13, 2007, p. 130 (describes identifying and controlling for identified news events a "natural solution").

[4] As long as there are sufficient degrees of freedom, the addition of more events (over-identification of events) will ensure a set of "clean" observations in the control sample of "non-event days" and avoid contaminating the market model estimates. Thus, adding "too many" events ensures the relative absence of bias and ensures consistency of the estimates but at some slight loss of efficiency. I have performed numerous statistical analyses demonstrating the importance of this issue in improving the overall efficiency and reliability of event study analyses. *See, for example*, Intriligator, *Econometric Models, Techniques, and Applications*, 1978, pp. 188-189, and Pindyck and Rubinfeld, *Econometric Models and Economic Forecasts*, 1991, pp. 162-166.

[5] The list of material items relied upon is based on the NASDAQ guidelines as recognized by the SEC in *Federal Register,* Vol. 67, No. 157, Aug. 7, 2002, pp. 51306-51310. We then added third party news and reports, and analyst reports to that list consistent with the academic studies. The dates identified as having potentially material news events and, therefore, associated with indicator variables are listed in Exhibit B. *See, also*, Ryan and Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-specific News Releases?" *Journal of Business Finance & Accounting*, Vol. 31(1) & (2), Jan./Mar. 2004, pp. 49-82, particularly the Appendix: "Description of the News Categories Driving Price and Trading Volume Activity." The Ryan and Taffler paper incorporates the prior work of Roll, "R^2," *Journal of Finance*, Vol. 43:3, Jul. 1988, pp. 541-566 (identified and controlled for all company-specific news events identified in *Dow Jones* news and *Wall Street Journal* databases for 96 large public companies) and Thompson, Olsen and Dietrich, "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the *Wall Street Journal* Index," *Journal of Accounting Research*, Vol. 25:2, Autumn 1987, pp. 245-274. Not all SEC filings were listed as potential events. Only those SEC filings otherwise discussed by analysts and in news reports were specifically included in the list of identified events. The dates identified as having potentially material news events and, therefore, associated with indicator variables are listed in the event study summary in Exhibit C-1.

[6] Most securities filings, including Form 10-Ks and 10-Qs and 8-Ks, are routine and/or duplicate previously disclosed news. Thus, only when a news article or analyst mentions something surprising or new in such filings are they customarily identified as possible events for the purposes of this study.

identified news events for that day.  Similarly, many identified potentially material news events will not lead to significant relative stock price movements (either because the news on those dates was mixed, the news was already anticipated, or the news did not otherwise significantly alter the consensus of investors) but may lead to increased trading volume.

18.   The second stage of the event study involved the identification and analysis of possible market indices and guideline or peer group companies relative to the returns of Northfield Laboratories' shares.  The purpose of this stage of the study is to control for the movements in Northfield Laboratories' share price that can be explained by the movements in the market and industry share prices of other companies and to isolate the effect of each event on the share price of Northfield Laboratories.

19.   The third stage of the analysis involved analyzing the candidate events (identified in stage one) in an integrated event study regression that explicitly corrected for changes in volatility during various time periods over the study period in this case.  I used the integrated regression, or event parameter, approach.[7]  I selected this approach

---

[7] The primary basis for this framework was provided for in Box and Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, Mar. 1975, pp. 70-79.  They state (p. 78), "In practice, it is perhaps more often the case that a response at a given point of time depends on events, both known and unknown, which have occurred not necessarily coincidentally but over the recent past.  Statistical methods have, in a word, 'lacked memory.'  The dynamic characteristics of both the transfer function and the noise parts of the model have tended to be ignored.  The application of time series methods can amend this situation."  It can be shown mathematically and by testing, that in creating a precise, reliable market model required for an event study, one should account for the effects of all potentially material company-specific news events during the study period, even news unrelated to the subject of interest and even if the events do not cause a significant relative stock price movement.  *See, for example*, Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 129-145.  *See, also*, Thompson, Olsen, and Dietrich, "The Influence of Estimation Period News Events on Standard Market Model Prediction Errors," *The Accounting Review*, Vol. 63:3, Jul. 1988, pp. 448-471, and Franses, *Time Series Models for Business and Economic Forecasting,* 1998, Ch. 6 (p. 144, "With *a priori* knowledge of specific events and approximate dates which may yield aberrant observations (…), it is not difficult to examine their relevance for a model that will be used for forecasting.  We can simply extend our model with additional regressors, such as the dummy variables.").

was instead of the older "two-pass" cumulative abnormal returns ("CAR") approach to event studies, which can often be a biased and inconsistent testing the significance and measuring the effects of specific news events.[8] The integrated regression approach yields

---

Many academic articles discuss the use of dummy/indicator variables to capture the effects of events including: Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287; Binder, "Measuring the Effects of Regulation with Stock Price Data," *The RAND Journal of Economics*, Summer 1985, pp. 167-183; Karafiath, "Using Dummy Variables in the Event Methodology," *The Financial Review*, August 1988, pp. 351-358; Malatesta, "Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares," *Journal of Financial and Quantitative Analysis*, March 1986, pp. 27-38; Marais and Schipper, "Chapter 17A: Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, 2005 Cumulative Supplement, pp. 17A:15-16, 18, 22-23 (discusses the "event parameter" method, the use of the method to accommodate multiple events and in managing more complex modeling issues); and Dufour, "Dummy Variables and Predictive Tests for Structural Change," *Economics Letters*, 6, 1980, pp. 241-247. (Marais has served as a consultant and co-expert in two securities cases in the past year in both testing and validating my methodology.) Examples in textbooks discussing using dummy/indicator variables to capture events in time include: Box, Jenkins, and Reinsel, *Time Series Analysis: Forecasting and Control*, (4th ed. Jul. 2008); Pena, Tiao, and Tsay, *A Course in Time Series Analysis*, 2000; Montgomery, Jennings and Kulahci, *Introduction to Time Series Analysis and Forecasting*, 2008; Yaffe, *An Introduction to Time Series Analysis and Forecasting: with Applications of SAS and SPSS*, 2000; Brockwell and Davis, *Introduction to Time Series and Forecasting*, 2003; McDowall, McCleary, Meidinger, Hay, *Interrupted Time Series Analysis*, 1980; Pindyck & Rubinfeld, *Econometric Models & Economic Forecasts*, 1991, pp. 104-108; Intriligator, *Econometric Models, Techniques, and Applications*, 1978, pp. 58-61, and Campbell, Lo and MacKinlay, *The Econometrics of Financial Markets*, 1997, p. 167.

[8] The traditional CAR analysis fails to control for company-specific news and, thus, provides a misspecified test in that it consistently fails to control for the factor it seeks to test and, thus, improperly formulates the hypothesis test, especially in a single company event study analysis. *See, for example,* Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 129-145; Nimalendran, "Estimating the Effects of Information Surprises and Trading on Stock Returns Using a Mixed Jump -Diffusion Model," *Review of Financial Studies*, Fall 1994, pp. 451-469; and Higgins and Peterson, "Power of One and Two Sample T-Statistics Given Event-Induced Variance Increases and Non-normal Stock Returns: A Comparative Study," *Quarterly Journal of Business and Economics*, Vol. 37, Winter 1998, pp. 27-49.

There is substantial general and specific literature in the statistics, economics and finance fields discussing the problems that can arise in the traditional two-pass CAR methodology. *See, for example,* Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, Jun. 1980, pp. 267-287. The authors in this paper state (p. 267), "The objective of this paper is to suggest that the traditional CAR methodology is often inappropriate and that *intervention analysis* [italics in original] is a possible alternative. Where the systematic risk (i.e. Beta) of a firm changes as the result (or in anticipation) of an announcement, the cumulative average residual methodology will result in biased residuals....Intervention analysis, on the other hand, can separate such risk changes from the information content of the announcement. In addition, intervention analysis also allows the observed auto-correlation in the market model residuals to be removed, thus providing improved beta estimates required for reliable statistical testing." Franses in *Time Series Models for Business and Economic Forecasting,* 1998, similarly recommends "intervention" analysis (p. 130) consistent with Box and Tiao (1975) and points out the statistical problems that arise when one does not capture the effects of known events (with dummy variables) or "neglects them" (pp. 128-129).

---

consistent and unbiased estimates of both the market model and the effects of events over the period of interest. After identifying all candidate events, the measured effect of each candidate event is analyzed in the context of daily returns.

20. The event study summarized in Exhibit B is based on the returns generated by Northfield Laboratories' shares on a daily basis from September 20, 2000, through September 20, 2006 (the "Study Period").[9] The analysis of the industry and market forces ended with the selection of one broad market index and two constructed, more narrowly defined industry indices, SUBINDEX and SUBIND2. The broad market index chosen was the Russell 2000 Index (RTY). The first constructed industry index ("SUBINDEX") was composed of five companies identified as peers or engaged in related activities: Biopure Corporation (BPUR); Alexion Pharmaceuticals, Inc. (ALXN); Incyte Corporation (INCY); Biogen Idec Inc. (BIIB); and Genetech Inc. (DNA). The second constructed industry index was composed of two companies engaged in related activities: Amgen Inc. (AMGN) and Penwest Pharmaceuticals (PPCO). These companies

The bias and inconsistency problems associated with the two-pass or CAR event analyses are particularly significant in single company event studies and can be proven through mathematical derivation and simulation testing. First, the "clean period" required to obtain estimates of the standard errors and the coefficients of the market model in the CAR methodology is almost never really clean in a statistical sense. Clean in a statistical sense implies few or no significant company-specific events and a properly specified market model. Because company-specific events are common in stock price return data, the residuals during the candidate "clean period" are usually not normally distributed (fat tails or kurtosis is common) and the estimated market model is biased and inconsistent due to an *omitted variables problem.* These problems lead to overstated standard errors and understated t-statistics during the event analysis stage of the two-pass methodology. Additionally, fundamental changes in the businesses of a company and its peer companies over time can render the market model coefficients in the "clean period" inapplicable to or biased relevant to the estimation period. (*See, for example*, Marais and Schipper, "Chapter 17A: Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, 2005 Cumulative Supplement, pp. 17A:16-21, wherein they discuss the problem of low "power" in single company event studies and the problem of "interventions" in the estimation period yielding "unstable results").

[9] The integrated approach, especially with a large number of events controlled for in the analysis, is performed over the period of interest and often includes (as controls) a period prior to the Class Period and after the Class Period. In this particular case, the study period begins approximately five months before the beginning of the Class Period and ends six months after the Class Period in order to focus the analysis on the specific time period of interest and exclude unrelated issues outside of the Study Period.

had share price movements more highly correlated with the movements in Northfield Laboratories' share price than other companies and industry indices considered. This combination provided the best fit in explaining the market and industry components of Northfield Laboratories' returns over the study period. Collectively, the three indices could explain 4.87% of the daily variance in Northfield Laboratories' stock price returns on non-event trade days during the Study Period and 4.28% of the daily variance in Northfield Laboratories' stock price returns on all trade days during the Study Period. This meant that much of the volatility in Northfield Laboratories' stock price was due to investor uncertainty, trading noise, and company-specific information, consistent with a Company with a single unique product under development and with substantial uncertainty as to its future prospects based on this single unique product. Nevertheless, the two broad industry indices and the SUBINDEX combined were "extremely statistically significant," and, consistent with an efficient market, Northfield Laboratories' share price moved contemporaneously and significantly with changes in the industry indices. The two broad industry indices and the SUBINDEX were combined using the coefficients from Exhibit B (in the regression with the events explicitly controlled for in the analysis) to produce a Composite Index that provided a predicted movement in Northfield Laboratories' share price on each observation day.

21.    I considered and rejected a number of other market and industry indices and guideline companies. The market and industry indices considered included: the NASDAQ Composite Index (CCMP), the AMEX Pharmaceutical Companies Index (DRG), the AMEX Biotech Companies Index (BTK), and the Bloomberg Boston Globe Massachusetts Life Sciences Index (BBBI). Other companies in the industry sector

considered but not included in the industry indices included (tickers): Vasogen, Inc. (VSGN); Edwards Lifesciences Corp. (EW); Perrigo Company (PRGO); Mylan, Inc. (MYL); Watson Pharmaceuticals, Inc. (WPI); King Pharmaceuticals, Inc. (KG); Millipore Corporation (MIL); and ResMed, Inc. (RMD). The aforementioned rejected indices and companies failed to provide a significant incremental explanation of the returns from Northfield Laboratories' shares over the Study Period because they were redundant with the selected indices, too specialized or had too many company-specific events to be appropriate for an index applicable to Northfield Laboratories.

22.    The regressions summarized in Exhibit B were based on the daily returns in natural log format. The t-statistics reported for the industry and market indices are from the regression outputs. Jointly and individually, the three industry indices are significant at greater than the 99.9% confidence level in explaining the returns of Northfield Laboratories. This is reflective of a growth stock with significant valuation uncertainty (due to uncertain future rates of growth of revenues and earnings) and volatility in the Study Period and strongly indicative of market efficiency.

23.    The event effects are summarized in percentage format in Exhibit B for ease of interpretation.[10]    The event coefficients in Exhibit B are also adjusted for the slight positive term in the regression. All identified events and the "relevant" events (those events that relate to facts alleged by the Plaintiffs as shown with a non-zero weight) were each jointly significant at greater than the 99.9% confidence level. Even though the identified events (100) represented only 7.22% of the total observation days, they were

---

[10] The constant is a trend term. Where the trend is not constant over time, one cannot assume that the trend will continue in any definite direction on any given date. Furthermore, a trend (or drift) term would suggest that an investor in Northfield Laboratories would know and expect Northfield Laboratories to significantly underperform or outperform its peers and the Composite Index over time and is, therefore, inconsistent with an efficient market.

able to explain approximately 24% of the entire variance in the stock price of Northfield Laboratories, more than three times the average daily variance on non-event days. Thus, while the number of identified news events was limited, they explained a substantial portion of the movement in Northfield Laboratories' share price consistent with an informationally efficient market.

24.     The t-statistics reported for the various event dates are based on the standard errors reported from the regression results (with zero drift assumed). For individual events, statistical significance will be set based on a t-statistic of 1.65 in absolute terms (a 90% confidence level using a two-tailed test, 95% confidence using a one-tailed test).[11] Individual events that were not statistically significant should, nevertheless, remain in the regression results as they affect the overall analysis because they are part of the entire event selection process.[12]   Otherwise, the exclusion of such intervention variables may

---

[11] Statistical significance has more than one meaning and is not a talismanic term. *See* Lehmann and Romano, *Testing Statistical Hypotheses*, Third Edition, 2005, pp. 57-58 ("The choice of a level of significance is somewhat arbitrary,…This is unfortunate, since the choice of significance levels should also take into consideration the power that the test will achieve against alternatives of interest."); Alan Stuart, et al., *Kendall's Advanced Theory of Statistics, Volume 2A: Classical Inference & The Linear Model,* p. 193 (6th ed. 1999) ("This numerical convenience [rule of thumb criteria for statistical significance] has persisted long beyond its hour of need."); Lehman and Romano, *Testing Statistical Hypotheses*, Third Edition, 2005, pp. 57-58 (choice of threshold for statistical significance is "usually somewhat "arbitrary" and "should take into account the power that the test will achieve", "p-value" should be reported as alternative, and choice of significance should be relaxed for tests with low power or when strong prior beliefs support conclusion"); Lapin, *Statistics for Modern Business Decisions,* p. 186 (1978) ("A decision rule must be chosen that will provide a lower probability of the more serious error . . . . He [the decision-maker] should therefore be wary of setting Alpha [the criteria for significance] and Beta at arbitrary or traditional levels."); Kennedy, A Guide to Econometrics, Fifth Edition, 2003, pp. 70, 409; Berry and Lindgren, *Statistics: Theory and Methods,* pp. 423-427 (2d ed. 1996) (arguing against a fixed criteria for statistical significance and for considerations of practical significance); and Cassidy, *Using Econometrics,* pp. 129-138 (1981) (describes the setting of confidence levels at the 10% rejection rate and "One-sided tests should be used whenever the researcher's prior permit.")  An event with a t-statistic of 2.33 or greater in absolute terms is often considered "highly significant" at the 99% level, and an event with a t-statistic greater than 3.0 is often considered "extremely significant" or an "outlier" that is so significant its existence is rare absent some actual event and inconsistent with random noise derived from the normal distribution given the number of degrees of freedom.

[12] Cassidy, *Using Econometrics,* pp. 252-253 (1981) discusses the problem with selectively deleting intervention variables that are insignificant from the analysis and discusses the use of collective (joint) tests for the inclusion of groups of intervention variables as a whole, rather than individual interventions. *See, also*, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, pp. 62, 254, 409, wherein he recommends

---

*Declaration of Scott D. Hakala, Ph.D., CFA*                                                                      17

alter the statistical inferences.  Events that have a t-statistic of greater than one in absolute terms are viewed as "meaningful" in that these events improve the overall "information" in the study and, all else being equal, were more probable than not, given the prior selection process, to have had some impact on the price of Northfield Laboratories' shares.

### Materiality and Loss Causation

25.    For purposes of this opinion, information is deemed to be material if "there [was] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

26.    In general, investors and analysts base their evaluation of a company's value and the appropriateness of purchasing shares in a company on the company's ability to reliably produce earnings (or cash flow) relative to other companies and general securities market information.  This evaluation is primarily determined by analysts and institutional investors based on representations of and interviews with management (including quarterly conference calls following earnings announcements), company releases, and disclosures in various filings with the SEC.  Individual investors then rely upon such information and the recommendations of analysts and institutional investors in forming their opinions and in making investment decisions.

27.    There is one perpetual theme directly related to the materiality of the alleged false and misleading statements in this case.  Northfield Laboratories' shares were valued based on its perceived ability to generate economic earnings (earnings in excess of a

---

using an F-test to test a group or set of dummy/intervention (time-series observations that are contaminated) variables for inclusion or exclusion in the regression when the variables are chosen *a priori* or as a set.

required return on investment and ultimately converted into net cash flow) from its sole product PolyHeme. The event study analysis (including the reviews of the news and analyst reports associated with that analysis) established that Northfield Laboratories' success was critically dependant on the results of drug trials proving the safety and efficacy of PolyHeme. Because Northfield had only one product under development, any statement or outcome related to this product was extremely material to the stock price and shareholders. Misstatements concerning trials, specifically ongoing trials and results of trials, clouded the truth related to PolyHeme throughout the Class Period and led to the inflation in the valuation of Northfield's shares by investors.

28. Economic loss causation is based on the portion of the loss in share price (assuming the shareholder purchased and sold the shares in the same amounts and at the same times, but at the "true" values instead of at the inflated prices) that would not have occurred had the truth, as alleged by the Plaintiffs, been disclosed in a timely manner. Fraud infuses material information that is false into the mix of information underlying the stock price (or omits to state material information); the market values that false information or omission; and the stock price is artificially inflated. The value of the false information (or the value incorrectly attributed to the price because true information is withheld) is sometimes referred to in securities litigation as the "inflationary component" of the price, or the "inflation." The stock then trades in the marketplace with both a true value and an inflation component, the latter of which is based on the fraud. The stock's "absolute" price—the dollar amount at which it is actually trading in the real world—is composed, in other words, of two parts: true value and inflation.

29.   "Inflationary loss" means the loss due to the fraud and is measured by inflation on the day of purchase minus inflation on the day of sale (or measuring date, if not sold before 90 days after the end of the Class Period).[13]   Because the class includes all shares purchased by qualified individuals, inflationary loss is measured on a per share basis because, had the truth been disclosed sooner and the share price been lower, the class would have paid a lower price per share on each day.[14]

30.   In this case, loss causation is clear for the reasons previously listed and based on the technical nature of the event study results.   When the "relevant truth" was revealed regarding PolyHeme, the stock price depreciated quickly and dramatically.   Once

_____

[13] This damage measure is well recognized and has been consistently applied by experts in securities litigation. Additionally, there are strong economic arguments as to why the inflationary loss is always a "reasonably foreseeable" loss and always caused by the fraud, notwithstanding the operation of the market or other events upon the inflation in the stock price.  This damages measure is sometimes referred to as the "out of pocket" rule, but that term, too, can be confusing and it is used in different ways.  The "out of pocket" rule is set forth in variety of places, including:  *Restatement of the Law, Torts, Second*, American Law Institute, 1977, Section 549; Page Keeton, et al., *Prosser and Keeton on The Law of Torts*, Fifth Edition, 1984, Section 110, pp. 767-777.  Recent cases where I have testified and this method of calculating damages has been allowed include:  *In re Broadcom Sec. Lit.*  (Approval of plan of allocation over objections September 2005); *In re Raytheon Sec. Lit.* (June 2004 bench ruling and later approval of plan of allocation after settlement); and *In re Clarent Sec. Lit.* (January 2005 ruling on motions in limine and trial testimony February 2005). For references by economic experts, *see, for example*, Michael Barclay & Frank C. Torchio, "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," 64 *L. & Contemp. Probs.,* pp. 105-106 (2001) (stating: "In general, damages per share are calculated as the artificial inflation when the shares were purchased minus the artificial inflation when the shares were sold."); John Finnerty & George Pushner, An Improved Two-Trader Model for Estimating Damages in Securities Fraud Class Actions, 8 *Stan. J. L. Bus. & Fin.,* p. 213 (2003)(discussing a damage model that measures damages based on inflation at time of purchase minus inflation at time of sale and allows for "in-and-out" or selling damages); Bradford Cornell & R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *37 UCLA L. Rev.*, pp. 883, 885-886 (1990) ("...the measure of damages for an investor is simply..., for plaintiffs who sold their securities before the [final] corrective disclosure, the difference between the price inflation at the time of purchase and the price inflation at the time of sale."). The same measurement is applied to holders of stock through the end of a class period – inflation at the time of purchase minus inflation at the date of measurement. The PSLRA also contains a cap on damages based on a 90-day look back period at the end of a class period. 15 U.S.C. §78u-4(e).

[14] Share purchases by certain institutions and funds are driven by the market value of the float relative to a target market of shares as a whole such that, if the truth was disclosed and the market value of the float declined, the total purchased amount in dollars would be reduced and the number of shares purchased would be the same.  Shareholders typically purchase set numbers of shares in orders divisible by 100.  If, in contrast, one assumed fixed dollar amounts of purchases, then had the share price been reduced by the disclosure the total dollar amounts of the purchases, there would not have been enough shares for the entire class to purchase shares of Northfield Laboratories in the hypothetical alternative world.

investors and the broader market learned that the years of Company announcements, press releases, news items, and statements were misleading, the market punished the stock and the inflation came out of Northfield Laboratories' share price.

31.    Based on the allegations in the Complaint, the analyst downgrade on January 6, 2006 is a foreseeable and direct result of the prior alleged fraud.  This downgrade led to a statistically significant estimated 7.0% relative decline in Northfield Laboratories' share price on January 6, 2006.  Similarly, the reports of adverse studies and evidence of safety concerns with respect to PolyHeme  in the *Wall Street Journal* on February 22, 2006, notwithstanding efforts by the Defendants to deny or explain away those reports,  further revealed the extent of the alleged misrepresentations and material omissions (in light of the statements made by the Defendants throughout the Class Period as to evidence for the safety and efficacy of PolyHeme) of the Defendants and led to a further relative decline in Northfield's share price of 5.1%.  The *Wall Street Journal* article was then followed by news of concerns from Senator Grassley on February 24, 2006 that led to another 7.15% relative decline in Northfield Laboratories' share price.   The total relative decline in Northfield Laboratories' share price from February 22 to 24, 2006 was 14.0% and was statistically significant (t-statistic of 2.38 over three days and t-statistic of 2.45 for the relative declines on February 22 and 24, 2006).  Additional reports and ethical concerns regarding previously undisclosed or understated risks associated with PolyHeme were revealed in connection with Senator Grassley's investigation on March 10 and 14, 2006. These reports and concerns led to statistically significant relative declines in Northfield Laboratories' share price of 10.7% on March 10, 2006 and 6.0% on March 14, 2006. Overall, Northfield Laboratories' shares lost 33.2% of their relative value from the close

of trading on January 5 to the close of trading on March 14, 2006.  The five identified partially corrective disclosure events on January 6, February 22 and 24, and March 10 and 14, 2006 combined accounted for a total relative decline in Northfield Laboratories' share price of 31.3%, explaining more than 90% of the total relative decline in that time period.  A joint test of significance found that the corrective events were "extremely" statistically significant as a group (joint t-statistic of 4.59 which implied greater than a 99.999% level of confidence).

32.    I expect to review additional materials and may consider additional information brought to my attention after issuing this report.  I expect to consider and respond to such information and will adjust the conclusions in this report, if such information suggests a need for change in my opinions or calculations is warranted.

I declare under penalty of perjury under the laws of the State of Texas and the United States that the foregoing is true and correct.  If called as a witness I could and would competently testify thereto.

Executed this  1st  day of April 2009 at Dallas, Texas.

_____
Scott D. Hakala, Ph.D., CFA