IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| | ) | No. 06CV1493 |
| IN RE NORTHFIELD LABORATORIES | ) | Honorable Judge George M. Marovich |
| INC. SECURITIES LITIGATION | ) | Magistrate Nan R. Nolan |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF DEFENDANTS**
**STEVEN A. GOULD AND RICHARD E. DEWOSKIN**
**IN OPPOSTION TO PLAINTIFFS' MOTION TO TRANSFER**

David C. Bohan
Jason P. Shaffer
KATTEN MUCHIN ROSENMAN, LLP
525 W. Monroe
Chicago, IL 60661
(312) 902-5200


*Attorneys for Richard E. DeWoskin*

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
330 N. Wabash
Chicago, IL   60611
(312) 222-9350

*Attorneys for Stephen A. Gould, MD*

**Contents**

Introduction..........................................................................................................................1

Argument ..............................................................................................................................3

  I.    TRANSFER IS IMPROPER BECAUSE THIS SECURITIES CASE HAS NOTHING TO
      DO WITH THE DELAWARE BANKRUPTCY ACTION. ...................................................3

  II.    TRANSFER IS IMPROPER BECAUSE NONE OF THE FACTORS SUPPORTING
      TRANSFER IS MET..........................................................................................................10

       A.    Plaintiffs Have Not Demonstrated That The Private Factors Support Transfer .....12

       B.    Plaintiffs Have Not Demonstrated That The Public Factors Support Transfer ......13

Conclusion ..........................................................................................................................15

## Introduction

Plaintiffs do not cite a single case in which a district court has transferred a pre-existing federal securities action to another district where a bankruptcy action is pending as to the bankrupt issuer. To our knowledge, none exists. The unprecedented nature of plaintiffs' request is all the more stark in the circumstances here, where (i) this securities case has been pending in this Court for over 3½ years, with multiple substantive rulings; (ii) the bankruptcy Plan of Liquidation for Northfield, which requires that the company be dissolved, already has been confirmed, and Northfield no longer exists as an entity; (iii) it is plaintiffs, rather than defendants, who seek to transfer this case from its current venue that plaintiffs themselves selected; and (iv) the only defendants remaining in this action are the two individual defendants, who are not in bankruptcy and who desire to have the claims against them expeditiously resolved in this Court. As shown below, this securities case has nothing to do with the Delaware bankruptcy action and should be resolved here. *See* Part I below.

Moreover, plaintiffs have not come close to meeting their burden of satisfying the Section 1404(a) transfer factors. 28 U.S.C. § 1404(a). Plaintiffs themselves chose to file this securities action in this forum. The Northern District of Illinois is where Northfield was headquartered from its founding in 1985 until its dissolution in September 2009, where virtually all events material to this case occurred, and where essentially all evidence relevant to this case is located. Not a single one of the parties or witnesses in this case resides in Delaware. Indeed, this action has no connection with Delaware — other than the fact that a former defendant (Northfield) was chartered there before it dissolved. In short, none of the private or public factors governing Section 1404(a) transfers supports a transfer to Delaware. *See* Part II below.

Besides being unprecedented, plaintiffs' transfer motion is exceedingly odd. Why would plaintiffs want to transfer a case from a forum they selected 3½ years ago? The answer is simple. The next significant event in this case is a ruling on plaintiffs' motion for class certification. Plaintiffs want to transfer this case to a distant venue because they realize that they have little chance of obtaining class certification under the prior rulings of this Court and the law

of this Circuit.  Having dismissed plaintiffs' original complaint, this Court permitted the case to go forward on plaintiffs' amended complaint, which plaintiffs had strategically altered to omit certain key allegations from their original complaint.  Those prior allegations showed that the information plaintiffs contend was fraudulently concealed, in fact was disclosed on various websites (including Northfield's) long before the stock drop upon which plaintiffs rely.  This Court ruled that "[w]hile this omission may cause plaintiffs problems" in subsequent proceedings, "it will not be used against them" on the motion to dismiss.  (9/23/08 Op. at 11.)  In connection with supervising class discovery, Magistrate Judge Nolan has ruled that plaintiffs must prove their fraud-on-the-market allegations by relying on public information, such as website disclosures, not private information.  (2/5/09 Order.)  Plaintiffs realize that the rulings in this Court do not bode well for them, and so they seek a fresh start in a new court.

On class certification, in this Court, plaintiffs no longer can avoid the defects inherent in their theory.  As class discovery has confirmed, the central information that plaintiffs allege was fraudulently concealed in this securities case — namely, the existence of heart attacks in a decade-old elective-surgery study — in fact was disclosed to thousands of people, via methods ranging from websites and internet "chatrooms" to local seminars and county fairs.  That information was publicly disclosed months and years before the stock drop upon which plaintiffs rely, without moving the stock price.  As a result, under this Court's prior rulings and Seventh Circuit precedent, plaintiffs cannot satisfy the efficiency and materiality elements of the fraud-on-the-market theory, which are critical for class certification.  Nor can plaintiffs satisfy the requirement that misrepresentations be made uniformly and engender harm throughout the class.

Plaintiffs' desire to avoid this Court's prior rulings regarding class certification is not a proper reason to change forums.

## Argument

**I.    TRANSFER IS IMPROPER BECAUSE THIS SECURITIES CASE HAS NOTHING TO DO WITH THE DELAWARE BANKRUPTCY ACTION.**

The entire premise of plaintiffs' transfer motion — that this securities case relates to the Delaware bankruptcy action and needs to proceed with it — is faulty.  In reality, this securities case, which pre-dates Northfield's bankruptcy filing by over three years, has nothing to do with the bankruptcy action.  Rather, this case concerns plaintiffs' securities claims against the two individual defendants:  Dr. Steven A. Gould and Richard E. DeWoskin.

The following facts demonstrate why this securities case has no connection with the bankruptcy proceedings in Delaware:

**1.    Northfield no longer exists as an entity, given that the Plan of Liquidation in the bankruptcy action already has been confirmed.**

In their motion, plaintiffs act as if Northfield exists and is a party to this lawsuit. Plaintiffs assert on the first page of their brief:  "Defendant [Northfield] is a Delaware corporation."  (Pl. Mem. 1.)  Plaintiffs then spend the rest of their brief referring to "Defendant" as being "Northfield."

Plaintiffs are wrong.  Northfield is not a Delaware corporation.  Nor is Northfield a defendant.  Northfield does not exist.  The Delaware bankruptcy court's September 11, 2009 Order confirming Northfield's Amended Plan Of Liquidation (Pls. Mem. Tab 1 Ex. A) expressly dissolved Northfield.  Section 6.01 of the Plan Of Liquidation, which is entitled "Cessation of Corporate Existence," provides:  "As of the Effective Date, automatically and without further action . . . the Debtor shall cease to exist and be deemed dissolved pursuant to applicable state law."  *Id.* at Tab 1 Ex. A.  The Effective Date of the Plan was September 25, 2009.  *See* Ex. A hereto, Notice Of Effective Date Of Debtors' Amended Plan Of Liquidation at 1.  The Notice makes clear that as of September 25, "the Debtor ceased to exist and is deemed dissolved," and all "Common Stock" of Northfield is "deemed cancelled and extinguished."  *Id.* at 1-2.

The point is that because the Plan of Liquidation has been confirmed, the bankruptcy proceedings are complete for all practical purposes.  There is no "Northfield" any more.

Northfield is not a defendant in this lawsuit.  The only defendants in this lawsuit are the two individuals, Dr. Gould and Mr. DeWoskin.  Because Northfield is not a defendant in this case and the bankruptcy proceedings are essentially over, there is no legitimate basis to transfer this action to a district without any connection to the remaining defendants or to this case.

> **2.** **Plaintiffs cannot obtain any bankruptcy recovery because plaintiffs are at the same priority level as the common stockholders — at the bottom.**

Under the Bankruptcy Code, persons claiming that they were defrauded into purchasing securities are at the same bankruptcy priority level as holders of the type of securities that the claimants allegedly were defrauded into purchasing.  In other words, persons alleging that they were defrauded into purchasing common stock (like plaintiffs here) are at the same bankruptcy priority level as common stockholders.  *See* 11 U.S.C. § 510(b) ("a claim . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock").

Therefore, plaintiffs will receive nothing via the bankruptcy proceedings because there are not sufficient assets to pay the creditors, much less the common stockholders.  After all, if Northfield had sufficient assets to pay all of its creditors and had some assets left over to pay common stockholders, then Northfield would not have filed for bankruptcy.  The disclosure statement for the Plan of Liquidation makes clear that the common stockholders — and hence securities claimants such as plaintiffs — will receive nothing via the bankruptcy.  (Ex. B hereto at 11.)

Because there are no assets to pay plaintiffs from the bankruptcy estate, plaintiffs' sole avenue for any possible recovery is this securities lawsuit against the individual defendants. Plaintiffs' fortunes rise or fall with their claims against the individual defendants.  *See generally Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989) (a controversy is not "related to" a bankruptcy action unless its resolution "affects the amount of property available

for distribution or the allocation of property among creditors"), *quoting In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987).[1]

   3.    **The bankruptcy court already has ruled that Northfield's insurance policies, which are the only estate assets that plaintiffs possibly can reach, can be used to pay defense costs in this securities action.**

   Plaintiffs contend that Northfield's insurance coverage is a reason why this securities action is connected with the bankruptcy action. (Pl. Mem. 2.) As plaintiffs recognize, if they are to receive any money from Northfield's estate, it "must come, if at all, from the Defendant's liability insurance coverage which covers any liability found as a result of Northfield's conduct." *Id.* The thrust of plaintiffs' argument is that plaintiffs need to have their claims heard in the bankruptcy court in order to recover from Northfield's insurance policies. *Id.*

   That argument is incorrect. The bankruptcy court already has ruled that the individual defendants — who are the only remaining defendants in this securities action — can use the policy proceeds to pay defense costs in this case. Northfield's insurance policies, by their terms, cover the individual defendants, both of whom are former directors and officers of Northfield and are insureds under the policies. The bankruptcy court's Order permitting the individual defendants to use the policy proceeds refers to this securities case by name: "*In re Northfield Laboratories, Inc. Sec. Litig.*, No. 06-C-1493 (N.D. Ill.) (the 'Litigation')." (Ex. C hereto, August 28, 2009 Order at 2, approving and adopting language of Stipulation.) The Order provides that "notwithstanding the automatic stay of 11 U.S.C. § 362, to the extent applicable, Genesis [the primary carrier] and the other insurers whose policies are specifically excess of the Policy shall be and hereby are authorized to make payments under the Policy or such other

---

[1]  That also is why securities actions involving insolvent companies regularly proceed in a different district than where the bankruptcy is pending. *See, e.g., In re Enron Securities, Derivative & "ERISA" Litig.*, MDL-1446 (S.D. Tex.) (securities action in Texas, where Enron was headquartered; bankruptcy proceedings in New York); *In re Delphi Corporation Securities, Derivative & "ERISA" Litig.*, MDL No. 1725 (E.D. Mich.) (securities action in Michigan, where Delphi was headquartered; bankruptcy proceedings in New York); *In re Washington Mutual, Inc., Securities, Derivative & "ERISA" Litig.*, MDL No. 1919 (W.D. Wash.) (securities action in Washington, where Washington Mutual was headquartered; bankruptcy proceedings in Delaware).

policies to or for the benefit of the Insureds for Defense Costs incurred in connection with the Litigation" — that is, incurred in connection with this securities case. *Id.*

The bankruptcy court's Order approving the use of Northfield's insurance policies to pay defense costs in this securities action demonstrates that plaintiffs do not need the bankruptcy proceedings to reach the insurance proceeds. If any judgment ever were entered in this case, the judgment would be handled in the same manner as the defense costs: a motion would be filed with the bankruptcy court to approve the release of any remaining insurance proceeds for the benefit of the insureds — namely, the individual defendants.

**4. In the alternative, if plaintiffs' securities claims could affect the bankruptcy estate, then plaintiffs have violated the automatic stay by pursuing this motion without bankruptcy court approval.**

Plaintiffs' own conduct in pursuing this motion demonstrates that plaintiffs do not believe that there is a connection between this securities case and Northfield's bankruptcy estate. If there were such a connection, then plaintiffs could not pursue this motion without first asking the bankruptcy court to lift the automatic stay. Under the Bankruptcy Code, the automatic stay prohibits "the commencement <u>or continuation</u>" of any "action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." 11 U.S.C. 362(a) (emphasis added). The Plan of Liquidation expressly provides that the automatic stay remains in effect and prohibits the continuation of actions against the estate: "The automatic stay arising out of Bankruptcy Code § 362(a) shall continue in full force and effect . . . and the Estate and the Liquidation Trust shall be entitled to all of the protections afforded thereby." (Pl. Mem. Tab 1 Ex. A at § 9.02(b).)

Therefore, if plaintiffs truly believe that this securities case relates to "the Estate," then plaintiffs were obligated to file a motion in the bankruptcy court seeking relief from the automatic stay before filing the motion here. But plaintiffs did not do so. Plaintiffs cannot have it both ways. Plaintiffs cannot contend that this securities case is so connected with the bankruptcy estate that the securities case should be transferred to the bankruptcy court, and at the

same time contend that the securities case is so unconnected with the bankruptcy estate that the automatic stay does not apply.[2]

5.      **This securities case cannot be heard in the bankruptcy court no matter what.**

According to plaintiffs, the reason why they want to transfer this case to the District of Delaware is so that they can move the case into the bankruptcy court.  Plaintiffs state: "The moving parties intend to request that the district court for the District of Delaware transfer the action to the bankruptcy court as an adversary proceeding, where the automatic stay will be lifted and pretrial discovery can be conducted most expeditiously."  (Pl. Mem. 3.)

In reality, this case cannot be heard in the bankruptcy court because it is a federal securities action.  Under the statute governing bankruptcy courts, where a bankruptcy proceeding concerns federal statutes "regulating organizations or activities affecting interstate commerce," the district court is required to withdraw the reference and hear the case itself:  "The district court <u>shall</u>, on timely motion of a party, so withdraw a proceeding [from the bankruptcy court] if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d) (emphasis added).

Under the law, federal securities cases are subject to Section 157(d) and must be heard by district courts, not bankruptcy courts.  *See, e.g., New Shah, Inc. v. Shah*, No. Civ. A. 99-461, 2000 WL 1728251, at *2 n.5 (D. Del. June 20, 2000) (denying the plaintiffs' motion to transfer federal securities claims to bankruptcy court because, even if the transfer were granted, the district court would be required to withdraw the securities claims under the mandatory withdrawal provision of § 157(d): "[E]ven if the court were to transfer this case, at least some —

---

[2]    There is a reason why plaintiffs do not have the courage of their convictions to ask the bankruptcy court to lift the automatic stay in order to proceed with this transfer motion:  the bankruptcy court likely would deny it.  Given that there are no assets in the estate to pay common stockholders (who are at the same priority level as plaintiffs), any conceivable judgment obtained by plaintiffs with respect to the estate would be pointless.  The bankruptcy court is unlikely to lift the stay to allow plaintiffs to chase a meaningless judgment, while causing needless administrative expenses for the estate in the process.

if not all — of Plaintiffs' claims would need to be decided by the district court, rather than the bankruptcy court, pursuant to 28 U.S.C. § 157(d).  So much for efficiency."); *Mishkin v. Ageloff*, 220 B.R. 784, 798-99 (S.D.N.Y. 1998) (holding that withdrawal of reference to bankruptcy court was mandatory where case involved significant interpretation of federal securities law); *In re Contemporary Lithographers, Inc.*, 127 B.R. 122, 128 (M.D.N.C. 1991) (holding that withdrawal of reference was mandatory where federal securities violations were alleged); *In re American Solar King Corp.*, 92 B.R. 207, 210-11 (W.D. Tex. 1988) (same); *Price v. Craddock*, 85 B.R. 570, 573 (D. Colo. 1988) (same).

    In addition, besides Section 157(d)'s mandatory withdrawal requirement, Section 157(e) provides that a bankruptcy court cannot conduct a jury trial without the consent of the parties: "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties."  28 U.S.C. § 157(e).  Again, because the parties have a jury right in federal securities cases, this case cannot be heard by the Delaware bankruptcy court.  *See, e.g.*, *In re Beale*, 410 B.R. 613, 617 (N.D. Ill. 2009) ("Regardless of whether the proceeding is core or non-core, any jury trial must be conducted by an Article III court unless the parties consent to the Bankruptcy Court"); *In re Valley Media, Inc.*, 289 B.R. 27, 32 (Bkrtcy. D. Del. 2003) (Bankruptcy courts have no authority to conduct jury trials); *In re Integrated Health Services*, Inc., 291 B.R. 615, 622 (Bkrtcy. D. Del. 2003) (bankruptcy court could not conduct jury trial even with parties' consent because district court had not specifically designated it to do so).

    Here, without mentioning those statutory provisions, plaintiffs assert that under the Plan of Liquidation, this securities case not only should be transferred to the bankruptcy court, it must be transferred.  According to plaintiffs, "the Plan itself reserves exclusive jurisdiction over this case to the Delaware bankruptcy court."  (Pl. Mem. 3; *see also id.* at 2 ("Article XI of the Plan vests exclusive jurisdiction in the bankruptcy court to hear and determine disputes involving

Claims, Interests, Avoidance Actions, all claims or causes of action that may exist against Northfield and its Former Officers and any motions to compromise or settle such disputes.").)

That argument is baseless.  The Plan of Liquidation provides that the "Bankruptcy Court shall have exclusive jurisdiction of all matters <u>arising out of and related to the Bankruptcy Case</u> and this Plan."  (Pl. Mem. Tab 1 Ex. A at § 11.01; emphasis added.)  This securities case does not arise out of the bankruptcy case.  Indeed, this securities case was pending for three years before the bankruptcy petition even was filed.  Moreover, the Plan provides that the bankruptcy court's jurisdiction is "subject to any jury trial rights of said litigants . . . which rights are expressly reserved and shall not be deemed waived pursuant to this Plan."  *Id.*  Accordingly, because there is a jury right in federal securities cases, this case cannot be heard by the Delaware bankruptcy court — both under the statute and under the Plan's own terms.

Therefore, once again, there is no connection between this case and the proceedings in bankruptcy court.  This case must be heard in a district court, not a bankruptcy court.

### 6.    The bankruptcy proceeding is a liquidation, not a reorganization.

Even if the bankruptcy action had some connection with this securities case, which it does not, the whole point of having a bankruptcy court supervise litigation does not apply when a plan has been confirmed and the debtor is being liquidated rather than reorganized.  As noted above, this effort by plaintiffs — seeking to transfer a pre-existing federal securities action to another district where a bankruptcy action is pending as to the issuer — is unprecedented.  Such a transfer would make even less sense when a bankruptcy plan already has been confirmed and the company is being liquidated.

The way the transfer issue typically arises after a plan is confirmed is the other way around — where a litigant in a post-plan bankruptcy action wants to transfer the case <u>away</u> from the bankruptcy forum (which often is an arbitrary venue) to a district having a connection with the dispute.  In those circumstances, courts repeatedly have held that, after a plan has been confirmed, there is no presumption that the case should be maintained in the bankruptcy forum. *See, e.g., In re Northwest Airline Corp.*, 384 B.R. 51, 61-62 (S.D.N.Y. 2008) (Sweet, J.) (holding

that dispute between the debtor airline and the City of Los Angeles over Los Angeles airport leases should be heard in California federal court rather than in the New York bankruptcy court: "[B]ecause Northwest's reorganization plan has been confirmed by the Bankruptcy Court, any presumption in favor of maintaining the venue of the Northwest Action before the Bankruptcy Court is substantially weakened."); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 124 (N.D. Tex. 2006) (holding that dispute between debtor and its former parent should be heard in Georgia federal court where both companies were headquartered rather than in the Texas bankruptcy court: "Any presumption [for maintaining venue where bankruptcy case is pending] has been significantly weakened, if not entirely destroyed, by the circumstance that this now is post-confirmation litigation.").

Here, the Plan not only has been confirmed, but the Plan is for liquidation rather than reorganization. Thus, there is no conceivable basis for this case to be transferred to a district having no relation to the events underlying the litigation.

*    *    *

In sum, this case has nothing to do with the Delaware bankruptcy action. Plaintiffs do not provide any reason why the case should be uprooted from this district, where it has been pending for 3½ years, and transferred to a district court in Delaware having no relation to the matter or experience with it.

## II.    TRANSFER IS IMPROPER BECAUSE NONE OF THE FACTORS SUPPORTING TRANSFER IS MET.

Even if this case had some connection with the Delaware bankruptcy proceeding, which it does not, plaintiffs have not met their burden of satisfying the Section 1404(a) transfer factors. A district court is permitted to transfer a case to another district for "the convenience of parties and witnesses, [and] in the interests of justice." 28 U.S.C. § 1404(a). In the Seventh Circuit, to meet that standard, plaintiffs have the burden of showing that the District of Delaware is "clearly more convenient" than the Northern District of Illinois. *Alberding Estate Admin. Trust ex rel. Moore v. Vinoy Park Hotel Co.*, No. 03 C 1250, 2003 WL 22176072, at *2 (N.D. Ill. September

10

15, 2003) (Marovich, J.); *accord American Farm Bureau Fed'n v. Alabama Farm Bureau Fed'n*, No. 05 C 1443, 2005 WL 1667802, at \*3 (N.D. Ill. July 12, 2005), *quoting Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989). In addition, plaintiffs "must show that a transfer will promote the efficient administration of justice, rather than simply shift the inconvenience from one party to the other." *Id.*

In determining whether plaintiffs have met their burden, this Court is to analyze the case using the statutory factors as "place holders" for a broad set of considerations. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 n.3 (7th Cir. 1986). Those considerations include both the "private interests" of the parties and the "public interests" of the Court. *Sitrick v. FreeHand Systems, Inc.*, No. 02 C 1568, 2003 WL 1581741, at \*1 (N.D. Ill. March 27, 2003), *citing Medi USA v. Jobst Inst., Inc.*, 791 F. Supp. 208, 210 (N.D. Ill. 1992). Private interest factors include: "(1) plaintiff's choice of forum, (2) the situs of the material events, (3) the relative ease and access to sources of proof, (4) the convenience of the parties and (5) the convenience of the witnesses." *Id.* (*citing Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp. 2d 958, 960 (N.D. Ill. 2000)). Public interest factors "relate to the court's familiarity with the applicable law, the speed at which the case will proceed to trial, and the desirability of resolving controversies in their locale." *Id.* (*quoting VonHoldt v. Husky Injecting Molding System Ltd.*, 887 F. Supp. 185, 188 (N.D. Ill. 1995)). The interests of justice "may be determinative in a particular case, even if the parties and witnesses might call for a different result." *Id.* (*quoting Coffey*, 796 F.2d at 220 (7th Cir. 1986)).

Here, plaintiffs have not and cannot demonstrate that the District of Delaware is "clearly more convenient" than the Northern District of Illinois. *American Farm Bureau*, 2005 WL 1667802, at \*3 (N.D. Ill. July 12, 2005), *quoting Heller*, 883 F.2d at 1293 (7th Cir. 1989).

### A.    Plaintiffs Have Not Demonstrated That The Private Factors Support Transfer.

#### 1.    Plaintiffs' choice of forum.

Plaintiffs' choice of forum is the Northern District of Illinois.  This district has been plaintiffs' choice of forum for the last 3½ years — until plaintiffs became worried about their inability to obtain class certification in this Court and in this Circuit.

When deciding a motion to transfer, "the trial court must give some weight to the plaintiff's choice of forum" — which for years has been Illinois.  *Federal Deposit Ins. Corp. v. Citizens Bank & Trust Co. of Park Ridge, Ill.*, 592 F.2d 364, 368 (7th Cir. 1979).  This court should not give any deference to plaintiffs' new forum choice (Delaware) because "the conduct and events giving rise to the cause of action did not take place" there.  *Dunn v. Soo Line R.R.*, 864 F. Supp. 64, 65 (N.D. Ill. 1994); *see D'Ancona & Pflaum LLC v. M2 Software, Inc.*, No. 00 C 7150, 2001 WL 873021, at *2 (N.D. Ill. August 02, 2001) (holding that where there is only a weak relationship with the underlying dispute, "the plaintiff's choice of forum becomes 'only one of many factors the court considers'") (*quoting Federated Dep't Stores, Inc. v. U.S. Bank Nat'l Assoc*, No. 00 C 6169, 2001 WL 503039, at *2 (N.D. Ill. May 11, 2001)).

#### 2.    The site of material events.

Virtually all events material to this case occurred in the Northern District of Illinois, where Northfield was headquartered from its founding in 1985 until its dissolution in September 2009.  In their complaint, plaintiffs acknowledge that "many of the acts, practices and transactions complained of herein occurred in substantial part" in this district and that "Defendants maintain[ed] their principal executive offices" in this district.  (Am. Cmplt. ¶ 15).

#### 3.    Relative ease of access to evidence.

Essentially all documents and evidence material to this case are in Illinois.  Northfield's records are in storage with an Illinois storage firm.  As part of the shut-down of the company, Northfield's records were placed in storage at a third-party vendor, Iron Mountain.  The individual defendants have been informed that those records remain stored at Iron Mountain's

facilities in Illinois.  Other former vendors of Northfield, such as Northfield's former website host, also are in Illinois.

### 4.     Convenience of the parties.

None of the parties — either defendants or plaintiffs — resides in Delaware.  Of the two remaining defendants, Dr. Gould is a resident of Illinois.  Mr. DeWoskin was formerly a resident of Illinois, but now is a resident of Florida, although he spends significant time in Illinois.  The lawyers for Dr. Gould and Mr. DeWoskin are Illinois lawyers.  As for plaintiffs, they are spread among states other than Delaware.  Nevertheless, plaintiffs already have demonstrated that Illinois is convenient for them.  They filed this action here and have prosecuted it here for the last 3½ years.

### 5.     Convenience of witnesses.

None of the witnesses in this case resides in Delaware.  Because Northfield was headquartered in Illinois, virtually all of the witnesses relevant to this case are in Illinois.  That includes Dr. Gould and other former Northfield personnel responsible for the ANH Trial and the challenged disclosures concerning it.  Although plaintiffs contend that the trustee overseeing Northfield's liquidation maintains his offices in Philadelphia (which they observe is near Delaware, Pl. Mem. 3), that fact is irrelevant.  The trustee is not a witness or party here, and he is not listed on the Court's docket as having appeared in this matter.  Plaintiffs also refer to several physicians at test sites where the ANH Trial occurred.  *Id.* at 4.  None is in Delaware.

In short, none of the private factors favors transfer.

### B.     Plaintiffs Have Not Demonstrated That The Public Factors Support Transfer.

The public factors likewise weigh in favor of keeping this case in the Northern District of Illinois.  Those factors embrace "traditional notions of judicial economy, rather than the private interests of the litigants and their witnesses."  *Sitrick*, 2003 WL 1581741, at *5 (N.D. Ill. Mar. 27, 2003 (*quoting TIG Ins. Co. v. Brightly Galvanized Products, Inc.*, 911 F. Supp. 344, 346 (N.D. Ill. 1996)).

1.      **The Court's familiarity with applicable law.**

Having handled this action for 3½ years, this Court already is familiar with the relevant law and the facts to which it is applicable.  This Court already has issued opinions on two separate motions to dismiss, and Magistrate Judge Nolan has handled discovery issues. Plaintiffs' motion for class certification is in the middle of briefing.  This Court's familiarity with this case weighs substantially in favor of keeping the case here.

2.      **The speed at which the case will proceed to trial.**

A judge in the District of Delaware would have to spend significant resources to become familiar with this case.  Plaintiffs cite various court statistics in an attempt to demonstrate that the District of Delaware is less congested than the Northern District of Illinois.  (Pl. Mem. 5.) The slight timing differences between the two districts pale in comparison to the administrative efficiency that comes with keeping a case in the Court that already has spent significant judicial resources adjudicating it.

3.      **The desirability of resolving controversies in their locale.**

Essentially all of the events material to this controversy took place in the Northern District of Illinois.  None took place in the District of Delaware.  Accordingly, transfer would contradict the "guiding principle . . . that the administration of justice will be served more efficiently when the action is brought before a court that is closer to the action."  *Barela v. Experian Information Solutions, Inc.*, No. 04 C 5144, 2005 WL 770629, at *5 (N.D. Ill. April 4, 2005) (*quoting Binz v. Iowa Interstate R.R., Ltd.*, No. 98 C 6381, 1999 WL 90642, at *3 (N.D. Ill. Feb. 10, 1999)).

Therefore, plaintiffs have failed to meet their burden of showing that any of the factors under 28 U.S.C. § 1404(a) supports transfer.  Plaintiffs have not come close to demonstrating that the District of Delaware is "clearly more convenient" than the Northern District of Illinois. *American Farm Bureau*, 2005 WL 1667802, at *3 (N.D. Ill. July 12, 2005) (*quoting Heller*, 883 F.2d at 1293 (7th Cir. 1989)).

**Conclusion**

For the foregoing reasons, plaintiffs' motion to transfer should be denied.

Dated: October 20, 2009                    Respectfully submitted,

                                           s/  Ronald L. Marmer
                                           Ronald L. Marmer
                                           J. Kevin McCall
                                           C. John Koch
                                           Suzanne J. Prysak
                                           JENNER & BLOCK LLP
                                           330 N. Wabash
                                           Chicago, IL  60611
                                           (312) 222-9350
                                           *Attorneys for Stephen A. Gould, MD*

                                           David C. Bohan
                                           Jason P. Shaffer
                                           KATTEN MUCHIN ROSENMAN, LLP
                                           525 W. Monroe
                                           Chicago, IL 60661
                                           (312) 902-5200
                                           *Attorneys for Richard E. DeWoskin*

## <u>CERTIFICATE OF SERVICE</u>

I, C. JOHN KOCH, an attorney, hereby certify that on this 20th day of October, 2009, I caused the foregoing **MEMORANDUM OF DEFENDANTS STEVEN A. GOULD AND RICHARD E. DeWOSKIN IN OPPOSTION TO PLAINTIFFS' MOTION TO TRANSFER** to be served with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel in Case No. 06-1493 on the attached service list at their e-mail addresses on file with the Court.

/s/ C. John Koch
C. JOHN KOCH

## <u>SERVICE LIST</u>

David C. Bohan
Jason Shaffer
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL   60661
Phone: 312-902-5566
Fax:     312-577-4734
***Attorney for Defendant Richard E. DeWoskin***

Patrick V. Dahlstrom
Leigh H. Smollar
Joshua B. Silverman
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
One North LaSalle Street
Chicago, IL  60602
Phone: 312-377-1181
Fax:     312-377-1184
***Liaison Counsel for Plaintiffs and the Class***

Laurence Rosen
Phillip Kim
THE ROSEN LAW FIRM, P.A.
350 Fifth Avenue
Suite 5508
New York, NY   10118
Phone: 212-686-1060
Fax:     212-202-3827
***Lead Counsel for Plaintiffs and the Class***

**List of Exhibits**

**Exhibit A** - Notice of Effective Date of Debtor's Amended Plan of Liquidation

**Exhibit B** - Debtor's Disclosure Statement for Its Amended Plan of Liquidation

**Exhibit C** - Order Pursuant to Sections 105(A) and 362(D)(1) Approving Stipulation Among Debtor, Doctor Steven A. Gould And Richard DeWoskin Regarding the Advancement of Defense Costs Under Insurance Policy Notwithstanding 11 U.S.C. § 362, attaching Stipulation Among Debtor, Doctor Steven A. Gould And Richard E. DeWoskin Regarding the Advancement of Defense Costs Under Insurance Policy Notwithstanding 11 U.S.C. § 362

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
|      Northfield Laboratories Inc.,[1] | )    Case No. 09-11924 (BLS) |
| | ) |
|           Debtor. | ) |
| | ) |

## NOTICE OF EFFECTIVE DATE OF DEBTOR'S AMENDED PLAN OF LIQUIDATION

PLEASE TAKE NOTICE that on September 11, 2009, the Court entered an Order

Pursuant to Section 1129(a) of the Bankruptcy Code and Rule 3020 of the Federal Rules of

Bankruptcy Procedure Confirming Debtor's Amended Plan of Liquidation [D.I. 129] in the

above-captioned case.

PLEASE TAKE FURTHER NOTICE that on September 25, 2009, the "Effective Date"

occurred with respect to the Debtor's Amended Plan of Liquidation (the "Plan").[2] On the

Effective Date, all of the assets of the Debtor were transferred to a liquidating trust (the

"Liquidation Trust"). Pursuant to the Plan, on the Effective Date, (i) the Debtor ceased to exist

and is deemed dissolved pursuant to applicable state law; (ii) each member of the Board of

Directors of the Debtor were terminated and have no further legal, equitable, fiduciary or other

obligation with respect to the Debtor, any party in interest in the above-captioned case, the

Liquidation Trust or the Remaining Assets; (iii) each officer of the Debtor was terminated and has

---

[1] The last four digits of the Debtor's federal tax identification number are: EIN: XX-XXX8733. The Debtor's mailing address is 1200 E. Business Center Dr., Mt. Prospect, IL 60056.

[2] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.

no ongoing fiduciary or other obligation with respect to the Debtor, the Liquidation Trust or the Remaining Assets.

PLEASE TAKE FURTHER NOTICE that all Interests, other than the Securities Claims, including equity securities in the Debtor, whether Common Stock, warrants or options, are deemed cancelled and extinguished as of the Effective Date.

Dated:  September 29, 2009
        Wilmington, Delaware

BIFFERATO LLC

Ian Connor Bifferato (No. 3273)
Thomas F. Driscoll III (No. 4703)
Kevin G. Collins (No. 5149)
800 North King Street, Plaza Level
Wilmington, Delaware  19801
Telephone: (302) 225-7600
Facsimile: (302) 254-5383

-and-

David F. Heroy
Andrew P.R. McDermott
Lawrence P. Vonckx
Baker & McKenzie LLP
One Prudential Plaza, Suite 3500
130 East Randolph Street
Chicago, Illinois  60601
Phone: (312) 861-8000
Facsimile: (312) 698-2345

*Attorneys for the Debtor and Debtor
In Possession*

# Exhibit B

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) Case No. 09-11924 |
| Northfield Laboratories Inc., | ) |
|  | ) |
| Debtor. | ) |
|  | ) |

## DEBTOR'S DISCLOSURE STATEMENT
## FOR ITS AMENDED PLAN OF LIQUIDATION

Dated: August 7, 2009

David F. Heroy
Andrew P.R. McDermott
Baker & McKenzie LLP
One Prudential Plaza, Suite 3500
130 East Randolph Street
Chicago, Illinois 60601
Email: amcdermott@bakernet.com
Phone: (312) 861-8000
Facsimile: (312) 698-2345

Bifferato LLC
Ian Connor Bifferato
Thomas F. Driscoll III
Bifferato LLC
800 N. King St., First Floor
Wilmington, DE 19801
Phone: (302) 225-7600
Facsimile: (302) 792-7470
Email: tdriscoll@bifferato.com

Attorneys for the Debtor

Northfield Laboratories Inc., debtor and debtor-in-possession (the "Debtor" or "Company") in the above-captioned Bankruptcy Case, submits this "Disclosure Statement" pursuant to section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on its Amended Plan of Liquidation dated August 7, 2009 (the "Plan"), which is attached hereto as **Appendix A**. The purpose of the Plan is to fairly and expeditiously liquidate and distribute the proceeds realized from the liquidation of the Debtor's remaining assets. The Plan, if approved by the Bankruptcy Court (if "Confirmed") and made effective, will be the operative document setting forth the means for liquidating the Debtor's remaining assets and determining the interests of creditors, shareholders and other parties in interest to the proceeds of that liquidation. This Disclosure Statement sets forth certain information regarding the Debtor's prepetition history, events leading to the Bankruptcy Case, the wind-down process and the Debtor's remaining assets and liabilities. This Disclosure Statement also describes the terms of the Plan, effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.[1]

The Debtor believes that the Plan is in the best interests of Holders of Claims and other parties in interest. As set forth in the Plan Recovery Analysis in Article IV.B on page 11, THE DEBTOR ESTIMATES THAT HOLDERS OF GENERAL UNSECURED CLAIMS WILL RECEIVE AT LEAST 85% OF THE VALUE OF THEIR CLAIMS AND, UNDER CERTAIN CIRCUMSTANCES, WILL RECEIVE FULL PAYMENT. THE COMMITTEE APPOINTED TO REPRESENT UNSECURED CREDITORS IN THIS CASE HAS EXPRESSED FULL SUPPORT FOR THE PLAN AND BELIEVES THAT IT IS IN THE BEST INTERESTS OF CREDITORS TO VOTE FOR THE PLAN. If the Plan is not confirmed, the Debtor believes that it will be forced either to file an alternative plan or liquidate under chapter 7 of the Bankruptcy Code, which would add another layer of costs and make a return of at least 85% unlikely.

**IT IS ESSENTIAL THAT YOU READ AND UNDERSTAND THE FOLLOWING, WHICH APPLY TO EACH AND EVERY ASPECT OF THIS DISCLOSURE STATEMENT:**

*This Disclosure Statement contains, among other things, summaries of certain provisions of the Plan, other documents, statutes and events leading to the Bankruptcy Case. Although the Debtor believes that these summaries are fair and accurate, these summaries do not purport to be precise or complete statements of all the terms of the Plan or documents referred to and are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents, statutory provisions or every detail of such events.*

*The statements contained herein are made as of the date hereof unless otherwise specified. Holders of Claims and Interests reviewing this disclosure statement should not infer that there have been no changes in the facts set forth herein between the date hereof and the time of such review.*

*No party is authorized to give any information with respect to the Plan other than that which is contained in this Disclosure Statement. No representations concerning the Debtor or the value of its property have been authorized by the Debtor other than as set forth in this Disclosure Statement. Any information, representations or inducements made to obtain an acceptance of the Plan that are other than, or inconsistent with, the information contained herein and in the Plan should not be relied upon by any Holder of a Claim or Interest.*

*This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.*

*This Disclosure Statement has been determined by the Bankruptcy Court to contain adequate information as required by Bankruptcy Code § 1125, which determination does not constitute a recommendation or approval of the Plan.*

*This Disclosure Statement does not constitute legal, business, financial or tax advice. Any Person desiring any such advice should consult with its own advisors.*

---

[1] Unless otherwise stated, any capitalized term used herein shall have the meaning assigned to such term or, if no meaning is so assigned, the meaning assigned to such term in the Plan.

# ARTICLE I

## EVENTS LEADING TO THE BANKRUPTCY CASE

The Company was founded and incorporated under the laws of the State of Delaware in June 1985 to commercialize the scientific development of a hemoglobin-based oxygen-carrying red blood cell substitute (PolyHeme). Development of PolyHeme began as early as 1970. Its purpose is the treatment of life-threatening hemoglobin levels when blood transfusion is needed, offering a solution to several traditional problems arising from blood transfusion such as transmission of disease, incompatibility and unavailability.

The Company financed its research and development and other activities through the sale of public and private securities and, to a lesser extent, the license of product rights. In 1994, the Company completed an initial public offering and its shares were publicly traded on NASDAQ under the ticker symbol "NFLD" from that time until trading was suspended on June 11, 2009. The Company's shares were subsequently de-listed effective July 13, 2009. All of the Company's public filings are available online at *http://www.sec.gov/edgar.shtml*.

### A.    PURSUIT OF REGULATORY APPROVAL

The success of PolyHeme and the Company depended primarily on its ability to obtain necessary regulatory approval of PolyHeme and the Company's manufacturing facilities from the United States Food & Drug Administration (the "FDA"). In 1996, the Company completed the first prospective, randomized, large volume Phase II trauma trial, directly comparing the use of a blood substitute to blood, after which the Company received FDA clearance to conduct an additional Phase II trauma study. After experiencing delays in the development and clinical testing, the Company received FDA clearance to conduct Phase III trials. The Company completed a Phase III clinical trial with PolyHeme in July 2006 and reported the data from that trial in May 2007. With the results of these trials, studies and analysis, the Company completed its Biologic License Application ("BLA") for PolyHeme and submitted it to the FDA on October 29, 2008. The FDA accepted the BLA for filing on December 30, 2008, granting it priority review.

On April 30, 2009, the Company received a complete response letter from the FDA pertaining to its BLA for PolyHeme. The letter stated that the FDA has completed its review of the Company's BLA and found "that the information and data submitted are inadequate for final approval action." Specifically, the FDA stated that the Company's study "... did not meet the pre-specified primary efficacy endpoint," and that "based on the totality of the data in the application, the FDA has determined that the data submitted do not support the proposed indication." The FDA also noted that "the safety data of all controlled studies reveal that the administration of PolyHeme places the patients at a higher risk of significant adverse events," and stated that "therefore, in the absence of clinical benefit, the risk/benefit assessment of the product in trauma is unfavorable."

### B.    WIND-DOWN OF THE DEBTOR'S BUSINESS

Following its review and analysis of the complete response letter received from the FDA on April 30, 2009, the Company determined that further clinical development of a reformulated version of PolyHeme, including additional clinical trials, would likely be required before it could again seek to obtain FDA approval. The Company concluded, however, that the time and substantial expense required to complete this additional clinical development, together with significant uncertainty that FDA approval ultimately would be obtained, made it unlikely that sufficient additional capital could be raised to support such further product development. Thus, upon the failure to receive necessary FDA approval of its sole product, the Company expeditiously began winding-down its operations.

To maximize the value that can be realized from the Debtor's assets, the Debtor contemplated, among other things, (i) marketing and sale of the Debtor's Mt. Prospect, Illinois, plant (the "Plant"); (ii) marketing and sale of the Debtor's intellectual property assets; (iii) sale of all other remaining assets; and (iv) preservation of the Debtor's value through the mitigation of administrative claims and other wind-down costs to

the extent possible (collectively, the "Wind-Down"). The Debtor is not currently engaged in any business other than the Wind-Down.

In May 2009, the Company terminated substantially all of its employees and currently employs only a skeleton staff to effectuate the Wind-Down. The Debtor retained certain employees as continuing employees or independent contractors because of their particular and specialized knowledge and skills regarding the Debtor's financial systems, filing systems, maintenance of the Plant Property and information technology.

As of June 30, 2009, the Debtor terminated the lease for its former headquarters in Evanston, Illinois and transferred its administrative functions to the Plant Property. As discussed further below, coincident with Confirmation of the Plan, the Debtor will be selling the Plant Property and transferring all of its remaining assets and administrative functions to a Liquidation Trustee, who will continue the Wind-Down, market the Debtor's intellectual property assets, investigate and resolve all Claims against the Estate, pursue Causes of Action belonging to the Debtor to the extent it determines that a return can be realized and distribute the cash assets of the Liquidation Trust to creditors and parties in interest as set forth in the Plan.

## ARTICLE II

### SIGNIFICANT EVENTS IN THE BANKRUPTCY CASE

On June 1, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing a case (the "Bankruptcy Case") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtor concluded that the Bankruptcy Case was the most efficient means to continue the Wind-Down while the Company transferred stewardship of its remaining assets and responsibilities to a trustee that could administer the Estate at the cheapest cost, all while preserving the rights of the Company, creditors and parties in interest through the confirmation of a chapter 11 plan.

On June 3, 2009, the Debtor filed its Plan of Liquidation and the related Disclosure Statement. The hearing on approval of the Disclosure Statement was originally set for July 13, 2009 (the "Disclosure Statement Hearing"). On that same day, the Debtor filed its Schedules and Statement of Financial Affairs [Docket No. 21] (the "Statement of Financial Affairs") that contain important financial information and disclosures required by the Bankruptcy Code and Bankruptcy Rules. On August 4, 2009, the Debtor filed amended Schedules [Docket No. 79]. Further financial information regarding the Debtor is available in the Debtor's Monthly Operating Report for June 2009, which was filed on July 20, 2009 [Docket No. 64]. The Debtor intends to file a Monthly Operating Report for July 2009 on or before August 20, 2009.

On June 15, 2009, the Bankruptcy Court entered an Order Authorizing and Approving Expedited Procedures for the Sale, Transfer or Abandonment of De Minimis Assets (the "De Minimis Asset Order"). Pursuant to the De Minimis Asset Order, the Debtor is permitted to sell assets valued at less than $25,000 subject to providing notice and opportunity to object to a discrete list of notice parties. Pursuant to the procedures set forth in the De Minimis Asset Order, on June 19, 2009, the Debtor conducted an auction in which it sold the office equipment, furniture and other assets at its Evanston offices for $16,000. The sale not only provided value to the Estate as reflected in the purchase price, but permitted the expeditious removal of the property from the Evanston offices to allow the Debtor to exit the offices prior to lease termination.

On June 24, 2009, the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee"). The Committee subsequently retained Saul Ewing LLP as its legal advisor. Since the formation of the Committee, the Debtor has consulted with the Committee concerning the administration of the chapter 11 case. The Debtor has kept the Committee informed of, and has conferred with the Committee on, matters relating to the Wind-Down and has sought the concurrence of the Committee to the extent its constituency would be affected by any proposed action.

Prior to the Petition Date, the Debtor terminated substantially all of its employees, leaving a bare-bones staff including employees possessing skills and knowledge essential to the Wind-Down. To prevent certain

of these employees from seeking alternative employment the Debtor sought to approve bonuses to: Peter Lehr, Assistant Controller, in the amount of $45,000, Bob Fazekas, Senior Facilities Engineer, in the amount of $17,600 and Kerry Taylor, Executive Administrative Assistant, in the amount of $15,000.  On July 10, 2009, the Bankruptcy Court approved these bonuses pursuant to its entered an Order Approving Certain Incentive and Retention Bonuses [Docket No. 56].  These employees will be eligible for bonuses if they remain employed by the Debtor or the Liquidation Trust through December 31, 2009, or are terminated involuntarily at an earlier date.

On [[August 10, 2009]], the Bankruptcy Court entered an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof.  This Order established procedures and set deadlines for filing proofs of claim and approved the form and manner of the bar date notice.  The Order established [[October 23]], 2009, as the last date for unsecured creditors and certain other creditors to file proofs of claim in the Bankruptcy Case.  The Order established [[November 30]], 2009, as the last date for governmental units to file proofs of claim in the case.

## ARTICLE III

### PRINCIPAL ASSETS, INDEBTEDNESS & EQUITY

A.    ASSETS

The principal assets of the Debtor include: (1) its manufacturing plant in Mount Prospect, Illinois (the "Plant Property") and the process manufacturing equipment therein (the "Equipment"); (2) its intellectual property; (3) Causes of Action belonging to the Debtor; and (4) Cash and other assets.

1.    Sale of the Plant Property and Equipment

After significant marketing efforts beginning in the middle of May 2009, the Debtor reached an agreement with Xttrium Laboratories, Inc. (the "Xttrium") to sell the Plant Property and the Equipment for the aggregate purchase price of $3,500,000 (the "Plant Sale").  On July 24, 2009, the Debtor entered into a Real Estate Sales Contract with Xttrium, subject to approval by the Bankruptcy Court.  The Real Estate Sales Contract contemplates that the Debtor will file a motion in the Bankruptcy Case on or before August 15, 2009, seeking approval of the Plant Sale at the same time as the Confirmation Hearing.  The motion seeking approval will discuss the Debtor's marketing efforts in more detail and a copy of the Real Estate Sales Contract will be appended thereto.  The Debtor expects that the closing of the Plant Sale will take place on the Effective Date of the Plan, in conjunction with the transition of administration of the Debtor's Estate to the Liquidation Trust.

The Debtor believes that the Xttrium sale is the highest best value that the Debtor could possibly achieve for the Plant Property and Equipment.  Although the net book value of the Plant Property is $6,752,111.49, an appraisal of the Plant Property dated as of February 24, 2009, estimated its liquidation value at $3,500,000 and the Debtor did not expect to achieve even that level of value.  In its continuing marketing, the Debtor had discussions with brokers familiar with the Mount Prospect industrial real estate market and the Kensington Business Park within which the Plant Property is located.  Based upon the general market and taking into account certain Illinois tax considerations, the market in the Kensington Business Park dramatically shifted downward from 2005 through 2007.  The current liquidity crisis has further distressed the market.  From the very beginning, it was clear that a manufacturing firm like Xttrium that could realize value from the combined use of the Plant Property and Equipment in a similar fashion to the Debtor would be willing to pay more for the assets than would speculative investors or other buyers with no interest in continued use of the Equipment.  Consistent with this understanding, in conducting its marketing efforts, the Debtor identified and received numerous other offers, none of which exceeded $2 million.

2.    The Intellectual Property

The Debtor has intellectual property; however, this property is primarily relevant to the continued development and marketing of PolyHeme. Given the recent conclusion by the FDA, it is not clear that the Debtor will realize any value from its intellectual property. On and after the Effective Date, the Debtor expects that the Liquidation Trustee will hire an intellectual property broker to assess the salability of the Debtor's intellectual property and assist in consummating any sales. Under the Bankruptcy Code, there are numerous filings and other requirements that would be required for the Debtor to retain such a professional and the Debtor determined that it would be more economical to wait until after Confirmation of the Plan to begin this marketing process as the Liquidation Trustee will not have these same restrictions.

3.    Causes of Action

The Debtor's property includes potential Causes of Action that, if prosecuted or settled by the Debtor could result in a recovery for the Debtor's Estate. During the Bankruptcy Case, the Debtor has not endeavored to investigate the existence or merits of every potential Cause of Action it may possess. All of the Debtor's rights to these potential Causes of Action, including avoidance actions under Bankruptcy Code §§ 547-550 will be transferred to the Liquidation Trust and the Liquidation Trustee will conduct appropriate investigations and pursue liquidation of Causes of Action to the extent it would provide a net benefit to the Estate. Except as set forth below, the Debtor cannot estimate the value of its potential Causes of Action at this time. Information regarding payments made by the Company in the 90 days prior to the Petition Date and to insiders of the Company within the 1 year prior to the Petition Date is available in the Statement of Financial Affairs.

The Company received a modification of the assessment on its Plant Property that resulted in an overpayment made by the Company in the amount of $25,421.90, which amount the Liquidation Trustee will seek to recover from the State of Illinois in October 2009.

The Debtor's Causes of Action include potential claims or Causes of Action that may exist against the Former Officers. At this time, the Debtor does not have sufficient information to determine whether any such claims exist or would provide any benefit to the Estate; however, the Debtor is also not prepared to waive these potential Causes of Action pursuant to the Plan without further investigation. After the Effective Date, the Debtor believes that the Liquidation Trustee will conduct an expeditious investigation into whether it will pursue any such claims and seek to resolve the matter in connection with settlement of the Former Officer Claims. If the Plan is not Confirmed, the Debtor would expect to conduct this investigation prior to Confirmation of any alternative Plan or conversion of the case to a case under chapter 7 of the Bankruptcy Code, after which the chapter 7 trustee likely would investigate and pursue any such claims. Consistent with the resolution of other Claims issues and pursuit of Causes of Action, the Debtor believes the most economical, efficient and best means to investigate and resolve these matters expeditiously is to seek Confirmation of the Plan and transition administration to the Liquidation Trustee. The Former Officers have reserved all rights, defenses, and counterclaims with respect to any potential Causes of Action that may be potentially be asserted against them, and expressly dispute the existence of any such Causes of Action.

4.    Cash and Other Assets

The Debtor expects that on the Effective Date, it will hold Cash in the amount of approximately $512,973.00. The Debtor also holds security deposits of approximately $2,725.00 Not all of the Debtor assets located at the Plant Property are included in the Plant Sale and the Debtor will seek to sell the remaining assets (consisting of computers, office furniture and miscellaneous equipment) prior to the Confirmation Hearing pursuant to the procedures outlined in the De Minimis Asset Order. The Debtor expects that the recovery on these assets will range from $3,000 to $5,000.

**B.   INDEBTEDNESS**

THE FOLLOWING ESTIMATES OF CLAIMS ARE PROVIDED SOLELY FOR THE PURPOSES ASSESSING POTENTIAL RECOVERIES UNDER THE PLAN AND NOTHING HEREIN SHALL BE DEEMED AN ADMISSION BY THE DEBTOR OF ANY ISSUE OF FACT OR LAW OR THE ALLOWED AMOUNT OF ANY CLAIM.

*The estimated amounts of Claims provided in the below discussion, although considered reasonable by the Debtor, necessarily are based on a variety of assumptions and are subject to contingencies that cannot be predicted with certainty; therefore, the actual Allowed amounts of these Claims may vary significantly and the estimates should not be relied upon as a guaranty or other assurance of the actual outcome of the Claims resolution process.*

The claims against the Debtor include (1) Priority Tax Claims and Administrative Claims, (2) Priority Claims; (3) General Unsecured Claims and (4) Securities Claims. The Debtor has no secured creditors.

1.   Priority Tax Claims and Administrative Claims

Priority Tax Claims include claims of governmental units for income tax, property tax and certain other tax and withholding obligations. As discussed above, governmental units have until [[November 30]], 2009, to file proofs of Priority Tax Claims. As the Company did not earn any income in the year prior to the Petition Date and has paid its taxes on a current basis, the Debtor is confident that Priority Tax Claims will not exceed $8,000.00, which amount is the estimated amount of Delaware State corporate tax owed by the Debtor.

Administrative Claims include the costs of administering the Bankruptcy Case, including payment of a broker's fee in connection with the Plant Sale and compensation of the Debtor's and the Committee's other professionals. The Debtor estimates that the total amount of these fees will be [[$703,100.00.]]

2.   Priority Claims

Priority Claims are Claims entitled to priority under Bankruptcy Code § 507, other than Priority Tax Claims and Administrative Claims. The Debtor estimates that the total amount of Priority Claims will be $76,650, which amount the Debtor expects will be payable to the Former Officers as severance earned in the 180 days before the Petition Date and entitled to priority up to $10,950 for each Former Officer as provided in Bankruptcy Code § 507(a)(4). As discussed more fully below, the Debtor's estimate of this amount should not be interpreted as a statement that the claims of the Former Officers will be allowed in any amount and payment of the foregoing Priority Claims are entirely subject to final allowance of the unsecured claims of the Former Officers.

3.   General Unsecured Claims

a.   Former Officer Claims

The Debtor has contractual severance obligations to the Former Officers under their employment contracts that were triggered by the termination of certain of the Former Officers in May 2009 and will be triggered by the termination of Dr. Steven Gould and Robert McGinnis under the Plan. If these claims are Allowed in full, the Debtor expects that these claims would be Class 2 General Unsecured Claims in the amounts listed below. These amounts assume that, if the unsecured claims of the Former Officers are Allowed, a portion would be treated as Priority Claims as discussed above.

| | |
|---|---|
| Doubleday, Marc | $ 323,175.00 |
| Gould, Steven | $ 886,458.00 |
| Hides, George | $ 283,050.00 |
| Kogut, Jack | $ 594,582.00 |
| McGinnis, Robert | $ 557,328.00 |
| Omert, Laurel | $ 244,310.00 |
| Twaddell, Sophia | $ 181,300.00 |
| *Total:* | *$3,070,203.00* |

Under Bankruptcy Code § 502(b)(7), if an objection to a claim of an employee for damages resulting from the termination of an employment contract is made, that claim may be capped at the amount of (a) the standard compensation provided by the employment contract, without acceleration, for one year plus (2) the amount of unpaid compensation due under such contract, without acceleration. The issues of (i) whether the 502(b)(7) cap applies to the foregoing claims and (ii) what the calculation of the Allowed amount of such Claims would be if the cap were applied have not been resolved at this time. Pursuant to the Plan, the Liquidation Trustee will expeditiously investigate these issues and provide each Former Officer with a memorandum setting forth the Liquidation Trustee's position with respect to the proper Allowed amount of these Claims. At that time, the Debtor expects that the Liquidation Trustee and the Former Officers will attempt to negotiate a settlement to avoid a costly claim objection process. Because this issue will be resolved at a later date, the Debtor cannot and should not predict what the ultimate amount of these claims will be and nothing herein should be interpreted as a statement that the 502(b)(7) cap is applicable or a representation as to the proper application of the cap.

Pursuant to agreements with the Company providing for their termination, the Former Officers terminated in May 2009 agreed to waive and release certain claims and causes of action that the Former Officers could have pursued against the Company. To the extent that these agreements are avoided or otherwise not honored by the Debtor or the Liquidation Trust, the Former Officers may have claims in excess of the foregoing amounts. The Debtor does not have sufficient information at this time to provide an estimate of the amount of these prospective claims.

   b.  Other General Unsecured Claims

The remaining General Unsecured Claims of the Debtor include various Claims accruing after the beginning of the Wind-Down, which the Debtor estimates will be $310,000. The Debtor has listed General Unsecured Claims in the amount of $104,714.97 in its Schedules. In addition, there have been proofs of claim filed in the Bankruptcy Case in the amount of $290,069.52 that are not reflected in the Schedules. The following considerations are reflected in the Debtor's estimates:

- The Debtor believes that the claim filed by Cornerstone Research in the amount of $286,476.28 will be paid in full by insurance coverage, as it relates to services provided in defense of the Securities Claims (discussed below). As a result, the Debtor does not believe that this claim will be entitled to a distribution from the Liquidation Trust.

- The Debtor believes that CIGNA/Great West may have a Class 2 General Unsecured Claim in as much as $167,492.00 for payment of pre-petition medical costs of the Company's employees under its health plan. These costs initially were paid by CIGNA/Great West and CIGNA/Great West may have a claim for reimbursement to the extent of the Company's deductible.

- Other than the Former Officers, the Debtor is not aware of any other parties that are expected to file proofs of claim in the Bankruptcy Case before the applicable bar date. The validity of any Claims filed after the date hereof will be assessed by the Debtor or Liquidation Trustee, as applicable.

4.    Securities Claims

Between March 17, 2006, and May 15, 2006, ten separate complaints were filed, each purporting to be on behalf of a class of the Debtor's shareholders, against the Company and Dr. Steven A. Gould, the Company's Chief Executive Officer, and Richard DeWoskin, the Company's former Chief Executive Officer. These putative class actions were consolidated in a case pending in the United States District Court for the Northern District of Illinois, Eastern Division. The Consolidated Amended Class Action Complaint was filed on September 8, 2006, and alleged, among other things, that during the period from March 19, 2001, through March 20, 2006, the named defendants made or caused to be made a series of materially false or misleading statements and omissions about the Company's elective surgery clinical trial and business prospects in violation of Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated there under and Section 20(a) of the Exchange Act. Plaintiffs alleged that those allegedly false and misleading statements and omissions caused the purported class to purchase the Company's common stock at artificially inflated prices. As relief, the complaint sought, among other things, a declaration that the action be certified as a proper class action, unspecified compensatory damages (including interest) and payment of costs and expenses (including fees for legal counsel and experts). The Company and the individual defendants filed a motion to dismiss the complaint, and on September 25, 2007, the court granted that motion, finding that the plaintiffs failed to state a claim. The court dismissed the complaint without prejudice, and on November 20, 2007, the plaintiffs filed a Consolidated Second Amended Class Action Complaint. On January 22, 2008, the Company and the individual defendants filed a motion to dismiss, and the briefing of that motion was completed on June 26, 2008. On September 23, 2008, the Court denied the motion to dismiss, and on December 5, 2008, the Company and the individual defendants answered the Consolidated Second Amended Class Action Complaint. Plaintiffs have advised that they intend to file a motion seeking certification of a class. Accordingly, the case has proceeded into discovery and briefing of class certification issues. The putative class action is at an early stage and it is not possible to predict the outcome or to estimate the amount of liability, if any, of the Company. The Company and the individual defendants intend to file an opposition to the motion for class certification. Upon the commencement of the Bankruptcy Case, the cases naming the Debtor as a defendant were stayed as against the Debtor under Bankruptcy Code § 362.

Bankruptcy Code § 510(b) states: "For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor ... for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. 510(b). The Securities Claims are alleged claims arising from the purchase of the Company's common stock, which is a security of the Company. It is well-settled that claims arising from the purchase of common stock are subordinated under section 510(b) to the claims of general unsecured creditors and have the same priority of distribution as common stock. See, e.g., In re Telegroup, Inc., 281 F.3d 133, 136-37 (3d Cir. 2002).

The Company has insurance coverage relating to the Securities Claims that provides for the cost of defense as well as several layers of multi-million dollar protection in the event of a negative judgment. It is the Debtor's belief that the Securities Claims will not be successful and, even if successful, will not exceed the applicable level of insurance coverage. As discussed below, the Securities Claims will only participate in distributions under the Plan to the extent that such claims exceed the limit of applicable insurance.

C.    EQUITY INTERESTS

The equity of the Debtor includes: (i) Common Stock; (ii) certain warrants; and (iii) certain options. As of May 29, 2009, the Debtor had 32,443,149 shares of Common Stock outstanding. On June 12, 2009, the Debtor filed its List of Equity Security Holders [Docket No. 31], which reflects approximately 500 holders. Certain of the holders on this list are institutional holders holding the Common Stock in "street" name. The actual number of holders of beneficial interests in Common Stock is likely far greater than 500 and based upon prior proxy solicitations, the Debtor estimates that the number of holders of beneficial interests in Common

Stock may well exceed 16,000. In addition to Common Stock, the Debtor has outstanding certain warrants issued in connection with financing transactions and stock options issued under the Debtor's equity compensation plans for directors, officers and employees. The Debtor does not expect either the warrants or options to be exercised. The warrants and options will be eliminated under the Plan.

# ARTICLE IV

## SUMMARY OF THE PLAN

Upon the Effective Date of the Plan, as more fully described below, all of the assets of the Debtor will be transferred to a liquidating trust (the "Liquidation Trust"). The Liquidation Trust will seek to finish the Wind-Down, liquidate the Debtor's assets and pursue Causes of Action, including Avoidance Actions, with the purpose of maximizing the recovery for the beneficiaries of the Liquidation Trust, including the Holders of Allowed Claims and, if possible, Holders of Interests. Holders of Common Stock will have a residual interest in the Liquidation Trust, after payment of priority, administrative and unsecured claims, in accordance with the number of common shares held on the Effective Date.

The Debtor strongly believes that the Plan maximizes recoveries for Holders of Allowed Claims and Interests and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Debtor believes that any alternative to Confirmation of the Plan, such as conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the proposal of an alternative plan of liquidation by the Debtor or an attempt by another party in interest to file a plan, would result in significant delays, litigation and additional costs and, ultimately, would lower the recovers to Holders of Allowed Claims and Interests.

A.    CLASSIFICATION & TREATMENT OF CLAIMS & INTERESTS

Except for Administrative Claims and Priority Tax Claims that are not classified, the Plan divides all Claims against and Interests in the Debtor into the following Classes and provides for the stated Distribution from the Liquidation Trust to each Holder of a Claim or Interest in the respective Class.

1.    Unclassified Claims

a.    Administrative Claims

If the Plan is Confirmed and becomes effective, subject to Bankruptcy Code §§ 328, 330(a) and 331, each Holder of an Allowed Administrative Claim would receive (i) Cash in the full amount of its Administrative Claim on the later of (A) the Effective Date or (B) as soon as practicable after the date on which such Claim becomes an Allowed Administrative Claim or (ii) such other treatment that is as (A) ordered by the Bankruptcy Court; or (B) agreed to by the Holder and the Debtor or Liquidation Trustee, as applicable.

b.    Priority Tax Claims

If the Plan is Confirmed and becomes effective, each Holder of an Allowed Priority Tax Claim would receive Cash (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (ii) over a period ending not later than 5 years after the Petition Date; and (iii) in a manner not less favorable than Allowed Class 2 General Unsecured Claims.

2.    Class 1 Priority Claims

Class 1 consists of all Priority Claims, which are Claims entitled to priority under Bankruptcy Code § 507. Allowed Class 1 Priority Claims are unaltered by the Plan. If the Plan is Confirmed and becomes effective, each Holder of an Allowed Class 1 Priority Claim would receive: (a) Cash in the full amount of its Class 1 Priority Claim on (i) the Effective Date or (ii) such later date as its Class 1 Priority Claim becomes

due and owing; or (b) such other treatment that is agreed to by the Holder and the Debtor or Liquidation Trustee, as applicable. Class 1 is Unimpaired and deemed to accept the Plan under Bankruptcy Code § 1126(c) and is not entitled to vote to accept or reject the Plan.

3.    Class 2 General Unsecured Claims

Class 2 consists of all General Unsecured Claims, which are those Claims that are not (i) "secured" within the meaning of Bankruptcy Code § 506; (ii) Priority Claims; (iii) Administrative Claims; or (v) Interests. If the Plan is Confirmed and becomes effective, on each Distribution Date, each Holder of an Allowed Class 2 General Unsecured Claim would receive a pro rata Distribution of any available Liquidation Proceeds[2] or such lesser amount that would result in the Holder receiving or retaining on account of its Allowed Class 2 General Unsecured Claim aggregate Distributions of a value, as of the Effective Date, equal to the Allowed amount of such Claim. Class 2 is Impaired and Holders of Class 2 General Unsecured Claim are entitled to vote to accept or reject the Plan.

4.    Class 3 Securities Claims

Class 3 consists of all Securities Claims to the extent such claims exceed the limit of applicable insurance. If the Plan is Confirmed and becomes effective, on each Distribution Date, each Holder of an Allowed Class 3 Securities Claim would receive a pro rata Distribution, together with Allowed Class 4 Interests, of any available Liquidation Proceeds that remain after the payment and satisfaction of all Allowed Class 2 General Unsecured Claims, including payment of interest at the legal rate from the Petition Date on all Allowed Class 2 General Unsecured Claims. Class 3 is Impaired. Pursuant to the Bankruptcy Court's Order Approving (I) Disclosure Statement; (II) Notice of Hearing on Disclosure Statement; (III) Procedures And Forms Of Documents For Solicitation Of Votes To Accept Or Reject Plan Of Liquidation; (IV) Notice Of Hearing On Confirmation Of Plan Of Liquidation; and (V) Granting Related Relief entered on [[August 10]], 2009 [Docket No. ___] (the "Solicitation Order"), Holders of Class 3 Securities Claims are not entitled to vote to accept or reject the Plan.

5.    Class 4 Interests

Class 4 consists of all Interests other than the Securities Claims, including equity securities in the Debtor, whether Common Stock, warrants or options. All Interests of the Debtor shall be deemed cancelled and extinguished as of the Effective Date. If the Plan is Confirmed and becomes effective, each Holder of an Allowed Class 4 Interest would receive a pro rata Distribution, together with Allowed Class 3 Securities Claims, of any available Liquidation Proceeds that remain after the payment and satisfaction of all Allowed Class 2 General Unsecured Claims, including payment of interest at the legal rate from the Petition Date on all Allowed Class 2 General Unsecured Claims. Class 4 is Impaired. Pursuant to the Solicitation Order, Holders of Class 4 Interests are not entitled to vote to accept or reject the Plan.

6.    Pro Rata Distribution among Class 3 and Class 4

For purposes of Distribution among Class 3 and Class 4, (a) each Holder of shares of Common Stock in Class 4 shall receive one "Unit" for each share of Common Stock held of record immediately prior to cancellation on the Effective Date; (b) each Holder of an Allowed Class 3 Securities Claim shall receive that number of Units that is equal to twenty (20) times the Allowed amount of the Class 3 Securities Claim, which multiple reflects the last reported trading price for the Common Stock of $.05 per share on July 31, 2009, as reported at *http://finance.yahoo.com/q?s=NFLDQ.PK*; and (c) "pro rata" means the proportion that the number of Units held by a Holder bears to the aggregate number of all Units.

---

[2] "Liquidation Proceeds" means all Cash held by the Debtor as of the Effective Date and all Cash realized from the liquidation of any Remaining Assets, less (i) the aggregate amount of Distributions made under this Plan and (ii) the Liquidation Reserve. "Liquidation Reserve" means Cash held in the Liquidation Trust retained by the Liquidation Trustee as a reserve to cover (i) the costs and expenses of administering the Liquidation Trust and liquidating the Remaining Assets, including compensation of the Liquidation Trustee; and (ii) amounts that the Liquidation Trust anticipates may become due under this Plan to Holders of Allowed Claims and Interests.

B.    PLAN RECOVERY ANALYSIS

   1.    Cash Proceeds from Wind-Down

| Description | Reference | Summary | | Proceeds |
|---|---|---|---|---|
| Plant Sale | Article III.A.1 | Purchase Price | $3,500,000 | $3,350,000.00 |
| | | Closing & Other Costs | ($150,000.00) | |
| Intellectual Property | Article III.A.2 | | *Not valued* | $0.00 |
| Causes of Action | Article III.A.3 | Tax Rebate | $25,421.90 | $25,421.90 |
| | | Other | *Not valued* | |
| Cash & Other Assets | Article III.A.3 | | | $520,698.00 |
| *Total Wind-Down Proceeds* | | | | *$3,896,119.90* |

   2.    Distributions to Holders of Claims and Interests

         After payment of the Liquidation Trust's costs, estimated at $250,000 (see below), the total proceeds available for distribution to Holders of Claims and Interests is estimated to be $3,646,119.90.

| Description | Reference | Estimate | Distribution | Recovery % |
|---|---|---|---|---|
| Priority Tax Claims & Administrative Claims | Article III.B.1 | $703,100.00 | $703,100.00 | 100.00% |
| Class 1 Priority Claims | Article III.B.2 | $76,650.00 | $76,650.00 | 100.00% |
| *Remaining Proceeds* | | | | *$2,866,369.90* |
| Class 2 General Unsecured Claims | Article III.B.3 | $3,380,203.00 | $2,866,369.90 | 84.80% |
| Class 3 Securities Claims | Article III.B.4 | *Not Estimated* | None | 0.00% |
| Class 4 Interests | Article III.C | *Not Estimated* | None | 0.00% |

   3.    Costs of the Liquidation Trust

         The Liquidation Trustee and any professionals retained by the Liquidation Trust will be compensated out of the proceeds of the Wind-Down and the Debtor estimates that the costs of administration of the Liquidation Trust will be $250,000, which is $50,000 per month for five months. Given the substantial uncertainty regarding the scope and length of the Wind-Down, the uncertainty regarding whether resolution of Claims will require litigation or whether the Liquidation Trustee will pursue Causes of Action, it is impossible to

predict with certainty what the costs of administration of the Liquidation Trust will be. This analysis assumes that the Claims resolution process will be substantially completed in December 2009, with Distributions being made in January 2010. Although the Liquidation Trustee may subsequently pursue Causes of Action belonging to the Estate after January 2010, this analysis assumes that the proceeds of those Causes of Action will exceed the costs of investigating and pursuing the Causes of Action, resulting in a negative net cost.

4.    Other Assumptions

The foregoing Plan Recovery Analysis assumes that the Former Officer Claims (Article Article I.B.3.a) are Allowed in full. To the extent that the Allowed amount of the Former Officer Claims are Allowed in an aggregate amount less than $2,556,369.90, Class 2 General Unsecured Claims will be paid 100% and Distributions will be made on account of Class 3 Securities Claim and Class 4 Interest. In addition, to the extent that the Liquidation Trust realizes a recovery on the Debtor's intellectual property and/or Causes of Action, the amount available for distribution will increase, resulting in a concomitant increase in total proceeds available for distribution to Holders of Claims and Interests.

C.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

If the Plan is Confirmed and becomes effective, all Executory Contracts and Unexpired Leases of the Debtor, other than the Independent Contractor Agreements, will be deemed rejected as of the Effective Date in accordance with Bankruptcy Code §§ 365 and 1123, except those contracts that have been rejected or assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court prior to the Effective Date. Any Holder of a Claim arising from rejection must file a proof of such Claim with the Bankruptcy Court within thirty (30) days of the Effective Date. Failure to timely file such proof of Claim will forever bar the Holder from seeking payment of the Claim.

If the Plan is Confirmed, the Independent Contractor Agreements, dated as of May 22, 2009, between the Debtor and each of Bob Fazekas, Peter Lehr and Kerry Taylor (each an "Independent Contractor"), copies of which were appended as Exhibit B [Docket No. 50] to the Debtor's Motion Pursuant To 11 U.S.C. §§ 363(b)(1) And 503(c) Approving Certain Retention And Incentive Bonuses [Docket No. 39] would be assumed by the Debtor on the Confirmation Date. The Liquidation Trustee, the Debtor and the Committee will determine whether the services of each of the Independent Contractor will be required by the Liquidation Trustee and if they are, the related Independent Contractor Agreement will be assigned to the Liquidation Trust.

D.    CESSATION OF CORPORATE EXISTENCE & TERMINATION OF OFFICERS & DIRECTORS

If the Plan is Confirmed and becomes effective, as of the Effective Date, automatically and without further action, (i) the Debtor shall cease to exist and be deemed dissolved pursuant to applicable state law; (ii) each then member of the Board of Directors of the Debtor shall be terminated and have no further legal, equitable, fiduciary or other obligation with respect to the Debtor, any party in interest in the Bankruptcy Case, the Liquidation Trust or the Remaining Assets; (iii) each Officer of the Debtor shall be terminated and have no ongoing fiduciary or other obligation with respect to the Debtor, the Liquidation Trust or the Remaining Assets.

E.    THE LIQUIDATION TRUST

If the Plan is Confirmed and becomes effective, all Remaining Assets, including Avoidance Actions and other Causes of Action, including those that may exist against the Former Officers, would be transferred, assigned and automatically vest in the Liquidation Trust, free and clear of all Claims, liens, charges, encumbrances, rights and Interests of creditors and equity security holders. The rights, powers and duties of the Liquidation Trust would be set forth in the Liquidation Trust Agreement, [[which agreement [will be filed in the Bankruptcy Case no later than ten (10) days before the Confirmation Hearing] [is attached hereto as Appendix B]]]. On the Effective Date, the Liquidation Trustee would execute the Liquidation Trust Agreement and each Holder of a Claim or Interest in any Class would be deemed to have ratified and become bound by the terms of the Liquidation Trust Agreement.

1.      Walker Nell Partners, Inc.

The Debtor, in consultation with the Committee, has selected Wayne R. Walker, Esq. of Walker Nell Partners, Inc. ("WNP") to serve as Liquidation Trustee. Mr. Walker has a Doctor of Jurisprudence from Catholic University (Washington, DC) and a Bachelor of Arts from Loyola University (New Orleans) and has over twenty years experience focused on responsible executive and operational officer roles, liquidations, trustee services, examiner and receiver roles, interim operational assignments, environmental trustee roles and wind-downs generally. Mr. Walker is a former Chapter 7 trustee in the Eastern District of Pennsylvania and has presided over numerous individual and corporate cases. He is a member of the American Bar Association, American Bankruptcy Institute and Turnaround Management Association.

WNP is an experienced provider of fiduciary services, turnaround management, restructuring services, litigation and dispute resolution and corporate financial support. Located in Philadelphia, WNP is well situated to efficiently administer the Wind-Down and administration of the Liquidation Trust. Further information on WNP can be obtained at *http://www.walkernell.com*.

2.      Powers & Duties of the Liquidation Trustee

As of the Effective Date, the Liquidation Trustee would have the power to use, acquire and dispose of all assets of the Debtor of any nature existing on the Effective Date, including all Cash held by the Debtor on the Effective Date, the Plant Property and all Causes of Action, including Avoidance Actions (the "Remaining Assets"). The Liquidation Trust would exercise that power without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan.

Following the Effective Date, the Liquidation Trust would not engage in any business activities or take any actions, except those necessary to effectuate the Plan, including (i) selling, transferring, liquidating or abandoning the Remaining Assets for the benefit of Holders of Allowed Claims and Interests, (ii) pursuing any claim or Cause of Action belonging to the Liquidation Trust and (iii) otherwise winding up the affairs of the Debtor, all in accordance with the Liquidation Trust Agreement. The Liquidation Trustee would be entitled to seek such orders, judgments, injunctions and rulings as it deems necessary or desirable to carry out the intentions and purposes, and to give full effect to the provisions, of The Plan.

3.      Distributions

The Liquidation Trustee would make the required Distributions on account of Class 1 Priority Claims, Administrative Claims and Priority Tax Claims as due after the Effective Date. The Liquidation Trustee would also make Distributions of all available Liquidation Proceeds to Class 2 General Unsecured Claims (until paid in full), Class 3 Securities Claim and Class 4 Interest in accordance with Article III of the Plan as soon as practicable whenever Liquidation Proceeds exceed $500,000 and will make a final Distribution upon a determination by the Liquidation Trustee to terminate, dissolve or otherwise wind-down the Liquidation Trust in accordance with The Plan and the Liquidation Trust Agreement.

Any Distribution to a Holder of an Allowed Claim would be made by the Debtor on the Effective Date or the Liquidation Trustee on or after the Effective Date, as applicable: (i) at the address set forth on a proof of claim filed by such Holder; (ii) at the address set forth in any written notices of address change delivered to the Debtor or Liquidation Trustee after the date of any related proof of claim; (iii) at the address for such Holder that is set forth on the Schedules, if no proof of claim has been filed and if neither the Debtor nor the Liquidation Trustee has received a written notice of a change of address; or (iv) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records.

4.    Resolution of Claims

The Liquidation Trustee would be entitled to object to Claims that have not been Allowed (i) by a Final Order of the Bankruptcy Court prior to the Effective Date or (ii) by the express terms of the Plan. Unless otherwise agreed to by the affected Holder and the Liquidation Trustee, any such objections must be filed in the Bankruptcy Case and served upon the affected Holder no later than sixty (60) days after the applicable bar date or be otherwise forever barred. The Liquidation Trustee would have the right to seek to extend the deadline for filing and serving any objections to Claims upon motion to the Bankruptcy Court. The Liquidation Trustee would have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims without further notice, compliance with the Bankruptcy Code or Bankruptcy Rules, or approval of the Bankruptcy Court.

The Liquidation Trustee will deliver to each Former Officer, within forty-five (45) days of the Effective Date, a memorandum setting forth (i) the amount that the Liquidation Trustee would agree to settle the applicable Former Officer Claim and (ii) the factual and legal basis for any reduction in the settlement amount from the applicable amount stated in any proof of claim filed by the Former Officer. If, in spite of the Liquidation Trustee's reasonable best efforts, the Liquidation Trustee has not completed his investigation of a given Former Officer Claim by the date of the memorandum, the memorandum shall instead (i) inform the Former Officer as to why the Liquidation Trustee's investigation is not completed, (ii) describe the further steps necessary to complete such investigation and (iii) provide an estimate of when the Liquidation Trustee anticipates that such investigation shall be completed. Any memorandum provided under this section shall be for settlement purposes only and, in accordance with Federal Rule of Evidence 408 and pursuant to The Plan, shall be inadmissible in any court proceeding relating to the Former Officer Claims

5.    Filing of Reports

Subsequent to the Effective Date, the Liquidation Trustee will file quarterly and other reports with the Bankruptcy Court that will include (a) the number and amount of disputed and resolved claims and the dollar amounts of each, (b) a summary of any Remaining Assets and (c) the general status of the administration of the Liquidation Trust.

**F.    PRESERVATION OF RIGHTS OF ACTION**

*Unless a claim or Cause of Action against a Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtor expressly reserves all claims and Causes of Action, including Avoidance Actions and all claims or Causes of Action that may exist against the Former Officers, for later adjudication by the Liquidation Trustee and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches shall apply to such claims or Causes of Action upon or after the Confirmation Date based on this Disclosure Statement, the Plan or the Confirmation Order. The Liquidation Trustee, in its sole discretion, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any and all Causes of Action, all of which are specifically reserved under the Plan for the benefit of the Liquidation Trust and its beneficiaries. The Debtor's failure to identify a claim, right of action, suit or proceeding herein or in the Plan is specifically not a waiver or release by the Debtor or its Estate of such claim, right of action, suit or proceeding nor shall it limit the Liquidation Trustee's right and power to enforce, sue on, settle or compromise such claim.*

**G.    EXCULPATION**

**THE DEBTOR, THE COMMITTEE, THE DEBTOR'S CURRENT 'OFFICERS, DIRECTORS, EMPLOYEES, AND EACH OF THE DEBTOR'S AND THE COMMITTEE'S ADVISORS, ATTORNEYS, REPRESENTATIVES OR AGENTS AND ANY OF SUCH PERSON'S SUCCESSORS AND ASSIGNS, SHALL NOT HAVE OR INCUR, AND ARE HEREBY RELEASED FROM, ANY CLAIM, OBLIGATION, CAUSE OF ACTION OR LIABILITY TO ONE ANOTHER OR TO ANY HOLDER OF ANY CLAIM OR INTEREST, OR ANY OTHER**

PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE BANKRUPTCY CASE, THE NEGOTIATION AND FILING OF THE PLAN, THE FILING OR CONVERSION OF THE BANKRUPTCY CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.

### H. CONSUMMATION OF THE PLAN

Following Confirmation of the Plan, the Plan would be substantially consummated on the Effective Date, which will be a Business Day selected by the Debtor after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to consummation of the Plan have been satisfied or waived.

## ARTICLE V

### CONFIRMATION OF THE PLAN

To become binding upon Holders of Claims and Interests and other parties, the Plan must be approved by order of the Bankruptcy Court, or "Confirmed." Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan. The following is a brief summary of the Plan Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

### A. CONFIRMATION STANDARDS

To confirm the Plan, the Bankruptcy Court must find that, among other things, the requirements of Bankruptcy Code § 1129 have been satisfied. These requirements are summarized below.

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The Debtor, as Plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation of the Plan is reasonable, or if such payment is to be fixed after the Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.    With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code.

6.    Each Class of Claims or Interests that is entitled to vote on the Plan either has accepted the Plan or is not Impaired, or the Plan can be confirmed without the approval of each voting Class under Bankruptcy Code § 1129(b).

7.    Except to the extent that the Holder of a particular Claim agrees to a different treatment of such Claim, Allowed Administrative Claims and Allowed Priority Claims will be paid in full as soon as reasonably practicable after the Effective Date.

8.    At least one Class of Impaired Claims or Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest in such Class.

9.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

10.    All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States trustee, will be paid as of the Effective Date.

The Debtor believes that the Plan satisfies the requirements of Bankruptcy Code § 1129, including, without limitation, that (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code and (iii) the Plan has been proposed in good faith.

**B.    FINANCIAL FEASIBILITY**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that Confirmation is not likely to be followed by the liquidation of the Debtor, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. The Plan contemplates that all assets of the Debtor will be disposed of and all proceeds of the assets will be distributed pursuant to the terms of the Plan. Since no further reorganization of the Debtor will be possible, the Debtor believes that the Plan meets the feasibility requirement. The Debtor believes that sufficient funds will exist to make all payments required by the Plan.

**C.    BEST INTERESTS OF CREDITORS TEST**

Often called the "best interests" test, Bankruptcy Code § 1129(a)(7) requires that the Bankruptcy Court find that each Holder of a Claim or Interest in each Impaired Class: (1) has accepted the Plan; or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if the Bankruptcy Case were converted to a chapter 7 case and the assets of such Debtor's Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and consummated.

Here, the cash available in a chapter 7 case for satisfaction of Allowed Claims would consist of the proceeds resulting from the liquidation of the Debtor's Estate, augmented by the cash, if any, held by the Debtor at the time of the commencement of the chapter 7 case. Any such cash amount would then be reduced by the costs and expenses of liquidation of the assets and such additional Administrative Claims and other Priority Claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to trustee(s) in bankruptcy, as well as those that might be payable to his or her attorneys, and to other professionals that such trustee(s) may

engage, plus any unpaid expenses incurred by the Debtor during the Bankruptcy Case that would be allowed as a priority in the chapter 7 case, such as compensation for attorneys, accountants, brokers or other professionals, and costs and expenses of the Debtor and any committees. Such administrative expenses from the chapter 7 case would have to be paid in cash in full from the Liquidation Proceeds before the balance of those proceeds could be made available to pay other Claims from the Bankruptcy Case.

Attached hereto as Appendix [C] is a Liquidation Analysis setting forth the Debtor's best estimate of the recoveries to Holders of Claims and Interests were the Bankruptcy Case converted to a case under chapter 7 of the Bankruptcy Code on the Effective Date. As demonstrated by the Liquidation Analysis, the Plan satisfies the "best interests" test primarily because the Plan ensures that the Plant Sale would go forward as planned. If the case were converted, Xttrium would be under no obligation to consummate the Plant Sale. The Plan also avoids the additional layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administrating the Debtor's assets for the benefit of creditors. The Debtor believes that costs associated with a chapter 7 case would exceed the amount that will be incurred in implementing the Plan and completing the Wind-Down of the affairs of the Debtor. Moreover, it is also anticipated that, in a chapter 7 case, distributions to creditors may be significantly delayed.

## D.    CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan; provided that such plan has been accepted by at least one impaired class. Section 1129(b) of the Bankruptcy Code states that, notwithstanding the failure of an impaired class to accept, the plan will be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or Interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank. In determining whether a plan discriminates unfairly, courts will take into account a number of factors. Accordingly, two classes of holders of unsecured claims could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the secured claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the debtor's plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value as of the Effective Date equal to the allowed amount of such claim; or (2) the holder of any claim or Interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or Interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of Interests includes the requirements that either: (1) the plan provide that each holder of an Interest in such class receive or retain under the plan, on account of such Interest, property of a value, as of the Effective Date, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled or (c) the value of such interest; or, (2) if the class does not receive such an amount as required under (1), no class of Interests junior to the non-accepting class receives a distribution under the plan.

The Debtor will seek Confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any Impaired Classes, as applicable, that rejects the Plan, and the Debtor reserves the right to do so with respect to any other rejecting Class of Claims or Interests, as applicable, or to modify the Plan such that the rejection by any Holders of Claims or Interests will not prevent Confirmation. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtor submits that if the Debtor does "cram-down" the Plan pursuant to Bankruptcy Code § 1129(b), the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The fair and equitable requirement is satisfied with respect to holders of Class 2 General Unsecured Claims because, although such holders may not receive a distribution equal to the Allowed amount of their Claims, in such event, no junior Claim or Interest would receive any distribution under the Plan. The fair and equitable requirement is satisfied with respect to holders of Class 3 Securities Claim and Class 4 Interests because there is no junior Claim or Interest that will receive any distribution under the Plan. Therefore, the requirements of Bankruptcy Code § 1129(b) would be satisfied in the event that the Debtor is required to "cram down."

**THE DEBTOR WILL SEEK CONFIRMATION OF THE PLAN UNDER BANKRUPTCY CODE § 1129(B) WITH RESPECT TO ANY CLASSES REJECTING THE PLAN, AND THE DEBTOR RESERVES THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN SUCH THAT ACCEPTANCE BY ANY CLASSES REJECTING THE PLAN IS NOT NECESSARY FOR CONFIRMATION.**

## ARTICLE VI

### CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

**HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    THE DEBTOR MAY NOT BE ABLE TO OBTAIN CONFIRMATION OF THE PLAN

The Debtor cannot ensure that it will receive the requisite acceptances to confirm the Plan. Even if the Debtor receives the requisite acceptances, the Debtor cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of Claims or Interests might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court were to determine that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

### B.    ADMINISTRATIVE CLAIMS & PRIORITY CLAIMS MAY EXCEED EXPECTED LEVELS

Section 1129(a) of the Bankruptcy Code requires that, in order to confirm a chapter 11 plan, administrative expenses of the chapter 11 case and various classes of priority claims must be paid in full in cash, unless the respective holders of such expenses and claims agree to less favorable treatment. The Debtor currently

expects that the amount of allowed administrative expenses and priority claims will not exceed Cash on hand as of the Effective Date, but there can be no assurance that such amounts will not be exceeded or, if such amounts are exceeded, that claimants would consent to a less favorable treatment.

### C.    RECOVERIES MAY NOT MEET EXPECTATIONS

Although the Remaining Assets will be transferred to the Liquidation Trust, there is no guarantee that the Liquidation Trust will realize the recovery estimated by the Debtors for any of its assets, including the Plant Property and there is no guarantee that the Liquidation Trustee will pursue or recognize a recovery on any claim or Cause of Action transferred to the Liquidation Trust.

### D.    LIQUIDATION UNDER CHAPTER 7

If no chapter 11 plan can be confirmed, the Debtor's Bankruptcy Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to the Holders of Claims and, if permitted, Interests, in accordance with the priorities established by the Bankruptcy Code. The recovery to Holders of Claims and Interests may be materially less than is proposed in the Plan if the Bankruptcy Case were so converted.

## ARTICLE VII

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor. Holders of Claims and Interests are advised to seek their own counsel as to the tax consequences to such Holder as a result of receiving any Distributions under the Plan.

Under the Plan, the Debtor is transferring all of its assets to the Liquidation Trust, which will then effectuate sales of such Remaining Assets. These transfers and sales of assets may result in the recognition of taxable gain or loss to the Debtor, based on the difference between the fair market and/or sale value of these assets and the Debtor's tax basis in these assets. The Debtor expects that the sale value of its assets in many cases will be less than the tax basis of such assets. To the extent that the Debtor realizes gain from the transfer of these assets the Debtor believes that they will have sufficient current losses and net operating loss carryovers to shelter these gains, although there could be some liability to the Debtor in certain states and under the federal alternative minimum tax.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE

CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR RECOMMENDATION TO ANOTHER PARTY OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE VIII

### RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to Holders of Claims and Interests than would otherwise result from liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Claims. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN SUPPORT CONFIRMATION OF THE PLAN AND VOTE TO ACCEPT THE PLAN.

\*      \*      \*      \*

THE INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THIS DISCLOSURE STATEMENT MAY CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. WORDS SUCH AS "EXPECT," "PLANS," "ANTICIPATES," "INDICATES," "BELIEVES," "FORECAST," "GUIDANCE," "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ADDITIONALLY, FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS WHICH DO NOT RELATE SOLELY TO HISTORICAL FACTS, SUCH AS STATEMENTS WHICH IDENTIFY UNCERTAINTIES OR TRENDS, DISCUSS THE POSSIBLE FUTURE EFFECTS OF CURRENT KNOWN TRENDS OR UNCERTAINTIES OR WHICH INDICATE THAT THE FUTURE EFFECTS OF KNOWN

TRENDS OR UNCERTAINTIES CANNOT BE PREDICTED, GUARANTEED OR ASSURED. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING, WITHOUT LIMITATION, THOSE DESCRIBED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE IMPLEMENTATION OF THE PLAN, THE CLOSING OF SALE TRANSACTIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR CURRENTLY BELIEVES TO BE IMMATERIAL MAY ALSO IMPAIR THE DEBTOR'S BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND THE VALUE OF THE DEBTOR'S ESTATE.  IF ANY OF THE RISKS OCCUR, THE DEBTOR'S BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS AND THE VALUE OF THE DEBTOR'S ESTATE, AS WELL AS THE DEBTOR'S ABILITY TO CONSUMMATE THE PLAN, COULD BE MATERIALLY ADVERSELY AFFECTED.

# Exhibit C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Northfield Laboratories Inc.,[1] | ) | Case No. 09-11924 (BLS) |
| | ) | |
| Debtor. | ) | Re: Docket No. 70 |
| | ) | |

### ORDER PURSUANT TO SECTIONS 105(a) AND 362(d)(1) APPROVING STIPULATION AMONG DEBTOR, DOCTOR STEVEN A. GOULD AND RICHARD DEWOSKIN REGARDING THE ADVANCEMENT OF DEFENSE COSTS UNDER INSURANCE POLICY NOTWITHSTANDING 11 U.S.C. § 362

Upon the Motion[2] of Northfield Laboratories Inc., debtor and debtor in possession (the "Debtor") in the above captioned case, for entry of an order, pursuant to sections 105(a) and 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") approving the stipulation among the Debtor, Dr. Steven A. Gould ("Gould") and Richard DeWoskin ("DeWoskin") regarding the advancement of defense costs under insurance policy notwithstanding 11 U.S.C. § 362 (the "Motion"); and upon consideration of the Motion and all pleadings related thereto; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its estate and creditors and other parties in interest; and the Court having jurisdiction over this matter to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been provided; and no other notice being needed; and upon the Motion and all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor:

IT IS HEREBY ORDERED THAT

---

[1]   The last four digits of the Debtor's federal tax identification number are: EIN: XX-XXX8733. The Debtor's mailing address is 1200 E. Business Center Dr., Mt. Prospect, IL 60056.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

CHIDMS1/2720507.3

1.   The Motion is granted;

2.   The Stipulation, attached as Exhibit B to the Motion, is approved;

3.   The Debtor is authorized to enter into the Stipulation; and,

4.   This Court shall retain jurisdiction with respect to all matters arising from or

related to the implementation of this Order.

Dated: August 28 , 2009
Wilmington, Delaware

United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) **Chapter 11** |
| **NORTHFIELD LABORATORIES INC.,** | ) **Case No. 09-11924** |
| | ) |
| Debtor. | ) ` |
| | ) |

## STIPULATION AMONG DEBTOR,
## DOCTOR STEVEN A. GOULD AND RICHARD E. DEWOSKIN
## REGARDING THE ADVANCEMENT OF DEFENSE COSTS UNDER
## INSURANCE POLICY NOTWITHSTANDING 11 U.S.C. § 362

**WHEREAS**, Genesis Insurance Company ("Genesis") issued Directors and

Officers Liability Policy No. YXB002349D to Debtor Northfield Laboratories, Inc. ("Debtor")

for the policy period of May 26, 2005 to May 26, 2006 (the "Policy");

**WHEREAS**, Genesis has received notice under the Policy relating to *In re*

*Northfield Laboratories, Inc. Sec. Litig.*, No. 06-C-1493 (N.D. Ill.) (the "Litigation").

**WHEREAS**, prior to the bankruptcy filing and subject to mutual reservations of

rights, Genesis has advanced on a current basis certain Defense Costs, as that term is defined in

the Policy (hereinafter "Defense Costs"), under the Policy in connection with the Litigation to or

on behalf of the Debtor, Doctor Steven A. Gould ("Gould") and Richard E. DeWoskin

("DeWoskin") (collectively, the "Insureds");

**WHEREAS**, Genesis has indicated that, subject to mutual reservations of rights,

it is willing to continue to advance on a current basis certain Defense Costs under the Policy in

connection with the Litigation to or on behalf of the Insureds, including without limitation

Defense Costs incurred on behalf of the Debtor pre-petition.

**WHEREAS**, on June 1, 2009, the Debtor filed a petition under Chapter 11 of

Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*;

**WHEREAS**, Gould and DeWoskin have incurred and continue to incur defense fees and costs in connection with the Litigation;

**WHEREAS**, in order to comply with the Policy and subject to the mutual reservations of rights, Genesis will advance Defense Costs to or for the benefit of the Insureds; and

**WHEREAS**, the advancement of Defense Costs may be deemed to implicate the automatic stay of 11 U.S.C. § 362 and thus the Debtor and Genesis seek the Court's approval of this stipulation;

**IT IS NOW THEREFORE STIPULATED AND AGREED** that, notwithstanding the automatic stay of 11 U.S.C. § 362, to the extent applicable, Genesis and the other insurers whose policies are specifically excess of the Policy shall be and hereby are authorized to make payments under the Policy or such other policies to or for the benefit of the Insureds for Defense Costs incurred in connection with the Litigation.

Dated:  August __, 2009

**AGREED AND ACCEPTED:**

**BAKER & MCKENZIE LLP**                    **JENNER & BLOCK LLP**


By: _____          By: _____
    David F. Heroy                              Ronald L. Marmer
    Andrew P.R. McDermott                       Suzanne J. Prysak
    One Prudential Plaza, Suite 3500            330 N. Wabash
    130 East Randolph Street                    Chicago, IL 60611
    Chicago, IL 60601                           Telephone: 312.222.9350
    Telephone: 312.861.8000                     Facsimile: 312.527.0484
    Facsimile: 312.698.2345                     Email: RMarmer@jenner.com
    E-mail: amcdermott@bakernet.com

    Ian Connor Bifferato                 *Counsel for Doctor Steven A. Gould*
    Thomas F. Driscoll III
    Bifferato LLC
    800 N. King Street, First Floor
    Wilmington, DE 19801
    Telephone: 302.225.7600
    Facsimile: 302.792.7470
    Email: tdriscoll@bifferato.com

*Counsel for Debtor Northfield Laboratories Inc.*

**KATTEN MUCHIN ROSENMAN LLP**


By: _____
    Jason P. Shaffer
    525 West Monroe Street
    Chicago, IL 60661-3693
    Telephone: 312.902.5200
    Facsimile: 312.902.1061
    E-mail: jason.shaffer@kattenlaw.com

*Counsel for Richard E. DeWoskin*