IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ) | |
| ) | No. 06CV1493 |
| IN RE NORTHFIELD LABORATORIES ) | Honorable Judge George M. Marovich |
| INC. SECURITIES LITIGATION ) | Magistrate Nan R. Nolan |
| ) | |
| ) | **GMR**     **FILED** |
| ) | |
| ) | **FEBRUARY 22, 2010** |

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

David C. Bohan
Jason Shaffer
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5566

*Attorneys for Richard E. DeWoskin*

Dated: February 16, 2010

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Attorneys for Steven A. Gould M.D.*

**Contents**

INTRODUCTION ........................................................................................................... 1

FACTS ......................................................................................................................... 4

    A.    The ANH Trial ........................................................................................... 5

    B.    The Trauma Trial ....................................................................................... 8

    C.    The Public Disclosures Of The Heart Attacks And ANH Trial Results .................. 10

    D.    The 2006 News Reports ............................................................................. 15

    E.    Proceedings In This Case ........................................................................... 16

ARGUMENT ............................................................................................................... 19

  Legal Standards ...................................................................................................... 19

I.    PLAINTIFFS HAVE NOT ESTABLISHED THE FRAUD-ON-THE-MARKET
    REQUIREMENT OF MARKET EFFICIENCY ............................................................. 23

    A.    Plaintiffs' Own Theory Defeats Market Efficiency Because They Contend That
        Publicly Available Information Was Not Incorporated Into The Stock Price For
        Months Or Even Years ............................................................................... 23

    B.    As Dr. Gompers Concludes, The Market Was Not Efficient And Was Driven By
        Investor Sentiment Rather Than New Information ............................................ 24

    C.    Plaintiffs Have Not Established Market Efficiency Because Dr. Hakala's Approach
        Is Unscientific And Ignores Critical Facts That Contradict His Result ................. 29

        1.    Dr. Hakala ignores key information that was publicly disclosed before
            2006 and that should have affected the stock price if the market truly were
            efficient .................................................................................... 30

        2.    Dr. Hakala ignores objective evidence of market inefficiency ............... 31

        3.    Dr. Hakala's efficiency determination is based on an event study that does
            not comply with accepted procedures and is biased towards finding
            statistically significant price movements ................................. 31

        4.    Dr. Hakala's deposition testimony confirms that his approach is
            unscientific ............................................................................... 36

II.    PLAINTIFFS HAVE NOT ESTABLISHED THE FRAUD-ON-THE-MARKET
       REQUIREMENT OF MATERIALITY ............................................................................ 40

       A.    As Dr. Gompers Concludes, The Specific Misrepresentations Remaining In This
             Case Were Not Material If The Market Were Efficient......................................... 40

       B.    Plaintiffs' Have Not Established Materiality ........................................................ 42

III.   COMMON ISSUES DO NOT PREDOMINATE BECAUSE PLAINTIFFS HAVE NOT
       DEMONSTRATED THAT THE ALLEGED MISREPRESENTATIONS WERE MADE
       AND UNDERSTOOD IN A UNIFORM MANNER THAT CAN BE TRIED ON A
       CLASS-WIDE BASIS..................................................................................................... 48

IV.    COMMON ISSUES DO NOT PREDOMINATE BECAUSE PLAINTIFFS HAVE NOT
       ESTABLISHED THAT THE FACT OF INJURY CAN BE TRIED ON A CLASS-WIDE
       BASIS............................................................................................................................. 51

V.     PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE TYPICAL AND
       ADEQUATE REPRESENTATIVES BECAUSE THEY ARE SUBJECT TO UNIQUE
       DEFENSES ..................................................................................................................... 54

       A.    The Named Representatives Did Not Purchase Any Shares Until After Significant
             Disclosures And Events Had Occurred.................................................................. 54

       B.    None Of The Named Plaintiffs Is A Proper Class Representative ......................... 56

CONCLUSION.................................................................................................................................. 63

# Authorities

## *Cases*

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ...................................................... 20, 21, 40, 41, 47

*Bell v. Fore Systems*, No. CIV. A. 97-1265, 2002 WL 32097540 (W.D. Pa. Aug. 2, 2002) ........ 3

*Berwecky v. Bear, Sterns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000) ............................................. 56

*Blades v. Monsanto*, 400 F.3d 562 (8th Cir. 2005) ................................................................ 20, 52

*Brewer Quality Homes, Inc. v. C.I.R.*, No. C 8222-99, 2003 WL 21545886
    (U.S. Tax Ct. July 10, 2003), *aff'd*, 122 Fed. Appx. 88 (5th Cir. 2004) ........................... 3

*In re Broadcom Corp. Sec. Litig.*, No. SACV01275GLTMLGX,
    2005 WL 1403756 (C.D. Cal. June 3, 2005) ................................................................... 2

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ............................................... 24, 25, 27, 28

*Cohen v. Laiti*, 98 F.R.D. 581 (E.D.N.Y.1983) ................................................................... 59

*Darvin v. International Harvester*, 610 F. Supp. 255 (S.D.N.Y. 1985) ..................................... 59

*Doe v. Chao*, 306 F.3d 170 (4th Cir. 2002) ........................................................................ 53

*In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427 (S.D. Tex. 2002) ............................................. 56

*Epstein v. American Reserve Corp.*, No. 79 C 4767,
    1988 WL 40500 (N.D. Ill. April 21, 1988) ....................................................................... 56

*Fener v. Operating Eng'rs Const. Indus. and Miscellaneous Pension Fund (LOCAL 66)*,
    579 F.3d 401 (5th Cir. 2009) ....................................................................... 2, 3, 34, 43

*First Chicago Corp. v. C.I.R.*, No. 31175-88, 1994 WL 284028 (U.S. Tax Ct. June 28, 1994) ... 3

*Fleischman v. Albany Medical Center*, No. 1:06-CV-765,
    2008 WL 2945993 (N.D.N.Y. July 28, 2008) ............................................................... 53

*Fotta v. Trustees of United Mine Workers of Am.*, 319 F.3d 612 (3d Cir. 2003) ....................... 53

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) ........................................... 20, 22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990) ....................................................................................... 54

*Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009) ............................................. 51

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ...................................... 20

*In re Initial Public Offering Securities Litig.*, 471 F.3d 24 (2d Cir. 2006) ........................... 20, 49

*J. H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994 (7th Cir. 1980) ................... 54, 55

*Kaplan v. Pomerantz*, 132 F.R.D. 504 (N.D. Ill. 1990) ....................................................... 59

*Kline v. Wolf*, 702 F.2d 400 (2d Cir. 1983) .................................................................. 59

*Kohler v. C.I.R.,* No. C 4261-03, 2006 WL 2059210 (U.S. Tax Ct. July 25, 2006) .................... 3

*McDonald v. Prudential Ins. Co. of America*, No. 95 C 5186,
  1999 WL 102796 (N.D. Ill. Feb. 19, 1999) ................................................................. 22

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ....................................... 52

*In re Metris Cos. Sec. Litig.*, 428 F. Supp. 2d 1004 (D. Minn. 2006) ......................................... 2

*In re MIVA, Inc. Sec. Litig., No. 2:05-cv-201*, 2008 WL 681755 (M.D. Fla. Mar. 12, 2008) ..... 55

*In re MIVA, Inc. Sec. Litig.,* No. 2:05-cv-201, 2009 WL 3821146 (M.D. Fla. Nov. 16, 2009) ..... 2

*Nicholas J. Murlas Living Trust v. Mobil Oil Corp.*, No. 93 C 6956,
  1995 WL 124186 (N.D. Ill. Mar. 20, 1995) ................................................................. 58

*In re Omnicom Group Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008) ................. 2, 34, 43

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.,*
  487 F.3d 261 (5th Cir. 2007) ...................................................................................... 52

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) ........................................................ 51

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ............................................................. 51

*Reed v. Advocate Health Care*, No. 06 C 3337, 2008 WL 162760 (N.D. Ill. Jan. 17, 2008) ...... 58

*Robinson v. Penn Central Co.*, 58 F.R.D. 436 (S.D.N.Y. 1973) .............................................. 55

*In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003) ................................................. 56

*In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir. 2008) ........................ 22, 40, 52

*In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litig.,*
  Nos. 05 C 4742, 05 C 2623, 2009 WL 3460218 (N.D. Ill. Oct. 20, 2009) ..................... 53

*Siegel v. Shell Oil Co.*, No. 06 C 0035, 2009 WL 449073 (N.D. Ill. Feb. 23, 2009) ................. 52

*Smith v. United States*, 923 F. Supp. 896 (S.D. Miss. 1996) ........................................................ 3

*In re St. Jude Medical Inc. Silzone Heart Valve Products Litigation*,
    522 F.3d 836 (8th Cir. 2008) ................................................................................. 53

*Stanek v. AT&T*, No. 96 C 4096, 1998 WL 831877 (N.D. Ill. November 25, 1998) ................. 22

*Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) ............................. 1, 19, 20, 21

*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008) ........................................... 50

*Tricontinental Indus. v. PricewaterhouseCoopers, LLP,* 475 F.3d 824 (7th Cir. 2007) ............. 20

*Ungar v. Amedisys, Inc.*, 401 F.3d 316 (5th Cir. 2005) .............................................................. 20

*West v. Prudential Sec., Inc.*, 282 F.3d 935 (7th Cir. 2002) .................................. 3, 19, 21, 24, 50

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989) ....................................... 21

*In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ,
    2008 WL 7084626 (D. Mass. Apr. 25, 2008) ........................................... 3, 33, 35, 40, 43

*Zimmerman v. Bell*, 800 F.2d 386 (4th Cir. 1986) ..................................................................... 49

**Statutes and Rules**

42 U.S.C. § 262(a) ..................................................................................................................... 5

17 C.F.R. § 242.203 ................................................................................................................. 28

21 C.F.R. § 312.3(b) .................................................................................................................. 5

Fed. R. Civ. P. 23 ......................................................................................................... 19, 22, 41

**Other Authorities**

5 *Moore's Federal Practice*, § 23.45[5][a][ii][A] (3d ed. 2010) ................................................. 48

7A C. Wright & A. Miller, *Federal Practice and Procedure*, §§ 1764 and 1765 (3d ed. 2005)  54

## INTRODUCTION

As this Court recognized in deciding to bifurcate class discovery from merits discovery in this case, the former practice of accepting plaintiffs' factual allegations as true for purposes of class certification is over.  This Court stated:  "[M]y reading of Seventh Circuit law indicates to me that before I as a District Judge can certify a class, it has to be determined whether or not the so-called fraud in the marketplace presumption prevails . . . ."  (Ex. 2, 10/14/08 Tr. at 3.)  The Seventh Circuit's seminal decision in *Szabo* radically changed prior practice regarding class certification motions.  *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001).  In *Szabo*, the Seventh Circuit held that district courts no longer can accept as true plaintiffs' factual allegations affecting class certification and leave disputes concerning those allegations for a later day.  Instead, district courts must act as preliminary fact finders and resolve disputed facts, even if those disputes "overlap the merits."  *Id.* at 676.  District courts must "receive evidence" and make "factual and legal" determinations by a preponderance of the evidence as to whether plaintiffs have established each requirement of Rule 23.  *Id.*

Here, under *Szabo* and its progeny, plaintiffs no longer can avoid key facts that contradict the fraud-on-the-market theory upon which plaintiffs premise their class certification motion.  The gist of plaintiffs' allegations is that Northfield Laboratories Inc. ("Northfield") fraudulently concealed that heart attacks were observed in a 1990s elective surgery study of Northfield's "PolyHeme" blood substitute — even though no one involved in the study (including the FDA) thought that the heart attacks were caused by PolyHeme.  In reality, information about the heart attacks was disclosed to thousands of people throughout the country — via methods ranging from websites and internet "chatroom" bulletin boards to local seminars and county fairs — months and years <u>before</u> the 2006 stock drop upon which plaintiffs rely.  For example, in June 2005, investors in the Northfield Yahoo internet "chatroom" posted and discussed the results of the elective surgery study, specifically including disclosure of the very information that plaintiffs contend was concealed — that "Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group."  (Ex. 3 at 1.)  Those investors also discussed and linked to

the websites of various hospitals, which had posted the identical disclosure on their internet sites. (Ex. 3 at 1, 18, 36, 45-46, 49, 65-67, 125-26; Ex. 27; Ex. 28; Ex. 29.)  As those investors further noted, hospitals had presented the same information at health fairs and community meetings throughout the country, including in PowerPoint presentations and brochures.  Indeed, one nurse in upstate New York submitted a report (filed with the FDA) stating that she used those brochures "at every event and distributed approximately 1000."  (Ex. 4 at 1.)

Rather than dealing with those facts and their impact on class certification, plaintiffs' expert, Dr. Scott Hakala, chooses to ignore them.  In reaching his flawed opinions about market efficiency and materiality, Dr. Hakala does not even mention those public disclosures.  Instead, Dr. Hakala conducted an "event study" based on a variety of unscientific techniques, such as selectively omitting data from trading dates subjectively chosen by him; inserting "dummy variables" to overstate the statistical significance of particular events he wishes to stress; and failing to disaggregate price changes connected with allegedly fraud-related events from those connected with non-fraud-related events.

That is why courts in other securities cases repeatedly have rejected the "expert" testimony of Dr. Hakala as being fatally defective.  *See, e.g., Fener v. Operating Eng'rs Const. Indus. and Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 410-11 (5th Cir. 2009) (Dr. "Hakala's testimony was fatally flawed" and his "conclusions . . . lack analytical support"); *In re Omnicom Group Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (Dr. Hakala's "event study at best incorrectly identifies several corrective disclosures and at worst fails to identify any at all"); *In re Metris Cos. Sec. Litig.*, 428 F. Supp. 2d 1004, 1014 (D. Minn. 2006) (Dr. Hakala's theory of loss causation "strain[s] the imagination"); *In re Broadcom Corp. Sec. Litig.*, No. SACV01275GLTMLGX, 2005 WL 1403756, at *2 (C.D. Cal. June 3, 2005) (Dr. Hakala's damages model "probably does not satisfy the Daubert test" and is of "highly questionable reliability and accuracy" as applied); *accord In re MIVA, Inc.*, No. 2:05-cv-201, 2009 WL 3821146, at *12 (M.D. Fla. Nov. 16, 2009) (Dr. Hakala "provided no analysis as to how much inflation may be attributable to either or both of the allegedly fraudulent statements" and

"fail[ed] to analyze the effect of each particular misrepresentation"); *In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ, 2008 WL 7084626, at *1 (D. Mass. Apr. 25, 2008) (rejecting Dr. Hakala's approach, which "no peer-reviewed journal supports"); *Bell v. Fore Systems*, No. CIV. A. 97-1265, 2002 WL 32097540, at *1, 4 (W.D. Pa. Aug. 2, 2002) (excluding Dr. Hakala's testimony because his damages model violates the PSLRA).[1]

Defendants' expert, Dr. Paul Gompers of the Harvard Business School, has examined the disclosures of the relevant information concerning Northfield and concludes that Dr. Hakala's opinions are incorrect. Dr. Gompers opines that Dr. Hakala's methodology "is unreliable and inconsistent with generally accepted practices in the field of finance" and "would not be accepted by any peer reviewed journal." (Ex. 1, Gompers Rep. ¶ 38.) Dr. Gompers concludes that the market for Northfield stock in fact was not efficient, and that the misrepresentations alleged by plaintiffs were not material even if he assumed that the market were efficient. *Id.* ¶¶ 74-110, 114-24; *see generally Fener*, 579 F.3d at 409 n.15, 410 (5th Cir. 2009) (rejecting Dr. Hakala's opinion as "fatally flawed" and accepting opinion of Dr. Gompers, whose "initial study — rather than Hakala's — discusses the proper way in which to examine [defendant's] disclosures").

As shown below, the Seventh Circuit has held squarely that a district court, faced with "clashing" views of experts on matters relevant to class certification, must chose between them and cannot postpone the issue until trial. *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th

---

[1] Dr. Hakala has suffered similar criticisms by courts in non-securities cases. *See, e.g., Kohler v. C.I.R.*, No. C 4261-03, 2006 WL 2059210, at *11-13 (U.S. Tax Ct. July 25, 2006) (placing "no weight on Dr. Hakala's report" because it makes unsupported subjective judgments with respect to weighing different income models); *Brewer Quality Homes, Inc. v. C.I.R.*, No. C 8222-99, 2003 WL 21545886, at *10 (U.S. Tax Ct. July 10, 2003) (finding that correction of just one set of inconsistencies in Dr. Hakala's expert report resulted in changes of seven to 10 percent in his conclusions, and that "Hakala's efforts to persuade us to walk that road serve only to cause us to doubt his judgment"), *aff'd*, 122 Fed. Appx. 88 (5th Cir. 2004); *Smith v. United States*, 923 F. Supp. 896, 903-04 (S.D. Miss. 1996) (finding that Dr. Hakala ignored important information likely to impact his conclusions, "makes no mention of this in his report," and is "more of an advocate . . . than an impartial expert"); *First Chicago Corp. v. C.I.R.*, No. 31175-88, 1994 WL 284028, at *3 (U.S. Tax Ct. June 28, 1994) (disregarding Dr. Hakala's expert report and noting that he reached conclusions "by manipulating the underlying assumptions").

Cir. 2002) ("A district judge may not duck hard questions by observing that each side has some [expert] support, or that considerations relevant to class certification also may affect the decision on the merits").  In addition, this Court must consider evidence showing that none of the named plaintiffs is a proper class representative for multiple reasons — such as giving false deposition testimony about their trading records and prior litigation history; refusing to vouch for the materiality of the challenged information; and continuing to purchase Northfield stock even after they assert the truth was disclosed.

For the reasons demonstrated in Dr. Gompers report and for additional reasons showing that the named plaintiffs are inadequate and atypical class representatives, the motion for class certification should be denied.

## FACTS

This Court summarized the background of this dispute in the Court's September 25, 2007 Opinion.  (Op. 1-19.)  In brief, Northfield was founded in 1985 to develop and market an oxygen-carrying, red-blood-cell substitute.  Persons needing blood, especially in trauma situations, effectively have only two options.  One is donated blood.  But for various reasons, including the need for typing and cross-matching, donated blood generally is not available until a patient reaches a hospital.  The other option is saline (salt water), which is the standard treatment in a pre-hospital setting, such as at an accident scene or in an ambulance.  However, saline does not carry oxygen and thus cannot keep vital organs alive.  *See generally* Ex. 5 at 1-2.[2]

Over twenty years ago, Northfield developed a red-blood-cell substitute, PolyHeme, for which Northfield received multiple patents.  *See, e.g.,* Ex. 6 (Patent No. 6,914,127).  To manufacture PolyHeme, Northfield started with hemoglobin removed from donated blood that was past its expiration date.  (Ex. 5 at 1; 2d Am. Cmplt. at ¶ 40.)  Northfield then chemically modified the hemoglobin so that it maintained its oxygen-carrying ability without the problems

---

[2]  The exhibits referenced in this memorandum are contained in the separately bound Appendix.

of typing, disease transmission, or short shelf-life inherent in ordinary donated blood.  (Ex. 5 at 1; 2d Am. Cmplt. at ¶ 40.)

Like any drug or medical product, Northfield could not market PolyHeme without the FDA's express approval, which for a product such as PolyHeme requires submission of a Biologics License Application ("BLA").  *See* 42 U.S.C. § 262(a).  FDA regulations provide that before the FDA will approve a BLA for a new product, a "clinical investigation" — often referred to as a clinical trial — must have been performed to evaluate the safety and effective-ness of the product for its intended use.  21 C.F.R. § 312.3(b).  Although there have been "numerous clinical trials involving PolyHeme" (2d Am. Cmplt. ¶ 49), plaintiffs' allegations in this case focus on a particular trial (*id.* ¶ 3) — a study of patients undergoing elective surgery to treat an abdominal aortic aneurysm, which is a weakening of the wall of the aorta.  That study sometimes is referred to as the "Acute Normovolemic Hemodilution" or "ANH" study.  *Id.* at ¶ 5.

**A.     The ANH Trial.**

In spring 1997, the FDA approved a protocol for the ANH study, which was to have a total enrollment of 240 patients.  (Ex. 7 at 1; Ex. 8 at 1.)  However, because of delays, the first patient was not enrolled and the trial was not commenced until February 1998.  In April 1998, Northfield announced that it hoped to complete enrollment of the full 240 patients by the fourth quarter of 1998.  (Ex. 9 at 2.)  But in August 1998, the FDA requested that the number of patients in the study be increased from 240 to 600.  The FDA requested that Northfield increase the size of the trial because a much larger competitor, Baxter Healthcare Corporation, had encountered safety problems with another potential blood substitute product.  *See* Ex. 10 at 6; 2d Am. Cmplt. ¶ 53.  Northfield was not able to enroll 240 patients by the fourth quarter 1998.  Indeed, even a year later, by November 1999, Northfield had enrolled only 138 patients.  (Ex. 8 at 2.)  The delay in enrolling patients (which sometimes is referred to as slow "patient accrual") was caused by multiple factors.  One important factor was that, during the course of the trial, a new stent procedure less complex than the ANH procedure had been developed for the repair of

aortic aneurysms.  (Ex. 8 at 1.)  The new stent procedure decreased the number of patients available for Northfield's trial.  *Id.* at 1.

Aortic aneurysm surgery via the ANH procedure is complex and requires the removal of a significant portion of the patient's blood.  Because of the paramount concern for patient safety, the protocol for the ANH Trial necessarily allowed significant flexibility by surgeons, who cannot know in advance how the operation will unfold.  (Ex. 8 at 3.)  By permitting the surgeons to vary the amount and types of liquid to be removed and infused into the patient, other variables, besides the use of PolyHeme, could produce differences between the treatment group and control group.  Those other variables are referred to as "confounders."  *Id.*  For example, based in part on the differing oxygen-carrying properties of the liquids being infused and depending on circumstances unique to particular patients, the protocol permitted surgeons to infuse different amounts of fluid.  *Id.*  In particular, depending on the circumstances, the study permitted surgeons to (a) remove a larger amount of PolyHeme patients' blood at the outset of the surgery (indeed, almost twice as much); (b) infuse twice as much fluid in the PolyHeme patients before and during surgery to replace the removed blood; and (c) reinfuse or return more blood and oxygen-carrying products in PolyHeme patients within the first 24 hours during and after surgery (4.4 liters in the PolyHeme group versus 2.2 liters in the control group).  *Id.* at 3-4.  Thus, surgeons could infuse a substantially higher volume of fluids into PolyHeme patients than control group patients.  *Id.*

By September 1999, more than two years after the FDA had approved the protocol for the study, Northfield had enrolled the first 120 patients in the trial.  (Ex. 10 at 6; Ex. 8 at 2; 2d Am. Cmplt. at ¶ 54.)  Under the terms of the protocol, Northfield was "blinded" from the study's results, meaning that Northfield was precluded from seeing them.  (Ex. 10 at 6.)  Instead, an Independent Data Monitoring Committee ("IDMC") was to perform an interim analysis of the data from those patients to assess patient safety.  (Ex. 8 at 2; 2d Am. Cmplt. at ¶ 54.)  In November 1999, the IDMC conducted a review and reported differences between the two groups, although the IDMC did not know which group was which.  (Ex. 8 at 2.)  The IDMC

determined that more patients in one group had experienced heart attacks. *Id.* The IDMC asked that the interim data be "unblinded" and that an analysis be conducted to assess whether the difference between the two groups was caused by a randomization failure, a treatment "confounder," or some inherent toxicity of PolyHeme. *Id.*

Northfield determined that the heart attacks occurred in the PolyHeme group. However, based on its analysis, Northfield concluded that the heart attacks likely were caused by fluid management issues in the implementation of the protocol and not by anything related to PolyHeme. (Ex. 8 at 5; Ex. 11 at 2, 4.) In some of the operations, the PolyHeme patients had potentially too much fluid infused into them before, during, and after the surgery. Northfield's view rested on multiple facts, including:

- Nine of the ten patients who had heart attacks also experienced other symptoms of fluid overload, suggesting that they had been administered too much fluid. (Ex. 8 at 4.)

- An independent cardiologist reviewed the ECG tracings of all patients in the ANH trial before and after the administration of PolyHeme and found no significant differences between the patients who received PolyHeme and those who did not. *Id.*

- None of the Principal Investigators (that is, the independent scientists and surgeons) in the study opined that the heart attacks were "possibly" or "probably" related to PolyHeme. *Id.*

- Distribution of the patients who suffered heart attacks was not consistent among medical sites (that is, the heart attacks occurred disproportionately at smaller sites which did fewer operations than larger sites). If PolyHeme itself had been the problem, the heart attacks should have occurred in similar percentages at both large sites and small sites. *Id.*

- The heart attacks were inconsistent with the experience in Northfield's other clinical trials involving PolyHeme, where patients had not experienced a greater incidence of heart attacks. (Ex. 8 at 1; Ex. 12 at 1.)

In the meantime, patient accrual in the ANH Trial had proved to be intolerably slow. The protocol that the FDA approved in Spring 1997 called for a total enrollment of 240 patients. (Ex. 10 at 6; Ex. 8 at 1.) However, because of delays, the first patient was not enrolled until nearly a year later, in February 1998. In August 1998, the FDA requested that the number of patients in

the study be increased from 240 to 600, which was prompted by safety problems arising with a competitor's blood-substitute product. *See* Ex. 10 at 6; 2d Am. Cmplt. ¶ 53. Northfield was unable to enroll 240 patients by the fourth quarter 1998 as Northfield had hoped (much less 600). Indeed, even a year later, by November 1999, Northfield had enrolled only 138 patients. (Ex. 8 at 2.) By October 2000, when the last patient was enrolled, Northfield had enrolled only 152 patients, barely a quarter of the required number. (Ex. 8 at 3.) At that accrual rate, it would have taken over <u>nine</u> additional years for Northfield simply to have enrolled the required number of patients, much less have completed the study, analyzed the data, and submitted an approval application to the FDA. For a small company with limited resources, continuing the ANH study made no economic sense, especially when there was a potential for trauma use.

## B. The Trauma Trial.

Northfield decided that, in light of the slow patient accrual for the ANH trial and the complexity of the protocol, the company's limited resources would best be spent focusing on FDA approval of PolyHeme for trauma situations as opposed to elective surgery situations. (Ex. 8 at 2; Ex. 13 at 5-6.) Accordingly, Northfield began winding down the ANH Trial. Northfield enrolled the last new patient in October 2000, although several investigation sites remained open and continued follow-up with existing patients. (Ex. 8 at 1-2; Ex. 15, Twaddell Dep. at 229-33.) Northfield terminated the trial entirely in November 2001, shutting down all investigation sites and retrieving all of the PolyHeme from them. (Ex. 14 at 5-6.) Northfield expressly disclosed that it was terminating the elective surgery trial and shifting its efforts towards trauma applications for which Northfield intended to file a BLA. For example, Northfield's August 2001 Form 10-K stated: "We intend to terminate our current elective surgery protocol after the BLA is filed [that is, an FDA application for trauma use based on earlier studies] and focus on these additional trials." (Ex. 13 at 6.)

Northfield submitted a BLA for trauma use that same month, August 2001. However, the FDA did not accept the application. Instead, the FDA issued a Refusal To File notice and told

Northfield that it needed to conduct a full study of PolyHeme in emergency trauma situations. (Ex. 16 at 1-2.)

In March 2003, the FDA approved a new study of PolyHeme in trauma situations, whereby ambulance paramedics would give PolyHeme to some accident victims and give saline to others. (Ex. 11 at 4.) Because patients typically are unconscious in those situations, the FDA approved the trauma trial on a rarely permitted "exception from informed consent" basis. Significantly, in permitting the trauma trial to proceed without the "informed consent" of patients, the FDA had full knowledge of the heart attacks in the ANH trial. In 2000, Northfield had reported to the FDA the data and findings from the ANH Trial, including the heart attacks. (Ex. 8 at 2; Ex. 11 at 4; 2d Am. Cmplt. ¶¶ 15-16.) As the director of the FDA's Office of Blood Research and Review, Dr. Jay Epstein, confirmed publicly, the FDA approved the trauma trial without requiring the informed consent of patients because "[t]he FDA's review suggested that 'volume overload' rather than 'any intrinsic toxicity of the product' was responsible for the cardiac events" in the ANH Trial. (Ex. 11 at 4.) In other words, the FDA reached the same conclusion as Northfield — that the heart attacks in the ANH Trial likely were unrelated to PolyHeme.

The IDMC for the trauma trial, which also had full knowledge of the heart attacks in the earlier ANH Trial, reviewed patient safety data in the trauma trial on four separate occasions (July 21, 2004; October 13, 2004; April 11, 2005; and November 15, 2005), following enrollment of the first 60, 120, 250, and 500 patients. (Ex. 5 at 3; Ex. 12 at 1; Ex. 17 at 3; Ex. 18 at 1.) The IDMC did not report findings similar to the experience that occurred in the ANH Trial or other safety concerns that warranted modification or cessation of the trauma trial. *Id.* Furthermore, in March 2006, following media criticism of the "exception from informed consent" nature of the trauma trial, the IDMC reiterated the committee's recommendation that the trauma trial continue without modification. (Ex. 18 at 1.)

### C.      The Public Disclosures Of The Heart Attacks And ANH Trial Results.

The central premise of plaintiffs' complaint here is that the heart attacks observed in the PolyHeme group during the ANH Trial were not disclosed until January to March 2006, when several stock drops occurred. *See* 2d Am. Cmplt. ¶¶ 11-13.  In reality, the heart attacks were disclosed to thousands of people in connection with the trauma trial, long before January to March 2006.  Yet Northfield's stock price generally rose, going from $3.63 at the beginning of 2003, to $6.36 at the beginning of 2004, to $21.56 at the beginning of 2005.  (Ex. 19.)

●      **48 trauma hospitals and their staffs knew.**  Starting in 2003, Northfield commenced the process of soliciting hospitals to participate in the trauma trial.  The first step in the process involved Northfield sending two detailed documents — an Investigator's Brochure and a Protocol — to hospitals that were considering participating in the trial.  The Investigator's Brochure and the Protocol both contained lengthy, explicit discussions of the ANH Trial and the heart attacks observed there, including the precise number of patients experiencing heart attacks in each group.  (Ex. 15, Twaddell Dep. at 49-53, 148-49, 156, 193-94.)  At least 48 hospitals and medical centers throughout the country received those two documents.  *Id.*

●      **Trauma patients and their families knew.**  Although the trauma trial was on an "exception from informed consent" basis, at least three hospitals, starting in summer 2004, chose to provide all patients enrolled in the trial with post-treatment consent forms that contained information concerning the heart attacks observed in the ANH trial.  (Ex. 20; Ex. 21; Ex. 22.)  For instance, the Brooke Army Hospital consent form stated that "[i]n one study where patients received PolyHeme during a complex surgery, there was an increased number of heart attacks noted." (Ex. 22 at 6.)  Hospitals in Texas and Kentucky used similar consent forms.  (Ex. 20; Ex. 21; Ex. 15, Twaddell Dep. 235-36.)

●      **Attendees at community meetings and events knew.**  Because of the lack-of-informed-consent nature of the trauma study, the FDA required "community disclosure" activities in all test-site cities.  Various hospitals and their principal investigators held community meetings to inform the public about PolyHeme, the trial protocol, and the procedure

for opting out of the trial (by wearing blue wrist bracelets).  (Ex. 4 at 1, 7-17; Ex. 23; Ex. 24 at 1-11.)  Each hospital had the discretion to script those meetings and to provide any information about PolyHeme and the associated risks that the hospital thought was relevant.  Many hospitals chose to use PowerPoint slides, a Frequently Asked Questions ("FAQs") brochure, and PolyHeme Backgrounder materials that were based on forms prepared by Northfield.  (Id.; Ex. 15, Twaddell Dep. at 71-72, 201-02.)  Starting in 2005, those materials explicitly discussed the heart attacks observed in the ANH Trial, stating:  "Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group."  (Ex. 4 at 4; Ex. 24 at 16; Ex. 25 at 6.)  According to FDA records, numerous community meetings, health fairs, and presentations were held at which those materials were presented.  Those events included:

> May 24 to June 2, 2005 — at least eight "public disclosure presentations" were held by Miami Valley Hospital (Ohio), with PowerPoint slides stating "Serious adverse events, including cardiovascular, were observed." (Ex. 26 at 1-3, 6, 14, 17.)

> June 21 to June 30, 2005 — at least four community disclosure meetings were held by the University of Utah with PowerPoint slides and handouts of the PolyHeme FAQs, including the ANH disclosures that "[s]erious cardiovascular adverse experiences occurred more frequently in the PolyHeme group." (Ex. 23.)

> June 29 to August 30, 2005 — at least three community disclosure meetings were held by the West Virginia University Hospital with handouts of the PolyHeme FAQs, including the ANH disclosures that "[s]erious cardiovascular adverse experiences occurred more frequently in the PolyHeme group." (Ex. 25.)

> August 1 to October 10, 2005 — at least four community forums, four meetings with public officials, and two meetings with the county medical society were held by the University of Kansas with PowerPoint slides and handouts of the PolyHeme FAQs, including the ANH disclosures that "[s]erious cardiovascular adverse experiences occurred more frequently in the PolyHeme group." (Ex. 24.)

> September 7 to October 5, 2005 — at least ten community disclosure meetings and events were held by the Albany Medical Center, including multiple fairs.  The nurse in charge of the events recites that the PolyHeme FAQ brochure was posted in "larger grocery stores" and at some Starbucks and Subway franchises in Albany.  She

adds:  "Polyheme Question & Answer Brochures — Used them at every event and distributed approximately 1000."  (Ex. 4 at 1.)[3]

Essentially all of those materials were posted on the FDA's website, where they remain to this day.  *See* fda.gov (search "PolyHeme Community Consultation").

● **Internet users and readers of press releases knew.**  As early as spring 2005, disclosures of the ANH Trial results were posted on various hospital websites and discussed in press releases that the hospitals issued.  (Ex. 4 at 2-6; Ex. 26; Ex. 27; Ex. 28; Ex. 29.)   Those hospitals generally posted the information in the form of the PolyHeme Backgrounder and FAQs.  Although there is some variation in those materials, for the most part, they stated (Ex. 4 at 4, emphasis added):

> PolyHeme was studied on one trial in patients experiencing planned acute blood loss while undergoing elective surgery for abdominal aortic aneurysm.  The trial included a non-routine procedure called acute normovolemic hemodilution (ANH) in which a large quantity of the patient's own blood, up to 60%, is removed prior to the surgery, and is later replaced.  The procedure in this study resulted in the infusion of large volumes of blood in addition to up to 6 units of PolyHeme in the experimental group, while smaller overall volumes of blood alone were administered in the control group.  <u>Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group.</u>  The patients in this study were older with more cardiovascular risk factors than those in the trials in trauma patients.  It cannot be determined whether these findings are due to the more extensive ANH in the PolyHeme group, to the reinfusion of more blood following surgery in the PolyHeme group or to PolyHeme itself.

Those internet postings included:

> May 23, 2005 — Miami Valley Hospital website.  (Ex. 26 at 1, 10 (memorandum from person in charge of disclosures stating that the website "went live" on May 23, 2005 with the PolyHeme FAQs, including the ANH disclosures).)

> June 24, 2005 or earlier — University of Utah website.  (Ex. 28.)  The PolyHeme FAQs, including the ANH disclosures, were posted on the University of Utah website at least by June 24, 2005; on that date,

---

[3]  Significantly, feedback forms at the Albany Medical Center community disclosure meetings confirm that the heart attack information was discussed at those meetings.  In answer to the question, "Do you have any comments or concerns you wish to share with the investigators?," one attendee handwrote:  "More research regarding cardiovascular risk factors."  (Ex. 4 at 17.)

investors in the Yahoo chatroom for Northfield posted a link to the Utah website and discussed ANH disclosures (see below).

September 7, 2005 — Albany Medical Center website.  (Ex. D at 1, 4 (memorandum from person in charge of disclosures stating that the website was "Live" on September 7, 2005 with the PolyHeme FAQs, including the ANH disclosures).)

The press releases issued by some hospitals in connection with the community disclosure meetings contained the same disclosures.  Those press releases included:

August 1, 2005 — University of Kansas press release containing the PolyHeme FAQs, including the ANH disclosures.  (Ex. 24 at 12-19.)

September 2, 2005 — Wyandotte County press release containing the PolyHeme FAQs, including the ANH disclosures.  (Ex. 30.)  Significantly, on September 18, 2005, an investor in the Yahoo chatroom concerning Northfield posted a link to the Wyandotte County press release and discussed its contents (see below).

In addition, some local government agencies posted the same information on their websites.  Those government internet postings included:

September 2, 2005 — Wyandotte County government posts on its website the press release containing the PolyHeme FAQs, including the ANH disclosures.  (Ex. 30; Ex. 3 at 69 (posting link).)

September 15, 2005 — Johnson County Board posts on its website the presentation that the University of Kansas made to it containing the PolyHeme FAQs, including the ANH disclosures.  (Ex. 68; the posting is still available at http://bocc.jocogov.org/agendas/091505AGENDA.pdf.)

Moreover, Northfield posted the same PolyHeme FAQs, including the ANH disclosures, on its own website on October 3, 2005.  (Ex. 15, Twaddell Dep. at 36-37, 77-78, 151; Ex. 31, Rohrs Dep. at 37-41; Ex. 32.)  Investors contacted Northfield about that posting.  *See, e.g.,* Ex. 33 (November 1, 2005 email from an investor, Bong Koh, asking Northfield's investor relations department about cardiovascular events in the ANH study described "[o]n your website").

●    **Investor chatroom participants knew.**  As noted above, in June 2005, participants in Northfield's Yahoo internet investor chatroom conducted lengthy discussions of the ANH Trial results, including the heart attacks.  (Ex. 3.)  Those discussions began on June 24,

2005, when one investor posted a link to the PolyHeme FAQs on the University of Utah website, and another investor posted the specific language from the FAQs that "Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group." (Ex. 3 at 1.)

Some of the investors in the chatroom noted that they had attended community meetings regarding the trauma trial where the heart attacks were discussed and that they had reviewed the disclosures on various hospital websites concerning them. (Ex. 3 at 57; Ex. 15, Twaddell Dep. at 53-54.)

At various points in July, September, October, November, and December 2005, the investors in the chatroom continued to discuss the heart attacks in the ANH Trial. *See, e.g.*, Ex. 3 at 65-67, 69-70, 81, 85-86, 96, 111, 116-17, 124-26. For example, on September 18, 2005, an investor posted a link to the September 2, 2005 Wyandotte County press release and asked if others had seen the heart attack information discussed there. *Id.* at 69. Another investor responded to the posting by stating that the heart attack information already had been "discussed, at length, when the UTAH FAQ's came out about 3-4 months ago." *Id.*

The Yahoo chatroom for Northfield was extremely active, with thousands of postings. As of March 6, 2005, there had been 117,828 posts in the chatroom. (Ex. 34.) As of February 21, 2006, there had been 164,391 posts in the chatroom. (Ex. 35.) Those figures do not count investors who read the messages in the chatroom, but did not post any of their own.

●     **Investor relations callers knew.** Several of the investors in the chatrooms discussed the fact that they telephoned or emailed Northfield's investor-relations spokesperson, Sophia Twaddell, and discussed the ANH trial results and heart attacks with her. (Ex. 3 at 6, 55, 65-66; Ex. 15, Twaddell Dep. at 36-42, 89-99, 104-05, 165-66, 211-17, 219-25, 234-35, 242-43.) Starting in spring 2005, as a result of the community meetings and various hospital disclosures, Northfield began receiving inquiries from investors about the heart attacks. *Id.* Northfield has records reflecting Ms. Twaddell's discussions of the heart attack information with Northfield's investors. (Ex. 36, Twaddell's talking points re ANH Trial.)

● **Analysts and readers of their reports knew.** In October 2005, an analyst firm — Marketing Research Bureau — began actively marketing a report containing explicit discussions of the ANH Trial results and the heart attacks observed there, including the statistical significance of those heart attacks. (Ex. 37 at 48-53; Ex. 15, Twaddell Dep. at 56-63.) The report discussed the ANH Trial heart attack information posted on various websites, and the report emphasized that the existence of more heart attacks in the PolyHeme group than the control group should be assumed to be "statistically significant" (Ex. 37 at 52, emphasis added):

> We must assume that the more frequent appearance of serious cardiovascular adverse experiences in PolyHeme-treated patients was <u>statistically significant</u>. We must also assume that the FDA has reviewed these findings, and for some reason felt comfortable allowing Northfield to go forward with a trauma resuscitation protocol . . . .

The analyst report was advertised on the internet, marketed via email, and shopped to various institutional investors, analysts, and professionals in the blood industry. (Ex. 56 (posting on Marketing Research Bureau website); Ex. 15, Twaddell Dep. at 56-63.)

In short, contrary to the central premise of plaintiffs' complaint, thousands of people and potential class members knew about the heart attacks long before the 2006 stock drop upon which plaintiffs rely.

**D.     The 2006 News Reports.**

Starting in January 2006, Northfield's stock dropped after a series of analyst and news reports, which precipitated this lawsuit. On January 6, 2006, UBS issued an analyst report downgrading Northfield's stock by 15%. (Ex. 38.) Northfield's stock price dropped that day. (Ex. 19.) Significantly, the report did not mention the ANH Trial results. Instead, according to the report, the downgrade was based on another PolyHeme study involving rats — a study that had been published eight months earlier, in April 2005, and was the subject of a detailed *Forbes* article in May 2005. (Ex. 39; Ex. 40.)

On January 10, 2006, UBS issued another report quoting Northfield's website disclosures about the ANH Trial results, including the heart attacks. (Ex. 42.) As plaintiffs' expert has acknowledged, Northfield's stock price did not drop significantly in reaction to the January 10

report, even though it was the only UBS report that mentioned the ANH Trial results.  (Ex. 19; Ex. 41, Hakala Dep. at 173.)  Nor did UBS downgrade Northfield's stock in that report or any subsequent one.  (Ex. 42; Ex. 43; Ex. 44; Ex. 45, Pace Dep. at 133-34.)

On February 22, 2006, the Wall Street Journal published a story concerning Northfield and the FDA.  (Ex. 11.)  The thrust of the story was that the FDA should not have approved the trauma study on a lack-of-informed-consent basis, in part because heart attacks had been observed in the earlier ANH Trial.  *Id.*  The story acknowledged that Northfield "decided the heart attacks might have been due to doctor inexperience in using PolyHeme, not a problem with the product itself," and that the FDA had agreed.  *Id.* at 4.  On February 24, 2006, the Wall Street Journal published a story concerning an inquiry by Senator Grassley into the FDA's decision to allow PolyHeme to be administered in the trauma trial without the informed consent of patients. (Ex. 46.)  On March 10, 2006 and March 14, 2006, the Wall Street Journal (and Bloomberg) published additional stories about Senator Grassley's investigation into the FDA's conduct regarding the trauma study.  (Ex. 47; Ex. 48.)  Northfield's stock price dropped after each of those stories.  (Ex. 19.)

### E.    Proceedings In This Case.

On March 17, 2006, various plaintiffs filed the first of ten lawsuits against Northfield and two of its officers charging them with securities fraud for failing to disclose the heart attacks in the ANH Trial.  In all of the original complaints, the proposed class was defined to include purchasers of Northfield securities over a two-year period between February 20, 2004 and February 21, 2006.  *E.g.,* Ex. 49 at 1.  On May 10, 2006, this Court consolidated the cases and ordered briefing on the issue of who should be appointed lead plaintiff.  Thereafter, various plaintiffs and plaintiffs groups sought to be lead plaintiff, but subsequently withdrew.  On June 19, 2006, the Court appointed Jonathan Meyers as lead plaintiff, but he too subsequently withdrew.  *See generally* Ex. 50, 8/24/06 Order (summarizing procedural history).

After various plaintiffs group decided that they did not want to proceed with this case, the Court appointed the Shield Plans to be lead plaintiffs.  *Id.* at 5.  On September 8, 2006, the Shield

Plans filed a Consolidated Amended Class Action Complaint.  On September 25, 2007, the Court dismissed the complaint without prejudice.  The Court emphasized that "an investment in Northfield was extremely risky," including the "inherently risky" nature of purchasing stock "in a company with no revenues."  (9/25/07 Op. at 22.)  The Court then analyzed each category of purported misstatements alleged in the complaint and concluded that plaintiffs had not stated a claim regarding any of them.  *Id.* at 23-30.  With respect to each challenged statement, the Court held that plaintiffs had failed to satisfy one or more of the strict pleading standards established under the PSLRA — the requirement that plaintiffs must specify facts showing that the challenged statements were materially false, that the statements had a causal connection with plaintiffs' purported loss, and that defendants acted with scienter.  *Id.* at 26-28, 30, 32.  The Court permitted plaintiffs to file a second amended complaint, which plaintiffs then submitted on November 20, 2007.

The second amended complaint, which is the current complaint, did not modify the central allegations of the first amended complaint, but expanded certain allegations to address deficiencies that the Court had noted in the prior complaint.  The current complaint asserts the same two counts as the previous complaint:  Count 1, violation of Section 10(b), and Count 2, "controlling person" liability under Section 20(a).  The current complaint seeks a five-year-long class period, stretching from March 19, 2001 through March 20, 2006.  Significantly, despite the lengthy class period, the Shield Plans did not purchase any Northfield stock until November 2004.  (Ex. 51.)  The other three plaintiffs named in the current complaint (Alan Goodman, James Rourke, and Daniel Nesi) first purchased Northfield stock even later, in February, May, and June 2005.  (Ex. 52; Ex. 53; Ex. 54.)

On September 23, 2008, this Court granted in part and denied in part the renewed motion to dismiss.  The Court noted that "plaintiffs have amended their complaint to omit reference" to the disclosures of heart attack information on Northfield's website.  (9/23/08 Op. at 11.)  The Court stated that "[w]hile this omission may cause plaintiffs problems at the summary judgment

stage, it will not be used against them here." *Id.*  The Court allowed the case to proceed as to five alleged misstatements:

- The August 2001 statements that "[we] intend to terminate our current elective surgery protocol after the BLA is filed" and that "final-stage, clinical trials, involving elective surgery patients and trauma patients are ongoing."  (9/23/08 Op. at 6-7.)

- The August 9, 2002 statement that "[d]ue to the complexity of the clinical protocol, however, patient accrual progressed slowly.  As a result, we closed the elective surgery protocol after our BLA was submitted." *Id.* at 7.

- The October 11, 2001 statement that there was "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction" in the study discussed there. *Id.* at 7-8.

- The September 4, 2001 statement that "Our trial results document a very compelling clinical benefit that we believe provides the substantial evidence of safety and efficacy required by the FDA." *Id.* at 8.

- The August 3, 2001 statement that "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies." *Id.* at 9.

The Court later bifurcated class-certification discovery and merits discovery, with class-certification discovery proceeding first.  (10/14/08 Order.)  In June 2009, after class-certification discovery was largely complete, Northfield filed for bankruptcy.  The Court stayed the case in light of the bankruptcy.  (6/9/09 Order.)  On November 13, 2009, the Court lifted the stay as to the individual defendants.[4]

In the meantime, before the stay was entered, plaintiffs had filed their motion for class certification and supporting memorandum.   The motion is based almost entirely on the conclusions of plaintiffs' expert, Dr. Scott Hakala.

---

[4]  On September 25, 2009, plaintiffs filed a motion to transfer this case to Delaware.   On November 10, 2009, this Court denied plaintiffs' motion to transfer, stressing that the Court did not countenance forum shopping.   On December 23, 2009, despite this Court's admonition, plaintiff Shield, represented by the same lead counsel as here, filed a class action complaint in the Delaware Bankruptcy Court asserting essentially the identical securities claims as here on behalf of the identical putative class.  (Ex. 55.)

Plaintiffs now have completed fact discovery on class issues, and their class certification motion is ripe for decision.

## ARGUMENT

### Legal Standards

**The *Szabo* principle.**   The Seventh Circuit in *Szabo* held that district courts no longer can certify classes based on plaintiffs' factual assertions while leaving for a later day the question of whether those factual assertions actually are true.  *Szabo*, 249 F.3d at 676 (7th Cir. 2001).  Instead, district courts must "receive evidence" and make "factual and legal" determinations under Rule 23 before allowing a case to proceed as a class action, even when those determinations "overlap the merits."  *Id.*  In particular, plaintiffs must present evidence sufficient to persuade the district court — sitting as a preliminary fact finder — that the factual allegations underlying each of Rule 23's criteria are true and that each of those criteria is satisfied.  *Id.* at 676-77.

In class actions after *Szabo*, the Seventh Circuit repeatedly has applied that principle, emphasizing that district courts cannot "duck hard questions" simply because "considerations relevant to class certification also may affect the decision on the merits."  *West*, 282 F.3d at 938 (7th Cir. 2002).  In *West*, the Seventh Circuit overturned class certification in a securities case where the plaintiff had failed to establish the fraud-on-the-market requirement of efficiency.  The Seventh Circuit held that the district court, faced with "clashing" views of experts on matters relevant to class certification, cannot postpone resolution of those questions until trial (*id.*):

> [T]he judge observed that each side has the support of a reputable financial economist . . . and thought the clash enough by itself to support class certification and a trial on the merits.  That amounts to a delegation of judicial power to the plaintiffs, who can obtain class certification just by hiring a competent expert.  A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits.

The Seventh Circuit concluded that when adjudicating class certification, factual disputes "must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *Id.*[5]

**Reliance/fraud-on-the-market presumption.**   The Section 10(b) securities claim alleged here requires plaintiffs to plead and prove reliance.   *Tricontinental Indus. v. PricewaterhouseCoopers, LLP,* 475 F.3d 824, 842 (7th Cir. 2007) ("[i]n order to state a claim for a private cause of action under Rule 10b-5, a plaintiff must allege" that the defendant made a statement "upon which the plaintiff justifiably relied").

In securities cases, one way to allege reliance is to allege direct, personal reliance on each of the claimed misstatements.   Plaintiffs do not allege that sort of reliance here.   They do not allege that they personally saw or read any of the statements that they now contend were misleading.   *See* 2d Am. Cmplt. ¶ 140.   Plaintiffs have not alleged personal reliance because doing so would eliminate any chance for class certification in this case.   Under established law, a class cannot be certified when individual issues of reliance exist.   *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones").

---

**5**   At least five other Circuits expressly have adopted *Szabo* regarding class certification determinations.   As those courts hold, class certification decisions "can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established."  *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *accord In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008) ("the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits — including disputes touching on elements of the cause of action"); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366-67 (4th Cir. 2004) (district court must "look beyond the pleadings and conduct a rigorous analysis"; "the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits"); *Ungar v. Amedisys, Inc.*, 401 F.3d 316, 321; 322-23 (5th Cir. 2005) ("Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification"); *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005) ("The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case").

Another way to allege reliance in a securities case is through the fraud-on-the-market theory.  Under that theory, plaintiffs obtain a presumption of reliance in certain circumstances involving "efficient" markets.  *See, e.g., Basic,* 485 U.S. at 246-48 (holding that when an active securities market exists and public information is readily incorporated into the price of securities, a rebuttable presumption of reliance exists).  That is why plaintiffs here plead, as they must to invoke the theory, that Northfield's stock was traded in a "highly efficient" market which "promptly digested current information regarding Northfield from all publicly available sources."  (2d Am. Cmplt. at ¶¶ 141-42.)  In an efficient market, information is "rapidly" reflected in the stock price.  *West,* 282 F.3d at 938, 940 (7th Cir. 2002) (the "foundation of the fraud-on-the-market doctrine" is that "markets are efficient in the sense that they rapidly adjust to all public information"); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989) ("Prompt incorporation of news into stock price is the foundation for the fraud-on-the-market doctrine").

Thus, having elected to invoke the fraud-on-the-market presumption, plaintiffs bear the burden of establishing each of its requirements in order to obtain class certification.  Two key requirements of the fraud-on-the-market presumption are that the market must be "efficient" and that the allegedly misrepresented information must be "material."  *Basic*, 485 U.S. at 248 n.27 (1988) (the requirements for the presumption include "that the misrepresentations were material" and "that the shares were traded on an efficient market").

In *West*, the Seventh Circuit specifically applied the *Szabo* principle to plaintiffs who choose the fraud-on-the-market path to obtain class certification.  In other words, plaintiffs who select that path bear the burden of establishing the requirements of the fraud-on-the-market presumption in order to obtain class certification.  *West*, 282 F.3d 935, 940 (7th Cir. 2002) (overturning class certification:  plaintiffs' expert report "calls into question his belief that the market for Jefferson Savings stock is efficient, the foundation of the fraud-on-the-market doctrine").  Other Circuits likewise have applied *Szabo* in securities cases with respect to plaintiffs' burden to establish the fraud-on-the-market presumption of reliance.  *See, e.g.,*

*Gariety*, 368 F.3d at 367 (4th Cir. 2004) (holding that district court erred in "accepting [plaintiffs'] assertions" concerning market efficiency and in refusing to make a "rigorous" factual inquiry into that element of the presumption); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 485 (2d Cir. 2008) (the *Szabo* principle "requires a district court to make a 'definitive assessment' that the Rule 23(b)(3) predominance requirement has been met.  This assessment cannot be made without determining whether defendants can successfully rebut the fraud-on-the-market presumption.").

In short, this Court must determine whether plaintiffs have met their burden of establishing the fraud-on-the-market requirements and all other elements of Rule 23.

**Requirements of Rule 23.**  As this Court has held, "[t]he four requirements for a class action under Rule 23(a) are: (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must be likely to protect the interests of the class fairly and adequately. . . .  Failure to meet any one of these elements precludes certification of the class." *Stanek v. AT&T*, No. 96 C 4096, 1998 WL 831877, at *3 (N.D. Ill. November 25, 1998) (Marovich, J.).

As this Court further has held with respect the additional requirements of Rule 23(b)(3), plaintiffs must establish that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *McDonald v. Prudential Ins. Co. of America*, No. 95 C 5186, 1999 WL 102796, at *2 (N.D. Ill. Feb. 19, 1999) (Marovich, J) (quoting rule).  This Court held that class certification accordingly is not appropriate where "there are numerous issues . . . which would require the Court to perform an individualized assessment as to each specific member of the proposed class" because "these individual issues predominate over any issues common to the entire class."  *Id.* at *5.

I.      **PLAINTIFFS HAVE NOT ESTABLISHED THE FRAUD-ON-THE-MARKET REQUIREMENT OF MARKET EFFICIENCY.**

A.      **Plaintiffs' Own Theory Defeats Market Efficiency Because They Contend That Publicly Available Information Was Not Incorporated Into The Stock Price For Months Or Even Years.**

At the threshold, the market for Northfield stock could not have been efficient because, under plaintiffs' own theory, the market did not rapidly assimilate the very information about which plaintiffs complain, such as the fact that heart attacks were observed in the ANH Trial and that more heart attacks were observed in the PolyHeme group than in the control group.  That information, which plaintiffs contend was concealed, in fact was disclosed to the public long before the January to March 2006 stock drop upon which plaintiffs rely.  Indeed, as detailed in the Fact section above, the heart attack information was disclosed to thousands of people — in community meetings, brochures, reports, press releases, and website notices regarding the trauma trial.  In particular, as shown above:

- Starting in 2003, the information was disclosed to 48 trauma hospitals and their staffs.

- Starting in summer 2004, the information was disclosed to numerous trauma patients and their families.

- Starting in spring 2005, the information was disclosed to attendees at numerous public community meetings.

- Starting in spring 2005, the information was disclosed to the general public on the internet.

- Starting in spring 2005, the information was disclosed to the general public in press releases.

- Starting in June 2005, the information was disclosed to the general public in the Yahoo investor chatroom concerning Northfield.

- Starting in June 2005, the information was disclosed to callers to Northfield's investor relations department.

- Starting in October 2005, the information was disclosed to investors who visited Northfield's website.

- Starting in October 2005, the information was disclosed to readers of analyst reports.

With respect to just one forum for those disclosures — the Yahoo chatroom for Northfield — that chatroom had enormous readership by investors.  As shown above, the chatroom had 117,828 posts as of March 2005 and 164,391 posts as of February 2006.  (Ex. 34; Ex. 35.)  Those figures do not even count investors who read the disclosures in the chatroom, but did not post any messages of their own.

Nonetheless, despite all of those disclosures, plaintiffs' theory is that the market did not incorporate the ANH heart attack information until January to March 2006.  As Dr. Gompers opines, that theory is fundamentally at odds with the notion that the market for Northfield stock was efficient.  (Ex. 1, Gompers Rep. ¶ 73.)  In order for a market to be efficient, publicly disclosed information must be incorporated into the stock price rapidly — not months or years later.  *Id.* at 29; *see, e.g., West*, 282 F.3d at 938 (7th Cir. 2002).

Accordingly, because plaintiffs cannot demonstrate market efficiency under their own theory, plaintiffs have not satisfied an essential requirement of the fraud-on-the-market presumption, without which class certification is impossible.  For that reason alone, a class cannot be certified here.

### B.     As Dr. Gompers Concludes, The Market Was Not Efficient And Was Driven By Investor Sentiment Rather Than New Information.

Dr. Gompers' analysis of Northfield trading confirms that the market for Northfield stock in fact was not efficient.  Dr. Gompers is the Eugene Holman Professor of Business Administration and Director of Research at the Harvard Business School.  (Ex. 1, Gompers Rep. ¶ 1.)  Prior to that time, Dr. Gompers was a professor at the University of Chicago Graduate School of Business.  *Id.*  Dr. Gompers has reviewed Northfield's trading history and has cataloged the specific evidence demonstrating why the market for Northfield stock was not efficient.  He does so taking into account the so-called *Cammer* factors — that is, factors consistent with market efficiency originally described in *Cammer v. Bloom*, 711 F. Supp. 1264,

1285-87 (D.N.J. 1989).  The point of those factors is to determine whether the market rapidly assimilates new information, which is the touchstone of market efficiency.[6]

Dr. Gompers' central reasons for his conclusion that the market for Northfield stock was not efficient are these:

- **Contrary to market efficiency, significant price movements did not occur rapidly after the release of new information.**

As Dr. Gompers observes, the "most important . . . *Cammer* factor" is "whether there is an immediate stock-price response to unexpected news events." (Ex. 1, Gompers Rep. ¶ 38.) Analyzing the trading in Northfield stock over the proposed class period, Dr. Gompers concludes that the opposite was true:  "I find that, throughout the proposed class period, the market for Northfield's stock did not often exhibit a cause and effect relationship between unexpected corporate events or financial releases and Northfield's stock price." *Id.* at ¶ 18.  He observes that "on many of the days which experienced significant stock price movements that appear to correspond with news or disclosures that could be relevant to investors, many of the price reactions were slow and took place over the course of several days."  *Id.*  He details multiple examples of that behavior — where the stock price took days to react to new information, even though "[a]ccording to the literature, new information" should be "incorporated in the price within minutes" if the market is truly efficient.  *See, e.g., id.* ¶¶ 29, 81-86, 97-98.  He concludes that "[p]rice movements that occur over such extended periods of time are inconsistent with an efficient market." *Id.* at ¶ 17.

- **Contrary to market efficiency, significant price movements occurred in reaction to the re-release of previously disclosed information.**

Dr. Gompers observes that Northfield's stock price often moved significantly in reaction "to previously disclosed information." *Id.* ¶ 78.  That "pattern of stock price movements is

---

**6** The *Cammer* factors are:  (1) large average trading volume, (2) a significant number of analysts following the stock, (3) the presence of numerous market makers and arbitrageurs, (4) eligibility to file an S-3 Registration Statement, and (5) an immediate stock-price response to unexpected news events. *Cammer*, 711 F. Supp. at 1286-87 (D.N.J. 1989).

inconsistent with an efficient market" because, in a truly efficient market, "the price would not change in response to previously issued news." *Id.* Again, Dr. Gompers details multiple specific examples of that price behavior. *See, e.g., id.* at ¶¶ 81-83, 93-96, 99-106. Dr. Gompers concludes that the price behavior of Northfield stock cannot be squared with market efficiency. *E.g., id.* at ¶¶ 78, 107.

- **Contrary to market efficiency, significant price movements occurred despite the lack of disclosures of any kind.**

Dr. Gompers also observes that Northfield's stock price often moved significantly "without the presence of new information" — that is, without any "new news or events." *Id.* at ¶¶ 17, 74, 78. Again, Dr. Gompers details multiple specific examples of that price behavior. *See, e.g., id.* at ¶¶ 87-96. Dr. Gompers concludes that "[i]n an efficient market, one would not generally expect unexplained stock price movements as a stock price should move solely based on new information." *Id.* at ¶ 17.

In all, Dr. Gompers observes that there were 67 days during the proposed class period "on which Northfield's stock price change was statistically significant." *Id.* at ¶ 78. Of those 67 instances, 29 "occurred on days where new information was released," but those price reactions often were "slow, and occur over the course of several days." *Id.* "Ten of the statistically significant stock price movements appear to be reactions to previously disclosed information." *Id.* "28 instances of significant price movement [occurred] without the presence of new information." *Id.* Dr. Gompers concludes that "[t]his pattern of stock price movements is inconsistent with an efficient market, in which new information would be impounded in the price quickly — not over the course of several days — and the price would not change in response to previously issued news." *Id.*

- **Contrary to market efficiency, there was low trading volume for significant portions of the class period.**

As Dr. Gompers observes, "weekly trading volume from 2001 to 2003 was relatively low." *Id.* ¶ 32. He lists the exact numbers in Exhibit A to his report. For example, "average weekly trading volume during 2002 was only 185,773 shares or 1.30% of shares outstanding."

*Id.* at ¶ 33.  In addition, "there were 21 weeks during that year where the weekly trading volume was below 1%."  *Id.*

- **Contrary to market efficiency, there was little or no analyst coverage for significant portions of the class period.**

As Dr. Gompers concludes, another of the *Cammer* indicia of market efficiency — the existence of significant analyst coverage — likewise was not satisfied for a significant portion of the proposed five-year-long class period (from March 2001 to March 2006).  He observes that plaintiffs have not "identified a single analyst who issued reports and/or opinions on Northfield" for the first three years of the proposed class, "prior to the April 2004 initiation of coverage by Whitaker Securities LLC."  *Id.* at ¶ 34.  Moreover, although plaintiffs have "identified four analysts which initiated coverage during 2005, all but one of these had an investment banking relationship with Northfield and their coverage is likely a result of those relationships rather than a result of market interest in the company."  *Id.*  In addition, "according to Thompson First Call, a respected provider of financial data, not a single equity research analyst issued earnings per share projections for Northfield between August 2001 and April 2005, suggesting a complete lack of coverage" for four years of the five-year class period.  *Id.*  As Dr. Gompers concludes, "[a]nalyst coverage is an important element of market efficiency because of the role analysts play in disseminating information to market participants."  *Id.*

- **Contrary to market efficiency, there was low institutional investor interest.**

As Dr. Gompers observes, plaintiffs also have not demonstrated that there were numerous market makers and arbitrageurs actively trading Northfield shares.  The only supporting evidence cited in plaintiffs' expert report is that the level of institutions holding Northfield stock, which ranged from 7% to 27% during the proposed class period, constitutes "substantial institutional investor interest."  *Id.* at ¶ 35.  However, as Dr. Gompers points out, "during the same period, NYSE listed firms had institutional holdings of 57% on average."  *Id.*  Moreover, "the fact that institutional investors held shares does not ensure that a market is efficient."  *Id.*  Rather, the "*Cammer* court specifically identified market makers and arbitrageurs because . . . a well

functioning arbitrage market is an important element of ensuring market efficiency." *Id.*  Dr. Gompers observes that plaintiffs have not presented any evidence as to "whether there was a well functioning arbitrage market during the class period." *Id.*  Moreover, although plaintiffs provide a list of market makers in an exhibit to their brief, that exhibit indicates that few market makers were active.  (Pl. Mem. Ex. 5.)  Most were responsible for only a small portion of the trading volume for the period covered by the exhibit.  *Id.*

- **Contrary to market efficiency, there were restrictions on short sales.**

Dr. Gompers also observes that there were "restrictions placed on the ability to short Northfield shares, for at least a portion of the proposed class period." *Id.* at ¶ 36.  Those restrictions limit "the ability of arbitrageurs to eliminate any mispricing in Northfield shares." *Id.*  In particular, Northfield was identified as a "'threshold security' under SEC Regulation SHO in January and February 2005," which triggered limitations on short sales. *Id.*; *see* 17 C.F.R. § 242.203.  Those limitations are consistent with a "sharp decline in short interest for Northfield between January and February 2005."  (Gompers Report ¶ 36.)  As Dr. Gompers observes, "[i]f there is no ability to short a stock, there is no way for arbitrageurs to correct the mispricing that may be present in a stock that is not accurately reacting to value-relevant information," and "such limits to arbitrage . . . contribute to market inefficiency." *Id.*

- **Contrary to market efficiency, Northfield was unable to file SEC Form S-3 for significant portions of the class period.**

As Dr. Gompers observes, another of the *Cammer* indicia of market efficiency — the eligibility to file S-3 registration statements — likewise is not satisfied for a portion of the proposed class period.  Dr. Gompers opines that the "the ability to file an S-3 has little relationship to . . . market efficiency" under the academic literature. *Id.* at ¶ 37.  Nevertheless, even if the factor has some relevance, Northfield was not able to file S-3 registration statements for portions of 2002 and 2003.  *Id.* ("[i]n order to file a form S-3 . . . the float (*i.e.*, market capitalization) must be at least $75 million, excluding insider holdings").

- **Contrary to market efficiency, Northfield's stock price movements were consistent with trading based on "irrational investor sentiment."**

Dr. Gompers concludes that the "pattern of stock price movements described above is consistent with a stock that is subject to trading due to irrational investor sentiment" — that is, trading "driven by factors other than value-relevant information." *Id.* at ¶ 107. The academic literature calls those traders "noise traders" or "uniformed traders," and they should not move the market if the market were efficient (*id.*):

> In any market there may be participants whose trading is driven by factors other than value-relevant information. In the finance literature, such traders are often referred to as "noise traders" or "uninformed traders." However, in an efficient market, such traders do not move the market. The literature shows that, in an efficient market, prices are set by "informed traders" or traders who trade on value-relevant information. When trading based on irrational investor sentiment does move the market, this is an indication that the market is not efficient.

Dr. Gompers bases his conclusion on a variety of facts about the trading in Northfield stock, including the fact that significant price movements did not occur promptly after the release of new information, and often occurred in reaction to the re-release of previously disclosed information or in reaction to no news at all. *Id.* at ¶¶ 78-110. He also bases his conclusion on academic literature showing that "a high percentage of small, retail investor trades" indicates a likelihood that "a stock price is driven by investor sentiment" rather than informed traders. *Id.* at ¶ 109. Dr. Gompers determined that small retail trades "constituted a high percentage of trades in Northfield" — 70 to 90% — on many of the dates on which significant price movement occurred. *Id.*

In short, as Dr. Gompers concludes, Northfield's stock trading reflects the hallmarks of an inefficient market.

## C.   Plaintiffs Have Not Established Market Efficiency Because Dr. Hakala's Approach Is Unscientific And Ignores Critical Facts That Contradict His Result.

To satisfy their burden of establishing market efficiency, plaintiffs rely entirely on the report of their expert, Dr. Scott Hakala. Plaintiffs have not met their burden because Dr. Hakala's opinion is flawed in multiple respects. As shown in the Introduction above, numerous

courts have rejected Dr. Hakala's opinions in securities cases.  Based on those decisions, on facts learned in Dr. Hakala's recent deposition, and on the defects described below, defendants plan to file a motion to exclude Dr. Hakala's opinion in this case because it does not satisfy the *Daubert* standard.

> **1.      Dr. Hakala ignores key information that was publicly disclosed before 2006 and that should have affected the stock price if the market truly were efficient.**

At the threshold, Dr. Hakala ignores the key defect identified in Part I.A above — that despite the existence of a supposedly efficient market as alleged by plaintiffs, publicly available information was not incorporated into the stock price for months or even years.  Dr. Hakala's report does not contain any discussion of the public disclosures of the heart attack information detailed in the Fact section above.  Dr. Hakala simply ignores all of those disclosures.

In particular, Dr. Hakala does not even mention the following key facts in his report: (1) the 2003 disclosures to 48 trauma hospitals and their staffs in the Investigator's Brochure and the Protocol; (2) the 2004 disclosures to trauma patients and their families in post-treatment consent forms; (3) the 2005 disclosures at community meetings and health fairs throughout the country;  (4) the 2005 internet disclosures on the websites of various hospitals and on Northfield's website; (5) the 2005 disclosures in hospital press releases; (6) the 2005 internet disclosures and discussions in the Yahoo investor chatroom concerning Northfield; (7) the 2005 disclosures to callers to Northfield's investor relations department; and (8) the 2005 disclosures to analysts at the Marketing Research Bureau and to readers of its analyst report, including the report's statement that the greater number of heart attacks in the PolyHeme group must be assumed to be "statistically significant" (Ex. 37 at 52).

Given that Dr. Hakala does not mention any of those disclosures, he does not even attempt to explain why Northfield's stock price did not rapidly incorporate that information — if the market were truly efficient, as he contends.  Put simply, ignoring key facts that contradict one's market-efficiency opinion is not a proper scientific method.

2.      **Dr. Hakala ignores objective evidence of market inefficiency.**

Dr. Hakala handles other objective evidence demonstrating market inefficiency in the same manner — he simply ignores it.   Dr. Hakala's report does not discuss key facts contradicting his view:

- Significant price movements did not occur promptly after the release of new information.  (Ex. 1, Gompers Rep. ¶¶ 78, 80-86.)

- Significant price movements occurred in reaction to the re-release of previously disclosed information.  *Id.* at ¶¶ 78, 93-96; 99-106.

- Significant price movements occurred despite the lack of disclosures of any kind.  *Id.* at ¶¶ 78, 80, 83, 87, 89, 91, 94, 97.

- There was low trading volume for significant portions of the class period. *Id.* at ¶ 33.

- There was little or no analyst coverage for significant portions of the class period.  *Id.* at ¶ 34.

- There was low institutional investor interest.  *Id.* at ¶ 35.

- There were restrictions on short sales.  *Id.* at ¶ 36.

- Northfield was not able to file SEC Form S-3 for significant portions of the class period.  *Id.* at ¶ 37.

As before, ignoring key facts that contradict one's opinion is not a proper scientific method and does not satisfy plaintiffs' burden to establish market efficiency.

3.      **Dr. Hakala's efficiency determination is based on an event study that does not comply with accepted procedures and is biased towards finding statistically significant price movements.**

Dr. Hakala's analysis of market efficiency "relies on an event study methodology that is unreliable and inconsistent with generally accepted practices in the field of finance."  (Gompers Rep. ¶ 39.)  Dr. Hakala's methodology "would not be accepted by any peer reviewed journal." *Id.*  That is so for multiple reasons:

**Subjective omission of data.**  In order to obtain a baseline of "normal" trading activity, Dr. Hakala selectively omits trading activity on 117 dates subjectively chosen by him.  In other words, in order to determine the significance of price movements on particular dates relevant to this suit, Dr. Hakala begins his effort by excluding price movements on a host of dates selected

by him based on his personal judgment.  As Dr. Gompers opines, that approach does not comport

with scientific method (*id*. at ¶¶ 42-43):

> A significant problem with Dr. Hakala's event study, however, is that his
> selection of material events is highly subjective.  For an event study methodology
> to be considered scientific and reliable, another researcher should be able to
> recreate the entire analysis (not just the statistical results) based on a description
> of the methodology. . . .  This is not the case with Dr Hakala's event study.  Dr.
> Hakala's selection of the 117 "material event" days required personal judgment
> and could not be independently recreated by another researcher.

Dr. Gompers reviewed Dr. Hakala's selection decisions and is "unable to discern a consistent

methodology used by Dr. Hakala" to pick and choose among dates to exclude or include from his

study — other than an effort to bias the study's results (see below).  *Id*. at 49.  "This

methodology is not objective nor is it replicable."  *Id*.

**Use of "dummy" variables.**  By eliminating 117 so-called "material" events from his

estimation period and by inserting "dummy variables" in place of the omitted price information,

Dr. Hakala understates the normal volatility of Northfield's stock and thus overstates the

statistical significance of the particular events he wishes to stress.  The use of "dummy" variables

is a method of excluding data for a particular date by giving it a zero value in an equation.  By

subjectively excluding dates on which large price swings could be expected, Dr. Hakala biases

his study in plaintiffs' favor to make it appear that particular price swings on dates he wishes to

highlight are more significant than they really are (*id*. at ¶ 50):

> By excluding from his estimation period all dates on which he expects
> Northfield's stock price to fluctuate, Dr. Hakala understates the "normal" level of
> volatility in Northfield's stock price. . . .  This has the effect of biasing the
> standard errors of the dummy coefficients downwards, which translates into a
> lower threshold of statistical significance for dates on which corrective
> disclosures are alleged.

As Dr. Gompers opines, "There is no theoretical basis for Dr. Hakala's extensive use of

dummy variables and in fact, several of the papers Dr. Hakala cites in his report warn against

their excessive use."  *Id*. at 51.  Significantly, the court in *Xcelera* rejected Dr. Hakala's

methodology for precisely this reason (among others):  "Hakala uses 'dummy variables' for

every date on which he claims there was any news at all about Xcelera that might have affected

the stock price. . . . [N]o peer-reviewed journal supports the view that dummy variables may be used on all dates on which <u>any</u> company news appears." *In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ, 2008 WL 7084626, at *1 (D. Mass. Apr. 25, 2008) (emphasis in original).

**Use of artificially constructed industry indices.**  Dr. Hakala creates his own subjectively composed industry indices in order to further bias his comparison of Northfield price movements.  In other words, instead of using an existing, objectively based industry index of peer group companies with which to compare Northfield stock prices, Dr. Hakala creates his own.  As Dr. Gompers observes, the "outcome of Dr. Hakala's selection is not the product of reliable scientific principles or methods."  *Id.* at ¶ 56.  To the contrary, "Dr. Hakala is engaging in what statisticians call 'data-mining,' which in this case means selectively choosing a set of companies that provides the best fit for his model."  *Id.* at ¶ 57.  Dr. Gompers concludes:  "This data mining approach is not accepted in academic literature.  Rather, the accepted and standard way to select competitors is to use an a priori selection criterion."  *Id.*

**Failure to correct for changes in market correlation over time.**  Dr. Hakala uses an artificially chosen study period, with arbitrary starting and ending points (March 19, 2001 to September 20, 2006).  Dr. Hakala then fails to correct for the fact that the correlation between Northfield's stock price and general market prices (sometimes called Northfield's "beta") changed over time.  *Id.* at ¶ 58.  As Dr. Gompers explains, "various techniques have been developed to estimate market models over longer periods of time to adjust" for those changes, and "[w]ithout such tests or estimation techniques, inferences drawn from faulty analysis cannot be relied upon."  *Id.*  Nevertheless, Dr. Hakala does not use any method to adjust for those changes and, instead, "performs his regression analysis over the entire period, a serious methodological flaw."  *Id.*  Dr. Gompers concludes:  "As such, his methodology is not academically rigorous and cannot be relied upon to estimate abnormal stock price movements."  *Id.*

**Failure to disaggregate confounding information.**  Dr. Hakala fails to disaggregate the effect of multiple pieces of news being released on a particular day.  As Dr. Gompers explains, disaggregation is critical to a meaningful event study:  "Analysis of such 'confounding

information' is important to determine whether stock price movements are driven by value-relevant news, as would be expected in an efficient market, rather than by some other factor." *Id.* at 61.  The Fifth Circuit recently rejected Dr. Hakala's opinion for this same error.  *Fener*, 579 F.3d at 510 (5th Cir. 2009) ("Hakala's testimony was fatally flawed; he wedded himself to the idea that the press release was only one piece of news and conducted his event study based on that belief.  We reject any event study that shows only how a 'stock reacted to the *entire bundle* of negative information,' rather than examining the 'evidence linking the *culpable* disclosure to the stock-price movement.'") (emphasis in original); *accord Omnicom*, 541 F. Supp. 2d at 554 (S.D.N.Y. 2008) (rejecting Dr. Hakala's event study "[b]ecause the law requires the disaggregation of confounding factors"; "to the extent that any corrective disclosures exist, the event study does not isolate their effect on Omnicom's stock price from that of the negative reporting, which dwarfed any shreds of new information disclosed in June 2002").

Dr. Gompers cites multiple examples of Dr. Hakala's failure to determine what portion of a price movement was caused by different pieces of news on the same date.  (Ex. 1, Gompers Rep. ¶¶ 62-64.)  Because of the flawed approach, Dr. Hakala does not have any way of knowing whether the price movements upon which he relies to support his efficiency opinion in fact were triggered by the news event he suggests.  *Id.*

Dr. Hakala's failure to disaggregate confounding information also affects his analysis of what he contends are "corrective disclosure dates."  *Id.* at ¶ 64.  Put simply, "Dr. Hakala makes no effort to disaggregate the stock price movement that was due to the corrective disclosure from the stock price movement that was due to information unrelated to the allegations."  *Id.* at ¶ 41.  By failing to disaggregate relevant information from irrelevant information (and also new information from old information, *see* Part II.B below), Dr. Hakala's approach makes it impossible to determine whether or the extent to which new information was rapidly reflected in the stock price.  *Id.* at ¶¶ 39-74.

Dr. Gompers sums up his views of Dr. Hakala's approach by specifically comparing "the methodology Dr. Hakala relied upon in this case with the methodology found to be unreliable in

the *Xcelera* matter." (Gompers Rep. ¶ 66.)   The court in *Xcelera* found that Dr. Hakala's testimony was not the product of reliable methods and criticized Dr. Hakala for the following flaws:

(1) "<u>Dummy variables</u>" — "Hakala uses 'dummy variables' for every date on which he claims there was any news at all about Xcelera that might have affected the stock price. . . .  [N]o peer-reviewed journal supports the view that dummy variables may be used on all dates on which <u>any</u> company news appears." *Xcelera*, 2008 WL 7084626, at *1 (D. Mass. Apr. 25, 2008) (emphasis in original).

(2) "<u>Failure to use relevant event dates</u>" — Dr. Hakala excludes dates from his study where the price rose (rather than fell) after a corrective disclosure, based on his subjective determination that there had been "negative anticipation" on earlier dates. *Id.*  The court concluded:  "Quite simply, his theory does not match the facts." *Id.*

(3) "<u>Market Efficiency</u>" — Dr. Hakala excludes certain dates and includes others in a way that "cannot be squared with the theory of market efficiency."  Under the "methodology utilized by Hakala, Xcelera's stock price does not reflect the disclosure of the dilution risk until August 2 even though the [corrective information] was issued on the evening of July 31," and even though an analyst report concerning the information was issued "in the morning of August 1." *Id.*   In addition, although "in an efficient market the release of previously-known information will not affect the stock price," Dr. Hakala "includes as relevant events" news reports that do "not provide any information not disclosed" in earlier reports. *Id.* at *2.

(4) "<u>Confounding Factors</u>."   "Hakala's analysis fails to take into consideration other factors that affected Xcelera's stock price in August 2000." *Id.*  The news reports that Dr. Hakala contends precipitated the Xcelera stock drop contained "negative discussion" of many issues that were unrelated to allegations in the complaint or that had been disclosed earlier.  "[A]ccordingly subsequent discussion on the issue

could not have affected the stock price." *Id.* Dr. Hakala made no effort to disaggregate those confounding factors.

Based on his comparison of Dr. Hakala's approach in *Xcelera* and this case, Dr. Gompers concludes "that the methodology applied in that case is identical to the methodology employed here and suffers from the same flaws identified by the court in that matter." *Id.* ¶ 68.

> **4.    Dr. Hakala's deposition testimony confirms that his approach is unscientific.**

In his deposition, Dr. Hakala acknowledged the following facts, each of which demonstrates that his approach is faulty:

- **In conducting his event study, Dr. Hakala did not include <u>any</u> of the dates on which the alleged misrepresentations were made (August 3, 2001; September 4, 2001; October 3, 2001; October 11, 2001; August 9, 2002)** (Ex. 41, Hakala Dep. at 111-12; 117-121):

    Q.    That date's not included in your event study?

    A.    No.
    . . . .
    Q.    Do you know why it wasn't included?

    A.    No.

- **In conducting his event study, Dr. Hakala did not look for the postings in the Yahoo chatroom concerning Northfield, much less consider their effect** (*id.* at 7-8, 180-81):

    Q.    Did you make any effort, prior to preparing your report in this case, to determine whether any of the information at issue in this case was discussed in the investor chat rooms?

    A.    No.

- **In conducting his event study, Dr. Hakala did not look for the postings on Northfield's website, much less consider their effect** (*id.* at 12):

    Q.    Did you attempt to determine what information was available on the company's Web site related to the issues in this case?

    A.    Not thorough, not — no.

- **In conducting his event study, Dr. Hakala did not look at the community consultation materials regarding the ANH Trial results, much less consider their effect** (*id.* at 232):

  Q.   Did you look at the community consultation disclosures in connection with the preparation of your report, Exhibit 1?

  A.   No.

- **In conducting his event study, Dr. Hakala did not look at the October 2006 Marketing Research Bureau report regarding the heart attacks observed in the ANH Trial, much less consider its effect.  The report emphasized that the existence of more heart attacks in the PolyHeme group than the control group should be assumed to be "statistically significant"** (*id.* at 26):

  Q.   Was that report a report that you had considered in connection with the preparation of your report?

  A.   No.  We did not focus on or locate that report.[7]

- **In conducting his event study, Dr. Hakala did not know when the existence of heart attacks was first disclosed to the market** (*id.* at 136-37):

  Q.   Based upon your event study, when was the existence of heart attacks and serious adverse events in [the] PolyHeme group in the ANH study first disclosed?
  . . . .
  A.   I don't know because I can't tell you.  The event study doesn't tell me when it was first disclosed.
  . . . .
  Q.   Did you consider the fact of the greater incidence of heart attacks to be an important fact?
  . . . .
  A.   I would have, but it wasn't what I considered when I did my study so the answer is no.

- **In conducting his event study, Dr. Hakala claimed to rely on a series of analyst reports for 2001, 2002, and 2003 that he never produced to**

---

[7]   In this regard, Dr. Hakala incorrectly asserted in his deposition that the market lacked information that the greater number of heart attacks in the PolyHeme group was "statistically significant."  *Id.* at 211-12.   As the October 2005 Marketing Research Bureau report demonstrates, the market had that information long before the stock drop on which Dr. Hakala relies.  (Ex. 37 at 52.)

**defendants and that, to defendants' knowledge, never existed** (*id.* at 75):

Q.     Do you recall reviewing analyst reports for the period 2002 as part of this assessment of what to include in your event study?

A.     Yes.

Q.     How about 2003?

A.     Yes.

- **In conducting his event study, Dr. Hakala relied upon the January 6, 2006 UBS report, even though the report is based on a rat study that was previously disclosed** (*id.* at 150, 165):

Q.     Do you have any reason to believe that [the UBS analyst's] conclusions were not based upon the rat study?

A.     No, no.

Q.     If it was based upon something other than the rat study, wouldn't it be your experience that the analyst would have referred to other information if that was the basis for his conclusion?

A.     I would have expected that.
               . . . .

Q.     In which case, [investors] are reacting to the analyst's interpretation of old information as opposed to new information, right?

A.     That's correct.

Q.     And that's what happened on January 6th, right?
               . . . .

A.     To some extent, yes.

- **In conducting his event study, Dr. Hakala did not rely on the January 10, 2006 UBS report, even though it is the first UBS report (although not the first report by others) to discuss the ANH Trial results.  The UBS January 10, 2006 UBS report did not significantly move the market** (*id.* at 159-60):

Q.     So does that mean that it's your conclusion that the first time the heart attacks in the ANH trial were publicly disclosed were on January 10th?

A.     At least as far as showing up in a news report or analyst report. That's the first time I could identify.

Q.     Well, disclosed to the market in a way that if it was material, it would impact the market?

A.     Right.

Q.     Is January 10th the first date?

A.     That it was disclosed, yes.

Q.     That the heart attacks in the ANH study were disclosed?

A.     Yes.

Q.     And it didn't move the market on January 10th, did it, in any statistically significant way?

A.     The movement on that day was not statistically significant, but it was negative, yeah.

- **In conducting his event study, Dr. Hakala did not attempt to disaggregate confounding factors** (*id.* at 140-41, 216-18):

Q.     And in your event study, did you separate out the effect of the context from the effect of the information itself that was being disclosed?
            . . . .

A.     I did not attempt to separate out those two aspects.
            . . . .

Q.     Did you make any attempt to determine whether the change in the stock price was in response to that information?

A.     No.

Q.     There's a number of different pieces of negative information in this February 22, 2006, article  . . . .  Did you make any effort to try to parse out the impact of price based upon issues that related to the general concept of nonconsent studies?

A.      Not at this stage of the litigation.

- **In conducting his event study, Dr. Hakala recognized that the only way to determine whether particular investors knew the truth about the supposedly undisclosed information is to "ask them"** (*id.* at 229-30):

39

> Q.   So under your scenario then, there could be — in a semistrong form efficient market, there could be a whole bunch of pockets of investors who might have access to publicly available information because they're better at finding the information than other investors; is that right?
> . . . .
> A.   To some extent, yes.
>
> Q.   Okay.  And how do you determine which of those investors actually had access to this information and which of them didn't?
>
> A.   You don't.  Unless you ask them, you can't.

The upshot is, plaintiffs bear the burden of establishing market efficiency in order to obtain the benefit of the fraud-on-the-market presumption of reliance, upon which class certification depends.  To do so, plaintiffs rely entirely upon Dr. Hakala's report, but his report ignores critical facts, ignores other evidence of market inefficiency, relies upon improper techniques, such as data mining, and would not be accepted by any peer reviewed journal. Numerous courts, including the court in *Xcelera*, have rejected Dr. Hakala's  unscientific and fatally flawed approach.  This Court should do the same.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THE FRAUD-ON-THE-MARKET REQUIREMENT OF MATERIALITY.

### A.   As Dr. Gompers Concludes, The Specific Misrepresentations Remaining In This Case Were Not Material If The Market Were Efficient.

Many of the same reasons shown above regarding the lack of market efficiency also demonstrate that the information challenged by plaintiffs was not material.  Materiality is another requirement that plaintiffs must establish to obtain the fraud-on-the-market presumption.  *See, e.g., Basic*, 485 U.S. at 248 n.27 (1988) (the requirements for the presumption include "that the misrepresentations were material" and "that the shares were traded on an efficient market"); *Salomon*, 544 F.3d at 486 n.9 (2d Cir. 2008) (holding that for class certification, plaintiffs bear the burden of establishing materiality:  "we hold that plaintiffs must show that the statement is material (a prima facie showing will not suffice)").  The fraud-on-the-market presumption, in

turn, is necessary for plaintiffs to satisfy Rule 23's predominance requirement regarding what otherwise would be individual issues of reliance.  *Basic,* 485 U.S. at 242.

Here, the challenged information could not have been material because Northfield's stock did not move significantly when the allegedly concealed information first was disclosed to the market — if the market truly were efficient as plaintiffs contend.  That is the precise conclusion of Dr. Gompers.  In his report Dr. Gompers opines that "if one were to assume, for the moment, that the market for Northfield stock was efficient" (which it is not, for the reasons shown in Part I above), then "the relevant information must not have been material" because there "was no significant stock price reaction" associated with its disclosure.  (Ex. 1, Gompers Rep. ¶ 19.)

Dr. Gompers specifically analyzed the pre-2006 disclosures of "[i]nformation regarding the occurrence of adverse events" in the ANH trial.  *Id.*  For example, he examined:  (a) the information presented in "May 2005 in multiple community disclosure sessions"; (b) the information "discussed on internet chat rooms in June 2005 and September 2005"; (c) the information "posted on Northfield's own website on October 3, 2005"; and (d) the information "discussed in a Marketing Research Bureau report in October 2005."  *Id.*  Dr. Gompers concludes that none of the information in those disclosures was material because, if the market were efficient, the information would have generated a significant price movement (*id.*):

> There was no significant stock price reaction associated with any of these events. In an efficient market, if the information regarding the occurrence of adverse events in earlier trials of PolyHeme was material, one would expect the disclosure of that information to result in a significant stock price movement.  Dr. Hakala failed to even analyze these earlier disclosures.

Plaintiffs' expert, Dr. Hakala, acknowledged that material information about Northfield's clinical trial results should have a pronounced effect on Northfield's stock price, given that PolyHeme was Northfield's only product:  "Because Northfield had only one product under development, any statement or outcome related to this product was extremely material to the stock price and shareholders."  (Hakala Rep. ¶ 27.)  Yet none of those disclosures, which included the ANH Trial heart attack information, significantly moved the market.  Therefore, because there "was no significant stock price reaction" associated with the disclosure of the

41

central information in this case, "the alleged misstatements regarding the ANH trial were not material."  (Ex. 1, Gompers Rep. ¶ 19.)

**B.     Plaintiffs' Have Not Established Materiality.**

To satisfy their burden of establishing materiality, plaintiffs again rely exclusively on the report of Dr. Hakala.  Plaintiffs have not met their burden because Dr. Hakala's materiality opinion is faulty in multiple respects.

**Failure to analyze specific misrepresentations.**   Dr. Hakala fails to undertake any analysis of the specific misrepresentations that survived the motion to dismiss.  As Dr. Gompers points out, "[a]ssuming that, as Dr. Hakala believes, the market for Northfield's shares is efficient it is a fairly straightforward matter to perform an event study analysis of the dates on which the alleged misrepresentations were made (or on the dates that omitted information was disclosed) in order to determine whether the stock price changed significantly in response to the information."  (Ex. 1, Gompers Rep. ¶ 109.)  However, "Dr. Hakala has undertaken no such analysis." *Id.*  Dr. Hakala's "event study does not include any of the dates on which the alleged misrepresentations which survived the motion to dismiss were made." *Id.*  "Nor does his report contain any analysis tying the alleged misrepresentations to specific corrective disclosures, as would be necessary to demonstrate that an omission was material." *Id.*

For that reason alone, Dr. Hakala's approach is faulty and cannot demonstrate materiality.

**Failure to disaggregate.**   Dr. Hakala does not even attempt to disaggregate fraud from non-fraud market effects in the corrective disclosures that he contends demonstrate materiality. Just as disaggregation is important to determining whether the market is efficient (*see* Part I.C above), disaggregation also is important to determining whether a particular corrective disclosure of supposedly misrepresented information is material.  As Dr. Gompers opines, "when multiple news events occur on a date that plaintiffs claim a corrective disclosure was made, Dr. Hakala makes no effort to disaggregate the stock price movement that was due to the corrective disclosure from the stock price movement that was due to information unrelated to the

allegations." (Ex. 1, Gompers Rep. ¶ 41.)  Instead, Dr. Hakala lumps together all information regarding PolyHeme in an effort to avoid the effects that disaggregation would engender on his conclusion.

As shown above, Dr. Hakala was obligated to disaggregate the price effects to examine whether a market drop from allegedly fraud-related disclosures occurred and was significant. *See, e.g., Fener*, 579 F.3d at 410 (5th Cir. 2009) ("Hakala's testimony was fatally flawed" because he "shows only how a 'stock reacted to the *entire bundle* of negative information'"; emphasis in original); *Xcelera*, 2008 WL 7084626, at *1 (D. Mass. Apr. 25, 2008) ("Hakala's analysis fails to take into consideration other factors that affected Xcelera's stock price in August 2000"); *Omnicom*, 541 F. Supp. 2d at 554 (S.D.N.Y. 2008) ("the law requires the disaggregation of confounding factors").

Here, the so-called corrective disclosures upon which Dr. Hakala relies reflected previously disclosed information and information unrelated to the five alleged misstatements remaining in this case.  In his report, Dr. Hakala relies upon the following five "partially corrective disclosure events" (Hakala Rep. ¶ 31):

- **The January 6, 2006 UBS Report**.  In that report, UBS concluded that PolyHeme "may slightly increase the risk of adverse events for more frail patients," and UBS downgraded the target price of Northfield's stock by 15%. (Ex. 38.)  However, the report does not base that conclusion on anything regarding the ANH Trial.  Indeed, the report does not even mention the ANH Trial or its results.  Rather, according to the report, the stock downgrade is based upon a different study involving rats — "an army study that compared PolyHeme with other resuscitative fluids in a rat model."  (Ex. 38 at 2.)  As Dr. Gompers observes, "[d]etailed results" of the rat study already had been published eight months earlier "in *Shock Journal* in April 2005."  (Ex. 1, Gompers Rep. ¶ 133.) In addition "a *Forbes Global* article published May 25, 2005 contained a discussion of this study, specifically referencing PolyHeme."  *Id.* at ¶ 134.

Therefore, the "news Dr. Hakala suggests is a corrective disclosure had been available to market participants for approximately eight months" and was unrelated to the ANH Trial results.   *Id.* at ¶ 135.   Dr. Hakala does not even attempt to disaggregate the price decline regarding the downgrade (which related to the previously disclosed rat study) from any purported price decline regarding corrective disclosures about the five alleged misstatements in this case.   Indeed, given that there were no corrective disclosures in the January 6 UBS report about anything connected with the ANH Trial, the report does not have any relevance to whether the misstatements alleged in the complaint are material.   *Id.*[8]/

- **The February 22, 2006 Wall Street Journal Article.**   The February 22 article states that heart attacks were observed in the ANH trial and criticizes the FDA for permitting the trauma trial to proceed without requiring the informed consent of patients.   (Ex. 11.)   However, as Dr. Gompers observes, "nearly all of the information about PolyHeme and the ANH trials in the WSJ article had been previously disclosed on numerous occasions throughout 2005 and early 2006," including "during the community outreach process for the trauma trial," "in Yahoo! chat rooms on June 24, 2005 and again on September 18, 2005," "in a Marketing Research Bureau paper that became available on October 10, 2005,"

---

[8]   The author of the January 6, 2006 UBS report testified that, despite his earlier statement in his deposition, he was not sure whether he was even aware of the ANH Trial results when he prepared the report.   (Ex. 45, Pace Dep. at 128 ("I'm not sure. . . .   I can't testify as to the specific date."); *see also id.* at 111-12.)   He further testified that if he had known of important information such as the ANH Trial results as of January 6 and if he had based his downgrade on that information, it would have been his practice to include that information in the January 6 report, which he did not.   *Id.* at 109-10.

Four days later, on January 10, 2006, Mr. Pace issued another UBS report that did discuss the ANH Trial.   The January 10 report quoted Northfield's website disclosures about the ANH Trial results, including the heart attacks.   (Ex. 42.)   However, although Dr. Hakala fails to mention it in his report, Northfield's stock price did <u>not</u> drop significantly in reaction to the January 10 report, even though it was the only UBS report that mentioned the ANH Trial results. (Ex. 19; Ex. 41, Hakala Dep. at 173.)   Nor did UBS downgrade Northfield's stock in that report or any subsequent one.   (Ex. 42; Ex. 43; Ex. 44.)

and in a January 10, 2006 UBS report. (Ex. 1, Gompers Rep. ¶ 139.) Dr. Hakala does not disaggregate the remaining information or connect its price effect with any new corrective disclosures regarding the five alleged misstatements remaining in this case. Accordingly, the impact of the February 22 article on Northfield's stock price cannot demonstrate whether any of the alleged misstatements was material.

● **The February 24, 2006 Wall Street Journal Article.** That article focuses on Senator Grassley's inquiry into the FDA's decision to allow PolyHeme to be administered to trauma patients without their informed consent. (Ex. 46.) As Dr. Gompers observes, "the information released on this date about the Senate inquiry into the ethics of the PolyHeme ambulance trial does not correct the alleged misrepresentations in this matter. Specifically, no new information is released that relates to cardiovascular issues in the ANH trial." (Ex. 1, Gompers Rep. ¶ 143.) In other words, Dr. Hakala does not identify any new corrective disclosures in the article concerning the five alleged misstatements in this case. Nor does Dr. Hakala disaggregate the effect of any purportedly new corrective disclosures from the effect of Senator Grassley's inquiry into facts already disclosed earlier — namely, that the FDA was allowing PolyHeme to be administered to trauma patients without their informed consent. The market had known about the lack-of-informed-consent nature of the trauma trial since 2003. (Ex. 57.) Because there is nothing in the article tied to new disclosures about the five alleged misstatements in this case, the resulting stock price movement cannot demonstrate whether any of the alleged misstatements was material.

● **The March 10, 2006 and March 14, 2006 Articles.** Those Wall Street Journal articles focus on ethical concerns raised by the federal Office for Human Research Protections into the FDA's decision to allow PolyHeme to be administered to trauma patients without their informed consent. (Ex. 47 at 1; Ex. 48 at 1.) The

articles repeat that Senator Grassley was inquiring into the matter and that he had sent a letter to the Department of Health and Human Services complaining about making "patients into 'potential guinea pigs' without their consent." *Id.* Again, as Dr. Gompers observes, "[t]here is no new information in these articles that corrects the alleged misrepresentations." (Ex. 1, Gompers Rep. ¶¶ 144-47.) As before, Dr. Hakala does not disaggregate the effect of the government inquiries or connect that effect to new corrective disclosures concerning the five alleged misstatements in this case. Consequently, the resulting stock price movements cannot demonstrate whether any of the alleged misstatements was material.

Unlike Dr. Hakala, Dr. Gompers focuses specifically on each of the five alleged misrepresentations in this case: (1) the date when the ANH trial was closed (Gompers Rep. ¶ 115); (2) the reasons for closing the trial (*id.* ¶ 117); (3) the results of the ANH trial (*id.* ¶¶ 119-20); (4) the safety of PolyHeme (*id.* ¶ 121); and (5) adverse effects linked with PolyHeme (*id.* ¶¶ 121-23). Dr. Gompers analyzes the purported corrective disclosures regarding each one of those alleged misrepresentations. *Id.* at ¶¶ 114-23. Based on the market's reaction to those disclosures, Dr. Gompers concludes that, if the market were efficient as Dr. Hakala contends, then none of the alleged misrepresentations is material. *Id.*

**Failure to consider FDA approval of trauma trial.** Dr. Hakala also fails to consider the fact that the FDA — and all of the trauma hospitals and the IDMC for the trauma trial — knew about the ANH Trial results including the heart attacks and went forward with the trauma trial anyway. The October 2005 analyst report from Marketing Research Bureau emphasized the importance of that fact: "We must assume that the more frequent appearance of serious cardiovascular adverse experiences in PolyHeme-treated patients was statistically significant. We must also assume that the FDA has reviewed these findings, and for some reason felt comfortable allowing Northfield to go forward with a trauma resuscitation protocol . . . ." (Ex. 37 at 52, emphasis added.)

That fact confirms that the information about which plaintiffs complain was not material. What the market cared about was whether PolyHeme would be approved for trauma use, given that trauma was the only potential use for which Northfield had a clinical trial pending and thus was the only use for which Northfield could hope to obtain FDA approval. That had been disclosed years before the stock-drop upon which plaintiffs rely. *See, e.g.,* Ex. 14 at 6; Ex. 58 at 6; Ex. 59 at 7. Accordingly, the only way that the ANH Trial results could be material is if those results affected the trauma trial. But the problem for Dr. Hakala and for plaintiffs is that the FDA (and all of the hospitals and the IDMC) knew about the ANH Trial results and proceeded with the trauma trial anyway, without requiring the informed consent of patients. Indeed, in March 2006, following media criticism of the lack-of-informed-consent nature of the trauma trial, the IDMC for the trauma trial reiterated the committee's recommendation that the trial, which had passed four separate interim IDMC safety checks, should continue without modification. (Ex. 18 at 1; *see* Ex. 5 at 3; Ex. 17 at 3; Ex. 18 at 1.) Thus, the people with the most expertise on the subject did <u>not</u> think that the ANH Trial results were material to the issue of whether PolyHeme was a viable product for trauma use. As the director of the FDA's Office of Blood Research and Review, Dr. Jay Epstein, confirmed publicly, the FDA approved the trauma trial because "[t]he FDA's review suggested that 'volume overload' rather than 'any intrinsic toxicity of the product' was responsible for the cardiac events" in the ANH Trial. (Ex. 11 at 4.)

Again, Dr. Hakala does not even mention that key point.

In sum, plaintiffs have not satisfied their burden of establishing materiality, which is necessary for them to obtain the fraud-on-the-market presumption that is critical to their class certification efforts. Moreover, without a stock price reaction, there is no link "between the alleged misrepresentation" and "the price received (or paid) by the plaintiff." *Basic*, 485 U.S. at 248. Thus, any presumption of reliance, even if it had been established, has been rebutted. *Id.* For that additional reason, class certification should be denied.

III. **COMMON ISSUES DO NOT PREDOMINATE BECAUSE PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE ALLEGED MISREPRESENTATIONS WERE MADE AND UNDERSTOOD IN A UNIFORM MANNER THAT CAN BE TRIED ON A CLASS-WIDE BASIS.**

Under established law, common issues do not predominate and a class cannot be certified where "class members may have had varied sources and amounts of information apart from the nondisclosures of the defendants." 5 *Moore's Federal Practice*, § 23.45[5][a][ii][A], at 23-226 (3d ed. 2010). There can be no predominance of common issues when the central issue of whether there has been a non-disclosure of the truth varies from class member to class member. As the *Moore's* treatise explains (*id.*, footnotes omitted, emphasis added):

> In order for common issues of nondisclosure to predominate . . . a plaintiff must demonstrate that the nondisclosure was, in fact, common to all members of the putative class. Predominance of common issues may be lacking in nondisclosure situations when, despite nondisclosure, <u>the information actually available to class members varies substantially from member to member</u>.

Here, as shown above, the information that plaintiffs contend was fraudulently concealed in fact was disclosed to thousands of people — via methods ranging from websites and internet chatrooms to community meetings and county fairs. Consequently, there is no way to determine which class members had access to what information without conducting individual mini-trials for each member.

One of the named class representatives, Daniel Nesi, admitted that exact point in his deposition in this case. As Nesi testified, the key issue concerning whether class members had knowledge of the ANH study results would have to be evaluated "individual to individual" (Ex. 60, Nesi Dep. 93-94, emphasis added):

> Q.     [I]f investors somehow knew about the heart attacks in the ANH trial in 2005 before the information you claim became public and caused the stock to drop, should they be included in the class?
>
>          . . . .
>
> THE WITNESS:   Why not?  If they made an error in judgment of the stock, I can't make the conclusion that they made it based on ignorance or based on reluctance to accept that as a negative.  <u>Those issues are some that you can only evaluate from individual to individual</u>, but nonetheless, these investors lost their money the same as I did.

48

*See also* Ex. 41, Hakala Dep. at 229-30 ("Q.  And how do you determine which of those investors actually had access to this information and which of them didn't?  A.  You don't.  Unless you ask them, you can't.").

Having to evaluate core liability issues "individual to individual" is the antithesis of class treatment.

In securities cases, when purported non-disclosures are not uniform throughout the class — that is, when some purported class members have knowledge of the truth and others do not — there can be no class certification.  The Second Circuit made that precise point in *In re Initial Public Offering Securities Litig.*, 471 F.3d 24 (2d Cir. 2006).  That case involved the alleged nondisclosure of misconduct in connection with IPOs, such as conditioning allocation of IPO shares to purchasers based on secret agreements to purchase additional shares in the aftermarket at higher prices.  The Second Circuit overturned the district court's class certification decision, holding that the key issue of knowledge of the challenged information varied from individual to individual (*id.* at 43, emphasis added):

> The Plaintiffs' allegations, evidence, and discovery responses demonstrate that the predominance requirement is defeated because common questions of knowledge do not predominate over individual questions.  The claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme. Obviously, the initial IPO allocants, who were required to purchase in the aftermarket, were fully aware of the obligation that is alleged to have artificially inflated share prices.  Those receiving or seeking allocations number in the thousands . . . [and the] requirements would have been known not just to the entities receiving allocations, but also to many thousands of people employed by the institutional investors.

The Second Circuit concluded that class certification was impossible because the fact that many class members knew about the alleged nondisclosures "would precipitate individual inquiries as to the knowledge of each member of the class."  *Id.* at 44; *accord Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) (upholding denial of class certification:  "To recover in an action for securities fraud, individual class members must demonstrate that the omitted information was not otherwise available to them. . . .  Because the extent of knowledge of the

omitted facts or reliance on misrepresented facts will vary from shareholder to shareholder, the question of whether the omission was material might require an individual inquiry for each shareholder."); *cf. West*, 282 F.3d at 937 (7th Cir. 2002) (overturning class certification in securities case where alleged misrepresentations were made to only some class members: "[E]xtending the fraud-on-the-market doctrine in this way requires . . . a departure from *Basic*" because "the details of the deceit differ from victim to victim, and the nature of the loss also may be statement-specific.").

Moreover, as the Seventh Circuit also has made clear, there can be no class certification if the entire class would not interpret the alleged misrepresentation the same way. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008) (overturning class certification where class members could have different interpretations of appliance label:  whether class members "apart from Thorogood, shared his understanding of Sears's representations and paid a premium to avoid rust stains is, to put it mildly, implausible, and so would require individual hearings to verify").  Here, a class member with knowledge of the heart attacks observed in the ANH study would not interpret the alleged misrepresentations at issue in this case in the same way as the named plaintiffs.  Consequently, individual hearings would be required.

In this regard, discovery has revealed that even the named plaintiffs in this case do not interpret the alleged misrepresentations in the same manner.  In connection with the motion to dismiss, this Court held that plaintiffs cannot state a claim on the issue of the ANH study being ended "as a result" of poor patient accrual unless the phrase "as a result" in Northfield's public disclosures is interpreted to mean that poor patient accrual "was the *only* reason for halting the study." (9/25/07 Op. at 24, emphasis in original.)  The named plaintiffs cannot show a common understanding of that phrase.  For example, plaintiff Rourke testified that "as a result" means that Northfield's explanation for why it ended the ANH Trial was the "main reason," but not necessarily the "only reason."  (Ex. 61, Rourke Dep. at 38-39 ("I would say they are saying it's either the only reason or the main reason").)  In contrast, plaintiff Nesi testified that "as a result" means that Northfield's explanation was the "only" reason for ending the study.  (Ex. 60, Nesi

Dep. at 66.)  The difference is not surprising.  Even the Supreme Court has split on the meaning of essentially the same phrase in statutes.  *Compare Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2350-51 (2009) (holding that statutory phrase "because of" requires more than proof that age was "a motivating factor" in the adverse action; "because of" means that plaintiff must prove that "age was the 'but-for' cause of the employer's adverse employment action") *with Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989) (holding that statutory phrase "because of" means that a plaintiff merely needs to present evidence that sex was "a motivating factor" in the adverse employment action).

Therefore, plaintiffs cannot satisfy Rule 23's requirement that common issues predominate, given that the alleged misrepresentations were not made or understood in a uniform manner that can be tried on a class-wide basis.

## IV.   COMMON ISSUES DO NOT PREDOMINATE BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THAT THE FACT OF INJURY CAN BE TRIED ON A CLASS-WIDE BASIS.

Common issues also do not predominate because plaintiffs cannot show that the "fact" of injury exists throughout the class — namely, that every class member actually suffered loss because of defendants' alleged misrepresentations.  As courts repeatedly have held, although the amount of injury can vary among class members, the fact of injury must exist throughout the class in order for class certification to be proper.  Courts have applied that principle in diverse types of cases.  Some courts refer to it as the need to show "proximate" injury in general tort class actions.  Some courts call it "RICO injury" in class actions under that statute.  Some courts call it "antitrust injury" in cases under the antitrust laws.  Some courts call it "loss causation" in securities cases.  But courts agree that the fact of injury must exist throughout the class and be provable on a class-wide basis in order for a class to be certified.

At least five Courts of Appeals, including the Seventh Circuit, have held that a class cannot be certified when the fact of injury varies within a class and is subject to individualized proof.  For example, in *Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006), the Seventh Circuit affirmed the denial of class certification in a case alleging that plaintiffs were deceived

into thinking that fountain Diet Coke had the same ingredients as bottled Diet Coke.  The Court held that a class could not be certified because the class included persons "who were not deceived" and thus had no injury "proximately caused" by Coke's alleged misconduct (*id.* at 514):

> Membership in Oshana's proposed class required only the purchase of a fountain Diet Coke from March 12, 1999, forward.  Such a class could include millions who were not deceived and thus have no grievance under the ICFA.  Some people may have bought fountain Diet Coke because it contained saccharin, and some people may have bought fountain Diet Coke even though it had saccharin.  Countless members of Oshana's putative class could not show any damage, let alone damage proximately caused by Coke's alleged deception.  *See Oliveira*, 267 Ill. Dec. 14, 776 N.E.2d at 164 (holding that those who "knew the truth" do not have valid ICFA claims because they cannot claim to have been deceived).

The Second Circuit has applied the same principle in a RICO context.  *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222-23, 226 (2d Cir. 2008) (denying class certification because "the issue of loss causation . . . cannot be resolved by way of generalized proof"; "[B]ecause factors other than defendants' misrepresentation may have intervened and . . . would require an individualized inquiry, plaintiffs cannot establish loss causation on a class-wide basis").  The Eighth Circuit has applied the same rule in an antitrust context.  *Blades v. Monsanto*, 400 F.3d 562, 572 (8th Cir. 2005) (denying class certification because antitrust injury could not be proved on a classwide basis: "We affirm the district court's holding that appellants cannot prove classwide injury with proof common to the class.").[9]

---

[9]  The Fifth Circuit has applied the same concept in a securities context, holding that plaintiffs in securities cases must demonstrate "loss causation" on a class-wide basis before a class can be certified.  *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007) (denying class certification:  "We hold hence that loss causation must be established at the class certification stage by a preponderance of all admissible evidence").  Plaintiffs criticize the Fifth Circuit's decision in *Oscar* and assert that other courts outside the Fifth Circuit have not followed the causation principle it adopts.  (Pl. Mem. 14.)  As all of the cases cited above demonstrate, that is incorrect.  The split in the Circuits to which plaintiffs refer concerns whether plaintiffs bear an additional burden of showing that the alleged misrepresentations had an impact on the stock price.  The Fifth Circuit in *Oscar* held that plaintiffs do have such a burden.  *Oscar,* 487 F.3d at 265 (5th Cir. 2007) ("We now require more than proof of a material misstatement; we require proof that the misstatement *actually moved* the market").  The Second Circuit in *Salomon* held that plaintiffs do not have such a burden.  544 F.3d at 483 (2d Cir.

District courts, including judges in this district, have made the same point, rejecting class certification when individual issues of proximate causation exist.  *See, e.g., In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litig.*, Nos. 05 C 4742, 05 C 2623, 2009 WL 3460218, at *5 (N.D. Ill. Oct. 20, 2009) (Grady, J. ) ("There is ample reason to believe that a great many of the putative class members were not injured."); *Siegel v. Shell Oil Co.*, NO. 06 C 0035, 2009 WL 449073, at **4-5 (N.D. Ill. Feb. 23, 2009) (St. Eve, J.) (plaintiff "failed in his burden of establishing that common evidence can be used" where plaintiff's "proposed class requires the Court to determine how each plaintiff reacted to Defendants'" conduct); *Fleischman v. Albany Medical Center*, No. 1:06-CV-765, 2008 WL 2945993, at **6-7 (N.D.N.Y. July 28, 2008) ("[Q]uestion of injury-in-fact cannot be certified because no evidence has been presented that demonstrates injury-in-fact to the class in its entirety. . . .   Injury-in-fact and damages, however, must be separately determined, as there exists too much disparity among the proposed class members to proceed under one common trial.").

Here, the only evidence upon which plaintiffs rely to show that the fact of injury exists throughout the class is the report of Dr. Hakala.  However, Dr. Hakala's report on that point is flawed for the same reasons shown above — such as his failure to consider facts showing the disclosure of heart attack information to class members long before January 2006.  Given the

---

2008).  However, the split over that issue does not affect the point raised here — that, as at least five Circuits have held, a class cannot be certified when the fact of injury varies within a class and is subject to individualized proof.  *See also, e.g., Fotta v. Trustees of United Mine Workers of Am.*, 319 F.3d 612, 619 (3d Cir. 2003) (upholding denial of class certification where issue of whether delay in paying ERISA benefits was "wrongful" in a way that injured class members varied throughout the class:  "To decide whether each putative class member would be entitled to interest, the District Court would have to determine whether the Fund wrongfully withheld or wrongfully delayed payment for each class member"); *Doe v. Chao*, 306 F.3d 170, 183-84 (4th Cir. 2002) (upholding denial of class certification where labor benefits depended on a statutory requirement that each class member demonstrate an actual "adverse effect" which gave rise to individualized issues that precluded certification); *accord In re St. Jude Medical Inc. Silzone Heart Valve Products Litigation*, 522 F.3d 836, 840 (8th Cir. 2008) (district court properly found that individualized questions predominated regarding whether patients or their doctors had ever been exposed to misrepresentations about the allegedly faulty medical device and "whether there is a causal nexus between alleged misrepresentations and any injury").

wide variation in information available to different class members at different times, the fact of alleged injury cannot be tried on a class-wide basis.

## V.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE TYPICAL AND ADEQUATE REPRESENTATIVES BECAUSE THEY ARE SUBJECT TO UNIQUE DEFENSES.

Because each of the named plaintiffs is subject to unique defenses, plaintiffs also cannot satisfy Rule 23's requirement that each named class representative be typical and adequate. Under established law, a class cannot be certified when the named representatives are subject to unique defenses. *J. H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation"); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("Regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its representation . . . there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."); 7A C. Wright & A. Miller, *Federal Practice and Procedure*, §§ 1764 and 1765 (3d ed. 2005) (collecting cases in which unique defenses defeated typicality and adequacy).

Here, the named representatives are subject to multiple unique defenses.

### A.   The Named Representatives Did Not Purchase Any Shares Until After Significant Disclosures And Events Had Occurred.

At the threshold, none of the named representatives purchased any Northfield shares until three and half years after the proposed class period began.  The proposed class period starts on March 19, 2001.  The Shield plaintiffs did not purchase until November 22, 2004.  (Ex. 51 at 1.)  Plaintiffs Goodman, Rourke, and Nesi did not purchase until February 3, 2005, May 24, 2005, and June 15, 2005, respectively.   (Exs. 52-54.)   By the time any of the named plaintiffs purchased, the following events already had happened and were known:

- August 2002:  Northfield disclosed that the ANH study had ended.  (Ex. 14 at 6, 8/9/02 Form 10-K ("[W]e closed the elective surgery protocol after our BLA [for

trauma] was submitted"). Accordingly, from at least that date, the market knew that there could be no FDA approval to use PolyHeme for elective surgery absent an entirely new clinical trial.

- March 2003: The FDA, with knowledge of ANH study results and the heart attacks observed there, approved a trauma trial on an "exception from informed consent" basis. (Ex. 57 at 1.)

- December 2003: Trauma hospitals across the country, with knowledge of the ANH study results and the heart attacks observed there, began participating in the trauma trial on an "exception from informed consent" basis. (Ex. 63 at 1; Ex. 15, Twaddell Dep. 49-53, 148-49, 156, 193-94.)

The point is that all of the named representatives are subject to the unique defense that by the time they purchased, the market already knew that (1) PolyHeme was not going to be approved for elective surgery use; (2) trauma use was the only avenue for FDA approval; and (3) the results of the ANH Trial did not prevent the FDA from approving the trauma trial on a lack-of-informed-consent basis, and did not prevent hospitals across the county from participating in the trauma trial.

Therefore, the named plaintiffs purchased too late to represent others in a five-year-long class period. *See, e.g., J.H. Cohn*, 628 F.2d at 998 (7th Cir. 1980) (early purchaser "would face a different question of proof on the materiality issue" than one who purchased "after a great deal more information . . . was available"); *Robinson v. Penn Central Co.*, 58 F.R.D. 436, 443 (S.D.N.Y. 1973) (purchaser could not represent others who bought before him since the late purchaser "would have an interest in minimizing the significance of earlier events in order to maximize the materiality of later events").[10]

_____

[10] The named plaintiffs also cannot represent persons who purchased before the first alleged misstatement that remains in this case. Under this Court's ruling on the motion to dismiss, the first alleged misstatement left in the case occurred on August 3, 2001. (9/23/08 Op. at 10.) Yet the proposed class begins five months earlier, on March 19, 2001. Given that the named plaintiffs do not allege any misrepresentations between March 19 and August 3, 2001, they do not have any basis to represent purchasers during that period. *See, e.g., In re Miva, Inc., Sec. Litig., No. 2:05-cv-201*, 2008 WL 681755, at *1-2 (M.D. Fla. Mar. 12, 2008) (class certification improper as to purchasers before the first alleged misstatement because their claims are "wholly unrelated to the claims that remain in this case").

**B.**     **None Of The Named Plaintiffs Is A Proper Class Representative.**

   **1.**     **Plaintiff Shield.**

Dr. Shield, who controls the investment decisions of the Shield Plans, is subject to the unique defense that he continued to purchase Northfield shares after the corrective disclosures upon which he relies.  Under established law, named representatives who continue to purchase while knowing the truth are subject to a unique defense that the information was not material to them.  *See, e.g., Epstein v. American Reserve Corp.*, No. 79 C 4767, 1988 WL 40500, at *4 (N.D. Ill. April 21, 1988) (denying class certification where certain plaintiffs purchased defendant's securities after the alleged fraudulent information had become known:  "[s]uch behavior is commonly held to create a unique defense vitiating typicality"); *Berwecky v. Bear, Sterns & Co.*, 197 F.R.D. 65, 69-70 (S.D.N.Y. 2000) ("a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative");  *In re Safeguard Scientifics*, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) (lead plaintiff was inadequate and atypical because his stock purchases after the disclosure of the alleged fraud subjected him to unique defenses); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455-56 (S.D. Tex. 2002) (post-disclosure trading made lead plaintiff inadequate and atypical).

Shield's trading in Northfield belies any assertion that the ANH Trial results were material to him.  Shield's first purchase of Northfield securities was in November 2004, at a time when Shield was aware that Northfield was conducting a Phase III trial in trauma.  (Ex. 63, Shield Dep. at 21-23.)  Far from vouching for the materiality of the challenged information, Shield testified that he is not sure whether he still would have purchased Northfield stock in 2004 if he had known about the ANH Trial heart attacks.  *Id.* at 31.  He testified that he may have been swayed by the potential application of PolyHeme in the trauma setting despite the heart attacks. *Id.*

Moreover, Shield continued to buy shares in Northfield between the time the corrective disclosures were issued and the filing of this lawsuit.  Specifically, Shield purchased 3000

additional shares on March 15, 2006 — after the January 6, 2006 UBS report, the February 22, 2006 Wall Street Journal article, the February 24 article concerning Senator Grassley's investigation, and the March 10 and 14 articles concerning the lack-of-informed-consent nature of the trauma trial. *Id.* at 26-27; *see also* Ex. 51. When asked why he continued to buy Northfield shares after the alleged fraud was disclosed, Shield testified that he believed Northfield's statements that "even though there was a problem with the elective surgery, that the acute trauma was still a very large application," and he thought that the explanation of fluid overload "might have some legitimacy." (Ex. 63, Shield Dep. at 10-11; 29-30; 64-65.) Shield recognized that many of the shareholders whom he seeks to represent in this litigation sold their shares immediately following the February 22, 2006 Wall Street Journal article and therefore had a different understanding of the materiality of the information than he had. *Id.* at 29-31. Upon learning of an impending SEC inquiry (later dropped without action), Shield decided that the allegations were serious enough for him to sell his shares. So on March 17, 2006, Shield sold all 14,400 shares that he held in Northfield. *Id.* at 11-14; Ex. 51 at 1-3. However, shortly after this lawsuit was filed, Shield repurchased 7000 Northfield shares on April 6 and 11, 2006. (Ex. 63, Shield Dep. 14-16; Ex. 51 at 19-20.) Shield explained that those April 2006 purchases were motivated by a belief that the heart attacks observed in the ANH Trial would <u>not</u> affect the trauma trial that Northfield was conducting. (Ex. 63, Shield Dep. at 14-17.) Shield testified that his purchase of 7000 Northfield shares shortly after the lawsuit was filed proved profitable for him when he sold them in December 2006. *Id.* at 14-17.

In light of those facts established in his own testimony, Shield is not an adequate or typical class representative.

### 2.    Plaintiff Goodman.

Goodman likewise continued to hold shares in Northfield that he purchased in 2005 until well after this lawsuit was filed, and he purchased additional shares repeatedly throughout 2007. (Ex. 52 at 5-8; Ex. 64, Goodman Dep. at 30-33, 38-46, 61-63, 116-19.) Goodman testified that he continued to hold and to purchase more Northfield shares because he believed that PolyHeme

had uses other than elective surgery and could be approved by the FDA despite the heart attacks observed in the ANH Trial.  *Id.* at 73.  Further, when asked specifically if he would have purchased Northfield stock in 2005 if he had known about the heart attacks observed in the ANH Trial, Goodman refused to state that the information was material to him.  *Id.* at 101-02.  Instead, he testified that he did not want to speculate.  *Id.*  Goodman confirmed that he purchased Northfield shares because he thought the use of PolyHeme on the battlefield for traumatic blood loss was a "good story."  *Id.* at 115-16.

Goodman also demonstrated a lack of veracity at his deposition.  When asked the routine question of whether he had reviewed any documents to prepare for his deposition, Goodman first said that he could not remember, despite the fact that he had prepared for his deposition less than two days earlier.  *Id.* at 12-14.  Then, when asked if the briefcase he brought into the deposition room contained documents, Goodman said that it did not contain documents.  *Id.* at 86.  Later he admitted that the briefcase did contain documents that he reviewed in preparation for his deposition.  *Id.* at 87-93.  Counsel for plaintiffs, however, would not allow Goodman to provide or even describe those documents during the deposition.  *Id.* at 87-93; 136-46.[11]/

In addition, during his approximately two-hour-long deposition, Goodman was taken into the hall repeatedly by his counsel.  *Id.* at 57, 62, 85, 90.  At one point, Goodman came back with a notation provided to him by counsel from which he read his answer to a pending question.  *Id.* at 63, 138-139.

---

[11]   Counsel for plaintiffs also took the position that the identification of whatever documents Goodman reviewed to prepare for his deposition was privileged information and could not be disclosed.  (Ex. 64, Goodman Dep. at 12-13, 86-87, 90-91, 136-37.)   When counsel for defendants asked Goodman to identify the documents in his briefcase that he acknowledged were used to refresh his recollection in preparing to provide testimony, counsel for plaintiffs objected and repeatedly instructed Goodman not to answer.  *Id.* at 85-93; 136-139.  Those instructions were improper.  *See, e.g., Reed v. Advocate Health Care*, No. 06 C 3337, 2008 WL 162760, at *1-2 (N.D. Ill. Jan. 17, 2008) (the use of the documents to refresh a witness' memory in preparing for deposition constitutes a waiver of the work product protection); *Nicholas J. Murlas Living Trust v. Mobil Oil Corp.*, No. 93 C 6956, 1995 WL 124186, at *2-3 (N.D. Ill. Mar. 20, 1995) (holding that documents that witnesses used to refresh their recollections when preparing for depositions should have been produced at the time of the depositions).

The law is clear that named representatives who lack veracity cannot be typical and adequate under Rule 23.  *E.g., Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990) (plaintiff's false deposition testimony warranted decertification of class because plaintiff no longer satisfied typicality and adequacy of representation requirements) (*citing Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) (court's conclusion that plaintiff's deposition testimony was erroneous warranted denial of class certification); *Darvin v. International Harvester*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (credibility problems in plaintiff's deposition rendered him inappropriate as class representative); *Cohen v. Laiti*, 98 F.R.D. 581, 584 (E.D.N.Y.1983) (class certification denied because plaintiff's deposition rendered his credibility subject to attack).

### 3.  Plaintiff Rourke.

Rourke similarly purchased more shares after knowing of the purported fraud, thereby demonstrating that the heart attacks observed in the ANH Trial were not material him.  Rourke purchased Northfield securities on two occasions:  1000 shares on May 24, 2005 (Ex. 53 at 1), and 1000 shares on December 22, 2006 (Ex. 53 at 4), which were long after this suit was filed. Rourke testified that his initial purchase was motivated by a story on the radio about the possible use of PolyHeme in cases of traumatic blood loss on the battlefield and in rural areas.  (Ex. 61, Rourke Dep. at 15-17.)  Rourke acknowledged that his first purchase of Northfield stock in 2005 was a "gamble."  *Id.* at 34-35.  When asked whether he would have purchased Northfield stock again in April 2005 if he had known about the heart attacks, Mr. Rourke refused to declare that the information was material to him.  *Id.* at 29.  Instead, he testified that he did "not want to speculate."  *Id.* at 29.

Rourke further testified that his additional purchase of Northfield shares in December 2006 — long after the alleged fraud purportedly was revealed — was motivated by the hope that "Northfield may be bought out, that somehow they may pull off the license with the FDA."  *Id.* at 18.  When asked why he continued to purchase stock in a company that developed only one product when he believed that the product caused heart attacks, Rourke acknowledged that he did not consider the heart attacks to be material:  "I had seen information that — that there were

some cardiac events, but, certainly, it was never relayed that there was any significant number of heart attacks." *Id.* at 20-21.

### 4.     Plaintiff Nesi.

Nesi provided false answers to verified interrogatories in this matter and gave false testimony at his deposition.  Specifically, in response to an interrogatory asking whether he ever had been sued, Nesi swore that he had not.  (Ex. 65 at 1, 5.)  When asked the same question at his deposition, however, he testified that "on several occasions" he has been sued for medical malpractice (he is a physician).  (Ex. 60, Nesi Dep. at 8.)  Nesi then testified that, apart from several malpractice cases, he had not been sued on any other occasion.  *Id.* at 9.  That testimony similarly was false.  In reality, Nesi had been sued for fraud, civil conspiracy, and unjust enrichment in a case that survived summary judgment and went to trial for several days in 2001, and was settled before the trial concluded.  (Ex. 66, Docket Sheet; Ex. 67, Opinion on summary judgment; Ex. 60, Nesi Dep. at 9-12.)  In addition, until being directly confronted with the fact at his deposition, Nesi failed to disclose that he also had been sued for sexual harassment.  (Ex. 60 at 12.)**12/**

Nesi's testimony regarding his motivations for purchasing Northfield stock in June 2005 likewise lack credibility.  Nesi first testified that he bought the stock because of the ANH elective surgery trial (Ex. 60, Nesi Dep. at 36-41), but he later testified that he had never even heard of the elective surgery trial until after he sold his Northfield shares (*id.* at 108, 119, 120).  In particular, Nesi testified that he purchased Northfield stock on June 15, 2005.  *Id.* at 23.  However, Nesi later filed an amended certification (on the same day that this brief was filed) stating that he actually purchased on May 27, 2005.  *See* Ex. 54 at 1-2.  In his deposition, in an

---

**12**    Although counsel for plaintiffs attempted to argue at the deposition that plaintiffs' interrogatory responses were limited to cases involving securities and class actions in the last 10 years (Ex. 60, Nesi Dep. at 12-14), that is incorrect.  Following a meet and confer, plaintiffs agreed to expand their answers to include all litigation.  (Ex. 65 at 1, Letter from P. Kim to S. Prysak.)  In any event, regardless of how the interrogatories are interpreted, the questions asked at Nesi's deposition regarding past lawsuits were not limited in terms of the date of litigation or the subject matter of the case.

apparent effort to bolster the claims in this litigation, Nesi testified that his decision to purchase Northfield stock in June 2005 (now switched to May 2005) was motivated by the elective surgery trial that, according to Nesi, Northfield was conducting at the time.  (Ex. 60, Nesi Dep. at 36-38; 40-41.)  The problem with that testimony is that Northfield's elective surgery trial had ended in 2001 — four years prior to Nesi's first purchase of Northfield stock.  When confronted with that fact at his deposition, Nesi shifted his position.  He testified that he knew the trial had been completed but that the data had not been released and "it appeared that it was going to be a positive result.  And it would have been too late to invest in this stock once those results were known because if it took a big bump, which I was expecting it to, after the release of that information, I would have missed the boat."  *Id.* at 38-39.  Then, when asked for clarification of that answer, given that the ANH Trial ended before completion and thus could not possibly have provided positive results, Nesi shifted his position again.  Nesi conceded that the elective surgery trial was immaterial to him at the time of his purchase, stating that "the growth potential was outstanding, whether [the elective surgery result] was released or not."  *Id.* at 39.  Indeed, despite his explicit testimony that he purchased Northfield stock in 2005 based on the promise of positive results from the elective surgery trial, he later testified directly on three occasions that he was <u>never</u> aware of the elective surgery study until some time after he sold his Northfield stock. *Id.* at 108, 119, and 120.

In addition to misrepresenting the reasons why he purchased Northfield stock and his awareness of the elective surgery trial, Nesi provided false testimony about when and why he sold his Northfield stock.  Specifically, at his deposition, when asked about the circumstances surrounding his decision to sue, Nesi testified that Northfield's share price had dropped from $17.00 to $2.00.  *Id.* at 19-21, 50, 83.  That drop, according to his testimony, led him to investigate why it happened and through that inquiry, he discovered the alleged fraud, sold his shares at a loss, and then contacted counsel.  *Id.*  When confronted with his certification regarding his Northfield stock transactions, which did not show any sale of his shares prior to the filing of the lawsuit, Nesi changed his story again.  Nesi stated that he could not remember when

he sold his stock.  *Id.* at 23-25.  Nevertheless, Nesi repeatedly testified that he sustained a substantial loss because of the revelation of the heart attack data, which caused his shares to fall from $17.00 to $2.00 per share, thereby motivating his decision to sell his Northfield stock.  *Id.* at 53-55.

That testimony again was false.  As it turns out, Nesi did not sell his shares immediately before the lawsuit was filed in March 2006.  Nor did he sell them shortly thereafter.  (In fact, far from sinking to $2.00, the price of Northfield stock never traded below $9.00 in March or April 2006.  *See* Ex. 19.)  Despite the alleged revelation of the supposed fraud by March 2006, account statements produced <u>after</u> Nesi's deposition demonstrate that he did not sell his shares in Northfield until December 2007 — 21 months after the alleged truth was revealed.  (Ex. 54 at 4, Nesi account statement.)  Contrary to his testimony, Nesi held onto his shares for nearly two years, until Northfield's shares dropped following the release of disappointing data from Northfield's trauma trial in December 2007.  Accordingly, despite Nesi's testimony that the release of the heart attack data caused his shares to drop from $17.00 to $2.00, his loss in fact was caused by his decision to remain invested in Northfield and await the trauma trial data.

Another example of Nesi's lack of veracity involves the first purported corrective disclosure alleged in the complaint — the January 6, 2006 UBS report regarding the rat study.  Nesi testified unequivocally that the January 6, 2006 UBS report did not contain information that was new to the market and that it instead reported on a rat study that he thought was "bogus" and had no relevance to trauma patients.  (Ex. 60, Nesi Dep. at 76-78.)  In the midst of that line of questioning, plaintiffs' counsel abruptly declared that a break was required and took Nesi into the hall.  *Id.* at 77-78.  Upon returning from his meeting with counsel, Nesi changed his mind and testified that he did not know whether the information in the January 6, 2006 UBS report was new information at the time of its release.  *Id.* at 78-79.

In light of those facts, none of the named plaintiffs is an adequate or typical class representative.

## CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion for class certification.

Dated: February 16, 2010                    Respectfully submitted,

                                            STEVEN A. GOULD, MD

                                            s/  Ronald L. Marmer
                                            One of His Attorneys

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL   60654
(312) 222-9350

                                            RICHARD E. DEWOSKIN

                                            s/  David C. Bohan
                                            One of His Attorneys

David C. Bohan
Jason Shaffer
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL   60661
(312) 902-5566