**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE NORTHFIELD LABORATORIES, INC.
SECURITIES LITIGAION

Master File No. 06 C 1493
Judge George M. Marovich
(Consolidated)

**REPLY DECLARATION OF SCOTT D. HAKALA, PH.D., CFA**

**REGARDING MARKET EFFICIENCY**

I.      **Preliminary Discussion**

1.      In this reply declaration, I consider and respond to and issues the assertions, criticisms and opinions offered in the Declaration of Professor Paul Gompers in this matter and the Expert Report of Paul Gompers ("Gompers Report") submitted with that declaration.  I adopt by reference the prior opinions and information relied upon in the Declaration of Scott D. Hakala, Ph.D., CFA Regarding Market Efficiency ("Hakala Report") dated April 1, 2009 and hereby affirm the testimony in my deposition on February 8, 2010.  I have reviewed in detail as well the materials relied upon by Professor Gompers and the documents and calculations provided as well as the deposition of Professor Gompers in this matter on March 23, 2010.  I have now reviewed additional testimony and materials obtained in discovery, including the deposition testimony of Patrick Pace on December 12, 2008 and information regarding an MRB report and its limited dissemination mentioned in the Gompers Report.  Additionally, I considered the Defendants' Memorandum in Opposition of Plaintiffs' Motion for Class Certification

("Defendants' Memorandum Opposition") and the exhibits and information cited in Defendants' Memorandum.

2.     As a general summary, Professor Gompers's report begins with an incorrect and improperly specified definition of market efficiency for reliance purposes and then never provides any credible evidence to support his conclusion that the market for Northfield's common shares was not efficient during the proposed class period from March 19, 2001 through March 20, 2006.   Professor Gompers's concept of market efficiency is inconsistent with and does not reflect current academic thought and does not recognize the concept of informational efficiency as set forth and supported with academic and legal citations in the Hakala Report (¶6 and footnote 1).  Indeed, Professor Gompers has repeatedly failed to find market efficiency in cases where most academics would have found market efficiency (including in cases involving Cisco Systems, Nortel, Williams Companies, and Parmalat).  Furthermore, when properly analyzed, the limited data and analyses presented in the Gompers Report are actually consistent with an informationally efficient market in that there was more than adequate trading volume and turnover in the common shares of Northfield throughout the proposed class period, institutional investors did trade the stock throughout the class period, investors could and did short the stock throughout the class period, and there was not ability on the part of investors to profitably trade based on prior news or stock price movement (no arbitrage profits).  Additionally, Northfield was covered and reported its developments throughout the proposed class period and one can find information on Thompson Research regarding Northfield from prior to the beginning of the proposed class period to the end of the proposed class period.  Finally, the purported event study analyses in the Gompers Report are biased and

incomplete such that they cannot be relied upon to reach any reliable conclusions regarding market efficiency or the statistical significance of specific relevant events.

3.      With respect to the methodological criticisms of the event study methodology in the Hakala Report asserted by Professor Gompers, these criticisms are assertions without any academic support or references provided in the Gompers Report and, also, without reliable analyses to support such assertions.   This lack of support for Professor Gompers's critical assertions is not surprising in light of the extensive support for the event study methodology set forth in the Hakala Report (¶¶17-24 and footnotes 3 to 12). The event study methodology in the Hakala Report is: (i) based on long-standing and widely recognized statistical principles; (ii) can be found in a number of peer-reviewed published papers that establish through testing that the statistical methodology in the Hakala Report is unbiased and reliable, whereas the event study methodology in the Gompers report is biased and unreliable by comparison; has been tested (as shown in Exhibit E to this reply declaration); has been acknowledged as a legitimate and generally accepted methodology by other experts (see, for example Exhibits F and G to this reply declaration); is replicable (when the concept of replication is correctly defined) as shown in Exhibit E to this reply declaration, and is based on sound economic principles.  In fact, as will be discussed later in this reply declaration, there are a number of instances where Professor Gompers makes assertions concerning statistical methodology and academic support for the event study methodology in the Hakala Report that are false, contradicted by academic literature cited herein and in the Hakala Report, and inconsistent with generally accepted statistical concepts and mathematical proofs.  In light of the academic literature and testable evidence provided in the Hakala Report and in Exhibit E to this

reply declaration and the paucity of academic citations and competent evidence by Professor Gompers, the liberal use of pejorative terms such as "arbitrary," "unscientific," "not generally accepted," and "subjective" is not academically acceptable.

4.     Professor Gompers's criticisms of the event study methodology in the Hakala Report, also, are immaterial and have no effect on the ultimate conclusions.  In Exhibit B-1 to this reply declaration, I added additional news events identified by Professor Gompers as being published and widely disseminated to the event study analysis, and the addition of these news events only improved the results and confirmed market efficiency for the class period as a whole.[1]   However, I did not add bulletin board postings by investors and information identified by Professor Gompers not identified in published news reports, as that is inconsistent with the protocol for identifying events and there was no evidence as to the timing and widespread nature of such information entering into the public market.  In Exhibit B-3, I summarize the event study over the first part of the class period (from, March 19, 2001 to August 14, 2004), the portion where Professor Gompers claims was more inefficient and find that the market for Northfield's shares was efficient in that Northfield's share price movements were significantly and contemporaneously correlated with market and industry indices and reflected in a reasonably rapid time period company-specific news events.  Finally, in Exhibit B-4 to this reply declaration, I demonstrate that limiting the event study in Exhibit B-1 to those events that meet a minimum level of statistical criteria consistent with academic criteria does not alter the conclusions of the study and actually increases the statistical significance of the events of interest in 2006, the exact opposite of what is asserted in the Gompers Report.

---

[1] Where possible exhibits are lettered consistent with the Hakala Report and the Gompers Report.  Thus, there is no Exhibits A or C attached to this reply declaration.

5.    Professor Gompers's view of loss causation is similarly conceptually flawed and would preclude a finding of loss causation almost always.  Professor Gompers's view of loss causation is that there is no loss causation if there is any possible confounding information, even if it can be shown through news and analysts reports and through other means that the disclosure of the relevant truth was the sole or primary cause of the decline in the stock price on certain days.  This is in stark contrast with my understanding that the long-standing principle is that the alleged misstatements and omissions need not be the sole cause of the loss but must merely be a "substantial factor" in the loss realized by investors and that the events that cause the loss must merely be the direct and foreseeable consequences of the alleged misstatements and omissions.  [*See*, for example, *Prosser and Keeton on Torts*, Fifth Edition, 1984, p. 273, 278, and 293-300 and Restatement of Torts, Second, §§431 and 433.  This is also discussed in Thorsen, Kaplan and Hakala, "Rediscovering the Economics of Loss Causation," *Journal of Business and Security Law Acceptance*, Vol. 6, No. 1 and 2, April 2006, pp. 93-125, cited, for example, in *In re Motorola Securities Litigation*, 2007 U.S. Dist. LEXIS 9530 (N. D. Illinois, February 8, 2007) more specifically in the context of economic loss in securities fraud.] In fact, there is no credible or realistic confounding information that would explain the losses realized by investors on January 6, February 22 and 24, and March 10, 14, and 20, 2006.  All of these events relate to the revelation that the safety of Polyheme was unproven and seriously in question in light previously undisclosed adverse study result.  While Professor Gompers purports to mention one piece of confounding news for the January 6, 2006 event, there is no evidence that that news had any impact on Northfield's share price, was unrelated to the relevant truth in this case, and/or otherwise contributed

to investor losses.  *The primary reason for the decline in Northfield's share price between January 6 and March 20, 2006 was related to new, not old, safety concerns with respect to Polyheme that arose because of previously undisclosed information being made public through a variety of sources.  My event study analysis found that these new concerns with respect to the adverse safety of PolyHeme were unique or different from prior concerns and contradicted prior alleged false and misleading statements and omissions of the defendants.*

6.      In reaching his loss causation and market efficiency conclusions, Professor Gompers consistently assumes that just because something might have been disclosed to some people in some clinics regarding some adverse events, the market knew or should have known everything with respect to the relevant truth alleged in the Complaint.   He makes this assumption notwithstanding the fact that Northfield never disclosed such information in its securities filings with the SEC and the defendants had made statements suggesting or stating that Polyheme had an established record of safety.  The allegations in the Complaint demonstrate that the defendants in this case asserted that past studies and research had established the safety of Polyheme and implied or stated that a prior study, the ANH study, had been discontinued for technical reasons unrelated to the issue of safety.  During the proposed class period, there was no formal or public disclosure to investors by the defendants of the findings that the serious adverse cardiac events in the ANH study had led to the discontinuation of that study or that the difference in the frequency of adverse cardiac events between the Polyheme group and the control group in that study was statistically significant.  Investors have a right to assume and conclude, especially in light of prior assurances of the defendants as to Polyheme's safety profile,

that the failure of Northfield to disclose in its securities filings the prior serious adverse cardiac events meant that such adverse information did not exist or was not material and did not have adverse implications for the safety of Polyheme in the ongoing clinical studies being conducted.   Until 2006, investors and analysts did not know of the statistical significance of the adverse cardiac events (i.e. 10 out of 81 patients receiving Polyheme suffered heart attacks while none were suffered by patients that did not receive Polyheme in the ANH study) and the reasons for the discontinuation of the ANH study. Thus, the absence of such disclosures in Northfield's securities filings and public press releases would and did lead investors and analysts to mistakenly conclude that Polyheme had an established record of safety from prior studies when that was not true.  It was only when an analyst report questioned that safety profile on January 6, 2006 and then articles were published in the *Wall Street Journal* and reported in other news outlets on February 22 and 24, 2006 that the statistically significant negative results of the ANH study began to come to light and the reasons for the ANH study's discontinuation were revealed.  This revealed the falsity of the prior alleged statements and omissions of the defendants and led to statistically significant declines in Northfield's share price on January 6 and February 22, 2006.  Additional information regarding the concerns of Senator Grassley, the Office for Human Research Protocol and other sources specific to the use of Polyheme (in light of the previously undisclosed statistically significant adverse cardiac events in the ANH study and the failure of Northfield to fully disclose this information) caused additional statistically significant declines in Northfield's share price on February 24, March 10, March 14, and March 20, 2006, as set forth in the event study summarized in Exhibit B-2 to this reply declaration and in Exhibit B-Alt to the Hakala Report.

II.     **The Gompers Report Analyses are Incomplete, Biased and Either Support a Finding of Market Efficiency or Fail to Refute Market Efficiency**

7.      *In the context of market efficiency and the tests for market efficiency (including statistical analyses and event studies), Professor Gompers opinions are not supported by a fair and objective review of the published and peer-reviewed academic literature or a comprehensive analysis of the trading in Northfield's common shares during the proposed class period.*   In fact, based on objective academic sources and data analysis:

a.   **Professor Gompers's opinions on market efficiency contain a number of substantial misconceptions and misstatements that lead him to the wrong conclusions regarding market efficiency**.

   i.   In this context, Professor Gompers has confused the **efficient market hypothesis** originally proposed by Professor Fama[2] and others as a working hypothesis and assumption for certain concepts in economics and finance with the concept of **market efficiency** currently understood by economic experts to be required for reliance in matter such as this.[3]   These are not new concepts and have been widely discussed and debated now in

---

[2] Fama, *Foundations of Finance*, 1976, p. 133.

[3] See, for example, Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, Second Edition, 2002, pp. 112-116, (p. 113, "Contrary to popular view, market efficiency does not require that the market price be equal to true value at every point in time.  All it requires is that the errors in the market price be unbiased;….Definitions of  market efficiency are also linked up with assumptions about what information is available to investors and reflected in the price."; p. 115, "The market inefficiency should provide the basis for a scheme to beat the market and earn excess returns [net of trading costs]….The probability of finding inefficiencies in an asset market decreases as the ease of trading on the asset increases.").   *See, also, In re Xcelera.com Securities Litigation* (District of Massachusetts, opinion September 2004; US First Circuit Court of Appeals, opinion December 13, 2005) and *Bowe v. PolyMedica Corp. (In re PolyMedica Corp. Sec. Litig.), 432 F.3d 1, 2005 U.S. App. LEXIS 27173 (1st Cir. Mass., 2005).*

the academic community for more than thirty years.[4]   Yet, Professor Gompers fails to recognize and understand the important, and now widely recognized, distinction between **informational efficiency** (which only requires that the market react in a reasonable period of time to publicly disseminated information) and **fundamental efficiency** (the market not only reacts to information but always correctly evaluates that information).

**Informational efficiency, which is the relevant inquiry, is a testable concept using statistical analyses, particularly rigorous event study analyses**.[5]   Fundamental efficiency, on the other hand, is generally not a testable concept because it can only be really tested in most cases if one knows in advance the precise model the market should be employing to value a given security (common stock or bond) and, even then, the test requires that one properly and accurately assess the mix of information and expectations of the participants in the relevant market.[6]   Since one generally cannot be assured of the precise and correct valuation model (given the many differences of opinion even among economic experts) and it is virtually impossible to know exactly the mix of public information and expectations of the relevant market participants, fundamental efficiency can almost never be reliably tested.   Additionally, Professor Gompers was provably wrong in his deposition when he incorrectly

---

[4] Ibid.
[5] Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, Second Edition, 2002, pp. 112-116, and Gilson and Black, *The Law and Finance of Corporate Acquisitions*, Second Edition, 1995, pp. 185-188.
[6] Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, Second Edition, 2002, pp. 112-116, and Gilson and Black, *The Law and Finance of Corporate Acquisitions*, Second Edition, 1995, pp. 185-188.

asserted that finding informational efficiency resulted in a finding of fundamental efficiency.   In fact, finding informational efficiency is typically a necessary condition (a prerequisite to) but is not a sufficient condition (does not guaranty or ensure) for finding fundamental efficiency.[7]

ii.   Furthermore, Professor Gompers does not recognize that the concept of **informational efficiency in the semi-strong form is the relevant issue for market efficiency in the context of reliance** in a fraud-on-the-market context.[8]   Professor Gompers's opinions on market efficiency (and loss causation) in this case (as well in prior cases such as in *In re Williams Companies Securities Litigation; Gammon Gold, and Parmalat*) assume that if any information existed in any place (even if not widely disseminated and not disclosed in a press release or securities filing) and revealed something relevant to the alleged truth, then the market should have reacted immediately as though it knew and understood the entire "relevant truth" even if the defendants continued to deny and conceal most or all of the "relevant truth."   Under this construct, the existence of leakage of information over time and partial, but incomplete disclosures, is not acknowledged in his framework as being possible or consistent with an efficient market.   Furthermore, Professor Gompers fails to recognize that the materialization of risks associated with the disclosures of new information related to the "relevant truth" can lead to additional

---

[7] Damodaran,  *Ibid*., pp. 112-116.
[8] See, for example, the discussion of the economic issue in *Bowe v. PolyMedica Corp. (In re PolyMedica Corp. Sec. Litig.), 432 F.3d 1, 2005 U.S. App. LEXIS 27173 (1st Cir. Mass., 2005).*

statistically significant losses to investors and be consistent with market efficiency.  In this, Professor Gompers confuses the semi-strong with the strong forms of market efficiency repeatedly in both his expert report and in his deposition.  The **semi-strong form of market efficiency only requires that information that is widely and publicly disseminated by incorporated in the security price (stock price) in a reasonably rapid manner**.  Under the semi-strong form of market efficiency, selective and partial disclosures of information to a limited number of market participants is considered the leakage of information but is not considered to be widely disseminated.  This concept of leakage and the ability of certain parties to trade on inside information are recognized to exist in an efficient market in the semi-strong form.[9]  By contrast, the **strong form of market efficiency requires that all information, including private and**

---

[9] The significance of leakage in advance of negative disclosures is well-recognized in the finance literature and consistent with an efficient market.  Princeton economics professor Burton G. Malkiel, *A Random Walk Down Wall Street*, 2003, pp. 192-93, reports, "[r]esearch indicates that, on average, stock prices react well in advance of unexpectedly good or unexpectedly bad earnings reports."  This is also discussed in Sankarshan Acharya, "Value of Latent Information: Alternative Event Study Methods," *Journal of Financial Markets*. 1993, pp. 363-85.  Other similar findings on the market's anticipation of earnings events can be found in Stanley G. Eakins et al., "Earnings Forecasts and Institutional Demand for Common Stock," *Journal of Applied Business Research*, January 1997, pp. 57+ (discussing the effect of whispers on earnings expectations relative to analyst earnings expectation numbers); *see also* Paul H. Malesta & Rex Thompson, "Partially Anticipated Events: A Model of Stock Price Reactions with an Application to Corporate Acquisitions," 14 *J. Fin. Econ.*, 1985, pp. 237-250; John Y. Campbell et al., *The Econometrics of Financial Markets*, 1997, p. 166.

Ragothaman and Bublitz in "An Empirical Analysis of the Impact of Asset Writedown Disclosures on Stockholder Wealth," *Quarterly Journal of Business and Economics*, June 1996, pp. 32+, state, "Early writedown studies focus on whether writedown announcements convey information about future cash flows. But the event methodology used in these studies ignores the fact that market agents learn about valuation-relevant events from many sources over a long period of time. Specifying a date when information reaches the market is not always feasible; information can reach the market gradually through many sources….Thus, in all prior studies the precise identification of the event date is a problem; the market seems to have alternative sources of information." Similarly, Eakins et al., *Ibid.*, in their paper conclude, "While initially surprising, the results presented in this paper may be simply affirming that institutional investors are rational believers in efficient markets."

For a discussion of leakage in the context of estimating damages in securities litigation, see Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, Vol. 37, June 1990, pp. 905-906.

**semi-private information, will be reflected in the current price of the security**.  Most economists reject the strong form of market efficiency but accept the semi-strong form of market efficiency as generally descriptive of the frequent trading of registered common stock in markets in the United States, but reject the strong form of market efficiency.  Indeed, the presence of partial disclosures and leakage of information is widely acceptable to be consistent with an efficient market in the semi-strong form context.[10]

b.  **Professor Gompers performs biased and unreliable statistical analyses**.

    i.  Statistical methods that might be reasonably acceptable or reliable in a large multi-company event study analysis, where one is studying the same types of events across a large sample of firms, are often not acceptable in single-company event study analyses.  **The multi-company event study methodology Professor Gompers recommends and employs in Exhibits D and E of the Gompers Report lacks "power" (tends to fail to find statistical significance when it should be found)[11] and is biased when applied in the single-company event study framework.**[12]   There is little academic literature that addresses the unique statistical issues in single company

---

[10] Gilson and Black, *Ibid.*, 1995, pp. 216-220 (discusses issues of anticipation, leakage, and learning over time in the context of event studies).  See, also, the references in the immediately prior footnote regarding leakage.

[11] *See* the working paper attached as Exhibit E.  See, also, Gilson and Black, Ibid., 1995, p. 202, and Thompson, Olsen, and Dietrich, "The Influence of Estimation Period News Events on Standard Market Model Prediction Errors," *The Accounting Review*, Vol. 63:3, Jul. 1988, pp. 466 and 468

[12] *See*, for example, Exhibits E; Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 130 and 135, and Jackson, Kline and Skinner, "The Impact of Non-Normality and Misspecification on Merger Event Studies," *International Journal of the Economics of Business*, July 2006, pp. 247-264.

event studies.[13]   In this context, Professor Gompers cannot rely on the academic event study literature for support precisely because that academic literature in the multi-company context and not in the single company context.  In fact, the failure of Professor Gompers both in his expert report and in his deposition, to recognize that there is a substantial difference between multi-company event studies typically published in the academic literature and single company event studies reveals his relative inexperience and lack of familiarity with advanced time-series statistical analysis.

ii.   **The statistical analyses presented in the Gompers Report are not approximately normally distributed because they fail to properly control for known company-specific events, as is required for reliable statistical inferences**.  It is well-known and widely accepted that stock price movements reflect three general forces:  market and industry news events; company-specific news events; and general trading noise caused by trading costs, investor uncertainty, and differences in beliefs and expectations across the relevant set of potential investors at any given point in time.[14]   The existence of company-specific news events that are potentially material contaminate the stock price movements, prevent the stock price movements from being normally distributed, and should generally be

---

[13] Gilson and Black, *Ibid*., 1995, p. 202.
[14] Roll, "R^2," *Journal of Finance*, Vol. 43:3, Jul. 1988, pp. 541-566, and Ryan and Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-specific News Releases?" *Journal of Business Finance & Accounting*, Vol. 31(1) & (2), Jan./Mar. 2004, pp. 49-82.

controlled for as much as is possible in order to avoid a number of statistical problems with the analysis.[15]   In this case, even with an incomplete and less reliable market model, Professor Gompers's period of analysis in Exhibit D to the Gompers Report has a total of 15 events days with extreme stock price movements that would be characterized as "outliers" (absolute t-statistic of 3.00 or greater; movements in the stock price so extreme as to be inconsistent with a normal distribution and consistent with evidence that something happened on those days),[16] whereas a normal distribution would allow for a total of 3.4 such "outliers" on average in the time period studied. Additionally, only 2.0%, or 25 observation days, should be associated with an absolute t-statistic of 2.33 or greater, but a total of 3.50%, or 44 days, have an absolute t-statistic of 2.33 or greater.   It is well-recognized and widely understood in the academic literature that the existence of company-specific events that cause significant stock price movements generally cause the statistical analyses and event study results to fail to be normally distributed, as is required for proper

---

[15] *See*, for example, Exhibits E; Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 130 and 135;  Thompson, Olsen, and Dietrich, "The Influence of Estimation Period News Events on Standard Market Model Prediction Errors," *The Accounting Review*, Vol. 63:3, Jul. 1988, pp. 466 and 468; and  Jackson, Kline and Skinner, "The Impact of Non-Normality and Misspecification on Merger Event Studies," *International Journal of the Economics of Business*, July 2006, pp. 247-264.

[16] *See*, for example, Franses, *Time Series Models for Business and Economic Forecasting,* 1998, Ch. 6;  and Pena, Tiao, and Tsay, *A Course in Time Series Analysis*, 2000, pp. 7 (if known one can control for shifts in value associated with interventions) and pp. 136-189 (Chapter 6 Outliers, Influential Observations and Missing Data, discusses the fact that "outliers", or relatively large movements in the stock price, are commonly observed in time series, such as stock price movements, and should be identified and controlled for in the analysis and notes on page 188 that "When outliers are present in the series, the usual sample estimator can overestimate the variance.  For this reason, it is advisable to use a robust estimator.").

statistical inferences, and can substantially bias the results.[17] Additionally, it is well-recognized and widely understood in the academic literature that the failure to control for known company-specific events that cause significant stock price movements will cause the rate of error to be overstated and the statistical significance of the events of interest to be understated.[18]

iii. **The market and industry indices used by Professor Gompers are incomplete and less reliable than the market and industry indices used in the Hakala Report.**  Professor Gompers uses a combination of a broad US market index and the NASDAQ Biotechnology Index to predict the returns of Northfield's common shares in Exhibit D.  By contrast, the market index selected in the Hakala Report (¶20) was the Russell 2000 Index which is more appropriate for a smaller capitalization stock such as Northfield's, and the two industry indices selected in the Hakala Report (¶20) were based on "five companies identified as peers or engaged in related activities" and "two

---

[17] Specific to event studies, *see* Jackson, Kline and Skinner, "The Impact of Non-Normality and Misspecification on Merger Event Studies," *International Journal of the Economics of Business*, July 2006, pp. 247-264; and, in general, *see* Pena, Tiao, and Tsay, *A Course in Time Series Analysis*, 2000, pp. 7 (if known one can control for shifts in value associated with interventions) and pp. 136-189 (Chapter 6 Outliers, Influential Observations and Missing Data, discusses the fact that "outliers", or relatively large movements in the stock price, are commonly observed in time series, such as stock price movements, and should be identified and controlled for in the analysis and notes on page 188 that "When outliers are present in the series, the usual sample estimator can overestimate the variance.  For this reason, it is advisable to use a robust estimator.").

[18] Specific to event studies, *see* Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 130 and 135; and, in general, *see* Pena, Tiao, and Tsay, *A Course in Time Series Analysis*, 2000, Chapter 6 Outliers, Influential Observations and Missing Data (discusses the fact that "outliers", or relatively large movements in the stock price, are commonly observed in time series, such as stock price movements, and should be identified and controlled for in the analysis and notes on page 188 that "When outliers are present in the series, the usual sample estimator can overestimate the variance.  For this reason, it is advisable to use a robust estimator.").

[biotechnology] companies engaged in related activities." While Professor Gompers improperly criticizes the Hakala Report for choosing more refined market and industry indices, it is a basic statistical principle that that more refined and appropriate a selected set of indices is in explaining the stock price movements that more reliable the analyses and conclusions. For that reason, a number of academic sources recommend and accept that the initially hypothesized model and selected indices may not be the best or optimal and allow for testing and refinement, as long as the choices have sound statistical and economic bases, to improve the choice of indices selected.[19]

iv.    For the reasons set forth in the prior three points, Professor Gompers's entire statistical analysis is unreliable and, therefore, not capable of reliably addressing the issue of market efficiency.[20]

c.    **The Gompers Report fails to provide any reliable evidence that the market for Northfield's common stock was not efficient, and much of the data he provided in exhibits to his report actually supports a finding of market efficiency.**

i.    First, given the foregoing points in (b), the limited and incomplete statistical analyses performed by Professor Gompers in Exhibits D and

---

[19] *See*, for example, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, pp. 107-109 (recommends identifying candidate variables and positing a statistical model based on economic theory and then testing down and testing to arrive at the final model); 389-413 (discusses the difficulties of applied work and recommends that one "Use common sense and economic theory.").
[20] This is the conclusion of Jackson, Kline and Skinner, "The Impact of Non-Normality and Misspecification on Merger Event Studies," *International Journal of the Economics of Business*, July 2006, pp. 263-264

E of the Gompers Report do not demonstrate that the share price of Northfield Laboratories did not reflect public information in a reasonably rapid manner. In other words, his analyses do not demonstrate that investors could predict future stock price movements based on prior stock price movements and could earn arbitrage profits trading on such information, especially since Professor Gompers did not systematically and comprehensively attempt to control for company-specific news events in his analyses.

ii.     **The analyses of trading volume and stock turnover by year in the Gompers Report actually supports market efficiency**. As shown in Exhibit A to the Gompers Report, the average weekly trading volume was sufficient and significant (low of 185,773 in 2002 and high of 2,019,672 in 2006) in every single year. Additionally, the average weekly turnover was more than adequate for an efficient market and ranged from 1.30% in 2002 to 7.55% in 2006 as shown in Exhibit A to the Gompers Report. Finally, Professor Gompers demonstrates in Exhibit G of the Gompers Report that many of the trades on selected days during the proposed class period involved significant purchases and sales of shares (greater than $5,000 in single amounts) as well as a lot of individual, smaller purchases and sales of shares. This is a healthy mix of trading in different size amounts and not a problem. Of course, the amount of trading and turnover was a direct reflection of the frequency and materiality of news events in each year, with the

most news occurred in 2006 in connection with the relevant loss causation events.

iii.   **The analyses of short selling in Exhibit B to the Gompers Report actually support a finding of market efficiency**.  Exhibit B to the Gompers Report demonstrates that investors could short the shares of Northfield common stock throughout the proposed class period and that the short interest increased and decreased considerably over time. Much of the increase in short selling is really related to market makers reporting temporary short sales and demonstrates a willingness to make a market in the stock in response to greater weekly turnover and trading volume in certain months and time periods.  Furthermore, Professor Gompers's assertions about the effect of Regulation SHO on short selling in January and February 2005 are wrong.  I recently studied Regulation SHO in the context of an assignment.  Regulation SHO was promulgated in 2004 and designed to prevent "naked" short selling and abusive trading practices.  Naked short selling occurs when an investor sells a stock the investor does not actually own and then does not borrow shares from a broker-dealer holding shares on behalf of an owner at the settlement date (three trade days after the trade was made).  The failure to borrow shares or purchase shares to deliver those shares from the seller to the buyer is called a 'failure to deliver." A stock that is identified as having a certain amount of failure to delivers in a given time period will be monitored and restrictions on

naked short selling may be imposed when some short sellers fail to cure their failure to deliver within a reasonable period of time after the settlement date.   Since Regulation SHO was promulgated in the second half of 2004, it is not surprising that there might a two month period in early 2005 when the trading of Northfield shares might be subject to greater scrutiny under Regulation SHO.   Contrary to Professor Gompers's assertion, that scrutiny under Regulation SHO does not prevent normal short selling, and does not it implicate the issue of an efficient market.   In fact, the short interest in Northfield's common stock was consistently in excess of 10% of the shares outstanding throughout 2005 and the first three months of 2006.

iv.   **The analysis of my event study on subperiods set forth in Exhibit C of the Gompers Report is incomplete and fails to establish an absence of market efficiency**.   As shown in Exhibit B-3 to this Reply Declaration, the event study analysis on the period from March 19, 2001 through August 17, 2004 still finds market efficiency in that the movements in Northfield's share price were significantly and contemporaneously correlation with movements in market and industry indices and significantly explained by identified company-specific news events.   The Exhibit C analyses in the Gompers Report, in fact, demonstrate that a statistically significant portion of the daily movement in Northfield's share price can be explained by market and industry forces and company-specific events in each year.   They also

demonstrate that my analyses of subperiods before and after August 17, 2004 were justified by the fact that Northfield's share price movements were move volatile in the years 2001 through 2004 than in 2005 and 2006 on non-event days.  Additionally, some portion of the volatility in Northfield's share price in 2001 through 2004 was associated with news events not identified in my initial event study analysis.  Greater volatility reflects great investor uncertainty when Northfield was at an earlier stage in its investigation studies but is still consistent with an informationally efficient market.

v.   **The anecdotal references to the intraday stock price movements of Northfield's common shares on eight selected windows of time of one to three days each, as illustrated in Exhibit F of the Gompers Report, prove nothing because they are not a comprehensive analysis over the entire proposed class period, incomplete in that they are not measured against a reliable reference point (such as market and industry stock price movements), assume one can know all of the information and exact timing of information becoming publicly available or leaking into the public market over time, and actually are consistent with market efficiency when properly and comprehensively analyzed**.  Indeed, I look at the intraday stock price charts in Exhibits F-1 to F-8 of the Gompers Report and see movements consistent with an efficient market with diverse (heterogeneous) investors, market and industry forces affecting

the stock price over time, and the kinds of stock price movements one might expect with a combination of a number of news articles, anticipation of news potentially affecting the stock price throughout the day, and learning and commentary on the news over time.   The anticipation of news events and learning and analysis in response to news events is commonly observed and entirely consistent with an efficient market.[21]   Looking at intraday stock price movements over one to three days against one or a few identified moments when news reports were identified to attempt to determine market efficiency is not much more reliable than one reading tea leaves to predict whether a given stock price will rise or fall tomorrow.   It is subject to a well-known "hindsight" bias in that what might appear to be predictable in hindsight might not have been at all systematically predictable in advance.

---

[21] See, for example, Gilson and Black, *Ibid.*, 1995, pp. 216-220 (discusses issues of anticipation, leakage, and learning over time in the context of event studies); Ragothaman and Bublitz in "An Empirical Analysis of the Impact of Asset Writedown Disclosures on Stockholder Wealth," *Quarterly Journal of Business and Economics*, June 1996, pp. 32+, state, "Early writedown studies focus on whether writedown announcements convey information about future cash flows. But the event methodology used in these studies ignores the fact that market agents learn about valuation-relevant events from many sources over a long period of time. Specifying a date when information reaches the market is not always feasible; information can reach the market gradually through many sources....Thus, in all prior studies the precise identification of the event date is a problem; the market seems to have alternative sources of information." Similarly, Eakins et al., *Ibid.*, in their paper conclude, "While initially surprising, the results presented in this paper may be simply affirming that institutional investors are rational believers in efficient markets."

**III.     The Gompers Report Criticisms of the Event Study Analysis in the Hakala Report are Rejected by Academic Literature and Demonstrably False**

8.     **The event study methodology employed in the Hakala Report is an unbiased and relatively reliable methodology and has substantially greater statistical power (ability to reliably find statistical significance when it should be found) than the event study methodology advocated by Professor Gompers**.  The event study methodology in the Hakala Report, and each step of that methodology, was based on numerous academic citations as set forth in the Hakala Report (in footnotes 3 to 12), further supported by rigorous testing in a working paper attached as Exhibit E to this reply declaration, and has repeatedly been subject to peer review by other experts (See,, for example, Exhibits F and G to this reply declaration) that have admitted that it is a generally accepted methodology.   Thus, the event study methodology in the Hakala Report is tested (*see* Exhibit E to this reply declaration), testable, replicable, and recommended in certain published, peer-reviewed academic papers over the event study methodology Professor Gompers advocates as his view of the "generally accepted" method.  In light of this, the assertions of Professor Gompers that there is no academic peer reviewed literature supporting the event study methodology in the Hakala Report, that the event study methodology in the Hakala report is not replicable or too subjective or arbitrary, and that the event study methodology in the Hakala Report overstates the statistical significance of the events of interest are all demonstrably false.   In fact, Professor Gompers makes these assertions (often with the frequent use of pejorative terms such a "subjective", "unscientific", and "arbitrary") while failing repeatedly to cite to any academic literature supporting them and failing to provide any rigorous testing to

support them.  He, furthermore, either fails to mention or acknowledge academic literature and expert opinions supportive of (indeed, recommending) the event study methods and statistical concepts employed in the Hakala Report in finding market efficiency or substantially misrepresents both the context and the implications of the academic literature cited in the Hakala Report in footnotes 3 to 12.  Indeed, the paucity of academic citations in support of Professor Gompers opinions, the extent to which Professor Gompers misrepresents certain of the academic literature I cited in support of my methods and opinions, and relative lack of thorough, unbiased, and reliable data analysis in the Gompers Report is notable and reflective of the lack of substance and support for Professor Gompers opinions.

     **a.**    **Professor Gompers misrepresents and ignores the content of a number of the academic papers cited in the Hakala Report.**

       i.    Professor Gompers misrepresents (page 40 of the Gompers Report) the paper by Box and Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, Mar. 1975, pp. 70-79.  They state (p. 78), "In practice, it is perhaps more often the case that a response at a given point of time depends on events, both known and unknown, which have occurred not necessarily coincidentally but over the recent past. Statistical methods have, in a word, 'lacked memory.'  The dynamic characteristics of both the transfer function and the noise parts of the model have tended to be ignored.  The application of time series methods can amend this situation."   This "foundation" paper for

"intervention analysis" provides a few simple examples to illustrate the methodology.  Professor Gompers takes those simple examples to assert that the paper does not support full implementation of intervention analysis.  This is a complete misrepresentation of the paper and the implications the follow from the quoted conclusion.  To the contrary, the paper set no limit on the number of interventions that might be identified and controlled for in the analysis and does not in any way suggest or imply that the interventions controlled for in the analysis must be statistically significant.  In fact, numerous subsequent academic papers and texts have noted that the implications of this paper actually require controlling for, at a minimum, all significant known interventions events.[22]

ii.   Professor Gompers similarly misrepresents on page 40 of the Gompers Report the implications of the paper by Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative

---

[22] See, for example, Franses, *Time Series Models for Business and Economic Forecasting,* 1998, Ch. 6 (p. 144, "With *a priori* knowledge of specific events and approximate dates which may yield aberrant observations (…), it is not difficult to examine their relevance for a model that will be used for forecasting. We can simply extend our model with additional regressors, such as the dummy variables."); Marais and Schipper, "Chapter 17A: Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, 2005 Cumulative Supplement, pp. 17A:15-16, 18, 22-23 (discusses the "event parameter" method, the use of the method to accommodate multiple events and in managing more complex modeling issues); Box, Jenkins, and Reinsel, *Time Series Analysis: Forecasting and Control*, (4th ed. Jul. 2008); Pena, Tiao, and Tsay, *A Course in Time Series Analysis*, 2000, pp. 7 (if known one can control for shifts in value associated with interventions) and pp. 136-189 (Chapter 6 Outliers, Influential Observations and Missing Data, discusses the fact that "outliers", or relatively large movements in the stock price, are commonly observed in time series, such as stock price movements, and should be identified and controlled for in the analysis and notes on page 188 that "When outliers are present in the series, the usual sample estimator can overestimate the variance.  For this reason, it is advisable to use a robust estimator."); Montgomery, Jennings and Kulahci, *Introduction to Time Series Analysis and Forecasting*, 2008;  Yaffe, *An Introduction to Time Series Analysis and Forecasting: with Applications of SAS and SPSS*, 2000;  Brockwell and Davis, *Introduction to Time Series and Forecasting*, 2003; McDowall, McCleary, Meidinger, Hay, *Interrupted Time Series Analysis*, 1980

---

*Reply Declaration of Scott D. Hakala, Ph.D., CFA*                                                                                    *24*

Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287. This paper recommends the intervention analysis method of the Box and Tiao paper just discussed to perform event studies. In order to illustrate the method and issue, the paper introduces a few events and using simulation techniques, the same techniques used in the working paper attached as Exhibit E to this reply declaration, demonstrates that the unless significant company-specific news events are identified and controlled for using intervention analysis the estimation of the market model in the event study will be biased and will result in biased estimates of the abnormal returns. The implication of this paper is that one must, at least, control for the extremely significant events associated with company-specific news and that the failure to do so may result in both biased estimates of the market model and overstated standard errors (which will cause the significance of the events of interest to be understated).

iii.    On page 40-41, the Gompers Report completely misrepresents the paper by Thompson, Olsen, and Dietrich, "The Influence of Estimation Period News Events on Standard Market Model Prediction Errors," The Accounting Review, Vol. 63:3, Jul. 1988, pp. 448-471, and ignores the prior related paper, Thompson, Olsen and Dietrich, "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the Wall Street Journal Index," *Journal of Accounting*

*Research*, Vol. 25:2, Autumn 1987, pp. 245-274.  The authors employ virtually the same protocol employed in the Hakala Report to identify and control for "all" company-specific news events consistent with the protocol.  The authors conducted their analysis first on a large number of companies with common shares publicly-traded share on the New York Stock Exchange (NYSE) and American Stock Exchange (AMEX) for the year 1983 and then "replicated" their study for the years 1982 and 1984.  First, consistent with the Hakala Report (¶17 and footnotes 3 and 5), they listed twelve types of company-specific news events that may be potentially material and affect the stock price of each company studied (1987 paper, p. 268).  Those twelve event types largely overlap the list used in the Hakala Report (footnotes 3 and 5) except for the addition of third party reports (specifically analyst reports) in the Hakala Report that fit within the same twelve types of events.  Second, they then searched a news database (the *Wall Street Journal Index*, now part of the Factiva database searched for news in the Hakala Report) to identify news events that potentially could affect the stock prices of the 2,358 companies studied in 1983.  Third, due to the limitations of the database and possible issues with the timing of the initial news release, they controlled for the day before each identified news event, the day of each identified news event, and the next trade day after each identified news event to ensure that the stock price movements in the control sample of non-event days in

1983 were not contaminated by the identified news events.  As noted in the 1987 Thompson, Olsen, and Dietrich paper (p. 247), this search was not able to identify and control for all company-specific news but that was the intent of the study.  Finally, in the 1998 Thompson, Olsen, and Dietrich paper, they identified and controlled for 33,994 news events across 2,310 companies, an average of approximately 15 events per year per company with the days before and after those news event days also controlled for in the analysis.  This means that more than 10% of all trade days were controlled for in the 1988 Thompson, Olsen, and Dietrich paper in 1983, despite many events being missed in the search.  In fact, some companies were excluded from the 1988 Thompson, Olsen, and Dietrich study (p. 457) because the number of non-event trade days remaining in 1983 was less than 30 for those companies, implying that news event days were found on most days during the study period.  This is consistent with the Hakala Report that controls for only 117 events out of a total of 1,383 observations, or approximately 8.5% of the trade days, and the revised event study in Exhibit B-1 to this report that controls for 130 events out of 1,383 observations, or approximately 9.4% of all trade days.  Furthermore, consistent with the Hakala Report, Thompson, Olsen, and Dietrich control for "all" company-specific news days (1988, p. 457) consistent with the protocol, regardless of their statistical significance, and use the "no-news" days as the base-line control observations for

comparison and statistical inference purposes.   In this context, Thompson, Olsen, and Dietrich, 1988, p.p. 464, state that, "The news-conditional model is costly to implement for two reasons: (1) *news release dates must be acquired for all relevant news items,…*" [emphasis added]  They then find that the stock price returns on news dates (p. 466)  "differ systematically from the distribution of non-[news] release period returns" and find in the context of event study analysis that controlling for "all" identified company-specific news causes an increase in "power" of the event study analysis over the "conventional market model," stating (pp. 468), "This increase in power appears to be due primarily to the inclusion of a broad set of firm-specific news events (i.e., those reported in the Wall Street Journal Index) in the model specification."  Given the prior discussion, any suggestion or reading of this paper to imply that it does not support and prove the validity of the event study methodology in the Hakala Report would be both false and misleading.   In contrast, Professor Gompers's ignores the clear and obvious implications of this paper that the methodology of identifying and controlling for all identified company-specific events meeting a pre-determined criteria is both an accepted practice and a significant improvement over the event study methodology that Professor Gompers advocates in the his Report.  Furthermore, the Gompers Report falsely asserts (on page 41), that, "In fact, it [the 1988 Thompson, Olsen, and Dietrich paper]

reinforces my criticism that the statistical significance of Dr. Hakala's model is inflated by his decision to subjectively remove news dates from his analysis." The only conclusion one can draw from this statement is that Professor Gompers does not understand that a statistical methodology that has greater statistical "power" is better than one that does not and a test with greater statistical "power" will be more likely to "properly" find statistical significance when it should be found.[23]

iv.   Additionally, Professor Gompers completely ignores and omits any reference to Roll, "R^2," *Journal of Finance*, Vol. 43:3, Jul. 1988, pp. 541-566. This widely cited paper identified and controlled for "all" company-specific news events in the years 1982 to 1986 identified in *Dow Jones* news and *Wall Street Journal* databases for 96 large public companies, consistent with the Thompson, Olsen and Dietrich papers in 1987 and 1988. Every date with an identified mention of a firm in either database was identified as an (p. 566) "information event" and "Regressions on systematic factors [estimation of the market model in the event study context] were conducted *only* with *non*-information dates." [emphasis in original] While the Roll paper found only a (p. 566) "marginally better" goodness-of-fit for the market model regressions using only the non-information dates to estimate the market model, he found that there was a "dramatic decline in sample

---

[23] The importance of statistical "power" is discussed in brief in the Kaye and Freedman, "Reference Guide to Statistics," *Reference Manual of Scientific Evidence*, Second Edition, 2000, pp. 125-126.

kurtosis from excluding public news events" and that the variance on non-news days was significantly lower.  In other words, the returns of stock prices on the non-information days were more "normally" distributed and news had a modest but statistically significant effect on the results on daily return data from 1982 to 1986.  This paper has two important implications:  first, it supports the concept of controlling for all company-specific news events as a generally accepted practice in estimating the market model in event study analysis; and, second, controlling for company-specific news events makes the return distribution from the market model more normally distributed (allowing for more reliable statistical inferences) and reduces the contaminating effect of news on the estimated model.

v.    The Gompers Report (p. 41) misstates the implications of the 1988 Karafiath paper.  While the paper is a more limited technical note, the conclusion that "dummy variables on event days can be used to estimate a market model…" is, contrary to what is implied by Professor Gompers, the same as "intervention analysis."  To suggest otherwise is both false and misleading.  Additionally, I spoke with Professor Karafiath (who was teaching not far from where I live in North Texas) last year regarding the working paper and results provided in Exhibit E to this reply declaration and he did not find my event study methodology to be invalid or inconsistent with his paper.

vi.   The Gompers Report (p. 41) also misses the point of the 2004 published Ryan and Taffler paper.  It should be noted initially that the Ryan and Taffler paper cites as references both the 1988 Roll paper and the 1987 Thompson, Olsen and Dietrich paper and is a peer-reviewed, published paper, regardless of Professor Gompers's effort to minimize its significance.  The paper studies 215 companies traded on the London Stock Exchange and finds that company-specific news events identified in three news databases commonly available in the United Kingdom and categorized in the paper (Appendix A at pp. 74-76) explain most of the variance in stock price returns and increases in trading volume observed between January 1, 1993 and December 31, 1995.   This paper has a number of important implications that Professor Gompers completely misrepresents or ignores.   First, it establishes that company-specific news events are important and significant in affecting stock price such that they should be controlled for in analyzing stock price movements (consistent with the broad theme of the 1975 Box and Tiao paper and the 1987 and 1988 Thompson, Olsen and Dietrich papers).   In that context, Ryan and Taffler, pp. 61-62, find that, "…a substantial portion of economically significant and hence value relevant company price changes and trading volume movements are driven by fundamental information and not by noise, sentiment, fads or trading frenzy."   Second, it provides a list of the types of news events one should consider and control for in

the analysis and which of those types of events tend to be the most significant on average in explaining stock price movements.  Given this, any suggestion that the protocol for selecting events in the Hakala Report is "arbitrary" or not based on peer-reviewed, published literature is false and misleading.  Finally, it suggests that one should, or at least can, identify and control for company-specific news as much as possible in estimating a market model (which is the basis for the event study analysis).  Such a process is not "arbitrary" or so "subjective" as to be unreliable, as repeatedly asserted by Professor Gompers.

vii.    Professor Gompers (Gompers Report, pp. 41-42) then completely misrepresents the content and context of Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 129-145.  Notably, this paper cites the 1988 paper by Roll for support, a paper that supports my event study methodology that was ignored by Professor Gompers in both his expert report and deposition.   Contrary to Professor Gompers's assertion that the paper "does not support Dr. Hakala's exclusion of numerous days from his analysis," the paper (p. 130) states, "In particular, unrelated events may be present during the chosen estimation window, which bias the estimation of the return-generating process parameters [the market model in the event study].  A natural solution seems to be to choose, on a case-by-case basis, an

estimation window free of such contaminating events." and, further, states, "The existence of such firm-specific events in the estimation window will most likely affect the estimation of the return-generating process and, in particular, the estimated variance of the parameters." More simply stated, this paper suggests that one must control for significant company-specific events in the estimation period used to estimate the market model and standard errors or else the event study analysis will (p. 135) "bias the significance test during the event window." This conclusion, supported by extensive Monte Carlo simulation tests consistent with the results in the working paper attached as Exhibit E to this reply declaration, directly contradicts Professor Gompers's false assertion that his event study methodology is correct and the event study methodology in the Hakala Report is biased toward findings statistical significance. In fact, by failing to identify and control for known company-specific events, this paper proves that the event study analyses in the Gompers Report are biased and unreliable. Additionally, the exact methodology used in the Hakala Report is discussed in the Aktas, de Bodt and Cousin paper (p. 139) as "in the spirit of Thompson (1988), a manually filtered approach (MANUAL)" and is used as the baseline (ideal or correct method) against which the alternative, non-manual methods were tested when the manual method is not feasible (or, as stated on p. 130, when "a 'brute force' approach quickly becomes intractable" in large,

multi-company event studies).   The fact that only a single or few events are simulated is only due to the use of a few events in the simulations to demonstrate the issue that even a few significant events will bias the results.

viii.   The 2007 Aktas, de Bodt and Cousin paper is not alone in reaching these conclusions.  Professor Gompers also disregards another paper published a year prior to the 2007 Aktas, de Bodt and Cousin paper, Jackson, Kline and Skinner, "The Impact of Non-Normality and Misspecification on Merger Event Studies," *International Journal of the Economics of Business*, July 2006, pp. 247-264.   In testing for using intervention analysis to control for known events, the Jackson, Kline and Skinner paper finds (p. 261), "Thus, the omitted event dummies do have a significant impact on the standard errors (with more omissions leading to larger inflation) (Kmenta 1984: 443-46)." They also find (p. 261), contrary to Professor Gompers's assertions, that "partial dummy variable coverage is not particularly helpful….*This suggests that failure to specific all of the events affecting market return can lead to (or contribute to) non-normality problems*.  In light of the results of section 3, it seems clear that attempting to test hypotheses using normal critical values in any of Models 2, 3. or 4 [the models that did not control for any events, only partially controlled for events, or only controlled for events related to the issue of concern], will result in the nominal significance limits of

those tests not being equal to the true significance limits so that the inferences arising from those tests are unreliable." [emphasis added in italics]   Finally, the paper concludes (p. 262), "Undoubtedly, inferences from these [event] studies as to the desirability of mergers they analyze are highly questionable because they are based on statistical tests in which the true significance level of the test is misstated.  At a minimum, analysts should test their residuals for non-normality,… Alternatively, or jointly, *they should also document that they have included all relevant events, both merger-related and non-merger related, in their event study model, particularly if statistical testing is necessary*." [emphasis added in italics] The Jackson, Kline and Skinner paper proves empirically that the event study methodology in the Hakala Report is far more reliable and correct than the event study methodology in the Gompers Report and rejects the methodology in the Gompers Report as so "unreliable" that it should "be put back on the shelf and left there."  Coming from a different set of prior statistical literature and tradition, these authors reach the same conclusion as other academic authors that an event study analysis must control as much as possible or practical for all potentially material company-specific news events and that the failure to attempt to control for all such company-specific news events renders the conclusions as to statistical significance biased and unreliable because the error terms in the market model will not be close to normally distributed and the

average error with be overstated.  Additionally, the methodology used to test competing models is the same Monte Carlo simulation methodology used in the working paper in Exhibit E to this reply declaration.

ix.   Professor Gompers also omits to mention that an entire chapter of a textbook, Franses, *Time Series Models for Business and Economic Forecasting,* 1998, Chapter 6, more generally supports the methodology employed in the Hakala Report over the methodology in the Gompers Report.  Franses (pp. 128-129) specifically identifies the statistical problems that arise when one does not identify and control for "outliers" (events that cause large movements in the stock price inconsistent with a normal distribution) and recommends the intervention analysis method of the 1975 Box and Tiao paper as the proper solution (p. 130).  Finally, Franses recognizes that one can identify and control for company-specific events in advance consistent with the Hakala Report (¶17).  The implication of the Franses text is that Professor Gompers's failure to identify and at least control for significant company-specific events in his event study analyses in Exhibit D renders the conclusions of the statistical analyses biased and unreliable, the same conclusion as the 2006 Jackson, Kline and Skinner paper and the  2007 Aktas, de Bodt and Cousin.

b.   **In making certain assertions, Professor Gompers ignores basic mathematics and the Monte Carlo simulations I produced that validate**

**the event study methodology in the Hakala Report**.  The tests for the validity of the event study methodology in the Hakala Report are summarized in Exhibit E to this declaration.  Those tests demonstrate that the methodology in the Hakala Report is unbiased and consistent with the correct estimates and conclusions as to statistical significance, while **the event study methodology advocated in the Gompers Report is empirically biased toward not finding statistical significance**.  Additionally, contrary to Professor Gompers's assertions in his report and in his deposition, the working paper in Exhibit E to this reply declaration establishes that **the inclusion of "too many events" will not overstate the statistical significance of the events of interest**.  In fact, contrary to Professor Gompers's assertion, the inclusion of "too many events" will cause the statistical significance of the events of interest to be understated slightly.  The reason for this is that each additional event identified and included in the event study analysis imposes a form of a "penalty" (called a loss of a "degree of freedom') such that the inclusion of additional marginal events and inclusion of events that are redundant (immaterial) will have either no effect or cause a very slight, insignificant decrease in the statistical significance of the events of interest.  Similarly, the failure to include some material events (due to errors of omission) will cause the statistical significance of the events of interest to be slightly understated.  In fact, mathematically and, as demonstrated in the working paper in the Exhibit E simulations, it is impossible for the inclusion of too many events and immaterial events and the omission of material events from the event

study methodology in the Hakala Report to generally cause the statistical significance of the events of interest to be overstated, as was falsely asserted by Professor Gompers in his report and in his deposition.

c. **Professor Gompers's criticism of the protocol for identifying and selecting company-specific events as "arbitrary" or "subjective" is false and inconsistent with recommended statistical literature. The identification and selection of company-specific events based on a protocol is based on sound judgments and academic authority.[24] Additionally, the protocol is replicable and reasonably reliable. Finally, modest differences between experts in selecting events in accordance with the specified protocol and errors in implementing the protocol for identifying and selecting company-specific events** (in terms of failing to identify a few company-specific events the fit within the protocol or the inclusion of additional events that do not fit the protocol) **do not significantly alter the conclusions as shown in Exhibits B-1, B-2, B-3, and B-4 to this declaration.**

---

[24] As stated in footnote 5 to the Hakala Report, "The list of material items relied upon is based on the NASDAQ guidelines as recognized by the SEC in *Federal Register,* Vol. 67, No. 157, Aug. 7, 2002, pp. 51306-51310. We then added third party news and reports, and analyst reports to that list consistent with the academic studies. The dates identified as having potentially material news events and, therefore, associated with indicator variables are listed in Exhibit B. *See, also*, Ryan and Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-specific News Releases?" *Journal of Business Finance & Accounting*, Vol. 31(1) & (2), Jan./Mar. 2004, pp. 49-82, particularly the Appendix: "Description of the News Categories Driving Price and Trading Volume Activity." The Ryan and Taffler paper incorporates the prior work of Roll, "R^2," *Journal of Finance*, Vol. 43:3, Jul. 1988, pp. 541-566 (identified and controlled for all company-specific news events identified in *Dow Jones* news and *Wall Street Journal* databases for 96 large public companies) and Thompson, Olsen and Dietrich, "Attributes of News About Firms: An Analysis of Firm-Specific News Reported in the *Wall Street Journal* Index," *Journal of Accounting Research*, Vol. 25:2, Autumn 1987, pp. 245-274. Not all SEC filings were listed as potential events."

i. **All statistical models require judgment as to the exact form of the statistical model and the variables to consider including in the analysis.**[25]   As long as the judgments made are based on economic grounds, they are consistent with good statistical practice.[26]   As stated in Campbell, Lo and MacKinlay, *The Econometrics of Financial Markets*, 1997, p. 524, "These considerations may be in the form of well-articulated mathematical models of economic behavior, or behavioral models motivated by psychological phenomena, or simply heuristic rules of thumb based on judgment, intuition, and past experience….All of this suggests the need for an a priori framework of specification for the model before confronting the data.  By proposing such a specification, along with the kinds of phenomena one is seeking to capture and the relevant variables to be used in the search, the chance of coming upon a spuriously successful model is reduced."  The reliance in the Hakala Report (¶17 and footnotes 3 and 5) on published criteria and academic studies as to the kinds of news events likely to be potentially material as a starting point for identifying and selecting events means that the criteria for selecting events was based on sound judgments and had substantial support.  To the extent the vast majority of the events selected in the event search in the Hakala Report were obvious and consistent with the stated protocol and academic

---

[25] *See, for example,*, Intriligator, *Econometric Models, Techniques, and Applications*, 1978, pp. 14-15 ("To the extent that it is impossible to convey precisely how to build a good model, modeling is partly an art and partly a science.") *See, also*, Intriligator, *Econometric Models, Techniques, and Applications*, 1978, pp. 188-189, and Pindyck and Rubinfeld, *Econometric Models and Economic Forecasts*, 1991, pp. 162-166

[26] *See*, for example, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, pp. 107-109 (recommends identifying candidate variables and positing a statistical model based on economic theory and then testing down and testing to arrive at the final model) and 389-391 (discusses the difficulties of applied work and recommends that one "Use common sense and economic theory.")

literature, then there is nothing "arbitrary" or particularly "subjective" in the results of the search.

ii.   **Professor Gompers's implicit definition of replication is plainly wrong and would reject almost all published events studies and statistical analyses.**   Replication is the repeating of an experiment to test the degree to which the originally reported results can be confirmed on repeated efforts.   A "replicate," as defined on statistics.com, "is the outcome of an experiment or observation obtained in the course of replication."   It follows from this, that a replicate will not result in exactly same identical numbers.   For example, if one were to replicate a recipe to bake a cake, even slight differences in the temperatures of the ovens, elevation above sea level, and movement of air within the ovens and the exact timing of baking would result in slight differences in the outcome.   Additionally, slight differences in the quality and exact composition and mix of ingredients, no matter how well measured or specified, will result in slight differences in the cakes being baked.   As a result, each replicate or attempt at baking a cake will result in the differences in the amount the cake rose, the firmness of the crust, the moistness of the interior, the uniformity of the interior, and the exact taste relative to each other replicate.   Thus, a replication need only validate that the degree of error in repetition of a study or protocol does not result in a significance change in the conclusions from the original study.   In the observational sciences, where one is working with historical data, replication is often met by simply

verifying that, given the stated assumptions and variables used in the statistical analysis and the underlying data, the calculations can be "replicated" or substantiated.  **Trivially, the event study analyses produced in the Hakala Report are replicable in the context that one can re-run the statistical analyses on the same data using the same statistical model and arrive at exactly the same calculations**.  **On the other hand, one might repeat the protocol for identifying and selecting company-specific events, searching over the exact same databases set forth in the Hakala Report, and verify that the replicate arrives at most of the same events and then test to see if the differences in the selected events are significant or change the conclusions.**  In that context, each replicate would likely find a few events not identified and selected in the original analyses and would fail to find a few events, out of 117 in this case, not identified in the original analysis.  One might then test the differences between the overall conclusions as to the events of interest and then combine the results to see if the combination makes a significant difference in the conclusions.  Professor Gompers appears to have never made this effort to replicate the protocol.  In light of the academic literature previously discussed, it is an accepted protocol to set forth a set of the types of events that could be potentially material and then search through news databases to identify news events that are consistent with the pre-specified types of events.  Thus, Professor Gompers's assertion that the methodology for selecting events in not replicable is plainly false and

he has no basis for asserting that the protocol is "arbitrary" or too "subjective" since he never tested it or verified those assertions.

iii.   **To the extent the identification of company-specific events occasionally failed to identified some events consistent with the protocol and including as events days that should not have been included, the effect on the conclusions of the event study are immaterial.  Professor Gompers identified a few widely disseminated events (earnings releases primarily and a couple of events related to issuances of securities by Northfield) missed in the original event search and I added a few additional events from my review of the Complaint and other information in the Gompers Report production in Exhibit B-1 to this reply declaration in comparison with Exhibit B of the Hakala Report.  I did not add the bulletin board and certain other items from local clinical studies identified in the Gompers's Report to the revised event study in Exhibit B-1 to this reply declaration because the information was either not widely disseminated or found in published news reports, not new or surprising, or the timing of the event was not ascertainable.  I found that there were no improperly included events in my original event study in the Hakala Report, contrary to Professor Gompers's assertions.  The additional events added in Exhibit B-1 to this reply declaration** increases the number of selected events from 117 to 130.  The effect of including these additional events is to slightly reduce the standard

error in Exhibit B to the Hakala Report from 3.66% to 3.56% in Exhibit B-1 of this reply declaration. The estimated effects and significance of the events of interest in Exhibit B-1 to this reply declaration change only slightly. For example, the relative decline in Northfield's share price on March 10, 2006 changes from -10.70% to -10.69% and the t-statistic that measures statistical significance changes from 3.09 to 3.17 as a result of the additional events being added to the event study analysis. The event effect on January 6, 2006, does not change from -7.10% in the revised event study in Exhibit B-1 to this declaration but the t-statistic increases slightly from 2.01 to 2.07. Thus, identifying additional events and improving the event identification process simply increases slightly the estimated correct statistical significance of the events of interest. Additionally, the subperiod event study in Exhibit B-Alt of the Hakala Report is identical to Exhibit B-2 to this declaration. Thus, additional events only were added in the period prior to August 17, 2004 and had no effect on the conclusions with respect to the primary events of interest in the shorter event study period analysis more appropriate for analyzing the events on January 6, February 22 and February 24, and March 10 and March 20, 2006.

d. **Professor Gompers's criticisms of the market and industry indices selected for the market model in the Hakala Report are inappropriate and inconsistent with good statistical practice.** Professor Gompers again takes a quote out of context. One should not read the quote from Campbell, Lo and

MacKinlay to suggest that no specification testing or refinement of the pre-specified model should be performed.[27]  Rather that quote suggests specifying as much as possible the model and candidate variables in advance consistent with theory but, in no way, says one should not refine the model at all if testing shows that the pre-specified model is inadequate or includes variables that simple do not fit the data.  The market index selected in the Hakala Report (¶20) was the Russell 2000 Index which is more appropriate for a smaller capitalization stock such as Northfield's, and the two industry indices selected in the Hakala Report (¶20) were based on "five companies identified as peers or engaged in related activities" and "two [biotechnology] companies engaged in related activities."   As previously stated, all statistical analyses require judgments.  It is standard and well-accepted practice to begin with a selected set of candidate variables identified in advance based on economic theory and the test to a final model consistent with the economic theory.[28]  The idea that one should specify a model in advance and conduct no specification testing to refine the model is to risk a misspecified or inadequately specified model.[29]  One cannot fully anticipate issues arising in the data that make a pre-determined specification inadequate, improper, or non-optimal.  The goal of applied statistical analysis is to arrive at a well-specified model that is adjusted to account for issues in the data.  An

---

[27] Campbell, Lo and MacKinlay, *The Econometrics of Financial Markets*, 1997, p. 524.

[28] *See*, for example, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, pp. 107-109 (recommends identifying candidate variables and positing a statistical model based on economic theory and then testing down and testing to arrive at the final model), 389-391 (discusses the difficulties of applied work and recommends that one "Use common sense and economic theory."), and 409 and 413 (recommends criteria for including and excluding variables in an analysis).

[29] See, for example, Spanos, Statistical Foundations of Econometric Modeling, 1986, pp. 17-18, "This presents the modeler with insurmountable difficulties at the statistical model specification stage when the data do not fit the 'straightjacket' chosen for them without their nature being taken into consideration."

inadequately or less well-specified model will typically fail more often to find statistical significance when the true model suggests statistical significance should be found.  Perhaps that is perceived in the best interest of a defense expert that seeks to not find statistical significance, but it is not good science or good statistical practice.  Thus, Professor Gompers's criticism amount to asserting that a poorly specified model or less well specified model should be preferred over a more properly specified model that has greater power and reliability.  This makes no sense and is rejected in the academic literature repeatedly as unrealistic and impractical.[30]

e.  **Professor Gompers's assertion that the study periods in the Hakala Report event study analysis were "arbitrary" and "fail to account for structural change" are false.**  The decision to perform an event study analysis over the period of the proposed class period and to include a six month period after the class period for testing purposes should be an obvious and standard choice.  Obviously, by performing a separate event study analysis over the subperiod from August 17, 2004 through September 20, 2006, I recognized that a structural change had likely occurred over time and addressed in the Hakala Report.   In that context, the criticisms are strained and make no sense. Additionally, in order to further address this issue, I performed a separate event study analysis over the period from March 19, 2001 to August 17, 2004 and provide a summary of that analysis in Exhibit B-3 to this reply declaration.  The resulting subperiod regression still finds market efficiency in the period from

---

[30] See, for example, Spanos, Statistical Foundations of Econometric Modelling, 1986, pp. 17-18, "This presents the modeler with insurmountable difficulties at the statistical model specification stage when the data do not fit the 'straightjacket' chosen for them without their nature being taken into consideration."

March 19, 2001 to August 17, 2004.  The choice to separate the study into two periods, one before August 17 and one after August 17, 2004 followed from differences in  the volatility of the stock price prior to and after that date and is consistent with a Northfield press release stating that the Company had achieved significant progress and was well on its way in its clinical studies.  ("This has truly been a productive year for Northfield," said Steven A. Gould, MD, Chairman and CEO.  "We achieved key regulatory, clinical, and financial goals. Our Phase III trial is well underway and we are positioned for continued progress toward the commercialization of PolyHeme in the year ahead.")

f. **Professor Gompers's assertions regarding the event study analyses performed in Xcelera.com and the resulting decision are both false and misleading**.  First, as shown in Exhibit B-4 to this reply declaration, limiting the selected events to those that meet some minimum criteria for "significance" does not change the conclusions and actually slightly reduces the "standard error" form 3.56% in Exhibit B-1 to 3.50% in Exhibit B-4.  Thus, the issue stated in the Xcelera.com decision cited by Professor Gompers is immaterial and has the opposite effect Professor Gompers implied in his report.  Second, since I testified as to this issue in my deposition, I would have expected Professor Gompers to read what I said under oath and actually read the discussion in my transcript and my actual work in Xcelera.com (including declarations) fairly and objectively. He obviously did not.  In Xcelera.com, I used the standard event study methodology set forth in the Hakala Report at the class certification stage. Despite aggressive attacks, the court rejected the opposing expert's testimony in

favor of mine and the decision was then affirmed by the First Circuit Court of Appeal.  However, at the damages phase, I relied heavily on Yahoo! bulletin board posting by investors to identify news events, the timing of news events, and to understand the reasons for certain intraday and daily stock price movements. The court held that anonymous bulletin board postings were not sufficient reliable and that I could not include "all" company-specific news, regardless of its significance in the event study.  While that decision is clearly inconsistent with the 1988 Roll paper, the 1987 and 1988 Thompson, Olsen and Dietrich papers, the 2004 Ryan and Taffler paper and the 2006 Jackson, Kline, and Skinner paper, it also reflects the relative lack of published news reports on Xcelera.com and my heavy reliance on bulletin board postings by investors regarding Xcelera.com in order to explain stock price movements in a manner unique to that case and not at all applicable to this case.  In this case, ironically, Professor Gompers cited to bulletin board postings by investors as a source of "public" news and I did not rely on bulletin board postings as a source of identifying news events.  Thus, if anything, the cited Xcelera.com ruling applies more to Professor Gompers's testimony than my testimony in this case.  Of course, Professor Gompers fails to note the numerous prior instances where courts have either outright rejected the criticisms of the event study methodology in the Hakala Report or declined to adopt the criticisms of the opposing experts of that methodology, including in a few cases where Professor Gompers was the opposing expert *(In re Parmalat Sec. Litig.*, *In re Williams Companies Sec. Litig.*, and *In re Raytheon Sec. Litig.*) and other cases where other Cornerstone-affiliated experts offered similar criticisms

and those criticisms were either rejected or not accepted (e.g., *In re JDS Uniphase Sec. Litig.* and *In re Goldman Sachs Sec. Litig.*).

g.   **Professor Gompers's criticisms regarding confounding events are false and misleading.   I do not find any significant confounding events could possibly explain the movements of Northfield's share price on the relevant event dates from January 6 to March 20, 2006.   Furthermore,** numerous academic sources have suggested that when multiple possible explanations exist for the movement in a stock price a combination of financial analysis and deductive reasoning may be applied to identify and indicate the portion of the movement related to the relevant information.[31]

---

[31] See, for example, Gilson and Black, *Ibid.*, p. 221, and Cornell and Morgan, *Ibid.*, pp. 894-897.

9.     I expect to review additional materials and may consider additional information brought to my attention after issuing this report.  I expect to consider and respond to such information and will adjust the conclusions in this report, if such information suggests a need for change in my opinions or calculations is warranted.

I declare under penalty of perjury under the laws of the State of Texas and the United States that the foregoing is true and correct.  If called as a witness I could and would competently testify thereto.

Executed this  31st day of March 2010 at Dallas, Texas.

_____

Scott D. Hakala, Ph.D., CFA