# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**GMR**

**FILED**

**APRIL 2, 2010**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 06 CV 1493
(consolidated)

      :

IN RE NORTHFIELD LABORATORIES,   :
INC. SECURITIES LITIGATION        :

      :

Judge George M. Marovich
Magistrate Nan R. Nolan

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS, LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184

Liaison Counsel for Plaintiffs and Class

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
350 Fifth Avenue, Suite 5508
New York, New York 10118
Tel: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and the Class

Dated: March 31, 2010

# TABLE OF CONTENTS

I.     SCOPE OF REVIEW AT CLASS CERTIFICATION……………………..………......1

II.    DEFENDANTS' "TRUTH ON THE MARKET" ARGUMENTS ARE BASED
ON FALSE ASSUMPTIONS……………………………………………..…..…...2

    A.  The Truth on the Market Affirmative Defense……………..……………..….……3

    B.  Defendants' So-Called "Truth" Did Not Reveal the Fraud And Is Itself
       Misleading………………………………………………………………..………5

        a.  Patient Post-Consent Forms (Exs. 20, 21, 22) Did Not Reveal the Truth Of The
           Fraud...……………………………………………………..……..…..6

        b.  Presentations Made To Communities (Exs. 4, 23, 24, 25, 26) In Furtherance of
           The Trauma Trial Did Not Reveal The Truth of the Fraud……………..……..7

        c.  Hospital Disclosures and Websites (Exs. 4, 26, 27, 28, 29, 30, 32) Did Not
           Reveal the Truth of the Fraud………………………………..……………..….7

        d.  Chatroom Disclosures Did Not Reveal The Truth of the Fraud (Exs. 3, 15)…...8

        e.  Disclosure to 48 Hospitals and Their Staffs and FDA Did Not Reveal the Truth
           of the Fraud…………………………………………..…………….…8

        f.  An "Analyst" Did Not Reveal The Truth Of Fraud (Ex. 37) In October 2005…9

    C.  The Purported "Truth" Did Not Credibly Enter the Market and Did Not Counter
       Balance Negative Effect of the Misstatements…………………………..……..10

        a.  Analysts Following Northfield Did Not Know Until January 2006……..…....13

        b.  Information Buried In Websites……………………………………..…...…14

        c.  Information Disclosed to Trauma Trial Participants, Researchers, and
           Community Members…………………………………………….….…...15

        d.  Yahoo! Finance Chatrooms…………………….……………….………16

III.   COMMON ISSUES PREDOMINATE…………………………………....….…17

    A.  Plaintiffs Are Entitled to the Fraud on The Market Presumption of Reliance.......17

        a.  Dr. Hakala's Event Study Methodology Is Generally Accepted, Unbiased and
           Relatively Reliable Methodology.…………..…………………………………21

    1.   Dr. Gompers misrepresents and ignores the content of a number of academic papers cited by Dr. Hakala……………………………...…………………22

    2.   Dr. Gompers' Criticism of Dr. Hakala's Protocol as Being "Arbitrary" and "Subjective" is False and Inconsistent With Statistical Literature…....……23

    3.   Including Events That Were Purportedly Omitted, Did Not Change The Dr. Hakala's Conclusions…………………………………………….……..…25

    4.   Dr. Gompers' Criticims of The Market Industry Indices Selected for Dr. Hakala's Market Model Are Misguided and Inconsistent with Good Statistical Practice…………………………………………………….....…25

    5.   Dr. Gompers' Assertions About the Event Study Periods were "Arbitrary" and "Failed to Account for Structural Change" are False…………..…..25

    6.   Criticisms About Disaggregation of Confounding Information is Without Merit………………………………………………………………..…...26

B.  Dr. Gompers' Analyses Are Incomplete, Biased and Either Support a Finding of Market Efficiency or Fail to Refute Market Efficiency …………………………..…29

    a.   Dr. Gompers Uses an Improperly Restrictive Definition of Market Efficiency And Loss Causation…………………………………………...........................30

    b.   Dr. Gompers Performs Biased and Unreliable Statistical Analyses…………....32

    1.   Dr. Gompers failed to Consider Changes In Statistical Methods That Arise from A Multi-Company Event Study and A Single Company Event Study………………… ……….………………..…………..……..32

    2.   Dr. Gompers Statistical Analyses in His Report Are Not Approximately Normally Distributed Because He Fails to Control For Known Company-Specific Events, As Is Required For Reliable Statistical Inferences…....…33

    3.   The Market And Industry Indices Dr. Gompers Utilizes Are Incomplete and Less Reliable Than Dr. Hakala's……………………….………..............…33

    c.   Dr. Gompers Fails To Provide Reliable Evidence that the Market For the Common Stock of Northfield was Inefficient, And Much of His Data Actually Supports a Finding of Market Efficiency……………………….…………..…34

    1.   Dr. Gompers' Anecdotal References to the Intraday stock price movements of Northfield's common shares on eight selected windows of time of one to three days each, as illustrated in Exhibit F of the Gompers Report, Prove Nothing………………….………………………………….……...34

C.  The Alleged Misrepresentations and Omissions are Material…………………....34

    a.   January 6, 2006 UBS Report…………………………………………...…....37

b.  February 22, 2006 Wall Street Journal Article……………………………….……38

c.  February 24, 2006 WSJ Article ……………………………………………....…39

d.  March 10, 2006 WSJ Article.…………………………………………….….…..40

e.  March 14, 2006 WSJ/Bloomberg Articles………………………….…….…..…40

f.  There is no Confounding Information the Foregoing Announcements…....…..41

g.  FDA Approval of Trauma Trial…………………………………………….…41

h.  Plaintiffs Need Not Prove that the Misrepresentations Were "Understood" in
    a Uniform Manner……………………………………………………….…….41

i.  Common Issues Regarding Loss Causation Predominate…………………….…42

IV.   NAMED PLAINTIFFS ARE ADEQUATE AND TYPICAL………………..….…43

    A.  The Timing Of Plaintiffs' Purchases During the Class Period Do Not Create Unique
        Defenses………………………………………………………………………...….44

    B.  The Shield Plans is Adequate and Typical………………….…..…………………46

    C.  Named Plaintiff Allan Goodman is Adequate…………………………………..48

    D.  Named Plaintiff James Rourke is Adequate……………………………….…50

    E.  Named Plaintiff Daniel Nesi, M.D. is Adequate……………………………..…51

V.    CONCLUSION…………………………………………………………………….…52

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972)..................................................................................................12

*Asher v. Baxter Intern., Inc.*,
  377 F.3d 727 (7th Cir. 2004) ............................................................................ passim

*Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.*,
  F.3d 208 (7th Cir. 1993) ....................................................................................4, 32

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................................ passim

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ............................................................................17 n.12

*Bovee v. Coopers & Lybrand*,
  216 F.R.D. 596 (S.D. Ohio 2003) ............................................................................51

*Cammer v. Bloom*,
  11 F.Supp. 1264 (D.N.J. 1989) .......................................................................... passim

*Caremark, Inc. v. Coram Healthcare, Corp,,*
  113 F.3d 645 (7th Cir. 1997) ..............................................................................14, 38

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003)................................................................................18

*Connecticut Retirement Plans & Trust Funds v. Amgen, Inc.*,
  2009 WL 2633743 (N.D. Cal. Aug. 12, 2009) ....................................................5, 46 n.22

*Cruden v. Bank of New York*,
  988 WL 9514 (S.D.N.Y. Feb. 1, 1988)......................................................................49

*Daniels v. Blount Parish & Co., Inc.,,*
  211 F.R.D. 352 (N.D. Ill. 2002)..................................................................................1

*Deveny v. Entropin, Inc.,*
  139 Cal.App.4th 408 (Cal.App. 4 Dist. 2006) ..............................................................15

*Feldman v. Motorola*,
  1993 WL 497228 (N.D. Ill. Oct. 14, 1993).................................................................45

*Fener v. Belo*,
　　579 F.3d 401 (5th Cir. 2009) ........................................................27

*Fograzzo v. Lehman Bros.*,
　　263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................43

*Freeland v. Iridium World Communications, Ltd.*,
　　233 F.R.D. 40 (D.D.C. 2006).........................................................32

*Freeman v. Laventhol & Horwath*,
　　915 F.2d 193 (6th Cir. 1990) ...................................................17 n.12

*Fry v. UAL Corp.*,
　　136 F.R.D. 626 (N.D. Ill. 1991).....................................................47

*Ganino v. Citizens Utilities Co.*,
　　228 F.3d 154 (2d Cir. 2000)................................................... passim

*Gaspar v. Linvatec*,
　　167 F.R.D. 51 (N.D. Ill. 1996).......................................................44

*Greenberg v. Boettcher & Co.*,
　　755 F.Supp. 776 (N.D. Ill. 1991) .............................................17 n.11

*Griffin v. GK Intelligent Sys., Inc.*,
　　196 F.R.D. 298 (S.D. Tex. 2000).....................................................20

*Guenther v. Cooper Life Sciences, Inc.*,
　　1992 WL 206256 (N.D. Cal., Apr. 7, 1992) .....................................15

*Harden v. Raffensperger, Hughes & Co., Inc.*,
　　65 F.3d 1392 (7th Cir. 1995) ........................................................12

*Harmon v. LyphoMed, Inc.*,
　　122 F.R.D. 522 (N.D. Ill. 1988).................................................20, 45

*Hayes v. Gross*,
　　982 F.2d 104 (3d Cir. 1992).....................................................17 n.12

*Hua Mui v. Union Needletrades Indus. & Textile Employees, AFL-CIO*,
　　1999 WL 4918 S.D.N.Y. Jan. 5, 1999)...........................................50

*In re Alstom SA Sec. Litig.*,
　　235 F.R.D. 266 (S.D.N.Y. 2008) ..................................................43

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .................................................................. passim

*In re Ashanti Goldfields Sec. Litig.*,
  2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) ...........................................29 n.19

*In re Bally Mfg. Sec. Corp. Litig.*,
  141 F.R.D. 262 (N.D. Ill. 1992) ............................................................... passim

*In re Boston Scientific Cor. Sec. Litig.*,
  604 F.Supp.2d 275 (D. Mass. 2009) .........................................................5, 27

*In re Carter-Wallace, Inc. Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000) .............................................................................35

*In re Colonial P'Ship Litig.*,
  1993 WL 306526 (D. Conn. Feb. 10, 1993) ..................................................49

*In re Connetics Corp. Sec. Litig.*,
  257 F.R.D. 572 (N.D. Cal. 2009) ..................................................................27

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008) ......................................................................43

*In re Direct General Corp.*,
  2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) .......................................29 n.19

*In re DVI, Inc. Sec. Litig.*,
  249 F.R.D. 196 (E.D. Pa. 2008) .....................................................................18

*In re Emulex Corp. Sec. Litig.*,
  210 F.R.D. 717 (C.D. Cal. 2002 .....................................................................51

*In re Enron Corp. Sec.*,
  529 F.3d 644 (S.D. Tex. 2006) .........................................................19, 47 n.23

*In re Frontier Group, Inc. Sec. Litig.*,
  2006 WL 1806507 (E.D.N.Y.,2006) ...............................................................48

*In re Healthsouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009) ...................................................................27

*In re Herley Indus., Inc. Sec. Litig.*,
  2009 WL 316988 (E.D. Pa. Sept. 30, 2009) ............................................29 n.19

*In re LDK Solar Sec. Litig.*,
   255 F.R.D. 519 (N.D. Cal. 2009) .................................................................26

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) ...............................................................47

*In re Nature's Sunshine Product's Inc. Secs. Litig.*,
   251 F.R.D. 656 (D. Utah 2008) ...............................................27, 29 n.19

*In re Nortel Networks Corp. Sec. Litig.*,
   2003 WL 22077464 (S.D.N.Y. 2003) ...............................29 n.19, 47

*In re Northfield Labs., Inc. Sec. Litig.*,
   527 F.Supp.2d 769 (N.D. Ill. 2007) .............................................2 n.1

*In re Northfield Labs., Inc. Sec. Litig.*,
   2008 WL 4372743 (N.D. Ill. Sept. 23, 2008) ..........................2 n.1, 5

*In re Omnicom Group Inc. Sec. Litig.*,
   41 F.Supp. 2d 546 (S.D.N.Y. 2008)...............................................27

*In re Organogenesis Sec. Litig.*,
   241 F.R.D. 397 (D. Mass. 2007).............................................47 n.25

*In re Parmalat Sec. Litig.*,
   2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)...................29 n.19, 32

*In re PE Corp. Sec. Litig.*,
   228 F.R.D. 102 (D. Conn. 2005)...................................37 n. 21, 42

*In re Pfizer, Inc. Sec. Litig.*,
   584 F.Supp.2d 621 (S.D.N.Y. 2008)...............................35, 41, 44

*In re PolyMedica Corp. Secs. Litig.*,
   432 F.2d 1 (1st Cir. 2005)...........................................................17 n.12

*In re Red Hat, Inc. Sec. Litig.*,
   261 F.R.D. 83 (E.D.N.C., August 28, 2009).................................27

*In re Rent-Way Sec. Litig.*,
   218 F.R.D. 101 (W.D. Pa. 2003) .................................................47

*In re Safeguard Scientifics*,
   216 F.R.D. 577E.D. Pa. 2003) ...............................................46 n.23

*In re Salomon Analyst Metromedia Litig.*,
  544 F.3d 474 (2d Cir. 2008)............................................................36, 47 n.24

*In re Scientific Atlanta Sec. Litig.*,
  571 F.Supp.2d 1315 (N.D. Ga. 2007) ..................................................43

*In re Scientific-Atlanta Sec. Litig.*,
  2009 WL 4281256 (N.D. Ga. Nov. 24, 2009) ......................................29 n.19

*In re Take-Two Interative Sec. Litig.*,
  551 F.Supp.2d 247 (S.D.N.Y. 2008)................................................32, 40

*In re Tyco International, Ltd.*,
  236 F.R.D. 62 (D.N.H. 2006) ............................................................43

*In re Tyson Foods, Inc.*,
  2003 WL 22316548 (D. Del. Oct. 6, 2003) ..........................................46

*In re Unisys Corp Secs. Litig.*,
  2000 U.S. Dist. LEXIS 13500 (E.D. Pa. Sept. 21, 2000) ....................15

*In re Vivendi Universal, S.A.*,
  2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).......................................42

*In re Wagner v. Barrick Gold Corp*,
  251 F.R.D. 112 (S.D.N.Y. 2008) ......................................................29 n.19

*In re Worldcom, Inc. Sec. Litig.*,
  346 F.Supp.2d 628 (S.D.N.Y. 2004)................................................14

*In re VMS Sec. Litig.*,
  136 F.R.D. 466 (N.D. Ill. 1991)........................................................45

*In re Xcelera.com*,
  430 F.3d 503 (1st Cir. 2005)................................................20, 28, 31

*In re Xcelera.com*,
  2008 WL 7084626 (D. Mass. Apr. 25, 2008) .....................................28, 29 n.19

*J. H. Cohn & Co. v. American Appraisal Associates, Inc.*,
  682 F.2d 994 (7th Cir. 1980) ............................................................45

*Kaplan v. Pomerantz*,
  132 F.R.D. 504 (N.D. Ill. 1990)........................................................50

*Kaplan v. Rose,*
    49 F.3d 1363 (9th Cir. 1994) ...................................................................5 n.2

*Koos v. First Nat'l Bank of Peoria,*
    96 F.2d 1162 (7th Cir. 1974) ...........................................................................44

*Lau v. Arrow Fin. Servs.,*
    245 F.R.D. 620 (N.D. Ill. 2007)........................................................................2

*Lapin v. Goldman Sachs & Co.,*
    254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................. passim

*Lawrence E. Jaffe Pension Plan v. Household Intern, Inc.,*
    2006 WL 332917 (N.D. Ill. Nov. 13, 2006) ...................................................42

*Lentell v. Merrill Lynch, & Co.,,*
    396 F.3d 161 (2d Cir. 2005)......................................................................14, 37

*Loeb Indus., Inc. v. Sumitomo Corp.,*
    306 F.3d 469 (7th Cir. 2002) ....................................................................2, 27

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    256 F.R.D. 586 (N.D. Ill. 2009)................................................................2, 35

*Marks v. CDW Computer Centers, Inc.,*
    122 F.3d 363 (7th Cir. 1997) ..........................................................................35

*Medimatch, Inc. v. Lucent Technologies, Inc.,*
    120 F.Supp.2d 842 (N.D. Cal. 2000) ..............................................................15

*Nicholas v. Poughkipsie Savings Bank/FSB,*
    1990 WL 145154 (S.D.N.Y. Sept. 27, 1990).................................................45

*O'Neil v. Appel,*
    165 F.R.D. 479 (W.D. Mich. 1996)................................................................20

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,*
    487 F.3d 261 (5th Cir. 2007) ..........................................................................27

*Payton v. County of Carroll,*
    473 F.3d 845 (7th Cir. 2007) ............................................................................1

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,,*
    2004 U.S. Dist. 28008 (N.D. Cal. May 27, 2004) ....................................29 n.19

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ................................................. passim

*Robinson v. Penn Central,*
    8 F.R.D. 436 (S.D.N.Y. 1973) ........................................................45

*Ross v. Abercrombie & Fitch Co.,*
    2008 WL 4059873 (S.D. Ohio Aug. 26, 2008)...............................27

*Ross v. Abercrombie & Fitch Co.,*
    257 F.R.D. 435 (S.D. Ohio 2009) ...........................................26, 48

*Siracusano v. Matrixx Initiatives, Inc.,*
    585 F.3d 1167 (9th Cir. 2009) .......................................................35

*Schleicher v. Wendt,*
    2009 WL 761157 (S.D. Ind. Mar. 20, 2009)................................17 n.11, 20, 43

*Searls v. Glasser,*
    64 F.3d 1061 (7th Cir. 1995) .........................................................35

*Serfaty v. Intern Automated Sys., Inc.,*
    180 F.R.D. 418 (D. Utah 1998) .....................................................19

*Shirk v. Fifth Third Bancorp,*
    2009 WL 692124 (S.D. Ohio Jan. 29, 2009) ...........................29 n.19

*Silversman v. Motorola, Inc.,*
    259 F.R.D. 163 (N.D. Ill. 2009).................................................2, 47

*Szabo v. Bridgeport Machines, Inc.,*
    249 F.3d 672 (7th Cir. 2001) ..................................................1, 2, 35

*Tatz v. Nonophase Techs. Corp.,*
    2003 WL 21372471 (N.D. Ill. Jun. 13, 2003)...................17 n.11, 19

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
    546 F.3d 196 (2d Cir. 2008)....................................................20, 31

*TSC Industries, Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)......................................................................35

*West v. Prudential Sec. Litig.,*
    282 F.3d 935 (7th Cir. 2002) ................................................. passim

*Worley v. Camplin*,
    333 F.3d 284 (1st Cir. 2003)....................................................................................37 n.21

*Young v. County of Cook*,
    2007 WL 1238920 (N.D. Ill. Apr. 25, 2007) ...............................................................2, 35

*Ziemack v. Centel, Corp.*,
    163 F.R.D. 530 (N.D. Ill. 1995)..............................................................................45

In their opening brief Plaintiffs demonstrated that all of the requirements for class certification under Rule 23 are satisfied. Securities claims are particularly well suited for class certification because Defendants' alleged misrepresentations and omissions of material fact are directed to the entire marketplace of investors with the same force and effect, and the market incorporates the false information into the stock price damaging all investors to the same extent. *Daniels v. Blount Parish & Co., Inc.*, 211 F.R.D. 352, 355-56 (N.D. Ill. 2002) (citations omitted).

In an effort to avoid class-wide liability, Defendants put forth several poorly reasoned bases for denying certification. Defendants' efforts to prevent class certification fall flat on every account. Defendants have not met their burden of proving the truth of the fraud was revealed to the market in 2005. Defendants' contention that vague references on a hospital websites and other equally obscure sources are credible disclosures of the truth to the market is laughable. Nor do Defendants succeed in their confusing and tautological attempts to discredit the sound statistical basis for Dr. Hakala's opinion that Northfield's stock traded in an efficient market during the Class Period. Northfield stock was traded on the Nasdaq national market, it had a market capitalization in the hundreds of millions of dollars and trading in its stock was deep and vigorous. Indeed, every one of the *Cammer* factors is met in this case -mandating a finding of market efficiency and permitting a fraud-on-the-market presumption of reliance.

Lastly, Defendants mean-spirited efforts to discredit the class representatives should be disregarded as baseless. Each of the proposed class representatives has demonstrated in their declarations and by their deposition testimony that their adequacy to serve as class representatives. Each are deeply involved in prosecuting this action, have claims that are typical of other Class members in all respects and are not subject to any unique defenses. Given their strong business and medical backgrounds these men are ideal representatives for the Class. For these reasons, as discussed more fully below, the Court should grant Plaintiffs' motion for Class certification, and appoint Drs. Shield and Nesi and Messrs. Rourke and Goodman as class representatives.

## I. SCOPE OF REVIEW AT CLASS CERTIFICATION

District courts have broad discretion in determining motions for class certification. *See Payton v. County of Carroll*, 473 F.3d 845, 847 (7th Cir. 2007). However, the relevant question on a class certification motion is whether the requirements are met-—"neither *Szabo* nor more

recent precedent permits the Court to decisively consider the merits and thus remove from the parties the benefit of summary judgment and trial." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 595 (N.D. Ill. 2009) (citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) & *West v. Prudential Sec. Litig.*, 282 F.3d 935, 938 (7th Cir. 2002)); *Silversman v. Motorola, Inc.*, 259 F.R.D. 163, 169 (N.D. Ill. 2009); *see also Lau v. Arrow Fin. Servs.*, 245 F.R.D. 620, 623 (N.D. Ill. 2007) ("This court does not read *Szabo* so broadly as to require the court to reach the ultimate issue in the case on a Rule 23 motion.") (citing cases).

Where, as here, class and merits discovery has been bifurcated, it would be "unjust" to delve into merits issues that were not "necessary" in determining whether the requirements of Rule 23 have been met. *Young v. County of Cook*, 2007 WL 1238920, at * 4 (N.D. Ill. Apr. 25, 2007) (holding that it would be "unjust" for a party to argue a merits-based point on class certification, when discovery was bifurcated on class and merits issues). Additionally, "'a court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits.'" *Silversman*, 259 F.R.D. at 168 (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002)).

## II.     DEFENDANTS' "TRUTH ON THE MARKET" ARGUMENTS ARE BASED ON FALSE ASSUMPTIONS

All of Defendants' arguments against class certification are based on their false characterization of Plaintiffs' claims. In Defendants' world, they want to Court to believe that Plaintiffs' claims are based solely on the following omission and related misstatements: "serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group" than in the control group in the ANH trial.

As summarized in the Court's orders on Defendants' motions to dismiss,[1] this case involves a much broader set of misrepresentations and omissions: <u>First</u>, Defendants concealed the failure of the ANH trial and the important reasons for its failure. Defendants secretly shut down the ANH trial *because of* the *statistically significant* incidence of heart attacks and other

---

[1]     *See In re Northfield Labs., Inc. Sec. Litig.*, 2008 WL 4372743 (N.D. Ill. Sept. 23, 2008); *In re Northfield Labs., Inc. Sec. Litig.*, 527 F.Supp.2d 769 (N.D. Ill. 2007).

serious adverse events. In particular, Defendants concealed that 10 of 81 patients receiving Polyheme suffered heart attacks (two of which died), and that there were no heart attacks or deaths in the group that did not receive Polyheme. Second, Defendants misrepresented the true reason for closing the ANH trial before completion. Defendants falsely stated that the ANH trial was closed because of slow patient accrual, and misrepresented that the ANH trial continued to produce important results when in fact it was already shut down because of the trial's highly negative safety and efficacy data. Third, Defendants misrepresented that Northfield's prior clinical trials provided no evidence of cardiac dysfunction, that its prior trials provided substantial evidence of safety and efficacy, and that none of the adverse effects (i.e. heart attacks) historically associated with other blood substitutes have been identified in Northfield's clinical studies.

Based on their mischaracterization of Plaintiffs' claims, and the unsupported contention that the *market* was aware of the so-called "truth" ("serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group"), Defendants assert incorrectly that Northfield's stock was not traded in an efficient market, and therefore Class members are not entitled to the fraud-on-the-market presumption of reliance. Because Defendants' "truth on the market" defense in intertwined in each of their arguments against market efficiency, Plaintiffs explain why the truth was never disclosed to the market until a series of piecemeal disclosures in early 2006.

### A. The Truth on the Market Affirmative Defense

The fraud-on-the-market theory of reliance creates a presumption that investors relied not on any particular alleged misstatements or omissions of the issuer, but instead relied on the integrity of the market price of the issuer's securities. "Because most publicly available information is reflected in market price, [thus] an investor's reliance on any public material misrepresentations … may be presumed for the purposes of a Rule 10b-5 action." *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988). This is so, because "public information reaches professional investors, whose evaluations of that information and trades quickly influence securities prices." *West v. Prudential Securities, Inc.*, 292 F.3d 935, 937 (7th Cir. 2002). Therefore in a fraud-on-the-market case, investors are not required to read, review or otherwise

rely on the alleged misstatements and omissions because the **market,** i.e. professional traders, mutual fund managers, securities analysts, do the reading, and they make trades or recommendations that influence the price of the security. *Asher v. Baxter Intern., Inc.*, 377 F.3d 727, 732 (7th Cir. 2004).

The fraud-on-the-market theory of reliance has a truth on the market corollary. *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 213-14 (7th Cir. 1993). "Under this corollary, a misrepresentation is immaterial if the information is already known to the *market* because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (emphasis added); *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996). Likewise, if the truth of the alleged fraud was known prior to the issuance of the alleged misstatements, "the basis for finding that the fraud had been transmitted through the market price would be gone." *Basic*, 485 U.S. at 248. "However, the corrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino*, 228 F.3d at 167 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)); *see also Basic*, 485 U.S. at 249 (explaining that the truth must "credibly enter[] the market and dissipate[] the effects of the misstatements"); *Associated Randall Bank*, 3 F.3d at 213 ("But once the truth was out, known to sophisticated traders, the price of the securities would have reflected all risks."). Indeed, the Seventh Circuit explained that the truth must be "widely known" in order for a misstatement to have no deleterious effect on the market price of a company's stock in connection with the fraud on the market theory. *Asher*, 377 F.3d at 732; *see also West*, 282 F.3d at 937 (rejecting argument that it was "unimportant" that the information was not disseminated through an "organ of general circulation" in assessing fraud on the market theory).

Defendants "bear a heavy burden" of proof to succeed on the truth on the market defense. *Provenz*, 102 F.3d at 1493 ("Summary judgment is proper only if they show that 'no rational jury

could find' that the market was misled'").[2] Courts have held that the application of the truth on the market defense is appropriate only at the later stages of the case - at summary judgment or trial. *Id., Connecticut Retirement Plans & Trust Funds v. Amgen, Inc.*, 2009 WL 2633743, at * 14 (N.D. Cal. Aug. 12, 2009) (holding that whether the fraud-on-the-market doctrine is rebutted by the truth-on-the-market affirmative defense must be decided on summary judgment or trial); *Ganino*, 228 F.3d at 167 ("The truth-on-the-market- defense is intensely fact-specific …"); *see also In re Boston Scientific Sec. Litig.*, 604 F.Supp.2d 275, 287 (D. Mass. 2009) (on class certification motion holding predominance requirement met, "[a]lthough defendants have raised colorable argument regarding [plaintiffs'] ability to prove loss causation, those issues are more properly addressed on summary judgment or at trial. … It is sufficient at this stage to conclude that the issues raised by defendants-e.g., when the information they allegedly concealed was actually disclosed to the market, and what market impact that disclosure generated-are fully susceptible of common proof.") (internal citation omitted).

**B. Defendants' So-Called "Truth" Did Not Reveal the Fraud And Is Itself Misleading**

Defendants claim that the truth of the alleged fraud was variously disclosed to participants of the Company's trauma trial, attendees at community meetings in connection with obtaining approval for the non-consent trauma trials for certain towns, hospital websites conducting the trauma trial, and certain investor chat-rooms. Def. Mem. at 10-15. Defendants' purported disclosures of the "truth" were not disclosures of the truth at all and did not reveal Defendants' fraud. All of these purported "truth" disclosures stated in sum and substance only that "serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group" than in the control group in the ANH trial. However, the same purported truth disclosures misleadingly told investors that Polyheme was safe – which was itself a lie – one that this Court has already deemed actionable under §10(b) of the Securities Exchange Act. *See Northfield Labs.*, 2008 WL 4372743, at * 5-* 8. None of Defendants' purported truth disclosures revealed: (1) that the ANH trial was secretly shut down *because of* the *statistically significant* incidence of heart attacks. Namely, that 10 of 81 patients receiving Polyheme

[2]    "If 'the evidence presents a sufficient disagreement to require submission to the jury,' summary judgment should be denied." *Id.*, (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1376 (9th Cir. 1994)).

5

suffered heart attacks and two died, and that there were no heart attacks in the group that did not receive Polyheme; (2) that the ANH trial was not shut down because of slow patient accrual but because of highly negative safety and efficacy data; (3) that Northfield's statements that the ANH trial continued to produce important results were false because these statements were made after the ANH trial was shut down; and (4) that that Northfield's prior clinical trials provided substantial evidence of safety and efficacy. Rather than disclose the truth, each of Defendants' purported "truth" disclosures was independently misleading and false.

### a. Patient Post-Consent Forms (Exs. 20, 21, 22)[3] Did Not Reveal the Truth Of The Fraud

Defendants cite to confidential post-patient consent forms that were part of the medical records of Trauma Trial patients, Exs. 20, docket no. 280-9, Ex. 21, docket no. 280-9, and Ex. 22, docket no. 280-10 to suggest that the truth was known to those patients. The patient post-consent forms variously state there were more heart attacks in the Polyheme group than in the experimental group. Ex. 20, without even mentioning the ANH trial, vaguely states:

> In one study there was an increase in heart attacks in the patients who received Polyheme vs. those who did not. This is thought to be related to the study procedures and not the study drug. There is also risk of death that may be associated with the study drug or to the traumatic injury. However no deaths have been directly attributed to the study drug.

Ex. 20, docket no. 280-9, at 110.

This statement doesn't even identify which clinical trial it refers to. Was it a Phase 2 or Phase 3? Was it elective surgery or trauma? This consent form is also materially misleading. There is no disclosure that the incidence of heart attacks in the ANH trial was *statistically significant*, the number of *heart attacks and deaths*, and the true reason the ANH trial was shutdown, and downplay any safety concerns of Polyheme. The consent forms misleadingly suggest that were actually heart attacks in the non Polyheme group by using the words "increase" and "vs." Ex. 20, docket no. 280-9, at 110. Indeed, one of the reasons Senator Grassley commenced his investigation of Northfield was to determine whether participants in the Trauma trial were

---

[3]   All references herein to "Ex. __" and "Exs. __" refer the Exhibits attached to Defendants' Appendix filed with their Opposition.

provided full disclosure about the serious adverse events in Northfield's prior history clinical trials. *See* Exs.46-48, Docket no. 280-13, at 160-171.

Similarly worded disclosures were placed in the other post-consent forms. *See* Ex. 21, docket 280-9, at 125 ("In an earlier study where patients received PolyHeme during a complex surgery, there was an increased number of heart attacks noted"); Ex. 22, docket 280-10, at 7 ("In one earlier study where patients received PolyHeme during a complex surgery, there was an increased number of heart attacks noted."). It is significant that each of these disclosures were accompanied by statements that PolyHeme was safe: "Although the long-term effects of Poly SFH-P injection (PolyHeme) are no known, extensive testing in animals has shown it to be a safe product." Ex. 20, docket no. 280-9m at 110.

### b. Presentations Made To Communities (Exs. 4, 23, 24, 25, 26 ) In Furtherance of The Trauma Trial Did Not Reveal The Truth of the Fraud

Defendants assert that the truth of the fraud was disclosed in community meetings that were held in furtherance of Northfield's attempt to obtain approval for the non-consent trauma trial in various communities starting in May of 2005. Like the post-consent forms, these disclosures state that there were more heart attacks in some unnamed study, but do not reveal the truth of the alleged fraud—the incidence of heart attacks in the ANH trial was statistically significant, the number of heart attacks and deaths, the true reason the ANH trial was shutdown, and like negative information about Polyheme's safety. *See* Ex. 4, docket no. 280-6, at 5 ("Serious cardiovascular adverse experiences occurred more frequently in the Polyheme group."); Ex. 23, docket no. 280-10, at 26 ("Serious adverse events, including cardiovascular, were observed"); Ex. 24, docket 280-10, at 55 ("Serious adverse events, including cardiovascular, were observed."), at 64 ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group."); Ex. 25, docket no. 280-10, at 74 ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group.").

### c. Hospital Disclosures and Websites (Exs. 4, 26, 27, 28, 29, 30, 32) Did Not Reveal the Truth of the Fraud

These disclosures also do not reveal the truth of the fraud and merely repeat the disclosures listed above and are misleading and incomplete for the same reasons.[4]  *See* Ex. 26, docket no. 280-11n at 11 ("Serious cardiovascular experiences occurred more frequently in the PolyHeme group."), at 18 ("Serious adverse events, including cardiovascular, were observed") ; Ex. 27, docket no. 280-11 at 28, ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme Group."); Ex. 28, docket no. 280-11, at 36 ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group."); Ex. 29, docket no. 280-11 at 41 ("In one earlier study where patients received PolyHeme during a complex surgery, there was an increased number of heart attacks noted."); Ex. 30, docket no. 280-11, at 49 ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme Group."); Ex. 32, docket no. 280-11, at 75 ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme  group."), at 79 ("Serious cardiovascular adverse experiences occurred more frequently in the PolyHeme  group.").

### d.  Chatroom Disclosures Did Not Reveal The Truth of the Fraud (Exs. 3, 15)

Defendants cite anonymous Yahoo message board postings to suggest that the truth of the fraud was disclosed.  However, like the disclosures listed above, these postings do not reveal the fraud but merely repeat the information set forth above.  *See* Ex. 3, docket no. 280-3 ("Serious cardiovascular adverse experiences occurred more frequently in the Polyheme group.").[5]

### e.  Disclosure to 48 Hospitals and Their Staffs and FDA Did Not Reveal the Truth of the Fraud

Defendants brazenly claim that "The Investigator's Brochure and the Protocol [for the trauma trial] contained lengthy, explicit discussions of the ANH Trial and the heart attacks observed there, including the precise number of patients experiencing heart attacks in each group."  Def. Mem. 10.  Both documents were purportedly provided to the investigators in the trauma trial, the participating hospitals and the FDA.  In support, Defendants cite to transcript of the Company's investors' relations person, Sophia Twaddell, who is not a medical doctor and

---

[4]  Ex. 4 is discussed above.
[5]  Exhibit 3 contains news release documents at 28 to 32, these new releases were not posted in the message board.

who has a degree in English Ex. 15, Twaddell Dep., at 13. However, her cited testimony reveals that the Investigator's Brochure and the Protocol were in their entirety marked "Confidential" and the reports themselves could not be publicly disseminated. Ex. 15, Twaddell Depo., at 52. Indeed, Dr. Gompers admitted at his deposition, that such confidential information, was not public information and would not have entered the market. Plaintiffs' Appendix of Exhibits, filed herewith "APPX", Deposition Transcript of Paul Gompers, Ex. 1, at 64-65.

Moreover, Defendants cannot meet their burden in establishing truth on the market, because they have not even submitted the Investigator's Brochure or Protocol with their papers nor have they even produced it to Plaintiffs in discovery! Certainly, the reasonable inference is that the Investigator's Brochure and Protocol do not say what Ms. Twaddell claims. Indeed, Ms. Twaddell testified that she did not have detailed knowledge of documents. Ex. 15, Twaddell Depo., at 49. ("I don't have detailed knowledge of the Investigator's Brochure,…"). In any event, Ms. Twaddell's suggestion that the full ANH study results were in fact provided to hospitals and investigators of Trauma Trial is contradicted by the fact that Dr. Norris, of Johns Hopkins, the purported "lead investigator" of the ANH trial who stated that Northfield never provided him the full study results of the ANH trial. In fact, Dr. Norris explicitly contradicted a Northfield press release of February 22, 2006 in which Northfield claimed that Dr. Norris of Johns Hopkins the "lead investigator" would be presenting the full ANH study results to substantiate Northfield's conclusions. ¶133.[6]

### f. An "Analyst" Did Not Reveal The Truth Of The Fraud (Ex. 37) In October 2005

Defendants cite a report marketed and sold by an outfit called the Marketing Research Bureau ("MRB"), to suggest that the report disclosed the fraud. As discussed in Section "IIC" *infra.*, this disclosure and the others cited above, did not credibly enter the market and dissipate Defendants' fraudulent statements and omissions, *Basic*, 485 U.S. at 249. Nor was this or the other disclosures "widely known" by the "market." *Asher*, 377 F.3d at 732. Discovery obtained

---

[6] All reference to "¶_" and "¶¶__" refer to the operative consolidated second amended complaint, docket no. 128.

by Defendants (which Defendants conveniently fail to submit) reveals that the contents of the report were only made available to the six biotechnology companies that purchased the report for prices ranging from $1,000 to $3,750. *See* APPX, Ex. 3. Contrary to Defendants' suggestion, the report was marketed in a manner that did not reveal its contents as demonstrated by the marketing material that Defendants obtained through subpoena from MRB (which Defendants yet again fail to submit). *See* APPX, Ex. 2. Dr. Gompers acknowledged at his deposition, under such circumstances it could be possible that the information may not have entered the market. *See* APPX, Ex. 1, Gompers Depo., at 101-105. A private report provided to six bio-tech companies cannot be considered a public disclosure. In any event, the cited language in the report states that MRB only surmises that that it "must assume that the more frequent appearance of serious cardiovascular adverse experienced in PolyHeme-treated patients was statistically significant." Ex. 37, Docket no. 280-12, at 57. The MRB report does not reveal the actual specific results and only contains the speculation of an obscure "analyst."

Because the documents that Defendants submit do not reveal the truth of the alleged fraud and in most instances the purported "truth" disclosures are misleading and incomplete, Defendants have failed to meet their "heavy burden", *Provenz*, 102 F.3d at 1493, in establishing that the *market* was aware of the truth of the fraud. Therefore, all of Defendants' arguments based on the contention that the "truth" was previously disclosed to the market must be rejected.

## C. The Purported "Truth" Did Not Credibly Enter the Market and Did Not Counter Balance Negative Effect of the Misstatements

In addition to proving that the full details of the fraud were known by the market, to establish truth on the market, Defendants must prove that the revelation of the fraud was "conveyed to the public 'with a degree of intensity and credibility sufficient to counter –balance effectively any misleading information created by' the alleged misstatements." *Ganino*, 228 F.3d at 167 (quoting *Apple Computer*, 886 F.2d at 1116)); *see also Basic*, 485 U.S. at 249 (explaining that the truth must "credibly enter[] the market and dissipate[] the effects of the misstatements"). Indeed, the Seventh Circuit explained that the truth must be "widely known" by the *market,* i.e. professional traders, mutual fund managers, securities analysts, that do the reading of the Company's public filings and news releases and they make trades or

recommendations that influence the price of the security.  *Asher*, 377 F.3d at 732; *see also West*, 282 F.3d at 937 (stating that in the fraud on the market corollary, information must be disseminated through an "organ of general circulation").  Defendants have utterly failed to meet their burden.

Defendants' purported "truth" disclosures never credibly entered the market for three reasons.  First, Northfield attempted to minimize the materiality of this information by failing to disclose this information in its SEC filings, its press releases, investor conference calls or through an "organ of general circulation" that the market looks to.  Instead, Northfield buried a seemingly innocuous disclosure about "more frequent cardiovascular events" in an obscure document available on Northfield's website that was never referenced in the Company's SEC filings or public press releases, and in documents it provided to the communities that participated in the trauma trial.  *See Asher*, *supra; see also* Hakala Reply Decl., ¶6.[7]

Second, the actual truth of the alleged fraud about Polyheme's safety and efficacy (i.e., statistically significant incidence of heart attacks, true reason for the shut-down of the ANH trial, and bigger picture of Polyheme's lack of safety and efficacy), did not credibly enter the market because Northfield continued to fail to disclose the adverse efficacy and safety information from the ANH trial and continued to tout that Polyheme was safe, efficacious, and that the elective surgery market was still a viable route for the Company.  *See* APPX Ex 5, at 7, filed with SEC on August 15, 2005 ("We believe that PolyHeme will be most useful in the treatment of acute blood loss.  The principal clinical settings in which patients experience acute blood loss are unplanned blood loss in trauma, emergency surgery and other causes of urgent hemorrhage, **and planned blood loss in elective surgery." "In elective surgery, PolyHeme has the potential to increase transfusion safety for patients and health care professionals."** The document also touted Polyheme's ability to replace blood volume "resulting from extensive blood loss"); APPX Ex. 4, at 3, field with SEC on January 19, 2005 ("Northfield Laboratories Inc. is a leader in the development of **a safe and effective alternative** to transfused blood for use in the treatment of **acute blood loss." "We believe PolyHeme is the only blood substitute in development that**

---

[7]  All reference to "Hakala Reply Decl., __" refers to the Reply Declaration of Scott D. Hakala, Ph.D, CFA Regarding Market Efficiency" filed herewith.

**has been well tolerated when infused in patients in clinical trials in sufficient quantities for the treatment of urgent,** large volume blood loss in trauma **and surgical settings**, with a particular focus on situations where donated blood is not immediately available." The document also touted Polyheme's ability to replace blood volume "resulting from extensive blood loss").

The information defendants disclosed selectively was incomplete and did not accurately describe the results of the ANH Trial, hence, the disclosures could not have dissipated the effects of the alleged misstatements. A reasonable investor could merely view the disclosure of cardiovascular events in the contexts described above as insignificant and just one of many general risk disclosures typically provided concerning any medical procedure—especially since the information was never disclosed in a SEC filing, company issued announcement, or in a company conference call. For example, some of the disclosures made to patients revealed the risk of HIV, urine discoloration, decreased platelet count, rash, edema and other general risks one would encounter with any medical procedure or drug. *E.g.,* Ex. 20, docket no. 280-9, at 110.

Certainly, investors were not expected to discern that such an unremarkable statement concerning cardiovascular events should be read to indicate that the ANH Trial was shut down because of a statistically significant number of heart attacks and other serious adverse events in PolyHeme patients. The market could reasonably believe as a general proposition that this disclosure was not the tip of an iceberg. Investors were entitled to assume that Northfield and defendants would abide by the securities laws and rely on management to disclose all required material information about Polyheme. *See Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1400 (7th Cir. 1995) ("a fundamental purpose [of the securities laws is]... to substitute a philosophy of full disclosure for the philosophy of caveat emptor.") (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)); *Apple Computer*, 886 F.2d at 1116 ("Even in a fraud on the market case, corporate insiders are not relieved of their duty to disclose material information where that information has received only brief mention in a few poorly-circulated or lightly-regarded publications. The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders. ")

Third, Defendants purported truth disclosures were never widely known by or disseminated to the market. Disclosing information to hospital staff or patients or burying vague

references to heart attacks on a website is not an adequate public disclosure to get the truth on the market.

### a.    Analysts Following Northfield Did Not Know Until January 2006

Defendants have not submitted a single piece of evidence from a securities analyst or other market professional to suggest that the truth began to credibly enter the market before January 6, 2006—when Plaintiffs allege that the truth began to leak into the market through partial disclosures.  In fact, lead UBS analyst, Patrick Pace, M.D., who covered and issued analyst reports on Northfield since June of 2005 (Ex. 45, docket no. 280-13, Pace Depo., at 16), did not learn that there were serious cardiovascular events in the ANH trial until immediately preceding the issuance of UBS's analyst report on January 6, 2006 (*Id.*, at 48-50, 111-113, 142). As a result, in the January 6, 2006 UBS report, Dr. Pace downgraded Northfield's stock, which caused the Company's stock to fall over 7%%.  Hakala Reply Decl., Ex. B-1.  It highly significant that Dr. Pace worked at UBS – the investment bank that underwrote Northfield's public offering in 2005.  *See* APPX, Ex. 5, at 1. If Dr. Pace didn't know the truth about the ANH Trial, how could any other market participant have known the truth?

Dr. Pace testified that his basis for lowering revenue and stock price estimates for Northfield resulted from his thesis that Polyheme was less safe in older patients, which was derived from his recent discovery of the Polyheme backgrounder document and Q&A from the internet.[8]  Ex. 45, Pace Depo. at 53-54.  Moreover, Dr. Pace testified that the January 10, 2006 analyst report reiterated the reason why the Company downgraded the stock four days prior on January 6, 2006.  *Id.,* at 59-60.  Dr. Pace also testified that during the time from the January 6, 2006 analyst report to the January 10, 2006 analyst report he did not discover any new information, nor did he get any new information from his conversations with Dr. Gould.  *Id.*, at 61-62.  Therefore, the January 6, 2006 analyst downgrade was the proximate result of Dr. Pace's discovery of the Polyheme Backgrounder and/or Q&A ("Serious cardiovascular experiences

---

[8]    When asked "Would you say that the clinical trial, the ANH trial, was more -- a more reliable source of information about potential safety issues than the rat study? Dr. Pace responded: "I would say yes, because it's in humans and not in rats."  Ex. 45, Pace Depo., at 54-55.

occurred more frequently in the PolyHeme group")[9] document from the Company's website. This is sufficient to demonstrate loss causation resulting from a materialization of the concealed risk. *See Lentell v. Merrill Lynch, & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (loss causation can be satisfied "both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk."); *see also Caremark, Inc. v. Coram Healthcare, Corp.,* 113 F.3d 645, 649 (7th Cir. 1997) (applying a lower standard and explaining that loss causation as nothing more than the standard common law fraud rule"); *E.g.,* Hakala Reply Decl., ¶¶5-6.

### b. Information Buried In Websites

Rather than disclose information to investors in an SEC filing, Company press release, or some other medium of wide general circulation, Defendants buried a vague reference to "more frequent cardiovascular events" in two obscure documents on their extensive website. And the documents were not even available in the "investor relations" section. Defendants offer not a shred of evidence that these two documents were widely known by the market in 2005 and dissipated the effect of the alleged misstatements and omissions. Defendants have utterly failed to establish that the obscure information on their website was widely known in the market or that the market was even aware of the website postings prior to January 2006—when UBS released its analyst reports. This is a powerful fact because UBS was the lead underwriter for Northfield's public stock offerings in 2005 (APPX, Ex. 4), and was required to perform extensive due diligence on Northfield and PolyHeme. *See In re Worldcom, Inc. Sec. Litig.*, 346 F.Supp.2d 628, 678 (S.D.N.Y. 2004) (citing authority and explaining the extensive due diligence an underwriter like UBS is required to conduct for an offering). That Northfield's underwriter was unaware of the truth further demonstrates that the truth did not enter the market.

Additionally, Northfield never alerted investors to the existence of the two particular documents containing the disclosures by reference in any SEC filing or company issued press release. Prior to May 2005, the Company had posted different versions of these two documents

---

[9] Like Defendants' other purported truth disclosures, the Polyheme Backgrounder and Q&A documents do not reveal the truth about the about alleged fraud, as it does not disclose, among other things, the adverse safety and efficacy information from the ANH Trial, the statistically significant incidence of heart attacks, the deaths, and number of heart attacks. *See* Ex. 5, docket no. 280-6, at 23; Ex. 17 at 74.

that did not contain the purported truth disclosures. Northfield never announced that these documents were amended, changed, or corrected, as Northfield would have been required to do with an SEC filing or financial statement. Therefore, a corporate webpage, particularly the unannounced modification of an existing webpage, does not serve as general public disclosure of information *See*, *Medimatch, Inc. v. Lucent Technologies, Inc.,* 120 F.Supp.2d 842, 854 (N.D. Cal. 2000) (knowledge in computing industry and not investors); *Deveny v. Entropin, Inc.* 139 Cal.App.4th 408, 430 (Cal.App. 4 Dist. 2006) ("The fact is that information on a website may exist in practical obscurity rather than provide notice to the public."); *see e.g. In re Unisys Corp Secs. Litig.,* 2000 U.S. Dist. LEXIS 13500 * 13-*14 (E.D. Pa. Sept. 21, 2000) (finding that a GSA contract, which was the subject of the action, was "not publicly" available by virtue of it being available on a website); *Guenther v. Cooper Life Sciences, Inc.,* 1992 WL 206256 * 5 (N.D. Cal., Apr. 7, 1992) (noting a sales agreement buried as an exhibit filed with the SEC cannot put an investor on inquiry notice of contents thereof). This is particularly true where, as here, "defendants consistently provided public information in the form of press releases and SEC filings that gave a rosy and encouraging picture of the prospects for [the drug]". *Deveny v. Entropin, Inc.* 139 Cal.App.4th at 430.

The same holds true for the various hospital websites, as Defendants have failed to demonstrate that same truth disclosures entered the market when the hospitals posted versions of the Q&A documents and Backgrounder documents on their website. Rather the record shows that the hospital websites were not an organ of general circulation. There is no evidence that market participants looked at or relied on any hospital websites for information concerning Northfield or PolyHeme. The market would have looked to the Company's SEC filings, Company issued press releases, and other public statements, or to widely read mass-media for material information about Polyheme's safety and efficacy.

### c. Information Disclosed to Trauma Trial Participants, Researchers, and Community Members

Defendants claim that because the purported "truth" was disclosed in certain patient consent forms ("serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group") and that somehow this private patient information entered the market. Patient

consent forms are a part of a person's medical record, and under various laws is confidential information.  Even, Plaintiffs' expert, Dr. Gompers acknowledged that such information would not be public information that the market would be aware of and would be protected under HIPPA.  APPX, Ex. 1, Gompers Depo., at 64. The same holds true with the unsubstantiated assertion by Sophia Twaddell that the "truth" of the entire alleged misstatements and omissions were made to the FDA and to various clinical investigators at the hospitals via the Company's investigator's brochure.  Ms. Twaddell's assertion is pure twaddle. She is not a medical doctor. She admitted she didn't even know what information was contained in the investigators brochure. And the information contained in the investigators brochure was marked and kept Confidential.  Ex. 45, Twaddell Depo., at 13, 52.  Dr. Gompers relied upon these facts in the investigators brochure -known only to the FDA and clinical investigators -as a basis for his opinion that the truth was on the market.  His opinion is therefore plainly wrong. It is also significant, that Defendants never produced, nor submitted to the Court the investigator's brochure.

Defendants also contend that during a number of community meetings hospital staff disclosed to some unspecified individuals that "serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group" and that this demonstrates the information was well known and credibly entered the market.  Information provided to unspecified individuals at a small community meeting does not rise to the level of the "truth" being well known or entering the market generally.  Defendants have not submitted any evidence that such community meetings were attended by stock analysts, investors, or any market professionals. Indeed the most knowledgeable market professional concerning Northfield, Dr. Pace of UBS, did not learn of the information until the week of January 6, 2006, and only through his analyst report did information begin to enter the market.

### d.  Yahoo! Finance Chatrooms

Defendants assert that several postings on the *Yahoo!* message board contained references to the hospitals' websites, the "truth" was known to the market.  As discussed above, the truth of the alleged fraud was not contained in the hospitals' websites and therefore for these same reasons, the Yahoo! Finance chatrooms do not provide evidence that the truth of the

alleged fraud credibly entered the market. While defendants claim that the number of postings in the chatrooms is proof the hospital disclosures were widely known, the chatrooms contain a lot of useless drivel, profanity, and spam.[10]

## III.   COMMON ISSUES PREDOMINATE

### A.  Plaintiffs Are Entitled to the Fraud on The Market Presumption of Reliance

Courts in this Circuit[11] and Courts of Appeals in other Circuits[12] have used the *Cammer*[13] factors to determine whether a company's stock is traded in an efficient market permitting plaintiffs the benefit of the fraud-on-the-market presumption of reliance. As explained below, Defendants' arguments challenging market efficiency are without merit and should be rejected.

**Factor One--Whether The Stock Trades at A High Weekly Volume.**  Dr. Hakala noted in his opening expert report, that average trading volume of Northfield stock during the Class Period exceeded 183,000 shares *per trade day*, and 8.4% per week. Defendants complain that the average weekly trade volume was only 1.3% in 2002 (Def. Mem. at 23), however, even at 1.3%, under *Cammer*, such a percentage would justify a "substantial presumption" of market efficiency. *Id.*, at 1293. Notably, in 2001 and 2003 the average weekly turnover was 2.76% and 2.06%, respectively (Gompers Report, Ex. A),[14] which under *Cammer,* would justify a "strong presumption" of market efficiency. *Id.* Additionally in 2004 through 2006, the average weekly turnover was 8.93%, 5.59%, 7.55% and 4.35%, respectively. Therefore, this factor weighs in

---

[10]    Because Northfield declared bankruptcy its stock is no longer traded, the chat room for Northfield has been taken down. To the extent the Court entertains any significance to the Yahoo Finance! Chat room postings, Plaintiffs request they be granted leave to subpoena the entire chatroom postings from Yahoo!.

[11]    *See Schleicher v. Wendt*, 2009 WL 761157, at * 5 (S.D. Ind. Mar. 20, 2009); *Tatz v. Nonophase Techs. Corp.*, 2003 WL 21372471, at * 7 (N.D. Ill. Jun. 13, 2003); *Greenberg v. Boettcher & Co.*, 755 F.Supp. 776, 782 (N.D. Ill. 1991).

[12]    *See*, *In re PolyMedica Corp. Secs. Litig.*, 432 F.2d 1, 4 (1st Cir. 2005); *Binder v. Gillespie,* 184 F.3d 1059, 1065 (9th Cir. 1999)*; Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir. 1992)*; Freeman v. Laventhol & Horwath,* 915 F.2d 193, 199 (6th Cir. 1990). Other district courts adopting the *Cammer* factors are too numerous to list.

[13]    *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989).

[14]    All reference to the "Gompers Report __" refer to Expert Report of Paul Gompers submitted by Defendants as Exhibit 1 to their Appendix submitted in opposition to Plaintiffs' instant motion.

favor of market efficiency. *See e.g., In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 209 (E.D. Pa. 2008) (explaining 1.7% weekly turnover weighed in favor of market efficiency creating a substantial presumption, and noting that numbers may be skewed with the inclusion of highly volatile periods but the complete exclusion of such periods calculating the average is not justified.); *see also* Hakala Reply Decl., ¶7cii.

**Factor Two--Securities Analysts**. At least six analysts published reports on Northfield during the class period.[15]   While Defendants are correct that analyst coverage began in 2004 (Def. Mem. at 27), this factor nonetheless is supportive of market efficiency.  That there may not have been analyst coverage in the earlier part of the class period is not dispositive, when considered in light of the other *Cammer* factors which demonstrate that information about the Company reached professional investors and that the Company's stock was actively traded and followed during this period.

**Factor Three--Market Makers and Arbitrageurs.**  There were over 60 market makers in Northfield stock.  *See* Rosen Opening Declaration, Ex. 5, docket no.222-6. Moreover, a significant number of shares were traded by these market makers.  For example, the top twenty market makers of Northfield stock conducted trades representing nearly 7.1 million shares of Northfield stock for the month of January, 2005.[16]   Rosen Decl., Ex. 5.  This represents a substantial portion when viewed in light of the average trading *per day* during the class period was 183,000 shares.  Hakala Decl., ¶8.  Therefore, this factor weighs in favor of market efficiency.  *See Cammer*, 711 F.Supp. at 1283 n. 30 (presence of 11 market makers supported finding of market efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003) (finding that 15-19 market makers is "significant" and "appears to support a determination of [market] efficiency.").

Additionally, there was significant institutional investor interest in Northfield stock during the class period.  As Dr. Hakala explained, during the class period approximately 24 to 68 reporting institutions held stakes in Northfield and ranged from 7% to 27%.  Hakala Decl., ¶ 8,

---

[15]   UBS AG, Harris Nesbitt, Cowen & Co., Cathay Financial, Whitaker Securities LLC, and William Blair & Company. Hakala Decl. ¶ 10 and Ex. B.
[16]   During the class period, Northfield's total outstanding shares, which ranged from 14.2 million to 26.7 million.  Hakala Decl., ¶ 7.

Ex. C.   These facts support a finding of market efficiency because reporting institutional investors search out material information about a Company, trade on the information, and disseminate information affecting the issuer. *See Tatz*, 2003 WL 21372471, at * 7 (N.D. Ill. Jun. 13, 2001) (finding an efficient market where institutional ownership ranged from 11% to 13%), *cf. Serfaty v. Intern Automated Sys., Inc.*, 180 F.R.D. 418, 423 (D. Utah 1998) (one institutional investor holding the stock weighed against an efficient market); Hakala Reply Decl., ¶7ci and 7cii.

Defendants suggest that there existed restrictions on short sales during the January and February of 2005, because of SEC Regulation SHO, rendering the market inefficient.  Def. Mem. 28, Gompers Report, ¶36.  Firstly, the ability to sell a stock short is not one of the *Cammer* factors.  Secondly, contrary to Defendants' inference that short selling was prohibited, the reality is, as Dr. Hakala explained, is that Regulation SHO "d[id] not prevent normal short selling and does not implicate the issue of an efficient market."[17]  Hakala Reply Decl., ¶7cii.  Indeed, Dr. Gompers' own Exhibit B2 his Report demonstrates that after January and February 2005 the amount of shares sold short actively fluctuated and even increased above the levels reported in January and February 2005.  Indeed, Dr. Hakala states that "the short interest in Northfield's common stock was consistently in excess of 10% of the shares outstanding throughout 2005 and the first three months of 2006." *Id.*  This actually supports market efficiency under Defendants' view because Northfield's stock even after Regulation SHO could be and was short sold, actively. *See* Gompers Report, ¶ 36 ("If there is no ability to short a stock, there is no way for arbitrageurs to correct the mispricing that may be present in a stock that is not accurately reacting to value-relevant information," and "such limits to arbitrage … contribute to market inefficiency."); *see also In re Enron Corp. Sec.*, 529 F.3d 644, 753 (S.D. Tex. 2006) (short

---

[17]   Regulation SHO was promulgated in 2004 and designed to prevent "naked" short selling and abusive trading practices.  Naked short selling occurs when an investor sells a stock the investor does not actually own and then does not borrow shares from a broker-dealer holding shares on behalf of an owner at the settlement date (three trade days after the trade was made).  The failure to borrow shares or purchase shares to deliver those shares from the seller to the buyer is called a 'failure to deliver."  A stock that is identified as having a certain amount of failure to delivers in a given time period will be monitored and restrictions on naked short selling may be imposed when some short sellers fail to cure their failure to deliver within a reasonable period of time after the settlement date.  Hakala Reply Decl., ¶7cii.

interest ranging from 1% to 11.8% of total shares outstanding during the class period was supportive or market efficiency).[18]

**Factor Four--S-3 Eligibility.** "Only corporations whose stocks are actively traded and widely followed use the S-3 form." *Harmon v. LyphoMed, Inc.*, 122 F.R.D. 522, 526 (N.D. Ill. 1988); *Cammer*, 711 F.Supp. at 1294-85 (S-3 eligibility is an "important factor"); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000) (S-3 requirement "extremely important"); *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996) ("Only corporations whose stocks are actively traded and widely followed are allowed to use the S-3 form by the SEC"). Defendants contend that Northfield was not eligible to file a Form S-3 "for portions of 2002 and 2003" because it did not meet a technical "public float" requirement (Def. Mem. 28). Defendants are plainly wrong on this point. Northfield did in fact file a Form S-3 on June 27, 2003. Nor do Defendants dispute (nor could they) that Northfield was admittedly eligible to file Forms S-3 throughout the rest of the class period. As a matter of fact, Northfield filed Forms S-3 with the SEC on May 13, 2004, December 23, 2004, and on September 1, 2006. It even filed a Form S-3 on July 20, 1999. These facts demonstrate that Northfield was continuously widely followed, actively traded, and support a finding of market efficiency.

**Factor Five—Whether there are empirical facts showing a causal relationship between important unexpected news events and stock price movements.** Generally this *Cammer* factor is satisfied through an "event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008) (citing *In re Xcelera.com*, 430 F.3d 503, 512 (1st Cir. 2005)); *see, e.g. Schleicher*, 2009 WL 761157, at * 5 (S.D. Ind. Mar. 20, 2009) (court considering event study as proof of this *Cammer* factor). If the event study shows that the stock price moves up in response to unexpected positive news or down in response to negative news, this *Cammer* factor is met.

In support of this *Cammer* factor Plaintiffs submitted the Expert Declaration of Dr. Hakala, his Reply Declaration and the event studies where he conducted analyses of material

---

[18] Prior to 2005 the short interest of Northfield's stock ranged from .82% to 20.78%. Gompers Report, Ex. B2—demonstrating an active short interest market for Northfield common stock.

public news about the Company and the impact of those news events on the Company's stock price during the class period. *See* Hakala Decl., Ex. B, B-ALT, Hakala Reply Decl., Exs. B-1 through B-4. His event studies demonstrate a strong correlation between the disclosures of unanticipated material information about Northfield's stock and movements in the stock price. *Id*. Disingenuously, Defendants challenge Dr. Hakala's event study methodology and claims it is not generally accepted, not supported by academic literature, and is not reliable. For the reasons that follow, the Court should accept Dr. Hakala's event studies as prima facie evidence of market efficiency.

### a. Dr. Hakala's Event Study Methodology Is Generally Accepted, Unbiased and Relatively Reliable Methodology

Dr. Hakala's event study methodology is often referred to as the Intervention Analysis or Event Parameter Method. Hakala Decl., ¶16. The first stage of the event study was the identification of material events. The intent of this step of the event study analysis is to control for all days when potentially material information came into the market. *Id.* The second stage of the event study involves the identification and analysis of "peer group" companies and analyzing their stock price return relative to the return of Northfield shares. The purpose of this stage of the study is to control for the movements in Northfield Laboratories' share price that can be explained by the general market movements in the share prices of other similar companies and to isolate the effect of each news event from the effect of the market generally on the share price of Northfield Laboratories. *Id.,* at ¶18. The third stage involves analyzing the candidate events (identified in stage one) in an integrated event study regression that explicitly corrects for changes in volatility during various time periods over the study period in this case. Dr. Hakala used the integrated regression, or event parameter, approach. *Id.*, at ¶19.

Contrary to Defendants' suggestion that Dr. Hakala's event study methodology is not generally accepted, biased, and unreliable (Gompers Report, ¶¶ 51-53), Dr. Hakala explains that each step of his event study methodology is "based on numerous academic citations", "has repeatedly been subject to peer review by other experts [See, for example, Exhibits F and G to this reply declaration] that have admitted that it is a generally accepted methodology" and been

subject to "rigorous testing in a working paper [attached as Ex E, thereto].  Hakala Reply Decl., ¶8.

1. **Dr. Gompers misrepresents and ignores the content of a number of academic papers cited by Dr. Hakala**

As explained in further detail in the Hakala Reply Declaration, Dr. Hakala's event study methodology is supported by numerous peer reviewed academic papers.   Dr. Hakala reply declaration explains that:

- the method by which he controlled for known company-specific potentially material events is supported by well-accepted academic papers;

- The protocol Dr. Hakala used to identify and control for company-specific news events is virtually identical to that used in the academic literature;

- Dr. Hakala's event study methodology controlled for company-specific events in similar magnitudes and utilized similar criteria as the academic literature;

- the academic literature reveals that controlling for all identified company-specific news increases the statistical power of the event study analysis (e.g. improves validity and reliability);

-  the academic literature states that controlling for all company-specific news events is a generally accepted practice in estimating the market model in event study analysis;

-  the academic literature states that controlling for all company-specific news yields a return distribution from the market model that is more normally distributed (allowing for more reliable statistical inferences) and reduces the contaminating effect of news on the estimated model;

- the academic literature establishes that company-specific news events are important and significant in affecting stock price such that they should be controlled for in analyzing stock price movements;

- the academic literature provides a list of the types of news events one should consider and control for in the analysis and which of those types of events tend to be the most significant on average in explaining stock price movements;

- the academic literature posits that one should, or at least can, identify and control for company-specific news as much as possible in estimating a market model (which is the basis for the event study analysis);

- the academic literature states that one must, as Dr. Hakala did, control for significant company-specific events in the estimation period used to estimate the market model and standard errors or else the event study analysis will "bias the significance test during the event window";

- the academic literature reveals the event study methodology employed by Dr. Hakala is statistically more reliable than Dr. Gompers'.

Hakala Reply Decl., ¶8a. Given the above support for Dr. Hakala's event study methodology, any suggestion that the protocol for selecting events in Dr. Hakala's event study is "arbitrary" or not based on peer-reviewed, published literature is false and misleading;

> 2. **Dr. Gompers' Criticism of Dr. Hakala's Protocol as Being "Arbitrary" and "Subjective" is False and Inconsistent With Statistical Literature**

Dr. Hakala's protocol for identifying and selecting company-specific events is not arbitrary and subjective. Dr. Hakala's protocol for selecting events is based on sound judgment and peer-reviewed academic literature. Hakala Reply Decl., ¶8c. Moreover that Dr. Hakala's methodology requires the use of professional judgment does not render it unreliable. On the contrary, using his judgment actually increases reliability. As Dr. Hakala explains:

> All statistical models require judgment as to the exact form of the statistical model and the variables to consider including in the analysis.25 As long as the judgments made are based on economic grounds, they are consistent with good statistical practice. As stated in Campbell, Lo and MacKinlay, The Econometrics of Financial Markets, 1997, p. 524, "These considerations may be in the form of

23

> well-articulated mathematical models of economic behavior, or behavioral models motivated by psychological phenomena, or simply heuristic rules of thumb based on judgment, intuition, and past experience….All of this suggests the need for an a priori framework of specification for the model before confronting the data. By proposing such a specification, along with the kinds of phenomena one is seeking to capture and the relevant variables to be used in the search, the chance of coming upon a spuriously successful model is reduced."

Hakala Reply Decl., ¶8ci.

Moreover, Dr. Gompers's claim that Dr. Hakala's method of selecting events is cannot be replicated is false. Def. Mem. 31-32. According to Dr. Hakala, Dr. Gompers' "implicit definition of replication is plainly wrong and would reject almost all published event studies and statistical analyses." "Replication is the repeating of an experiment to test the degree to which the originally reported results can be confirmed on repeated efforts." Hakala Reply Decl., ¶8cii. Dr. Hakala explains that a "replicate … is the outcome of an experiment or observation obtained in the course of replication." *Id.* Dr. Hakala provides the following analogy to demonstrate that his protocol for selecting events is replicable under the generally accepted definition.

> if one were to replicate a recipe to bake a cake, even slight differences in the temperatures of the ovens, elevation above sea level, and movement of air within the ovens and the exact timing of baking would result in slight differences in the outcome. Additionally, slight differences in the quality and exact composition and mix of ingredients, no matter how well measured or specified, will result in slight differences in the cakes being baked. As a result, each replicate or attempt at baking a cake will result in the differences in the amount the cake rose, the firmness of the crust, the moistness of the interior, the uniformity of the interior, and the exact taste relative to each other replicate. **Thus, a replication need only validate that the degree of error in repetition of a study or protocol does not result in a significance change in the conclusions from the original study.**
>
> *     *     *     *
>
> On the other hand, one might repeat the protocol for identifying and selecting company-specific events, searching over the exact same databases set forth in the Hakala Report, and verify that the replicate arrives at most of the same events and then test to see if the differences in the selected events are significant or change the conclusions. In that context, each replicate would likely find a few events not identified and selected in the original analyses and would fail to find a few events, out of 117 in this case, not identified in the original analysis. One might then test the differences between the overall conclusions as to the events of interest and then combine the results to see if the combination makes a significant difference in the conclusions. Professor Gompers appears to have never made this effort to

replicate the protocol. In light of the academic literature previously discussed, it is an accepted protocol to set forth a set of the types of events that could be potentially material and then search through news databases to identify news events that are consistent with the pre-specified types of events. Thus, Professor Gompers's assertion that the methodology for selecting events in not replicable is plainly false and he has no basis for asserting that the protocol is "arbitrary" or too "subjective" since he never tested it or verified those assertions.

Hakala Reply Decl., ¶8cii.

Therefore, Dr. Hakala's protocol not improperly subjective, arbitrary and is replicable.

### 3. Including Events That Were Purportedly Omitted, Did Not Change The Dr. Hakala's Conclusions

Defendants complain that certain events were missing from the event study that should have been included, in light of Dr. Hakala's protocol. Dr. Hakala explains he did not include any bulletin board postings because "the information was not either widely disseminated or found in published news reports…" *Id.* Dr. Hakala included those new events (earnings releases, and events relating to Northfield's stock issuances), and he concluded that effect of these new events on his "conclusions" are "immaterial." Reply Hakala Decl., ¶8cii, Ex. B-1. Therefore, Defendants criticisms about missing information in the Dr. Hakala's event study are without merit.

### 4. Dr. Gompers' Criticisms of The Market Industry Indices Selected for Dr. Hakala's Market Model Are Misguided and Inconsistent with Good Statistical Practice

Dr. Gompers' criticism s of Dr. Hakala's selection of indices in Dr. Hakala's event study is another red herring. As explained in detail in ¶8d of Dr. Hakala's reply declaration, his selection of market indices (i.e. use of judgment) is consistent with fundamental and reliable statistical practices. *See* Hakala Reply Decl., ¶8d.

### 5. Dr. Gompers' Assertions About the Event Study Periods were "Arbitrary" and "Failed to Account for Structural Change" are False

25

Citing paragraph 58 of the Gompers' Report, Defendants assert that Dr. Hakala's selection of the starting and end points for his event studies submitted with his opening declaration (Exs. B (March 19, 2001 to September 20, 2006) and B-Alt (August 17, 2004 to September 20, 2006) was arbitrary and somehow invalidate his event studies. Dr. Hakala explains in his Reply Declaration at ¶8e, that selecting the first day of the class period as the starting date and the ending date six months after the close of the class period is an "obvious and standard" choice. *Id.* Moreover, Dr. Hakala did account for structural change because he conducted the B-ALT analysis with his opening declaration in order to reflect the change in volatility in Northfield's stock over the period. *Id.,* at ¶8e, and ¶7civ. As explained in Dr. Hakala's Reply Declaration and contrary to Dr. Gompers' inference, this was not results driven, because Dr. Hakala conducted an event study on both the front and back ends of August 17, 2004 and Dr. Hakala concluded the market was efficient. *Id.*

### 6. Criticisms About Disaggregation of Confounding Information is Without Merit

Defendants argue that "Dr. Hakala fails to disaggregate the effect of multiple pieces of news being released on a particular day." Confounding information as Dr. Gompers describes is information unrelated to alleged fraud. APPX, Ex. 1, Gompers Depo., at 112-114. In truth, Dr. Hakala did consider whether there was confounding information contained in the partial corrective disclosures beginning in January 2006, and he applied deductive reasoning and logic to determine there was no confounding information. *See* Hakala Reply Decl., ¶5, 8g. Dr. Hakala shows through his event study, that on dates of the partial corrective disclosures, January 6, 2006, February 22, 2006, February 24, 2006, March 10, 2006, March 14, 2006 and March 20, 2006, that a partial disclosure of the alleged fraud was made and that there were statistically significant stock drops associated with these announcements. *Id.* In any event, determining whether information is confounding or corrective is not a perquisite to class certification. *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 532 (N.D. Cal. 2009) (At class certification rejecting defendants' arguments "that the stock's fall could have actually resulted from other 'negative and confounding factors'" as they are not related to commonality and predominance); *see also Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 454 (S.D. Ohio 2009) (holding that

arguments concerning whether partial corrective disclosures contained confounding information and whether confounding information caused the stock drop, was not proper for class certification).

Defendants cite the Fifth Circuit decision in *Fener v. Belo*, 579 F.3d 401 (5th Cir. 2009) in support of their proposition, however, *Fener v. Belo*, is not applicable to this case because in the Fifth Circuit a plaintiff *must* prove loss causation by a preponderance of the evidence in order to invoke the fraud-on-the-market presumption of reliance at class certification. The *Fener* decision reiterated the Court's prior holding in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007) which required proof of loss causation by a preponderance of the evidence for the fraud-on-the-market theory to apply. *Fener*, 560 F.3d at 409. What Defendants fail to mention in their papers is that *Oscar* and its progeny have been rejected by numerous Courts outside the Fifth Circuit as misreading *Basic. See, e.g., In re Red Hat, Inc. Sec. Litig.*, 261 F.R.D. 83, 93 ("This court joins those courts and declines to add another element to the plaintiff's burden of establishing the fraud-on-the-market presumption."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 184-85 (S.D.N.Y. 2008) (explaining that "proof of loss causation is not a prerequisite for certification of a class"); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D. Cal. 2009) (same); *In re Healthsouth Corp. Sec. Litig.*, 257 F.R.D. 260, 283 (N.D. Ala. 2009) ("the *Oscar* case has never been followed in the Eleventh Circuit and this court will not be the first to adopt it."); *In re Boston Scientific Cor. Sec. Litig.*, 604 F.Supp.2d 275, 287-87 (D. Mass. 2009) (same); *In re Nature's Sunshine Products, Inc. Sec. Litig.*, 251 F.R.D. 656, 666 (D. Utah 2008) (same); *Ross v. Abercrombie & Fitch Co.*, 2008 WL 4059873, at * 3 (S.D. Ohio Aug. 26, 2008). Defendants also cite *In re Omnicom*, 541 F.Supp. 2d 546, 554 (S.D.N.Y. 2008), however the issue there was loss causation and it was at summary judgment. Simply, the cases cited by Defendants in this regard are not applicable. *See, Loeb Indus., Inc.*, 306 F.3d at 480 (7th Cir. 2002) ("a court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits."). In any event, Dr. Hakala testified at his deposition that he would conduct a more expansive event study in order to prove loss causation at the time the case entered the merits phase. Ex., 41, docket no. 280-13, Hakala Depo, at 8-10.

Additionally, Dr. Gompers argues that the methodology Dr. Hakala employed in this case was the same as the one he employed that had been rejected in *In re Xcelera.com Sec. Litig.,* 2008 WL 7084626 (D. Mass. Apr. 25, 2008). This is simply not the case. The *Xcelera.com* decision was at the damages stage of the case, and not class certification. Hakala Reply Decl., ¶8f. More than four years before, on class certification, the district court certified the class and the certification decision was upheld on appeal by the First Circuit. *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 50, 518 (1st Cir. 2005). Dr. Hakala explains that concern in *Xcelera.com* was the fact that he "relied heavily on Yahoo! bulletin board posting by investors to identify news events, the timing of news events, and to understand the reasons for certain intraday and daily stock price movements. The court held that anonymous bulletin board postings were not sufficiently reliable and that I could not include 'all' company-specific news, regardless of its significance in the event study." Hakala Reply Decl., ¶8f. Dr. Hakala also notes, that the decision is contrary to the academic literature and "also reflects the relative lack of published news reports on Xcelera.com and my heavy reliance on bulletin board postings by investors regarding Xcelera.com in order to explain stock price movements in a manner unique to that case and not at all applicable to this case." *Id.*. Ironically, in this case Professor Gompers cited to bulletin board postings by investors as a source of "public" news While Dr. Hakala did not rely on bulletin board postings as a source of identifying news events.

These two isolated cases were addressing loss causation, and utilized different facts and different methods and have no bearing on whether his event study methodology is reliable or generally accepted in this particular case addressing market efficiency. One can examine the cases in which Dr. Gompers has opined on market efficiency and use those results to reject his opinions in this case.

First, Dr. Gompers has never provided an expert declaration or testimony in which he claimed that a market for a publicly traded stock *was efficient. See* APPX, Ex. 1, Gompers Depo., at 20-21. Perhaps Gompers doesn't believe markets are efficient or he simply takes a partisan stance as a defense expert. Second, as Dr. Hakala points out, Dr. Gompers has previously provided similar opinions criticizing Dr. Hakala's event study methodology in several cases and the Courts have disregarded Gompers' criticisms and accepted Dr. Hakala's opinions

and certified a class. Hakala Reply Decl., ¶8f. In these and in other cases, Dr. Gompers opined the market for a company's stock was not efficient, yet the Court certified the class.[19] So under Defendants' rationale, Dr. Hakala's event study methodology should must be accepted.

**B. Dr. Gompers' Analyses Are Incomplete, Biased and Either Support a Finding of Market Efficiency or Fail to Refute Market Efficiency**

Notwithstanding the fact that Dr. Hakala has performed a proper event study and adequately demonstrated market efficiency in this matter, the competing analyses conducted by

---

[19] **Cases in which Dr. Gompers' opines of an inefficient market, yet court certifies class.** *See In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *15 (E.D.N.Y. Mar. 30, 2004) (Dr. Gompers opined that market was inefficient, notably there defendants argued there were too many institutional holders of the Company's stock, very little short interest, nonetheless, Court certified class); *In re Nortel Networks Sec. Litig.*, 2003 WL 22077464, at * 2 (S.D.N.Y. Sept. 8, 2003) (Dr. Gompers opined on market inefficiency and the class was certified); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 2004 U.S. Dist. 28008 (N.D. Cal. May 27, 2004) (Dr. Gompers considering each *Cammer* factor and then opining that the market for Cisco shares was inefficient, and court certifying class).

**Cases where Dr. Hakala opines there is an efficient market and the court certifies class.** *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *9-*10 (S.D.N.Y. Aug. 21, 2008) (in a case where Dr. Gompers repeats many of the arguments made here, and where Dr. Hakala opined the market was efficient and a class was certified); *In re Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112 (S.D.N.Y. 2008) (class certified with Dr. Hakala's event study methodology); *In re Xcelera.Com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) (district decision certifying class utilizing Dr. Hakala's event study affirmed); *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 2009 WL 4281256, at * 3 (N.D. Ga. Nov. 24, 2009) (denying Daubert motion seeking to exclude Dr. Hakala's opinions on loss causation and damages); *In re Herley Indus., Inc. Sec. Litig.*, 2009 WL 316988, at * 14 (E.D. Pa. Sept. 30, 2009) (certifying class where Dr. Hakala had opined on market efficiency); *Amgen*, 2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) (same); *In re Nature's Sunshine Products, Inc. Sec. Litig.*, 251 F.R.D. 656 (D. Utah 2008) (certifying class where Dr. Hakala had opined on market efficiency); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168 (S.D.N.Y. 2008) (certifying class where Dr. Hakala opined on market efficiency and where his methodology was challenged); *In re Direct General Corp.*, 2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) (certifying class where Dr. Hakala opined on market efficiency); *see also Shirk v. Fifth Third Bancorp*, 2009 WL 692124 (S.D. Ohio Jan. 29, 2009) (denying motion to exclude Dr. Hakala on the grounds that his opinion is unreliable because of his "selection of a benchmark index and a hypothetical alternative investment" and "his event study methodology is flawed and unreliable.")

Dr. Gompers is incomplete, biased, and fails to refute Dr. Hakala's findings and/or supports a finding of market efficiency for the following reasons.

### a. Dr. Gompers Uses an Improperly Restrictive Definition of Market Efficiency And Loss Causation

Dr. Gompers has "confused" the efficient market hypothesis used as a basis for certain concepts in economics and finance with the concept of market efficiency currently understood by economic experts to be required for reliance in matters such as this. Hakala Reply Decl., ¶ 7ai. "Professor Gompers fails to recognize and understand the important, and now widely recognized, distinction between **informational efficiency** (which only requires that the market react in a reasonable period of time to publicly disseminated information) and **fundamental efficiency** (the market not only reacts to information but always correctly evaluates that information)." *Id.*

Dr. Hakala observes that by failing to recognize that all that is required for market efficiency is an informationally efficient market, Dr. Gompers forecloses the possibility that there can ever be leakage of the truth or even a partial corrective disclosure in an efficient market. Dr. Hakala explains that:

> Professor Gompers's opinions on market efficiency (and loss causation) in this case (as well in prior cases such as in *In re Williams Companies Securities Litigation; Gammon Gold, and Parmalat*) **assume that if any information existed in any place (even if not widely disseminated and not disclosed in a press release or securities filing) and revealed something relevant to the alleged truth, then the market should have reacted immediately as though it knew and understood the entire "relevant truth" even if the defendants continued to deny and conceal most or all of the "relevant truth." Under this construct, the existence of leakage of information over time and partial, but incomplete disclosures, is not acknowledged in his framework as being possible or consistent with an efficient market. Furthermore, Professor Gompers fails to recognize that the materialization of risks associated with the disclosures of new information related to the "relevant truth" can lead to additional statistically significant losses to investors and be consistent with market efficiency. In this, Professor Gompers confuses the semi-strong with the strong forms [fundamental efficiency] of market efficiency repeatedly in both his expert report and in his deposition.**

Hakala Reply Decl., ¶7aii.

Dr. Hakala further explains:

> This concept of leakage and the ability of certain parties to trade on inside information are recognized to exist in an efficient market in the semi-strong form. By contrast, the **strong form of market efficiency requires that all information, including private and semi-private information, will be reflected in the current price of the security**. Most economists reject the strong form of market efficiency but accept the semi-strong form of market efficiency as generally descriptive of the frequent trading of registered common stock in markets in the United States, but reject the strong form of market efficiency. **Indeed, the presence of partial disclosures and leakage of information is widely acceptable to be consistent with an efficient market in the semi-strong form context.**

*Id.*

It is not surprising that Courts have adopted positions and expressed views consistent with Dr. Hakala's definition of market efficiency. The First Circuit in *In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) affirmed a district court's grant of class certification in which Dr. Hakala had opined on market efficiency. Moreover, the *Xcelera* court reiterated that the all that is required for market efficiency is informational efficiency and not fundamental efficiency. *Id.*, at 510.

Moreover, the notion that information that has not entered the market, i.e. not "widely known" or private or semi-private information must be reflected in a Company's stock price, which underlies Dr. Gompers' opinions, is also not supported by the case authorities in fraud-on-the-market cases. *See West*, 282 F.3d at 937 (7th Cir. 2002) (rejecting argument that it was "unimportant" that the information was not disseminated through an "organ of general circulation" in assessing fraud on the market theory); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 200 n. 4 (2d Cir. 2008) (explaining that the *Basic* theory is "premised on the existence of an informationally efficient market, in which 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock prices.'") (quoting *Basic*, 485 U.S. at 246 n. 24)).

Dr. Gompers' definition of market efficiency is also completely inconsistent with case authorities cited above concerning the truth on the market defense, which requires the corrective "information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged

misstatements." *Ganino*, 228 F.3d at 167 (quoting *Apple Computer*, 886 F.2d at 1116); *see also Basic*, 485 U.S. at 249 (the truth must "credibly enter[] the market and disspiate[] the effects of the misstatements"); *Associated Randall Bank*, 3 F.3d at 213 ("But once the truth was out, known to sophisticated traders, the price of the securities would have reflected all risks.").

Nor is it consistent with the case authorities on loss causation or partial corrective disclosures. *See Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 231 (5th Cir. 2009) (per curiam) (explaining that if a "complete" disclosure of the fraud were required, defendants could immunize themselves through a series of partial disclosures) (Sandra Day O'Connor (ret.) sitting by designation); *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 510 (S.D.N.Y. 2005); *In re Take-Two Integrative Sec. Litig.*, 551 F.Supp.2d 247 (S.D.N.Y. 2008); *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 47 & n. 9 (D.D.C. 2006) (*Dura* does not require "proof of a complete, corrective disclosure"; and collecting cases observing the lack of such a requirement)).

Accordingly, the Court should disregard Dr. Gompers' criticisms of Dr. Hakala's event study because Gompers' position is contrary to the vast majority of academic literature and legal precedent.

### b. Dr. Gompers Performed Biased and Unreliable Statistical Analyses

#### 1. Dr. Gompers failed to Consider Changes In Statistical Methods That Arise from A Multi-Company Event Study and A Single Company Event Study.

Dr. Hakala explains that "statistical methods that might be reasonably acceptable or reliable in a large multi-company event study analysis, where one is studying the same types of events across a large sample of firms, are often not acceptable in single-company event study analyses." Hakala Decl., ¶7b. Dr. Hakala adds that "[t]he multi-company event study methodology Professor Gompers recommends and employs in Exhibits D and E of the Gompers Report lacks "power" (tends to fail to find statistical significance when it should be found), and is biased when applied in the single-company event study framework." *Id.* In light of this error by Dr. Gompers, Dr. Hakala observed that "the failure of Professor Gompers both in his expert report and in his deposition, to recognize that there is a substantial difference between multi-company event studies typically published in the academic literature and single company event

studies reveals his relative inexperience and lack of familiarity with advanced time-series statistical analysis." *Id.,* at ¶7bi, *see also* Gompers' Report, Appendix A, Docket no.280-2.

## 2. Dr. Gompers Statistical Analyses in His Report Are Not Approximately Normally Distributed Because He Fails to Control For Known Company-Specific Events, As Is Required For Reliable Statistical Inferences

Dr. Hakala states that "it is well-recognized and widely understood in the academic literature that the existence of company-specific events that cause significant stock price movements generally cause the statistical analyses and event study results to fail to be normally distributed, as is required for proper statistical inferences, and can substantially bias the results." Hakala Reply Decl., ¶7bii. Yet Dr. Gompers' statistical analyses did not control for known company-specific events and Dr. Gompers' statistical analyses was not normally distributed. *Id.* Therefore indicating, that Dr. Gompers' study results were unreliable and biased. *Id.*

## 3. The Market And Industry Indices Dr. Gompers Utilizes Are Incomplete and Less Reliable Than Dr. Hakala's

Dr. Gompers in his analyses uses indices that are broader than, and thus less reliable than the indices selected by Dr. Hakala. According to Dr. Hakala, "it is a basic statistical principle that that more refined and appropriate a selected set of indices is in explaining the stock price movements the more reliable the analyses and conclusions." Hakala Reply Decl., ¶7biii. "For that reason, a number of academic sources recommend and accept that the initially hypothesized model and selected indices may not be the best or optimal and allow for testing and refinement, as long as the choices have sound statistical and economic bases, to improve the choice of indices selected." *Id.*

Because of the above-mentioned deficiencies in Gompers' statistical analyses, his results are not reliable indicators as to whether the market for Northfield stock is efficient. Hakala Reply Decl., ¶7biv.

c. **Dr. Gompers Fails To Provide Reliable Evidence that the Market For the Common Stock of Northfield was Inefficient, And Much of His Data Actually Supports a Finding of Market Efficiency[20]**

1. **Dr. Gompers' Anecdotal References to the Intraday stock price movements of Northfield's common shares on eight selected windows of time of one to three days each, as illustrated in Exhibit F of the Gompers Report, Prove Nothing**

Dr. Hakala explains that Dr. Gompers' limited analysis of eight selected windows of time of one of one to three days each, in the Gompers' Report is proof of nothing "because they are not a comprehensive analysis over the entire proposed class period, incomplete in that they are not measured against a reliable reference point (such as market and industry stock price movements), assume one can know all of the information and exact timing of information becoming publicly available or leaking into the public market over time, and actually are consistent with market efficiency when properly and comprehensively analyzed." Hakala Reply Decl., ¶7cv. Moreover, Dr. Hakala observes from Exhibits F1 to F8 of the Gompers Reports that in actuality the stock price stock price "movements consistent with an efficient market … ." *Id.*

In short, Dr. Hakala explains that Dr. Gompers' limited approach "[l]ooking at intraday stock price movements over one to three days against one or a few identified moments when news reports were identified to attempt to determine market efficiency is not much more reliable than one reading tea leaves to predict whether a given stock price will rise or fall tomorrow. It is subject to a well-known "hindsight" bias in that what might appear to be predictable in hindsight might not have been at all systematically predictable in advance." *Id.*.

**C. The Alleged Misrepresentations and Omissions are Material**

Materiality in a securities fraud case exists where "there is a substantial likelihood that disclosure of that information would have been viewed by the reasonable investor to have

---

[20] Dr. Hakala notes other parts of Dr. Gompers' report that actually support a fining a market efficiency, those opinions are cited in Plaintiffs' analysis of the *Cammer* factors above and other interrelated opinions previously mentioned. *See gen.* Hakala Reply Decl., ¶7.

significantly altered the total mix of information." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (citing *Basic*, 485 U.S. at 231-32)). "The ultimate issue of materiality [is] appropriately resolved 'as a matter of law" only where the omissions and misstatements are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). "Not surprisingly, this determination is highly fact-dependent analysis." *Id.*; *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) ("a materiality determination is rarely appropriate at the summary judgment stage…").

Here there is no question that the adverse information about Polyheme in the ANH trial was material. Indeed, the Court has determined that Defendants' misstatements and omissions are material. Defendants do not contest that those statements were made. Therefore for the same reasons that Court found the misstatements and omissions were material in the Court's orders on the motions to dismiss, there should be no question as to materiality of the alleged misstatements and omissions. *See, e.g., Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178-79 (9th Cir. 2009) (even where the adverse events were *not* statistically significant, information was material); *In re Pfizer, Inc. Sec. Litig.*, 584 F.Supp.2d 621, 635-36 (S.D.N.Y. 2008) (same); *Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 40-42 (2d Cir. 2000) (is statistically significant adverse events, material). Any further searching inquiry of materiality is inappropriate at the stage and is not necessary for class certification, *Szabo*, 249 F.3d at 675, for class certification— especially here where Plaintiffs have not been permitted to conduct any merits discovery. *Makor Issues & Rights*, 256 F.R.D. at 595 ("neither *Szabo* nor more recent precedent permits the Court to decisively consider the merits and thus remove from the parties the benefit of summary judgment and trial."); *Young*, 2007 WL 1238920, at * 4 (holding that it would be "unjust" for a party to argue a merits-based point on class certification, when discovery was bifurcated on class and merits issues).

Defendants contend that the alleged misstatements and omissions are not material because Plaintiffs have failed to prove Northfield's stock price reacted when the alleged misrepresentations were made or when the truth was revealed. Defendants misread and mischaracterize the law.

First, there is no requirement that a plaintiff must demonstrate price impact of the alleged misleading statement or omission at the time it is made or when the truth is revealed, in order to enjoy the fraud-on-the-market presumption. Indeed, this is confirmed by the two cases cited by Defendants in support their erroneous proposition. As explained by the Second Circuit in *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 482-83 (2d Cir. 2008), *Basic* was a two part-opinion, first addressing the definition of materiality under Rule 10b-5 and in the second part adopting the fraud on the market presumption of reliance. In explaining the definition of materiality, the Supreme Court focused the inquiry in the objective perspective of a reasonable investor, "rather than in terms of actual impact on market price." *Id.*, at 482. The Second Circuit, quoting *Basic*, held that:

> Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if material information had been disclosed, or if the misrepresentation had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.

*Id.*, at 482 (quoting *Basic*, at 245).

In fact, the *Salomon* court explicitly states that "plaintiffs do not bear the burden of showing impact on price" in order to establish the fraud on the market presumption of reliance. The *Salomon* court went on to reiterate that under *Basic*, it is defendants' burden to demonstrate no price impact. *Id.* at 483.

Second, Defendants conflate the materiality and loss causation requirements under Rule 10b-5. Indeed, Dr. Gompers' deposition testimony reveals that he essentially conducted the same analysis for materiality and loss causation. Gompers Report ¶126. However, as noted above, no Court outside the Fifth Circuit has held that proof of loss causation is required to establish the fraud-on-the-market presumption of reliance. And for the reasons set forth above the Court should not make new law and be the first court in this Circuit to follow the Fifth Circuit and create a loss causation requirement for the fraud-on-the-market presumption of reliance.

Third, Defendants argue that the alleged misstatements and omissions were not material because the alleged corrective information, i.e. the "truth" of the alleged misrepresentations and omissions were disclosed in 2005 and not through Plaintiffs' alleged partial corrective

disclosures beginning on January 6, 2006. Firstly, whether a particular disclosure is partially corrective, fully corrective or contains new information is an intensive fact issue best suited for trial, not for class certification.[21] Secondly, Defendants' analysis mischaracterizes the partial corrective disclosures and is illogical.

### a. January 6, 2006 UBS Report

The January 6 UBS, issued by Patrick Pace, M.D., downgraded the Company's stock by 15%. Defendants do not dispute this and Dr. Gompers even admits that stock drop on this day was statistically significant. Gompers Report ¶ 131. Defendants argue that the downgrade was not based on the ANH trial, and so "there were no corrective disclosures in the January 6, UBS report about anything connected with the ANH Trial, the report does not have any relevance to whether the misstatements alleged in the complaint are material." Def. Mem. 43-44. This argument is without merit and appears to be a loss causation argument in disguise. While Plaintiffs are not required to prove loss causation, the record shows that the downgrade was a materialization of a concealed risk: the risk that Polyheme was unsafe, albeit based on an incomplete disclosure. It is clear from Dr. Pace's deposition testimony, that the cause of the downgrade was his learning of one of the "truth" disclosures ("serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group") immediately before he wrote the report. Dr. Pace testified this information caused him to downgrade the Company's stock and issue the report. Indeed, he testified that between the time of the issuance of the January 6, 2006 analyst report and his subsequent January 10, 2006 analyst report, he did not learn of any new information. Therefore, the facts demonstrate that Dr. Pace learned of the undisclosed risk, ("serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group"), which in turn caused him to issue the report downgrading the stock; which in turn caused the stock price to drop. Under these circumstances, Defendants have not proven the lack of loss causation with respect to the January 6, 2006 announcement. . *See Lentell v. Merrill Lynch, &*

---

[21]  *See In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 110 (D. Conn. 2005) ("Moreover, questions of whether the information was disseminated and available prior to the secondary offering, and what weight to give to that information, are factual questions that go to the merits of the plaintiffs' claims, and therefore are inappropriate to address at this stage of the proceedings."); *see also Worley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003).

*Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (loss causation can be satisfied "both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk."); *see also Caremark, Inc. v. Coram Healthcare, Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) (applying a lower standard and explaining that loss causation as nothing more than the standard common law fraud rule"); *E.g.,* Hakala Reply Decl., ¶¶5-6.

### b. February 22, 2006 Wall Street Journal Article

Defendants also cite to Dr. Gompers' opinion that "nearly all of the information about Polyheme and the ANH trials in the WSJ article had been previously disclosed throughout 2005 and early 2006", i.e. ("serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group").

Dr. Gompers' views regarding WSJ article demonstrates his unreasonable partisan views in this case. For example the February 22, 2006 WSJ journal article discloses for the first time, the actual number of patients that suffered heart attacks and disclosed for first time that patients died, ("Ten of 81 patients who received the fake blood suffered a heart attack within seven days and two of those died."), the article also revealed for the first time that patients who did not receive Polyheme suffered no heart attacks ("None of the 71 patients in the trial who received real blood were found to have had a heart attack."). The WSJ journal article also for the first time revealed that the serious adverse events were conclusively "statistically significant." ("The higher rate of heart attacks and serious events [heart rhythm aberrations and pneumonia] was considered statistically significant.").

According to Dr. Gompers' "observations" he believed that the WSJ article conveyed the same information as the purported truth disclosures in the January 10, 2006 UBS analyst report ("serious cardiovascular adverse experiences occurred more frequently in the PolyHeme group"). When confronted, Dr. Gompers testified that since the purported truth disclosure on January 10th was the "results" of the ANH trial and that because the WSJ article provided additional more particularized results, the disclosures were the same. Gompers' opinion is illogical. Disclosure that the PolyHeme group has more frequent heart attacks without providing any baseline for comparison provides almost no information from which an investor can determine whether the

disclosure is positive news or negative news. The January 6 UBS analyst report downgraded Northfield stock based on Dr. Pace's belief that "a potential safety risk in patients who are generally more frail could limit Polyheme's use." Ex. 38. The January 6 report referred to a U.S. Army study on rats as a basis for the downgrade. Only in the January 10th report did Dr. Pace explain that that January 6 downgrade was based on "cardiac events in the previous elective surgery trial". Ex. 42, docket no. 280-13. The UBS reports did not provide any more details than this scant reference to cardiac events. Only upon publication of the WSJ article could investors really understand the significance of the heart attacks in the PolyHeme group.

The purported truth disclosures prior to the WSJ article were themselves misleading, as they indicate that that there may have been heart attacks in the group not receiving Polyheme, by stating serious cardiovascular adverse experiences occurred *more frequently* in the Polyheme group. Moreover, the prior truth disclosures continued to tout that safety and efficacy of Polyheme. Indeed, the WSJ article itself points out that the Lehigh Valley Hospital materials for local meetings said "Past studies have shown that PolyHeme… has not caused organ damage." The article also notes that a Brooke Army Medical Center disclosure stated that "In clinical trials to date, Polyheme has demonstrated no clinically relevant adverse effects. Up to now, Polyheme has not caused any clinically bad problems." Notably, Defendants have not submitted those materials in support of their truth on the market defense, and it would certainly weigh against finding that such information credibly entered the market and dissipated the misstatements and omissions.

c. **February 24, 2006 WSJ Article**

As with the February 22, 2006, Defendants claim that because the truth was on the market in 2005 through the purported truth disclosures discussed above, the price impact of the February 24, 2006, is not attributable to the alleged misstatements and omissions, and thus the allege misstatements and omissions are immaterial.

Defendants do not contest that the announcement of Sen. Grassley's investigation was old news rather they claim, through Dr. Gompers, that the Senator's Grassley's investigation was unrelated or confounding to the Northfield's alleged misstatements or omissions.

39

Despite Dr. Gompers' best efforts to "bob and weave" around the truth at deposition (*See* APPX, Gompers Depo., at 138-143), the plain language of the article demonstrate that Senator Grassley's investigation was caused by Northfield's failure to disclose the serious cardiovascular adverse events in the ANH trial. ("Sen. Grassley focused both on whether patients in the [trauma trial] were made aware of all adverse events with the product, and whether it was appropriate to conduct such a trial without the consent of patients."). Indeed, it was confirmed in the WSJ's March 10, 2006 article. ("Sen. Grassley is investigating whether patients in the new study are aware of the previous study's deaths and heart attacks, and whether it is appropriate to conduct the new study without patient's consent."). Clearly, the Grassley investigation and consequent stock drop was the materialization or proximate result of the undisclosed risk. *See In re Take-Two Integrative Sec. Litig.*, 551 F.Supp.2s 247, 286-87 (S.D.N.Y. 2008) (the court found that a single notice that the SEC was conducting an informal, non-public investigation into certain stock options grants, coupled with a 7.5% stock price drop the next day, created a sufficient causal connection to plead loss causation.).

### d. **March 10, 2006 WSJ Article.**

Defendants similarly claim the March 10, 2006 WSJ article contained old information because the truth was already known and that the investigation by Sen. Grassley is unrelated to the undisclosed facts about ANH trial. The article reveals the new fact that the federal Office for Human Research Protections ("OHRP")—the agency that monitors research practices—was now involved and expressed "urgent ethical concerns" to the FDA and that the OHRP was meeting with the FDA that day. Dr. Gompers admitted that the disclosure was new information, but he refused to acknowledge it was related to the concealed facts concerning the ANH Trial. *See* APPX, Ex. 1, Gompers Depo, at 144-145. Contrary to Dr. Gompers' assessment of these facts, the OHRP inquiry was again the materialization or proximate result of the undisclosed risk.

### e. **March 14, 2006 WSJ/Bloomberg Articles**

Defendants repeat their prior arguments about information in the press release not being new. The articles however provide additional information about the investigators' findings and demonstrate the increasing scrutiny that Northfield was under as a result of its concealing the

negative results of the ANH Trial. Sen. Grassley's revised position that the study was in fact "unethical." The article reveals that two hospitals that were involved in the Trauma Trial "have suspended their participation in the study" as well. Therefore, this announcement is also a materialization of the undisclosed risk.

### f. There is no Confounding Information in the Foregoing Announcements

Simply, there is no confounding information any of the foregoing articles. As demonstrated above, each of the articles contain new additional information related to the ANH trial. *See also* Hakala Reply Decl., ¶¶5, 8g.

### g. FDA Approval of Trauma Trial

Defendants continue to rehash arguments that were properly rejected by the Court on its orders on the motions to dismiss. As set forth above, at this stage of the case, Plaintiffs have adequately demonstrated materiality because the misstatements and omissions about the ANH trial would be viewed by a reasonable investor to alter the total mix of information available. These merits based issue with an intensive fact question that will be addressed in later stages in the litigation at summary judgment and/or trial at which time Plaintiffs would have had the full benefit of merits discovery. In any event, the FDA's approval of Polyheme in the trauma trial does not render information about the ANH trial immaterial. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 584 F.Supp.2d 621, 637 (S.D.N.Y. 2008) ("the FDA is not the arbiter of materiality for the purposes of the securities laws. Rather, an alleged omission is material if there is a substantial likelihood that the disclosure of the omitted fact would be viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

### h. Plaintiffs Need Not Prove that the Misrepresentations Were "Understood" in a Uniform Manner

Defendants argue that "there can be no predominance of common issues when the central issue of whether there has been a non-disclosure of the truth varies from class member to class member" because "the information that plaintiffs contend was fraudulently concealed in fact was disclosed…" Def. Mem. 48. This is merely a restatement of Defendants' truth-on-the-market

argument discussed above, and should be rejected for the same reasons. The idea that these are individual issues is wrong.

Questions surrounding whether the purported truth disclosures in hospital websites and community meetings revealed the alleged fraud and whether the purported truth credibly entered the market and was well known (i.e., "understood"), and whether it dissipated the effects of the alleged misstatements is not an individual issue but by definition a common class-wide issue, which defendants have the burden of proving. *See, e.g., In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 110 (D. Conn. 2005) (certifying class and that defendants truth on the market defense "that the information which the plaintiffs' claim was missing from the prospectus was made publicly known prior to that date" was a class-wide issue and not an individual issue, and the predominance requirement was met); *see, also Lawrence E. Jaffe Pension Plan v. Household Intern., Inc.*, 2006 WL 332917, at * 2 (N.D. Ill. Nov. 13, 2006) ("The truth on the market defense turns on the representations made to the marketplace as a whole, and not to any individual plaintiff.") (citing *In re Vivendi Universal, S.A.*, 2004 WL 876050, at * 5 (S.D.N.Y. Apr. 22, 2004) ("[T]he truth on the market defense has nothing to do with plaintiffs' individual claims, which turn on the representation made to them, not to the marketplace.")); *see also Asher*, 377 F.3d at 732 ("[I]f the truth or the nature of a business risk is widely known, an incorrect statement can have no deleterious effect.").

### i. Common Issues Regarding Loss Causation Predominate

Defendants argue that "[c]ommon issues also do not predominate because plaintiffs cannot show that the 'fact' of injury exists throughout the class—namely, that every class member actually suffered loss because of defendants' misrepresentations." Def. Mem. at 51. Defendants claim this is so because of the "disclosure of heart attack information to class members long before January 2006." Def. Mem. 54. This argument is puzzling. Essentially the argument goes because the alleged truth was in the market in 2005 (a class-wide defense), there will be individual questions regarding loss causation. However, Defendants have failed to meet their heavy burden in establishing the truth was in the market. Even if the disclosures in 2005 could be viewed as disclosing some material aspect of the alleged fraud (it did not), individual questions about loss causation and damages will not predominate and preclude class

certification. *See, e.g., Schleicher v. Wendt*, 2009 WL 761157, at *12-*13 (S.D. Ind. Mar. 20, 2009) (rejecting argument that individual questions of loss causation and damage defeat predominance requirement even where loss causation determinations "will be difficult because of the intervening negative disclosures that the [Company] did make" and individual damage determinations will be "complex"); *In re Tyco International, Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006) (certifying class and rejecting arguments that loss causation would cause insuperable problems of class-wide proof because of differences as to when class members bought and sold stock during a period when partial corrective disclosures were issued); *In re Scientific Atlanta Sec. Litig.*, 571 F.Supp.2d 1315, 1342 (N.D. Ga. 2007) (individualized damages determinations or assessments do not preclude class certification) (collecting cases); *See also In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 29 (D. Mass. 2008) ("Once the [fraud on the market] presumption attaches, all other questions of loss causation are common to the class.").

Lastly, when the case proceeds to the merits, Plaintiffs will prove loss causation through a more detailed event study as Dr. Hakala described in his deposition. Ex., 41, docket no. 280-13, Hakala Depo, at 8-10. This demonstrates that loss causation is subject to proof common to all Class members. The issue of loss causation is a common question that predominates. *See Fograzzo v. Lehman Bros.*, 263 F.R.D. 90, 109 (S.D.N.Y. 2009) (rejecting predominance challenge that expert failed to isolate confounding factors in order to explain price impact of alleged misstatements and omissions, because "successful employment of a methodology and demonstration that the analyst reports did indeed cause plaintiffs' loss is unnecessary at the class certification stage. Plaintiffs need only prove by the preponderance of the evidence that loss causation can be proven on a class-wide basis [i.e., an event study].")*; Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) ("the relevant question is only whether Plaintiff's expert's methodology will apply to the entire class"); *In re Alstom SA Sec. Litig.*, 235 F.R.D. 266, 281 (S.D.N.Y. 2008) (not requiring even a methodology, and explaining that "[a]t the class certification stage, plaintiffs need only establish that they may be able to [ ] prove loss causation at trial.").

## IV.  NAMED PLAINTIFFS ARE ADEQUATE AND TYPICAL

### A. The Timing Of Plaintiffs' Purchases During the Class Period Do Not Create Unique Defenses

A unique defense becomes disabling only when "a major focus of the litigation will be on an arguable defense unique to the named plaintiff." *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir. 1974). Stated differently, a plaintiff is not a proper class representative "only when a unique defense will consume the merits of the case." *Gaspar v. Linvatec*, 167 F.R.D. 51, 58 (N.D. Ill. 1996) (quotation marks and citations omitted).

Defendants argue that the named plaintiffs, who purchased their shares beginning in 2004, are subject to the purported "unique defense" because: (a) the market knew as of August 2002 that an additional clinical trial was required for FDA approval of Polyheme for elective surgery uses—albeit the Company providing a false reasons for shutting down the ANH trial; (b) in March 2003 FDA approved the trauma trial; and (c) in December 2003 hospitals began participating in the trauma trial.

Preliminarily, it appears that Defendants are yet again arguing materiality and none of these alleged disclosures impugn the materiality of the alleged misstatements and omissions. "[T]he FDA is not the arbiter of materiality of the purposes of the securities laws." *Pfizer*, 584 F.Supp.2d at 637. Moreover, [d]isclosure to the FDA to the FDA does not by itself provide a safe harbor under the securities laws." *Id.* In any event, Defendants' arguments are without merit. These are all class-wide issues common to all class members as discussed below.

First, none of these purported "defenses" are *unique* to named plaintiffs, and thus fails. This challenge to materiality will be made to all class members who purchased after the 2002 and 2003 disclosures. Therefore, the purported defenses are not unique to the named plaintiffs rather this merits-based argument is applicable to nearly half of the class period (March 19, 2001 through March 20, 2006).

Second, as a general proposition, that Plaintiffs began purchasing their stock in 2004 and 2005 is irrelevant to the named Plaintiffs' typicality or adequacy. Plaintiffs have alleged a common course of conduct by the Defendants through inter-related material misstatements and omissions about Polyheme's safety and effectiveness in elective surgery applications during the

44

class period in Northfield's press releases, SEC filings and other public announcements which caused shareholders who purchased during the class period damage. Therefore, whether there *may be* varying degrees of materiality during the class period does not defeat typicality. "This argument has been repeatedly rejected in fraud-on-the-market cases since the decision in *Basic.*" *Feldman v. Motorola*, 1993 WL 497228, at * 6 (N.D. Ill. Oct. 14, 1993) (collecting cases); *see also Nicholas v. Poughkipsie Savings Bank/FSB*, 1990 WL 145154, at * 5-* 6 (S.D.N.Y. Sept. 27, 1990) ("Whether plaintiff and other class members bought early in the Class Period or late, they are all alleged to have been injured by the inter-related misstatements and omissions.... [D]efendants' argument implies that only someone who bought on the last day of a Class Period would be able to bring an action.... Such arguments have been made and rejected by other courts.").

Defendants citation to *J.H. Cohn*, 682 F.2d 994, 998 (7th Cir. 1980) is off the mark as it did not involve the typicality or adequacy requirements of Rule 23. *J.H. Cohn,* involved a denial of a writ of mandamus and answered the question "whether the district court's decision to deny class certification constituted an extreme abuse of discretion to warrant the remedy of mandamus." *In re VMS Sec. Litig.*, 136 F.R.D. 466, 475 n. 2 (N.D. Ill. 1991). *J.H. Cohn* is also factually distinguishable as it was not a fraud-on-the-market case, and involved oral misstatements to plaintiffs, which is not the case here. *Id.*, at 995-96. Indeed, numerous courts have refused apply *JH Cohn* in assessing a class certification motion. *See Ziemack v. Centel, Corp.*, 163 F.R.D. 530, 534-35 (N.D. Ill. 1995) (rejecting to apply *JH Cohn* at class certification) (citing; *In re Bally Mfg. Sec. Litig.*, 141 F.R.D. 262, 267 (N.D. Ill. 1992) (reasoning in *JH Cohn* is "questionable at best."); *Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 526 n. 2 (N.D. Ill. 1988); *In re VMS Sec. Litig.*, 136 F.R.D. 466, 475 n. 2 (N.D. Ill. 1991)).

Lastly, Defendants citation to *Robinson v. Penn Central,* 58 F.R.D. 436, 443 (S.D.N.Y. 1973) does not defeat typicality or adequacy. Other than the parenthetical cited by Defendants, Defendants do not directly argue that there exist intraclass conflicts between earlier and later purchasers of Northfield. In any event, Defendants' apparent suggestion of conflict between earlier purchasers and later purchasers is a "conflict," is one that exist in every securities class action that has a class period greater than one day. Under Defendants' reasoning, to have a

proper class representative, the class representative would have purchased shares on each day of the class period and would have been required to purchase those shares for same amount of money on each day. It is not surprising that such "conflicts" are rejected by Courts. *See In re Tyson Foods, Inc.*, 2003 WL 22316548, * 6 (D. Del. Oct. 6, 2003) (rejecting argument at class certification, that class representative who sold early during the class period, because "defendants fail to identify the presence of real intraclass conflict not otherwise found in the securities fraud claims.").[22]

### B. The Shield Plans is Adequate and Typical

By way of background, it is not disputed that Paul H. Shied, M.D. is the trustee of the Lead Plaintiff the Shield Plans and made the investment decisions to buy and sell Northfield stock. Dr. Shield is more than adequate to serve as class representative and the claims of the shield plans are typical. Dr. Shield is psychiatrist and a graduate of Swarthmore College and the University Pennsylvania Medical School. He completed his internship at UCLA and completed his residency at Yale. Following medical training he served two years in the U.S. Air Force and then entered private practice. Ex. 63, Shield Depo. at 4-5. Simply, Dr. Shield is more than adequate to serve as class representative.

Defendants claim that because Dr. Shield purchased shares after a partial corrective disclosure and after the end of the class period his claims are atypical and/or inadequate. Defendants' arguments are contrary to the great weight of case authorities and should be rejected. First, any purchases made after a partially corrective disclosure *during* the class period do not render the Shield Plans' claims atypical or Dr. Shield inadequate, because these are not issues unique to the Shield Plans, thus by definition there is no unique defense. Second, the Shield Plans' purchases after the close of the class period are likewise irrelevant. While Defendants cite older cases suggesting otherwise (Def. Mem. 56)[23], the clear majority of more

---

[22] Courts have also uniformly rejected similar "conflicts" that exist in every securities class action. The so-called "equity conflict" that is between purchasers who continue to hold their stock and those who sold their stock. *See In Connecticut Retirement Plans and Trust Funds v. Amgen*, 2009 WL 2633743, at *6 - *8 (C.D.Cal., Aug. 12, 2009) (collecting cases).

[23] The cases are also distinguishable on the facts. *In re Safeguard Scientifics*, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) involved a plaintiff that was an admitted day-trader who had also omitted

recent cases from the same and other jurisdictions make clear that post corrective disclosure or class period purchases do not render a proposed class representative inadequate or atypical. *See Silversman v. Motorola, Inc.,* 259 F.R.D. 163, 172 (N.D. Ill. 2009) ("The post-disclosure purchase of the additional shares therefore will not necessarily present individual issues of reliance that render the investor atypical or inadequate to represent class members who did not purchase such additional shares.") (quoting and citing cases); *In re Monster Worldwide, Inc. Sec. Litig.,* 251 F.R.D. 132, 135 (S.D.N.Y. 2008) ("The post-disclosure purchase of the additional shares therefore will not necessarily present individual issues of reliance that render the investor atypical or inadequate to represent class members who did not purchase such additional shares.") [24]; *In re Nortel Networks Corp. Sec. Litig.,* 2003 WL 22077464, at * 3 (S.D.N.Y. 2003) (rejecting atypicality argument where plaintiff purchased stock "well after the alleged 'fraud' was 'exposed'"); *In re Rent-Way Sec. Litig.,* 218 F.R.D. 101, 114 (W.D. Pa. 2003) ("[T]hese purchases, having occurred after the putative class period, are irrelevant to the instant litigation."); *In re Bally Mfg. Sec. Corp. Litig.,* 141 F.R.D. 262, 269 n. 7 (N.D. Ill. 1992)(" Bally's contention that plaintiff Karinsky's claims are atypical because he purchased stock *after* the proposed class period is unavailing.") (emphasis in original); *Fry v. UAL Corp.,* 136 F.R.D. 626, 632 (N.D. Ill. 1991) ("Because subsequent purchases by the plaintiffs are irrelevant to the liability of UAL with regard to alleged misrepresentations effecting the earlier sales of securities by the plaintiffs, such purchases do not render the claims of Fry and Dwyer atypical.").[25] Therefore, the Court should follow the more recent and majority view and reject these arguments.

Defendants' citation to Dr. Shield's deposition testimony does not reveal that he did not rely on the integrity of the market for Northfield's shares. Defendants complain that because Dr. Shield's frank statement, four years after the fact, that he could not speculate as to whether he would have purchased his stock had he known of the ANH heart attacks, is irrelevant in a fraud

---

a "significant number of trades" in his certification. *In re Enron Sec. Litig.,* 206 F.R.D. 427, 455-56 (S.D. Tex. 2002), a lead plaintiff ruling, involved a shareholder who relied on the advice of an investment advisor and purchased their stock following the disclosure of the fraud.

[24]   Quoting, *In re Salomon Analyst Metromedia,* 236 F.R.D. 208, 216 (S.D.N.Y. 2006), vacated and remanded on other grounds, 544 F.3d 474 (2d Cir. 2008).

[25]   *See also  In re Organogenesis Sec. Litig.,* 241 F.R.D. 397,

on the market case. *See, e.g;, Bally Mfg. Corp.*, 141 F.R.D. at 268 ("[proposed class representative's] speculation as to how he might have acted, given certain circumstances, is insufficiently concrete to be of any real use to Bally on [his typicality]") (citing *Basic*, 485 U.S. at 245) ("Requiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted ... if the misrepresentation had not been made, ... would place an unnecessarily unrealistic burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.").

Additionally, there is nothing problematic about Dr. Shield's purchases following the partial corrective disclosures that indicate that he did not rely on the integrity of the market. Indeed, Defendants do not cite to a single case that presents the same factual scenario. Dr. Shield purchased additional 3,000 shares on March 15, 2006. He explained that he kept his shares, because the Company had refuted the veracity of the WSJ article on that date and he could not believe that a publicly traded company would actually deceive investors as it did. Then when Dr. Shield learned of more information that in his mind tipped the balance of adding further credibility to the WSJ article, through his learning of the regulatory investigations against Northfield he sold his shares a few days later in March 2006. Ex. 61, Shield Depo., at 25-28, 11-13. That Dr. Shield then in April of 2006, made a new investment decision to purchase Northfield shares again is likewise immaterial. Dr. Shield explained that his new investment in Northfield was at half the size of his previous investment in light of additional risks he believed Polyheme had in light of the adverse news about the ANH trial. *Id.*, at 15. These facts demonstrate that Dr. Shield made a rational decision to reinvest in Northfield. *See Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 446 (S.D. Ohio 2009) (rejecting post-disclosure argument as "irrelevant" and crediting argument that "a party may believe a stock may be a bargain after such deflation, and may believe that it is now trading at a price with defendants' fraud removed from it."); *see also In re Frontier Group, Inc. Sec. Litig.*, ("The fact that Taub attempted to recoup her losses by continuing to purchase Frontier stock after the disclosure of the alleged misrepresentations has no bearing on whether or not she relied on the integrity of the market during the class period.").

### C. Named Plaintiff Allan Goodman is Adequate

Allan Goodman is semi-retired. Mr. Goodman is a graduate to Temple University and spend the bulk of his professional career as a life insurance broker and in real estate. Ex. 64, Goodman Depo., at 6-7. Mr. Goodman's claims are typical and he is adequate. Defendants repeat the arguments about post class period purchases. For the same reasons and authority cited above, these arguments against Mr. Goodman should be rejected as well.

Defendants erroneously suggest that that Mr. Goodman was not forthright in his deposition. This argument is without merit. Generally courts will find a proposed representative inadequate if the "plaintiff's credibility is so vulnerable to attack that the plaintiff is subject to unique defense making his claim atypical and antagonistic to other members of the class." *Cruden v. Bank of New York*, 1988 WL 9514, at * 5 (S.D.N.Y. Feb. 1, 1988). As one Court explained,

> The existence of questions about the credibility of named representatives will not ordinarily place the interests of those representatives in conflict with other class members. All witnesses are potentially subject to attacks on their credibility. Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.

*In re Colonial P'Ship Litig.*, 1993 WL 306526, at * 5 (D. Conn. Feb. 10, 1993).

Defendants point to the fact that Mr. Goodman took four breaks during the deposition suggest that he misstated whether he reviewed documents in advance of the deposition. Def. Mem. at 58-59.[26] Mr. Goodman's deposition testimony merely reveals the nervousness that he was under followed by Mr. Goodman's concern to protect privileged information. Moreover, there is no evidence (nor could there be) that Mr. Goodman misstated his investment history in Northfield, is trading philosophy or any other pertinent information. Indeed, he complied with all of Defendants' discovery demands, which included the production trade confirmations, corroborating account statements for nearly a 7 year period trade confirmations. Under these

---

[26] If breaks were relevant, then Ms. Twaddell's testimony should like was be rejected as well. As Ms. Twaddell and/or her counsel initiated breaks in the midst of questioning about material issues to this case. Ex., 15 , docket 280-9, Twaddell Depo., at 233, 203, 163, and 58.

circumstances, this discrepancy in his deposition testimony, under the pressure of a heated deposition, does not demonstrate his lack of credibility and does not disqualify him as inadequate. *See, e.g., Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177-78 (S.D.N.Y. 2008) (original statement was that he purchased stock personally, and his later statement that his investment advisor purchased the stock, "does not impugn Plaintiff's credibility in any meaningful way."); *Hua Mui v. Union Needletrades Indus. & Textile Employees, AFL-CIO*, 1999 WL 4918, at * 4 (S.D.N.Y. Jan. 5, 1999) (despite "general" credibility problems, plaintiff was an adequate lead plaintiff where the credibility issued "[did] not specifically relate to … the duty of fair representation central to this lawsuit."), *cf. Kaplan v. Pomerantz*, 132 F.R.D. 504, 509-10 (N.D. Ill. 1990) (proposed representative gave false testimony in a "deliberate attempt to conceal information.").

### D.  Named Plaintiff James Rourke is Adequate

James Rourke is a software development manager and has been in this profession for forty years.  He purchased 1,000 shares of Northfield stock in May 24, 2005 during the class period and an additional 1,000 shares approximately 9 months after the close of the class period in December 22, 2006.  Mr. Rourke purchased the shares through his self-directed portion of his retirement account.  Ex. 61, docket no. 280-17, Rourke Depo. at 5-6.  Defendants repeat the same arguments above about post-class period purchases, and the Court should deny this argument for same reasons and authorities cited above.   However, some facts bear noting.

Defendants take out of context Mr. Rourke's testimony that his purchase of Northfield stock was a "gamble."   What Defendants omit from the cited testimony is that Mr. Rourke was merely testifying to the fact that all stocks have risk.  The following is pertinent excerpt from his deposition.

```
12      Q. Did you consider Northfield stock when you
13      purchased it in 2005 to be a gamble?
14      A. Yes. I did.
15      Q. And why is that?
16      A. Well, any stock purchase is a gamble.
17      Q. Is stock in a company, a development stage
18      company like Northfield, more of a gamble?
19      A. Absolutely.
```

Ex. 61, Docket no. 280-17, Rourke Depo., at 34. Moreover, Mr. Rourke later testified that when he invested in Northfield that he did not expect to lose any money. Rourke Depo., at 50. Additionally, Defendants sound an alarm because Mr. Rourke testified that this post class period purchase was made in the "hopes that [the stock price] would go back up" or that Northfield might get "bought out." Def. Mem. 59. These facts are irrelevant to Mr. Rourke's adequacy or typicality. *See Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 611 (S.D. Ohio 2003) (rejecting argument that class representatives were atypical when they purchased stock *during class period*, because they speculated that Company might get bought out, the Court explained: "[That the proposed class representatives] bought stock based on speculation does not prove non-reliance.") (collecting cases); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) ("Evidence of 'stock speculation' by class representatives is not sufficient to defeat a finding of typicality except in cases where the class representative engaged in significant speculative investment strategies.").

Lastly, that Mr. Rourke did not want to speculate as to what he would have done had he known of "heart attacks" is not grounds for attacking his adequacy or typicality. *See, e.g;, Bally Mfg. Corp.*, 141 F.R.D. at 268 ("[proposed class representative's] speculation as to how he might have acted, given certain circumstances, is insufficiently concrete to be of any real use to Bally on [his typicality]") (citing *Basic*, 485 U.S. at 245) ("Requiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted ... if the misrepresentation had not been made, ... would place an unnecessarily unrealistic burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.").

### E. Named Plaintiff Daniel Nesi, M.D. is Adequate

Defendants attempt to elevate Dr. Nesi's lack of recollection and inconsistent statements at deposition, to suggest that Dr. Nesi lacks any credibility. Dr. Nesi is a respected ear nose and throat medical doctor. Ex. 60, Docket no. 280-17, Nesi Depo., 5-6. It is clear that Dr. Nesi's recollection is not perfect and Defendants exploited that and Dr. Nesi's apparent lack of patience with defense counsel. Therefore, it is no surprise that through repetitive questioning one would obtain inconsistent statements. While his financial interest in this case is not relatively large, Dr. Nesi, who had no prior relationship with counsel, has actively participated in this litigation,

appeared for deposition, and produced hundreds of pages of documents to defendants. Dr. Nesi's willingness to serve as class representative under these circumstances should be commended not attacked. In any event, the prior lawsuit information is immaterial. The fraud lawsuit against Dr. Nesi and others was tried and Dr. Nesi and other defendants obtained a jury verdict in their favor. *See* APPX, Ex. 6. Consistent with Dr. Nesi's testimony it appears that plaintiffs' in that matter withdrew their appear (APPX 6), and the case was resolved without any monetary payment. Nesi Depo, at 10-11. Moreover, Dr. Nesi testified that he believed the sexual harassment lawsuit arose from an employee he had 15-20 year ago that was not successful. *Id.*, at 10-13.

Accordingly, the Court should reject the attacks against Dr. Nesi.

## V. CONCLUSION

For the foregoing reasons and the reason set forth Plaintiffs' opening papers, the Court should grant Plaintiffs' motion for class certification in its entirety.

Dated: March 31, 2010

Respectfully submitted,

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS, LLP**

  /s Leigh Handelman Smollar
Leigh Handelman Smollar
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184

Liaison Counsel for Plaintiffs and Class

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
350 Fifth Avenue, Suite 5508
New York, New York 10118
Tel: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and the Class