**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
|  |  | No.  06 CV 1493 |
|  |  | (consolidated) |
|  | : |  |
| IN RE NORTHFIELD LABORATORIES, | : |  |
| INC. SECURITIES LITIGATION | : |  |
|  | : |  |
|  |  | Judge George M. Marovich |
|  |  | Magistrate Nan R. Nolan |

**APPENDIX OF EXHIBITS TO PLAINTIFFS' REPLY MEMORANDUM IN FURTHER
MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION, APPOINTMENT OF
CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

> **POMERANTZ HAUDEK BLOCK
> GROSSMAN & GROSS, LLP**
> Patrick V. Dahlstrom
> Leigh Handelman Smollar
> 10 South LaSalle Street, Suite 3505
> Chicago, Illinois 60603
> Tel: (312) 377-1181
> Fax: (312) 377-1184
>
> Liaison Counsel for Plaintiffs and Class
>
> **THE ROSEN LAW FIRM, P.A.**
> Laurence M. Rosen
> Phillip Kim
> 350 Fifth Avenue, Suite 5508
> New York, New York 10118
> Tel: (212) 686-1060
> Fax: (212) 202-3827
>
> Lead Counsel for Plaintiffs and the Class
>
> Dated: March 31, 2010

<u>APPENDIX OF EXHIBITS</u>

**<u>Exhibit</u>**

1. Deposition Transcript of Paul A. Gompers, Ph.D, dated March 29, 2010

2. Marketing Materials Produced by Marketing Research Bureau in Response to defendants' subpoena dated December 21, 2009.

3. Marketing Research Bureau's Ledger and Invoices For Sales of the Marketing Research Bureau's Sales the document entitled "Synthetic Oxygen Carriers (Blood Substitutes): Opportunity Assessment of Three Leading Hemoglobin-Based Products, Hemopure (Biopure), PolyHeme (Northfield) and Hemospan/MP4 (Sangart), the Marketing Research Bureau produced in response to defendants' subpoena dated December 21, 2009.

4. Prospectus excerpt of Northfield Laboratories, Inc. filed with the SEC on January 19, 2005.

5. 10-K of Northfield Laboratories, Inc. filed with the SEC on August 15, 2005.

6. Docket report, dated March 31, 2010, in the matter entitled *Packer, et al. v. Magellan Finance et. al.*, No. 2:98-CV-00380-CN (E.D. Pa.).

# EXHIBIT 1

**1**

```
 1                    VOLUME: I
                      PAGES:  1 to 213
 2                    EXHIBITS: 1 to 7
 3
 4         UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
 5
 6   Case No. 06-CV-01493
 7
                                    )
 8   IN RE:                         )
                                    )
 9   NORTHFIELD LABORATORIES,       )
     INC.                           )
10                                  )
                                    )
11   SECURITIES LITIGATION          )
12
13       DEPOSITION OF PAUL A. GOMPERS,
     Ph.D., called as a witness on behalf of
14   the Plaintiffs, pursuant to the applicable
     provisions of the Federal Rules of Civil
15   Procedure, before Jeanette N. Maracas,
     Registered Professional Reporter and Notary
16   Public in and for the Commonwealth of
     Massachusetts, at the Offices of G&M Court
17   Reporters & Associates, 42 Chauncy Street,
     Boston, Massachusetts, on Tuesday, March 23,
18   2010, commencing at 9:10 a.m.
19
20
21
22
23
24
```

```
 1                    VOLUME: I
                      PAGES:  1 to 213
 2                    EXHIBITS: 1 to 7
 3
 4         UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
 5
 6   Case No. 06-CV-01493
 7
                                    )
 8   IN RE:                         )
                                    )
 9   NORTHFIELD LABORATORIES,       )
     INC.                           )
10                                  )
                                    )
11   SECURITIES LITIGATION          )
12
13       DEPOSITION OF PAUL A. GOMPERS,
14   Ph.D., called as a witness on behalf of
15   the Plaintiffs, pursuant to the applicable
16   provisions of the Federal Rules of Civil
17   Procedure, before Jeanette N. Maracas,
18   Registered Professional Reporter and Notary
19   Public in and for the Commonwealth of
20   Massachusetts, at the Offices of G&M Court
21   Reporters & Associates, 42 Chauncy Street,
22   Boston, Massachusetts, on Tuesday, March 23,
23   2010, commencing at 9:10 a.m.
24
```

**2**

```
 1   APPEARANCES:
 2
 3
     THE ROSEN LAW FIRM, P.A.
 4   By: Phillip Kim, Esq.
     350 Fifth Avenue
 5   New York, New York 10118
     For Dr. Paul Shield
 6   E-mail: Pkim@rosenlegal.com
 7
 8   JENNER & BLOCK, LLP
     By: J. Kevin McCall, Esq.
 9   By: Suzanne J. Prysak, Esq.
     353 N. Clark Street
10   Chicago, Illinois 60654
     For Steven Gould, M.D.
11   E-mail: Jmccall@jenner.com
     E-mail: Sprysak@jenner.com
12
13
     KATTEN, MUCHIN, ROSENMAN, LLP
14   By: David C. Bohan, Esq.
     525 W. Monroe Street
15   Chicago, Illinois 60661
     For Richard DeWoskin
16   E-mail: David.bohan@kattenlaw.com
17
18
19
20
21
22
23
24
```

**3**

```
 1              I N D E X
 2
 3   Testimony of:        Direct   Cross
 4   Paul A. Gompers, Ph.D.
 5     (by Mr. Kim)       4,208
       (by Mr. McCall)             206
 6     (by Mr. Bohan)              208
 7
 8           E X H I B I T S
 9
     No.      Description         Page
10
11   1  Deposition subpoena.        4
12   2  Declaration of Professor
        Paul Gompers.              9
13
     3  PolyHeme Backgrounder
14      document, 4/15/05.        74
15   4  Questions and Answers
        PolyHeme Trauma Trial.    74
16
     5  2/22/06 Wall Street Journal
17      article.                 126
18   6  2/24/06 Wall Street Journal
        article.                 138
19
     7  3/10/06 Wall Street Journal
20      article.                 144
21
22
23
24
```

**4**

```
 1           P R O C E E D I N G S
 2          PAUL A. GOMPERS, Ph.D.
 3        A witness called for examination
 4   by counsel for the Plaintiffs, having been
 5   first duly sworn, was examined and testified
 6   as follows:
 7           DIRECT EXAMINATION
 8   BY MR. KIM:
 9   Q.  Good morning, Dr. Gompers.  My name is
10   Phillip Kim.  I'm an attorney with the Rosen
11   law firm.  We represent the plaintiffs in
12   the Northfield securities litigation.
13        I've looked at your expert report
14   and it looks like you've done a lot of
15   depositions so I'll dispense with the general
16   rules of the deposition with the assumption
17   that you understand generally how these
18   things proceed.  Is that a fair assessment?
19   A.  Sure.
20        MR. KIM:  Mark this as Exhibit
21   No. 1.
22        (Exhibit 1 marked for
23   identification.)
24   Q.  Dr. Gompers, I'm showing you a subpoena that
```

5

1     was addressed to you. Do you recall seeing
2     that document before today?
3   **A. I do.**
4   Q. And attached to that document is a request
5     for specific documents. Do you see that?
6   **A. Yes.**
7   Q. Do you plan on producing any documents that
8     have been requested in that subpoena?
9   **A. I've produced what I'm going to produce.**
10     **A number or a lot of what you want in here**
11     **is actually protected under confidentiality**
12     **orders with prior law firms, prior clients,**
13     **but I'll take it under advisement and, you**
14     **know...**
15   Q. So your position is you do have documents
16     in your possession that may be responsive
17     to those requests?
18   **A. Most -- having had similar types of requests**
19     **in the past, I did a search of which**
20     **documents were not covered by some sort of**
21     **confidentiality agreement, and clearly any**
22     **documents associated with this case which**
23     **I've received have been produced as, along**
24     **with my expert report, I believe that**

6

1     **anything related to prior cases that would**
2     **be responsive to this are protected under**
3     **CL. Typically the reports themselves I do**
4     **not keep and many times, actually, asked to**
5     **destroy those things. So as I sit here, I**
6     **have no documents that would be responsive**
7     **to this that were not protected under some**
8     **sort of confidentiality agreement.**
9   Q. Can I see those for a second? Well, for
10     the first request, that doesn't seem to touch
11     and concern other cases.
12   **A. Oh, I'm happy to, if you ask me, I can**
13     **discuss Adel Turki and Jennifer McCabe were**
14     **the people at Cornerstone who helped me**
15     **with this matter, provided the research**
16     **assistance as I prepared this report.**
17   Q. So are you saying you don't have any
18     documents that are responsive to that
19     MR. BOHAN: Pardon me for
20     interrupting. Are you going to be providing
21     copies of the exhibits?
22     MR. KIM: I just don't have a copy
23     of that. I put that out last night.
24   **A. I do not have with me a document which lists**

7

1     **their education and names. I don't know**
2     **what Jennifer's education is or Adel's**
3     **education, or I'm happy to state that**
4     **they're the ones who assisted me on this**
5     **report.**
6   Q. All right. How about No. 7 and No. 8? I
7     think that's case-specific.
8   **A. I'm happy to produce the bills which I've**
9     **supplied. I don't have them here. I would**
10     **have to go get them on my computer so I**
11     **have no problem with that. And No. 8, my**
12     **document is, or my compensation is not**
13     **at all, and I believe it's in my report**
14     **that I actually state a response to No. 8.**
15     **So while I don't have them with me, I'm**
16     **happy to produce my bills in this matter**
17     **today.**
18   Q. Thank you, Dr. Gompers. And I believe No.
19     11, that's the last question I have. What
20     about that request?
21   **A. I'll search. There are times I'll do expert**
22     **matters without a formal retainer. I don't**
23     **recall whether I have a formal retainer in**
24     **this matter, but if I do, I'll produce that**

8

1     **as well.**
2   Q. Thank you.
3     MR. McCALL: I don't think there is
4     one, Phil.
5     MR. KIM: Okay.
6     MR. McCALL: I'm pretty sure.
7     Didn't we look for it?
8     MS. PRYSAK: Yes. There's not one.
9     MR. McCALL: There isn't.
10   Q. Now, Dr. Gompers, how did you become involved
11     in this litigation?
12   **A. To the best of my recollection, I received**
13     **a phone call from Adel Turki, he's a vice**
14     **president at Cornerstone, who mentioned**
15     **that there was a matter in which a group**
16     **of attorneys had requested an introduction**
17     **to an expert who knew the biopharma industry**
18     **as well as issues related to finance.**
19   Q. When was that, approximately?
20   **A. It was over a year ago, so winter, spring**
21     **'09. The exact date I don't recall.**
22   Q. What type of services, if any, did you
23     provide in connection with this litigation
24     other than drafting the expert report?

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

9

1    A. That's what I provided in this matter. So
2        I was asked to offer an opinion on issues
3        of class certification. I directed my
4        research support team to undertake a variety
5        of analyses and I prepared the report. So
6        the embodiment of what I provided is this
7        expert report.
8            MR. KIM: No. 2.
9            (Exhibit 2 marked for
10       identification.)
11   Q. Dr. Gompers, I'm showing you what's been
12       marked by the reporter as Exhibit No. 2.
13       Is that the expert report that you had
14       drafted in connection with your services in
15       this litigation?
16   A. Make sure that it's a signed copy.
17   Q. Sure.
18   A. This appears to be that. I have no reason
19       to doubt that it's not what I submitted
20       because that's what it looks like.
21   Q. And who else was involved in preparing the
22       expert report?
23   A. I prepared the report. I had research
24       staff do analyses under my direction, but I

10

1        prepared the report.
2    Q. So you drafted, you personally drafted each
3        section of the report?
4    A. I did.
5    Q. Who were the persons that assisted in
6        conducting the research?
7    A. As I mentioned, Jennifer McCabe was the
8        senior associate who oversaw the, sort of
9        implementation of whatever programs needed
10       to be run or the data that needed to be
11       gathered and the new searches that needed
12       to be done. The officer involved at
13       Cornerstone was Adel Turki and I believe
14       his title is vice president.
15   Q. Last name is Turki?
16   A. T U R K I, A D E L.
17   Q. Was there anyone else involved in assisting
18       you in preparing the expert report?
19   A. I believe that there were at least two
20       analysts, and I just don't recall their
21       names. They worked under Jennifer.
22   Q. What is the educational background of
23       Jennifer McCabe, if you know?
24   A. I don't know. She has an advanced degree. I

11

1        don't know if it's a Master's or Ph.D., but
2        it's one of the two.
3    Q. How about Mr. Turki?
4    A. He has an M.B.A.
5    Q. Do you know in what particular subject? Was
6        it just an M.B.A.?
7    A. I don't know the specialization.
8    Q. How many hours did you spend in preparing
9        the expert report?
10   A. I haven't reviewed my bills, but I would
11       guess on the order of 80 to 100. I'd have
12       to look, but that's probably about right.
13   Q. And how many hours did your assistants
14       spend in preparing the expert report?
15   A. I have no idea.
16   Q. Now, what is your relationship between
17       yourself as an expert and Cornerstone? Is
18       Cornerstone what you consider -- are you
19       considered a consultant of Cornerstone, an
20       employee of Cornerstone or is it something
21       else?
22   A. They support my research when I do these
23       matters. I'm not an employee. I think that
24       they list me as an affiliated expert, which

12

1        there's no contractual relationship, but
2        when I work on expert consulting matters,
3        much like, you know, at Harvard Business
4        School when I do research, I have a team
5        of Ph.D. students and full-time research
6        associates and undergraduates who help me
7        do that research. Cornerstone provides
8        the research staff which supports my research
9        in these expert matters.
10   Q. For the time that you spent repairing the
11       report in this matter, who does the billing?
12       Do you personally send the bills out or is
13       that something that Cornerstone handles?
14       Does Cornerstone handle all the
15       administrative matters in connection --
16   A. I send out my own bills and Cornerstone
17       sends out their own bills.
18   Q. In Paragraph 5 of your report, it says, "in
19       the future I may receive compensation from
20       Cornerstone Research that reflects the work
21       that has been done by Cornerstone Research
22       on this matter." What does that mean?
23   A. Over the last three or four years, just given
24       the number of years that I've been supported

13

1  by Cornerstone in my research, Cornerstone
2  for a variety of experts who have done a
3  lot of work with them, provide compensation
4  or some sort of compensation recognition of
5  that. So every year in April over the last
6  three or four years I received a check that
7  reflects the fact that I do things like
8  analysts training for them, present seminars
9  in CLE programs that they run, as well as
10  work on a variety of many legal expert
11  matters. It sort of, the compensation is
12  for the total of that work and so it's not
13  broken down by I did this, this or this.
14  There's just some general amount that I've
15  received in recognition for having done a
16  number of things for Cornerstone over the
17  course of the prior year.
18  Q. These things you mentioned about the CLE,
19  things of that nature, that the reason for
20  this additional compensation, at the time
21  you provide the CLE services, are you
22  compensated at that time?
23  A. No.
24  Q. Now, Dr. Gompers, have you ever published a

14

1  peer-reviewed article on event study
2  methodology?
3  A. I've published numerous articles which use
4  event study methodology, so if we go through
5  my CV, you'll see that, and we can go through
6  individual papers, many of the papers employ
7  event study methodology. In fact, if you
8  look at my report, in a couple of places
9  I cite the Kothari and Warner review in the
10  handbook of corporate finance published in
11  2007 in which they looked at all the major
12  finance and economics journals and reviewed
13  563 papers that employed event studies. If
14  you go to the bibliography of that paper,
15  many of those citations are actually to my
16  work, so I published numerous papers that
17  employ event study methodology in
18  peer-reviewed journals.
19  Q. Is that a yes or a no?
20      MR. BOHAN: I object to the form
21  of the question.
22  A. So very few papers are published on the raw
23  event study methodology. In fact, you've got
24  Brown and Water in '80 and '81 and you've got

15

1  one or two others over the course of the
2  last 30 years. People employ event study
3  methodology as a tool or method in their
4  research, and I have employed it in my
5  research on numerous occasions.
6  Q. Dr. Gompers, I don't know if that's
7  responsive to my question, but I'll ask
8  another question. Other than employing
9  event study methodology, have you ever
10  published a peer-review article on event
11  study methodology? Yes or no.
12      MR. McCALL: Asked and answered.
13  A. I believe my last answer was responsive.
14  You'd have to -- in my view, yes, I describe
15  the methodology.
16  Q. That's fine.
17  A. It is reviewed and it is published.
18  Q. Okay. As part of your studies, have you
19  studied econometrics and statistics?
20  A. Absolutely.
21  Q. And what specific classes did you take?
22  Let's say at the graduate level.
23  A. Probability, I took the probability and
24  statistics course, the introductory to

16

1  econometrics course, the time series course,
2  there was a panel data course. So over
3  the course of my Ph.D. time, I took five or
4  six courses on econometrics and statistics.
5  Q. How much time was spent on time series
6  statistics?
7  A. I took an entire course taught by Jim Stock,
8  who is probably one of the world's leading
9  time series experts, so it was an entire
10  course on time series analysis.
11  Q. When you say an entire course, how many
12  credit hours? Was that over the course of
13  a semester or two semesters?
14  A. It's an entire semester.
15  Q. When was that, approximately?
16  A. 1991, 1992.
17  Q. That was part of your graduate studies that
18  you had taken the Ph.D.?
19  A. It is.
20  Q. And how much time of your statistical work
21  involved intervention analysis?
22  A. So intervention analysis is the same as
23  saying a dummy variable approach. And so
24  dummy variables are talked about in all types

17

1   of analyses, in panel data, time series
2   analysis, so you wouldn't talk just about,
3   quote, "intervention" or "dummy variable
4   analysis." It's in the context of a
5   specific type of estimation that can be
6   intervention analysis, as I said, in time
7   series analysis, panel data analysis and
8   non-parametric analysis.
9   Q. Okay. So you're saying that the prior
10  statistic courses that you mention touched
11  and concerned intervention analysis
12  generally. Is that fair to say?
13  A. All of them would have discussed the use
14  of dummy variables in the context of specific
15  analysis. All intervention analysis is is
16  identifying changes where you put either a
17  zero or a one in for a particular observation
18  and it could be a specific law which becomes
19  enacted, it could be a specific corporate
20  event, but all it is is putting in a variable
21  which is a zero or a one, which is why it's
22  called a dummy variable.
23  Q. Now, to the extent that you can, all the
24  courses that you previously mentioned, can

18

1   you estimate how much time was spent on
2   the subject of intervention analysis? Was
3   it ten percent of the course time, five
4   percent of the course time, 50 percent,
5   100 percent, if that's possible?
6   A. It's not possible, so it's one approach
7   that one takes in setting up a model to
8   estimate. So when you set up a model to
9   estimate, sometimes you have what are
10  called continuous variables that take a
11  variety of values. Other times there are
12  discrete events or discrete changes which
13  you denote by putting in a dummy variable
14  which is a zero or a one, and I would say
15  many, if not most papers at some point in
16  time might have a specification where
17  there are types of variables that if you're
18  looking at labor rates and you want to
19  compare males to females, you would put a
20  dummy variable in there. So it's a part of
21  so many analyses that you can't really
22  quantify it in a way that you'd like me to
23  quantify it.
24  Q. That's fine. And, Dr. Gompers, how long

19

1   have you been providing testimony in the
2   capacity of as an expert witness, just
3   ballpark?
4   A. So I believe the first expert matter that
5   I testified on was back in 1998.
6   Q. When you say "testified," are you including
7   declarations or is that --
8   A. That would include back to 1998 in terms
9   of the first declaration as well.
10  Q. And you've been with Cornerstone since that
11  time or did that happen later?
12  A. So I would rephrase it, which is it's not
13  since that time, but since 2001 Cornerstone
14  has provided the research support when I
15  am engaged in expert consulting matters.
16  Q. And in how many of those expert matters,
17  as we sit here today, involved the 10B5
18  case? And when I say a 10B5 case, do you
19  know what I'm referring to?
20  A. I do.
21  Q. Okay.
22  A. And is this, you want 10B5 case independent
23  of the type of expert work I'm providing or
24  are you specifically thinking about the

20

1   class certification stage?
2   Q. I'm thinking in general. We can narrow it
3   in subsequent questions.
4   A. Maybe 15, yeah, probably 15 over the last
5   ten years.
6   Q. And of those 15, how many of those were
7   for the plaintiffs, how many were for the
8   defendants?
9   A. All of them would have been for the
10  defendants.
11  Q. Now, of those 15, how many of those were
12  at the class certification stage regarding
13  market efficiency?
14  A. So sometimes I'll explore class certification
15  and issues of market efficiency won't be part
16  of that analysis, but in terms of eight or
17  ten of those would have involved at least
18  some analysis related to market efficiency.
19  Q. Now, of the eight or ten that involved market
20  efficiency, were the classes certified in
21  those matters or not?
22  A. Not all the time, no.
23  Q. Do you know off the top of your head how
24  many were certified and how many were not

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

21

1     certified?
2     A. No, I mean, I don't keep score.
3     Q. So it's fair to say that with respect to
4       10B5 cases at the class certification stage,
5       you've never provided testimony that the
6       market for a particular stock was efficient,
7       is that correct?
8     A. I've done -- well, I've been engaged to
9       look at market efficiency and concluded the
10      market was efficient, but in those matters
11      did not provide a report because the
12      attorneys that I was working with didn't
13      ultimately want me to put in a report. It
14      didn't fit their strategy. But when I've
15      submitted reports at the class certification
16      stage that deal with market efficiency,
17      I've opined that those particular markets
18      were inefficient.
19    Q. So in some cases where you opined that the
20      market was inefficient, it's fair to say
21      that in those cases the court in any event
22      certified the class, is that correct?
23          MR. McCALL: Objection to form.
24    A. I don't recall any court actually certifying

22

1       the class. I believe one or two cases that
2       I recall the courts deferred that matter to
3       a later date so they let the issue proceed
4       without making a final ruling on class
5       certification so they let the action continue
6       without deciding the issue of market
7       efficiency at that stage.
8     Q. And what cases were those?
9     A. Off the top of my head, I don't recall, but
10      I do recall particular matters which went
11      forward were not because the judge ruled
12      that the market was efficient, but because
13      they decided to let that issue be decided
14      at a later stage.
15    Q. Well, attached to your expert report
16      there's an Appendix A. Do you see that?
17    A. Yes. That's my CV.
18    Q. And after looking at this list, I believe
19      it provides a list of cases where you
20      provided expert deposition testimony. Does
21      that refresh your recollection?
22    A. So I recall these matters and I recall the
23      expert testimony that I provided in most of
24      these matters. Most of them I couldn't tell

23

1       you exactly what the court ruling was, so
2       some of them I recall, many of them I don't.
3       Looking at this list doesn't refresh my
4       memory on all of the ones that I don't
5       recall, as I sit here.
6     Q. Okay. Do you know who the expert for the
7       plaintiff in this case is?
8     A. Yes.
9     Q. Do you know who that is?
10    A. Dr. Hakala.
11    Q. In the matters in which you provided expert
12      testimony and declarations, do you recall
13      Dr. Hakala being on the other side of you?
14    A. On a number of occasions he has been.
15    Q. And do you recall the names of those cases?
16    A. Not all of them. He was on the other side
17      in Raytheon. He was on the other side in
18      Belo, B E L O. There are others as well in
19      which he's on the other side. As I sit
20      here, I just don't recall all the matters
21      that he was on the other side.
22    Q. Now, Dr. Gompers, in the Raytheon case you
23      testified that the market for Raytheon stock
24      or securities was inefficient, is that

24

1       correct?
2     A. That's incorrect.
3     Q. Okay. What's your recollection?
4     A. So in the Raytheon securities matter I
5       was brought on as a rebuttal expert to
6       Dr. Hakala, and in particular I was asked
7       to rebut his event study and trading model,
8       and so I was rebutting his methodology
9       that he used in both his event study and
10      his trading model, and so I didn't have any
11      opinion related to market efficiency and
12      ultimately the judge in that matter, Judge
13      Patti Saris, ruled to exclude his testimony.
14      I don't remember if it was a Daubert motion,
15      but his testimony was stricken as not being
16      scientifically reliable.
17    Q. The Gammon Gold case, that was a case in
18      which Dr. Hakala was on the other side of
19      you, is that correct?
20    A. That is correct.
21    Q. And in that case you testified that the
22      market for Gammon Gold securities was
23      inefficient?
24    A. I'd have to go look at the report. I may

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

25

1    have.  I just don't recall the sort of
2    exact -- Gammon Gold was, was that a U.S.
3    action or Canadian action, because Gammon
4    was a Canadian company.
5    Q.  It was a Canadian.  It was in Ontario.
6    A.  Yeah, because Canadian securities laws --
7    I'm not a lawyer, but Canadian securities
8    laws does not have this notion of reliance
9    based on market efficiency, so I don't
10   recall whether or not -- I can't imagine
11   that in a Canadian matter I would have at
12   that stage testified on market efficiency,
13   but I just don't recall.  Without reviewing
14   the report, I don't recall.  It was a gold
15   company and I remember that there were
16   issues of the amount of gold in particular
17   mines and the value of the company, but I
18   just don't recall the particulars of the
19   report.  And there are certainly some of
20   these reports deal with market efficiency.
21   I just don't recall the Gammon Gold case
22   and dealing with market efficiency.
23   Q.  So your response is you just don't recall?
24   A.  I didn't review the Gammon report prior to

26

1    this, and some of the times securities
2    matters that I deal with touch upon market
3    efficiency and sometimes they don't, and I
4    don't recall all the cases, as I sit here,
5    those that did and some that didn't.  Some
6    I recall and some I don't.
7    Q.  Now, in Gammon Gold the court certified the
8    class in that case.  Did you know that?
9    A.  I don't know that.
10   Q.  And in Gammon Gold do you recall challenging
11   Dr. Hakala's event study methodology in that
12   case?
13   A.  I do.
14   Q.  And in that case do you recall criticizing
15   Dr. Hakala's event study methodology on the
16   basis that it wasn't replicable?
17   A.  That it was subjective, yes, and, as such,
18   it was unreplicable.  There are particular
19   aspects of his event study which were not
20   replicable, yes.
21   Q.  In Gammon Gold you criticized Dr. Hakala
22   on his selection of market indices as being
23   too subjective?
24   A.  The major criticism was --

27

1    Q.  The question was, was one of the criticisms
2    in Gammon Gold with respect to Dr. Hakala's
3    event study methodology was the selection
4    of market indices being too subjective.
5    Do you recall that being one of the
6    criticisms?
7    A.  No.  Now I remember.  No, it's not that it
8    was too, it was subjective.  It was that
9    it was wrong.  So he was looking at the
10   trading of Gammon Gold -- I mean, Gammon
11   is a Canadian company and he used the U.S.
12   stock market index to try and explain the
13   movement of Gammon Gold, a Canadian company,
14   when first principles in economics tells
15   us that we should utilize the Canadian
16   stock market.  So I remember that in my
17   report showing how the selection of a U.S.
18   index for a Canadian stock was problematic.
19        There were also issues that related
20   to that in terms of certain issues of his
21   results depended upon conversion of the
22   Gammon Gold stock price to U.S. dollars.
23   In particular, when you looked at
24   predictability, the stock market return of

28

1    Gammon was predictable in Canadian dollars
2    and, for whatever reason, when he converted
3    it to U.S. dollars and used a U.S. index,
4    it wasn't.  Again, there was no basis in
5    economic finance to have that as the
6    particular test you would utilize, so my
7    criticism wasn't that it was subjective.
8    My criticism was that it was wrong.
9    Q.  Okay.  Dr. Gompers, I know we're at the
10   early stages of the deposition.  I certainly
11   appreciate your answers.  It's educating me
12   and I appreciate that, but I think in order
13   so we're not here for 15 hours, if you can,
14   just respond to the question that's asked.
15   So I believe that question was sort of
16   phrased as a yes or no, but I do appreciate
17   some of the explanations that you give, but
18   in order to kind of, so we're not here all
19   day, do you understand that?
20   A.  I'll do my best, but when you ask the
21   question, as I was speaking, I was
22   remembering what was in the report, and
23   when you brought up the issue of the index
24   selection, it took me a while to remember,

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

29

1    **and once I remembered, I wanted to make**
2    **sure that, just that I was clear about**
3    **actually what I was criticizing Dr. Hakala**
4    **on when it came to the issue of the stock**
5    **market index.**
6    Q. I understand that, and thank you. Do you
7        recall ever providing an expert opinion in
8        the Cisco case?
9    **A. I worked on the Cisco case and I'm trying**
10   **to remember if I --**
11   Q. So the question is do you recall providing
12       an expert report or testimony in the Cisco
13       case?
14            MR. McCALL: I'll object to you
15       cutting the witness off when he answers, and
16       I didn't object to your instruction, but
17       don't cut the witness off in the middle of
18       his answer.
19            MR. KIM: The witness is
20       non-responsive. You'll have your opportunity
21       to cross-examination or redirect, and I'm
22       not going, cutting the witness off. You'll
23       have your opportunity to get clarification.
24       And if the witness is not responding to the

30

1        question that's posed in order to save
2        time --
3            MR. McCALL: If you want to withdraw
4        your questions, withdraw your questions, but
5        don't cut the witness off when he answers.
6        And so I'm going to insist that the witness
7        be given the opportunity to answer your
8        question and that you not cut him off.
9            MR. KIM: Are you representing him?
10       Are you his lawyer?
11            MR. McCALL: No.
12            MR. KIM: Are you telling him not
13       to answer questions?
14            MR. McCALL: I'm not telling him
15       not to answer questions. I'm going to insist
16       that you give the witness the opportunity to
17       answer your questions and that you not cut
18       him off.
19            MR. KIM: If he answers my question,
20       if it's responsive, I will.
21            MR. McCALL: If you don't like the
22       answer to the questions at the beginning of
23       his answer, wait until he's --
24            MR. KIM: I'm not getting into a

31

1        debate with you.
2            MR. McCALL: Wait until he's
3        finished with his answer, then ask him a new
4        question.
5    Q. Dr. Gompers, so my question to you is yes or
6        no, do you recall providing expert testimony
7        or declaration in the Cisco matter?
8            MR. McCALL: I'm going to object
9        to you trying to constrain the way the
10       witness answers the question.
11            MR. KIM: You can object all you
12       want.
13   Q. You can answer the question yes or no.
14   **A. I worked on the Cisco matter. I don't**
15   **recall whether I provided a report or not.**
16   **I was not deposed in the matter if I did**
17   **provide a report. So I just don't recall,**
18   **as I sit here, whether or not I ultimately**
19   **filed a report. I certainly worked on the**
20   **Cisco matter. Whether or not I filed a**
21   **report, I just don't recall whether or not**
22   **a report was ultimately filed in that case.**
23   Q. Do you recall opining that the market for
24       Cisco Systems securities was not efficient?

32

1    **A. To the best of my recollection, when the**
2    **time period in question was '99, 2000, into**
3    **2001 and there were certainly very strong**
4    **indicators that the market for Cisco was**
5    **inefficient over that period of time during**
6    **the technology bubble of the '99, 2000 time**
7    **frame.**
8    Q. And do you recall providing expert testimony
9        in the Parmalat case?
10   **A. I do, yes.**
11   Q. And in that case Dr. Hakala testified for
12       the plaintiffs?
13   **A. I don't recall, but if you sort of represent**
14   **that, I just don't recall.**
15   Q. I'll represent that to you. And in that
16       case you recall opining that the market for
17       Parmalat securities was not efficient?
18   **A. It's a little more subtle than, so this is**
19   **going to be a slightly longer answer because**
20   **there were multiple securities involved in**
21   **Parmalat. My opinion on market efficiency**
22   **only concerned the Parmalat bonds. The**
23   **Parmalat equity, the market efficiency**
24   **argument did not extend to Parmalat equity.**

33

1  There were issues about class certification
2  with Parmalat equity not dealing with market
3  efficiency, but when one looked at the
4  Parmalat bonds, there were strong indications
5  that the Parmalat bonds did not trade in an
6  efficient market.
7  Q. But in that case, the court ultimately
8  certified the class, isn't that correct?
9  A. I'd have to go back to the decision. I
10  don't recall whether the court let it
11  continue. I don't recall whether the court
12  certified just the class of the equity
13  holders and not the bond holders. I just
14  don't recall exactly what the decision was.
15  Q. Let's assume that the court certified the
16  class with respect to the bond holders.
17  Does that mean that the court rejected your
18  opinion in the Parmalat case?
19       MR. McCALL: Object to foundation.
20  A. Not necessarily. As I said, a number of
21  times, a couple of times courts defer the
22  issue of market efficiency to a later stage
23  and allow the proceedings to go forward.
24  I don't recall whether Parmalat was one of

34

1  those or not. I haven't reviewed the
2  Parmalat decision and I don't recall.
3  Q. Now, Dr. Gompers, do you understand the
4  difference between informational efficiency
5  and fundamental efficiency in assessing the
6  aspects of efficient market hypothesis?
7       MR. McCALL: Object to the form of
8  the question.
9  A. So those are not definitions that a financial
10  economist, an academic financial economist
11  would find a distinction between them. So
12  from someone who teaches, researches and is
13  involved in finance as a professor at Harvard
14  Business School, informational efficiency
15  implies fundamental efficiency. It is
16  totally consistent with Fama's definition
17  that those two things are identical.
18       I do understand that one particular
19  court has tried to make a distinction between
20  informational efficiency and fundamental
21  efficiency and that Dr. Hakala has tried to
22  propose that himself, but such a distinction
23  is absolutely at odds with Fama's definition
24  of market efficiency which is the basis of

35

1  Basic v. Levinson and all the law that we
2  have around the issue of reliance and
3  efficient markets in sort of a legal
4  context.
5       So from an academic perspective,
6  there's no distinction. They're identical.
7  One particular court has tried to make a
8  distinction between those two things.
9  Q. So, in your view, there is no difference
10  between informational efficiency and
11  fundamental efficiency?
12  A. Informational efficiency as defined by
13  Fama that an efficient market is one in
14  which the stock price reacts fully and
15  quickly to new value-relevant information,
16  that implies fundamental efficiency directly
17  in Fama's definition, which I quote in my
18  report, fully, meaning that the value of
19  the information is fully reflected in the
20  stock price. Therefore, informational
21  efficiency as defined by Fama implies
22  fundamental efficiency. It's one for one.
23  It's the same.
24  Q. So, in your view, there is no difference?

36

1       MR. BOHAN: I object. It's been
2  asked and answered.
3  A. It's not in my view. It's in Eugene Fama's
4  view. If you look at academic finance, the
5  entire work on efficient markets, those two
6  things are identical.
7  Q. So are you saying that it's not your view
8  or are you saying, do you agree with Fama?
9  A. I agree with Fama that an efficient market
10  fully and quickly reflects value-relevant
11  information and, hence, the informational
12  efficiency implies fundamental efficiency.
13  Q. Well, according to Dr. Hakala, isn't
14  informational efficiency the testable
15  hypothesis required for market efficiency
16  for the purposes of the fraud on the market?
17  A. I'm unaware of Dr. Hakala ever publishing
18  a peer-reviewed article on the topic and,
19  hence, don't really understand how he is
20  capable of contradicting Eugene Fama on
21  this particular matter.
22       I understand what he wrote in his
23  report, but that distinction does not exist
24  in academic finance, the distinction between

f49f c79c-d64c-41e7-86a6-aa4640bf54dc

37

1  **informational efficiency and fundamental**
2  **efficiency.**
3  Q. Now, when you drafted your expert report,
4  you use that construct as the basis for the
5  opinions in your expert report that there
6  is no difference between informational
7  efficiency and fundamental efficiency?
8  **A. No. I use as a basis Eugene Fama's**
9  **definition of market efficiency which is**
10  **quoted in the Basic v. Levinson decision.**
11  Q. So when you were drafting this report, you
12  used Mr. Fama's view that there is no
13  difference between informational efficiency
14  and fundamental efficiency, is that fair?
15  **A. I utilized Professor Fama's definition of**
16  **market efficiency that is quoted directly**
17  **in my report and in the Basic decision.**
18  Q. Okay. And you mentioned that there were
19  some courts that had adopted this or had
20  talked about a difference between the two.
21  Do you recall what decision that was?
22  **A. I don't recall what the exact decision is,**
23  **but I don't recall which circuit it was**
24  **either.**

38

1  Q. Was that the First Circuit's opinion in
2  Xcelera? Does that refresh your
3  recollection?
4  **A. I don't know if it was Xcelera or not.**
5  Q. Now, what's the difference between strong
6  form and semi-strong form of market
7  efficiency?
8  **A. Strong form market efficiency implies that**
9  **all information, both public and private,**
10  **is reflected in a company's stock price.**
11  **The semi-strong form states that all public**
12  **information is fully reflected in a**
13  **company's stock price.**
14  Q. Isn't it true in the semi-strong form of
15  market efficiency, it only requires that
16  widely disseminated public information be
17  reflected in the stock price in a reasonably
18  rapid manner?
19  **A. That's incorrect. That definition is wrong.**
20  Q. Okay. And even if there is an efficient
21  market, can it be the case that the market
22  can react to news and commentary and
23  additional analysis of new events to cause
24  a stock price to move on the day following

39

1  an event?
2     MR. McCALL: Object to the form.
3  **A. Not in an efficient market. The way the --**
4  **the way the definition of efficient market --**
5  **the implications of the definition of an**
6  **efficient market is that when a piece of**
7  **information comes to the public, that the**
8  **value implications of that are incorporated**
9  **in the stock price rapidly. There's a**
10  **whole literature that looks at the speed**
11  **of adjustment to the announcement of new**
12  **information and, in general, that work,**
13  **first of all, when we only had daily stock**
14  **price showed that in general it was within**
15  **a day, but now that we have intraday stock**
16  **price reaction, people have shown that very**
17  **quickly, in a matter of, clearly in a matter**
18  **of hours, but sometimes in a matter of**
19  **minutes.**
20     **So the additional analysis, if the**
21  **information is already out there, the value**
22  **implications of that in an efficient market**
23  **are impounded on the day that that**
24  **information comes to the market.**

40

1  Q. Now, do you agree or disagree with the
2  statement that market efficiency merely
3  requires that the movement on the following
4  day not be predictable ahead of time?
5     MR. McCALL: Object to the form.
6  **A. No, that's -- so you got the logic wrong.**
7  **So if the return on the next day is**
8  **predictable from the prior day's return,**
9  **then that violates market efficiency. It**
10  **actually violates weak-form market**
11  **efficiency. But even if the next day's**
12  **stock price is not predictable, it still is**
13  **the case that the market can be inefficient.**
14  **So it is sufficient just to prove**
15  **market inefficiency to show predictability,**
16  **but the lack of predictability does not**
17  **show that the market is efficient.**
18  Q. So if a company were to issue an earnings
19  announcement one day that could cause a
20  certain price reaction that day and yet
21  an analyst, after conducting additional
22  research and interviews customers and
23  competitors, might issue a report downgrading
24  or upgrading the stock on the following day

f49c79c-d64c-41e7-86a6-aa4640bf54dc

41

1    and that downgrade or upgrade can have a
2    significant effect on the stock price, in
3    your view, is that correct in an efficient
4    market?
5          MR. McCALL:  Object to the form.
6  **A.  It's an incomplete hypothetical.  If --**
7    **well, you just said that the analyst does**
8    **additional interviews and collects additional**
9    **information and, therefore, his downgrade**
10   **would embody additional information, so**
11   **there's the earnings announcement that has**
12   **its effect and then if the analyst does**
13   **additional data-gathering and**
14   **information-gathering and the like, then**
15   **his downgrade would contain new information.**
16   **It wouldn't contain the earnings announcement**
17   **information.  It would contain different**
18   **information and, therefore, the price**
19   **reaction to his upgrade or her upgrade or**
20   **her downgrade would be a response to the**
21   **information that he or she collected which**
22   **was different from the value of the earnings**
23   **announcement.  The value implication of the**
24   **earnings announcement would be incorporated**

42

1    **on the day of the earnings announcements.**
2  Q.  What if the upgrade or downgrade was based
3    on in part -- let's just say based wholly
4    on the earnings announcement?
5          MR. McCALL:  Object to the form.
6  **A.  If there was no additional information,**
7    **then an efficient market would say that the**
8    **upgrade or downgrade by itself should not**
9    **cause additional stock price reaction because**
10   **the implications of the earnings**
11   **announcement, the value implications of that**
12   **earnings announcement in an efficient market**
13   **will be impounded on the day that that**
14   **information comes to the market.**
15   **So if the analyst says the only**
16   **thing I'm basing this on is the earnings**
17   **announcement, I've done nothing else in**
18   **between and the only thing I'm doing is**
19   **changing my recommendation based on**
20   **yesterday's earnings announcement, there**
21   **should be no -- in an efficient market, if**
22   **the market is efficient, there should be no**
23   **stock price reaction to that.**
24  Q.  Well, what if the market's reaction to the

43

1    analyst's report -- I mean, can the market's
2    reaction to the analyst's report be
3    consistent with an efficient market if
4    investors could not have reliably predicted
5    that the analyst's report being issued with
6    that specific recommendation in advance of
7    its publication, meaning that the investors
8    could not predict the specific recommendation
9    of the analyst?
10        MR. McCALL:  Objection to form.
11  **A.  In an efficient market, the value of a**
12   **piece of information, in this case the**
13   **earnings announcement, is incorporated into**
14   **the stock price quickly and fully.  If**
15   **there's no additional information that**
16   **comes to the market on the subsequent day**
17   **and the only thing that causes the change**
18   **in the recommendation was the earnings**
19   **announcement, if the market is efficient,**
20   **it should incorporate that on the day that**
21   **the earnings are announced, not on the day**
22   **that the recommendation changes.**
23  Q.  Well, what if the analyst's report said,
24    well, based upon, you know, me following the

44

1    company for the last two years and my own
2    analysis and education and background and
3    based upon what the company has stated in
4    its earnings announcement the day before I
5    downgrade the stock and the stock goes down,
6    would that be considered new information,
7    old information or something else?
8  **A.  The only new information is the opinion of**
9   **one investor, so it's information about**
10   **an opinion, but the information about the**
11   **company was released the day before.  So**
12   **in that case it's -- it's still hard.**
13   **The notion of efficient market is**
14   **the collective wisdom of thousands or**
15   **millions of investors who trade the stock.**
16   **I just can't imagine that it would be**
17   **consistent with the market that information**
18   **is released the day before, that's the**
19   **only change, and the analyst says I'm**
20   **changing this solely because of the change**
21   **in the earnings announcement, not because**
22   **they pronounced some change, the future**
23   **projection or the future of the company.**
24   **If they just sort of said that's the only**

45

1    thing that came to the market, I just
2    don't -- that information should be impounded
3    on the day of the earnings announcement.
4    Q.  In your view, would one wait to determine
5        the basis for an analyst's upgrade or
6        downgrade of a stock to determine that,
7        would you want to see their deposition
8        testimony?
9    A.  It could be useful, and I've read the
10       deposition testimony of analysts before.
11   Q.  And in an efficient market, isn't it true
12       that the market itself, investors and
13       analysts can learn over time new information
14       or does it have to happen at once?
15           MR. McCALL:  I object to the form
16       of the question.
17   A.  So new information can come to the market
18       all the time.  So companies make
19       announcements, there's results of trials,
20       there's announcements about product sales.
21       There's all kinds of information which
22       comes to the market.  So, clearly, you know,
23       if we didn't learn anything, the stock price
24       would stay the same forever, so clearly the

46

1        stock price changing means information is
2        coming to the market all the time.
3    Q.  In your view, does new information have to --
4        well, strike that question.  In an efficient
5        market, does new information come out in a
6        single event or can it come out -- strike
7        that question.
8            Now, Dr. Gompers, are you familiar
9        with the Cammer factors?
10   A.  I am.
11   Q.  Do you agree that the Cammer factors are
12       indicative of market efficiency?
13   A.  I think I'm clear in my report that
14       efficient -- stocks which are traded in an
15       efficient market will generally have stock
16       market characteristics consistent with the
17       Cammer factors, so stocks which trade in an
18       efficient market generally have those
19       characteristics.  Just because those
20       characteristics hold does not necessarily
21       mean that the market is efficient.  And I
22       should be clear that I'm talking about
23       the first four of the five Cammer factors
24       because the fifth Cammer factor is a direct

47

1    test of market efficiency, if you understand
2    it, and it's in the notion that you test the
3    cause-and-effect relationship of a stock
4    price movement to new value-relevant
5    information coming to the market, so the
6    kind of event study analysis that I employ
7    in my report.
8        The first four, however, are just
9    structural characteristics which are
10   generally efficient stocks.
11   Efficiently-traded stocks generally have
12   those characteristics, but those
13   characteristics by themselves do not prove
14   that the market is efficient.
15   Q.  So is it fair to say that if the fifth
16       Cammer factor by itself, in your view, was
17       satisfied, then the company's security is
18       trading in an efficient market.  Is that
19       your testimony?
20   A.  A properly specified event study is the
21       direct way to test for market efficiency,
22       absolutely.
23   Q.  So as long as the fifth Cammer factor is
24       satisfied and let's say the company doesn't

48

1    meet the other four, first four, it would
2    be your opinion that in that case the
3    company's stock will be traded in an
4    efficient market?
5    A.  That is correct.  I didn't offer up the
6        Cammer factor.  From my report I was, when
7        I talk about the Cammer factors, those were
8        the ones relied upon by Dr. Hakala and he
9        presents them and I showed, show in my
10       report that the first four don't hold for
11       a substantial portion of the class period.
12   Q.  Now, Dr. Gompers, you have Exhibit 2 in
13       front of you.  Can you turn to Paragraph 33
14       of your report.  I think it starts on Page 26
15       and continues to Page 27.  Can you just read
16       Paragraph 33 and let me know when you're
17       finished.
18   A.  (Witness examines document)  Yes, I'm
19       finished.
20   Q.  Now, at the bottom of Paragraph 33 you said
21       that the average weekly trading volume during
22       2002 was only 185,000 and some shares or 1.3
23       percent of the shares outstanding.  And based
24       upon your experience, is a 1.3 percent weekly

49

1   turnover a low number, a high number?
2   A. It's a low number.
3   Q. What would you consider with respect to
4     the first Cammer factor a high number?
5     Where would you have to be above to be
6     considered a high number? What's the
7     threshold between low and high, in your
8     view?
9   A. So I'm not offering up the Cammer factors.
10    There's some discussion in the, I believe
11    it was in the Cammer decision or maybe the
12    other about a two percent cut-off and that
13    anything below one percent is in its opinion
14    sort of highly liquid and problematic. So
15    I would never use this as a test of market
16    efficiency.
17        What I'm trying to do in this
18    report and as I go through the four Cammer
19    factors, is just show the subjective and
20    cursory nature that Dr. Hakala approaches
21    them. He's the one who's trying to offer
22    these, and what I'm showing is that his
23    analysis obfuscates the whole issue about
24    even if his own standards are met, and so I

50

1     would never hold any particular threshold.
2         You asked is this a relatively low
3     number. If you look at shares, 1.3 percent
4     average weekly trading value is an incredibly
5     low number for a typical stock. So I'm not
6     offering this up as any particular threshold.
7     It's a low number, but it also just shows
8     that Dr. Hakala, by averaging over the whole
9     period is -- I don't know. I wouldn't say
10    necessarily deceitful, but he's trying to
11    hide the nature of Northfield's stock over
12    big portions of the class period.
13  Q. So it says here that in 2002 it was 1.3
14    percent, but above you cite Dr. Hakala's
15    statement that it was, on average it was,
16    actually, 8.4 percent per week, is that
17    correct?
18  A. That's over the whole entire class period.
19  Q. So if it's 1.3 percent in 2002, that means
20    in later parts of the class period it could
21    have been even higher than 8.4 percent,
22    such as ten percent, 11 percent, 12 percent,
23    that's just statistics, right?
24        MR. McCALL: Object to the form of

51

1     the question.
2   A. So we can look at Exhibit A, but clearly if
3     one year has an average which is lower than
4     the average of the whole period, there are
5     other periods which by necessity have to
6     have an average which is higher than the
7     whole period.
8   Q. Now, in assessing market efficiency, does
9     the number of analysts following the stock
10    play any, have any factor in determining
11    whether a market is efficient or not?
12  A. So as I mentioned, stocks which are traded
13    efficiently will generally have analysts
14    covering those stocks. In and of themselves,
15    having analysts following a stock does not
16    necessarily make it efficient. So you can
17    have stocks which are followed by lots of
18    analysts, yet the stock could still be
19    inefficient.
20  Q. Okay. Now, in your view of the first four
21    Cammer factors, could you rate, if you can,
22    and if you can't, you can tell me why, rate
23    in importance which one of those four that
24    you would tend to see more often in an

52

1     efficient market than in an inefficient
2     market? Would you see a high average trading
3     volume more in efficient markets or would
4     you see a higher number of analysts or would
5     you say that there would be more companies
6     eligible to file an S-3 if the stock traded
7     in an efficient market?
8   A. So typically we think about -- so Dr. Hakala
9     talks about the level of institutional
10    ownership, which is typically not the third
11    Cammer factor. Typically, I believe the
12    way the Cammer court discusses the third
13    Cammer factor, that they talk about market
14    makers and arbitrageurs, so that's the nature
15    of the third Cammer factor, and typically
16    stocks that have lots of market makers and
17    particularly lots of arbitrageurs so if
18    there are a lot of -- so the way efficient
19    markets work is when smart arbitrageurs try
20    to correct mispricing with their trading
21    behavior. Now, clearly there are hindrances
22    to the arbitrage market, and I talk in my
23    report in particular about some of the
24    constraints about the short market

53

1 potentially with Northfield. There are a
2 whole bunch of others as well.
3 So the way we think about efficient
4 markets is we think about the functioning
5 of the arbitrage market which is discussed
6 in the third Cammer factor, and examination
7 of the arbitrage market would be something
8 that would be important to look at in order
9 to understand market efficiency, but in
10 general, the others have little influence
11 about whether the market is efficient or
12 inefficient.
13 Q. So, in your view, the presence of market
14 makers and arbitrageurs of the first four
15 Cammer factors is more consistent with an
16 efficient market than, say, the high average
17 trading volume, number of analysts or the
18 ability to file an S-3?
19 MR. McCALL: Objection to form.
20 A. Yes, when you look at the academic
21 literature. So the whole literature around
22 failures of market efficiency rest on what
23 are called limits to arbitrage, factors that
24 make arbitrage of mispricing difficult, and,

54

1 therefore, the direct discussion in the
2 third Cammer factor of market makers and
3 arbitrageurs is consistent with the
4 literature over the last 15 or 20 years on
5 the breakdown in the situations in which
6 market efficiency breaks down.
7 Q. Now, in assessing market efficiency, is it
8 fair to say that in order to determine
9 whether information about a company has
10 an impact on the value of the company's
11 stock, that one has to first consider
12 whether the information has fully entered
13 the market? Is that a fair statement?
14 A. No. The definition of market efficiency
15 is that when information, that public
16 information is fully and quickly incorporated
17 into the stock price. So market efficiency
18 doesn't say everybody needs to know the
19 information for it to be incorporated into
20 the stock price or 90 percent of people or
21 57 percent of the people. What it says is
22 public information. That's the whole basis
23 of the issue of reliance, is that I don't
24 need to know -- in an efficient market, I

55

1 don't need to know every piece of public
2 information. As long as somebody else
3 knows that piece of information, its value
4 relevance is impounded into the stock price.
5 So the notion that it has to be
6 widely disseminated or some percentage of
7 people need to know it is irrelevant from
8 the determination of market efficiency.
9 Q. Now, when I was talking about market
10 efficiency in that question, is your answer
11 considering the strong form of market
12 efficiency or the semi-strong form of market
13 efficiency?
14 A. Semi-strong.
15 Q. In the strong form of market efficiency,
16 the company's stock price impounds in
17 private and public information, is that
18 correct?
19 A. That is correct.
20 Q. And in the semi-strong form, it only, the
21 company's stock price only impounds public
22 information, correct?
23 A. That is correct.
24 Q. Now, what's your definition of private

56

1 information?
2 A. Private information is a piece of information
3 that one person has. It's, you know, I
4 learned that there's going to be a merger
5 announcement because I overheard in the
6 hallway or I found a piece of garbage
7 because I'm a garbage collector and I found
8 a piece of paper in the garbage that talks
9 about it, so that's private information.
10 It has not been released to the public.
11 I find it in a way or obtained it in a way
12 akin to that or something that I gained
13 through I'm an employee of a particular
14 company and I know because I'm working on a
15 project. That's private information.
16 Q. So if more than one person knows the
17 information, then it's public?
18 A. No. If it's been disseminated in a way
19 which is freely accessible, so there are
20 lots -- especially today there are lots of
21 media through which we can find information,
22 but if it's freely available in the market
23 to anybody, if you can go and anybody can
24 access it, it's public.

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

57

1 Q. So in a semi-strong form of market
2 efficiency, your opinion is that it doesn't
3 matter whether the information is widely
4 disseminated, but it turns on whether the
5 information is freely available to the
6 market?
7 A. If it's accessible to the market, yes.
8 Q. When you say "the market," who are you
9 referring to? Are you talking about
10 investors, market participants such as
11 analysts, market makers or something else?
12 A. To anybody.
13 Q. So like John Q citizen off the street who
14 owns no stocks, that he's considered, in
15 your view, if he knows the information
16 that's available to him, then the market
17 must know?
18 A. No, no, so there's no -- you're
19 mischaracterizing my answer. What I'm
20 saying is, you know, the piece of information
21 is available to John Q public, it's available
22 to John Q investor and it's available to
23 John Q lawyer. It's available and you can
24 access it in the market. And when we find

58

1 strong indication that not just is it
2 available to John Q public, but if we find
3 people who own that a particular stock are
4 discussing a piece of information that's
5 posted in the public, it's absolutely
6 public information.
7 Q. Do you know who Sophia Twaddell is, T W A D D
8 E L L?
9 A. I do.
10 Q. Okay. And who do you know her to be?
11 A. I believe she's the CFO or was the CFO of
12 Northfield.
13 Q. Now, I'm going to pose this hypothetical
14 to you. Let's assume in 2003 elementary
15 schools in the area where Northfield had
16 its facilities took some field trips over
17 to Northfield's facilities, and let's say
18 there were five field trips, each consisting
19 of 30 students, two teachers and two soccer
20 moms for each of these trips. Let's say
21 during these trips that Sophia Twaddell,
22 she led the tour and she was explaining
23 all of Northfield's equipment and things of
24 that nature and she told each of these five

59

1 groups that in a prior clinical trial,
2 that heart attacks occurred most frequently
3 in patients receiving PolyHeme than those
4 who did not, and prior to these presentations
5 to these elementary school students, that
6 information had never been disclosed
7 publicly.
8 So, in your view, if in 2003
9 Northfield stock was being traded in an
10 efficient market, should the statements
11 that Ms. Twaddell gave to these various
12 school students and teachers, should that
13 have -- did that information enter the
14 market? Was that publically available
15 information?
16 A. Not necessarily.
17 Q. And why is that?
18 A. I'd have to look for confirming evidence
19 that it went beyond the group of elementary
20 school children. So if I found --
21 Q. There were teachers and mothers there as
22 well.
23 A. If I found evidence from, say, Internet chat
24 rooms with investors who actually owned the

60

1 stock who said, you know, I have this
2 information and little Sally was told this
3 and I was able to ultimately, you know,
4 confirm it not just as hearsay, but was
5 able to confirm it and I found confirming
6 evidence from other sources, then I would
7 sort of say that information did ultimately
8 end up as public information, but it's not
9 necessary that that kind of statement make
10 it into the public realm. It was a verbal
11 communication in the context of people who
12 may not be interested in trading the stock
13 and it may not get disseminated. That's
14 very different than posting on the company
15 website, posting on hospital websites and
16 actual discussions with investors who link
17 other investors to that information. So
18 in that case, absolutely it's public
19 information. In the hypothetical you stated,
20 I would have to look for other evidence that
21 it ultimately got into the market.
22 Q. So to determine whether in assessing an
23 efficient market whether the information is
24 public, you need to make a determination of

f49c79c-d64c-41e7-86a6-aa4640bf54dc

---

61

1    whether that information actually made it
2    to investors or was available to investors
3    rather than just being available to anyone
4    on the street?
5  **A. So if you look at what I did compared to**
6    **what Dr. Hakala did, I went and I looked**
7    **for prior news, prior publications, prior**
8    **information that was available to anybody**
9    **in the public on websites and the like and**
10   **direct links to people that saw this**
11   **information.**
12     **So unlike Dr. Hakala, who makes no**
13   **assessment about whether or not information**
14   **was actually in the market prior to a**
15   **particular announcement, I look for evidence**
16   **that in public places it's available.**
17     **There's no way in your hypothetical,**
18   **there's no way that I, as an investor, could**
19   **go and find that information because I**
20   **don't live where Northfield's plant was, my**
21   **children weren't there and there's nothing**
22   **that necessarily says that little Sally is**
23   **going to put on her blog that she went to the**
24   **Northfield plant that day and learned from**

---

62

1    **Ms. Twaddell that these were the results.**
2    **That's very different than finding that the**
3    **information was put on a public website of**
4    **hospitals and the company and that actual**
5    **investors who held, doctors who held**
6    **Northfield stock discussed this information,**
7    **provide links to this information, and in**
8    **that case it's impossible to believe that**
9    **that's not public information. In fact,**
10   **it's counter to everything that one would**
11   **believe.**
12  Q. So in my hypothetical, if little Sally
13   had a blog and she posted we went on a
14   field trip today and Sophia Twaddell told
15   me that PolyHeme in a prior clinical trial
16   caused heart attacks and in the group that
17   didn't receive PolyHeme didn't have heart
18   attacks, would that be publically available
19   information because it's posted on a
20   publicly available blog?
21  **A. Not necessarily. There's the issue of,**
22   **one of credibility, how could you verify**
23   **that that was true? That's very different**
24   **than the company's own website or disclosures**

---

63

1    **the company makes in the context of these**
2    **trials that it was undertaking in these**
3    **various hospitals and the links on those**
4    **hospital websites.**
5  Q. So in determining whether information,
6   public information has entered the market,
7   it's important, in your view, the credibility
8   of the information, where it comes from? Is
9   that what you're saying?
10  **A. So there are opinions and opinions don't**
11   **necessarily add new information to the**
12   **market, but there is information and people**
13   **who are trading Northfield stock, you know,**
14   **little Sally may not have anybody who goes**
15   **to her blog. But if I found investor chat**
16   **rooms who sort of say, you know, I saw this**
17   **on little Sally's blog and ultimately was**
18   **able to track down the information and, yes,**
19   **what Sally said was true, at that point**
20   **then I think Sally's information would be**
21   **considered public information. But you**
22   **need to -- the important thing here is that**
23   **you can't just go from headlines and make**
24   **little dummy variables and say this is new**

---

64

1    **information, this is not new information.**
2    **A researcher needs to undertake an analysis**
3    **of all the available sources of information,**
4    **understand whether or not it's new or not.**
5  Q. Okay.
6    MR. KIM: You want to take a couple
7   of minutes?
8    MR. McCALL: Yes.
9    (Break taken)
10  BY MR. KIM:
11  Q. Now, Dr. Gompers, let's assume that
12   biotech company A stock is traded in an
13   efficient market and let's say there's
14   adverse information about biotech company A's
15   main product and that adverse information,
16   however, is contained in a patient's medical
17   record. In that situation, is the adverse
18   information contained in the patient's
19   medical record publicly available?
20  **A. Not under HIPPA.**
21  Q. So if there is adverse, in an efficiently
22   traded stock there's adverse information
23   about the company and it's contained in a
24   record or writing that is protected,

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

65

1    confidential or under HIPPA, as you
2    mentioned, then that information would not
3    be considered publicly available information
4    in an efficient market. Is that fair?
5  **A. If it's not -- well, it's possible that the**
6    **information in the patient's record could**
7    **be disseminated as some collective result**
8    **via a disclosure on a company website or a**
9    **hospital website or the like so that**
10    **disclosure could reveal the information**
11    **without revealing the exact information in**
12    **a person's record, but there are ways that**
13    **that information can come to the market**
14    **without that person's record being revealed.**
15    **If the only place where that**
16    **information is is that patient's record and**
17    **there's no summary of it posted on a website**
18    **or published eventually somewhere else, then**
19    **that private information, if the only place**
20    **it is is in a patient record, it's not, then**
21    **it's private information.**
22  Q. Okay. Now, in assessing whether information
23    is public information or private information,
24    isn't it useful to review analysts' reports

66

1    to determine what the market was aware of
2    or whether it was not aware of it?
3  **A. So one place you could look would be to**
4    **look to analysts' reports and, for example,**
5    **if you look at the analysts' reports after**
6    **the February 22nd Wall Street Journal**
7    **article, they sort of said that the**
8    **information in that article was not new,**
9    **it's just not new at all. So one place**
10    **you could go would be to analysts' reports,**
11    **but I'd clearly look at a lot of other**
12    **places as well.**
13  Q. Now, let's turn to your report to Paragraph
14    16. Just take a quick look at that and
15    let me know when you're finished.
16  **A. (Witness examines document) Yes.**
17  Q. Now, in your view, these disclosures that
18    you mentioned in Paragraph 16, your view
19    is that all these disclosures constitute
20    public information and not private
21    information?
22  **A. Yes.**
23  Q. And that the market was aware of this
24    information?

67

1  **A. Yes.**
2  Q. And other than the existence of this
3    information, were you provided any evidence
4    to suggest that the market was aware of
5    this information other than the disclosures
6    themselves?
7  **A. So clearly for much of this, for much of**
8    **this there's discussion of, for example,**
9    **the community outreach, the hospital FAQs**
10    **and the company website were discussed on,**
11    **I believe it's the fourth, third bullet**
12    **point here. Actual holders of Northfield**
13    **stock indicated that they had sort of seen**
14    **this, provided links on the message board**
15    **directly to this information, so --**
16  Q. How do you know that these people actually
17    held Northfield stock?
18  **A. If you read through them, you sort of see,**
19    **oh, I think I'm going to sell the stock or**
20    **there are discussions of many of them sort**
21    **of state I'm a holder of the stock. The**
22    **people who go to these boards, I think it's**
23    **fair to say that the people who participate**
24    **in these investor chat rooms by and large,**

68

1    **if you're going to go in the Northfield**
2    **chat room you're not doing it for your**
3    **enjoyment. You're doing it because you**
4    **hold company stock.**
5  Q. These disclosures that you cite, do any
6    of these disclosures state that in the
7    ANH trial, that ten of 81 patients that
8    received PolyHeme and suffered heart
9    attacks, do any of the disclosures you
10    cite mention that specific fact?
11  **A. No.**
12  Q. Do any of these disclosures you cite
13    mention the fact that there were
14    statistically significant incidents of
15    serious cardiovascular adverse events in
16    the ANH trial?
17  **A. The Marketing Research Bureau report itself**
18    **discusses it.**
19  Q. Other than the Marketing Research Bureau
20    report?
21  **A. They don't specifically use the term**
22    **"statistically significant," but in the**
23    **context of scientific research, if you say**
24    **something has a higher incidence of X, you**

69

1  only state that it has a higher incidence
2  of X if it's statistically significant.
3        So this is the disclosure here for,
4  or the language in Marketing Research Bureau,
5  somebody who reads scientific research knows
6  that, you know, if it's not statistically
7  significantly different, you sort of state
8  that they have equivalent rates of adverse
9  events. You state it has a higher rate if
10 it's statistically significant. It's sort
11 of implied in that disclosure.
12 Q. So as a scientist, you're suggesting that
13    if you were to say that there were higher
14    rates, then that means the same as saying
15    the rate was statistically significant?
16 A. So having published many peer-reviewed
17    journal articles, when you write, when you
18    state something is higher, you only state
19    that something is higher or something is
20    lower if that relationship is statistically
21    significant because you can't make that
22    statement reliably if it's not statistically
23    significant.
24 Q. But these are not journals, right? These

70

1  disclosures you site aren't -- these are
2  supposed to be geared to investors, in your
3  view, right?
4        MR. McCALL: Object to the form.
5  A. So when you talk about research, numbers
6  are never identical necessarily, but you
7  talk about a difference only in the context
8  of which something is statistically
9  significantly different.
10 Q. And do any of these disclosures that you
11    cite in your report, do they talk about why
12    the ANH trial was shut down?
13       MR. McCALL: Object to the form.
14 A. There was disclosure about why the ANH
15    trial was closed down. I don't recall
16    whether or not that was included in these.
17    It was clearly discussed in prior 10-Ks.
18    I just don't recall from these full FAQs
19    about whether that language was in these
20    disclosures or not, so I just don't recall.
21 Q. Do you know if any of these disclosures
22    stated that the ANH trial was shut down
23    because of statistically significant
24    incidents of serious adverse cardiovascular

71

1  events?
2        MR. BOHAN: I object to the form
3  of the question.
4  A. I don't believe that language was in any
5    of these disclosures.
6  Q. And if these public disclosures themselves
7    contained false and misleading information --
8    let me strike that question, actually.
9        Now, do you think it would have
10   been relevant to investors to know that the
11   ANH study might have been discontinued due
12   to an increase of serious cardiovascular
13   adverse events and not the result of
14   Northfield having trouble obtaining patients
15   for the ANH study?
16       MR. McCALL: Object to the form and
17   the foundation.
18 A. Are you asking me to assume that it was --
19   that it was discontinued for a particular
20   reason or are you asking me -- so...
21 Q. Do you think it would have been important
22   to investors at this time in 2005, that it
23   would have been important for investors to
24   know why a particular clinical trial was

72

1  shut down and if the reason for the trial
2  being shut down was the fact that there
3  were serious cardiovascular events, would
4  that have been something that, in your view,
5  been important to investors?
6        MR. McCALL: Object to the form,
7  foundation.
8  A. As a general rule, perhaps. In this
9    particular circumstance, not necessarily.
10   Given that the FDA had been given all the
11   information from the ANH trial and had
12   allowed the trauma trials to go forward,
13   the results of a past trial in that case
14   for ANH I don't necessarily believe that
15   it was relevant to the trauma trial. The
16   elective surgery trial, that application was
17   no longer what they were pursuing. They
18   were pursuing trauma and, therefore, what's
19   important for the company going forward is
20   the trauma use and not the elective surgery
21   use.
22 Q. In a company like Northfield, do you think
23   the safety of PolyHeme, do you think any
24   information impacting on the safety of

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

73

1 PolyHeme was information that would have
2 been material to investors?
3 **A. Potentially.**
4 Q. Is that a yes or a no?
5 MR. BOHAN: Object to the form of
6 the question.
7 **A. It depends upon the context and the**
8 **specifics.**
9 Q. In order to -- you say potentially now.
10 In order to determine that, would that be
11 something a reasonable investor could do
12 on their own?
13 **A. With what particular disclosure?**
14 Q. Anything regarding safety. If there's
15 information, a disclosure about something
16 impacting PolyHeme safety, would a reasonable
17 investor be able to make his, her or its
18 own determination of whether that information
19 was material?
20 **A. The market would -- if the market is**
21 **efficient, then if that information is**
22 **value-relevant, then we would expect it to**
23 **impact the stock price in that regard. So**
24 **the important thing is is it new information,**

74

1 **is it value-relevant information and then**
2 **is it incorporated into the market.**
3 Q. Now, let me show you...
4 MR. KIM: What are we up to?
5 (Exhibit 3 marked for
6 identification.)
7 MR. KIM: This is four.
8 (Exhibit 4 marked for
9 identification.)
10 Q. Now --
11 MR. McCALL: Wait, hold on. I've
12 got a Q&A.
13 MR. KIM: It's already attached
14 there? Yes, it's a Q&A. The backgrounder
15 document which is there, for some reason,
16 whoever prepared this didn't include that.
17 MR. McCALL: We need to have at
18 least one copy over here, Phil, if you ask
19 questions about exhibits.
20 MR. KIM: You're sitting next to
21 Dr. Gompers. You can share the backgrounder
22 document. I'll see if I have another copy
23 of the Q&A.
24 MR. McCALL: The Q&A is Exhibit 4?

75

1 MR. KIM: Yes.
2 MR. McCALL: So when we get to the
3 backgrounder document, just...
4 MR. KIM: I'll give you some extra
5 time.
6 MR. McCALL: Go slower so that we
7 can stand up and look at the document.
8 MR. BOHAN: Kevin is sitting next
9 to the witness. Phil, can I sit next to you,
10 then?
11 Q. Now, Dr. Gompers, I'm showing you Exhibit
12 No. 4, which is the questions and answers on
13 the PolyHeme trauma trial. Have you seen
14 this document before today?
15 **A. I have.**
16 Q. Is this one of the documents that are cited
17 in your report as being a prior disclosure?
18 **A. It's similar to -- I don't know if it's an**
19 **exact one that I cite in my report, but**
20 **it's similar to those that are, the sort of**
21 **answers to frequently asked questions and**
22 **on a lot of the company websites and the**
23 **like, hospital websites, so I have no reason**
24 **to doubt, without checking Bates stamps,**

76

1 **whether or not it is, but I've seen multiple**
2 **versions of this.**
3 Q. So similar disclosures were made on the
4 various hospital websites that you cite and
5 the company's website?
6 **A. And distributed at a variety of community**
7 **meetings as well.**
8 Q. Can you turn to Page 4 of the document and
9 under the heading, What Has Been the Safety
10 Experience with PolyHeme in Prior Studies,
11 do you see that heading?
12 **A. Yes.**
13 Q. Now, in the second paragraph, I want you to
14 read that paragraph and let me know when
15 you're finished, the one that starts with
16 "PolyHeme was studied." Do you see that?
17 **A. Yes. (Witness examines document) Okay.**
18 Q. Now, in that paragraph it says, "serious
19 cardiovascular adverse experiences occurred
20 more frequently in the PolyHeme group." Do
21 you see that?
22 **A. Yes.**
23 Q. And similar statements were made in the
24 various other disclosures that you cite in

f49c79c-d64c-41e7-86a6-aa4640bf54dc

77

1    Paragraph 16 of your report?
2  A. Correct.
3  Q. Now, doesn't that statement imply that the
4     group that was not receiving PolyHeme, those
5     individuals suffered serious cardiovascular
6     adverse experiences as well?
7  A. No. It just says more frequently in the
8     PolyHeme group. When you read this, what
9     this says is that the summary statistic
10    for the rate of cardiovascular events was
11    higher in the PolyHeme group than the other
12    group.
13 Q. But I'm asking you about the sentence
14    that says, "serious cardiovascular adverse
15    experiences occurred more frequently."
16 A. Yes.
17 Q. So, in your view, doesn't that seem to
18    suggest that there were heart attacks in
19    the non-PolyHeme group?
20         MR. McCALL: Asked and answered.
21 A. Not necessarily.
22 Q. Well, do you know if there were any heart
23    attacks in the non-PolyHeme group in the ANH
24    trial?

78

1  A. I believe that in the ANH trial it was ten
2     of 81 and zero, whatever, mortality was --
3     there were other issues of mortality over
4     the period of time, but the incidence of
5     cardiovascular events in that initial period,
6     I believe, was exclusively with the PolyHeme
7     group.
8  Q. And next to you you have Exhibit No. 3?
9  A. Yes.
10 Q. And it's the backgrounder document, and is
11    that document kind of a same document that's
12    referred to in Paragraph 16 of your report
13    and where similar disclosures were made?
14 A. I believe.
15 Q. You can take a look through it first.
16 A. (Witness examines document)
17         MR. McCALL: Phil, where did this
18    document come from? It looks like it was
19    filed in the case.
20         MR. KIM: I think you guys filed
21    that.
22         MR. McCALL: Okay. With the
23    motions, okay.
24         MR. KIM: With the header on it.

79

1  A. I mean, I've seen documents like this.
2  Q. Now, in the second page of the document --
3         MR. McCALL: Hold on just a second.
4     David wants to look at the identification
5     number. Go ahead.
6  Q. In the second page of the document under
7     Experience with PolyHeme, it's the third
8     paragraph that says "PolyHeme was studied in
9     one trial," do you see that?
10 A. Yes.
11 Q. Can you take a read of that paragraph and let
12    me know when you're finished.
13 A. (Witness examines document) Okay.
14 Q. Now, that third paragraph states in the
15    middle again, "serious cardiovascular adverse
16    experiences occurred more frequently in the
17    PolyHeme group." Do you see that?
18 A. Yes.
19 Q. Now, the statement in that third paragraph
20    is nearly identical to the statement that
21    was in Exhibit No. 4, is that correct?
22 A. There are some slight differences, I believe.
23 Q. But in sum and substance it's --
24 A. It's roughly the same disclosure.

80

1  Q. Okay. And, to your recollection, were
2     similar disclosures made at the community
3     outreach meetings?
4  A. Yes.
5  Q. And at the hospital websites and hospital
6     press that you cite in your expert report?
7  A. Yes.
8  Q. And at the investor chat rooms that you
9     cite in your expert report?
10 A. There were links to the company website
11    and links to the hospital websites that
12    discuss these specific disclosures and
13    actually cut and pasted this exact language
14    on the investor chat rooms.
15 Q. Now, did you conduct any sort of empirical
16    analysis to determine the number of
17    individuals who accessed this information,
18    either the information that's cited in
19    Paragraph No. 16?
20 A. I didn't do a tabulation. I don't know
21    how many people came to the community
22    meetings and the like, but what's clear is
23    that it was picked up by -- it was, A,
24    available generally, anybody who wanted to

81

1  could have access to it and, B, that actual
2  investors in Northfield saw the information
3  and discussed the information.
4  Q.  Now, do you think that Yahoo message board
5      is a reliable source for information for
6      investors?
7  A.  So a lot of people have opinions there,
8      I hate this stock, I love this stock and
9      anything else, and there I wouldn't call
10     that information.  I would call that
11     opinions.  But as reflective of actual
12     facts, did investors in Northfield know
13     these disclosures, that's a great place to
14     go and identify whether or not the facts
15     were known and, as I showed, the facts were
16     shown about investors having seen this
17     information.
18 Q.  So is the Yahoo chat rooms a credible source
19     for information for investors?
20 A.  It's a credible place to go to find out
21     whether or not investors knew pieces of
22     information.  So the fact that I was able
23     to identify many days, I can't remember
24     the exact number of days, but there are

82

1  dozens of days in which there are links on
2  the Northfield chat room to this particular,
3  these particular pieces of information,
4  people cutting and pasting this exact
5  language and information so as a place to
6  go to say whether or not investors in
7  Northfield knew this information, that's a
8  great place to go.
9  Q.  Now, do you have any specific facts that
10     show whether in 2005, that analysts knew
11     of the information that was contained in
12     Exhibit No. 4 and Exhibit No. 3 about the
13     serious cardiovascular events in the ANH
14     trial?
15 A.  I'm trying to think.  It's only mid year
16     when we start seeing analysts' reports
17     subsequent to the security offering.  I'm
18     trying to remember sort of exactly.  I don't
19     recall any of the analysts' reports in 2005
20     discussing it, and I'm just thinking of
21     the testimony of Dr. Pace and Dr. Song
22     about when they actually learned of the
23     information, but I don't recall any specific
24     information.  Perhaps Cowen, I'm trying to

83

1  think whether or not the Cowen -- was it
2  Schwimmer?  Anyway, so the exact, you know,
3  what's important is did investors know this
4  information.
5  Q.  Now, if there were such facts, it would be
6      in your report, right?
7  A.  If prior to my report I saw that information,
8      it would be in the report, yes.
9  Q.  At the time you wrote your report, did you
10     read Dr. Pace's deposition?
11 A.  No.  It was only subsequent to my report.
12 Q.  Why did you read his report after you had
13     written a report?
14 A.  In preparation for this deposition, I had a
15     couple of questions and the attorneys thought
16     it would be useful to read Dr. Pace's
17     deposition.
18 Q.  Back to Paragraph 16 of your report, the
19     first bullet point is disclosures at
20     community outreach meetings.  Do you see
21     that?
22 A.  Yes.
23 Q.  And it's your understanding that these
24     outreach meetings were conducted in

84

1  furtherance of Northfield's attempt to
2  conduct its trauma trial in various
3  communities.  Is that fair to say?
4  A.  Yes.
5  Q.  Now, such community outreach meetings, is
6      that a typical conduit which publicly-traded
7      companies use to release financial
8      information?
9  A.  Well, I mean, there are regulations about
10     financial market information and the way
11     you disseminate financial information.  So
12     companies -- this was done with a purpose
13     of the FDA requiring this for the trial.
14     Now, by them doing that, it provides public
15     information to the market.  It's not the
16     typical practice because, you know, there
17     are a variety of ways in which information
18     gets to the market, some of which are
19     required public disclosures, some of which
20     happen in forums like this.
21 Q.  So this isn't the typical forum in which
22     information that would, say, be contained
23     in a 10-K or 10-Q would be disseminated?
24 A.  Yeah, companies don't typically do this

85

1      voluntarily.  It's done because it's part
2      of a trial.
3  Q.  Now, these community outreach meetings, I
4      think you cited some Powerpoint presentations
5      and such.  Do any of the Powerpoint
6      presentations contain any financial
7      information or statements of that nature?
8  A.  I don't believe they do and I don't believe
9      they could.
10 Q.  When you say -- why don't you think they
11     could?  Why do you say that?
12 A.  Well, certainly forward-looking statements
13     couldn't be offered in this kind of a
14     restrictive forum in terms of public
15     disclosures.  I mean, I don't recall even
16     seeing historical ones, but clearly
17     forward-looking financial statements can't
18     be offered to a subset of people.  It's
19     got to be disseminated in the context of
20     either an SEC filing or a public conference
21     call.
22 Q.  Would that also be the same regarding
23     material information about a company's lone
24     product?

86

1  A.  You can talk about at like a conference or
2      the like particular products.  We know like
3      at various medical conferences people discuss
4      things.
5  Q.  What if that information had not previously
6      been disclosed in a company press release
7      or SEC filing?  Would disclosing that
8      information at a community outreach meeting,
9      would that meet the requirements set forth
10     by the SEC, to your knowledge?
11 A.  Well, I'm not an SEC regulator, but I think
12     the question is whether or not it was
13     forward-looking and that's the sort of the
14     real test.  Clearly a discussion of a past
15     trial in this community outreach is fine and
16     they did it in this context.
17 Q.  Now, with respect to the hospital websites
18     and hospital press releases, do you see that?
19 A.  Yes.
20 Q.  Now, did any of the hospital websites or
21     press releases include financial information
22     regarding Northfield?
23 A.  Not to the best of my knowledge.
24 Q.  And was a disclosure on a hospital website a

87

1      traditional method for publicly-traded
2      companies to release information about its
3      financials?
4  A.  Most companies aren't, pharmaceutical
5      companies or biotech companies --
6  Q.  Well, pharmaceutical companies --
7          MR. McCALL:  Hold on just a second.
8      Phil, you cut him off.  Could you read the
9      question and the witness' answer back?
10         (Record read)
11 A.  So I can imagine that a biotech or pharma
12     company might put information about a trial
13     that's being conducted at a hospital on the
14     hospital website, and so the question is,
15     you know, is that a release of public
16     information, and the answer to that is
17     absolutely, yes, even if most companies
18     wouldn't in the course of business put that
19     type of information on a company website --
20     on a hospital website.
21 Q.  So, in your view, if new information, new
22     material information is posted on a hospital
23     website and not anywhere else by a biotech
24     company, that information is widely

88

1      disseminated to the market?
2  A.  So it's certainly public information and
3      the fact that it's discussed on the investor
4      chat rooms gives me comfort and helps me
5      conclude that that information was public,
6      it was picked up by investors, investors
7      knew that information.
8  Q.  Do you know that if, at any of these
9      community outreach meetings, do you know
10     definitively if any of these people who
11     attended were investors of Northfield?
12 A.  I do not.
13 Q.  Do you know if stock analysts were invited
14     to these community outreach meetings?
15 A.  I don't know.
16 Q.  Do you know if they attended?
17 A.  Not to the best of my recollection.
18 Q.  Do you know if Northfield had invited stock
19     analysts to these community outreach
20     meetings?
21 A.  I don't know.
22 Q.  Now, you cite these disclosures in Paragraph
23     16 in opining that the alleged misstatements
24     and omissions in this case are not material,

89

1    is that correct?
2    A. So no. I cite them here to provide evidence
3       that this information was public. It had
4       been released by the company. Investors
5       knew this information. To the extent that
6       we see, for example, a stock price reaction
7       to old news, so Dr. Hakala never looks at
8       prior information and not just for this
9       disclosure, but for a lot of disclosures I
10      find evidence that there's a prior
11      announcement of a particular news story and
12      Dr. Hakala tries to include a subsequent
13      news story that just restates that news.
14           One thing in order to test market
15      efficiency we have to do is to understand
16      whether or not what's sort of covered in a,
17      for example, newspaper story is old news or
18      new news. And so, for example, if you look
19      at the February 22nd, 2006 New York Times
20      article, that information in that article
21      is old news. The news relative to the ANH
22      trial is old news. And to the extent that
23      the market is reacting to that old news,
24      that's evidence of market inefficiency.

90

1            I cite in my report an academic
2       study that does the exact same test that I
3       do and shows that a newspaper story with a
4       reaction to old information is evidence of
5       market inefficiency.
6    Q. Well, I was asking you more so about
7       materiality right now. And you say in your
8       opinion, is it fair to say your opinion is
9       is that the alleged misrepresentations and
10      omissions are not material because when we
11      allege that the truth of the information --
12      well, are you relying on the fact that
13      Paragraph 16 which lists a bunch of
14      disclosures that happened in 2005, that
15      the truth of the alleged omissions and
16      misrepresentations were released on those
17      dates, therefore, the alleged
18      misrepresentations and omissions are not
19      material because they could not have
20      defrauded the market after the disclosures
21      in Paragraph 16 remain?
22           MR. BOHAN: I object to the form
23      of the question.
24    A. So there are two responses to that, the first

91

1    of which is if you assume the market is
2    efficient. My opinion is that the market
3    is not efficient and, therefore, you can't
4    do a test of materiality by looking at the
5    stock price movement. But if you assume
6    for a second that the stock market for
7    Northfield was efficient, then the fact
8    that there was no stock price reaction to
9    the disclosures here in Paragraph 16 would
10   indicate that this information was not
11   material.
12        A second response would be to
13   look directly at the analyst reports after
14   publishing the February 22nd New York Times
15   article in which the analyst says that the
16   results of that, the results of the prior
17   elective surgery trial have no bearing on
18   our estimates of the potential of PolyHeme
19   in a trauma application, so they themselves,
20   the analysts who Dr. Hakala said you should
21   turn to, state that those results have no
22   implication for their estimates of the
23   potential of PolyHeme for a trauma
24   application. So those two things together

92

1    would lead me to say that that information
2    was not material.
3    Q. So in an efficient market, in order for a
4       misstatement or omission to be material, it
5       needs to move the stock price when that
6       information is disclosed?
7    A. Yes.
8    Q. So your opinion is that in an efficient
9       market, if a mistake was made on January 1st,
10      2005, in order for that misstatement to be
11      material on January 1st of 2005 when the
12      misstatement was issued, that misstatement
13      has to move the stock price?
14    A. No. What I'm talking about is to look at
15      when the, quote, "alleged curative
16      information" comes to the market.
17    Q. The truth of the alleged misrepresentation
18      or omission, is that what you're talking
19      about when you say the "curative
20      information"?
21    A. When information comes to the market which
22      corrects the alleged misinformation, if
23      there's no stock price information to that,
24      then that information is not material.

93

1  Q. Okay. So it doesn't matter whether the
2     stock moves on the day the actual
3     misrepresentation is issued in assessing
4     materiality, is that correct?
5  A. Depending upon the type of announcement,
6     one test of misinformation could be to look
7     at when information -- one test of
8     materiality could be to look at potential
9     purported misstatements and to see whether
10    or not those misstatements affect the stock
11    price. Not all misstatements or omissions
12    would necessarily affect the stock price,
13    but one could look to see if misstatements
14    affect the stock price.
15 Q. So it's fair to say that if a misstatement
16    is issued on January 1st of 2005 and it has
17    no impact on the stock price on that day
18    and a year later the truth, the curative
19    information comes out and the stock price
20    goes down, then you could have a material
21    misstatement --
22       MR. McCALL: Object to the
23    hypothetical.
24 Q. -- under that scenario?

94

1        MR. McCALL: Object to the
2     hypothetical form.
3  A. That wasn't what you asked me. You were
4     asking me about Paragraph 16 which has
5     alleged curative information.
6  Q. I'm asking you a different question. It's
7     a hypothetical. The hypothetical is on
8     January 1st of 2005, a misstatement is
9     issued and the stock price does not move
10    on that date, and a year later another
11    disclosure comes out and it contains the
12    truth of the misstatement or omission, and
13    on that date the stock price goes down.
14    In that scenario, the misstatement and
15    omission could be material, could it not?
16 A. It's possible, but that's incomplete.
17    You'd have to show that the market was
18    efficient. You'd have to show that there
19    was no confounding information. You'd have
20    to -- there are a lot of other steps and
21    so it's possible, but you'd have to do a
22    complete analysis and have to understand
23    the entire context in order to make that
24    determination.

95

1  Q. Okay. So what I'm trying to get at is is
2     that assuming -- what I'm trying to get at
3     is in order for information to be material
4     in an efficient market, when the misstatement
5     or -- in order for the misstatement to be
6     material, you do not necessarily need a
7     stock price movement on the day the
8     statement, the misstatement is issued, is
9     that correct?
10 A. There are circumstances under which on the
11    date of a misstatement the stock price
12    might not move.
13 Q. But if all these other requirements that
14    you say are required are met, then it could
15    be a material misstatement even if the stock
16    does not move on the day the misstatement
17    is issued?
18 A. It's possible.
19 Q. Okay. Now, in your view, you had testified
20    earlier about curative information, and
21    what is your definition, as you understand
22    it, of curative information in the context
23    of assessing materiality if there is one?
24 A. There's a piece of information that either

96

1     has not been given to the market or incorrect
2     information has been given to the market,
3     and when information comes to the market
4     which either fills the gap where the
5     information had been omitted or corrects
6     the information which has been misstated.
7  Q. Is that the same definition, as you
8     understand it, in the context of loss
9     causation?
10 A. Loss causation requires you to tie it to --
11    so loss causation requires tying direct,
12    tying a corrective disclosure to a specific
13    piece of information which was known or
14    knowable and identifying the value impact
15    that that piece of information has at each
16    point during the class period.
17 Q. Now, in the context of either materiality
18    or loss causation, is it required that a
19    curative disclosure be widely disseminated?
20 A. I'm not a lawyer so I can't offer an opinion
21    as a legal expert, but what I can offer an
22    opinion on is as a financial economist who
23    understands how, if a market is efficient,
24    how that information is impounded into the

97

1    stock price.
2        So I'm able to offer an opinion
3    that if prior to dates in the complaint and
4    additional dates that Hakala fabricates in
5    his report in which alleged curative
6    information comes to the market, if I can
7    show that that information came to the market
8    earlier and there was no reaction to that
9    information, then, as a financial economist,
10   I can state that if the market is efficient,
11   there's no loss causation, or as a financial
12   economist, that that material, that
13   information would not be considered material
14   under the assumption of market efficiency.
15   Q. Now, do you believe that Exhibit Nos. 3
16   and 4 were curative information?
17   A. So the information, Exhibits 3 and 4 contain
18   information which disclose information about
19   the prior ANH trial to the public.
20   Q. So, in your view, Exhibit Nos. 3 and 4 and
21   the -- let's stick with Exhibits 3 and 4, in
22   your view, cured some of the alleged
23   misrepresentations and omissions alleged by
24   plaintiffs in this case?

98

1        MR. BOHAN: Object to the form of
2    the question.
3    A. I'm not agreeing that there was any
4    misstatements or omissions. What I'm saying
5    in my opinion is that these kinds of
6    disclosures provide disclosure of public
7    information relative to the results of the
8    ANH trial. I'm in no way agreeing that
9    there were misstatements and omissions.
10   Q. Now, do you agree that in order to determine
11   whether the information that's contained
12   in Exhibits 3 and 4 actually cured or put
13   the market on notice of the truth of the
14   alleged misrepresentations and omissions,
15   that that is a factual question?
16       MR. BOHAN: Could you read the
17   question back, please?
18       (Question read)
19       MR. McCALL: Hold on just a second.
20   I'm going to object to the extent you're
21   asking him whether something is a factual
22   question in terms of the distinction between
23   questions of law and fact, which is a legal
24   definition. If you're asking him with

99

1    respect to a financial definition within
2    his area of expertise, I don't object.
3        MR. BOHAN: I think the question
4    is vague and ambiguous on that ground also
5    and so I join in that objection.
6    A. So I'm an expert, as a financial economist
7    offering an opinion about did the disclosure
8    of this information have an effect on the
9    market and relative to the alleged
10   misstatements and omissions, when this
11   information comes to the market, which even
12   the analyst that Dr. Hakala cites as we
13   should look to for analysis stated, you know,
14   for example, after the February 22nd, that
15   this wasn't new, this wasn't anything new,
16   but as an economist, I can look and see
17   that when this information comes to the
18   market about the results of the ANH trial
19   which are alleged to have been withheld
20   from the public, did that affect the stock
21   market for Northfield, and that's the opinion
22   that I'm offering. I'm not offering an
23   opinion from a legal definition about whether
24   or not this is a curative disclosure.

100

1    Q. So I guess my question is, in Exhibits 3
2    and 4 it says that serious cardiovascular
3    adverse experiences occurred more frequently
4    in the PolyHeme group, right?
5    A. Yes.
6    Q. And my question to you is does that
7    statement correct the misrepresentation,
8    the alleged misrepresentation that the
9    company failed to disclose that there were
10   ten patients out of 81 in the PolyHeme
11   group that suffered heart attacks and that
12   there were none that suffered heart attacks
13   in the group not receiving PolyHeme?
14       MR. BOHAN: I object to the form
15   of the question.
16   A. I believe that I testified earlier that
17   these disclosures don't have the ten of 81
18   numbers in them.
19   Q. But what I'm saying is, is that that -- my
20   question is, do you need to be a financial
21   expert to make that determination?
22       MR. McCALL: Object to the form.
23   Q. Isn't that just a simple factual thing that
24   one statement says one thing and another

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

101

1    statement says another?
2    **A. This doesn't say ten of 81. It does discuss**
3        **the results of the ANH trial and it discusses**
4        **the cardiovascular events in the PolyHeme**
5        **group in the ANH trial.**
6    Q. Yes, but my question is, in order for you
7        to just answer that question, you didn't
8        need to be an expert, a financial expert to
9        make that explanation, right? It's just a
10       factual question that any reasonable investor
11       could make, isn't that correct?
12           MR. McCALL: Object to the form
13       of the question.
14   **A. I don't understand your question here.**
15       **I mean, it's my understanding that the**
16       **alleged misstatement that there wasn't**
17       **release of the results of the ANH trial**
18       **and here there's a discussion of what those**
19       **are. So I'm not quite certain what you're**
20       **trying to ask in the question.**
21   Q. Okay. Now, in your expert report you
22       mention the MRB report, is that correct?
23   **A. That is correct.**
24   Q. And prior to being retained in this matter,

102

1    did you ever hear of MRB, or, I guess, the
2    long name is the Marketing Research Bureau,
3    Incorporated?
4    **A. I had not.**
5    Q. Did you subsequently learn what type of
6        business they're in or what they do?
7    **A. They publish reports on companies.**
8    Q. And do you know how many people received
9        the MRB report?
10   **A. I don't know how many people received**
11       **the report.**
12   Q. Do you know if the MRB report was publicly
13       available on a website?
14   **A. I believe there was a summary available on**
15       **a website and a table of contents on the**
16       **website and then you can purchase it.**
17   Q. Did you see the summary or the table of
18       contents prior to drafting your report?
19   **A. I did not.**
20   Q. Now, what is your basis in stating that --
21       well, do you contend that the MRB report
22       was public information?
23   **A. It was known to investors of Northfield.**
24   Q. And how do you know that it was known to

103

1    investors of Northfield?
2    **A. Ms. Twaddell testified to that in her**
3        **deposition.**
4    Q. And do you recall what she said?
5    **A. I believe she said she had a call from an**
6        **investor in October who had a copy of the**
7        **MRB report.**
8    Q. Other than that, do you have any other
9        facts that would show that investors knew
10       of the MRB report?
11   **A. I believe she also had a call with the,**
12       **with one of the analysts following Northfield**
13       **about the report sometime in early January,**
14       **I believe.**
15   Q. Of when?
16   **A. 2006.**
17   Q. Anything else?
18   **A. Not to the best of my knowledge.**
19   Q. Who is the analyst?
20   **A. I don't know if it was Mr. Schwimmer or --**
21       **I'd have to go back to Ms. Twaddell's --**
22   Q. So you're relying on Ms. Twaddell's
23       testimony?
24   **A. Yes.**

104

1    Q. If I told you, if I represented to you
2        that the MRB report was only sold to six
3        corporations who were in the biotech
4        industry, would that make the information
5        publicly available, assuming that there was
6        no Ms. Twaddell testimony?
7    **A. I'd want to explore further and look further.**
8        **Not in and of itself, but I would have to**
9        **look at who they were, I'd look at other**
10       **evidence. So, again, one of the things one**
11       **does when one wants to test for market**
12       **efficiency is one absolutely needs to go**
13       **through and look at what information was**
14       **available and all sources for that**
15       **information and all testimony around that**
16       **information. It's something that Dr. Hakala**
17       **didn't do at all and I spent a lot of time**
18       **going through to document myself. So I**
19       **would start from there and then I would go**
20       **further.**
21   Q. Do you know how much the MRB report cost?
22   **A. I don't recall.**
23   Q. Well, I'll represent to you that the MRB
24       report was sold at prices varying from 3,700

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

105

1    or 3,750, $3,750 to 2,000 and $1,000.
2    Would that impact on whether a particular,
3    the MRB report was publicly available, the
4    price at which the report was sold for?
5    **A. Not necessarily.**
6    Q. Well, certainly if an investor buys a
7    report for over $3,000, just speaking on a
8    behavioral level, they're probably not
9    going to be willing to just give that
10    information away. Is that a fair
11    assessment?
12    **A. But, again, so it gets back to the notion**
13    **of market efficiency. So when an investor**
14    **obtains that information, trading on that**
15    **information causes the information to be**
16    **impounded into the stock price, again, the**
17    **whole notion of reliance is that not every**
18    **investor needs to know every piece of**
19    **information, but just needs to be able to**
20    **rely that an investor who knows that**
21    **information would trade on that information,**
22    **hence, the information becomes impounded**
23    **into the stock price.**
24    **(Pause)**

106

1    Q. If I'm quiet, it means -- and I steal this
2    line from Suzanne, it means I'm crossing
3    out some questions and skipping some things.
4    MS. PRYSAK: It's a trademark, you
5    know.
6    MR. KIM: It's a trademark. I've
7    got a new section coming up. It's quarter
8    of 12:00. Do you want to take lunch for a
9    half an hour? I don't want to break up
10    the section. Is that all right with you?
11    Half an hour?
12    MR. McCALL: That's fine.
13    (Lunch break)
14
15
16
17
18
19
20
21
22
23
24

107

1    AFTERNOON SESSION
2    BY MR. KIM:
3    Q. Dr. Gompers, now, in your report you state
4    that the analysis for determining materiality
5    and loss causation are similar. In what
6    ways are they similar, in your view?
7    **A. So materiality relates to whether or not a**
8    **given piece of information from a financial**
9    **economics point of view is value-relevant,**
10    **so would the particular piece of information**
11    **change the mix of public information in a**
12    **way that investors would consider to be**
13    **value-relevant.**
14    **Loss causation looks at tying a**
15    **particular piece of information to an alleged**
16    **misstatement or omission and demonstrating**
17    **that that piece of information cures that**
18    **alleged misstatement or omission. So the**
19    **loss causation piece is tying it directly**
20    **to the misstatements or omission. The**
21    **materiality relates to is it considered**
22    **value-relevant from the perspective of**
23    **investors.**
24    Q. Now, in the context of loss causation, does

108

1    the curative -- well, in the context of
2    loss causation, can the curative disclosure
3    take the form of several disclosures over a
4    period of time?
5    **A. So I could envision circumstances in which**
6    **there were multiple elements to a particular**
7    **misstatement or omission in which different**
8    **pieces of the misstatement or omission were**
9    **revealed in discrete information events.**
10    Q. Now, do you understand sometimes they're
11    referred to as partial corrective disclosures
12    or partial curative disclosures? Is that
13    your understanding?
14    **A. Yes.**
15    Q. Now, for a disclosure to be curative, how
16    specific does it have to be --
17    MR. McCALL: Object to the form
18    of the question.
19    Q. -- as to your understanding?
20    **A. I think that requires me to render sort of**
21    **a legal opinion on a particular matter.**
22    **What I've done is to look at pieces of news,**
23    **look on days -- from the viewpoint of**
24    **materiality, look on days in which**

f49c79c-d64c-41e7-86a6-aa4640bf54dc

109

1    information is revealed and whether or not
2    it affects the market and similarly to look
3    on days identified in the complaint and to
4    understand the information released and how
5    it's affecting the stock market on those
6    days identified by the complaint and
7    plaintiff experts.
8        So whether or not it's a curative
9    disclosure sort of requires a legal decision
10   to be made, but what I've done is to look
11   at days on which the results of the ANH
12   trial are discussed, look at forums in which
13   the ANH trial results are discussed and to
14   estimate whether or not there's a price
15   impact of those pieces of information.
16   Q.  Now, you had said that that was with respect
17   to materiality, and my question is what
18   about with respect to loss causation?  Is
19   that the same analysis that you conducted
20   to determine whether or not pieces of
21   information in this case were curative or
22   not?
23   A.  So there's two pieces to that, one of which
24   is that, to the extent that release of

110

1    information is correcting a misstatement
2    or omission as it relates to the results
3    that are purported to have been withheld
4    from the public, I look at particular days,
5    and if the market -- so I find that in
6    order to do loss causation, we need to
7    separate out multiple confounding pieces
8    of information.  One needs to identify within
9    a particular announcement what piece of
10   information is new and what's not new.
11   From that perspective and in order to do
12   loss causation, you need to have shown the
13   market is efficient as well.  If the market
14   is not efficient, you can't use an event
15   study to show loss causation.
16       In the second section of my report
17   where I talk about loss causation, if I
18   assume that the market is efficient, then
19   on the days which are alleged to be curative
20   by the plaintiff, information related to the
21   ANH trials cannot be causing the stock price
22   to move because it's not new on that day,
23   and in an efficient market, it's only new
24   information which will move the stock price.

111

1    Therefore, there must be other elements of
2    the information that if it was efficient,
3    were moving the stock price and that,
4    those are the arguments related to loss
5    causation, that under the assumption of
6    market efficiency, on the alleged curative
7    disclosure dates, it must be other pieces
8    of information that are moving the stock
9    price and not the information about the
10   ANH trials.
11   Q.  Now, did it take any of your financial
12   background and experience to determine
13   whether a statement in the alleged curative
14   disclosures were new or old information?
15   A.  As part of any analysis of market efficiency
16   or any event study overall, one of the
17   things one looks at is on what is the
18   information released on statistically
19   significant stock price movement days and
20   based on your expert analysis, what pieces
21   of information in that announcement or that
22   news story or whatever information comes to
23   market is new information and what's old
24   information, because if the market is

112

1    efficient, it's only going to be reacting
2    to new information, and this is why you
3    need to do what I did and what Dr. Hakala
4    did not do, which is to look at what
5    information was available in the market
6    prior to the alleged curative disclosures.
7    Q.  Now, as you've used it in your report and
8    today, what is your definition of confounding
9    information?
10   A.  Confounding information is information which
11   is disseminated simultaneously with another
12   piece of information which is alleged to
13   have been curative.
14   Q.  So confounding information, in your view,
15   is information that's irrelevant to the
16   alleged -- well, is irrelevant to the
17   alleged curative information?
18   A.  There are multiple pieces of information
19   released, some of which may be related to
20   the alleged curative disclosure, some of
21   which is not related to the alleged curative
22   disclosure.  So in order to demonstrate
23   loss causation, an expert needs to
24   disentangle which pieces of information are

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

113

1    related to the curative disclosure and which
2    aren't and to quantify the impact which is
3    attributable to information which is new,
4    value-relevant and directly related to a
5    curative disclosure.
6    Q. So is it fair to say that confounding
7       information includes information that is
8       not related to the curative information?
9          MR. McCALL: Object to the form
10      of the question.
11   A. So there's the curative -- so we can talk
12      in specifics here. It's alleged that the
13      results of the ANH trial were withheld. In
14      that case, if that were true, the curative
15      information is the release of that particular
16      set of information. Then one would look at
17      what the other aspects of the announcement
18      are, and other than the release of the
19      information related to the trials, the
20      other information would be confounding
21      information. And then you try to disentangle
22      which effects are due to disclosure of new
23      results and which are new results related
24      to the alleged omission or misstatement and

114

1    which are unrelated.
2    Q. So your understanding of the case is that
3       the misrepresentations and omissions
4       concerned the non-disclosure or misstatements
5       about the results of the ANH trial?
6    A. I believe there are also allegations about
7       if one looks across the five surviving
8       misstatements, the dates that survived, some
9       of those have to do with discussions about
10      the reason that the ANH trial was abandoned
11      as well as whether or not the ANH trial was
12      actually ongoing at the time, but relates to
13      the ANH trial.
14   Q. But one of them is what I just asked you
15      about, is the results, right? That's one
16      of the alleged misrepresentations and
17      omissions, correct?
18   A. That is correct.
19   Q. Now, the fact that ten out of 81 people
20      suffered heart attacks in the group that
21      received the PolyHeme in the ANH trial and
22      the fact that zero of the people that did
23      not receive PolyHeme did not receive heart
24      attacks, is it fair to say that that, those

115

1    facts could be considered a result or one
2    of the results of the ANH trial?
3    A. It is a numerical quantification of the
4       results, but not a complete result because
5       in order to understand results, you need
6       context. It is numerical data that relates
7       to outcomes of the ANH trial, but there are
8       other elements as well, similarly what was
9       the volume of fluids replaced in the control
10      versus the PolyHeme group, what are the
11      other profiles of the patients in each of
12      those. And so there are a variety of other
13      elements that are related to the results.
14      One quantification would be -- one
15      quantification which is an element of
16      those results are the numbers that you
17      just cited.
18   Q. So that's an element of what the results
19      are, one of the elements, in your view?
20         MR. McCALL: Object to the form.
21   A. It's one statement of them. It's clearly,
22      as I've related, the results of a more, a
23      higher incidence of cardiovascular events
24      in the PolyHeme as opposed to the control

116

1    group were disclosed repeatedly in a variety
2    of forums and a variety of media.
3    Q. So you think that the statement that serious
4       cardioadverse events occurred more frequently
5       in the PolyHeme group than the group that
6       did not receive PolyHeme is substantially
7       the same as the fact that ten out of 81
8       patients who received PolyHeme suffered
9       heart attacks and that zero people who
10      didn't receive heart attacks is substantially
11      the same information?
12   A. So if you look at the analysts who wrote
13      analysts' reports after the February 22nd,
14      2006 New York Times article, that's exactly
15      what they said. They said there's nothing
16      new here, you know, we knew this. And if
17      you look at Dr. Pace's deposition, he also
18      noted that as well in his response to
19      questions around the publishing of the
20      February 22nd New York Times article. So
21      the quantification of ten of 81 from at
22      least the analysts' perspectives was not
23      new news.
24   Q. When you say "analysts," are you talking

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

117

1  about -- you're talking about Dr. Pace?
2  A. No. There were two analysts' reports
3     published on the day that the New York Times
4     article came out. Both of those analysts'
5     reports indicated that they did not view
6     the New York Times article as providing new
7     information about the potential for PolyHeme
8     in trauma applications.
9  Q. Is that cited in your report?
10 A. I've certainly cited as material considered
11    those analysts' reports. I'm not sure
12    whether I put that in my report or not, but
13    clearly --
14 Q. Who wrote those reports?
15 A. There was a Cowen analyst report and I
16    can't remember who wrote the other report
17    on the 22nd, but there were two analyst
18    reports on February 22nd, and both of those
19    analysts in their report in response to
20    the New York Times article indicate that in
21    their opinion, this is not new information
22    and doesn't have any implications on the
23    potential for PolyHeme in the current trauma
24    trial that was ongoing at the time.

118

1  Q. Was there a reason why that's not
2     specifically set forth in your report?
3  A. I clearly read those reports. If it's not
4     written in my report, I don't know why it's
5     not currently written in my report, but
6     having reviewed for deposition those analyst
7     reports, it's clear that they say that
8     there's nothing new in the February 22nd
9     news story.
10 Q. Now, if another analyst said that there
11    was something clearly new in the February
12    22nd article, how would you reconcile that?
13 A. Well, he may not have known, but if the
14    other two analysts knew, then I would go
15    by what those other analysts said.
16 Q. So you just go by a majority?
17 A. No. Not everybody needs to know every
18    piece of information in order for the
19    information to be public. This gets back
20    to a lot of your earlier questions which
21    is does it have to be widely known. The
22    fact that at least two of the whatever
23    number of analysts knew it and said it
24    makes me comfortable with stating that it

119

1  was known. Similarly, the fact that those
2  analysts say that it doesn't affect the
3  prospects for their current clinical
4  application which is trauma again gives me
5  comfort that it doesn't affect the value
6  of those trials.
7  Q. Now, can loss causation be established
8     without a curative disclosure?
9  A. I can't offer a legal opinion to that, but
10    clearly as a financial economist trying to,
11    first of all, show loss causation and then
12    subsequently to that try and estimate
13    damages, you need a curative disclosure
14    and you need a stock price reaction to
15    that curative disclosure.
16 Q. Well, isn't it true that loss causation
17    can be established if the price drop of
18    the security results from foreseeable
19    consequence of the alleged misstatement
20    or omission?
21       MR. McCALL: I'm going to object
22    to the extent that sounds like a legal
23    question, which he's not here to testify as
24    an expert on.

120

1  Q. Let me give you an example.
2  A. Okay.
3  Q. Let's say, for example, a company fails to
4     disclose a material risk about its sales.
5     This is a company that's engaged in sales,
6     and let's say an analyst learns of this
7     material risk and then downgrades the
8     company stock because of that risk, the
9     risk that the analyst learned of, and
10    the downgrade causes the stock to fall
11    immediately. Assuming that the failure to
12    disclose this material risk is actionable,
13    is there loss causation in that instance,
14    in your view?
15 A. So if there's -- unlike in this case where
16    there's prior disclosure of the information,
17    if there was absolutely no prior disclosure
18    at all, there was no information related
19    at all to the sales risk, then a curative
20    disclosure does not have to say word for
21    word the opposite of what the omission or
22    misstatement was. The information can come
23    about in another form, so the information
24    can come to the market without it being

f49f79c-d64c-41e7-86a6-aa4640bf54dc

121

1     exactly expressed the way the misstatement
2     or omission was expressed.
3     Q. So it doesn't have to be like a word-for-word
4        confession that demonstrates that the prior
5        misstatement is completely false?
6     A. That would be correct.
7     Q. Now, in Paragraph 136 of your report, it's
8        Page 75, you mention that Dr. Hakala was
9        referencing old news that caused the stock
10       drop on January 6 of 2006?
11    A. Yes.
12    Q. And is that old news the news that you were
13       talking about in Paragraph 16 of your report?
14    A. So the -- no. If you look at the disclosure
15       of January 6, the UBS analyst, Dr. Pace
16       discusses his downgrade in response to an
17       Army study on rats that had been published
18       in the Shock journal and had been previously
19       summarized in Forbes and, as such, that was
20       old news. The sort of rat study and the
21       Forbes are old news. So it was the
22       downgrade, the only new content of the
23       January 6th announcement was the downgrade
24       itself given that the information from the

122

1     rat study and from the Forbes summary to that
2     had been previously publicly available
3     and disclosed.
4     Q. Okay. Didn't Dr. Pace testify that one
5        of the reasons why he downgraded the stock
6        was information that he had just recently
7        learned immediately before he issued the
8        January 6th analyst report that there were
9        more serious adverse cardiovascular events
10       in the PolyHeme trial than in -- more
11       serious cardiovascular adverse events in
12       the ANH trial from people receiving PolyHeme
13       than people who didn't?
14           MR. McCALL: I'm going to object
15       to that as misrepresenting Pace's testimony.
16    Q. Let's assume that's what he said. Let's
17       assume that Dr. Pace had said one of the
18       reasons why he downgraded the stock was
19       because he had just recently learned that,
20       he had recently learned of the backgrounder
21       document, Exhibit 3, and the Q&A document,
22       Exhibit 4.
23           MR. McCALL: I still object to
24       the question as misrepresenting Pace's

123

1     testimony.
2     A. It's inconsistent with my reading of Pace,
3        which is that Dr. Song -- Dr. Pace didn't
4        have an assistant, Dr. Song came on board
5        and Dr. Song sometime in late '05 or first
6        week of '06 found the Shock journal article
7        and it was the rat study that led to his
8        analysis that led to his downgrade, so it's
9        inconsistent. But if you're asking me to
10       assume that, then it seems counter to my
11       read of the deposition, but I'll assume it
12       for a second.
13    Q. And if you assume that and that was, that
14       caused the downgrade of, UBS's downgrade
15       that caused UBS stock to fall, isn't that
16       a curative disclosure of the alleged
17       misrepresentations and omissions in this
18       case?
19    A. Not at all.
20    Q. Okay. And that's because you think that
21       information was publically available back
22       in 2005 through the various disclosures in
23       Paragraph 16 of your report, is that correct?
24    A. That is correct.

124

1     Q. Now, do you know if Dr. Pace had received
2        any new, any additional information between
3        the time of the issuance of the January 6th
4        analyst report and the January 10th analyst
5        report? I'm just asking if you know.
6     A. So the testimony I remember Dr. Pace giving
7        relates to he released the January 10th
8        report discussing the ANH trial just to
9        sort of re-enforce the point that at least
10       in his mind, the implications of the results
11       of ANH revealed the same risks as the rat
12       study.
13           So in his mind, and I believe even
14       Dr. Hakala testified to this as well, that
15       in terms of what risks they revealed, they
16       revealed similar risks. And the January, I
17       believe Dr. Pace's testimony was that in his
18       mind, the results of the ANH trial revealed
19       the same risks for PolyHeme as did the rat
20       study.
21    Q. My question is a little different than
22       your answer. And my question was do you
23       know whether Dr. Pace, from the time he
24       issued the January 6th analyst report and to

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

125

1    the time he issued the January 10th analyst
2    report, whether he had obtained any new
3    information about PolyHeme or the ANH trial
4    during that period of time?
5    **A. I don't believe Dr. Pace's recollection**
6    **was that precise. There were lots of**
7    **questions about when he learned things, and**
8    **I recall his testimony being him not, most**
9    **of the things he was not able to recall**
10   **exactly when he learned.**
11   Q. So you don't know?
12   **A. I don't recall him testifying that he**
13   **learned something new between the 6th and**
14   **the 10th.**
15   Q. Okay. Now, in the January 10th UBS analyst
16   report, does that analyst report mention
17   the fact that there were ten patients out
18   of 81 that received heart attacks in the
19   PolyHeme group in the ANH trial?
20   **A. I don't believe it does.**
21   Q. Does it say that there were deaths in the
22   group that received the PolyHeme trial or
23   PolyHeme in the ANH trial?
24   **A. I don't recall the exact language around**

126

1    **the discussion of the results. It was more**
2    **similar to the disclosures throughout 2005.**
3    Q. And was there any disclosure in the January
4    10th analyst report that said there
5    was a statistically significant incidence
6    of heart attacks in the PolyHeme ANH trial
7    group as compared to the control group that
8    didn't receive PolyHeme?
9    **A. I don't believe they used the term**
10   **"statistically significant."**
11        MR. KIM: What are we up to?
12        (Exhibit 5 marked for
13   identification.)
14   Q. Now, Dr. Gompers, I'm showing you Exhibit
15   No. 5, it's the February 22nd, 2006 Wall
16   Street Journal article. Are you familiar
17   with this article?
18   **A. I am.**
19   Q. Now, it's your opinion that the February
20   22nd, 2006 article contains old news, is
21   that correct?
22   **A. As it relates to the implications of the**
23   **ANH trial for the value of Northfield,**
24   **absolutely.**

127

1    Q. Now, on the fourth page of the article, third
2    paragraph from the top, would you just read
3    that paragraph. It starts with "besides."
4    **A. (Witness examines document)**
5    Q. There's a sentence in there that says, "the
6    higher rate of heart attacks and serious
7    events was considered statistically
8    significant, meaning there is a minimal
9    likelihood it happened by chance." Do you
10   see that sentence?
11   **A. Yes.**
12   Q. And were those facts disclosed in prior
13   news items?
14   **A. The specific quantification here, I could**
15   **not find those being disclosed. The**
16   **implication for the results of this trial**
17   **for the value of Northfield, yes.**
18   Q. And those were in the disclosures you cite
19   in Paragraph 16 of your report?
20   **A. That is correct.**
21   Q. If you turn to the first page, first
22   paragraph, it talks about the ten of 81.
23   Is your answer the same for that as well?
24        MR. McCALL: Object to the form.

128

1    **A. Yes.**
2    Q. That they were previously disclosed and
3    the items that you cited in Paragraph 16 of
4    your report?
5    **A. The question is whether or not the**
6    **implications of the results for a past**
7    **trial for the value of Northfield as it**
8    **relates to PolyHeme in the current**
9    **application that they're pursuing, trauma,**
10   **were revealed in prior disclosures, whether**
11   **or not this exact language was disclosed.**
12   **And when one looks at my Paragraph 16 and**
13   **the discussion of the variety of disclosures**
14   **which occurred throughout 2005, my opinion**
15   **is that those disclosures revealed the**
16   **information that was relevant for assessing**
17   **its implication for the value of Northfield.**
18   Q. So you're saying that the disclosure,
19   assuming that -- well, the disclosure that
20   serious cardiovascular events occurred
21   more frequently in the PolyHeme group as
22   compared to the non-PolyHeme group, had the
23   same effect on Northfield's value as the
24   statement that the incidence of heart attacks

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

129

1    in that trial was statistically significant?
2    Is that your testimony?
3         MR. BOHAN:  I object to the form
4    of the question.
5    A.  In terms of understanding its implication
6    for the value of Northfield in its current
7    trauma application, it's not just my opinion.
8    If you look at the analysts, the analysts
9    say that it's their opinion that it's
10   different populations, it's a different
11   application.  The FDA had access to all
12   the results.  The IRBs that reviewed the
13   application in the variety of hospitals
14   had access to all the results, and in the
15   analysts' opinion, this wasn't new news as
16   it would relate to the value of PolyHeme
17   in trauma applications and, therefore,
18   Northfield.
19   Q.  So the short answer is that is your position,
20   then?
21   A.  Yes.
22        THE WITNESS:  Actually, could you
23   re-read his question just so I want to make
24   sure that my yes is correct.

130

1         (Question read)
2    A.  That the implications for Northfield's
3    value were revealed by those disclosures
4    and contain the implications for value of
5    the February 22nd Wall Street Journal
6    article.
7    Q.  So you're saying those two disclosures
8    are interchangeable and they would reveal
9    the same implications?
10        MR. BOHAN:  I object to the form
11   of the question.  Respectfully, Phil, I
12   think he has answered your question and I
13   think you're attempting to recharacterize
14   it.  It's not a productive search.
15        MR. KIM:  I'm having difficulty
16   understanding it so I'm just asking a
17   question.
18   A.  There are many ways to describe and summarize
19   the results of a particular study.  My
20   opinion is that the disclosures that were
21   made in 2005 contained the implications for
22   Northfield's value as it relates to
23   PolyHeme's potential for use in trauma,
24   which was the application that Northfield

131

1    was looking at.
2         So my opinion is that whether or
3    not you say ten of 81 or whether you say the
4    statistic that you pointed to on Page 4, the
5    implications for the value in trauma are
6    the same.  That's not just my opinion as
7    well, but when one reads the analysts'
8    reports issued on February 22nd in which
9    those numbers come out after this article,
10   they say the same thing.
11   Q.  Okay.  Well, what about did you look at
12   whether these two statements that we've
13   been talking about had the same implication
14   as to PolyHeme's effect in elective surgery?
15   A.  As of 2006, everybody knew that Northfield
16   was no longer pursuing elective surgery as
17   a use of PolyHeme and the value of the
18   company was dependent upon its use in
19   trauma.
20   Q.  I'm asking you, did you look at that?  Is
21   that that you didn't look at it or you did
22   look at it?
23        MR. BOHAN:  Could you rephrase
24   the question?  Did he look at what?

132

1    Q.  Did you look at whether these two statements
2    we've been talking about, which is the
3    disclosure in Exhibits 3 and 4 as compared
4    to the statement that the higher rate of
5    heart attacks and serious events was
6    considered statistically significant, did
7    you look to see what implication those two
8    statements had on the value of Northfield
9    as it related to elective surgery?
10   A.  You can't do that analysis because when you
11   look over the relevant time frame at the
12   various information coming to the market
13   and the price changes of Northfield, because
14   Northfield was only pursuing a trauma
15   application, none of the value of Northfield
16   related to the prospects of PolyHeme as an
17   elective surgery application.  Therefore,
18   when you look at the release of this
19   information, because it's zero, you can't,
20   you know, there's no effect on the value --
21   there's no measurable effect on the value
22   of PolyHeme on elective surgery because
23   it's no longer reflected in the stock price.
24   Q.  Did Northfield ever say it would never pursue

133

1    elective surgery for a potential indication
2    for PolyHeme?
3    **A. It certainly made clear that what it was**
4    **pursuing full-bore was the trauma application**
5    **and frequently stated that that was its**
6    **position about where the market for PolyHeme**
7    **was going to be.**
8         MR. KIM: Can you re-read my
9    question?
10        (Question read)
11   **A. I don't recall having read a statement**
12   **where they said we are never going to pursue**
13   **elective surgery.**
14   Q. And you were aware that during the class
15   period that Northfield had continued to
16   tell investors that an elective surgery
17   indication could potentially be an area
18   where they could derive income had PolyHeme
19   been approved by the FDA for elective
20   surgery?
21        MR. BOHAN: I'm going to object
22   to the form of that question.
23   **A. Early in the class period, that's true. I**
24   **don't --**

134

1    Q. So they did --
2         MR. McCALL: I'm going to object to
3    you cutting the witness off.
4         MR. BOHAN: I think that is unfair,
5    Phil. I would also ask that you allow the
6    witness to finish his answer.
7         MR. KIM: Well, you can finish
8    the answer, but then I'm going to object to
9    everything beyond his first word.
10        MR. McCALL: Okay. Could you read
11   the question back and then read the witness
12   when he was cut off?
13        (Record read)
14   **A. Early in the class period they did, but by**
15   **mid 2002 I'm unaware of any statement by**
16   **Northfield that it was continuing to pursue**
17   **or intending to continue to pursue elective**
18   **surgery as an application.**
19   Q. Now, did you rely on any sort of -- you
20   can strike that.
21        Now, you're aware that on the same
22   day the Wall Street Journal article was
23   released, Northfield issued a press release
24   itself?

135

1    **A. Yes.**
2    Q. And that press release was titled Northfield
3    Laboratories Strongly Disputes Wall Street
4    Journal Story Conclusions?
5    **A. Yes.**
6    Q. Now, as a general question, if a company
7    comes out disputing information that's
8    contained in the third-party article, would
9    you expect that the company's article
10   would mute or amplify a stock price reaction
11   that may have happened with respect to the
12   third-party article?
13   **A. Well, it depends upon whether or not the**
14   **stock market is efficient. It depends on**
15   **the type of information revealed. It**
16   **depends upon what aspects the company's**
17   **disputing. So it's possible that it could**
18   **amplify, mute or have no effect.**
19   Q. And did you look in this case to determine
20   whether the February 22nd, 2006 article
21   issued by Northfield had an impact on the
22   price movement on February 22nd of 2006?
23   **A. I believe, to the best of my recollection,**
24   **that the intraday stock price did not have**

136

1    **an effect. You can actually look at Exhibit**
2    **F8 here, if you want. Before Northfield**
3    **issues their strongly-disputes, it starts**
4    **to go up, and then once they issue their**
5    **strongly-disputes, it sort of bounces**
6    **around, but is relatively flat from the**
7    **portion of time in which they issue their**
8    **strongly-disputes.**
9    Q. Now, do you believe that in an efficient
10   market, that the market has to correctly
11   react to information that's publicly
12   available? Can the market be wrong?
13   **A. That's Fama's definition. It's not just**
14   **my definition. It's Fama's definition or**
15   **any definition that anybody who's trained**
16   **in financial economics would accept, that**
17   **an efficient market fully and completely**
18   **incorporates the value of new information.**
19   **So that's the definition. If it gets it**
20   **wrong, then by definition it's inefficient.**
21   Q. What if the news information turns out to
22   be false?
23        MR. McCALL: Object to the form.
24   **A. So, again, it's incomplete in terms of let's**

f49c79c-d64c-41e7-86a6-aa4640bf54dc

137

1  assume it's false, when does the truth come
2  out, are there implications by having
3  slandered the company with that information.
4  So it's incomplete. So clearly if there
5  was false information that came out, when
6  the correct information came out, one would
7  expect in an efficient market in general a
8  reversal, but whether it's a complete
9  reversal or not, it would depend upon a
10  whole set of other assumptions about the
11  particular circumstance.
12  Q. And it would also depend factually on what
13  the particular disclosure said, right? I
14  mean, what factually they said?
15      MR. McCALL: Same objection to form.
16  A. We can talk, I mean, we can talk about
17  particular situations, but I can imagine
18  that one could come up with a whole host of
19  hypotheticals which were contrived and
20  unrealistic that may have any sort of
21  relationship between the stock price and
22  the information that was false to the
23  information that revealed the falsehood.
24

138

1      (Exhibit 6 marked for
2  identification.)
3  Q. Dr. Gompers, I'm showing you Exhibit No. 6.
4  It's a Wall Street Journal article dated
5  February 24, 2006. Are you familiar with
6  this article?
7  A. I am.
8  Q. Now, in your report you say that "notably
9  that the Wall Street Journal article did
10  not reveal any new information about the
11  ANH trial, but rather contained confounding
12  information relating to Senator Grassley's
13  inquiry into the trauma trial." So is it
14  your position that Senator Grassley's
15  investigation was not related to the ANH
16  trial's results?
17  A. So it's my understanding that Senator
18  Grassley was concerned about the way the
19  trauma trial was being pursued in terms of
20  approvals and non-approvals to opt in and
21  to opt out. Clearly it's Senator Grassley's
22  investigation or inquiry which is the new
23  information on this day. The results of
24  the ANH trial are not at all new.

139

1  Q. I see. So you think Senator Grassley's
2  investigation has nothing to do with the
3  results of the ANH trial?
4  A. The new piece of information here has to
5  do with Senator Grassley's investigation
6  about what was going on. So if you look
7  here, I mean, again, just to Senator
8  Grassley's statement here at the bottom
9  of this first page and the beginning of
10  the second page, I see nothing here which
11  sort of says -- it says here about wearing
12  the bands and wearing the, opting in and
13  opting out and the like. So the concerns
14  here from Senator Grassley are about the
15  opting in and the opting out. Clearly the
16  results of ANH had been discussed, as we
17  talked about significantly this morning
18  and this afternoon, at various times
19  throughout 2005.
20  Q. So you're saying that they have -- so
21  Senator Grassley's investigation has
22  nothing to do with the ANH trial results.
23  Is that your testimony?
24      MR. McCALL: Object to the form.

140

1  A. I cannot speak for Senator Grassley because
2  I can't read Senator Grassley's mind, but
3  this article seems to indicate that at
4  least what he's expressing about is the
5  way the trauma trial is being run and the
6  ability to opt in or opt out of the trauma
7  trial.
8  Q. Well, in the middle of the article starting
9  at Senator Grassley's head where it says
10  Senator Grassley, do you see that? It says,
11  "Senator Grassley focused both on whether
12  patients in the study were made aware of
13  all adverse events with the product and
14  whether it was appropriate to conduct a
15  trial without the patient's consent."
16      So does that change your view as
17  to whether Senator Grassley's investigation
18  had anything to do with the results of the
19  ANH trial?
20  A. That's what it states here. It doesn't --
21  what it doesn't change is it doesn't change
22  my opinion about what's the new information,
23  and this isn't -- there's no way this could
24  be considered curative relative to the

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

141

1      results of the ANH trial.  The fact that
2      Senator Grassley has chosen to pursue an
3      inquiry is what's the new information.  It
4      does say here that he wants to make sure
5      the patients were made aware or potential
6      patients are made aware of adverse events.
7  Q. So your opinion is that the new information
8      is the fact that Senator Grassley has
9      conducted this investigation?
10 A. And is pursuing Northfield.
11 Q. And is it your opinion that on February 24th,
12     that information is what caused the stock
13     to drop?
14 A. Well, given that my opinion is the market
15     is inefficient, it's impossible to
16     disentangle that.  If one assumes that the
17     market is efficient for looking at
18     materiality and loss causation, the only
19     piece of new news in this article would be
20     Senator Grassley's inquiry into Northfield.
21 Q. And I think you note in your report, you
22     can correct me if I'm wrong, but the stock
23     drop on that day was statistically
24     significant, is that correct?

142

1  A. I believe it was.  We can look at the summary
2      that I have on Exhibit E.
3  Q. If you go to Paragraph 143 on Page 78.
4  A. (Witness examines document)  So in my,
5      based on my regression analysis, I find
6      that it's statistically significant minus
7      7.6 percent.
8  Q. Now, if you were to assume that Senator
9      Grassley decided to conduct his investigation
10     because he had felt that the results of
11     the ANH trial were not timely disclosed,
12     would there be loss causation in that
13     instance?
14 A. The results -- as a financial economist,
15     the stock price effect would not be due
16     to a release of the information.  It would
17     be the actions of a particular individual
18     and, therefore, would not be ascribable to
19     having an alleged misstatement or omission
20     because one looks at the stock price reaction
21     of what happens on a particular date when
22     that information comes to the market.  So
23     there's a legal -- if you're asking me to
24     render a legal opinion, I can't render a

143

1      legal opinion, but as a financial economist,
2      I would not consider that a curative
3      disclosure and I would not consider that
4      to demonstrate loss causation.
5  Q. You say that it wouldn't be a curative
6      disclosure because it was the action of
7      one person?  I may have not understood
8      your answer.
9          MR. McCALL:  Object to the form.
10 Q. What's the significance of being the
11     action of one person?  Isn't this really
12     the action of his office?
13 A. It's the fact that Senator Grassley has
14     conducted an inquiry into Northfield, into
15     the trauma trial, that is the new piece of
16     information on this particular day.  And
17     if we assume that market is efficient,
18     that is what would be causing the stock
19     price to decline, not anything related to
20     the release of information about the ANH
21     trial.
22 Q. But your view is not based on a legal
23     perspective, right?
24 A. I'm not a lawyer or a judge.  I can't render

144

1      a legal opinion.  I can render an opinion
2      as a financial economist.
3          (Exhibit 7 marked for
4          identification.)
5  Q. Now, Dr. Gompers, I'm showing you plaintiff's
6      No. 7.  It's a March 10th, 2006 Wall Street
7      Journal article entitled Blood-Substitute
8      Study is Criticized by U.S. Agency.  Are
9      you familiar with this article?
10 A. Yes.
11 Q. Now, you say in your expert report that
12     this article contains old news relating to
13     the ANH trial?
14 A. Yes.
15 Q. And is there any confounding information
16     in this news article?
17 A. So there's a bunch of pieces of information,
18     two hospitals suspending their enrollment
19     because of the Wall Street Journal article,
20     you know, Office of Human Research
21     Protections in the sort of middle paragraph.
22     So there are a bunch of pieces of confounding
23     information one would need to disentangle
24     to figure out which ones were new, which

145

1    ones were not new.  Clearly information
2    relative to the ANH trial was by this time
3    very old.
4    Q.  Well, in your report you don't list any
5    confounding information.  You take the
6    position that all the information is old.
7         MR. McCALL:  Object to the form
8    of the question.
9    Q.  You can look at Paragraph 144 of your report.
10   A.  There's no new information that corrects
11   the alleged misrepresentations.
12   Q.  So, as you sit here today, the statement
13   that two hospitals participating in the
14   study have suspended enrolling patients in
15   it since a Wall Street Journal story about
16   the study was published on February 22nd,
17   your position is that's confounding
18   information?
19   A.  As a result of -- yes, as a result of what
20   Senator Grassley is doing in terms of
21   inquiry, what's going on there are all
22   confounding information, and --
23   Q.  So your view is that the hospitals that
24   were participating in the study, and I

146

1    think they're referring to the trauma
2    trial, suspending enrollment was a result
3    of Senator Grassley conducting his inquiry?
4    A.  Well, it clearly wasn't the result of the
5    results of the ANH trial because all of
6    the hospitals IRB boards actually even had
7    the ten of 81 and the zero of 70.  So they
8    had all the -- all these IRBs in the
9    hospitals which approve the trials had the
10   information, so the information on the
11   results of the ANH trial to them are not
12   new at all.  In fact, from the day that
13   they've signed up for the trial, they knew
14   all of that information.
15        The only thing which has happened
16   subsequent to any of that is Senator
17   Grassley's inquiry into the trauma trial.
18   So stopping is totally unrelated to the
19   results of the ANH trial.
20   Q.  So my question was, in your view, was a
21   suspension of enrolling patients in the
22   trauma trial in the two hospitals, was
23   that the result of Senator Grassley's
24   investigation of Northfield?

147

1    A.  I don't have the information from those
2    hospitals.  It's confounding information.
3    You asked me what was confounding
4    information.  There are a bunch of pieces
5    of confounding information in this article
6    that are totally unrelated to the results
7    of the ANH study and that --
8    Q.  As you say, if all the hospitals had the
9    data and information, isn't it reasonable
10   to conclude that but for a high-profile
11   senator such as Senator Charles Grassley
12   conducting an investigation, that these
13   hospitals would have continued their studies,
14   right?  They wouldn't have suspended their
15   studies?  So isn't it reasonable to assume
16   that the scrutiny that the investigation
17   brought on these trials might have been a
18   contributing factor to these two hospitals
19   suspending enrollment?
20        MR. McCALL:  I'm going to object
21   to the form of the question.  And, Phil, in
22   two of your recent questions you cut the
23   witness off.  So I'd ask you again to let
24   the witness finish his answer and then ask

148

1    him another question.
2    A.  So while it's possible that Senator
3    Grassley's investigation negatively
4    affected the publicity around the trial
5    and, therefore, the hospitals choose to do
6    it, I can't say whether or not that was
7    the reason the two hospitals have suspended
8    enrollment in those trials because I don't
9    have any additional information other than
10   what's in this article, but it is confounding
11   information that these two hospitals have
12   chosen to suspend enrollment.
13   Q.  So you think the hospitals suspending
14   enrollment has nothing to do with the
15   disclosure or the non-disclosure of the
16   ANH trial results?
17        MR. McCALL:  Objection as asked
18   and answered.
19   A.  The hospitals knew the results of the ANH
20   trial.  Within the packet submitted to each
21   of the IRB boards were the results, including
22   the numerical results that you talked about.
23   They were all part of the submission to the
24   IRBs and these hospitals.

149

1  Q. Did you see that, the actual IRB materials
2     that were submitted?
3  A. I don't believe I've actually seen the
4     actual IRB material, but I've seen testimony.
5     I believe Ms. Twaddell testified that the
6     information related that Mr. Burton had
7     came from the submissions to those IRBs.
8     It has also been conveyed to me by counsel
9     that all of the IRB submissions contained
10    the complete results of the prior ANH trials.
11 Q. So you didn't actually personally see the
12    materials that the IRB received?
13 A. I don't believe I've seen those materials.
14 Q. And were you aware that materials submitted
15    to the IRB are considered confidential?
16 A. I believe that that is an issue which has
17    been discussed in this matter a number of
18    times.
19 Q. So yes, that would be confidential material?
20 A. Yes, it's typically considered confidential.
21    You're not supposed to take IRB material
22    and give it to other people.
23 Q. Now, the March 10th press announcement also
24    says in the third paragraph, "the Federal

150

1     Office for Human Research Protections has
2     expressed urgent ethical concerns to the
3     FDA." Do you see that?
4  A. Yes.
5  Q. Now, was the fact that the Office for Human
6     Research Protections was expressing these
7     concerns, urgent ethical concerns, had that
8     been previously disclosed in any news article
9     that you're aware of or in anything that's
10    cited in your expert report?
11       MR. McCALL: Can you repeat that
12    question, please, or could you read it back?
13       (Question read)
14 A. I've seen no earlier indication of that
15    announcement.
16 Q. And your view is the fact that the Office
17    for Human Research Protections expressing,
18    quote, "urgent ethical concerns," that's
19    unrelated to the disclosure or non-disclosure
20    of the ANH trial results?
21 A. Well, clearly because the ANH trial results
22    had been repeatedly disclosed during 2005,
23    it's unrelated.
24 Q. Now, Dr. Gompers, did you conduct an event

151

1     study in connection with your expert report?
2  A. I did.
3  Q. And what clean or estimation period did
4     you use in your event study analysis to
5     estimate the market model?
6  A. So when one looks at the relationship of
7     Northfield stock with the market and industry
8     indexes, those relationships are unstable
9     throughout the class period. It's a very
10    long alleged class period and it becomes
11    impossible to run one model that encompasses
12    all of those days because of the instability
13    of the parameter estimates in the model.
14       So what I do for each day during
15    the alleged class period is to run a control
16    period, which is one year of trading prior
17    to that day. I estimate the parameter
18    estimates for the market and industry index
19    and use that to get an abnormal return on
20    each day during the class period.
21 Q. So is it true to say that the estimation
22    period that you use covered periods when
23    statements relevant to the plaintiff's
24    complaint were made?

152

1  A. For certain of the dates, that would be true.
2  Q. And for certain of them, it wouldn't be true?
3  A. That is correct.
4  Q. And for which dates would that not be true?
5  A. For any date in which any of the alleged
6     misstatements and omissions were beyond a
7     year from the date in question.
8  Q. What do you mean, "beyond a year for the
9     date in question"? Can you elaborate on
10    that?
11 A. So if you look, it is just 100 percent
12    incorrect to use one model to estimate the
13    period in question. We know from --
14 Q. What do you mean by "the period in question"?
15 A. The alleged class period. So if you use
16    one model for the alleged class period, a
17    variety of tests will show you that the
18    coefficients on the market and the industry
19    are time-varying, and we know for a fact
20    that a lot of research has shown that the
21    relationship between a stock in the market
22    or a stock in its industry will change over
23    time, so we need to allow the coefficients
24    on the industry and the market to change.

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

153

1     I made the choice to use a
2  pre-control period.  So any day, if there's
3  an alleged misstatement on March 10th of
4  2001, then any date between March 10th of
5  2001 and March 9th, 2002 would include that
6  one day in terms of a parameter estimate
7  for that alleged misstatement on March 10,
8  2001.  Once you go beyond March 9th of 2002,
9  that date would no longer be included in
10  the estimation period of the parameter
11  values on the market index and on the
12  industry index.
13  Q.  Isn't it true that your estimation period
14      was contaminated by known company-specific
15      news events?
16  A.  So any event study always contains a period
17      in which company news is coming to the
18      market.  It is not an acceptable event study
19      methodology to do what Dr. Hakala does and
20      try to dummy out every single day for which
21      there is news.  There's not been a single
22      peer-reviewed journal article to have that
23      technique.  In my 15 years of teaching a
24      course, I teach a Ph.D course on empirical

154

1   methods in corporate finance and spend a
2   considerable amount of time in the course
3   teaching the proper event study methodology
4   to Ph.D. students at Harvard.  Not once
5   have I seen a paper utilizing the methods
6   Dr. Hakala employed and just sort of from
7   its first principles is theoretically wrong.
8       So any event study includes a
9   control period that has company news, and
10  that's exactly what you want to test.  You
11  want to see if the movement on any one day
12  is significant relative to every other day,
13  some of which may or may not also happen.
14  Q.  So in your event study analysis, did you
15      control for all known and identified
16      company-specific events in your period of
17      study?
18  A.  The basis of having a control period,
19      absolutely.  So it compares is the movement
20      on this day normal relative to everything
21      that affected the company stock price in the
22      prior year.
23  Q.  So you did control for all known and
24      identified company-specific events in your

155

1  period of study?
2  A.  When you do an event study, you want to
3      control for the normal movement of a
4      company stock relative to the market and
5      relative to an industry, the accepted
6      event study methodology.  So if you read --
7      I talked about Kothari and Warner, who
8      review event studies in every top finance
9      and economics journal, 563 of them.  Not a
10     single one employs the dummy variable for
11     every news day that Dr. Hakala -- everybody
12     employs the kind of methodology which is
13     employed here where you find that normal
14     relationship in a period before or after
15     you're looking at.
16  Q.  So my question was in your event study
17      analysis, did you control for all known
18      and identified company-specific events in
19      your period of study?  Yes or no.
20         MR. McCALL:  Asked and answered.
21  A.  My regression analysis does.  I don't stick
22      dummy variables in there like Dr. Hakala
23      does, but my analysis absolutely controls
24      for that.

156

1  Q.  It took three times to get that answer.
2      Now, do you understand what an outlier is
3      in statistics?
4  A.  Yes.
5  Q.  And what is an outlier?
6  A.  Well, an outlier really is in the context
7      of measuring the statistical significance
8      of something.  So an outlier would be an
9      observation which is you name the threshold.
10     There's a certain number of standard
11     deviations away from a typical observation.
12  Q.  Now, I'm going to ask you a couple of
13      questions on outliers and I want you to
14      assume that an outlier is a movement in
15      the stock price inconsistent with the normal
16      distribution and has a T statistic of at
17      least 3.0 in absolute terms.  Now, did you
18      make any effort to control for outliers in
19      your analysis?
20  A.  You want to be able to identify those
21      outliers.  So what you want to do is, you
22      want to be able to identify those outliers
23      in an objective, unbiased manner.
24  Q.  Did you do it?

157

1  A. Absolutely.
2  Q. How many outliers were there in your
3     analysis?
4  A. Well, I don't look at a T statistic of 3.0.
5     I look at a T statistic of 1.97 which is a
6     statistical significance at the 95 percent
7     confidence level and I find 67 of them.
8  Q. And that's using a T statistic of what?
9  A. 1.97, which is the standard scientific
10    significance level of a 95 percent confidence
11    interval.
12 Q. Did you look to see whether those 67
13    outliers, whether that number was indicative
14    of a normal distribution?
15 A. So I did not adjust my T statistics for
16    any potential non-normality of the
17    distribution of stock returns. I saw
18    nothing to indicate that it was necessary,
19    nor do typical event studies do that.
20 Q. So if you had adjusted for a normal
21    distribution and there were less than 67
22    outliers, there were only like five, what
23    would that mean to you?
24       MR. BOHAN: I object to the form

158

1     of the question. It's vague and ambiguous.
2  A. So it wouldn't mean anything. So the way we
3     think about statistical significance is
4     to look at any one particular day. It
5     would just say that during this period of
6     time we don't find -- we only find five
7     stocks that have a T statistic of greater
8     than people say roughly two, but only five
9     percent of the days --
10 Q. In your view, it wouldn't mean anything,
11    so let's just move on to the next question.
12       MR. BOHAN: I'm going to object.
13    I'm going to insist the witness is permitted
14    to answer the question. I think that's very
15    unfair of you.
16       MR. KIM: I don't know if I'm being
17    unfair. I'm just trying to get through this
18    deposition.
19       MR. BOHAN: No, but that's not
20    proper.
21 Q. If you feel you need to expound on your
22    answer, you can.
23       MR. McCALL: So can you read back
24    the question and read his answer, please?

159

1       (Record read)
2       MR. KIM: I object to anything
3    after Dr. Gompers says after the words "mean
4    anything" as non-responsive.
5       MR. BOHAN: But the way it works
6    is he's permitted to finish his answer,
7    then if you have an objection to his answer,
8    then you interpose your objection, then you
9    can ask the next question. So let's hear
10    the rest of the answer before you object.
11 A. We not necessarily expect for any one firm
12    that five percent of the days are going to
13    have a T statistic greater than two. It's
14    only if we looked at millions and millions
15    and millions of companies would we eventually
16    find that on average five percent of the
17    days would have a T statistic greater than
18    two. For any one company, if it's five or
19    67, that's meaningless relative to the test
20    that we're employing.
21 Q. In your analysis, did you make any efforts
22    to control for outliers in your analysis?
23 A. My analysis goes to identify the outliers.
24 Q. So other than identifying them, you didn't

160

1    otherwise control for them?
2  A. I employ the standard event study methodology
3     that is accepted in the literature, that I
4     teach Harvard Ph.D. students, that Kothari
5     and Warner say is the right event study
6     methodology. You can't find a single
7     peer-reviewed academic article that does
8     the kind of dummy variable approach of
9     sticking a dummy variable for every news
10    day that Dr. Hakala employs in this case
11    and every other case he works on.
12 Q. Now, can the presence of outliers bias
13    the statistical results of an analysis if
14    the outliers relate to no news events?
15 A. If they relate to no news events? In
16    statistical simulations it can, but nobody
17    employs -- there's no -- so you're asking
18    a question specifically about a particular
19    article that Dr. Hakala cites in one of
20    the footnotes in which there's a simulation
21    done by the authors to look at if you induce
22    artificial variance on a particular day,
23    does that affect your coefficient. In a
24    simulation, that's true. There's no

161

1    **empirical method of actually employing that**
2    **methodology and, furthermore, there's no**
3    **academic support for that in terms of**
4    **employing Dr. Hakala's method.**
5           MR. KIM: Can you read the first
6    couple of words of his response?
7        (Answer read)
8           MR. KIM: Everything after "can" I
9    object as being non-responsive.
10   Q. Now, can the presence of a number of
11      outliers cause a statistical analysis to be
12      unreliable?
13   **A. That's sort of incomplete. So, I mean --**
14   Q. I'm just saying generally in statistics.
15      You are trained in statistics, correct?
16   **A. I am.**
17   Q. Well, as a general principle in statistics,
18      does the presence of a number of outliers
19      cause the statistical analysis to be
20      unreliable?
21   **A. Not necessarily.**
22   Q. Now, what effect does the presence of
23      outliers associated with known
24      company-specific news have on the reliability

162

1       of your estimating model?
2    **A. It in no way affects it.**
3    Q. And how does the presence of outliers
4       associated with company-specific news
5       affect your estimated standard errors?
6    **A. It in no way affects it.**
7    Q. Now, did you read some of the papers and
8       texts cited by Dr. Hakala?
9    **A. Absolutely, and, in fact, I cite to those**
10      **in my own paper.**
11   Q. And don't some of those papers say that the
12      presence of significant events associated
13      with company-specific news render your
14      estimated model unreliable?
15   **A. No.**
16   Q. Don't they say that the estimated standard
17      errors in your estimated model are unreliable
18      if you fail to control for significant known
19      company-specific news?
20   **A. My model? No.**
21   Q. Okay. Any model?
22   **A. Hypothetical simulated models, yes. Nobody**
23      **has looked at an empirical -- so people**
24      **employ a variety of techniques to look at**

163

1    **company-specific announcements and its**
2    **effect on stock prices. From time to time**
3    **people will try to identify those days**
4    **with a dummy variable on particularly**
5    **identified events, and if those events are**
6    **expected to affect the stock price, you**
7    **would include for those pre-specified events,**
8    **for example, if you wanted to look at a**
9    **merger or acquisition announcement or an**
10   **earnings announcement.**
11          **In no way, and there's not a single**
12   **academic paper which uses or even supports**
13   **the use of the type of event study that**
14   **Dr. Hakala uses by sticking an event study**
15   **for every single subjectively determined**
16   **news day.**
17          MR. KIM: What was the question
18   that I asked? Can you read that back?
19       (Question read)
20   Q. Now --
21          MR. McCALL: Phil, let's take a
22   break.
23       (Break taken)
24   BY MR. KIM:

164

1    Q. Dr. Gompers, do you know how many published
2       academic texts and papers say that one must
3       control for outliers associated with known
4       events?
5    **A. It depends upon in what context. It depends**
6       **on what you mean by an outlier.**
7    Q. Well --
8    **A. Just let me finish. Can I just finish,**
9       **really finish? So there are certain types**
10      **of analyses in which you want to control**
11      **for outliers because you have a concern**
12      **that that data is not representative of**
13      **what it is you're trying to examine.**
14          **When it comes to an event study**
15      **analysis, when you're looking at the stock**
16      **price reaction to particular pieces of**
17      **information, you want to identify those**
18      **outliers. The way you go about identifying**
19      **those outliers is to find the relationship**
20      **between a company stock and the market**
21      **and/or its industry   and, as such, an event**
22      **study, you are actually identifying the**
23      **outliers. By putting in dummy variables**
24      **for every single news day you're actually**

165

1    **substantially biasing your results by**
2    **reducing the residual standard errors from**
3    **your model and, therefore, artificially**
4    **inflating the statistical significance of**
5    **the days that you're looking at. It is both**
6    **biased and unscientific to do that in an**
7    **event study context.**
8         MR. KIM: I object to that response
9    as being non-responsive.
10   Q. So my question is, are there a lot of papers
11   that just say that in general, that one
12   must control for outliers associated with
13   known events, or is there any paper? Because
14   I don't think that your first response caught
15   that.
16   **A. I believe that I said in a specific context**
17   **in specific circumstances if you're looking**
18   **at wage rates or if you were looking at --**
19   **so the context in the way in which you**
20   **control for outliers and estimation, and**
21   **we may be interested in a particular**
22   **relationship between the rate, wage rate**
23   **and education and let's say that we believe**
24   **for some reason there was an outlier effect**

166

1    **which may bias our coefficient. In that**
2    **case we'd want to choose a methodology which**
3    **may help us more cleanly estimate. That's**
4    **not related to what we're trying to do here**
5    **in a stock price event study.**
6         MR. KIM: So it's the same objection
7    as before.
8    **A. As a general matter, there's no paper which**
9    **sort of blanket says we always control for**
10   **outliers.**
11        MR. McCALL: So, Phil, he answered
12   your question twice. You insist on asking a
13   general question again that isn't conducive
14   to a general answer.
15        MR. McCALL: Actually, I believe that
16   the witness was responsive in his last
17   sentence.
18   Q. Now, did you test your statistical analysis
19   to ensure that the distribution of residuals
20   was normally distributed? Yes or no.
21        MR. McCALL: Object to the form of
22   that question.
23   **A. So because each day has a different control**
24   **period, I didn't look at the normal**

167

1    distribution of the residuals.
2    Q. So that's no?
3    **A. That's correct.**
4    Q. Okay. Now, isn't it true that the presence
5    of omitted variables can cause the error
6    terms in a time series regression analysis
7    to be not normally distributed?
8    **A. It depends upon the particular circumstances,**
9    **but it's possible.**
10   Q. And isn't it true that the presence of an
11   omitted variable from a regression can
12   cause the results of the regression analysis
13   to lack precision and power?
14   **A. In general, that's true, but in my event**
15   **studies there are no omitted variables and**
16   **I employed the standard academic methodology**
17   **for an event study, so those are --**
18   Q. I didn't ask about your event study. I was
19   asking about the presence of omitted
20   variables, and I believe you answered that
21   question.
22        MR. McCALL: Well, you didn't.
23   You cut the witness off again and you keep
24   insisting on doing that. So I'm going to

168

1    keep insisting that the witness get the
2    opportunity to finish his answer.
3    Q. Now, if omitting variables --
4         MR. McCALL: Hold on. Would you
5    read back the question and the witness'
6    answer at the point where he cut him off?
7         (Record read)
8         MR. KIM: I object to everything
9    after -- what was his first couple of words?
10        (Record read)
11        MR. KIM: After the word "true,"
12   I object as being non-responsive.
13   Q. Now, if omitted variables cause the errors
14   to not be normally distributed, doesn't
15   that mean that you cannot assume a normal
16   distribution in attempting statistical
17   inferences like testing for the statistical
18   significance of a specific variable or event?
19        MR. BOHAN: Can I ask a clarifying
20   question? Are you talking about omitting
21   variables from a regression analysis?
22        MR. KIM: Yes, that's what we are
23   talking about.
24        MR. BOHAN: I object to the grounds

169

1    that it's vague and ambiguous.
2    Q. Do you understand the question?
3    **A. You're talking about a very -- you're**
4    **talking about a general concept and, in**
5    **general, that's true. There's not been a**
6    **single paper which has proposed and omitted**
7    **variable bias in the context of an event**
8    **study regression analysis that I employ,**
9    **and there's not a single peer-reviewed**
10   **academic paper which suggests as a solution**
11   **the approach taken by Dr. Hakala, which is**
12   **to insert a dummy variable for every**
13   **subjectively selected news day during a**
14   **particular point in time.**
15   **So while in general it's true**
16   **that an omitted variable bias could cause**
17   **these types of problems, it's not identified**
18   **in event study literature, nor is Dr.**
19   **Hakala's purported event study methodology**
20   **ever suggested or utilized in connection**
21   **with any suggestion of omitted variable**
22   **bias in an event study.**
23   Q. Now, Dr. Gompers, isn't it also true that
24      the presence of omitted variables will cause

170

1    your standard errors to be over-stated and
2    your estimate for T statistics for specific
3    events to be under-stated?
4    **A. That's incorrect. The effect could go either**
5    **way. It could go up or it could go down in**
6    **general.**
7    Q. Now, isn't it true that it's well-known
8       that the failure to control for omitted
9       variables can cause your entire statistical
10      analysis to be biased in both the estimated
11      market model and in the estimated standard
12      errors?
13   **A. Now you said market models. I'm assuming**
14   **what you mean by that is in an event study**
15   **analysis, and the answer to that question**
16   **is no, nobody is, nobody has suggested**
17   **employing the kind of analysis that Dr.**
18   **Hakala employs as any solution to any**
19   **potential omitted variable problem in a**
20   **market model.**
21   Q. Now, in some parts of your report you
22      criticized Dr. Hakala's report on the issue
23      of replication, is that correct?
24   **A. Yes.**

171

1    Q. Now, are you asserting essentially that a
2       study is not replicable unless you can obtain
3       precisely the exact same statistical model,
4       including the selection of events following
5       the protocol set forth by Dr. Hakala for
6       selecting events?
7    **A. One would need to -- in order for it to be**
8    **replicable, one would need to know the**
9    **criteria by which particular events were**
10   **chosen and, therefore, come up with the same**
11   **set of events. What's interesting about**
12   **Dr. Hakala is that even events that he says**
13   **should be included, he misses. So his**
14   **analysis is not only subjective, it's also**
15   **flawed based on his own statement.**
16   **So, for example, he says you**
17   **should include all earnings announcements.**
18   **He misses a number of them. He says that**
19   **you should include all announcements of**
20   **capital raising. He misses those. So not**
21   **only is it subjective and non-replicable,**
22   **it's flawed because he doesn't completely**
23   **adhere to his own rules.**
24   Q. So is it fair to say that in criticizing

172

1    Dr. Hakala's report, that you're saying
2    that the use of judgment to select
3    company-specific events to control for in
4    the intervention analysis by definition makes
5    it not replicable?
6    **A. There is certainly a role for expert judgment**
7    **in evaluating news, so, for example, in**
8    **looking at whether or not news is new or**
9    **old and previously released, but when there**
10   **have been studies done which suggested using**
11   **a dummy variable approach to event studies,**
12   **the criteria for picking those days is**
13   **objectively stated in advance, merger**
14   **announcements, stock repurchase, earnings**
15   **announcement. The type of analysis that**
16   **Dr. Hakala does requires his own subjective**
17   **read, and we have no idea why he included a**
18   **particular day or not and how it falls into**
19   **any particular rule or not.**
20   Q. Let me give you a hypothetical. If you and
21      I were to follow a recipe to bake a cake
22      and let's say we both followed the recipe,
23      what are the odds that the cake that I bake
24      and the cake that you bake following the

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

173

1    same recipe would turn out exactly the same
2    if they were baked in different ovens and we
3    made the cakes at different times?
4    **A. I have no way to offer an opinion there**
5    **because I know how good of a cook I am, but**
6    **I have no information about how good of a**
7    **cook you are.**
8    Q. My cooking skills are questionable, but --
9         MR. McCALL: A new hypothetical.
10   Q. But what I'm saying is now if we follow
11   the same recipe, is it likely that both
12   our cakes would have the same moisture
13   content? Is it likely that both our cakes
14   would have the same kind of crust? Would
15   the cakes turn out identically the same if
16   we followed the same exact recipe?
17        MR. McCALL: Outside the witness'
18   area of expertise.
19   **A. I imagine they would be darn close.**
20   Q. So you would agree if we follow the same
21   recipe, that my cake would never exactly
22   replicate your cake?
23        MR. McCALL: Same objection.
24   Outside the witness' area of expertise.

174

1    **A. So --**
2    Q. If you can't answer the question, that's
3    fine, you can say you can't answer the
4    question.
5    **A. The cakes would be very similar.**
6    Q. But they wouldn't be identical. I mean, we
7    could have used different eggs, we could
8    have used the same eggs, my oven could be
9    different than yours.
10   **A. I guess they wouldn't be identical, but**
11   **they'd be pretty close.**
12   Q. Now, generally in statistics, in statistical
13   analysis, generally isn't it true that it
14   requires a series of judgments?
15   **A. There are elements of analysis that an**
16   **expert employs or researcher employs which**
17   **require judgment. There's also elements**
18   **that don't require judgments.**
19   Q. So some of those areas of judgment, that
20   would include how to frame the statistical
21   issue to be addressed. Would you agree with
22   me on that?
23   **A. There are often alternative statistical**
24   **approaches which could be employed to a**

175

1    **particular set of data.**
2    Q. But that would require some judgment to
3    determine which criteria, which frameworks
4    or criteria to use?
5    **A. That would be correct.**
6    Q. In statistical analysis, judgment is required
7    to determine what statistical model to use
8    to analyze the particular statistical issue.
9    Would you agree with that?
10   **A. Sometimes, but you can also look at a**
11   **variety of measures. So, for example, one**
12   **would look at the stability of coefficient.**
13   **So, for example, if we get concrete for a**
14   **second, whenever anybody does an event study,**
15   **especially an event study over a long period**
16   **of time, it is incumbent upon -- I'm editor**
17   **of four top-tier economics and finance**
18   **journals, and if a paper came to me**
19   **purporting to do an event study over a**
20   **four-and-a-half-year period of time and**
21   **showed no evidence that the researcher had**
22   **tested for time varying coefficients of the**
23   **model, that paper would be summarily rejected**
24   **immediately.**

176

1         **So there are ways to test whether**
2    **or not -- there are certain judgments in**
3    **terms of the type of model that one might**
4    **initially approach a set of data with, but**
5    **then one would run tests to verify that**
6    **the results are consistent and unbiased**
7    **and stable over the period of time in**
8    **question. Certainly looking at a**
9    **four-and-a-half-year period of time,**
10   **five-year period of time, one would**
11   **absolutely want to check to make sure that**
12   **the coefficients are stable.**
13   Q. So you would agree that in determining
14   what statistical model to use and analyze
15   a statistical issue requires a level of
16   judgment?
17   **A. It requires training and understanding of**
18   **what the literature sets out as the standard**
19   **for estimation, and within that context**
20   **there may be judgment, but once it's**
21   **employed, one also does a variety of tests**
22   **to make sure that it is appropriate.**
23   Q. And then it requires a statistical analysis,
24   it requires a level of judgment to determine

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

177

1    what variables to include in the statistical
2    model, isn't that correct?
3    **A. It depends upon the model. In an event**
4    **study, the models are -- the variables that**
5    **one includes are very well-specified. If**
6    **you look at the Brown and Warner, the seminal**
7    **Brown and Warner articles that summarize**
8    **event study methodology, if you look at the**
9    **chapter written by Kothari and Warner or**
10   **if you read one of the hundreds of papers**
11   **published on event study methodology,**
12   **including my own papers which I've written**
13   **utilizing event studies, the variables you**
14   **put into an event study are very**
15   **well-specified. There's not judgment in --**
16   **in terms of controlling for the market and**
17   **the industry, those are very well X**
18   **antispecified variables that you include.**
19   Q. In your event study, you made a judgment as
20       to what market indices to include in your
21       study, is that correct?
22   **A. That is correct.**
23   Q. Now, is it fair to say that many texts in
24       econometrics and statistical process both

178

1    characterize -- well, is it fair to say that
2    many texts on econometrics state that
3    statistical process as both an art and a
4    science?
5    **A. They're clearly judgments. I think that**
6    **I've testified over the last 15 minutes**
7    **that at various points in time you employ**
8    **judgment based on your training, based on**
9    **your knowledge of the literature, and then**
10   **you also employ tests within that context**
11   **as well. So absolutely judgment plays a**
12   **role, but it's informed judgment based on**
13   **your understanding of the field and based**
14   **on your understanding of what's accepted**
15   **practice in the literature.**
16   Q. Isn't it also true that there's statistical
17       texts that acknowledge that two researchers
18       addressing the same statistical issue are
19       unlikely to employ exactly the same
20       statistical model?
21   **A. That's true, but one would expect you to**
22   **look at examples in the literature which**
23   **support that. And if I look at all of the**
24   **event studies ever published in economics**

179

1    **and finance journals, I see a lot that**
2    **support the methodology I employ and not a**
3    **single one that supports Dr. Hakala.**
4    Q. Now, what is your definition of "replication"
5        as you use it in your report?
6    **A. So let's talk about, first of all,**
7    **replication of Dr. Hakala's industry indexes.**
8    Q. I'm sorry. So you have two definitions of
9        "replication"?
10   **A. I don't have two definitions of**
11   **"replication." What I have are two examples**
12   **where replication becomes an issue. So**
13   **there's an issue about replication as it**
14   **relates to the subjective assessment on which**
15   **days to insert a dummy variable. There's**
16   **also issues of replication as it comes, as**
17   **regards to the construction of the industry**
18   **index that Dr. Hakala employs.**
19       **Now, replication isn't -- Dr. Hakala**
20   **seems to have a definition of replication**
21   **which is if I give you the input data and**
22   **the computer programs, you're going to get**
23   **the same output that I get. That is not the**
24   **definition of replication that we think about**

180

1    **in terms of scientific research. In terms**
2    **of scientific research, the way we think**
3    **about replication is can I outline the**
4    **particular criteria by which I make choices**
5    **in my analysis and someone skilled in the**
6    **art of research that I'm employing would come**
7    **up with the same set of results based on**
8    **those criteria.**
9        **So it's not simply does a computer**
10   **program spit out the same numbers, but can**
11   **I outline a set of criteria which lead to a**
12   **certain set of decisions that then result**
13   **in a particular set of results.**
14   Q. Now, do those results in your view of
15       replication have to be the same, identical?
16   **A. If one were given the criteria by which**
17   **the choices were made, the output would be**
18   **the same.**
19   Q. Identical?
20   **A. Yes.**
21   Q. Now, Dr. Gompers, I just want you to assume
22       that replication means a repeat of an
23       experiment following a specific protocol,
24       okay? And in the natural sciences, does

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

181

1  replication have to result in exactly or
2  precisely the same statistical results as
3  the original experiment?
4  **A. No.**
5  Q. And isn't it true that replication will
6  never arrive at precisely the same result
7  in many instances such as the double-blind
8  studies that Northfield conducted in this
9  case?
10  **A. The reason is you're generating data in**
11  **which there are a variety of factors that**
12  **you can't control for. Here the data is**
13  **already given to you and you're developing**
14  **a set of criteria with which to identify the**
15  **data, so it's different running a natural**
16  **experiment.**
17  **It's also -- so, for example,**
18  **I'm doing some what's called experimental**
19  **economics right now where I do online games**
20  **to elicit the behavioral biases of venture**
21  **capitalists and entrepreneurs. Clearly I'm**
22  **following a methodology, but I can't control**
23  **for all the individual variation so my**
24  **statistical output from that, while I'm**

182

1  **running the same methodology, may be**
2  **different because of the individual variation**
3  **of the way people will play the game.**
4  **But when one looks at the type of**
5  **analysis that I'm doing in this report or**
6  **that Dr. Hakala did in his report, a**
7  **scientifically-appropriate methodology is**
8  **one which spells out the criteria by which**
9  **one approaches the data and then comes to a**
10  **particular set of results based on those**
11  **criteria.**
12  **So, for example, if we look at his**
13  **industry indexes, we have no basis with**
14  **which to replicate how he came up with them.**
15  **He says he's got the first index, which I**
16  **believe it's five companies that he considers**
17  **to be related to Northfield, and then he's**
18  **got a second index, which is two which are**
19  **exposed to the same factors, and we have no**
20  **idea where those seven companies actually**
21  **came from in terms of constructing those two**
22  **indexes, and there would be no way for a**
23  **researcher to go and without seeing the**
24  **names of those companies come to identify**

183

1  **those same companies.**
2  Q. Now, would you agree that given the events
3  chosen and the variables chosen, you can
4  replicate the actual calculations and
5  statistical results in Dr. Hakala's report?
6  **A. I think that's what I answered about ten**
7  **minutes ago in terms of Dr. Hakala's**
8  **replication; if I give you data and computer**
9  **codes, you get the same results.**
10  Q. My question is you would agree if you
11  were given that information, that you could
12  replicate his calculations?
13  MR. BOHAN: The data and the code?
14  Q. No. That given the events he chose and
15  the variables that he used, that you could
16  replicate the actual calculations and
17  statistical results in his report?
18  MR. McCALL: Object to the form
19  of the question. It's vague.
20  **A. So if I was given his data and his code,**
21  **the output would be the same. There have**
22  **been times in which on other matters, in**
23  **which --**
24  Q. I'm talking about this matter.

184

1  **A. Theoretically, if one employs the same**
2  **statistical method to the data that Dr.**
3  **Hakala provides and includes the same**
4  **industry indexes and the same dummy**
5  **variables, the output should be the same.**
6  **The only reason that I pause is in the past**
7  **I've tried to replicate some of Dr. Hakala's**
8  **work and have been able to get close, but**
9  **there are times in which I don't seem to**
10  **be able to precisely replicate it. But**
11  **theoretically, given the data and given the**
12  **dummy variables and the industry indexes**
13  **that Dr. Hakala has, you should get out of**
14  **that computer code the same output.**
15  Q. Did you personally attempt to replicate Dr.
16  Hakala's protocol for selecting potentially
17  material, company-specific events?
18  **A. I did not, but what I did identify were**
19  **even relative to dates that Dr. Hakala says**
20  **were in deposition testimony, he identified**
21  **types of events that he says should**
22  **absolutely be included and clearly identified**
23  **dates that he didn't include when that**
24  **information was announced.**

185

1          **Similarly I showed particular**
2    **dates from Dr. Hakala's analysis in which he**
3    **identified a news story that is just a sheer**
4    **repeat of a news story which appeared the**
5    **day before or two days before.  So while I**
6    **did not myself try to sit in a smoke-filled**
7    **room and identify significant news days, I**
8    **do identify clear errors in what Dr. Hakala**
9    **did.**
10   Q.  Now, in your report, I believe somewhere
11       you noted that Dr. Hakala referred to a
12       paper by Roll, R O L L, the Roll paper,
13       which is cited in the Journal of Finance
14       in 1988.  Do you recall that?
15          MR. McCALL:  What page are you
16       looking at, Phil?
17   A.  **Starting on Page 40 I cite a bunch of**
18       **papers that Dr. Hakala sites in his paper.**
19       **I don't see the Roll paper referenced in**
20       **my paper.**
21   Q.  So you don't recall whether you referenced
22       the Roll paper in the report?
23   A.  **I do not have a recollection of citing the**
24       **Roll paper in my report.  And, in fact, if**

186

1       **you look at my documents considered, it's**
2       **not listed in here as a paper so I must not**
3       **reference it in my report.**
4    Q.  Were you aware that Dr. Hakala had cited
5       the Roll paper in his expert report?
6    A.  **I don't recall Dr. Hakala citing the Roll**
7       **paper.**
8    Q.  Are you familiar with the Roll paper?
9    A.  **I know Professor Roll and I've read lots of**
10      **Professor Roll's paper.  I don't recall**
11      **which particular 1988 article that you're**
12      **referring to, so if I had the particular**
13      **article, it might refresh my memory, but**
14      **Professor Roll has written many papers over**
15      **the years.**
16   Q.  In connection with your expert report, did
17      you attempt to replicate any event study
18      methodology advocated by Roll?
19   A.  **I don't know what you're referring to in**
20      **terms of event studies advocated by Roll.  To**
21      **the best of my recollection, I don't --**
22          MR. BOHAN:  I don't mean to
23      interrupt your examination, but maybe you
24      should give him the title of the Roll

187

1       article.  Is it the R-squared article?
2    Q.  Well, in connection with your expert report,
3       did you rely on -- you didn't rely on any
4       article by Roll, did you?
5    A.  **I relied on the standardly-accepted event**
6       **study methodologies as I teach in my Ph.D.**
7       **course, as I've employed in my peer-reviewed**
8       **published journal articles, as advocated by**
9       **people who are skilled in the art and have**
10      **reviewed it like Kothari and Warner and the**
11      **like.**
12   Q.  But if you had relied on some writing of
13      Roll, that would have been listed as the
14      materials relied upon in your expert report?
15   A.  **If I had reviewed it prior to writing my**
16      **report, I would have included it as a**
17      **reference.**
18   Q.  Now, in your expert report you note some
19      articles by Thompson, Olsen and Dietrich
20      that Dr. Hakala had cited in his report,
21      is that correct?
22   A.  **That is correct.**
23   Q.  Now, did you attempt to replicate the
24      Thompson, Olsen and Dietrich protocol and

188

1       methodology and compare it with the results
2       of Dr. Hakala's analysis?
3    A.  **Just let me go to my portion of the report**
4       **where I discuss --**
5          MR. BOHAN:  The bullet on Page 40.
6    A.  **So there's no event study methodology here**
7       **that they recommend to go to the data.**
8       **What the Thompson, Olsen and Dietrich paper**
9       **does is they look for companies in which**
10      **there's published news accounts and look at**
11      **the distribution of stock returns on days**
12      **in which there are publicly disclosed news**
13      **announced and the distribution on non-news**
14      **days, and rather unsurprising they find**
15      **that the distribution on news days is**
16      **different.**
17         **This article in no way advocates**
18      **employing Dr. Hakala's event study**
19      **methodology so it's a simple summary of a**
20      **fact that the distribution returns on news**
21      **days is different than the distribution**
22      **returns on non-news days.  There's nothing**
23      **in this which suggests, advocates or**
24      **recommends employing the type of event**

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

189

1    study methodology that Dr. Hakala employs
2    and, in fact, you can see the absurdity of
3    this if you think about a company like
4    Microsoft or a company like Google in which
5    there are multiple, multiple, multiple news
6    stories every single day.  If you were to
7    follow Dr. Hakala's methodology, one would
8    never be able to run an event study for
9    Microsoft or one would never be able to run
10   an event study for Google because there are
11   news stories about those companies every
12   single day.  That in and of itself is proof
13   that even for the most news-covered stocks,
14   you could never do an event study, the
15   methodology makes absolutely no sense.
16   Q.  Now, isn't it true that the types of events
17       identified and controlled for in the
18       Thompson, Olsen and Dietrich paper mostly
19       overlap with the types of events controlled
20       for by Dr. Hakala?
21   A.  Again, you're using the wrong term.  All
22       Thompson, Olsen and Dietrich do is to look
23       at the distribution of returns on days in
24       which there are published news and days on

190

1    which there is not published news, and they
2    find that the distribution is different.
3    There's nothing in this paper that
4    recommends that you insert dummy variables
5    on every single news day to do an event
6    study.  That's not their recommendation.
7    They don't do that analysis and it doesn't
8    support that analysis.  It's the simple
9    identification of news days having a
10   different stock price distribution than
11   non-news days.
12   Q.  Well, didn't Thompson, Olsen and Dietrich
13       control for all company-specific events
14       identified that meet their criteria and not
15       just some?
16   A.  Again, you say "control for."  What they
17       did is a very simple analysis to say let's
18       calculate the stock returns and distribution
19       of stock returns on days in which there are
20       published news and days at which there's not
21       published news, and those two distributions
22       are different.  That's what they did.  It's
23       a simple replicable test where they say all
24       news.  They didn't sit there and sort of go

191

1    and say I'm going to check the box here and
2    not here and not here.  It was a simple test
3    to say is the distribution of returns
4    different.  It has nothing to do with the
5    estimation of an event study for a particular
6    company.
7    Q.  Well, do you agree or disagree that in
8        controlling for all company-specific events,
9        Thompson, Olsen and Dietrich often controlled
10       for more than 20 or 30 percent of the trade
11       days in the estimation windows for certain
12       individual companies?
13   A.  For a firm of Microsoft, they would include
14       100 percent of the days.  They're not doing
15       an event study.  They're not controlling
16       for event days.  They've done a simple
17       summary of the returns on news days and
18       non-news days.  All that says is that for
19       some companies they have news on 20 or
20       30 percent of the days.  There are companies
21       that today have news on 100 percent of the
22       days.  It has nothing to do, this paper has
23       nothing to do with how one should perform
24       an event study for a given firm.

192

1    Q.  Now, would you agree that the article says
2        that controlling for all company-specific
3        events improves the power of the event
4        study analysis?
5    A.  No.  What the article says is that the
6        distribution of returns on event days, news
7        days is different than the distribution of
8        events on non-news days.
9    Q.  Now, in preparing your report, did you find
10       any academic text or articles cited by Dr.
11       Hakala that said one can identify and control
12       for known potentially significant and
13       company-specific events chosen a priority?
14   A.  Absolutely.  There are event studies that
15       use the dummy variable approach all the time
16       where they identify specific events.  They
17       can be an earnings announcement, they can
18       be a merger and acquisition announcement,
19       but Dr. Hakala can't site to a single
20       published article that either advocates or
21       utilizes the type of methodology that he
22       employs here in which a researcher has
23       published a paper where they've gone through
24       and subjectively chosen what they believe

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

193

1    to be news days and inserts dummy variables
2    for each of those news days.
3        Dummy variables are fine. Inserting
4    a dummy variable for a pre-specified event
5    is fine. It's certainly not the number of
6    events that he employs and it's certainly
7    not the subjective nature that he employs.
8  Q. Now, in your view, is there like a
9    bright-line number or formula of dummy
10   variables that are indicative of
11   unreliability or not being generally
12   accepted?
13       MR. McCALL: Objection.
14 Q. Or is that something that you just, there's
15   no bright line, it depends on the
16   circumstances or something else?
17       MR. McCALL: Object to the form.
18 A. So typically when the papers have utilized
19   a dummy variable, they identify a specific
20   class of events, so it's all earnings
21   announcements or it's all announcements of
22   raising capital. So it would depend upon
23   the ability to sort of pre-specify and
24   objectively identify those days. And so

194

1    while there's no bright-line test, typically
2    the papers which have been published which
3    utilize a dummy variable have typically
4    been constrained to one particular type of
5    event, merger and acquisition, earnings
6    announcement, capital raising.
7  Q. Now, were you aware that other academic
8    experts have reviewed Dr. Hakala's event
9    study methodology?
10 A. I know he purports to have had others
11   review them. So, for example, in other
12   matters he says that he sent his work to
13   Jennifer Francis and Katherine Shipper,
14   both of whom I know quite well, and neither
15   one of them have ever commented explicitly
16   on his work. And, in fact, we don't need
17   to go into the specifics here, but besides
18   sending dismissive e-mails to him, have
19   had no substantive communication with him,
20   although he represents to have discussed it.
21       In other matters I know he's
22   testified that he's had discussions with
23   both Jennifer Francis and Katherine Shipper,
24   both of whom I know have told me that

195

1    explicitly they've sent dismissive e-mails
2    to him but have never commented on his work.
3  Q. Are you familiar with a Dr. Laurentius
4    Marias?
5  A. I don't know Lauren Marias.
6  Q. Now, in preparing your expert report in
7    this case, did you review Dr. Hakala's
8    working paper testing his event study
9    methodology?
10 A. I have seen what he purports to be a
11   working paper. The paper, it's not, it
12   doesn't appear on SSRN, has not been
13   submitted to any journal. It's just a
14   simulation that he runs. And, again, as
15   an editor of four of the leading economics
16   and finance journals, I can clearly state
17   that the purported working paper, if it
18   came across my desk, would be very quickly
19   dealt with.
20 Q. So you're familiar with his working paper?
21 A. In another matter in which I was working
22   in which Dr. Hakala was on the other side,
23   he wrote a rebuttal report in which he
24   attached as an exhibit to that rebuttal

196

1    report his working paper, so I have seen
2    what Dr. Hakala states is his working paper.
3  Q. Now, pursuant to that working paper, isn't
4    it true that his test shows that variations
5    and errors in the number of identified
6    company-specific events controlled for
7    still results in a more precise and less
8    biased analysis than failing to control
9    for known company-specific events?
10 A. Not at all. So what Dr. Hakala does is
11   he makes up data. Literally he says I'm
12   going to make up data and I'm going to say
13   on these 50 days there is large stock price
14   movement, and then he asks the questions,
15   asks the question, if I fabricated this
16   data and I artificially make these days
17   high, is it the case that I can identify
18   those days more easily if I stick dummy
19   variables on those days.
20       It is in some sense a hard-wire
21   test in which I manufacture data and, lo
22   and behold, if I know how I manufactured
23   the data, I can identify the way the data
24   was manufactured. That is literally the

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

197

1  only thing this test shows. There's no real
2  data in the paper. There's no real theory
3  behind it. It's simply if I fabricate data,
4  can I identify the, fabricate the data by
5  knowing how I fabricated the data.
6  Q. The Monte Carlo simulation on a known
7  statistical process is a common and
8  generally-accepted method for testing,
9  computing complex statistical methodologies,
10 isn't it?
11 A. People absolutely do Monte Carlo simulation.
12 Q. And isn't it true that Dr. Hakala finds
13 that his methodology is more precise and
14 less biased than the methodology you
15 advocate?
16 A. In his simulated data. So, as I said, he
17 creates the simulated data, he then
18 artificially juices up the return, he
19 artificially increases the return on a
20 certain number of days and then, lo and
21 behold, finds that if you stick dummy
22 variables on that day, it increases his
23 ability to identify those days.
24     It's a little bit obvious from

198

1  sort of a statistical insight, so there's
2  nothing -- first of all, there's nothing
3  interesting or novel about that. Yes, of
4  course, that's the case. Second, that has
5  nothing to do with the reality of how one
6  implements an event study. And, as I said,
7  if you do a search on SSRN, in which there
8  are hundreds of thousands of academic papers
9  submitted to, if you do a search for Dr.
10 Hakala, you won't find Dr. Hakala's paper
11 on there.
12 Q. So would you agree that numerous academic
13 texts and articles cited by Dr. Hakala in
14 that his expert report specifically advocates
15 identifying and controlling for known
16 company-specific events in general?
17     MR. McCALL: I'll just object. I
18 think you've asked and answered or asked
19 this question and it's been answered in 14
20 different variations. Now, maybe Dr. Hakala
21 gave you a whole list of questions, Phil,
22 but --
23     MR. KIM: Kevin, let's not remind
24 the torturous deposition of Dr. Hakala which

199

1  lasted well beyond seven hours in which
2  multiple questions that I believe --
3     MR. McCALL: You keep asking the
4  same question in somewhat different forms.
5  Substantively they're the same.
6  A. So academic texts and articles have
7  identified a parsimonious number of events
8  that you might want to control for in a
9  dummy variable fashion. I think I testified
10 that papers have looked at things like
11 earnings announcements and so those papers,
12 when they do an event study, do include
13 dummy variables, but they only, only include
14 them for the earnings announcements. Another
15 set of papers would look at merger
16 announcements and, yes, they include dummy
17 variables in an event study on merger
18 announcement days.
19     So including dummy variables in an
20 event study to control for company-specific
21 events has absolutely been advocated in
22 the literature and has been employed in
23 peer-reviewed research. But what you don't
24 find advocated and you never -- you can

200

1  look through every single academic journal
2  or every single text and will not find a
3  single example of a paper which says we
4  should control with a dummy variable for
5  every single day on which there is any
6  type of news.
7  Q. So is one of your criticisms of Dr. Hakala's
8  event study that he's controlling for too
9  many company-specific events?
10 A. So think about what it is we're trying to
11 do with an event study. We're trying to
12 compare the response to a particular event
13 relative to the typical stock price movement
14 on all other days. Now, when you look at
15 earnings announcements, you compare the
16 collection of how earnings announcements
17 affect stock price to every single other
18 day and you leave every other kind of
19 announcement in there. If you dummy out
20 every single news day, as my report
21 discusses, you reduce the residual standard
22 errors. What does that mean? That means
23 it is far more likely that you will find a
24 statistically significant stock price

201

1    movement on a given day than you would if
2    you employed the correct event study
3    methodology without a dummy variable for
4    all news days.  I might hypothesize why Dr.
5    Hakala does that.  I won't, as we sit here,
6    but clearly it is very biased and
7    over-identifies statistically significant
8    days.
9  Q.  That conclusion that you came to that his
10    selection -- well, that conclusion you
11    came to that his standard errors are
12    under-stated, in your expert report do you
13    cite any peer-reviewed published paper to
14    support that assertion?
15  A.  I show it by looking at the residual
16    standard errors in his model without dummy
17    variables and his model with dummy variables
18    and show how the significance level falls
19    dramatically, what the threshold for
20    statistical significance.
21        So my report, I can't remember
22    the exact number, but it goes from like
23    seven point something percent down to six
24    point something percent, so it's over a

202

1    percent reduction in the level necessary
2    to find statistical significance.  And it
3    is the exact same criticism that the Xcelera
4    court leveled against Dr. Hakala when it
5    excluded his testimony.
6  Q.  So you just conducted your own test, you
7    didn't cite any peer-reviewed or published
8    paper in support of that assertion?
9  A.  So think about if on average days in which
10    there are news have bigger stock price
11    reaction than days in which there's no
12    published news, if I dummy out those days,
13    essentially what I've done is I've removed
14    normal variation from stock, from the stock
15    price return and what's left over because
16    remember, when you put in a dummy variable,
17    it's as if you make the standard error on
18    that day zero.
19        So by removing all of the big days,
20    by removing these news stories with the
21    dummy variable, you've artificially reduced
22    the remaining unexplained variation and,
23    therefore, the standard error, the residual
24    standard error that you need to identify

203

1    statistical significance is greatly reduced,
2    hence, we're going to over-identify the
3    number of statistically significant days.
4  Q.  Now, Dr. Gompers, isn't it true that every
5    time Dr. Hakala identified a control for a
6    company-specific event, the regression
7    analysis reduced the number of degrees of
8    freedom by one?
9  A.  Yes.
10  Q.  And suppose that Dr. Hakala chose an event
11    a priority that had mixed news such as that
12    the estimated effect of the event was zero
13    percent on Northfield's stock price.  Now,
14    by including that event that caused no net
15    movement in Northfield's stock price in
16    his analysis and given the loss of a degree
17    of freedom, wouldn't the inclusion of that
18    event in the analysis cause the standard
19    error to increase and the T statistics for
20    the estimated events of interest to decrease,
21    all else being equal?
22  A.  All else being equal, but that's not the
23    case here because we know from prior research
24    that news story days are associated with

204

1    larger stock price movement.  There's
2    actually been work that shows that the
3    direction of causality may also run in the
4    other direction, that news gets published
5    when there's big stock price movement.
6        So we know that on average, just
7    by selecting a day in which there's a news
8    story, we will on average be taking out
9    those days that have bigger stock price
10    movements and, hence, we know that that
11    exercise will cause a bias in the standard
12    errors down.  So if it's zero, absolutely.
13    If he's dummied out days in which the
14    expected return was zero, that would be
15    true, but because we know that news story
16    days in general have higher stock price
17    reactions, we know that including dummy
18    variables on those days will reduce the
19    standard errors.
20  Q.  So does that mean that by selecting events a
21    priority and by including events that are
22    not statistically significant in the
23    analysis, the effect is to actually increase
24    the standard of error and reduce the T

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

205

1    statistics for the events of interest?
2    **A.  Well, that's theoretically possible in some**
3      **hypothetical sample.  It's not true in**
4      **general with stock returns and news stories**
5      **and it's certainly not the case when you**
6      **look here and do an analysis of Northfield.**
7    Q.  Isn't it also true that if Dr. Hakala had
8      only controlled for the significant events,
9      his standard errors would have been reduced
10     and his T statistics for the events of
11     interest would have increased?
12   **A.  Dr. Hakala used to do that and he'd been**
13     **thrown out a lot with that so he's moved**
14     **to this.  So Dr. Hakala used to find the**
15     **significant days and only include the**
16     **significant days so that absolutely leads**
17     **to greater bias, so the standard errors**
18     **would have been even smaller had he only**
19     **included dummy variables on the significant**
20     **days.**
21          **It is still the case, however,**
22     **that including dummy variables on subjective**
23     **news days reduces the standard error relative**
24     **to the generally-accepted event study**

206

1    **methodology that's employed in the**
2    **literature.**
3          MR. KIM:  You want to take like
4    three minutes, five minutes?
5          (Break taken)
6          MR. KIM:  I have no further
7    questions at this time.
8          MR. McCALL:  I have one.
9          CROSS EXAMINATION
10   BY MR. McCALL:
11   Q.  Professor Gompers, Mr. Kim asked you a number
12     of questions about outliers.  Do you recall
13     that topic?
14   **A.  Yes.**
15   Q.  Do you recall in your report that you
16     observed that there were a number of days
17     on which Northfield stock moved in a
18     statistically significant manner but
19     there was no news?
20   **A.  Yes.  I believe that when Mr. Kim asked**
21     **me about that question, I stated that I**
22     **had 67 days that are significant at the**
23     **95 percent confidence interval.  Of those,**
24     **I believe the tabulation is, I find that**

207

1    **ten appeared to react to old news, 29**
2    **appeared to react to what appears to be,**
3    **at least in my review, new news, and 28**
4    **reacted to no identifiable news.**
5          **So searching all the sources I**
6    **could, I was able to find nothing on those**
7    **28 days on which there was a statistically**
8    **significant stock price movement.**
9    Q.  So on those days that you just referenced
10     in your prior answer, did you consider the
11     observations that you made to be observations
12     of outliers that you would see just in a
13     normal, random distribution and, therefore,
14     having no significance to your analysis?
15   **A.  Absolutely not, because when you look at**
16     **each one of those days, any one of those**
17     **days you are 95 percent confident that the**
18     **stock price is moving not by sheer chance.**
19     **Therefore, when you look at those outliers**
20     **and find no news, I conclude in my report**
21     **and discuss it in my report that that's**
22     **strong indication that the Northfield stock**
23     **market was not operating efficiently.**
24          MR. McCALL:  That's all I have.

208

1          MR. BOHAN:  I have one question.
2          CROSS EXAMINATION
3    BY MR. BOHAN:
4    Q.  You were asked near the start of your
5      deposition whether you have ever published
6      a peer-reviewed article that addresses event
7      study methodology.  Do you recall that?
8    **A.  Yes.**
9    Q.  I'm going to ask you a different question,
10     I think a more precise question.  Have you
11     ever had accepted for publication in a
12     peer-reviewed journal an article in which
13     your design or use or application of an
14     event study was exposed to peer review?
15   **A.  Absolutely.**
16          MR. BOHAN:  No other questions.
17          MR. KIM:  I have one question.
18          REDIRECT EXAMINATION
19   BY MR. KIM:
20   Q.  What were the names of those articles?
21   **A.  If we go through my CV, fifth paper down.**
22   Q.  What page is that on the bottom?  I'm sorry.
23   **A.  It's Page 2 of Appendix A, so this paper**
24     **actually develops and looks at a number of**

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

209

1    what are considered long horizon event
2    study methodologies so it looks to measure
3    the stock price reaction not on a single
4    day, but over a period of a year or more,
5    and looks at and actually won a paper, won
6    an ward as the best paper in the Journal of
7    Finance, which is the top finance journal.
8    The paper, Venture Capital Distributions,
9    which is the No. 2 paper on Page 3, employs
10   both single-day event study methodology as
11   I employ in my report, as well as long-run
12   event study methodology.
13          Looking at now down to the sixth
14   paper, Is the Abnormal Return Following
15   Equity Issuance Anomalous, that's again a
16   paper which develops and tests a variety
17   of long horizon event study methodologies.
18   The paper, Who Under-reacts to Cash Flows,
19   in the Journal of Financial Economics is a
20   paper that does a daily event study
21   methodology.
22          The next paper down, The Role of
23   Lock-Ups in Initial Public Offering, employs
24   event study methodology.  The paper several

210

1    down that's called The Really Long Run
2    Performance of Initial Public Offerings again
3    employs long horizon event study methodology.
4    All of those papers did use event study
5    methodology in them.
6    Q.  They used your event study methodology?
7    A.  That is correct.
8          MR. KIM:  Thank you.  No more
9    questions.
10         (Whereupon the deposition was
11   concluded at 3:22 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

211

1          DEPONENT'S ERRATA SHEET
2          AND SIGNATURE INSTRUCTIONS
3
4          The original of the Errata Sheet has
5    been delivered to J. Kevin McCall, Esq.
6          When the Errata Sheet has been
7    completed by the deponent and signed, a copy
8    thereof should be delivered to each party of
9    record and the ORIGINAL delivered to Phillip
10   Kim, Esq., to whom the original deposition
11   was delivered.
12
13
14         INSTRUCTIONS TO DEPONENT
         After reading this volume of your
15   deposition, indicate any corrections or
     changes to your testimony and reason therefor
16   on the Errata Sheet supplied to you and sign
     it.  DO NOT make marks or notations on the
17   transcript volume itself.
18
19   REPLACE THIS PAGE OF THE TRANSCRIPT
     WITH THE COMPLETED AND SIGNED ERRATA
20   SHEET WHEN RECEIVED.
21
22
23
24

212

1    ATTACH TO THE DEPOSITION OF: Paul A. Gompers,
                                 Ph.D.
2
     CASE: In Re: Northfield Laboratories, Inc.
3          Securities Litigation
4          ERRATA SHEET
5
6    INSTRUCTIONS:   After reading the transcript
     of your deposition, note any changes or
7    corrections to your testimony and the reason
     therefor on this sheet.  DO NOT make any
8    marks or notations on the transcript volume
     itself.  Sign and date this Errata Sheet
9    (before a Notary Public, if required).
     Refer to Page 211 of the transcript for
10   Errata Sheet distribution instructions.
11   PAGE   LINE
              CHANGE:
12            REASON:
              CHANGE:
13            REASON:
              CHANGE:
14            REASON:
              CHANGE:
15            REASON:
              CHANGE:
16            REASON:
              CHANGE:
17            REASON:
              CHANGE:
18            REASON:
19         I have read the foregoing transcript
     of my deposition and except for any
20   corrections or changes noted above, I hereby
     subscribe to the transcript as an accurate
21   record of the statements made by me.
22   Date
23
24          Paul A. Gompers, Ph.D.

f49fc79c-d64c-41e7-86a6-aa4640bf54dc

213

1     COMMONWEALTH OF MASSACHUSETTS)
2     SUFFOLK, SS. )
3
4
5         I, Jeanette Maracas, Registered
      Professional Reporter and Notary Public in
      and for the Commonwealth of Massachusetts, do
6     hereby certify that there came before me on
      the 23rd day of March, 2010, at 9:10 a.m.,
7     the person hereinbefore named, who was by me
      duly sworn to testify to the truth and
8     nothing but the truth of his knowledge
      touching and concerning the matters in
9     controversy in this cause; that he was
      thereupon examined upon his oath, and his
10    examination reduced to typewriting under my
      direction; and that the deposition is a true
11    record of the testimony given by the witness.
12
13        I further certify that I am neither
      attorney or counsel for, nor related to or
      employed by, any attorney or counsel employed
14    by the parties hereto or financially
      interested in the action.
15
16        In witness whereof, I have hereunto
      set my hand this 29th day of March, 2010.
17
18
19
20
         Notary Public
21        My commission expires 9/6/13
22
23
24

# EXHIBIT 2

# **MRB** MARKETING RESEARCH BUREAU

**Synthetic Oxygen Carriers (Blood Substitutes):**
**Opportunity Assessment of Three Leading Hemoglobin-Based Products**
*Hemopure (Biopure), PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

October 12, 2005

As an individual with a specific interest in oxygen carriers – blood substitutes – I invite you to purchase this definitive examination of the prospects of three leading players in the race to commercialize one of the "holy grails" of human medicine.

The Marketing Research Bureau specializes exclusively in market assessments of human blood and blood-derived products, with over 25 years of experience in this unique environment.

As you review the enclosed table of contents, you will quickly recognize that this assessment thoroughly ***addresses and answers*** the most important questions on your mind. But beyond this, I can assure you that you will learn much more to help guide your planning or investment decisions.

The complete report is available for $3,750.  Without any additional charge, we will be happy to address any special questions you may have for up to one hour.

I welcome your call or e-mail to inquire further about this newly released report.
To order, please fax (or mail) the enclosed order form, or you may confirm your order by e-mail.

Sincerely,

Patrick L. Robert
President

Enclosures

Fax: 203.891.8855

THE MARKETING RESEARCH BUREAU INC.
284 RACEBROOK ROAD, ORANGE, CT  06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

PHONE: 888.777.9796
203.799.0298

**MRB**  **MARKETING RESEARCH BUREAU**

SYNTHETIC OXYGEN CARRIERS
(Blood Substitutes):

Opportunity Assessment of Three Leading
Investigational Hemoglobin-Based Products:

Hemopure (Biopure Corporation)
PolyHeme (Northfield Laboratories)
Hemospan/MP4 (Sangart, Inc.)



The Marketing Research Bureau, Inc.
284 Racebrook Road
Orange, Connecticut 06477
(203) 799-0298
Fax: (203) 891-8855

October 2005

**MRB** MARKETING RESEARCH BUREAU

## Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

    Product Characteristics      1

    Safety-Related Findings in Animal and Patient Studies      2

    Efficacy in Patient Studies      5

    Projected U.S. Approval and Commercialization Prospects      7

**Biopure Corporation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    Introduction and Historical Overview      10

    Technology      12

    Preclinical Studies      15

    Early Clinical Studies      16

    Recent Clinical Development Prior to Phase III U.S. Trial      18

    The Pivotal U.S. Phase III Orthopedic Surgery Trial      20

    The Economics of Hemopure in Elective Surgery      25

    Approval of Hemopure in South Africa      26

    A Word About the Veterinary Product: Oxyglobin      27

    Safety Concerns with Hemopure      29

    Manufacturing Site      33

    Recent Activity: December 2003 Through September 2005      34

    Conclusions      36

*continued…*

FAX: 203.891.8855

**THE MARKETING RESEARCH BUREAU INC.**
284 RACEBROOK ROAD, ORANGE, CT 06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

PHONE: 888.777.9796
203.799.0298

# MRB  MARKETING RESEARCH BUREAU

**Northfield Laboratories** . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

    Program Background                    38

    Technology                    40

    Product Characteristics                    41

    Preclinical and Early Clinical Testing                    42

    Biologics License Application (BLA) Filing and Rejection                    47

    Elective Surgery Trial (Abdominal Aortic Aneurysm)                    48

    1998 PolyHeme Study in 13 Trauma Patients                    53

    A Dissection of the Phase III Prehospital Trauma Trial                    56

    Walter Reed Hypotensive Resuscitation Study in Rat Model                    62

    Rationale for In-hospital Administration In Lieu of RBCs                    63

    Conclusions                    66

**Sangart** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **68**

    Introduction                    68

    Product Characteristics                    69

    Viral Inactivation                    75

    Manufacturing Issues                    75

    Preclinical Studies                    76

    Clinical Development of Hemospan/MP4                    77

    Commercialization Strategy                    79

    Conclusions                    81

Fax: 203.891.8855

**THE MARKETING RESEARCH BUREAU INC.**
284 RACEBROOK ROAD, ORANGE, CT 06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

PHONE: 888.777.9796
203.799.0298



## MARKETING RESEARCH BUREAU

### ORDER FORM    Please fax to: 203.891.8855

**Synthetic Oxygen Carriers (Blood Substitutes):**
**Opportunity Assessment of Three Leading Hemoglobin-Based Products**
*Hemopure (Biopure), PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

### Price and Delivery:

$3,750 Shipment by priority mail within the U.S. upon receipt of the order or payment, and by airmail for international orders.

☐ Please send the report by overnight courier (add $20.00 for domestic shipment and $45.00 international)

### Payment:

☐ Payment follows by check in US dollars, issued on a U.S. Bank or U.S. correspondent bank or by wire transfer to Bank of America, Orange, Connecticut 06477, USA, account number 00007103 7303, routing number 0260-0959-3 Swift code: BOFAUS3N.

☐ By Enclosed Check in US dollars, issued on a US Bank or US correspondent bank

☐ Please bill me—Purchase order Number (optional) _____

By Credit Card   ☐ Visa / Mastercard / Eurocard   ☐ American Express

Card Number _____ Expiration date _____

Please print your name _____

Signature _____

### Report to be sent to:

Name/Title _____

Company _____

Address _____

City/Postal Code _____

Country _____

Telephone _____ Fax: _____

E-Mail _____ Date: _____

**MRB** **MARKETING RESEARCH BUREAU**

# SYNTHETIC OXYGEN CARRIERS (BLOOD SUBSTITUTES):
## Opportunity Assessment of Three Leading Hemoglobin-Based Products
### *Hemopure (Biopure), PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

November 11, 2005

As someone with a special interest in oxygen carriers – blood substitutes – we are pleased to offer this definitive assessment of the prospects of three leading U.S. competitors in the race to commercialize one of the true "holy grails" of human medicine.

The Marketing Research Bureau specializes exclusively in market analysis of human blood and blood-derived products, with over 25 years of experience in this unique environment.

As you review the enclosed table of contents, you will quickly recognize that this assessment thoroughly addresses the most commonly asked questions about these hemoglobin-based oxygen carriers, or HBOCs. But beyond this, *Synthetic Oxygen Carriers* provides answers that will help guide your planning or investment decisions.

The complete report is available for $1,750. At no additional cost, we will also be happy to address special questions you may have (up to one hour).

I welcome your call or e-mail to inquire further about this newly released report. *To order, please fax (or mail) the enclosed order form, or you may confirm your order by e-mail.* We can ship your report by overnight mail, to arrive next morning.

Sincerely,

Patrick L. Robert

Patrick L. Robert
President

Enclosures

**THE MARKETING RESEARCH BUREAU INC.**
284 RACEBROOK ROAD, ORANGE, CT 06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

FAX: 203.891.8855

PHONE: 888.777.9796
203.799.0298



**MRB** **MARKETING RESEARCH BUREAU**

# SYNTHETIC OXYGEN CARRIERS
## (Blood Substitutes):

## Opportunity Assessment of Three Leading Investigational Hemoglobin-Based Products:

## Hemopure (Biopure Corporation)
## PolyHeme (Northfield Laboratories)
## Hemospan/MP4 (Sangart, Inc.)

The Marketing Research Bureau, Inc.
284 Racebrook Road
Orange, Connecticut 06477
(203) 799-0298
Fax: (203) 891-8855

October 2005

**THE MARKETING RESEARCH BUREAU INC.**
284 RACEBROOK ROAD, ORANGE, CT 06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

FAX: 203.891.8855

PHONE: 888.777.9796
203.799.0298

# MRB  MARKETING RESEARCH BUREAU

## Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

    Product Characteristics      1

    Safety-Related Findings in Animal and Patient Studies      2

    Efficacy in Patient Studies      5

    Projected U.S. Approval and Commercialization Prospects      7

**Biopure Corporation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    Introduction and Historical Overview      10

    Technology      12

    Preclinical Studies      15

    Early Clinical Studies      16

    Recent Clinical Development Prior to Phase III U.S. Trial      18

    The Pivotal U.S. Phase III Orthopedic Surgery Trial      20

    The Economics of Hemopure in Elective Surgery      25

    Approval of Hemopure in South Africa      26

    A Word About the Veterinary Product: Oxyglobin      27

    Safety Concerns with Hemopure      29

    Manufacturing Site      33

    Recent Activity: December 2003 Through September 2005      34

    Conclusions      36

*continued…*

**THE MARKETING RESEARCH BUREAU INC.**
284 RACEBROOK ROAD, ORANGE, CT 06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

FAX: 203.891.8855

PHONE: 888.777.9796
203.799.0298

# MRB MARKETING RESEARCH BUREAU

**Northfield Laboratories** . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

Program Background                                                    38

Technology                                                           40

Product Characteristics                                              41

Preclinical and Early Clinical Testing                               42

Biologics License Application (BLA) Filing and Rejection             47

Elective Surgery Trial (Abdominal Aortic Aneurysm)                   48

1998 PolyHeme Study in 13 Trauma Patients                            53

A Dissection of the Phase III Prehospital Trauma Trial               56

Walter Reed Hypotensive Resuscitation Study in Rat Model             62

Rationale for In-hospital Administration In Lieu of RBCs             63

Conclusions                                                          66

**Sangart** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **68**

Introduction                                                         68

Product Characteristics                                              69

Viral Inactivation                                                   75

Manufacturing Issues                                                 75

Preclinical Studies                                                  76

Clinical Development of Hemospan/MP4                                 77

Commercialization Strategy                                           79

Conclusions                                                          81

**THE MARKETING RESEARCH BUREAU INC.**
284 RACEBROOK ROAD, ORANGE, CT 06477 USA
WWW.MARKETINGRESEARCHBUREAU.COM

FAX: 203.891.8855

PHONE: 888.777.9796
203.799.0298

# MRB — MARKETING RESEARCH BUREAU

**ORDER FORM**   Please fax to: 203.891.8855

## SYNTHETIC OXYGEN CARRIERS (BLOOD SUBSTITUTES):
### Opportunity Assessment of Three Leading Hemoglobin-Based Products
*Hemopure (Biopure), PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

### Price and Delivery:

$1,750 Shipment by priority mail within the U.S. upon receipt of the order or payment, and by airmail for international orders.

☐ Please send the report by overnight courier (add $20.00 for domestic shipment and $45.00 international)

### Payment:

☐ Payment follows by check in US dollars, issued on a U.S. Bank or U.S. correspondent bank or by wire transfer to Bank of America, Orange, Connecticut 06477, USA, account number 00007103 7303, routing number 0260-0959-3 Swift code: BOFAUS3N.

☐ By Enclosed Check in US dollars, issued on a US Bank or US correspondent bank

☐ Please bill me—Purchase order Number (optional) _____

By Credit Card    ☐ Visa / Mastercard / Eurocard     ☐ American Express

Card Number _____ Expiration date _____

Please print your name _____

Signature _____

### Report to be sent to:

Name/Title _____

Company _____

Address _____

City/Postal Code _____

Country _____

Telephone _____ Fax: _____

E-Mail _____ Date: _____

# EXHIBIT 3

Case 1:06-cv-01493 Document #: 293-2 Filed 04/02/09 Page 70 of 129 PageID #:11950

(Blood Substitutes) three leading
Hemoglobin based products

| 2005 Invoice Date | Company | Invoice amt | Tax | Payment Date | CK# |
|---|---|---|---|---|---|
| 11 14 | Sanguine Corporation | 2000 – | | 11/14/05 | 247B |
| 11 16 | Blood Center of America | 1000 – | | 11/18/05 | 26395 |
| 10 25 | Novo Nordisk | 3950 – | | 11/28/05 | 1019758 |
| 12/14/05 | Sangart Inc | 1400 – | | 12/14/05 | 9166 |
| 3/27/06 | US Venture Partners | 1750 – | | 3/27/06 | CC |
| 11/6/06 | LFB | 1750 – | | 2-1-07 | WT |

# I N V O I C E

#06-544

LFB
3, avenue des Tropiques
B.P. 305
F - 91958 – Courtabœuf Cedex
France

November 28, 2006

Market research report entitled *Synthetic Oxygen Carriers (Blood Substitutes):
Opportunity Assessment of Three Leading Products: Hemopure (Biopure),
PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

Total due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 1,750.00
(One thousand seven hundred and fifty US dollars)

As per email order dated November 26, 2006, from Mr. Jean-Christophe Beneytout.

**PAYMENT BY CHECK**
The check must be made in US dollars and issued on a US correspondent bank.

**PAYMENT BY WIRE TRANSFER**
Transfer to Bank of America, Orange, Connecticut 06477, USA, account number
003850938248. Routing number and swift codes available upon request.

Our tax ID Number is: 06-142 3668

Thank you for your business

# I N V O I C E

### #05-544

Thomas Drees, Ph.D.
Sanguine Corporation
101 East Green Street
Suite 6
Pasadena, CA  91105

November 14, 2005

Market research report entitled *Synthetic Oxygen Carriers (Blood Substitutes):*
*Opportunity Assessment of Three Leading Products: Hemopure (Biopure),*
*PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

Total due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 2,000.00
(Two thousand dollars)

As per faxed letter from Patrick Robert dated October 26, 2005.

**PAYMENT BY CHECK**
The check must be made in US dollars and issued on a US correspondent bank.

**PAYMENT BY WIRE TRANSFER**
Transfer to Bank of America, Orange, Connecticut 06477, USA, account number
00007103 7303, routing number 0260-0959-3. Swift Code: BOFAUS3N. Please
provide the invoice number.

Our tax ID Number is: 06-142 3668

Thank you for your business

# I N V O I C E

#05-544


Novo Nordisk Inc.
Attn: Accounts Payable
100 College Road West
Princeton, NJ  08540

October 25, 2005

Market research report entitled *Synthetic Oxygen Carriers (Blood Substitutes):*
*Opportunity Assessment of Three Leading Products: Hemopure (Biopure),*
*PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

Total due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 3,750.00
(Three thousand seven hundred and fifty dollars)

ORDERER: CRTR
APPROVER: PPHI
COST ACCT: 053-34060-58503000


**PAYMENT BY CHECK**
The check must be made in US dollars and issued on a US correspondent bank.

**PAYMENT BY WIRE TRANSFER**
Transfer to Bank of America, Orange, Connecticut 06477, USA, account number
00007103 7303, routing number 0260-0959-3. Swift Code: BOFAUS3N. Please
provide the invoice number.

Our tax ID Number is: 06-142 3668

Thank you for your business

# I N V O I C E

#05-544

BCA/hemerica
1300 Division Road
Suite 102
West Warwick, RI  02893

November 16, 2005

Market research report entitled *Synthetic Oxygen Carriers (Blood Substitutes):*
*Opportunity Assessment on one Leading Product: PolyHeme (Northfield)*
extracted from the Market research report entitled *Synthetic Oxygen Carriers*
*(Blood Substitutes): Opportunity Assessment of Three Leading Products:*
*Hemopure (Biopure), PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

Total due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 1,000.00
(One thousand dollars)

Per order on November 2, 2005 from Mr. Charles Mosher, President and CEO.


**PAYMENT BY CHECK**
The check must be made in US dollars and issued on a US correspondent bank.

**PAYMENT BY WIRE TRANSFER**
Transfer to Bank of America, Orange, Connecticut 06477, USA, account number
00007103 7303, routing number 0260-0959-3. Swift Code: BOFAUS3N. Please
provide the invoice number.

Our tax ID Number is: 06-142 3668

Thank you for your business

# P A I D

## I N V O I C E

#05-544

Sangart, Inc.
1189 Sorrento Valley Road, Suite 104
San Diego, CA 92121

December 14, 2005

Market research report entitled *Synthetic Oxygen Carriers (Blood Substitutes):
Opportunity Assessment of Three Leading Products: Hemopure (Biopure),
PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

Report (Special price) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,400.00
(One thousand four hundred dollars)

Per order on December 1, 2005 from Mr. Andrew Gomperts, Sr. Director Business
Development.

**PAYMENT BY CHECK**
The check must be made in US dollars and issued on a US correspondent bank.

**PAYMENT BY WIRE TRANSFER**
Transfer to Bank of America, Orange, Connecticut 06477, USA, account number
00007103 7303, routing number 0260-0959-3. Swift Code: BOFAUS3N. Please
provide the invoice number.

Our tax ID Number is: 06-142 3668

Thank you for your business

# THE MARKETING RESEARCH BUREAU, INC.

**284, Racebrook Road**         **Phone: (203) 799-0298**
**Orange, CT 06477**         **Fax: (203) 891-8855**
**USA**         **E-Mail: mrb_ibpn@earthlink.net**


# I N V O I C E

#05-544


Novo Nordisk Inc.
Attn: Accounts Payable
100 College Road West
Princeton, NJ  08540

October 25, 2005

Market research report entitled *Synthetic Oxygen Carriers (Blood Substitutes):*
*Opportunity Assessment of Three Leading Products: Hemopure (Biopure),*
*PolyHeme (Northfield) and Hemospan/MP4 (Sangart)*

Total due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 3,750.00
(Three thousand seven hundred and fifty dollars)

ORDERER: CRTR
APPROVER: PPHI
COST ACCT: 053-34060-58503000


**PAYMENT BY CHECK**
The check must be made in US dollars and issued on a US correspondent bank.

**PAYMENT BY WIRE TRANSFER**
Transfer to Bank of America, Orange, Connecticut 06477, USA, account number
00007103 7303, routing number 0260-0959-3. Swift Code: BOFAUS3N. Please
provide the invoice number.

Our tax ID Number is: 06-142 3668

Thank you for your business

# EXHIBIT 4

```
<DOCUMENT>
<TYPE>424B2
<SEQUENCE>1
<FILENAME>c91184b2e424b2.txt
<DESCRIPTION>PRELIMINARY PROSPECTUS SUPPLEMENT
<TEXT>
<PAGE>
```

THE INFORMATION IN THIS PRELIMINARY PROSPECTUS SUPPLEMENT IS NOT COMPLETE AND MAY BE CHANGED. THIS PRELIMINARY PROSPECTUS SUPPLEMENT AND THE ACCOMPANYING PROSPECTUS ARE NOT AN OFFER TO SELL THESE SECURITIES AND THEY ARE NOT SOLICITING AN OFFER TO BUY THESE SECURITIES IN ANY STATE WHERE THE OFFER OR SALE IS NOT PERMITTED.

FILED PURSUANT TO RULE 424(B)(3)
REGISTRATION NO. 333-121622

PRELIMINARY PROSPECTUS SUPPLEMENT     SUBJECT TO COMPLETION     JANUARY 19, 2005
--------------------------------------------------------------------------------

(TO PROSPECTUS DATED DECEMBER 23, 2004)

3,500,000 SHARES

(NORTHFIELD LABORATORIES INC. LOGO)

COMMON STOCK
--------------------------------------------------------------------------------
We are offering all of the 3,500,000 shares of common stock offered by this prospectus supplement.

Our common stock is quoted on the Nasdaq National Market under the symbol "NFLD." On January 14, 2005, the last reported sales price of our common stock on the Nasdaq National Market was $21.02 per share.

INVESTING IN OUR COMMON STOCK INVOLVES A HIGH DEGREE OF RISK. BEFORE BUYING ANY SHARES, YOU SHOULD CAREFULLY READ THE DISCUSSION OF MATERIAL RISKS OF INVESTING IN OUR COMMON STOCK IN "RISK FACTORS" BEGINNING ON PAGE S-8.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS SUPPLEMENT OR THE ACCOMPANYING PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<Table>
<Caption>

|                                         | PER SHARE | TOTAL |
| --------------------------------------- | --------- | ----- |
| <S>                                     | <C>       | <C>   |
| Public offering price                   | $         | $     |
| Underwriting discounts and commissions  | $         | $     |
| Proceeds, before expenses, to us        | $         | $     |

</Table>

The underwriters may also purchase up to an additional 525,000 shares of common stock at the public offering price, less the underwriting discounts and commissions, to cover over-allotments, if any, within 30 days of the date of this prospectus supplement. If the underwriters exercise this option in full, the total underwriting discounts and commissions will be $     , and our total proceeds, before expenses, will be $     .

The underwriters are offering the common stock as set forth under "Underwriting." Delivery of the shares will be made on or about          ,

2005.

    Sole Book-Running Manager

UBS INVESTMENT BANK                                      SG COWEN & CO.
                        ------------------------
                            HARRIS NESBITT
<PAGE>

--------------------------------------------------------------------------------

You should rely only on the information contained and incorporated by reference
in this prospectus supplement and the accompanying prospectus. We have not, and
the underwriters have not, authorized anyone to provide information different
from that contained or incorporated by reference in this prospectus supplement
or the accompanying prospectus. You should not assume that the information in
this prospectus supplement and accompanying prospectus is accurate as of any
date after their respective dates. These documents do not constitute an offer to
sell or a solicitation of an offer to buy these shares of common stock in any
circumstances under which the offer or solicitation is unlawful.


TABLE OF CONTENTS
--------------------------------------------------------------------------------

<Table>
<Caption>
        PROSPECTUS SUPPLEMENT             PAGE
        --------------------             ----
<S>                                      <C>
Prospectus supplement summary.........  S-1
Risk factors..........................  S-8
Special note regarding forward-looking
statements............................  S-20
Use of proceeds.......................  S-21
Capitalization........................  S-22
Market price of common stock..........  S-23
Dividend policy.......................  S-23
Dilution..............................  S-23
Underwriting..........................  S-25
Incorporation of certain documents by
   reference..........................  S-28
Legal matters.........................  S-28
</Table>

<Table>
<Caption>
           PROSPECTUS                  PAGE
           ----------                  ----
<S>                                    <C>
About this prospectus.................   1
Where you can find more information...   1
Forward-looking information...........   3
Our business..........................   3
Risk factors..........................   4
Use of proceeds.......................  11
Ratio of earnings to fixed charges and
   preference dividends...............  11
Dilution..............................  11
Description of the securities we may
   offer..............................  12
Plan of distribution..................  15
Legal matters.........................  17
Experts...............................  17
</Table>

--------------------------------------------------------------------------------

PolyHeme(R) is a registered trademark of Northfield Laboratories Inc.
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------
<PAGE>

Prospectus supplement summary

This summary highlights selected information appearing elsewhere or incorporated
by reference in this prospectus supplement and accompanying prospectus and may
not contain all of the information that is important to you. This prospectus
supplement and accompanying prospectus include information about the shares we
are offering as well as information regarding our business and detailed
financial data. You should read this prospectus supplement and accompanying
prospectus in their entirety, including the information incorporated by
reference in this prospectus supplement and accompanying prospectus.

Unless the context requires otherwise, the words "Northfield," "we," the
"Company," "us" and "our" refer to Northfield Laboratories Inc.

BUSINESS OVERVIEW

Northfield Laboratories Inc. is a leader in the development of a safe and
effective alternative to transfused blood for use in the treatment of acute
blood loss. We are presently conducting a pivotal Phase III trial of our human
hemoglobin-based blood substitute, PolyHeme(R). We believe PolyHeme has the
potential to improve survival in critically injured patients and to thereby
transform the treatment of trauma.

We are presently developing PolyHeme for a unique indication: the early
treatment of urgent, life-threatening blood loss following trauma when donated
blood may not be immediately available. We believe that this indication
addresses a critical unmet medical need, since some trauma patients bleed to
death before they have access to blood.

We are pursuing a unique regulatory strategy in order to seek Food and Drug
Administration, or FDA, approval of PolyHeme. We are conducting the first-ever
pivotal Phase III trial in the United States in which a human blood substitute
is being used to treat severely injured and bleeding patients, beginning at the
scene of injury and continuing during transport to the hospital and the early
period of hospitalization. Because of the life-saving potential of PolyHeme, our
trial is being conducted under a federal regulation, 21 CFR 50.24, that permits
certain types of emergency research using an exception from the requirement for
prospective informed consent by individual patients. Our current trial is based
on our experience in prior clinical trials documenting the potential
life-sustaining capability of PolyHeme when given in rapid, massive infusions to
critically injured patients in the hospital.

We have also taken advantage of Special Protocol Assessment, or SPA, one of the
features of the Food and Drug Modernization Act of 1997. Our SPA reflects an
agreement with FDA on our trial design, the trial endpoints and the broad
concepts for clinical indications those endpoints will support in an application
for product approval by FDA. The assessment of efficacy in our trial will be
based on the data on patient survival at 30 days. A key feature of our SPA is
the agreement on dual primary endpoints of superiority and non-inferiority
between the treatment and control groups. Either of these endpoints will provide
evidence of efficacy.

As part of our trial protocol, an Independent Data Monitoring Committee, or
IDMC, consisting of independent medical and biostatistical experts is
responsible for periodically evaluating the safety data from the trial and
making recommendations relating to continuation or modification of the trial
protocol to minimize any identified risks to patients. The IDMC has completed
its first two reviews of data on mortality and serious adverse events in the
first 120 patients enrolled in the trial and has recommended that the trial

continue without modification. This is the first time that a trial of a human blood substitute has passed this patient evaluation milestone in a high risk trauma population.

We believe that PolyHeme ultimately represents a substantial global market opportunity, based on the need for a universally compatible, immediately available oxygen carrying product and PolyHeme's potential for eventual approval for multiple indications.

S-1

<PAGE>

OUR PRODUCT

Our product, PolyHeme, is a unique human hemoglobin-based oxygen carrier in development for the treatment of urgent, large volume blood loss in trauma and resultant surgical settings, with a particular focus on settings where blood is not immediately available.

PolyHeme is a solution of chemically modified human hemoglobin which simultaneously restores lost blood volume and hemoglobin levels. Hemoglobin is the oxygen-carrying component of the red blood cell. PolyHeme is designed for rapid, massive infusion, which is the way blood is transfused in trauma patients.

We purchase donated red blood cells from The American Red Cross and Blood Centers of America for use as the starting material for PolyHeme. We use a proprietary process of separation, filtration, chemical modification, purification and formulation to produce PolyHeme. Hemoglobin is first extracted from red blood cells and filtered to remove impurities. The hemoglobin is next chemically modified using a multi-step process to create a polymerized form of hemoglobin. The modified hemoglobin is then incorporated into a solution which can be administered as an alternative to transfused blood. PolyHeme is designed to avoid potential undesirable effects such as vasoconstriction, kidney dysfunction, liver dysfunction and gastrointestinal distress. One unit of PolyHeme contains 50 grams of modified hemoglobin, approximately the same functional amount of hemoglobin delivered by one unit of transfused blood.

We believe PolyHeme will have the following important benefits:

  UNIVERSAL COMPATIBILITY.  Our clinical studies to date indicate that PolyHeme is universally compatible and accordingly does not require blood typing prior to use. The potential benefits of universal compatibility include the ability to use PolyHeme immediately, the elimination of transfusion reactions and the reduction of the inventory burden associated with maintaining sufficient quantities of all blood types.

  OXYGEN-CARRYING ABILITY.  Our clinical studies indicate that PolyHeme carries as much oxygen and loads and unloads oxygen in a manner similar to transfused blood.

  BLOOD VOLUME REPLACEMENT.  Infusion of PolyHeme also restores blood volume. Therefore, PolyHeme should be useful as an oxygen-carrying resuscitative fluid in the treatment of hemorrhagic shock resulting from extensive blood loss.

  IMPACT ON DISEASE TRANSMISSION.  We believe, and laboratory tests have thus far indicated, that the manufacturing process used to produce PolyHeme greatly reduces the concentration of infectious agents known to be responsible for the transmission of blood-borne diseases. There are no currently approved methods in this country to reduce the quantity of such infectious agents in red blood cells.

  EXTENDED SHELF LIFE.  We estimate that PolyHeme has a shelf life in excess of 12 months under refrigerated conditions, well in excess of the 28 to 42 day refrigerated shelf life currently permitted for blood.

# EXHIBIT 5

```
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<FILENAME>c97477e10vk.txt
<DESCRIPTION>FORM 10-K
<TEXT>
<PAGE>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
------------------

FORM 10-K
------------------

FOR ANNUAL AND TRANSITION
REPORTS PURSUANT TO SECTION 13 OR
15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

```
<Table>
<S>    <C>
[X]      ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                    SECURITIES EXCHANGE ACT OF 1934
```

For the fiscal year ended May 31, 2005

```
[ ]      TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                    SECURITIES EXCHANGE ACT OF 1934
```

For the transition period from _____ to _____
```
</Table>
```

COMMISSION FILE NUMBER 0-24050

NORTHFIELD LABORATORIES INC.
(Exact name of Registrant as Specified in Its Charter)

```
<Table>
<S>                                              <C>
              DELAWARE                                    36-3378733
       (State of Other Jurisdiction of                (I.R.S. Employer
         Incorporation or Organization)             Identification Number)
1560 SHERMAN AVENUE, SUITE 1000, EVANSTON, ILLINOIS        60201-4800
       (Address of Principal Executive Offices)           (Zip Code)
                              (847) 864-3500
                 (Registrant's Telephone Number, Including Area Code)
</Table>
```

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:

COMMON STOCK, PAR VALUE $.01 PER SHARE

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. [X] Yes [ ] No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in the definitive proxy or information statement incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the Registrant is an accelerated filer (as

defined in Rule 12b-2 of the Act). [X] Yes [ ] No

As of November 30, 2004, 21,551,364 shares of the Registrant's common stock, par value $.01 per share, were outstanding. On that date, the aggregate market value of voting stock (based upon the closing price of the Registrant's common stock on November 30, 2004) held by non-affiliates of the Registrant was $378,131,185 (20,220,919 shares at $18.70 per share).

As of July 31, 2005, there were 26,751,397 shares of the Registrant's common stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement for its 2005 Annual Meeting are incorporated by reference into Part III of this Form 10-K. The Registrant maintains an Internet website at www.northfieldlabs.com. None of the information contained on this website is incorporated by reference into this Form 10-K or into any other document filed by the Registrant with the Securities and Exchange Commission.
<PAGE>

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

This Annual Report contains forward-looking statements concerning, among other things, our prospects, clinical and regulatory developments affecting our potential product and our business strategies. These forward-looking statements are identified by the use of such terms as "intends," "expects," "plans," "estimates," "anticipates," "forecasts" "should," "believes" and similar terms.

These forward-looking statements involve risks and uncertainties. Actual results may differ materially from those predicted by the forward-looking statements because of various factors and possible events, including those discussed under "Risk Factors." Because these forward-looking statements involve risks and uncertainties, actual results may differ significantly from those predicted in these forward-looking statements. You should not place undue weight on these statements. These statements speak only as of the date of this Annual Report.

All subsequent written and oral forward-looking statements attributable to Northfield or any person acting on our behalf are qualified by the cautionary statements in this section. We will have no obligation to revise these forward-looking statements.
<PAGE>

PART I

ITEM 1.  BUSINESS.

Northfield Laboratories Inc. is a leader in developing a hemoglobin-based oxygen-carrying resuscitative fluid for the treatment of urgent, large volume blood loss in trauma and resultant surgical settings. The initial indication we are seeking for our product, PolyHeme(R), is the early treatment of urgent, life-threatening blood loss following trauma when donated blood may not be immediately available. We believe that this indication addresses a critical unmet medical need, since some trauma patients bleed to death before they have access to blood. We believe PolyHeme has the potential to improve survival in critically injured patients and to thereby transform the treatment of trauma.

We are pursuing a unique regulatory strategy in order to seek Food and Drug Administration, or FDA, approval of PolyHeme. We are conducting the first-ever pivotal Phase III trial in the United States in which a hemoglobin-based oxygen carrier is being used to treat severely injured and bleeding patients, beginning at the scene of injury and continuing during transport to the hospital and the early period of hospitalization. Our current trial is based on our experience in prior clinical trials documenting the potential life-sustaining capability of PolyHeme when given in rapid, massive infusions to critically injured patients in the hospital. Some of these patients received up to 20 units of PolyHeme, equivalent to twice their normal blood volume. Because of the life-sustaining potential of PolyHeme, our trial is being conducted under a federal regulation,

21 CFR 50.24, that permits certain types of emergency research using an exception from the requirement for prospective informed consent by individual patients.

We have also taken advantage of Special Protocol Assessment, or SPA, one of the features of the Food and Drug Modernization Act of 1997. Our SPA reflects an agreement with FDA on our trial design, the trial endpoints and the broad concepts for clinical indications those endpoints would support in an application for product approval by FDA. The assessment of efficacy in our trial will be based on the data on patient survival at 30 days. A key feature of our SPA is the agreement on dual primary endpoints of superiority and non-inferiority between the treatment and control groups. Either of these endpoints may be used to provide evidence of efficacy.

As part of our trial protocol, an Independent Data Monitoring Committee, or IDMC, consisting of independent medical and biostatistical experts is responsible for periodically evaluating the safety data from the trial and making recommendations relating to continuation or modification of the trial protocol to minimize any identified risks to patients. The IDMC has completed the first three of four planned reviews of data from the initial 60, 120 and 250 patients enrolled in the trial and has recommended on each occasion that the trial continue without modification. This is the first time that a trial of a hemoglobin-based oxygen carrier has passed this patient evaluation milestone in a high risk trauma population. The final interim analysis is scheduled to occur after 500 patients have been enrolled, and we anticipate being able to announce that milestone before the end of calendar 2005.

As of June 30, 2005, approximately 400 patients had been enrolled in our trial, or more than half the planned 720 patients. Based on present enrollment at currently active sites, we estimate that approximately 600 patients will be enrolled by the end of calendar 2005. Our current goal is to complete the patient enrollment phase of our trial early in calendar 2006. Our ability to achieve this goal will depend, in part, on the number of clinical sites participating in our trial and the ability of these sites to enroll patients at the projected rates. We will provide quarterly updates on enrollment until full enrollment is reached.

We believe that PolyHeme ultimately represents a substantial global market opportunity, based on the need for a universally compatible, immediately available oxygen carrying product and PolyHeme's potential for eventual approval for multiple indications.

BACKGROUND

The principal function of human blood is to transport oxygen throughout the body. The lack of an adequate supply of oxygen as a result of blood loss can lead to organ dysfunction or death. The transfusion of

3

<PAGE>

human blood is presently the only effective means of immediately restoring diminished oxygen-carrying capacity resulting from blood loss. We estimate that approximately 14 million units of blood are transfused in the United States each year, of which approximately 8.4 million units are administered to patients suffering the effects of acute blood loss.

The use of donated blood in transfusion therapy, while effective in restoring an adequate supply of oxygen in the body of the recipient, has several limitations. Although testing procedures exist to detect the presence of certain diseases in blood, these procedures cannot eliminate completely the risk of blood-borne disease. Transfused blood also can be used only in recipients having a blood type compatible with that of the donor. Delays in treatment, resulting from the necessity of blood typing prior to transfusion, together with the limited shelf-life of blood and the limited availability of certain blood types, impose constraints on the immediate availability of compatible blood for transfusion. There is no commercially available hemoglobin-based oxygen carrying red blood cell substitute in this country which addresses these problems.

Our scientific research team has been responsible for the original concept, the early development and evaluation and clinical testing of PolyHeme, and has authored over 100 publications in the scientific literature relating to hemoglobin-based oxygen carrier research and development. Members of our scientific research team have been involved in development of national transfusion policy through their participation in the activities of the National Heart Lung Blood Institute, the National Blood Resource Education Panel, the Department of Defense, the American Association of Blood Banks, the American Blood Commission, the American College of Surgeons and the American Red Cross.

OUR PRODUCT

Our product, PolyHeme, is a human hemoglobin-based oxygen carrying resuscitative fluid in development for the treatment of urgent, large volume blood loss in trauma and resultant surgical settings, with a particular focus on settings where blood is not immediately available.

PolyHeme is a solution of chemically modified human hemoglobin which simultaneously restores lost blood volume and hemoglobin levels. Hemoglobin is the oxygen-carrying component of the red blood cell. PolyHeme is designed for rapid, massive infusion, which is the way blood is transfused in trauma patients.

We purchase donated red blood cells from The American Red Cross and Blood Centers of America for use as the starting material for PolyHeme. We use a proprietary process of separation, filtration, chemical modification, purification and formulation to produce PolyHeme. Hemoglobin is first extracted from red blood cells and filtered to remove impurities. The hemoglobin is next chemically modified using a multi-step process to create a polymerized form of hemoglobin. The modified hemoglobin is then incorporated into a solution which can be administered as an alternative to transfused blood. PolyHeme is designed to avoid potential undesirable effects such as vasoconstriction, kidney dysfunction, liver dysfunction and gastrointestinal distress. One unit of PolyHeme contains 50 grams of modified hemoglobin, approximately the same functional amount of hemoglobin delivered by one unit of transfused blood.

We believe PolyHeme will have the following important benefits:

Universal Compatibility.  Our clinical studies to date indicate that PolyHeme is universally compatible and accordingly does not require blood typing prior to use. The potential benefits of universal compatibility include the ability to use PolyHeme immediately, the elimination of transfusion reactions and the reduction of the inventory burden associated with maintaining sufficient quantities of all blood types.

Oxygen-Carrying Ability.  Our clinical studies indicate that PolyHeme carries as much oxygen and loads and unloads oxygen in a manner similar to transfused blood.

Blood Volume Replacement.  Infusion of PolyHeme also restores blood volume. Therefore, PolyHeme should be useful as an oxygen-carrying resuscitative fluid in the treatment of hemorrhagic shock resulting from extensive blood loss.

4

<PAGE>

Impact on Disease Transmission.  We believe, and laboratory tests have thus far indicated, that the manufacturing process used to produce PolyHeme substantially reduces the concentration of infectious agents known to be responsible for the transmission of blood-borne diseases. There are no currently approved methods in this country to reduce the quantity of such infectious agents in red blood cells.

Extended Shelf Life.  We estimate that PolyHeme has a shelf life in excess of 12 months under refrigerated conditions, well in excess of the 28 to 42 day refrigerated shelf life currently permitted for blood.

OUR PIVOTAL PHASE III TRIAL

We are currently enrolling patients in a pivotal Phase III trial in which PolyHeme is being used for the first time in the U.S. to treat severely injured patients in hemorrhagic shock before they reach the hospital. Under this protocol, treatment with PolyHeme begins at the scene of the injury or in the ambulance and continues during transport and the initial 12 hour post-injury period in the hospital. Since blood is not presently carried in ambulances, the use of PolyHeme in this setting has the potential to improve survival and address a critical, unmet medical need.

As of August 1, 2005, 21 clinical sites in the United States were enrolling patients in our pivotal Phase III trial and six other sites had received final Institutional Review Board, or IRB, approval and were preparing to begin patient enrollment. Multiple additional sites were engaged in the required public disclosure and community consultation process. Each of the sites participating in the trial is designated as a Level I trauma center, indicating its capacity to treat the most severely injured trauma patients. We anticipate that a total of 25 or more clinical sites across the United States will eventually participate in the trial. The trial has an expected enrollment of 720 patients.

As part of our trial protocol, an Independent Data Monitoring Committee, or IDMC, consisting of independent medical and biostatistical experts, is responsible for periodically evaluating the safety data from the trial and making recommendations relating to continuation or modification of the trial protocol to minimize any identified risks to patients. The protocol includes four planned evaluations by the IDMC that occur after 60, 120, 250 and 500 patients have been enrolled and monitored for a 30-day follow up period. The IDMC focuses its reviews on mortality and serious adverse events and evaluates all safety data as the trial continues. We receive a recommendation from the IDMC after each review, but we will not have access to the trial data reviewed by the IDMC until the trial is complete.

The IDMC has completed three of the four planned reviews of the trial data. In July 2004, the IDMC recommended that our trial continue without modification based on the committee's initial review of blinded data from the first 60 patients enrolled in the trial. In October 2004, the IDMC recommended continuation of the trial without modification based on its review of data following enrollment of the first 120 patients in our trial. In April 2005, the IDMC recommended that our trial continue without modification based on the committee's review of blinded data from the first 250 patients enrolled in the study. This is the first time that a trial of a hemoglobin-based oxygen carrier has passed this patient evaluation milestone in a high risk trauma population.

As part of the third interim analysis, the IDMC also conducted an adaptive sample size determination as specified in the trial protocol. A blinded power analysis was performed to determine if any increase in the sample size of the study was necessary. The assessment was based on a comparison between the mortality rate predicted in the protocol and the observed mortality rate in the trial to date. The IDMC concluded that no adjustment in the number of patients to be enrolled in the study would be required. Therefore, planned enrollment remains at 720 patients.

We anticipate that the IDMC will complete its final review of trial data on the first 500 patients enrolled in our trial and make a recommendation to us in the fourth quarter of calendar year 2005.

As of June 30, 2005, approximately 400 patients had been enrolled in our trial, or more than half the planned 720 patients. Based on present enrollment at currently active sites, we estimate that approximately 600 patients will be enrolled by the end of calendar 2005. Our current goal is to complete the patient

5

<PAGE>

enrollment phase of our trial early in calendar 2006. Our ability to achieve this goal will depend, in part, on the number of clinical sites participating in our trial and the ability of these sites to enroll patients at the projected rates. We will provide quarterly updates on enrollment until full enrollment is reached.

TRIAL DESIGN AND CLINICAL ENDPOINTS

We have reached agreement with FDA on Special Protocol Assessment, or SPA, for our pivotal Phase III trial. SPA is designed to facilitate the review and approval of drug and biological products by allowing for FDA evaluation of the trial sponsor's proposed design and size of clinical trials intended to form the primary basis for an efficacy claim in a Biologics License Application, or BLA, submitted to FDA. If agreement is reached between FDA and the trial sponsor, SPA will document the terms and conditions under which the clinical trial will be conducted. Our SPA reflects an agreement with FDA on our trial design, the trial endpoints and the broad concepts for clinical indications those endpoints would support in an application for product approval by FDA.

Our pivotal Phase III trial is being conducted under a federal regulation that permits research to be conducted in certain emergent, life-threatening situations using an exception from the requirement for prospective informed consent by individual patients. Participation by each clinical trial site is overseen by an IRB. Under the applicable federal regulation, an IRB may give approval for patient enrollment in trials in emergency situations without requiring individual informed consent provided specific criteria are met. Patients must be in a life-threatening situation for which available treatments are unproven or unsatisfactory and scientific evidence must be needed to assess the safety and effectiveness of alternative treatments. The experimental therapy being evaluated must also provide patients potential for direct clinical benefit. In addition, medical intervention must be required before informed consent can be obtained and it must be impracticable to conduct the trial using only consenting patients. Where informed consent is feasible, the sponsor's consent procedures and forms must be reviewed and approved by the IRB, and attempts to obtain informed consent must be documented by the sponsor. Before enrollment can begin, the regulation requires public disclosure of information about the trial, including the potential risks and benefits, and the formation of an independent monitoring committee to oversee the trial. Consultation must also occur with representatives of the community where the study will be conducted and from which the study population will be drawn. Each of the clinical sites currently participating in our trial has completed the required public disclosure and community consultation procedures and received IRB approval to enroll patients in accordance with the trial protocol.

Under our trial protocol, patients enrolled in the trial are randomly assigned to either a treatment group or a control group. The treatment group receives PolyHeme at the scene of the injury or in the ambulance during transport and continues to receive PolyHeme, if necessary, during the initial 12 hour post-injury period in the hospital. Patients in the treatment group may receive a maximum of six units of PolyHeme. The control group receives saline solution in the field and donated blood, if necessary, in the hospital.

Evaluation of the efficacy data generated in our pivotal Phase III trial will focus on patient survival at 30 days after the date of injury. The mortality rate observed for patients in the treatment group in our trial will be compared statistically with the mortality rate for patients in the control group. A key feature of our SPA is the agreement on dual primary end points of superiority and non-inferiority between the treatment and control groups. The trial design is unusual in that either of the primary endpoints of superiority or non-inferiority may be used to provide evidence of efficacy.

Our trial is being conducted primarily in urban settings because urban Level I trauma centers have the patient volume, resources and sophistication to conduct a clinical trial of this complexity. In urban areas, however, transit times in the ambulance may be brief, and the control group will reach the hospital, where patients will have access to blood, in relatively short periods of time. The observed outcome in our trial may therefore not demonstrate the expected magnitude of survival benefit that might occur if the trial were being conducted in the rural setting, where more extended transport times are typical and where the availability of blood may be limited. It is therefore possible that the observed survival rate in the treatment group may trend towards the survival rate observed in patients in the control group who have rapid access to blood. This

<PAGE>

outcome would represent non-inferiority, which would satisfy one of the dual primary endpoints for efficacy in our trial protocol.

## THE MARKET OPPORTUNITY

Transfused blood represents a multi-billion dollar market in the United States. We estimate that approximately 14 million units of blood are transfused in the United States each year. The transfusion market in the United States consists of two principal segments. The acute blood loss segment, which we estimate comprises approximately 60% of the transfusion market, includes transfusions required in connection with trauma, surgery and unexpected blood loss. The chronic blood loss segment, which we believe represents approximately 40% of the transfusion market, includes transfusions in connection with general medical applications and chronic anemias.

We believe that PolyHeme will be most useful in the treatment of acute blood loss. The principal clinical settings in which patients experience acute blood loss are unplanned blood loss in trauma, emergency surgery and other causes of urgent hemorrhage, and planned blood loss in elective surgery. For trauma and emergency surgical procedures, the immediate availability and universal compatibility of PolyHeme may provide significant advantages over transfused blood by avoiding the delay and opportunities for error associated with blood typing. In elective surgery, PolyHeme has the potential to increase transfusion safety for patients and health care professionals.

In addition to the foregoing applications for which blood is currently used, there exist potential sources of demand for which blood is not currently used and for which PolyHeme may be suitable. These include applications in which the required blood type is not immediately available or in which transfusions are desirable but not given for fear of a transfusion reaction due to difficulty in identifying compatible blood. For example, we believe PolyHeme may be used by Emergency Medical Technicians at the scene of injury and during transport to the hospital by ground or air ambulance. Emergicenters and surgicenters also both experience events where PolyHeme may be useful. In addition, the United States military has expressed interest in the use of hemoglobin based oxygen carryings for the treatment of battlefield casualties. There may also be potential market opportunities for PolyHeme in novel areas such as ischemia and oncology.

We believe that the initial indication we are seeking for PolyHeme -- unavailability of red blood cells -- represents the greatest clinical and commercial opportunity for the product since it addresses a critical unmet medical need and has the potential to provide a survival benefit. At present, no adequate alternative to blood exists for the treatment of patients with life-threatening hemorrhage who need replacement of lost oxygen-carrying capacity. PolyHeme is the first hemoglobin-based oxygen carrier to pursue this indication, and our goal is for PolyHeme to be first to the market for this indication.

We recently engaged a national consulting firm to conduct an independent assessment of the potential market opportunity for PolyHeme. Using a variety of primary and secondary sources along with original research, their analysis indicates a potential market opportunity in the United States for PolyHeme's initial indication of unavailability in excess of 350,000 units per year, representing an estimated market value of $400 to $500 million. In addition, the global opportunity for our initial indication, as well as multiple other potential indications, is estimated to be six to seven times the U.S. unavailability projection, or $2 to $3 billion.

## MANUFACTURING AND MATERIAL SUPPLY

We use a proprietary process of separation, filtration, chemical modification, purification and formulation to produce PolyHeme. Since 1990, we have produced PolyHeme in our manufacturing facility. We believe this facility is capable of producing sufficient quantities of PolyHeme for our current clinical trial.

Our current manufacturing facility has the capacity to produce 10,000 units of PolyHeme annually. We have leased space adjacent to our current facility that will allow a further expansion of an additional 75,000 units of capacity per year as our next step. We have begun preconstruction activities for our planned expansion of manufacturing capacity for Polyheme. We are developing a request for proposal that we intend to

7

<PAGE>

issue this fall. After reviewing bids, we will select the contractor, negotiate and award the final contract, and begin final engineering. Our independent engineering consultants and we believe that our existing manufacturing process may be scaled up without substantial modification to produce commercial quantities of PolyHeme in larger facilities.

If FDA approval of PolyHeme is received, we presently intend to manufacture PolyHeme for commercial sale in the United States using our own facilities. We currently have licensing arrangements for the manufacture of PolyHeme in certain countries outside the United States. We may also consider entering into other collaborative relationships with strategic partners which could involve arrangements relating to the manufacture of PolyHeme.

The successful commercial introduction of PolyHeme will also depend on an adequate supply of blood to be used as a starting material. We believe that an adequate supply of blood is obtainable through the voluntary blood services sector. We have had extensive discussions with existing blood collection agencies, including The American Red Cross and Blood Centers of America, regarding sourcing of blood. We currently have short-term purchasing contracts with each of these agencies. We have also entered into an agreement with hemerica, Inc., a subsidiary of Blood Centers of America, under which hemerica would supply us with up to 160,000 units per year of packed red cells, the source material for PolyHeme. This quantity of blood would permit us to operate a manufacturing facility producing approximately 75,000 units of PolyHeme per year. We have not purchased any blood supplies under this agreement to date. We will continue to pursue long-term supply contracts with such agencies and other potential sources, although we cannot ensure that we will be able to obtain sufficient quantities of blood from the voluntary blood services sector to enable us to produce commercial quantities of PolyHeme if FDA approval is received.

MARKETING STRATEGIES

If FDA approval of PolyHeme is received, we presently intend to market PolyHeme with our own sales force in the United States. We are exploring potential sales, marketing and distribution plans for PolyHeme. We may also consider entering into collaborative relationships with strategic partners which could involve arrangements relating to the sale and marketing of PolyHeme.

We have entered into license agreements with Pfizer Inc., formerly known as Pharmacia Corporation, and Hemocare Ltd., an Israeli corporation, to develop, manufacture and distribute PolyHeme in certain European, Middle Eastern and African countries. The license agreements permit Pfizer and Hemocare to utilize PolyHeme and related manufacturing technology in return for the payment of royalties based upon sales of PolyHeme in the licensed territories.

In March 1989, we granted Pfizer an exclusive license to manufacture, promote and sell PolyHeme in a territory encompassing the United Kingdom, Germany, the Scandinavian countries and certain countries in the Middle East. Under the terms of the license agreement, Pfizer has the right, upon consultation with us, to promote and sell PolyHeme in the licensed territory under its own trademark. The license agreement with Pfizer provides for a nonrefundable initial fee, two additional nonrefundable fees based upon achievement of certain regulatory milestones, and ongoing royalty payments based upon net sales of PolyHeme in the licensed territory. The license agreement further provides for a reduction of royalty payments upon the occurrence of certain events. In addition, under the terms of the agreement, we have the right under certain circumstances to direct Pfizer's clinical testing of PolyHeme in the licensed territory.

# EXHIBIT 6

CLOSED, CASREF, SPECIAL

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:98-cv-00380-CN

| | |
|---|---|
| PACKER, et al v. MAGELLAN FINANCE, et al | Date Filed: 01/23/1998 |
| Assigned to: HONORABLE CLARENCE C. NEWCOMER | Date Terminated: 06/01/2000 |
| Referred to: MAGISTRATE JUDGE M. FAITH ANGELL | Jury Demand: Defendant |
| Demand: $0 | Nature of Suit: 470 Racketeer/Corrupt |
| Cause: 18:1962 Racketeering (RICO) Act | Organization |
| | Jurisdiction: Federal Question |

**Plaintiff**

**WILLIAM B. PACKER, SR.**          represented by          **H. ROBERT FIEBACH**
COZEN O'CONNOR
1900 MARKET ST
PHILADELPHIA, PA 19103
215-665-4166
Fax: 215-665-2013
Email: rfiebach@cozen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
COZEN O'CONNOR
1900 MARKET STREET
PHILADELPHIA, PA 19103
215-665-5513
Email: jmchugh@cozen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
COZEN & O'CONNOR
1900 MARKET STREET
THE ATRIUM, THIRD FLOOR
PHILADELPHIA, PA 19103
TEL 215-665-4187
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
COZEN & O'CONNOR
1900 MARKET ST

PHILA, PA 19103

Fax:
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WILLIAM B. PACKER, JR.**                represented by   **H. ROBERT FIEBACH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT A. AYERLE**                represented by   **H. ROBERT FIEBACH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PATRICIA P. AYERLE**                represented by   **H. ROBERT FIEBACH**
*H/W*                                                                (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LINDA NICHOLAS**                    represented by  **H. ROBERT FIEBACH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HAROLD H. GEBERT**                    represented by  **H. ROBERT FIEBACH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOAN M. GEBERT**               represented by   **H. ROBERT FIEBACH**
*H/W*                                             (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **JENNIFER M. MCHUGH**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **LAURA REED**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **LILLIAN E. BENEDICT ,**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**PETER H. GEBERT**              represented by   **H. ROBERT FIEBACH**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **JENNIFER M. MCHUGH**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **LAURA REED**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **LILLIAN E. BENEDICT ,**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ELLEN J. GEBERT**                    represented by   **H. ROBERT FIEBACH**
*H/W*                                                   (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **JENNIFER M. MCHUGH**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **LAURA REED**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **LILLIAN E. BENEDICT ,**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**EUGENE SCHRIVER, III**               represented by   **H. ROBERT FIEBACH**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **JENNIFER M. MCHUGH**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **LAURA REED**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **LILLIAN E. BENEDICT ,**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**LAURA SCHRIVER**                     represented by   **H. ROBERT FIEBACH**
*H/W*                                                   (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HAMPTON RANDOLPH**       represented by     **H. ROBERT FIEBACH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVELYN RANDOLPH**       represented by     **H. ROBERT FIEBACH**
*H/W*     (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BALLENROSE INVESTORS**     represented by     **H. ROBERT FIEBACH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER M. MCHUGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA REED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LILLIAN E. BENEDICT ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**V.**

**Defendant**

**MAGELLAN FINANCE CORPORATION**     represented by     **DAVID L. BRAVERMAN**
BRAVERMAN DANIELS KASKEY LTD
1650 MARKET STREET 21ST FLOOR
ONE LIBERTY PLACE
PHILADELPHIA, PA 19103
215-575-3800
Email: dbraver@braverlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
DAVID J. PERLMAN ATTORNEY AT LAW
302 BRYN MAWR AVENUE
BALA CYNWYD, PA 19004
484-270-8946
Email: djpman@comcast.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
SALTZ POLISHER PC
993 OLD EAGLE SCHOOL ROAD
SUITE 412
WAYNE, PA 19087
610-964-3333
Fax: 610-964-3334
Email: es@saltzpolisher.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
FELLHEIMER BRAVERMAN &
KASKEY
1650 MARKET STREET
ONE LIBERTY PLACE, 21ST FLOOR
PHILA, PA 19103
TEL 215-575-3918
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**
633 W. GERMANTOWN PIKE
SUITE 103
PLYMOUTH MEETING, PA 19462
215-616-8600
Fax: 610-940-1996
Email: jcaprara@capraralaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ELMER F. HANSEN, JR.**     represented by     **DAVID L. BRAVERMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KENNETH S. GOODKIND**
FLASTER GREENBERG PC
1810 CHAPEL AVE WEST, 3RD FL
CHERRY HILL, NJ 08001
856-661-2273
Fax: 856-661-1919
Email:
ken.goodkind@flastergreenberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ELMER F. HANSEN, III**     represented by    **DAVID L. BRAVERMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KENNETH S. GOODKIND**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ELYSE HANSEN**                                                      represented by   **DAVID L. BRAVERMAN**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **DAVID J. PERLMAN**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **EVERETT K. SHEINTOCH**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **JAMIE M. PERRAPATO**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **JOSEPH A. CAPRARA**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**JILL E. HANSEN**                                                   represented by   **DAVID L. BRAVERMAN**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **DAVID J. PERLMAN**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **EVERETT K. SHEINTOCH**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **JAMIE M. PERRAPATO**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

                                                                                        **JOSEPH A. CAPRARA**
                                                                                        (See above for address)
                                                                                        *LEAD ATTORNEY*
                                                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHANIE B. HANSEN**      represented by   **DAVID L. BRAVERMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL NESI**      represented by   **DAVID L. BRAVERMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID SHERMAN**                represented by   **DAVID L. BRAVERMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BLUE BELL INVESTORS, G.P./BLUE**      represented by   **DAVID L. BRAVERMAN**
**BELL INVESTMENTS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DAVID J. PERLMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**EVERETT K. SHEINTOCH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAMIE M. PERRAPATO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH A. CAPRARA**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


V.

**Movant**

**HANSEN PROPERTIES**      represented by   **JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Movant**

**SUSQUEHANNA ROAD ASSOCIATES**      represented by   **JOSEPH A. CAPRARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


| Date Filed | # | Docket Text |
|---|---|---|
| 01/23/1998 | 1 | Complaint. filing fee $ 150 receipt # 655945 (aam) (Entered: 01/23/1998) |
| 01/23/1998 | | Summons(es) issued; 9 originals mailed to: Counsel 1/23/98 (aam) (Entered: 01/23/1998) |
| 01/23/1998 | | Special Case Management Track. (aam) (Entered: 01/23/1998) |
| 03/09/1998 | 2 | MOTION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS FOR AN EXTENSION OF TIME IN WHICH TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT , CERTIFICATE OF SERVICE. (mb) (Entered: 03/10/1998) |
| 03/11/1998 | 3 | ORDER THAT DEFENDANT'S MOTION FOR AN EXTENSION OF TIME IN WHICH TO ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT IS GRANTED ; IT IS FURTHER ORDERED THAT THE DEFENDANTS SHALL ANSWER OR OTHERWISE RESPOND TO THE COMPLAINT WITHIN SEVEN DAYS OF THE DATE OF THIS ORDER ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 3/12/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (mb) (Entered: 03/12/1998) |
| 03/11/1998 | 4 | Response by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS to DEFENDANTS' MOTION FOR AN EXTENSION OF TIME IN WHICH TO ANSWER OR |

| | | |
|---|---|---|
| | | OTHERWISE RESPOND TO THE COMPLAINT, Certificate of Service. (lawmfa2) (Entered: 03/12/1998) |
| 03/16/1998 | 5 | Affidavit of: ALLAN PASSEN re: served summons and complaint upon DEFENDANT ELMER F. HANSEN JR., DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS. Served by: personal service on 2/2/98. (fe) Modified on 03/17/1998 (Entered: 03/17/1998) |
| 03/16/1998 | 6 | Affidavit of: ALLAN PASSEN re: served summons and complaint upon DEFENDANT MAGELLAN FINANCE, DEFENDANT DANIEL NESI. Served by: personal service on 2/3/98. (fe) (Entered: 03/17/1998) |
| 03/16/1998 | 7 | Affidavit of: JAY THAYER re: served summons and complaint upon DEFENDANT STEPHANIE B. HANSEN. Served by: personal service on 2/3/98. (fe) (Entered: 03/17/1998) |
| 03/16/1998 | 8 | Affidavit of: HAROLD A. PUTNAM re: served summons and complaint upon DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN. Served by: personal service on 2/17/98. (fe) (Entered: 03/17/1998) |
| 03/17/1998 | 9 | MOTION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS TO DISMISS , OR TO STAY , MEMORANDUM, CERTIFICATE OF SERVICE. (jl) (Entered: 03/17/1998) |
| 03/26/1998 | 10 | MOTION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS TO STAY DISCOVERY ,OR IN THE ALTERNATIVE FOR PROTECTIVE ORDER PENDING RESOLUTION OF DEFENDANTS' MOTION TO DISMISS , MEMORANDUM, CERTIFICATE OF SERVICE. (mb) (Entered: 03/26/1998) |
| 03/31/1998 | 11 | Memorandum by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS in opposition to MOTION TO DISMISS OR STAY, Certificate of Service. (fdc) (Entered: 04/01/1998) |
| 04/02/1998 | 12 | Memorandum of Law by PLAINTIFFS in Opposition to DEFENDANTS' MOTION TO STAY DISCOVERY OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER PENDING RESOLUTION OF DEFENDANTS' MOTION TO DISMISS, Certificate of Service. (lawmfa2) (Entered: 04/03/1998) |
| 04/09/1998 | 13 | ORDER THAT DEFENDANT'S MOTION TO DISMISS OR TO STAY IS DENIED ;( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 4/9/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (mb) (Entered: 04/09/1998) |

| | | |
|---|---|---|
| 04/09/1998 | 14 | ORDER THAT DEFENDANT'S MOTION TO STAY DISCOVERY OR IN THE ALTERNATIVE MOTION FOR PROTECTIVE ORDER PENDING RESOLUTION OF DEFENDANTS' MOTION TO DISMISS IS DENIED AS MOOT ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 4/9/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (mb) (Entered: 04/09/1998) |
| 04/17/1998 | 15 | Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to motion to compel DEFENDANT DANIEL NESI for deposition, Certificate of Service. (fdc) (Entered: 04/17/1998) |
| 04/22/1998 | 16 | Reply Memorandum of Law in Support of PLAINTIFFS' MOTION TO COMPEL DEFENDANT DANIEL NESI TO APPEAR FOR HIS DEPOSITION ON A DATE CERTAIN AND FOR SANCTIONS FOR FAILURE TO APPEAR FOR DEPOSITION, Certificate of Service. (lawmfa2) (Entered: 04/22/1998) |
| 04/24/1998 | 17 | ORDER THAT PLAINTIFFS' MOTION TO COMPEL DEFENDANT DANIEL NESI TO APPEAR FOR HIS DEPOSITION ON A DATE CERTAIN AND FOR SANCTIONS FOR FAILURE TO APPEAR FOR DEPOSITION IS DENIED. ETC. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 4/24/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (fe) (Entered: 04/24/1998) |
| 04/24/1998 | 18 | Answer to Complaint by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS; jury demand. (adr) (Entered: 04/24/1998) |
| 04/24/1998 | | ISSUE JOINED. (adr) (Entered: 04/24/1998) |
| 04/27/1998 | 19 | STIPULATION AND ORDER THAT ALL DEFENDANTS SHALL HAVE AN EXTENSION OF TIME OF TWO DAYS TO AND INCLUDING 4/24/98 WITHIN WHICH TO ANSWER PLAINTIFF'S COMPLAINT ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 4/27/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS. (fe) (Entered: 04/27/1998) |
| 05/14/1998 | 20 | Response by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS to affirmative defenses and Certificate of Service. (fe) (Entered: 05/15/1998) |
| 05/14/1998 | 21 | MOTION by PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH TO DISMISS COUNTERCLAIM , MEMORANDUM, CERTIFICATE OF SERVICE. (fe) (Entered: 05/15/1998) |

| | | |
|---|---|---|
| 05/22/1998 | 22 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS TO COMPEL CONTINUATION OF DEPOSITION OF DEFENDANT DANIEL NESI , and FOR SANCTIONS , MEMORANDUM, CERTIFICATE OF SERVICE. (fe) (Entered: 05/26/1998) |
| 05/27/1998 | | Pre-trial conference SET at 11:15 6/11/98 (fe) (Entered: 05/27/1998) |
| 06/01/1998 | 23 | Counterclaimants' Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to MOTION TO DISMISS COUNTERCLAIM , Certificate of Service. (fe) (Entered: 06/02/1998) |
| 06/05/1998 | 24 | Response by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS to MOTION TO COMPEL CONTINUATION OF DEPOSITION OF DEFENDANT DANIEL NESI, MOTION FOR SANCTIONS, Certificate of Service, Certificate of Service. (fe) Modified on 06/08/1998 (Entered: 06/08/1998) |
| 06/16/1998 | 25 | ORDER THAT PLFFS' MOTION TO COMPEL CONTINUATION OF DEPOSITION OF DEFT DANIEL NESI AND FOR SANCTIONS IS GRANTED IN PART AND DENIED IN PART. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 6/16/98 ENTERED AND COPIES FAXED. (gn) (Entered: 06/16/1998) |
| 06/30/1998 | 26 | Statement by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH of the Case and Discovery Plan, Certificate of Service. (rp) (Entered: 07/01/1998) |
| 07/15/1998 | 27 | ORDER THAT UPON CONSIDERATION OF THE MOTION OF COUNTERCLAIM DEFENDANTS, HAROLD GEBERT, JOAN GEBERT, PETER H. GEBERT, ELLEN J. GEBERT, HAMPTON C. RANDOLPH AND EVELYN M. RANDOLPH TO DISMISS COUNTERCLAIM PURSUANT TO FRCP 12(B)(1) AND, ALTERNATIVELY, FRCP 12(B)(6), AND DEFENDANTS' RESPONSE THERETO, IT IS HEREBY ORDERED THAT DISPOSITION OF SAID MOTION IS STAYED, THE COURT HAVING BIFURCATED DISCOVERY IN THIS CASE INTO TWO STAGES AND THE INSTANT MOTION BEING RIPE FOR DISPOSITION AT THIS TIME. (SIGNED BY JUDGE CLARENCE C. NEWCOMER) 7/15/98 ENTERED AND COPIES MAILED AND FAXED. (dt) (Entered: 07/15/1998) |

| 07/27/1998 | 28 | ORDER THAT DISCOVERY SHALL PROCEED FORTHWITH IN THIS MATTER, BUT ONLY AS TO COUNTS IV THROUGH VII OF THE COMPLAINT, ALL INITIAL DISCOVERY SHALL BE COMPLETED BY 11/1/98; DISCOVERY WITH RESPECT TO ANY OTHER ISSUE IN THIS LITIGATION, INCLUDING DISCOVERY ON DEFENDANTS' COUNTERCLAIM, SHALL BE HELD IN ABEYANCE UNTIL FURTHER ORDER OF THIS COURT; DEFENDANTS MAY FILE A DISPOSITIVE MOTION WITH RESPECT TO COUNTS IV THROUGH VII, INCLUSIVE, ON OR BY 11/5/98; PLAINTIFFS' RESPONSE THERETO, IF ANY, SHALL BE FILED ON OR BY 11/16/98 ETC ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 7/27/98 ENTERED AND COPIES FAXED. (ph) (Entered: 07/27/1998) |
| --- | --- | --- |
| 07/27/1998 | 29 | Letter dated 7/20/98 from H. Robert Fiebach to Judge Newcomer re: proposed order. (td) (Entered: 07/27/1998) |
| 07/28/1998 | 30 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS TO COMPEL DIRECTED TO MAGELLAN FINANCE CORPORATION , MEMORANDUM, CERTIFICATE OF SERVICE. (fe) (Entered: 07/29/1998) |
| 08/10/1998 | 31 | CONSOLIDATED OPPOSITION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS to MOTIONS TO COMPEL AND TO THE ENFORCEMENT OF SUBPOENAS, Certificate of Service. (fe) (Entered: 08/10/1998) |
| 08/19/1998 | 32 | Memorandum by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS in support of MOTION TO COMPEL AND IN OPPOSITION TO DEFENDANTS'[2-1] MOTION FOR AN EXTENSION OF TIME , AFFIDAVIT OF LILLIAN E. BENEDICT, ESQUIRE, AFFIDAVIT OF JENNIFER M. MCHUGH, Certificate of Service. (fe) (Entered: 08/20/1998) |
| 08/26/1998 | 33 | ORDER THAT PLAINTIFFS' MOTION TO COMPEL DIRECTED TO MAGELLAN FINANCE CORPORATION, PLAINTIFFS' MOTION TO COMPEL DIRECTED TO ELMER F. HANSEN, JR., PLAINTIFFS' MOTION TO COMPEL DIRECTED TO JILL HANSE, ELYSE HANSEN AND STEPHANIE HANSE, AND DEFENDANTS' CONSOLIDATED RESPONSE THERETO, IT IS HEREBY ORDERED THAT SAID MOTIONS ARE GRANTED IN PART AND DENIED IN PART. TO THE EXTENT THAT THE DISCOVERY SOUGHT BY PLAINTIFFS IS IN CONFORMITY WITH |

| | | |
|---|---|---|
| | | THIS COURT'S 7/24/98 ORDER LIMITING INITIAL DISCOVERY TO COUNTS IV THROUGH VII OF PLAINTIFFS' COMPLAINT, THE MOTIONS ARE GRANED, AND DEFENDANTS ARE ORDERED TO PROVIDE THE REQUESTED DISCOVERY WITHING FOURTEEN DAYS OF THIS ORDER. TO THE EXTENT THAT THE DISCOVERY SOUGHT IS NOT IN CONFORMITY WITH THIS COURT'S ORDER OF 7/24/98, THE MOTIONS ARE DENIED. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 8/26/98 ENTERED AND COPIES FAXED ON 8/25/98. (fe) (Entered: 08/26/1998) |
| 10/01/1998 | 34 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS TO COMPEL PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF SERVICE. (fe) (Entered: 10/01/1998) |
| 10/08/1998 | 35 | Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS , Certificate of Service. (fe) (Entered: 10/08/1998) |
| 10/14/1998 | 36 | ORDER THAT PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS IS GRANTED IN PART AND DENIED IN PART AS MOOT, ETC. ( SIGNED BY JUDGE CLARENCE NEWCOMER ) 10/14/98 ENTERED AND COPIES FAXED BY CHAMBERS. (fe) (Entered: 10/14/1998) |
| 10/23/1998 | 37 | STIPULATION AND ORDER REGARDING NUMBER OF DEPOSITIONS ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/27/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS 10/23/98. (td) (Entered: 10/27/1998) |
| 10/27/1998 | 38 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS TO EXTEND DISCOVERY PEROID , CERTIFICATE OF SERVICE. (jl) (Entered: 10/28/1998) |
| 10/30/1998 | 39 | MOTION by DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO THEIR REQUESTS FOR PRODUCTION OF DOCUMENTS, INCLUDING BUT NOT LIMITED TO FINANCIAL INFORMATION, INCLUDING TAX RETURNS , CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (md) Modified on 11/02/1998 (Entered: 11/02/1998) |

| 11/02/1998 | 40 | SUPPLEMENTAL MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS TO EXTEND DISCOVERY PERIOD , CERTIFICATE OF SERVICE. (fe) (Entered: 11/03/1998) |
|---|---|---|
| 11/02/1998 | 41 | Joint Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to PLAINTIFFS' MOTION TO EXTEND DISCOVERY PERIOD, Certificate of Service. (md) Modified on 11/03/1998 (Entered: 11/03/1998) |
| 11/04/1998 | 42 | Memorandum by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS in opposition to DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO THEIR REQUESTS FOR PRODUCTION OF DOCUMENTS, INCLUDING BUT NOT LIMITED TO FINANCIAL INFORMATION, INCLUDING TAX RETURNS , Certificate of Service. (fe) (Entered: 11/04/1998) |
| 11/04/1998 | 43 | ORDER THAT DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO THEIR REQUESTS FOR PRODUCTION OF DOCUMENTS, INCLUDING BUT NOT LIMITED TO FINANCIAL INFORMATION, INCLUDING TAX RETURNS IS GRANTED IN PART AND DENIED IN PART, ETC. PLAINTIFF'S MOTION TO EXTEND DISCOVERY PERIOD IS GRANTED. DISCOVERY SHALL BE COMPLETED BY 12/1/98; DEADLINE FOR FILING OF ALL DISPOSITIVE MOTIONS IS 12/4/98 AND RESPONSE TO MOTION IS DUE 12/18/98 ; ALL PROVISIONS OF THIS COURT'S PRETRIAL SCHEDULING ORDER REMAIN IN FORCE. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 11/5/98 ENTERED AND COPIES MAILED AND FAXED BY CHAMBERS ON 11/4/98. (fe) Modified on 11/09/1998 (Entered: 11/05/1998) |
| 11/04/1998 | 44 | Affidavit of Jennifer M. McHugh, Esquire. (fe) Modified on 11/06/1998 (Entered: 11/05/1998) |
| 11/04/1998 | 45 | Affidavit of Lillian E. Benedict, Esquire. (fe) Modified on 11/06/1998 (Entered: 11/05/1998) |
| 11/06/1998 | 46 | ORDER DENYING PLAINTIFFS' SUPPLEMENTAL MOTION TO EXTEND DISCOVERY PEROID; THE COURT ALREADY HAVING GRANTED PLAINTIFF'S MOTION TO EXTEND DISCOVERY ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 11/6/98 ENTERED AND COPIES MAILED AND |

| | | |
|---|---|---|
| | | FAXED. (ph) (Entered: 11/06/1998) |
| 11/30/1998 | 47 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS TO QUASH ,and FOR A PROTECTIVE ORDER , MEMORANDUM, CERTIFICATE OF SERVICE. (jl) (Entered: 12/01/1998) |
| 12/03/1998 | 48 | EMERGENCY MOTION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS TO AMEND BRIEFING SCHEDULE SET BY ORDER OF NOVEMBER 4 , CERTIFICATE OF SERVICE. (md) (Entered: 12/04/1998) |
| 12/04/1998 | 49 | ORDER THAT THIS COURT'S 11/4/98 ORDER IS AMENDED AS FOLLOWS: DISPOSITIVE MOTION DUE: 12/18/98; RESPONSE DUE: 1/22/99 . (SIGNED BY JUDGE CLARENCE C. NEWCOMER) 12/7/98 ENTERED AND COPIES MAILED; COPIES FAXED FROM CHAMBERS. (adr) (Entered: 12/07/1998) |
| 12/07/1998 | 50 | Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to MOTION TO QUASH AND MOTION TO COMPEL, Certificate of Service. (rs) (Entered: 12/08/1998) |
| 12/07/1998 | 51 | Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to Plaintiffs' MOTION TO QUASH and MOTION TO COMPEL, Certificate of Service. (jl) (Entered: 12/08/1998) |
| 12/14/1998 | 52 | ORDER GRANTING IN PART, DENYING IN PART PLFF'S MOTION TO QUASH AND FOR A PROTECTIVE ORDER. DEFTS' MOTION TO COMPEL IS GRANTED IN PART AND DENIED IN PART. IT IS FURTHER ORDERED THAT PLFFS SHALL TURN OVER THE EXPERT REPORT OF THOMS W. NIHILL WITHIN (7) DAYS OF THE DATE OF THIS ORDER, ETC. IT IS FURTHER ORDERED THAT THIS COURT'S BRIEFING SCHEDULE IS HEREBY AMENDED AS FOLLOWS: DISPOSITIVE MOTION DUE 1/4/99. RESPONSE DUE 2/1/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 12/15/98 ENTERED AND COPIES MAILED AND FAXED. (gn) (Entered: 12/15/1998) |
| 12/17/1998 | 53 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, |

| | | |
|---|---|---|
| | | PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS FOR EXPEDITED CONSIDERATION OF THEIR MOTION FOR RECONSIDERATION , CERTIFICATE OF SERVICE. (cb) (Entered: 12/17/1998) |
| 12/17/1998 | 54 | MOTION by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS FOR RECONSIDERATION OF [52-1] ORDER , MEMORANDUM, CERTIFICATION, CERTIFICATE OF SERVICE. (cb) (Entered: 12/17/1998) |
| 12/18/1998 | 55 | Memorandum by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS in opposition to MOTION FOR RECONSIDERATION, Certificate of Service. (rs) (Entered: 12/21/1998) |
| 12/22/1998 | 56 | ORDER THAT PLAINTIFFS' MOTION FOR EXPEDITED CONSIDERATION OF THEIR MOTION FOR RECONSIDERATION IS GRANTED; MOTION FOR RECONSIDERATION OF THE ORDER DATED 12/14/98 IS GRANTED IN PART AND DENIED IN PART; THE MOTION IS GRANTED AS TO AN EXTENSION OF TIME IN WHICH PLAINTIFFS' EXPERT REPORT, IF ANY, SHALL BE DUE, THE MOTION IS DENIED AS TO THE PREPARATION OF ANY NON EXPERT REPORTS BY DEFENDANTS ETC ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 12/23/98 ENTERED AND COPIES MAILED AND FAXED 12/22/98. (ph) (Entered: 12/23/1998) |
| 01/19/1999 | 57 | Affidavit of Service of Expert Report. Jennifer M. Mc Hugh certifies that on 1/19/99, she served a true and correct copy of Plaintiffs' Expert Report of Thomas Nihill, Esquire, Certificate of Service. (fdc) (Entered: 01/20/1999) |
| 01/25/1999 | 58 | EXPEDITED MOTION by DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III TO MODIFY ORDER TO EXTEND TIME, MEMORANDUM, CERTIFICATE OF SERVICE. (mrs) (Entered: 01/26/1999) |
| 01/26/1999 | 59 | Memorandum by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS in opposition to MOTION TO MODIFY THE DECEMBER 21, 1998 ORDER TO EXTEND TIME FOR DEFENDANTS TO PRODUCE AND EXPERT REPORT AND TO FILE A SUMMARY JUDGMENT MOTION, Certificate of Service. (np) (Entered: 01/27/1999) |

| 01/28/1999 | 60 | ORDER THAT UPON CONSIDERATION OF DEFENDANTS' EXPEDITED MOTION TO MODIFY THE DECEMBER 21, 1998 ORDER TO EXTEND TIME FOR DEFENDANTS TO PRODUCE AN EXPERT REPORT AND TO FILE A SUMMARY JUDGMENT MOTION, AND PLAINTIFF'S RESPONSE THERETO, IT IS HEREBY ORDERED THAT SAID MOTION IS GRANTED IN PART AND DENIED IN PART. THE MOTION IS GRATNED AS TO AN EXTENSION AND DENIED AS TO THE LENGTH OF THE EXTENSION. IT IS FURTHER ORDERED THAT DEFENDANTS' EXPERT REPORT SHALL BE DUE ON OR BY FEBRUARY 8, DEFENDANT'S SUMMARY JUDGMENT MOTION, IF ANY, DUE ON OR BY FEBRUARY 19, AND PLAINTIFFS' RESPONSE THERETO DUE ON OR BY MARCH 19, 1999. (SIGNED BY JUDGE CLARENCE C. NEWCOMER) 1/28/99 ENTERED AND COPIES MAILED AND FAXED. (dt) (Entered: 01/28/1999) |
| --- | --- | --- |
| 02/19/1999 | 61 | MOTION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS FOR SUMMARY JUDGMENT , MEMORANDUM, CERTIFICATE OF SERVICE, EXHIBITST, Volumes I and II. (mrs) (Entered: 02/22/1999) |
| 02/19/1999 | 62 | MOTION by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS FOR SUMMARY JUDGMENT , MEMORANDUM, CERTIFICATE OF SERVICE. (aam) (Entered: 02/22/1999) |
| 02/19/1999 | 63 | Exhibits to Motion for Summary Judgment Volume 1 by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS. (aam) (Entered: 02/22/1999) |
| 02/19/1999 | 64 | Exhibits to Motion for Summary Judgment Volume II by DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT ELYSE HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT DANIEL NESI, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS. (aam) (Entered: 02/22/1999) |
| 03/22/1999 | 65 | Brief by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS in opposition to DEFTS' MOTION FOR SUMMARY JUDGMENT, with Exhbits in support (3 Vol.), Certificate of Service. (rs) (Entered: 03/22/1999) |

| 06/01/1999 | 66 | MEMORANDUM AND ORDER THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS GRANTED IN PART AND DENIED IN PART. THE MOTION IS GRANTED AS TO PLAINTIFFS' FRAUD CLAIM REGARDING THE 1992 BUY-IN TRANSACTION, AND SUMMARY JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFFS ON THAT CLAIM. THE MOTION IS DENIED AS TO ALL OTHER CLAIMS. IT IS FURTHER ORDERED THAT THE PARTIES SHALL COMPLY WITH THE FOLLOWING DISCOVERY SCHEDULE FOR PHASE II OF DISCOVERY: DISCOVERY COMPLETION DATE: 9/10/99. DISPOSITIVE MOTIONS DUE: 9/10/99. RESPONSES DUE: 9/29/99. READY FOR TRIAL 9/30/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 6/1/99 ENTERED AND COPIES MAILED. (fdc) (Entered: 06/01/1999) |
| --- | --- | --- |
| 06/15/1999 | 67 | DEFENDANTS' MOTION TO QUASH SUBPOENAS, TO ESTABLISH PROCEDURE FOR FUTURE SUBPOENAS, AND FOR SANCTIONS, MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 06/15/1999) |
| 06/18/1999 | 68 | ORDER THAT THIS COURT'S ORDER OF 7/13/98 STAYING THE DISPOSITION OF THE MOTION OF COUNTERCLAIM DEFENDANTS, HAROLD GEBERT, JOAN GEBERT, PETER H. GEBERT, ELLEN J. GEBERT, HAMPTON C. RANDOLPH, AND EVELYN M. RANDOLPH TO DISMISS COUNTERCLAIM PURSUANT TO F.R.C.P. 12(b)(1) AND, ALTERNATIVELY, F.R.C.P. 12(b)(6) IS HEREBY VACATED, THE COURT FINDING THAT THE MOTION IS NOW RIPE FOR DISPOSITION. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 6/18/99 ENTERED AND COPIES MAILED. (fdc) (Entered: 06/18/1999) |
| 06/30/1999 | 69 | Memorandum of Law by PLAINTIFF WILLIAM B. PACKER SR., PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF ROBERT A. AYERLE, PATRICIA P. AYERLE, PLAINTIFF LINDA NICHOLAS, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF LAURA SCHRIVER, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF BALLENROSE INVESTORS in Opposition to DEFENDANTS' Motion to Quash Subpoenas, to Establish procedure for future Subpoenas, and for Sanctions, Certificate of Service. (fdc) (Entered: 07/01/1999) |
| 07/02/1999 | 70 | ORDER THAT THE MOTION OF COUNTERCLAIM DEFENDANTS IS GRANTED. IT IS FURTHER ORDERED THAT DEFENDANTS' COUNTERCLAIMS ARE HEREBY DISMISSED WITHOUT PREJUDICE. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 7/2/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 07/02/1999) |
| 07/12/1999 | 71 | ORDER THAT THE DEFENDANTS' MOTION TO QUASH SUBPOENAS, TO ESTABLISH PROCEDURE FOR FUTURE SUBPOENAS, AND FOR SANCTIONS IS DENIED. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 7/9/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 07/12/1999) |
| 07/12/1999 | 72 | Objections by GABLE, PERITZ, MISHKIN & CO. to PLAINTIFF'S Subpoena, Certificate of Service. (fdc) (Entered: 07/13/1999) |
| 08/04/1999 | 73 | Declaration of Lillian E. Benedict, Esquire. (fdc) (Entered: 08/05/1999) |
| 08/04/1999 | 74 | PLAINTIFFS' MOTION TO EXTEND DISCOVERY SCHEDULE SET FORTH IN ORDER ENTERED 6/1/99 , CERTIFICATE OF SERVICE. (fdc) (Entered: 08/05/1999) |

| | | |
|---|---|---|
| 08/12/1999 | 75 | MOTION BY PLAINTIFFS TO COMPEL THE PRODUCTION OF DOCUMENTS BY THIRD-PARTY GABLE, PERRITZ, MISHKIN & COMPANY , CERTIFICATE OF SERVICE. (fdc) (Entered: 08/12/1999) |
| 08/12/1999 | 76 | Memorandum of Law by PLAINTIFFS in Support of their Motion to Compel directed to Third Party Gable, Perritz, Mishkin & CO., Certificate of Service. (fdc) (Entered: 08/12/1999) |
| 08/12/1999 | 77 | Affidavit of Jennifer M. McHugh, Esquire. (fdc) (Entered: 08/12/1999) |
| 08/12/1999 | 78 | Affidavit of Lillian E. Benedict, Esquire. (fdc) (Entered: 08/12/1999) |
| 08/13/1999 | 79 | PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY SUBPOENAED PARTY, TEXTRON FINANCIAL CORPORATION , CERTIFICATION PURSUANT TO LR 26.1, MEMORANDUM, CERTIFICATE OF SERVICE. (dt) (Entered: 08/16/1999) |
| 08/16/1999 | 80 | Supplemental Declaration of Lillian E. Benedict, Certificate of Service. (fdc) (Entered: 08/17/1999) |
| 08/16/1999 | 81 | DEFENDANTS' Answer in Opposition to PLAINTIFFS' Motion to Extend Discovery, Certificate of Service. (fdc) (Entered: 08/17/1999) |
| 08/17/1999 | 82 | PLAINTIFFS' Reply Memorandum of Law in Support of Motion to Extend Discovery Period set forth in Order entered 6/1/99, Certificate of Service. (fdc) (Entered: 08/17/1999) |
| 08/19/1999 | 83 | ORDER THAT PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS BY THIRD-PARTY GABLE, PERRITZ, MISHKIN & COMPANY IS DENIED AS MOOT. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 8/19/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 08/19/1999) |
| 08/19/1999 | 84 | ORDER THAT PLAINTIFF'S MOTION TO EXTEND DISCOVERY SCHEDULE SET FORTH IN ORDER ENTERED 6/1/99 IS GRANTED. SCHEDULING ORDER DEADLINES: DISCOVERY COMPLETED BY 11/10/99; DEADLINE FOR FILING DISPOSITIVE MOTIONS BY 11/10/99; RESPONSE TO DISPOSITIVE MOTIONS BY 11/29/99; TRIAL POOL DEADLINE SET FOR 11/30/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 8/19/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 08/19/1999) |
| 08/30/1999 | 85 | Memorandum of NONPARTY TEXTRON FINANCIAL CORPORATION in Opposition to PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS, Certificate of Service. (fdc) (Entered: 08/30/1999) |
| 09/08/1999 | 86 | ORDER THAT THE PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY SUBPOENAED PARTY, TEXTRON FINANCIAL IS DENIED, THE COURT FINDING THAT TEXTRON DID NOT WAIVE ITS OBJECTIONS, THAT TEXTRON HAS ALREADY PRODUCED ALL DOCUMENTS RESPONSIVE TO PLAINTIFFS' SUBPOENA, AND THAT PLAINTIFFS ARE NOT ENTITLED TO THE CONFIDENTIAL INTERNAL NOTATIONS OF TEXTRON'S DELIBERATIONS ON BORROWERS' CREDITWORTHINESS. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 9/8/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 09/08/1999) |

| | | |
|---|---|---|
| 09/27/1999 | 87 | MOTION BY PLAINTIFFS FOR LEAVE TO AMEND COMPLAINT AND TO JOIN ADARE, INC. AND BALLYBUNION, LP AS DEFENDANTS , MEMORANDUM, CERTIFICATE OF SERVICE (APPENDIX ATTACHED-VOLS.I AND II). (fdc) (Entered: 09/27/1999) |
| 10/05/1999 | 88 | PLAINTIFFS' MOTION TO COMPEL SHEAFF LANE TRUST AND STATION SQUARE TRUST TO PRODUCE DOCUMENTS IN RESPONSE TO SUBPOENAS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/06/1999) |
| 10/05/1999 | 89 | DEFENDANTS' MOTION TO COMPEL DISCOVERY , MEMORANDUM, DECLARATION, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/06/1999) |
| 10/08/1999 | 90 | PLAINTIFF'S MOTION TO COMPEL SUSQUEHANNA ROAD ASSOCIATES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/12/1999) |
| 10/08/1999 | 91 | PLAINTIFFS' MOTION TO COMPEL HANSEN PROPERTIES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/12/1999) |
| 10/08/1999 | 92 | PLAINTIFFS' MOTION TO COMPEL POD 27, INC. TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/12/1999) |
| 10/08/1999 | 93 | PLAINTIFFS' MOTION TO COMPEL HANSEN PROPERTIES, INC. TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/12/1999) |
| 10/12/1999 | 94 | PLAINTIFFS' MOTION TO COMPEL STATION SQUARE PARTNERS TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/12/1999) |
| 10/12/1999 | 95 | PLAINTIFFS' MOTION TO COMPEL PLYMOUTH MEETING ASSOCIATES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 10/12/1999) |
| 10/19/1999 | 96 | STIPULATION AND ORDER THAT THE TIME FOR DEFENDANTS TO FILE A RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT AND TO JOIN ADARE, INC. AND BALLYBUNION, LP AS DEFENDANTS IS HEREBY EXTENDED UP TO AND INCLUDING FRIDAY, 10/15/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/19/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 10/19/1999) |
| 10/20/1999 | 97 | STIPULATION AND ORDER THAT THE TIME FOR DEFENDANTS TO FILE A RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT AND JOIN ADARE, INC. AND BALLYBUNION, L.P. IS HEREBY EXTENDED UP TO AND INCLUDING FRIDAY, 10/22/99. IT IS FURTHER STIPULATED AND |

| | | |
|---|---|---|
| | | AGREED BETWEEN COUNSEL FOR PLAINTIFFS AND COUNSEL FOR DEFENDANTS, THAT THE TIME FOR PLAINTIFFS TO FILE A RESPONSE TO DEFENDANTS' MOTION TO COMPEL DISCOVERY OF DEFENDANTS'S FIRST SET OF RICO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS AND DEFENDANTS' SECOND SET OF INTERROGATORIES DIRECTED TO PLAINTIFFS, IS HEREBY EXTENDED UP TO AND INCLUDING TUESDAY, 10/26/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/21/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 10/21/1999) |
| 10/22/1999 | 98 | Response by PLAINTIFF BALLENROSE INVESTORS, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF LAURA SCHRIVER, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF LINDA NICHOLAS, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF ROBERT A. AYERLE, PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF WILLIAM B. PACKER SR. to [87-1] MOTION FOR LEAVE TO AMEND COMPLAINT AND TO JOIN ADARE, INC. AND BALLYBUNION, LP AS DEFENDANTS , Certificate of Service. (ph) (Entered: 10/22/1999) |
| 10/22/1999 | 99 | ORDER THAT PLFF'S MOTION TO COMPEL SHEAFF LANE TRUST & STATION SQUARE TRUST TO PRODUCE DOCUMENTS IS DENIED AS MOOT, ETC. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/25/99 ENTERED AND COPIES MAILED: COPIES FAXED ON 10/22/99. (kw) (Entered: 10/25/1999) |
| 10/27/1999 | 100 | ORDER THAT A FINAL PRETRIAL CONFERENCE SHALL TAKE PLACE ON THURSDAY, 12/9/99 AT 11:15 AM IN CHAMBERS. ALL PARTIES SHALL COME TO THE CONFERENCE WITH THE AUTHORITY TO SETTLE THIS MATTER. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/27/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 10/27/1999) |
| 10/27/1999 | 101 | STIPULATION AND ORDER THAT THE TIME FOR PLAINTIFFS TO FILE A RESPONSE TO DEFENDANTS' MOTION TO COMPEL DISCOVERY OF DEFENDANTS' FIRST SET OF RICO INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS AND DEFENDANTS' SECOND SET OF INTERROGATORIES DIRECTED TO PLAINTIFFS, IS HEREBY EXTENDED UP TO AND INCLUDING FRIDAY, 10/29/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/27/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 10/27/1999) |
| 10/27/1999 | 102 | STIPULATION AND ORDER THAT THE TIME FOR DEFENDANTS TO FILE A RESPONSE TO PLAINTIFFS' MOTION TO COMPEL THIRD PARTIES, HANSEN PROPERTIES, INC., HANSEN PROPERTIE, POD 27, INC. AND SUSQUEHANNA ROAD ASSOCIATES TO PRODUCE DOCUMENTS IN RESPONSE TO SUBPOENAS IS HEREBY EXTENDED UP TO AND INCLUDING 10/29/99. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 10/27/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 10/27/1999) |
| 10/29/1999 | 103 | Response by NOTICE ONLY POD 27, INC. to MOTION TO COMPEL POD 27, INC. TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS, Memorandum, Certificate of Service. (tj) (Entered: 11/01/1999) |

| 10/29/1999 | 104 | MOTION by PLAINTIFF EVELYN RANDOLPH, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF LAURA SCHRIVER, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF LINDA NICHOLAS, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF ROBERT A. AYERLE, PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF WILLIAM B. PACKER SR. TO COMPEL , MEMORANDUM, CERTIFICATE OF SERVICE. (lal) (Entered: 11/01/1999) |
|---|---|---|
| 10/29/1999 | 105 | Response by MOVANT HANSEN PROPERTIES to MOTION TO COMPEL HANSEN PROPERTIES, INC. TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , Certificate of Service. (fe) (Entered: 11/01/1999) |
| 10/29/1999 | 106 | Response by MOVANT SUSQUEHANNA ROAD to PLFFS' MOTION TO COMPEL, memorandum, Certificate of Service. (fb) (Entered: 11/01/1999) |
| 10/29/1999 | 107 | Response by MOVANT HANSEN PROPERTIES to MOTION TO COMPEL PLYMOUTH MEETING ASSOCIATES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS , MEMORANDUM, CERTIFICATE OF SERVICE. (mrs) (Entered: 11/01/1999) |
| 11/01/1999 | 108 | Memorandum by THIRD PARTY HERB GABLE in support of MOTION TO QUASH SUBPOENA. (ky) (Entered: 11/01/1999) |
| 11/02/1999 | 109 | PLAINTIFFS' MOTION TO COMPEL AND FOR SANCTIONS AGAINST DEFENDANT DAVID S. SHERMAN , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 11/02/1999) |
| 11/02/1999 | 110 | PLAINTIFFS' MOTION FOR LEAVE TO FILE REPLY BRIEFS IN SUPPORT OF THEIR MOTIONS TO COMPEL AGAINST POD 27, INC., SUSQUEHANNA ROAD ASSOCIATES, HANSEN PROPERTIES, AND HANSEN PROPERTIES, INC. , CERTIFICATE OF SERVICE. (fdc) (Entered: 11/02/1999) |
| 11/02/1999 | 111 | PLAINTIFFS' Response to THIRD PARTY HERB GABLE'S Motion to Quash Subpoena, Certificate of Service. (fdc) (Entered: 11/03/1999) |
| 11/03/1999 | 112 | MOTION BY THIRD PARTY HERB GABLE TO QUASH SUBPOENA . (fdc) (Entered: 11/03/1999) |
| 11/04/1999 | 113 | ORDER THAT THE DEFENDANTS' MOTION TO QUASH SUBPOENA DIRECTED TO JOHN A. CAPRARA, ESQ. IS HEREBY DENIED AS MOOT. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 11/5/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 11/05/1999) |
| 11/08/1999 | 114 | PLAINTIFFS' MOTION TO COMPEL DIRECTED TO ELMER F. HANSEN, JR., AND MAGELLAN FINANCE CORPORATION , CERTIFICATE OF SERVICE. (fdc) (Entered: 11/08/1999) |
| 11/08/1999 | 115 | PLAINTIFFS' MOTION TO COMPEL DIRECTED TO DEFENDANTS , CERTIFICATE OF SERVICE. (fdc) (Entered: 11/08/1999) |
| 11/10/1999 | 116 | MOTION BY DEFENDANT BLUE BELL INVESTORS, DEFENDANT DAVID SHERMAN, DEFENDANT DANIEL NESI, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT ELYSE HANSEN, |

| | | |
|---|---|---|
| | | DEFENDANT ELMER F. HANSEN III, DEFENDANT ELMER F. HANSEN JR., DEFENDANT MAGELLAN FINANCE TO DROP WILLIAM B. PACKER, SR. AS A PARTY PLAINTIFF FOR LACK OF STANDING , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 11/10/1999) |
| 11/10/1999 | 117 | MOTION OF DEFENDANT BLUE BELL INVESTORS, DEFENDANT DAVID SHERMAN, DEFENDANT DANIEL NESI, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT ELYSE HANSEN, DEFENDANT ELMER F. HANSEN III, DEFENDANT ELMER F. HANSEN JR., DEFENDANT MAGELLAN FINANCE FOR PARTIAL SUMMARY JUDGMENT , MEMORANDUM, DECLARATION, CERTIFICATE OF SERVICE. (fdc) (Entered: 11/12/1999) |
| 11/10/1999 | 118 | MOTION BY DEFENDANT BLUE BELL INVESTORS, DEFENDANT DAVID SHERMAN, DEFENDANT DANIEL NESI, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT ELYSE HANSEN, DEFENDANT ELMER F. HANSEN III, DEFENDANT ELMER F. HANSEN JR., DEFENDANT MAGELLAN FINANCE FOR SUMMARY JUDGMENT FOR LACK OF DAMAGES , MEMORANDUM, DECLARATION, CERTIFICATE OF SERVICE. (fdc) (Entered: 11/12/1999) |
| 11/12/1999 | 119 | MEMORANDUM AND ORDER THAT PLAINTIFFS' MOTION TO COMPEL POD 27, INC. TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS IS GRANTED IN PART AND DENIED IN PART. POD 27 SHALL PRODUCE THE FOLLOWING TO PLAINTIFFS WITHIN 5 DAYS OF THIS ORDER: (a) FEDERAL AND STATE TAX RETURNS FOR 1993 THROUGH 1998. (b) ALL FINANCIAL STATEMENTS PREPARED BY IT OR ON ITS BEHALF FOR THE YEARS 1993 THROUGH 1998. (c) BOOKS AND RECORDS FOR 1998, INCLUDING, BUT NOT LIMITED TO, POD'S GENERAL LEDGER. PLAINTIFFS' REQUESTS FOR POD TO TURN OVER ALL DOCUMENTS RELATING TO ANY LOANS ENTERED INTO BY POD AND ALL DOCUMENTS RELATING TO THE ACQUISITION OF ANY PROPERTY BY POD IS DENIED AS OVERBROAD AND LACKING SPECIFICITY. PLAINTIFF'S MOTION TO COMPEL SUSQUEHANNA ROAD ASSOCIATES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS IS GRANTED. PLAINTIFFS' MOTION TO COMPEL HANSEN PROPERTIES, INC. TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS IS GRANTED IN PART AND DENIED IN PART. HANSEN INC. SHALL PRODUCE THE FOLLOWING TO PLAINTIFFS WITHIN 5 DAYS OF THIS ORDER: (a) FEDERAL AND STATE TAX RETURNS FOR 1993 THROUGH 1998. (b) ALL FINANCIAL STATEMENTS PREPARED BY IT OR ON ITS BEHALF FOR THE YEARS 1993 THROUGH 1998. (c) BOOKS AND RECORDS FOR THE PERIOD 1993 THROUGH 1998, INCLUDING, BUT NOT LIMITED TO, HANSEN INC.'S GENERAL LEDGER. PLAINTIFF'S REQUESTS FOR HANSEN INC. TO TURN OVER ALL DOCUMENTS RELATING TO ANY LOANS ENTERED INTO BY HANSEN INC. AND ALL DOCUMENTS RELATING TO THE ACQUISITION OF ANY PROPERTY BY HANSEN INC. IS DENIED AS OVERBROAD, OVERLY BURDENSOME, AND LACKING SPECIFICITY. PLAINTIFFS' MOTION TO COMPEL HANSEN PROPERTIES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS IS GRANTED IN PART AND DENIED IN PART. HANSEN PROP. SHALL PRODUCE THE FOLLOWING TO PLAINTIFFS WITHIN 5 DAYS OF |

| | | |
|---|---|---|
| | | THIS ORDER: (a) FEDERAL AND STATE TAX RETURNS FOR 1993 THROUGH 1998. (b) ALL FINANCIAL STATEMENTS PREPARED BY IT OR ON ITS BEHALF FOR THE YEARS 1993 THROUGH 1998. (c) BOOKS AND RECORDS FOR THE PERIOD 1993 TO 1998, INCLUDING, BUT NOT LIMITED TO, HANSEN PROP.'S GENERAL LEDGER. PLAINTIFFS' REQUESTS FOR HANSEN PROP. TO TURN OVER ALL DOCUMENTS RELATING TO ANY LOANS ENTERED INTO BY HANSEN PROP. AND ALL DOCUMENTS RELATING TO THE ACQUISITION OF ANY PROPERTY BY HANSEN PROP. IS DENIED AS OVERBROAD AND LACKING SPECIFICITY. THIRD PARTY HERB GABEL'S MOTION TO QUASH SUBPOENA IS GRANTED, AS PERTAINING TO THE DOCUMENT REQUESTS FOR TAX RETURNS AND TAX RELATED DOCUMENTS. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 11/15/99 ENTERED AND COPIES MAILED. (fdc) (Entered: 11/15/1999) |
| 11/12/1999 | 120 | MOTION BY PLAINTIFFS TO COMPEL SUBPOENAED THIRD PARTY, TEXTRON FINANCIAL CORPORATION TO PRODCUE APPRAISAL , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 11/15/1999) |
| 11/16/1999 | 121 | PLAINTIFFS' Response to DEFENDANTS' Motion to Compel and for Sanctions against David S. Sherman, Certificate of Service. (fdc) (Entered: 11/17/1999) |
| 11/23/1999 | 122 | PLAINTIFFS' MOTION FOR LEAVE TO FILE A REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL AND FOR SANCTIONS AGAINST DEFENDANT DAVID S. SHERMAN , CERTIFICATE OF SERVICE. (fdc) (Entered: 11/23/1999) |
| 11/23/1999 | 123 | ORDER THAT THE PLAINTIFFS' MOTION TO COMPEL DIRECTED TO ELMER F. HANSEN, JR., AND MAGELLAN FINANCE CORPORATION IS DENIED AS MOOT, THE PARTIES HAVING RESOLVED THE ISSUE. ( SIGNED JUDGE CLARENCE C. NEWCOMER ) 11/23/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 11/23/1999) |
| 11/23/1999 | 124 | PLAINTIFFS' Memorandum of Law in Opposition to DEFENDANTS' MOTION TO DROP WILLIAM B. PACKER, SR. AS A PARTY PLAINTIFF Pursuant to FRCP 21, Certificate of Service. (fdc) (Entered: 11/24/1999) |
| 11/29/1999 | 125 | PLAINTIFFS' Brief in Opposition to DEFENDANTS' Motion for Summary Judgment with respect to PLAINTIFFS' RICO Claims, Certificate of Service, Exhibits (Vols. I thru VII). (fdc) (Entered: 11/30/1999) |
| 11/30/1999 | 126 | Declaration of Michael Jordan. (fdc) (Entered: 12/01/1999) |
| 11/30/1999 | 127 | Declaration of Lillian E. Benedict, Esq. (fdc) (Entered: 12/01/1999) |
| 11/30/1999 | 128 | Declaration of William R. Kendall, Esq. (fdc) (Entered: 12/01/1999) |
| 12/01/1999 | 129 | ORDER THAT THE PLAINTIFFS' MOTION TO COMPEL DIRECTED TO DEFENDANTS IS DENIED AS MOOT, THE PARTIES HAVING RESOLVED THE ISSUE. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 12/1/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 12/01/1999) |
| 12/01/1999 | 130 | PLAINTIFFS' Brief in Opposition to DEFENDANTS' Motion for Summary Judgment for Lack of Damages, Certificate of Service. (fdc) (Entered: 12/02/1999) |

| | | |
|---|---|---|
| 12/01/1999 | 131 | Memorandum of NONPARTY TEXTRON FINANCIAL CORP. (TFC) in Opposition to PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF APPRAISAL, and in Support of TFC'S Request for Rule 45(C)(1) Sanctions, Certificate of Service. (fdc) (Entered: 12/02/1999) |
| 12/03/1999 | 132 | ORDER THAT BY 12/31/99, ALL PARTIES ARE TO EXECUTE THE ATTACHED CONSENT FORM AND FILE IT WITH THE CLERK'S OFFICE WITH A COPY TO CHAMBERS. IN JANUARY, 2000 PARTIES WILL BE CONTACTED TO DISCUSS THE SCHEDULING OF ALL REMAINING PROCEEDINGS IN THIS MATTER, INCLUDING A SETTLEMENT CONFERENCE AND TRIAL, IF THE MATTER IS NOT RESOLVED BY AGREEMENT. GIVEN THE VOLUME OF THE PLEADINGS, AND THE NUMBER OF DISPOSITIVE MOTIONS THAT ARE PENDING IN THIS ACTION, AN ORAL ARGUMENT MAY BE SCHEDULED ON THE DISPOSITIVE MOTIONS EARLY NEXT YEAR. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 12/3/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 12/03/1999) |
| 12/03/1999 | 133 | ORDER THAT THE ABOVE-CAPTIONED CASE IS REFERRED TO U.S. MAGISTRATE JUDGE M. FAITH ANGELL TO CONDUCT ALL PROCEEDINGS AND ORDER THE ENTRY OF JUDGMENT IN ACCORDANCE WITH 28 USC 636(c) AND FRCP 73. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 12/3/99 ENTERED AND COPIES MAILED AND FAXED (fdc) (Entered: 12/03/1999) |
| 12/03/1999 | | Case referred to MAGISTRATE JUDGE M. F. ANGELL (fdc) (Entered: 01/28/2000) |
| 12/07/1999 | 134 | ORDER THAT THE PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT AND TO JOIN ADARE, INC. AND BALLYBUNION, LP AS DEFENDANTS IS DENIED. DEFENDANTS' MOTION TO COMPEL DISCOVERY IS GRANTED IN PART AND DENIED IN PART. DEFENDANTS' MOTION TO DROP WILLIAM B. PACKER, SR. AS A PARTY PLAINTIFF FOR LACK OF STANDING PURSUANT TO FRCP 21 IS DENIED. ( SIGNED BY JUDGE CLARENCE C. NEWCOMER ) 12/7/99 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 12/07/1999) |
| 12/15/1999 | 135 | MOTION BY DEFENDANT MAGELLAN FINANCE, DEFENDANT ELMER F. HANSEN JR., DEFENDANT ELMER F. HANSEN III, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT ELYSE HANSEN, DEFENDANT DAVID SHERMAN, DEFENDANT BLUE BELL INVESTORS, DEFENDANT DANIEL NESI FOR RECONSIDERATION OF THEIR MOTION TO DROP WILLIAM B. PACKER, SR., AS A PARTY PLAINTIFF FOR LACK OF STANDING , MEMORANDUM, CERTIFICATE OF SERVICE. (dt) (Entered: 12/16/1999) |
| 12/17/1999 | 136 | MOTION by DEFENDANT BLUE BELL INVESTORS, DEFENDANT DAVID SHERMAN, DEFENDANT DANIEL NESI, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT ELYSE HANSEN, DEFENDANT ELMER F. HANSEN III, DEFENDANT ELMER F. HANSEN JR., DEFENDANT MAGELLAN FINANCE FOR LEAVE TO FILE A REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT FOR LACK OF DAMAGES , CERTIFICATE OF SERVICE. (REPLY BRIEF ATTACHED) (af) Modified on 12/20/1999 (Entered: 12/17/1999) |

| 12/21/1999 | 137 | EXPEDITED MOTION BY THE DEFENDANTS TO MODIFY THE 8/19/99 SCHEDULING ORDER TO EXTEND TIME FOR DISCOVERY , MEMORANDUM, CERTIFICATE OF COUNSEL, CERTIFICATE OF SERVICE. (fdc) (Entered: 12/22/1999) |
| --- | --- | --- |
| 12/21/1999 | 138 | PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER ENTERED 12/7/99 , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 12/22/1999) |
| 12/21/1999 | 139 | PLAINTIFFS' Exhibits in Support of their Motion for Reconsideration of the Order entered 12/7/99. (fdc) (Entered: 12/22/1999) |
| 12/27/1999 | 140 | Memorandum of Law by PLAINTIFF EVELYN RANDOLPH, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF LAURA SCHRIVER, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF LINDA NICHOLAS, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF ROBERT A. AYERLE, PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF WILLIAM B. PACKER SR. in opposition to DEFENDANTS' MOTION FOR RECONSIDERATION OF THE ORDER DATED 12/7/99 WHICH DENIED DEFENDANTS' MOTION TO DROP WILLIAM B. PACKER, SR., AS A PARTY-PLAINTIFF, Certificate of Service. (md) (Entered: 12/28/1999) |
| 01/03/2000 | 141 | PLAINTIFFS' Memorandum of Law in Opposition to DEFENDANTS' MOTION FOR LEAVE TO FILE A REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT FOR LACK OF DAMAGES, Certificate of Service. (fdc) (Entered: 01/04/2000) |
| 01/06/2000 | 142 | PLAINTIFFS' Memorandum of Law in Opposition to DEFENDANTS' Expedited Motion to Modify the 8/19/99 Scheduling Order to Extend Time for Discovery, Certificate of Service. (fdc) (Entered: 01/07/2000) |
| 01/19/2000 | 143 | DEFENDANTS' MOTION TO STRIKE EXPERT REPORT OF STUART F. EBBY AND TO PRECLUDE HIM FROM PROVIDING EXPERT TESTIMONY AT TRIAL , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 01/20/2000) |
| 01/21/2000 | 144 | ORDER DENYING MOTION TO STRIKE EXPERT REPORT OF STUART F. EBBY DENYING MOTION TO PRECLUDE HIM FROM PROVIDING EXPERT TESTIMONY AT TRIAL DENYING MOTION FOR RECONSIDERATION OF ORDER ENTERED 12/7/99 DENYING MOTION TO MODIFY THE 8/19/99 SCHEDULING ORDER TO EXTEND FOR DISCOVERY DENYING MOTION FOR LEAVE TO FILE A REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT FOR LACK OF DAMAGES DENYING MOTION FOR RECONSIDERATION OF THEIR MOTION TO DROP WILLIAM B. PACKER, SR., AS A PARTY PLAINTIFF FOR LACK OF STANDING DENYING MOTION FOR LEAVE TO FILE A REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL AND FOR SANCTIONS AGAINST DEFENDANT DAVID S. SHERMAN. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 1/21/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 01/21/2000) |
| 02/03/2000 | 145 | ORDER THAT PLAINTIFFS' MOTION TO COMPEL SUBPOENAED THIRD PARTY, TEXTRON FINANCIAL CORPORATION TO PRODCUE APPRAISAL IS DENIED. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT FOR LACK OF DAMAGES IS DENIED. PLAINTIFFS' MOTION TO COMPEL IS DENIED. |

| | | PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANT DAVID S. SHERMAN IS DENIED. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 2/4/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 02/04/2000) |
|---|---|---|
| 03/14/2000 | 146 | ORDER THAT THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT IS DENIED. PRETRIAL CONFERENCE WILL BE HELD ON 4/28/00 AT 10:00 AM.; TRIAL DATE SCHEDULED FOR 5/9/00; PRETRIAL MEMORANDA DUE 4/10/00. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 3/15/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 03/15/2000) |
| 04/10/2000 | 147 | PLAINTIFFS' Statement of Disputed Facts pursuant to LRCP 16.1(d)2(b)2(A), certificate of service. (fdc) (Entered: 04/11/2000) |
| 04/10/2000 | 148 | Plaintiff's Pretrial Memorandum, Certificate of Service. (ldb) (Entered: 04/11/2000) |
| 04/10/2000 | 149 | Proposed Jury instructions and Proposed Verdict Form by BALLENROSE INVESTORS, EVELYN RANDOLPH, HAMPTON RANDOLPH, LAURA SCHRIVER, EUGENE SCHRIVER III, ELLEN J. GEBERT, PETER H. GEBERT, JOAN M. GEBERT, HAROLD H. GEBERT, LINDA NICHOLAS, PATRICIA P. AYERLE, ROBERT A. AYERLE, WILLIAM B. PACKER JR., WILLIAM B. PACKER SR. Certificate of Service . (ldb) (Entered: 04/11/2000) |
| 04/10/2000 | 150 | MOTION by PLAINTIFF BALLENROSE INVESTORS, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF LAURA SCHRIVER, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF LINDA NICHOLAS, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF ROBERT A. AYERLE, PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF WILLIAM B. PACKER SR. IN LIMINE TO EXCLUDE THE REPORT AND TESTIMONY OF LAURENCE A. HIRSCH, CRE, MAI, SGA , CERTIFICATE OF SERVICE. (ldb) (Entered: 04/11/2000) |
| 04/10/2000 | 151 | MOTION by PLAINTIFF BALLENROSE INVESTORS, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF LAURA SCHRIVER, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF LINDA NICHOLAS, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF ROBERT A. AYERLE, PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF WILLIAM B. PACKER SR. IN LIMINE TO EXCLUDE REFERENCE TO TREBLE DAMAGES AND ATTORNEYS FEES UNDER RICO , CERTIFICATE OF SERVICE. (ldb) (Entered: 04/11/2000) |
| 04/10/2000 | 152 | Defendant's Pretrial Memorandum. (fdc) (Entered: 04/11/2000) |
| 04/10/2000 | 153 | DEFENDANTS' Proposed Points for Charge, Certificate of Service. (fdc) (Entered: 04/11/2000) |
| 04/10/2000 | 154 | DEFENDANTS' Proposed Special Interrogatories, Certificate of Service. (fdc) (Entered: 04/11/2000) |
| 04/10/2000 | 155 | DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF THOMAS W. NIHILL AT TRIAL , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: |

| | | 04/11/2000) |
|---|---|---|
| 04/10/2000 | 156 | DEFENDANTS' MOTION IN LIMINE TO LIMIT THE EVIDENCE AT TRIAL TO THE APPROPRIATE MEASURE OF DAMAGES , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 04/11/2000) |
| 04/10/2000 | 157 | DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF STUART F. EBBY AT TRIAL , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 04/11/2000) |
| 04/14/2000 | 158 | Plaintiffs' Amended Pre-Trial Memorandum, Certificate of Service. (fdc) (Entered: 04/17/2000) |
| 04/17/2000 | 159 | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Limit The Testimony of Thomas W. Nihill at Trial, Certificate of Service. (dt) (Entered: 04/18/2000) |
| 04/17/2000 | 160 | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Preclude Testimony of Stuart F. Ebby at Trial, Certificate of Service. (dt) (Entered: 04/18/2000) |
| 04/17/2000 | 161 | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion in Limine to Limit The Evidence at Trial to The Appropriate Measure of Damages, Certificate of Service. (dt) (Entered: 04/18/2000) |
| 04/17/2000 | 162 | Plaintiffs' Objections to Defendants' List of Exhibits and Discovery Items, Certificate of Service. (dt) (Entered: 04/18/2000) |
| 04/17/2000 | 163 | PLAINTIFFS' Proposed Voir Dire, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 164 | PLAINTIFFS' Objections to DEFENDANTS' Proposed Points for Charge and Special Interrogatories, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 165 | DEFENDANTS' Objections to PLAINTIFFS' Proposed Jury Instructions and Proposed Verdict Form, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 166 | DEFENDANTS' Objections to PLAINTIFFS' Trial Exhibits, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 167 | DEFENDANTS' Response to PLAINTIFFS' Motion in Limine to Exclude the Report and Testimony of LAURENCE A. HIRSH, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 168 | DEFENDANTS' Response to PLAINTIFFS' Motion in Limine to exclude reference to treble damages and attorneys' fees under RICO, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 169 | DEFENDANTS' Objections to the Qualifications of PLAINTIFFS' Expert Witnesses, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 170 | DEFENDANTS' Request for Offers of Proof. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 171 | DEFENDANTS' Amended Proposed Special Interrogatories to the Jury, Certificate of Service. (fdc) (Entered: 04/18/2000) |
| 04/17/2000 | 172 | DEFENDANTS' Special proposed Voir dire questions, Certificate of Service. (fdc) (Entered: 04/18/2000) |

| 04/24/2000 | 173 | PLAINTIFFS' Response to DEFENDANTS' Request for offers of proof, certificate of service. (fdc) (Entered: 04/24/2000) |
| 05/01/2000 | 174 | ORDER THAT AS DISCUSSED IN THE FINAL PRETRIAL CONFERENCE THE TRIAL IN THE ABOVE-CAPTIONED MATTER WILL BE BIFURCATED, TRYING LIABILITY ISSUES FIRST AND DAMAGES ISSUES IN THE SECOND PHASE OF TRIAL. BY THE CLOSE OF BUSINESS ON WEDNESDAY, 5/3/00, BOTH PARTIES ARE TO SUBMIT REVISED WITNESS AND EXHIBIT LISTS. THE REVISED LISTS SHOULD SEPARATE LIABILITY WITNESSES/EXHIBITS AND DAMAGES WITNESSES/EXHIBITS. IN ADDITION, EACH PARTY IS TO LIST ALL REMAINING OBJECTIONS TO THE OTHER PARTIES' EXHIBITS. THE TRIAL IN THE ABOVE-CAPTIONED MATTER WILL BE HELD IN COURTROOM 3-A, 3RD FLOOR, US COURTHOUSE, 601 MARKET STREET, PHILADELPHIA, PA. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 5/1/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 05/01/2000) |
| 05/01/2000 | 175 | ORDER THAT THE DEFENDANTS' MOTION IN LIMINE TO LIMIT THE TESTIMONY OF THOMAS N. NIHILL AT TRIAL IS DENIED IN PART, RESERVED IN PART. PLAINTIFFS' EXPERT, THOMAS W. NIHILL, WILL BE PERMITTED TO TESTIFY AT TRIAL REGARDING HIS 3/6/00 REPORT. DEFENDANTS' CHALLENGE TO MR. NIHILL'S TESTIMONY ON DAMAGES RELATED ISSUES WILL BE DECIDED PRIOR TO THE SECOND PHASE, THE DAMAGES PHASE, OF TRIAL. DEFENDANTS' MOTION TO PRECLDUE THE TESTIMONY OF STUART F. EBBY AT TRIAL IS GRANTED IN PART, DENIED IN PART. STUART F. EBBY WILL BE PERMITTED TO TESTIFY AS AN EXPERT IN REAL ESTATE LAW. HE MAY TESTIFY GENERALLY AS TO THE CREATION AND ACQUISITION OF JUDGMENT LIENS AND MORTGAGES; HE MAY ALSO TESTIFY AS TO COMMON PRACTICES AND HOW THE VARIOUS JUDGMENTS AGAINST THE SHEAFF LANE AND STATION SQUARE PROPERTIES DEVIATED FROM COMMON PRACTICES. HOWEVER, MR. EBBY WILL NOT BE PERMITTED TO TESTIFY AS TO THE INTENT ON THE DEFENDANTS AND/OR MIDLANTIC'S STATE OF MIND, NOR WILL HE BE PERMITTED TO OPINE HOW MIDLANTIC MAY HAVE VIEWED THE VARIOUS JUDGMENTS AGAINST THE HANSEN PROPERTIES. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 5/1/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 05/01/2000) |
| 05/04/2000 | 176 | PLAINTIFFS' Revised Witness List, Certificate of Service. (fdc) (Entered: 05/04/2000) |
| 05/04/2000 | 177 | ORDER THAT ALL OF THE FOLLOWING DISCOVERY MOTIONS, TO THE EXTENT THAT THEY HAVE NOT ALREADY BEEN RESOLVED, AR DISMISSED AS MOOT BECAUSE THE DISCOVERY PERIOD IS OVER AND THIS CASE IS READY FOR TRIAL: PLAINTIFFS' MOTION TO COMPEL STATION SQUARE PARTNERS TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS, PLAINTIFFS' MOTION TO COMPEL PLYMOUTH MEETING ASSOCIATES TO COMPLY WITH PLAINTIFFS' SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS; PLAINTIFFS' MOTION TO COMPEL AND PLAINTIFFS' MOTION FOR LEAVE TO FILE REPLY BRIEFS IN SUPPORT OF THEIR MOTIONS TO COMPEL AGAINST POD 27, INC., SUSQUEHANNA ROAD ASSOCIATES, HANSEN |

| | | |
|---|---|---|
| | | PROPERTIES AND HANSEN PROPERTIES, INC. ( SIGNED BY JUDGE M. F. ANGELL ) 5/5/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 05/05/2000) |
| 05/05/2000 | 178 | DEFENDANTS' MOTION FOR RECONSIDERATION , MEMORANDUM, CERTIFICATE OF SERVICE. (fdc) (Entered: 05/05/2000) |
| 05/05/2000 | 179 | ORDER THAT EACH PARTY WILL BE GIVEN FIVE DAYS TO PRESENT THEIR CASE-IN-CHIEF IN THE LIABILITY PHASE OF THE TRIAL. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 5/8/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 05/08/2000) |
| 05/05/2000 | 180 | PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S ORDER OF 5/5/00 LIMITING EACH PARTY TO FIVE DAYS TO PRESENT THEIR CASE-IN-CHIEF , CERTIFICATE OF SERVICE. (fdc) (Entered: 05/08/2000) |
| 05/05/2000 | 181 | PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE ORDER DATED 5/4/00 , CERTIFICATE OF SERVICE. (fdc) (Entered: 05/08/2000) |
| 05/09/2000 | 182 | Minute entry: before Judge M. Faith Angell on 5/8/00 at 1:45 pm. (fdc) (Entered: 05/10/2000) |
| 05/09/2000 | 183 | PLAINTIFFS' Response to MOTION FOR RECONSIDERATION OF DEFENDANTS' MOTION IN LIMINE TO LIMIT THE TESTIMONY OF THOMAS W. NIHILL AT TRIAL, Certificate of Service. (fdc) (Entered: 05/10/2000) |
| 05/15/2000 | 184 | Transcript of Jury Trial before the Hon. M. Faith Angell on 5/11/00 at 9:55 am. (fdc) (Entered: 05/16/2000) |
| 05/15/2000 | 185 | Transcript of Jury Trial before the Hon. M. Faith Angell on 5/12/00 at 10:55 am. (fdc) (Entered: 05/16/2000) |
| 05/23/2000 | 186 | Transcript for May 19, 2000 at 9:30 a.m. (fh) (Entered: 05/23/2000) |
| 05/23/2000 | 187 | Transcript for May 15, 2000 at 9:30 a.m. (fh) (Entered: 05/23/2000) |
| 05/23/2000 | 188 | Transcript for May 9, 2000. (fh) (Entered: 05/23/2000) |
| 05/23/2000 | 189 | Transcript for May 10, 2000 at 9:30 a.m. (fh) (Entered: 05/23/2000) |
| 05/25/2000 | 190 | Transcript of Jury Trial before the Hon. M. Faith Angell on 5/22/00 at 9:30 am. (fdc) (Entered: 05/25/2000) |
| 05/31/2000 | 191 | Transcript of Jury Trial on 5/26/00 at 1:15 pm. before the Hon. M. Faith Angell. (fdc) (Entered: 06/01/2000) |
| 06/01/2000 | 192 | ORDER THAT JUDGMENT BE AND THE SAME IS HEREBY ENTERED IN FAVOR OF THE DEFENDANTS. ( SIGNED BY MAGISTRATE JUDGE M. F. ANGELL ) 6/2/00 ENTERED AND COPIES MAILED AND FAXED. (fdc) (Entered: 06/02/2000) |
| 06/01/2000 | 193 | Questions to jurors and answers thereof. (fdc) (Entered: 06/02/2000) |
| 06/01/2000 | 194 | ORDER THAT THE CLERK OF COURT FOR THE EASTERN DISTRICT OF PA BE AND HE IS HEREBY DIRECTED TO FURNISH LUNCH FOR JURORS AND ONE DEPUTY CLERK ENGAGED IN THE ABOVE ENTITLED CASE. (fdc) (Entered: 06/02/2000) |

| | | |
|---|---|---|
| 06/01/2000 | | Case closed (kv) (Entered: 06/07/2000) |
| 06/06/2000 | 195 | Minute entry: 5/9/00, civil jury trial, Plaintiff and Defendant make their opening statements. Plaintiff's witness called and sworn. (jl) (Entered: 06/06/2000) |
| 06/06/2000 | 196 | Minute entry: 5/10/00, civil jury trial, Testimony and Cross-Examination of Peter Gebert continues. (jl) (Entered: 06/06/2000) |
| 06/06/2000 | 197 | Minute entry before Judge M. Faith Angell on 5/11/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 198 | Minute entry before Judge M. Faith Angell on 5/12/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 199 | Minute entry before Judge M. Faith Angell on 5/15/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 200 | Minute entry before Judge M. Faith Angell on 5/16/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 201 | Minute entry before Judge M. Faith Angell on 5/17/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 202 | Minute entry before Judge M. Faith Angell on 5/19/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 203 | Minute entry before Judge M. Faith Angell on 5/22/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 204 | Minute entry: before Judge M. Faith Angell on 5/23/00 at 9:00 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 205 | Minute entry before Judge M. Faith Angell on 5/24/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 206 | Minute entry before Judge M. Faith Angell on 5/25/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 207 | Minute entry before Judge M. Faith Angell on 5/26/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 208 | Minute entry before Judge M. Faith Angell on 5/30/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/06/2000 | 209 | Minute entry before Judge M. Faith Angell on 5/31/00 at 9:30 am. (fdc) (Entered: 06/06/2000) |
| 06/22/2000 | 210 | Notice of appeal by PLAINTIFF BALLENROSE INVESTORS, PLAINTIFF EVELYN RANDOLPH, PLAINTIFF HAMPTON RANDOLPH, PLAINTIFF LAURA SCHRIVER, PLAINTIFF EUGENE SCHRIVER III, PLAINTIFF ELLEN J. GEBERT, PLAINTIFF PETER H. GEBERT, PLAINTIFF JOAN M. GEBERT, PLAINTIFF HAROLD H. GEBERT, PLAINTIFF LINDA NICHOLAS, PLAINTIFF PATRICIA P. AYERLE, PLAINTIFF ROBERT A. AYERLE, PLAINTIFF WILLIAM B. PACKER JR., PLAINTIFF WILLIAM B. PACKER SR.. Fee Status: paid . Copies to: JUDGE CLARENCE C. NEWCOMER , Clerk USCA, Appeals Clerk, and JOSEPH A. CAPRARA, SCOTT D. PATTERSON, LAURA REED, H. ROBERT FIEBACH, LILLIAN E. BENEDICT, JENNIFER M. MC HUGH, |

| | | EVERETT K. SHEINTOCH, JAMIE M. PERRAPATO, DAVID L. BRAVERMAN, DAVID J. PERLMAN, KENNETH S. GOODKIND, BRUCE D. LOMBARDO (fdc) (Entered: 06/22/2000) |
|---|---|---|
| 06/22/2000 | 211 | Copy of Clerk's notice to USCA re: [210-1] appeal . (fdc) (Entered: 06/22/2000) |
| 06/26/2000 | 212 | Copy of TPO form ref: [210-1] appeal . (fdc) (Entered: 06/27/2000) |
| 07/06/2000 | 213 | Notice of cross appeal by DEFENDANT BLUE BELL INVESTORS, DEFENDANT DAVID SHERMAN, DEFENDANT DANIEL NESI, DEFENDANT STEPHANIE B. HANSEN, DEFENDANT JILL E. HANSEN, DEFENDANT ELYSE HANSEN, DEFENDANT ELMER F. HANSEN III, DEFENDANT ELMER F. HANSEN JR., DEFENDANT MAGELLAN FINANCE . Fee Status: paid . Copies to: JUDGE CLARENCE C. NEWCOMER , Clerk USCA, Appeals Clerk, and H. ROBERT FIEBACH, LILLIAN E. BENEDICT, JENNIFER M. MC HUGH, LAURA REED, DAVID J. PERLMAN, EVERETT K. SHEINTOCH, KENNETH S. GOODKIND, BRUCE D. LOMBARDO, SCOTT D. PATTERSON, Certificate of service (ph) (Entered: 07/07/2000) |
| 07/06/2000 | 214 | Copy of Clerk's notice to USCA re: [213-1] appeal . (ph) (Entered: 07/07/2000) |
| 07/10/2000 | 215 | Copy of TPO form ref: [213-1] appeal. (fdc) (Entered: 07/11/2000) |
| 08/10/2000 | 216 | Transcript of 5/16/00, jury trial (jl) (Entered: 08/10/2000) |
| 08/10/2000 | 217 | Transcript for May 30, 2000 Jury Trial Before The Honorable M. Faith Angell Magistrate Judge. (dt) (Entered: 08/10/2000) |
| 08/11/2000 | 218 | Transcript for jury trial - 5/17/00 (ph) (Entered: 08/14/2000) |
| 08/11/2000 | 219 | Transcript for jury trial - 5/25/00 (ph) (Entered: 08/14/2000) |
| 08/22/2000 | 220 | Transcript of Jury Trial before the Hon. M. Faith Angell on 5/8/00 at 1:50 pm. (fdc) (Entered: 08/22/2000) |
| 08/22/2000 | 221 | Transcript of Jury Trial before the Hon. M. Faith Angell on 5/9/00 at 9:30 am. (fdc) (Entered: 08/22/2000) |
| 08/22/2000 | 222 | Transcript of Jury Trial before the Hon. M. Faith Angell on 5/12/00 at 10:55 am. (fdc) (Entered: 08/22/2000) |
| 08/22/2000 | 223 | Transcript of Jury Trial on 5/23/00 at 9:00 am before Hon. M. Faith Angell. (fdc) (Entered: 08/22/2000) |
| 08/22/2000 | 224 | Transcript of Jury Trial before Hon. M. Faith Angell on 5/24/00 at 9:45 am. (fdc) (Entered: 08/22/2000) |
| 08/24/2000 | 225 | Transcript for Hearing held 05/26/00. (np) (Entered: 08/25/2000) |
| 03/27/2001 | 226 | Stipulation of Dismissal by PLAINTIFFS as to DEFENDANTS. (fdc) (Entered: 03/27/2001) |
| 03/28/2001 | 227 | Certified copy of order from USCA dated: 3/28/01. Re: In accordance with the agreement of the parties in the above entitled case, it is entered dismissed by the Clerk under the authority conferred upon her by Rule 42(b), FRAP without cost to either party. (fdc) (Entered: 03/28/2001) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/31/2010 15:25:42 | | | |
| **PACER Login:** | lr0222 | **Client Code:** | edpa-pk |
| **Description:** | Docket Report | **Search Criteria:** | 2:98-cv-00380-CN |
| **Billable Pages:** | 28 | **Cost:** | 2.24 |