UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| *IN RE* NORTHFIELD LABORATORIES, INC. | ) | No. 06 C 1493 |
| SECURITIES LITIGATION | ) | |
| | ) | Judge George M. Marovich |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Lead plaintiffs, the Paul H. Shield, M.D. Inc. Money Purchase Plan and the Paul H.

Shield, M.D. Inc. Profit Sharing Plan, together with named plaintiffs Alan Goodman, James

Rourke and Daniel Nesi, assert two claims against defendants Northfield Laboratories, Inc.

("Northfield"), Steven A. Gould, M.D. ("Gould") and Richard E. DeWoskin ("DeWoskin").  In

Count I, plaintiffs assert that defendants violated § 10(b) of the Securities Exchange Act of 1934

(the "Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5.  In Count II, plaintiffs

assert against DeWoskin and Gould a "control person" claim for violation of § 20(a) of the Act.

Lead plaintiffs and the named plaintiffs move for class certification.

## I.    Background

The Court has outlined the facts of this case in previous opinions.  *See In re: Northfield*

*Labs., Inc. Securities Lit'n*, 527 F. Supp.2d 769 (N.D. Ill. 2007) and 2008 WL 4372743 (Sept.

23, 2008).  The Court does not repeat the facts here.

Defendant Northfield was founded in 1985 by defendants DeWoskin and Gould.

Northfield's primary purpose was to research and develop a hemoglobin-based blood substitute

called PolyHeme to treat life-threatening blood loss.  PolyHeme was a hemoglobin-based,

oxygen-carrying blood substitute that was compatible with all blood types.  Northfield

manufactured PolyHeme by extracting hemoglobin molecules from outdated human blood, chemically modifying the hemoglobin into a polymerized form of hemoglobin and incorporating the polymerized hemoglobin into a solution, which could then be administered to humans. Northfield was never able to bring PolyHeme to market, and the company declared bankruptcy on June 1, 2009.  Defendant DeWoskin served as Chairman and CEO from 1985 to July 2002. Defendant Gould took over as Northfield's Chairman and CEO in July 2002.

The Court previously concluded that plaintiffs had stated a claim against defendants for securities fraud.  First, plaintiffs allege that after Northfield had closed a clinical trial due to allegedly negative results, defendants stated, on August 3, 2001, that they *intended* to close the trial.  Second, plaintiffs allege that defendants, in Northfield's August 9, 2002 10-K filing (and in its 2003 and 2004 10-K filings), misstated the reason why the clinical study was stopped. Third, plaintiffs allege that on October 11, 2001, Gould made a misstatement when he stated "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction" were observed in a clinical trial even though cardiac dysfunction was observed. Fourth, plaintiffs allege that a September 4, 2001 press release contained misstatements about clinical trial results.  Fifth, plaintiffs allege that defendants included misstatements in an August 3, 2001 proxy statement when they said "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies" when in fact, plaintiffs allege, cardiac events were not only present but historically associated with hemoglobin solutions.

## II.     Standard on a motion for class certification

As the parties proposing the class, the plaintiffs bear the burden of establishing that the putative class meets all of the requirements of Rule 23(a) and one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure.  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th

Cir. 2006).  Rule 23(a) allows individual plaintiffs to represent a class "only if: (1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of law or fact

common to the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class."  *Fed.R.Civ.P.* 23(a).  The plaintiffs seek to proceed under Rule

23(b)(3), which allows a class action to proceed if "the court finds that the questions of law or

fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  *Fed.R.Civ.P.* 23(b)(3).

In *Szabo v. Bridgeport Machines, Inc.*, the Seventh Circuit explained that a district court

is not limited to the pleadings when considering a motion for class certification.  The Seventh

Circuit said:

> Before deciding whether to allow a case to proceed as a class action, . . . a judge
> should make whatever factual and legal inquiries are necessary under Rule 23.
> This would be plain enough if, for example, the plaintiff alleged that the class had
> 10,000 members, making it too numerous to allow joinder, see Rule 23(a)(1),
> while the defendant insisted that the class contained only 10 members.  A judge
> would not and could not accept the plaintiff's assertion as conclusive; instead the
> judge would receive evidence (if only by affidavit) and resolve the disputes
> before deciding whether to certify the class.

*Szabo*, 249 F.3d 672, 676 (7th Cir. 2001).  Furthermore, the Seventh Circuit explained that if

class certification issues overlap with the merits, "then the judge must make a preliminary

inquiry into the merits."  *Id.*

III.    **Discussion**

Plaintiffs move to certify a class of:

> all persons who purchased securities of Northfield Laboratories, Inc., including purchasers of common stock and call options, and sellers of put options, during the period from March 19, 2001, through March 20, 2006, inclusive.

Plaintiffs wish to exclude from the class "defendants, members of the immediate family of each of the defendants, any person, firm, trust, corporation, office, director, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any excluded party."

### A.    The Rule 23(a) requirements

#### 1.    Numerosity

Plaintiffs state that they do not know the number of class members but that the number is in the thousands.  Defendants do not dispute this.  Given that (1) Northfield had 14,242,000 shares outstanding at the beginning of the class period and 26,761,000 shares outstanding at the end of the class period; and (2) between 6.7% and 26.6% of the shares were held by institutional investors over the course of the proposed class period, the Court agrees that the number of class members is so high as to make joinder impracticable.

#### 2.    Common questions

Plaintiffs assert and defendants do not dispute that there are common questions of law and fact.  In order to prevail on a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, the plaintiffs must establish: (1) a material misrepresentation; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005).  Factual and

legal issues that will be common to the class include whether Northfield made material misrepresentations and whether defendants acted with scienter.  Accordingly, the Court concludes that there are common questions of law and fact.

### 3.     Typicality and adequacy

The typicality and adequacy requirements tend to merge, and they "serve as guideposts" for determining whether "the named plaintiff's claims and the class claims are so interrelated that the interests of the class will be fairly and adequately protected in their absence."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

Plaintiffs argue that they are typical and adequate, because their claims arise out of the same set of circumstances as the class and because their claims are not antagonistic to the claims of the class.  Defendants make two main arguments as to why the lead and named plaintiffs are not adequate class representatives.

First, defendants argue that none of the lead or named plaintiffs are adequate, because each purchased additional shares of Northfield even *after* the alleged fraud was revealed.  The cases defendants cite for this proposition do not explain why purchasing shares after the fraud would make one an inadequate class representative.  As far as the Court can tell, the cases trace back to the idea that current shareholders and former shareholders might have an inherent conflict of interest, because current shareholders have an interest in the defendant company's maintaining a healthy balance sheet, while the former shareholders are merely interested in obtaining the maximum amount of cash from the company.  *See In re: Park City Sec. Lit'n*, 189

F.R.D. 91, 108 (D. N.J. 1999).[1] That conflict between current and former shareholders, however, does not exist here, because Northfield is no longer a going concern.

Furthermore, the fact that an individual found it reasonable to purchase shares at a lower price after the alleged fraud was disclosed does not mean the individual failed to rely on the market price when s/he made purchases during the class period.  Accordingly, the Court agrees with the Courts that have concluded that individuals who made purchases after the alleged fraud was disclosed are not automatically inadequate class representatives.  *See Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 172 (N.D. Ill. 2009); *In re Monster Worldwide, Inc. Sec. Lit'n*, 251 F.R.D. 132, 135 (S.D. N.Y. 2008) ("the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market during the class period, that is, before the information at issue was corrected or changed.") (quoting *In re Salomon Analyst Macromedia*, 236 F.R.D. 208, 216 (S.D. N.Y. 2006), *vacated on other grounds*, 544 F.3d 474 (2d Cir. 2008)).

Second, defendants argue that two of the named plaintiffs, Goodman and Nesi, are inadequate class representatives, because they demonstrated a lack of veracity at their depositions.  The Court agrees with the general principle that a lack of honesty makes one an inadequate class representative.  *See Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990).  There, the court said,

---

[1]*Park City* is cited by *In re: Enron Corp. Sec. Lit'n*, 206 F.R.D. 427, 455 (S.D. Tex. 2002), which defendants cite for the proposition that an individual who purchases securities after an alleged fraud is disclosed is not an adequate class representative.

> In light of these instances of false deposition testimony, the Court cannot in good conscience allow this case to continue as a class action with plaintiff serving as the class representative.  A plaintiff's honesty and integrity are important considerations in allowing him to represent a class. . . . Plaintiff may be correct in asserting that the subjects of his statements are of marginal relevance to this lawsuit; nonetheless, they evince a willingness to give intentionally false testimony in an effort to further his interests in this litigation.  Under these circumstances, allowing him to prosecute this case as a class action would not be fair to the Court, to the defendants, or to the other individuals whose interests plaintiff purports to represent.

*Kaplan*, 132 F.R.D. at 510.  This Court, likewise, has no tolerance for false testimony and agrees with *Kaplan*.  The Court now turns to the question of whether either Goodman or Nesi gave false testimony during his deposition.

Defendants argue that Goodman gave false testimony about whether he reviewed documents in preparation for his deposition and whether he brought documents with him to the deposition.  Here are excerpts from his deposition:

Q:      Did you review any documents in preparing for your deposition?

A:      I'm not positive of reviewing documents.  It's possible.  I'm not 100 percent sure of that, but it's possible

Q:      When did this meeting take place?

A:      A couple days ago.  I guess it was Saturday, I believe.  It was Saturday.

Q:      You don't remember if you reviewed documents two days ago?

A:      When you say "documents," that–explain to me what you mean by documents.

Q:      I mean press releases, analyst reports, news articles, the Complaint, your certification, your account statements.


A:      We may have reviewed my account statements, yes.  If that's what you're referring to in documents, that would be accurate.

(Goodman Dep. at 14).

Q:     Mr. Goodman, did you bring a briefcase with you here today?

A:     I did.

Q:     Does it contain documents?

A:     No.

Q:     It's empty?

A:     Does it contain documents?

Q:     Yes.

A:     You have my documents.

Q:     Do you have any documents in your briefcase relating to Northfield or this litigation?

Attorney for plaintiffs:     Well, let me just say this, other than items that may be work product of us, of our law firm, you can answer the question.  You don't have to mention things that, you know we generated, memoranda regarding this case or anything of that nature, if such exist, that are contained in your briefcase, but other than that, are there any documents, you can answer that question.

A:     Other than the work product, I don't have any documents.

(Goodman Dep. 86-87).

The lawyers proceeded to discuss whether documents a witness reviews in preparation for a deposition are discoverable and the limits of the work product doctrine.  The attorney for plaintiffs agreed to review the documents in Goodman's briefcase and state for the record his position with respect to whether or not they were discoverable.

Attorney for plaintiffs:     I would just like to make a record.  The documents that are in Mr. Goodman's bag are privileged

communications between me and Mr. Goodman regarding the case. Also contained in the bag are certain pleadings on file in the case to which I selected and provided to Mr. Goodman. There are also notes in certain of the margins which reflect my mental impressions and also notes in which we had communications with Mr. Goodman regarding the case. So, it's our position that all of that is privileged and is not subject to discovery.

Q:      Mr. Goodman, did you review those materials in preparing for your deposition today?

A:      Did I review which materials?

Q:      The materials that your counsel just itemized that are in your briefcase.

A:      I believe I did, yes.

Q:      Did you use them to refresh your recollection as to the issues or the facts of this case?

A:      Dates, yes.

(Goodman Dep. at 90-91).

It is obvious from the transcript that Goodman testified falsely when he answered, "No," to the question, "Does [your briefcase] contain documents?"  Plaintiffs attribute Goodman's answer to nervousness, but this Court disagrees.  As the court concluded in *Kaplan*, this Court concludes that Goodman's willingness to give a false answer to a deposition question makes him an inadequate representative of the class.  Goodman may not serve as a class representative in this litigation.

Defendants argue that Nesi gave false statements with respect to his involvement in prior litigation.  During the course of discovery, defendants served Nesi with interrogatories, one of which asked about prior lawsuits in which Nesi had been a plaintiff or a defendant.  Nesi

objected to the interrogatory as irrelevant; but, he responded, subject to his objection, that he had

not been a plaintiff or defendant in a securities action in the last ten years.  At his deposition,

Nesi admitted that he had been involved in medical malpractice, employment and fraud

litigation.  Despite defendants' argument, the Court concludes that Nesi did not give a false

statement in answer to the interrogatory, because he objected to the interrogatory and then

answered (truthfully, as far as the Court can tell) the narrower question that he had not been

involved in securities litigation in the last ten years.  Defendants have not shown that that answer

was false.  Defendants also argue that Nesi gave false answers at his deposition.  Here are

excerpts:

Q:      Have you ever been sued?

A:      Yes.

Q:      Can you identify when you've been sued?

A:      Been sued for medical malpractice on several occasion, the last one being
        in 1996.

                              *    *    *

Q:      So, in addition to being sued for malpractice, were you ever sued in any
        other capacity?

A:      Not that I can recall.

Q:      Are you familiar with a case called Packer v. Magellan Finance Corp.?

A:      Oh, yes, I am.

Q.      That case–there was a ruling on a summary judgment motion in 1999, in
        June of 1999, and it appears that the case proceeded after that.  Can you
        tell me when the case or if the case is over?

Attorney for plaintiffs:        Objection to form.

Q:      You can answer.

> A:     That–I forgot about that one.  That was fun.  That case was adjudicated
>         some time in either 2000, 2001, etc.  I don't remember the exact dates.  I
>         was an investor in a country club.  And some of the other investors who
>         were participating prior to my being involved sold their interests and were
>         suing the principal who I sold the country club to for buyer's remorse.
>
> *   *   *
>
> Q:     Are there any other cases that you didn't remember?
>
> A:     Not that I can recall.
>
> Q:     Were you ever sued for any sort of employment action?
>
> A:     I may have been, but I don't remember anything that was ever actually
>         litigated.
>
> Q:     Well, were you sued for any sort of sexual harassment or sexual
>         discrimination?
>
> A:     Oh, I believe so, yes.  I had a disgruntled employee, must be 15 or 20
>         years ago, that was alleging sexual harassment, but the case never went
>         anywhere because nothing could be proved.

(Nesi Dep. at 8-12).

The Court does not find evidence of false statements in Nesi's deposition transcript.  Nesi did not testify that he had never been involved in other litigation.  He said he did not recall any other litigation.  Defendants have not convinced the Court that Nesi testified falsely when he said he did not recall any other litigation.

The Court concludes that lead plaintiffs the Paul H. Shield, M.D. Inc. Money Purchase Plan and the Paul H. Shield, M.D. Inc. Profit Sharing Plan and named plaintiffs Rourke and Nesi have claims typical of the class and would be adequate class representatives.

**B.     Rule 23(b) requirements**

Plaintiffs argue that this case can proceed as a class action, because it meets the requirements of Rule 23(b)(3), which requires the court to find "that the questions of law or fact

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed.R.Civ.P.* 23(b)(3).

Whether individual or common questions will predominate boils down, in this case, to the method by which the plaintiffs will prove reliance.  In order to prevail on a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, the plaintiffs must establish: (1) a material misrepresentation; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005).  Several of those elements (including misrepresentation, scienter, the connection to the security and loss causation) will be, for the most part, subject to common proof.  Economic loss is subject to individual proof, but it is unlikely to predominate over the common issues.  The heart of the issue (of whether individual or common questions will predominate), then, is how the members of the class will prove reliance.  If the plaintiffs can take advantage of the fraud-on-the-market theory to establish a presumption of reliance, then common issues will predominate; but, if plaintiffs must establish reliance individually, then individual issues will predominate, and proceeding as a class will be inappropriate.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.").

In *Basic*, the Supreme Court held that plaintiffs may establish a rebuttable presumption of reliance by showing that the relevant stock traded in an open and developed (i.e., efficient) market. *Basic*, 485 U.S. 224. The Supreme Court explained the fraud-on-the-market theory:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatement . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic*, 485 U.S. at 241-242 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-1161 (3rd Cir. 1986)). As the Seventh Circuit has explained, "[i]n an efficient capital market, all information known to the public affects the price and thus affects every investor." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 731 (7th Cir. 2004). Using the fraud-on-the-market theory to establish reliance, however, "works only to the extent that markets efficiently reflect (and thus convey to investors the equivalent of) all public information." *Asher*, 377 F.3d 731-731 (citing Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 Cornell L.Rev. 907, 917-922 (1989); Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan. L.Rev. 1059 (1990)).

The fraud-on-the-market theory has a "truth-on-the-market" corollary. *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 214 (7th Cir. 1993). That is to say that just as the market price, in an efficient market, reflects all false public statements, it also reflects any true public statements. *See Asher*, 377 F.3d at 732 ("When markets are informationally efficient, it is impossible to segment information as plaintiffs propose. They ask us to say that they received (through the price) the false oral statements but

-13-

not the cautionary disclosures.  That can't be; only if the market is inefficient is partial

transmission likely, and if the market for [defendant's] stock is inefficient then this suit collapses

because a fraud-on-the-market claim won't fly.  An investor who invokes the fraud-on-the-

market theory must acknowledge that *all* public information is reflected in the price, just as the

Supreme Court said in *Basic*.").

The Seventh Circuit has not weighed in on the factors a court should consider in

determining whether a stock traded in an efficient market, and, hence, whether a plaintiff class

was entitled to a presumption of reliance under the fraud-on-the-market theory.  In 1989, the

District of New Jersey became one of the first courts to consider the issue in *Cammer v. Bloom*,

711 F. Supp. 1264 (D. N.J. 1989).  There, the court listed the types of information which, if

alleged, would allow an inference of an efficient market.  Those types of information included:

(1) trading volume (because high volume suggests investor interest); (2) analyst coverage

(because analysts review information and make buy/sell recommendations); (3) market makers

(because that indicates interest in the stock and lots of trading volume); (4) whether the company

was entitled to file an S-3 Registration statement (which the court thought indicated that

information about the company was widely known); and (5) empirical evidence of an immediate

stock price response to the release of new information about the company.  Since then, a number

of other courts, including courts in this district, have adopted the *Cammer* factors.  *See Tatz v.*

*Nanophase Technologies Corp.*, Case No. 01 C 8440, 2003 WL 21372471 at *7 (N.D. Ill. June

13, 2003); *Greenberg v. Boettcher & Co.*, 755 F. Supp. 776, 782 (N.D. Ill. 1991).  For the

reasons explained below, this Court concludes that the best indicators of an efficient market are

analyst coverage, trading volume and empirical evidence that prices change quickly to reflect new information.

The fraud-on-the-market theory is based on the efficient capital markets hypothesis, which "posits that stock prices quickly reflect information without bias."  Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 Cornell L.Rev. 907, 910-911 (1989).  The parties agree that, in *Basic*, when the Supreme Court approved of the use of the fraud-on-the-market theory to establish a presumption of reliance, it meant the "semi-strong" version of the efficient capital markets hypothesis (i.e., that all *public* information is reflected in price) as opposed to the "strong" version of the efficient capital markets hypothesis (i.e., that all *public and private* information is reflected in price).  In theory, "[m]arket prices of actively-traded securities are much more likely to reflect relevant information about those securities because of the continuous buying and selling decisions of investors."  Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 Cornell L.Rev. 907, 911 (1989).  Those buying and selling decisions are often influenced by securities analysts.  Thus, the more actively a company's stock is traded and the more professional traders and analysts focus on that company's stock, the more likely it is that the market for that company's stock is efficient (and that it is appropriate to apply the fraud-on-the-market theory to the case).  *Cf.  Asher*, 377 F.3d at 731 (The fraud-on-the-market "theory is that other people (professional traders, mutual fund managers, securities analysts) did the reading, and that they made trades or recommendations that influenced the price.")

Economists have found empirical evidence to support the efficient markets hypothesis.

For example, in theory, stock prices should change quickly reflect to new information, and

empirical research supports this.

> [An] important study supporting the semi-strong form of the [efficient capital markets hypothesis] examined the effects of large block trades on stock prices. Large block trades frequently convey information about share prices, particularly when such trades are made by corporate insiders or market professionals.  If the stock market is efficient, share prices should adjust quickly to reflect any new information contained in the sale of a block of stock.  The study found that virtually all of the share price adjustment took place within the first five minutes of the block sale.  After the first five minutes, the price adjusted slightly, but not enough to compensate traders for their transaction costs.  Share prices had adjusted completely within fifteen minutes.  Other studies of such diverse events as takeover attempts, changes in accounting procedures, and changes in Federal Reserve Board policy confirm these results.

Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics:  An Analysis of the*

*Fraud-on-the-Market Theory*, 42 Stan. L.Rev. 1059, 1082-1083 (1990) (citing Larry Y. Dann,

David Mayers & Robert J. Raab, *Trading Rules, Large Blocks, and the Speed of Adjustment*, 4 J.

FIN. ECON. 3 (1977)).  Both the plaintiffs' expert and the defendants' expert (more on them

later) agree that in an efficient market, new information is quickly reflected in price.  *See* Hakala

Dep. at 78-79 ("if we see a piece of material news come into the market, and the market doesn't

react very much on the first day and then reacts a lot on the second day or the third day, that

would tend to be a strong indication to me that the market may not be efficient."); Gompers

Report at 23.

This Court is persuaded that analyst coverage and trading volume are indications of an

efficient market, although the Court concludes that the *best* indication of an efficient market is

empirical evidence that new information is quickly reflected in the price of a share of the stock.[2]

Accordingly, the Court will consider those three factors in determining whether plaintiffs have

established that the market for Northfield shares was efficient during the proposed class period

(March 19, 2001 to March 20, 2006) and, hence, that they can avail themselves of the fraud-on-

the-market theory's presumption of reliance.

### 1.    Analyst coverage

As defendants concede, plaintiffs have put forth evidence that, in April 2004, an analyst

at Whitaker Securities LLC began covering (i.e., issuing reports on and making buy/sell

recommendations with respect to) Northfield.  Four additional analysts (including Cowen & Co.

and UBS) began covering Northfield in 2005.  Plaintiffs put forth no evidence of analyst

coverage of Northfield prior to April 2004.  Defendants have put forth evidence that between

August 2001 and April 2005, not a single analyst issued an earnings per share prediction for

Northfield.

The Court concludes that the lack of analyst coverage for the first three years of the class

period suggests Northfield shares did not trade in an efficient market during the first years of the

class period.

### 2.    Trading volume

Plaintiffs argue that the trading volume of Northfield shares during the class period was

high and that, therefore, the market for Northfield shares was efficient.  In support, plaintiffs

supply a chart of the number of Northfield shares traded on each trading day of the class period.

Plaintiffs also offer the expert opinion of Scott D. Hakala, Ph.D, ("Dr. Hakala") who opines

---

[2]The Court finds the other two *Cammer* factors to be redundant.

(among other things) that the average daily trading volume of Northfield shares during the class period was 183,000 shares, or 1.8% of all outstanding shares. Defendants object to the admissibility of Dr. Hakala's report based on Rule 702 of the Federal Rules of Evidence.

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702. In *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court explained that a court faced with a proffer of scientific evidence must act as a gatekeeper to ensure that the testimony "is not only relevant, but reliable." The gate-keeping function applies not only to scientific knowledge, but also to technical or other specialized knowledge. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Although the factors which determine the reliability of evidence depend on the type of evidence offered, the Court can consider the validity of the methodology, whether the technique has been subjected to peer review and whether the expert properly applied her methodology. *Daubert*, 509 U.S. at 592-593.

The Court first notes that a factfinder, when faced with a list of the number of shares traded on each trading day during the class period, does not need the assistance of an expert when considering whether trading volume in Northfield shares was high or low. The math is very simple. The Court also notes that the methodology used by Dr. Hakala when calculating the trading volume is suspect. Dr. Hakala did not calculate the average daily trading volume for the various months or even the various years within the class period. Instead, Dr. Hakala made one calculation of average trading volume over the entire five-year class period. Dr. Hakala's calculation disguises both (1) the low average daily trading volume in 2001, 2002 and 2003; and

(2) the significant increase of average daily trading volume over the course of the class period. In April 2001, just after the start of the class period, average daily trading volume was fewer than 30,000 shares, or .21% of the outstanding shares.  On many days in 2001, fewer than 10,000 of the more than 14,262,000 outstanding shares exchanged hands.  A year later, in April 2002, average daily trading volume was up slightly to .26% per day.  By April 2003, average daily trading volume was up to .75% of outstanding shares.  It is not until February 2004 that trading volume is regularly above 100,000 shares per day.  In April 2004, average daily trading volume was 2.4% of shares, and in April 2005, average daily trading volume was 2.3% of outstanding shares.

The Court concludes that trading volume does not indicate that Northfield shares traded in an efficient market over the course of the class period.  Although it appears that the average daily trading volume in the last years of the class period is sufficiently high to suggest an efficient market, the volume in the first years is too low to be considered evidence that Northfield shares traded in an efficient market.

### 3.    Empirical evidence of price changes

As the Court explained above, the best evidence of an efficient market is empirical evidence that a share price quickly changes to reflect new information.

In support of their claim that Northfield shares traded in an efficient market during the class period, plaintiffs offer the opinion of Dr. Hakala, who performed an event study and concluded:

> [p]erception of positive drug trial results and related news of potential market approval of PolyHeme led to significant relative increases in Northfield Laboratories' share price before and during the Class Period on August 16, 2001; March 6, 2003; June 12, 2003; February 23, 2004; April 11, 2005; and November 15, 2005.  By contrast, fears of negative trial results and safety concerns led to significant relative declines in Northfield Laboratories' share price during and immediately after the Class Period on November 20, 2001, January 6, 2006, February 22 to 24, 2006, and March 10 and 14, 2006.

(Dr. Hakala Report at 8).

An event study is a regression analysis designed to examine the effect of an event–news about a company–on a dependant variable–the company's share price. *See In re Apollo Group, Inc. Sec. Lit'n*, 509 F. Supp.2d 837, 844 (D. Ariz. 2007). The purpose of an event study is to determine whether the price of a share of a company's stock reacts quickly to new information. A valid event study attempts to control for a stock's usual volatility and to control for general movements of price within an industry.

Defendants argue that Dr. Hakala's event study is unreliable, because Dr. Hakala made decisions about that study that tend to skew it toward a conclusion that the market was efficient. For example, defendants argue that Dr. Hakala's excessive use of dummy variables understates the usual volatility of the stock, which has the effect of making it appear that news had a greater affect on price than it actually had. The Court agrees. Generally, in an event study, the author of the study attempts to determine the usual volatility of the stock by excluding a few key dates on which the stock price is expected to react to news. For example, the author would exclude (from the calculation of the stock's usual volatility) the four dates of the year when the company issued its quarterly earnings, because on those dates, the share price is expected to change based on new information. In Dr. Hakala's study, instead of excluding a few dates, he excludes 117 event dates. In addition, defendants point out that Dr. Hakala excluded all dates on which he could find *any* news about Northfield, even if the news was not new. As defendants have shown, the effect of Dr. Hakala's selection of so many event dates is to reduce the expected level of volatility to 3.66% from 4.09%, which has the corresponding effect of making it appear as though the release of news had a greater impact on share price than it actually had. The Court finds this method to be unreliable and excludes Dr. Hakala's report.

Furthermore, the Court notes that even if it considered Dr. Hakala's report, it does not find in the report evidence that the market for Northfield shares was efficient–especially in the early years of the class period, when the misstatements are alleged to have been made.  The alleged misstatements occurred on August 3, 2001, September 4, 2001, October 11, 2001 and August 9, 2002.  Yet, Dr. Hakala's report does not indicate a statistically significant price change on those dates, as one would expect if the statements were, as plaintiffs allege, material.  The fact that the price did not change suggests the market was not efficient.

In order to establish that class issues predominate over individual issues, plaintiffs bear the burden of showing that they are entitled to avail themselves of the presumption of reliance under the fraud-on-the-market theory.  That requires them to establish that, during the class period, Northfield shares traded in an efficient market.  Plaintiffs have not put forth any empirical evidence that prices for Northfield shares quickly reflected new information during the class period.  Although there is some evidence to suggest that Northfield might have traded in an efficient market during the final years of the class period (because analysts had begun covering Northfield and because average daily trading volume was above 2% of outstanding shares), the same evidence makes clear that Northfield did not trade in an efficient market during the first years of the class period, when no analysts covered Northfield and when average daily trading volume was very low.  Accordingly, the Court concludes that plaintiffs have not shown that the market for Northfield shares was efficient during the class period and that, hence, they cannot avail themselves of the presumption of reliance.[3]  Plaintiffs in this litigation must prove reliance individually, which means individual issues will predominate over class issues.

---

[3]Ordinarily, the Court would weigh plaintiffs' evidence with respect to whether Northfield shares traded in an efficient market against defendants's evidence (which, in this case, was the expert report of Paul Gompers, Ph.D.)  Because plaintiffs' evidence was not convincing, the Court need not consider defendants' evidence.

Because the proposed class does not meet the requirements of Rule 23(b)(3), the plaintiffs' motion for class certification is denied.

**IV.**     **Conclusion**

For the reasons set forth above, the Court denies plaintiffs' motion for class certification.

This case is set for status on June 15, 2010.

ENTER:

_____
George M. Marovich
United States District Judge

DATED:  May 18, 2010