UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|     |     |     |
| --- | --- | --- |
| *IN RE* NORTHFIELD LABORATORIES, INC. SECURITIES LITIGATION | ) ) ) ) ) ) | No. 06 C 1493<br><br>Judge George M. Marovich |

**MEMORANDUM OPINION AND ORDER**

Lead plaintiffs, the Paul H. Shield, M.D. Inc. Money Purchase Plan and the Paul H. Shield, M.D. Inc. Profit Sharing Plan, and defendants Northfield Laboratories, Inc. ("Northfield"), Steven A. Gould, M.D. ("Gould") and Richard E. DeWoskin ("DeWoskin"), collectively the "parties," have reached an agreement to settle plaintiffs' claims that defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5. The Court held a fairness hearing hearing on the matter of the settlement on June 26, 2012. The Court now grants final approval of the settlement agreement. Also before the Court is class counsel's motion for reimbursement of attorneys' fees and expenses from the settlement fund.

**I.    Background**

Defendant Northfield was founded in 1985 by defendants DeWoskin and Gould. Northfield's primary purpose was to research and develop a hemoglobin-based blood substitute called PolyHeme to treat life-threatening blood loss. PolyHeme was a hemoglobin-based, oxygen-carrying blood substitute that was compatible with all blood types. Northfield manufactured PolyHeme by extracting hemoglobin molecules from outdated human blood, chemically modifying the hemoglobin into a polymerized form of hemoglobin and incorporating

the polymerized hemoglobin into a solution, which could then be administered to humans. Northfield was never able to bring PolyHeme to market, and the company filed a petition for bankruptcy protection on June 1, 2009.

The Court previously concluded that plaintiffs had stated a claim against defendants for securities fraud. First, plaintiffs alleged that after Northfield had closed a clinical trial due to allegedly negative results, defendants stated, on August 3, 2001, that they *intended* to close the trial. Second, plaintiffs alleged that defendants, in Northfield's August 9, 2002 10-K filing (and in its 2003 and 2004 10-K filings), misstated the reason why the clinical study was stopped. Third, plaintiffs alleged that on October 11, 2001, Gould made a misstatement when he stated "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction" were observed in a clinical trial even though cardiac dysfunction was observed. Fourth, plaintiffs alleged that a September 4, 2001 press release contained misstatements about clinical trial results. Fifth, plaintiffs alleged that defendants included misstatements in an August 3, 2001 proxy statement when they said "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies" when, in fact, plaintiffs alleged, cardiac events were not only present but historically associated with hemoglobin solutions.

The first time plaintiffs moved for class certification, the Court denied the motion. Lead plaintiffs had proposed a class of all persons who had purchased Northfield's shares between (and including) March 19, 2001 and March 20, 2006. The problem with that class definition was that plaintiffs were unable to put forth evidence that Northfield shares traded in an efficient market for the early years of the class period. The upshot was that the plaintiffs could not avail themselves of the fraud-on-the-market theory and would, instead, have to prove reliance

individually. That meant that individual issues would predominate and that the case was not suitable for class treatment.

The lead plaintiffs then moved to certify a smaller class, one made up of persons who purchased Northfield shares between (and including) August 16, 2004 and March 20, 2006. After plaintiffs filed their second motion for class certification, the parties began discussing settlement and asked the Court to stay briefing on that motion (which plaintiffs ultimately withdrew). Over the course of several months, the parties continued to discuss settlement. With the help of a retired federal judge as mediator, the parties reached a settlement agreement.

As part of the proposed settlement, the parties asked the Court to certify a class of persons who purchased shares of Northfield between (and including) August 16, 2004 and March 20, 2006. The Court granted the motion for class certification.

As part of the settlement, defendants agreed to put $1,500,000.00 into a settlement fund for the plaintiff class. The money came from the insurance policy that has been funding the defense of this lawsuit. Additional money from Northfield is not available. The parties agree that it is very unlikely that enough assets remain to allow these plaintiffs to obtain any money from the bankruptcy estate. This is not a surprise considering that Northfield never sold a single product and that all of its cash flow came from investors. Of the $1,500,000.00, the parties allocated $100,000.00 for the expenses related to notifying the class members and administering the claims process. The parties also agreed that the two lead plaintiffs will receive a combined total $10,000.00. The Court granted preliminary approval of the settlement.

The Court also approved a notice procedure for the class, and that notice has been given. The parties printed a summary notice in *Investors' Business Daily* on March 1, 2012 and also published it electronically on the *GlobeNewswire* on February 28, 2012. The claims administrator mailed 21,927 copies of the Notice and Proof of Claim. The Court set a deadline

for plaintiffs' attorneys to file their request for fees and expenses that was more than a month before the deadlines for (1) opting out of the class, (2) filing a proof of claim, and (3) objecting to the settlement. Ultimately, the claims administrator received 2,061 claims. Not one person objected to the settlement. One person opted out of the settlement.

## II. Discussion

### A. Final approval of settlement

Once a class is certified, the class claims may not be settled without the approval of the court. Fed.R.Civ.P. 23(e) ("The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval"). A court may approve a settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). In considering whether a class action settlement is fair, adequate and reasonable, a court "must consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to the settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.'" *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)). The most important factor is the strength of the plaintiff's case. *Id.*

The only factor the Court did not consider when it granted preliminary approval of the settlement was the opposition to the settlement among affected parties. Now that the class members have been notified of the settlement and have had a chance to object, it is clear that there is no opposition to the settlement among the affected parties. It appears that the class members agree with the Court's and the parties' attorneys' assessment that the settlement of $1,500,000.00 is fair, adequate and reasonable.

The plaintiff class is unlikely ever to get more. Northfield is being liquidated by the bankruptcy court, and the parties agree that it is unlikely that enough assets will remain to give the plaintiff class a higher recovery later. This makes sense considering that Northfield never sold its sole product and that its only source of cash flow was investors. Instead, the settlement proceeds are coming from an insurance policy, which is also funding the defense of this case. If this case continues, the insurance policy may reach its limits (by paying the fees and costs of defense of this suit) before plaintiffs ever prevail. That is so, because this case would be an expensive one to try. The parties would still need to do discovery on the merits, and a trial would involve expensive experts. Finally, it is not clear the plaintiffs could win even if they continue the suit. Most of the alleged misstatements occurred before the class period, which means the plaintiffs may have difficulty establishing the materiality of those misstatements. The truth with respect to some of the misstatements may have been revealed before the class period began. For all of these reasons, it is clear to this Court that the settlement is fair, adequate and reasonable.

### B. Attorneys' fees and expenses

Next, plaintiffs have filed a motion for attorneys' fees in the amount of $185,000.00 and expenses in the amount of $487,353.54. Together, these sums constitute approximately 44.8% of the settlement fund.

#### 1. Attorneys' fees

Rule 23(h) of the Federal Rules of Civil Procedure allow a court to award reasonable attorneys' fees. Fed.R.Civ.P. 23(h). Such a payment from the settlement fund is "'based on the equitable notion that those who have benefited from litigation should share in its costs.'" *Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007) (quoting *Skelton v. General Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988)).

In this case, plaintiffs' attorneys seek fees in the amount of $185,000.00, which represents about 12.3% of the settlement fund. This Court's task is to consider whether this is consistent with a hypothetical *ex ante* bargain for the attorneys' work on this case. *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) (When the attorneys' fees are coming from the settlement fund, a court "must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."). Plaintiffs' attorneys have not provided a copy of the original agreement they made with their clients (the named plaintiffs), but the history of this case suggests that an award of 12.3% is a reasonable approximation for what the market might have paid. This case started when, after an unflattering story about Northfield's Phase III testing of Polyheme was published in the *Wall Street Journal* on February 22, 2006, the litigation flood gates opened. Within weeks, eight lawsuits alleging securities fraud had been filed in this court. All of the cases were consolidated, and six different groups of shareholders (and their various attorneys) filed motions to be appointed lead plaintiff and class counsel. Although class action attorneys often ask for thirty-three percent of any settlement, it would not be surprising for that percentage to decrease as the number of plaintiffs and plaintiffs' firms vying for the job increased. It would be expected that the attorneys would decrease their price as the quantity of competitors offering the same service increased. Thus, the 12.3% of the settlement fund that plaintiffs' attorneys request in this case is consistent with what a hypothetical *ex ante* bargain for legal services might have been. The Court approves payment to the plaintiffs' attorneys in the amount of $185,000.00 for fees.

      **2.**     **Expenses**

Next, the Court considers the expenses for which plaintiffs' attorneys seek reimbursement. An attorney from each firm (lead counsel and local counsel) filed an affidavit supporting the claimed expenses.

### a. Local counsel

The Court approves reimbursement to local counsel Pomerantz Haudek Grossman & Gross LLP for the following reasonable expenses: $4.98 for depositions/transcripts; $6,412.27 for a damages consultant; $1,200.00 for filing fees, service of process and subpoenas; $220.23 for travel/transportation; $495.04 for photocopies and database fees; $415.65 for postage, messenger and Federal Express fees; and $76.31 for telephone/facsimile expenses.

The Court will not grant the firm's request for $375 for "Press Releases to Class Members." The firm does not explain what these were or when or why they were sent. Nor does the firm cite any caselaw holding that such an expense should be reimbursed. Accordingly, the Court declines to grant reimbursement for what sounds like a firm marketing expense.

The Court will not approve the firm's request for reimbursement of online legal research fees. *See Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 409 (7th Cir. 2000) ("Computer research charges are considered a form of attorneys' fees. The idea is that computer-assisted legal research essentially raises an attorney's average hourly rate as it reduces (at least in theory) the number of hours that must be billed. As a form of attorneys' fees, the charges associated with such research are not separately recoverable expenses. When a court uses the percentage-of-recovery method of calculating attorney's fees, such charges are simply subsumed in the award of attorneys' fees.") (internal citations omitted); *Silverman v. Motorola, Inc.*, Case No. 07 C 4507, 2012 WL 1597388 at *4 (N.D. Ill. May 7, 2012) (denying request for reimbursement of computerized legal research expenses).

### b. Lead counsel

The Court approves reimbursement to lead counsel the Rosen Law Firm for the following reasonable expenses: $4,821.00 for mediation fees; $4,300.00 for a statistical consultant; $5,000.00 for an FDA consultant; $9,516.88 for deposition transcripts; $836.00 for filing fees,

service of process and subpoenas; $28,086.68 for travel expenses; $1,782.24 for photocopies and database fees; $1,510.83 for postage, messenger and Federal Express expenses; and $150.07 for conference calls. The Court will not grant the firm's request for reimbursement of online legal research expenses or for press releases to class members for the same reasons explained above.

Finally, the Rosen Law Firm seeks $411,267.01 as reimbursement for its expert witness expenses. The Rosen Law Firm hired these experts to calculate the plaintiffs' damages and to establish that Northfield shares traded in an efficient market, which was essential to the Court's decision to grant class certification. These are expenses for which private litigants would reimburse their attorneys. *See In re: Synthroid Mkg Lit'n*, 264 F.3d 712, 722 (7th Cir. 2001) (explaining the appropriateness of considering what the private market would bear in determining whether litigation expenses are reasonable). Accordingly, the Court approves reimbursement of this expense.

For these reasons, the Court approves reimbursement of expenses to Pomerantz Haudek Grossman & Gross LLP in the amount of $8,824.49. The Court approves reimbursement of expenses to the Rosen Law Firm in the amount of $467,270.71.

### 3. Private Securities Litigation Reform Act

Finally, the Court must consider whether the sum of fees and expenses is reasonable. The Private Securities Litigation Reform Act limits to "a reasonable percentage" the "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class." 15 U.S.C. § 78u-4(a)(6). Here, the Court is awarding plaintiffs' counsel 44.07% of the settlement fund for fees and expenses.

Even though 44% is at the very top of the percentage range considered reasonable by courts, the Court thinks the amount is reasonable under the unique circumstances of this case, where a great portion of the numerator was one indispensable expense and where the

denominator is small due to the defendant's bankruptcy. The largest expense (which is greater than the fees paid to the attorneys) was for the experts on market efficiency. Without these experts, the plaintiffs could neither have established that class action treatment was warranted in this case nor have proven their claim. It is hard to imagine the defendant agreeing to settle the claims without the protection from future litigation that settlement of claims as a class provides, and class treatment would not have been possible absent the expert's evidence that Northfield shares traded in an efficient market during the class period. Thus, those expert expenses were an essential, though expensive, part of the case. The reason the expert expenses are making up such a large percentage of the settlement fund in this case is because Northfield's bankruptcy severely limited the ability of these plaintiffs to recover damages. Only an insurance policy was available to fund the settlement. Though the sum of the fees and expenses in this case constitutes an unusually large percentage of the settlement fund, it is reasonable in this case.

### III. Conclusion

For the reasons set forth above, the Court hereby grants final approval of the settlement. The Court approves an incentive award of $10,000.00 to named plaintiffs the Paul H. Shield, M.D. Inc. Money Purchase Plan and the Paul H. Shield, M.D. Inc. Profit Sharing Plan (to share as they see fit). The Court approves an award of $185,000.00 from the settlement fund to the Rosen Law Firm for attorneys' fees. The Court approves an award of $467,270.71 from the settlement fund to the Rosen Law Firm as reimbursement for expenses. The Court approves an award of $8,824.49 from the settlement fund to Pomerantz Haudek Grossman & Gross LLP for reimbursement of expenses.

ENTER:

George M. Marovich
United States District Judge

DATED: June 26, 2012